UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, PROMISE ARIZONA, LYDIA CAMARILLO, and JUANITA VALDEZ-COX, | |
| *Plaintiffs*, <br> v. | Civil Action No. |
| WILBUR L. ROSS, sued in his official capacity as U.S. Secretary of Commerce, | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| STEVEN DILLINGHAM, sued in his official capacity as Director of the U.S. Census Bureau, | |
| U.S. DEPARTMENT OF COMMERCE, and | |
| U.S. CENSUS BUREAU, | |
| *Defendants*. | |

**COMPLAINT**

**INTRODUCTION**

1.      On July 11, 2019, President Trump issued Executive Order 13880, Collecting Information about Citizenship Status in Connection with the Decennial Census ("EO 13880"), that directs:  (1) Secretary Ross to instruct the Census Bureau to create an inter-agency working group to collect citizenship data in connection with the 2020 decennial census for redistricting; (2) the Department of Commerce to "strengthen its efforts, consistent with law, to obtain State administrative records concerning citizenship"; and (3) all federal agencies to provide citizenship data via administrative records to the Census Bureau.  On July 12, 2019, the Census Bureau

published a notice dated July 3, 2019, stating that Secretary Ross had directed the Census Bureau to collect and produce Citizenship Voting Age Population ("CVAP") information prior to April 1, 2021 that states may use in redistricting.

2. The President's order and Secretary Ross's directive that the Department of Commerce provide states with CVAP information for redistricting is motivated by a racially discriminatory scheme to reduce Latino political representation and increase the over-representation of non-Latino Whites, thereby advantaging White voters at Latino voters' expense. As the Department of Commerce and the Census Bureau comply with Secretary Ross's directive and EO 13880 to collect citizenship data and when they produce population tabulations that purport to exclude non-citizens for purposes of drawing state and local districting plans, voters will be denied their constitutionally guaranteed rights to equitable political representation based on actual population.

3. The Court should enjoin Defendants' actions as violative of the Administrative Procedure Act ("APA") for a number of reasons. First, Defendants failed to articulate an adequate rationale for making the decision to collect and produce citizenship data from administrative records. Second, for discriminatory reasons, EO 13880 and Secretary Ross's directive instructs the Census Bureau to perform an impossible task contrary to law: to determine the total number of non-U.S. citizens without an actual enumeration of the non-U.S. citizen population. Administrative records cannot provide citizenship data to the states without the use of statistical sampling and estimation, and therefore cannot provide a total enumeration of the citizen and non-citizen population. Third, Secretary Ross's compliance with EO 13880 is in excess of the statutory authority that the Secretary has to conduct the decennial census. By deciding to collect citizenship data in response to EO 13880, Secretary Ross is improperly

allowing the President's judgment to displace his own discretion over the census.   The Constitution vests Congress, not the President, with discretion over the conduct of the census. Congress delegated this responsibility to the Secretary, not the President.   Fourth, Defendants failed to comply with the mandated procedures and requirements for making a substantive change to the data collected and reported by the Census Bureau in connection with the 2020 decennial census, in violation of the requirements of federal laws and regulations.

4.     Defendants' actions should also be enjoined because they are motivated by racial animus, are discriminatory toward Latinos and non-citizens, and are the result of a partisan conspiracy intended to dilute the representation of non-citizens and Latinos, in violation of the equal protection guarantee of the Fifth Amendment of the U.S. Constitution, and 42 U.S.C. § 1985(3).

5.     Plaintiffs seek declaratory and injunctive relief to prevent Defendants from violating the APA, the equal protection guarantee of the Fifth Amendment of the U.S. Constitution, and 42 U.S.C. § 1985(3).

## PARTIES

### *Plaintiffs*

6.     Plaintiff La Unión del Pueblo Entero ("LUPE") is a nonprofit membership organization founded by labor rights activists César Chávez and Dolores Huerta.   LUPE's mission is to build strong, healthy communities in the Texas Rio Grande Valley through community organizing and civic engagement.   To promote civic engagement in the communities it serves, LUPE conducts know-your-rights discussions and membership meetings, participates in issue-focused advocacy, connects its members to social services, conducts census outreach, and conducts voter registration, education, and non-partisan get-out-the-vote campaigns.

7.      LUPE is headquartered in San Juan, Texas, and its members primarily reside in Hidalgo, Cameron, Willacy, and Starr Counties, Texas.   LUPE has over 8,000 members, including Latinos, U.S. citizens, and non-U.S. citizens.   Some LUPE members are immigrants not authorized to be present in the United States.   LUPE has members that live in neighborhoods, cities, counties, and voting districts with relatively larger Latino and non-U.S. citizen populations when compared to Texas and the United States.

8.      Plaintiff Promise Arizona ("PAZ") is a nonprofit, faith-based membership organization founded in 2010 in response to the passage of Arizona Senate Bill 1070.   It is headquartered in Phoenix, Arizona.   PAZ's mission is to build Latino and immigrant political power to ensure family unity, a path to citizenship, worker protections, and a path to equitable educational opportunities for all immigrants. To achieve its mission, PAZ promotes civic engagement, provides scholarships to members and other individuals for immigration-related expenses, partners with community colleges to conduct educational and job training programs, conducts youth leadership programs, and provides assistance with applications for immigration relief.   To promote civic engagement, PAZ registers members and individuals to vote, educates members about important voting issues, conducts get-out-the-vote campaigns, and participates in various issue-focused advocacy.

9.      PAZ has members and serves individuals who primarily reside in Maricopa, Yuma, and Pinal Counties, Arizona.   PAZ has hundreds of members, including Latinos, U.S. citizens, non-U.S. citizens, and members of mixed-status families (in which some members are citizens or non-U.S. citizens with legal status and others are not).   Some PAZ members and some of the individuals PAZ serves are immigrants not authorized to be present in the United States. PAZ has members and serves individuals who live in neighborhoods, cities, counties, and voting

districts with relatively larger Latino and non-U.S. citizen populations when compared to Arizona and the United States.

10.     Plaintiff Juanita Valdez-Cox is a member and the Executive Director of LUPE, and has held that position since approximately 2007.  She identifies as Latina, is a registered voter, and lives in Donna, Texas.  According to American Community Survey ("ACS") data, the total population of Donna, Texas, is 16,507 and Latinos constitute approximately 92.3 percent of the total population.

11.     Plaintiff Lydia Camarillo is the President of Southwest Voter Registration Education Project ("SVREP") and has worked with SVREP for approximately twenty years.  Ms. Camarillo identifies as a Latina, is a registered voter, and lives in San Antonio, Texas.  According to ACS data, the total population of San Antonio, where Plaintiff Lydia Camarillo resides, is 1,461,623, and Latinos constitute approximately 64 percent of the total population.

***Defendants***

12.     Defendant Wilbur L. Ross is Secretary of the U.S. Department of Commerce.  The Secretary of Commerce carries out the functions and duties imposed on him by the Census Act, issues rules and regulations to carry out his responsibilities, and delegates functions and duties as necessary.  13 U.S.C. § 4.  The Secretary of Commerce prepares questionnaires, determines inquiries, and determines the number and form of statistics, surveys, and censuses.  13 U.S.C. § 5.  Congress delegated the duty to conduct the census to the Secretary of Commerce, who must take a census on April 1 every 10 years "in such form and content as he may determine [.]"  13 U.S.C. § 141 (a); *see also* 13 U.S.C. § 5.  In that capacity, Defendant Ross directed the Census Bureau to produce CVAP information as part of the redistricting dataset

provided to States prior to April 1, 2021, for the purpose of affording states the option of using a voter-eligible population base for redistricting.  Defendant Ross is sued in his official capacity.

13.     Defendant Steven Dillingham is the Director of the U.S. Census Bureau.  The Director of the U.S. Census Bureau oversees the 2020 decennial census operations and is responsible for ensuring the accuracy of the 2020 decennial census count.  Defendant Dillingham directs the Census Bureau and performs census-related duties assigned by law, regulation, or the Secretary of Commerce.  13 U.S.C. § 21.  He is sued in his official capacity.

14.     Defendant U.S. Department of Commerce is an agency of the U.S. government which oversees the U.S. Census Bureau and its conduct of the decennial census and other census programs.

15.     Defendant U.S. Census Bureau is an agency within the U.S. Department of Commerce.  13 U.S.C. § 2.  The Census Bureau is responsible for conducting all census programs, including the development and implementation of the 2020 decennial census and the collection of information for and formulation of the P.L. 94-171 population tabulations used by states for redistricting.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiffs' causes of action under the United States Constitution and federal statutes.  This Court has jurisdiction under 5 U.S.C. §§ 702 and 704 over Plaintiffs' claims under the APA.  This Court may grant Plaintiffs' request for declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1), because:  (1) Defendants Dillingham (in his official capacity) and United States Census Bureau

reside in Prince George's County within this District, and (2) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

A.     **Background on the U.S. Census and P.L. 94-171 Redistricting Data File**

   1.     **The Census Act and the Census Bureau**

18.     The U.S. Constitution requires an "actual Enumeration" of every person living in the United States to take place every ten years.  U.S. Const. art. I, § 2, cl. 3.

19.     The Constitution gives Congress authority to conduct the census "in such a Manner as [Congress] shall by Law direct," U.S. Const. art. I, § 2, and "vests Congress with wide discretion over . . . the conduct of the census," *Wisconsin v. City of N.Y.*, 517 U.S. 1, 15 (1996).  Pursuant to this authority, Congress delegated the duty of conducting the census to the Secretary of Commerce, subject to the provisions of the Census Act of 1976, 13 U.S.C. § 141, *et seq.* (the "Census Act"), and other applicable federal statutes and regulations promulgated thereunder.

20.     Section 141(f) of Tile 13, requires that the Secretary report his "determination[s]" as to the content of the next census within certain deadlines in advance of the Census Date.  13 U.S.C. § 141(f); 90 Stat. 2462.

21.     The Census Act authorizes the Secretary to collect information "other" than total population only "as necessary."   13 U.S.C.  § 141(a).  The Secretary may not modify the "subjects" for the decennial census report to Congress under § 141(f)(1), without finding that "new circumstances exist under which necessitate" such a modification and reporting that finding to Congress.  *Id.* § 141(f)(3).

22.     Section 6 of Title 13 addresses the methods that the Secretary is authorized to use in collecting data other than the enumeration of total population for apportionment purposes.  In particular, Section 6 provides:

> (a) The Secretary, whenever he considers it advisable, may call upon any other department, agency, or establishment of the Federal Government, or of the government of the District of Columbia, for information pertinent to the work provided for in this title.

> (b) The Secretary may acquire, by purchase or otherwise, from States, counties, cities, or other units of government, or their instrumentalities, or from private persons and agencies, such copies of records, reports, and other material as may be required for the efficient and economical conduct of the censuses and surveys provided for in this title.

> (c) To the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required, the Secretary shall acquire and use information available from any source referred to in subsection (a) or (b) of this section instead of conducting direct inquiries.

13 U.S.C. § 6.

23.     The Census Bureau is a statistical agency subject to the standards and directives of the Office of Management and Budget ("OMB") under the Paperwork Reduction Act ("PRA"), 44 U.S.C. §§ 3501-21, and the federal Information Quality Act ("IQA"), *see* consolidated Appropriations Act of 2001, Pub. L. No. 106-554, 114 Stat. 2763 (2000) (amending PRA).

24.     The PRA sets forth standards that federal agencies must meet before the OMB can approve a proposed data collection, and requires the OMB to "coordinate the activities of Federal statistical system to ensure the efficiency and effectiveness of the system[] and the integrity, objectivity, impartiality, utility, and confidentiality of information collected for statistical purposes."  44 U.S.C. § 3504(e)(1).

25.     Under the OMB's Policy Directive No. 1, federal statistical agencies must:  (1) provide objective, accurate, and timely information; (2) have credibility with data users; (3) have the trust of the individuals whose information is collected; and (4) be independent from political and other undue external influence in the development, production, and dissemination of statistics.[1]

26.     Policy Directive No. 1 states that the Census Bureau is a federal statistical agency.  The Directive also states that federal statistical agencies must "seek input regularly from the broadest range of private-and public-sector data users" in any plans for information collection or dissemination and must "apply sound statistical methods to ensure statistical products are accurate."[2]

27.     The Census Bureau must also "conduct objective statistical activities," which means that they must "produce data that are impartial, clear, and complete" and make information available on an "equitable, policy-neutral, transparent, timely, and punctual basis."[3] The agency "must seek to avoid even the appearance that agency design, collection, processing, editing, compilation, storage, analysis, release, and dissemination processes may be manipulated."[4]  To guarantee such impartiality, statistical agencies including the Census Bureau "must function in an environment that is clearly separate and autonomous from the other administrative, regulatory, law enforcement, or policy-making activities within their respective

---

[1] Statistical Policy Directive No. 1:  Fundamental Responsibilities of Federal Statistical Agencies and Recognized Statistical Units ("Policy Directive No.1"), 79 Fed. Reg. 71611-12 (Dec. 2, 2014), *available at* https://www.govinfo.gov/content/pkg/FR-2014-12-02/pdf/2014-28326.pdf.
[2] *Id.* at 71615.
[3] *Id.*
[4] *Id.*

Departments" and "must be able to conduct statistical activities autonomously when determining information to collect and process."[5]

28.     Pursuant to the IQA, the Census Bureau's Information and Quality Guidelines state that the Census Bureau must "provide information that is accurate, reliable, and unbiased."[6]

**2.      Apportionment, the Bureau's Apportionment Tabulation, State Redistricting, and the P.L. 94-171 Redistricting Data File**

29.     The decennial count of the national population is used to allocate seats in the U.S. House of Representatives to states based on the "whole number of persons in each State."  U.S. Const. amend. XIV, § 2.

30.     Federal law requires the Secretary of Commerce to deliver the "tabulation of total population of states . . . for the apportionment of Representatives in Congress among the several States" to the President by the end of the census year, who must report them to Congress within a week after the start of Congress's new session.  13 U.S.C. § 141(a)-(b); 2 U.S.C. § 2a.

31.     After the Secretary of Commerce takes the census in a form and content determined by the Secretary of Commerce, he reports the population tabulations to the President. 13 U.S.C. § 141(b).  "After receiving the Secretary's report, the President 'shall transmit to the Congress a statement showing the whole number of persons in each State . . . as ascertained under the . . . decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions[.]'"  *Franklin v. Massachusetts*, 505 U.S. 788, 792 (1992) (quoting 2 U.S.C. § 2a(a)).

---

[5] *Id*. at 71615.
[6]     Information     Quality     Guidelines     Objectivity,     U.S.     Census     Bureau, https://www.census.gov/about/policies/quality/guidelines/objectivity.html (last visited Aug. 28, 2019).

32.     Decennial census data are also used for state legislative redistricting.  *See*, *e.g.*, 13 U.S.C. § 141(c) ("tabulations of population of each State . . . shall . . . be completed, reported, and transmitted to each respective State within one year after the decennial census date" by the Secretary of Commerce).

33.     Public Law (P.L.) 94-171, enacted in 1975, "directs the Census Bureau to make special preparations to provide redistricting data needed by the fifty states.  Within a year following Census Day, the Census Bureau must send the data agreed upon to redraw districts for the state legislature to each state's governor and majority and minority legislative leaders."[7]

34.     To fulfill this obligation, the Census Bureau is also required to conduct the program in a non-partisan manner.  13 U.S.C. § 141(c).

35.     To comply with the requirements of P.L. 94-171, "the Census Bureau set up a voluntary program that enables participating states to receive data for voting districts (e.g., election precincts, wards, state house and senate districts) in addition to standard census geographic areas such as counties, cities, census tracts, and blocks."[8]

36.     While P.L. 94-171 only requires the Census Bureau to furnish counts of the total population, additional data items are also included.  For example, since 1990 the Census Bureau has included summaries for the major race groups specified by the Statistical Programs and Standards Office of the OMB in Directive 15 (as issued in 1977 and revised in 1997).[9]

---

[7]     *Public Law 94-171 (P.L. 94-171)*, U.S. Census Bureau, Fact Finder, https://factfinder.census.gov/help/en/public_law_94_171_p_l_94_171.htm (last visited Aug. 15, 2019).

[8]     *Id.*

[9]     *Decennial Census P.L. 94-171 Redistricting Data*, U.S. Census Bureau (Mar. 8, 2017), *available at* https://www.census.gov/programs-surveys/decennial-census/about/rdo/summary-files.html.

37.     The 2020 Census Redistricting Data Program ("2020 CRDP") provides states the opportunity to delineate voting districts and to suggest census block boundaries for use in the 2020 census redistricting data tabulations ("P.L. 94-171 Redistricting Data File").  The CRDP is also "responsible for the effective delivery of the 2020 Census P.L. 94-171 Redistricting Data prior to April 1st, 2021, one year from census day."[10]

38.     On July 15, 2014, the Census Bureau announced and sought public comments on the establishment of the 2020 CDRP.[11]

39.     As part of its process, the Census Bureau issued a "prototype product to illustrate what the states can expect from the decennial census."[12]  The "prototype data product [is used] to illustrate and solicit feedback on what the 2020 Census P.L. 94-171 Redistricting Data File will look like and how it addresses the needs of the states for their legislative redistricting requirements.  This prototype is used to build and test systems in advance of the official data release so that states can begin work immediately, as many have short statutory deadlines that begin with the receipt of their data."[13]

40.     The Census Bureau's standard procedure is "[i]f substantive changes are needed to the 2020 Census P.L. 94-171 Redistricting Data File design based on comments received

---

[10] Redistricting & Voting Rights Data Office, *Redistricting Data Program Management*, U.S. Census Bureau (last revised Dec. 27, 2018), https://www.census.gov/programs-surveys/decennial-census/about/rdo/program-management.html?.

[11] Establishment of the 2020 Census Redistricting Data Program, 79 Fed. Reg. 41258 (Jul. 15, 2015), *available at* https://www.govinfo.gov/content/pkg/FR-2014-07-15/pdf/2014-16532.pdf.

[12] Redistricting & Voting Rights Data Office, *Redistricting Data Program Management*, U.S. Census Bureau (last revised Dec. 27, 2018), https://www.census.gov/programs-surveys/decennial-census/about/rdo/program-management.html?.

[13] *Id.*

regarding this prototype, then an additional Federal Register Notice explaining those differences will be issued."[14]

41.     On November 8, 2017, the Census Bureau published a notice in the Federal Register asking for public comment on the "Proposed Content for the Prototype 2020 Census Redistricting Data File."[15]  The prototype did not include citizenship population tabulation data as substantive content to be included in the P.L. 94-171 file.  The Census Bureau received three public comments.  None of the public comments requested that the Census Bureau include citizenship data in the 2020 Census Redistricting File.[16]

42.     The final Prototype 2020 Census Redistricting Data File published in the Federal Register on May 1, 2018, did not include citizenship population tabulation data as substantive content to be included in the P.L. 94-171 file.[17]

43.     On December 28, 2018, in connection with the Census Bureau's submission to OMB for clearance, the Census Bureau submitted a proposal for collection of information under the provisions of the PRA.[18]  The proposal posted to the Federal Register, included the following notice:

---

[14] *Id.*

[15] Ron Jarmin, *Final Content Design for the Prototype 2020 Census Redistricting Data File* (Apr. 24, 2018), *available at* https://www.federalregister.gov/documents/2018/05/01/2018-09189/final-content-design-for-the-prototype-2020-census-redistricting-data-file.

[16] *Id.*

[17] *2020 Census Prototype Redistricting Data (Public Law 94-171) Summary File from the End-to-End Census Test*, U.S. Census Bureau, https://www2.census.gov/programs-surveys/decennial/rdo/about/2020-census-program/Phase3/Phase3_prototype_schematic_final.pdf?# (last visited Aug. 27, 2019).

[18] *OMB Information Collection Request, 2020 Census, OMB Control Number 0607-1006*, Department of Commerce and U.S. Census Bureau, *available* at https://www.reginfo.gov/public/do/DownloadDocument?objectID=88197702 (last visited Sep. 13, 2019).

The purpose of the 2020 Census Redistricting Data Program (RDP) is to provide to each state the legally required redistricting data tabulations by the mandated deadline of one year from Census Day: April 1, 2021. In compliance with Public Law (Pub. L.) 94-171, the Census Bureau will tabulate for each state the total population counts by race and Hispanic origin. The Census Bureau will tabulate these counts for the total population and for the population age 18 and over in a prototype redistricting data file released as part of the 2018 End-to-End Census Test. The Census Bureau intends to work with stakeholders, specifically "the officers or public bodies having initial responsibility for the legislative apportionment of each state," to solicit feedback on the content of the prototype redistricting data file.   If those stakeholders indicate a need for tabulations of citizenship data on the 2020 Census Public Law 94-171 Redistricting Data File, the Census Bureau will make a design change to include citizenship as part of that data.[19]

44.     The December 28, 2018 notice was issued in connection with a prior proposal that included a citizenship question on the 2020 decennial census for the pretextual reason of using the data for VRA enforcement.

45.     Since its creation, citizenship population data has not been included in any of the tabulations contained within the P.L. 94-171 Redistricting Data File.

46.     In February 2019, the Department of Commerce released the final version of the OMB request.[20]   The request noted that the issue of whether a citizenship question would be included in the 2020 census was still being litigated.[21]   The document also provides that if "stakeholders indicate a need for tabulations of citizenship data on the 2020 Census P.L. 94-171 Redistricting Data File, the Census Bureau will make a design change to include citizenship as part of that data, *if collected*.  That new design would then be published in the Federal Register after it is completed in the summer of 2019."[22]

---

[19] *Id*. at 38-39.
[20] *Information Collection Request 2020 Census – Enumeration Operations OMB Control Number 0607-1006,* U.S. Census Bureau, *available at* https://t.co/j0FuZmgUKf?amp=1
[21] *Id*. at 38-42.
[22] *Id*. at 30-31 (emphasis added).

47.     On March 29, 2019, the Census Bureau published the prototype redistricting data file to states based on the test enumeration of Providence County, Rhode Island, that took place in 2018.[23]  The Providence County, Rhode Island test did not collect citizenship data, and the prototype redistricting data file did not contain citizenship data.

### 3.     Citizenship Data From the Census Bureau's American Community Survey

48.     There will not be a question on the 2020 decennial census regarding the citizenship of respondents and their households.  Therefore, the decennial census hard count will not include a count of the total population divided into citizen and non-citizen categories.

49.     The ACS is an ongoing, yearly survey by the Census Bureau that collects demographic information including ancestry, citizenship, educational attainment, income, language proficiency, migration, disability, employment, and housing characteristics from approximately 2.5 percent of U.S. households.

50.     ACS data are an estimate of population characteristics, including citizenship, are based on sample data, and are not a count of citizens and non-citizens.  ACS data are not used to determine whether voting districts are equipopulous and comply with the "one person, one vote" constitutional requirement.  Rather, "in the overwhelming majority of cases, jurisdictions have equalized total population, as measured by the decennial census" total population enumeration. *Evenwel v. Abbott*, 136 S. Ct. 1120, 1124 (2016).

### B.     Defendants' Collection of Citizenship Data For Apportionment and Redistricting Purposes

51.      On March 26, 2018, Defendant Ross directed the Census Bureau to add a citizenship question to the 2020 census and to use federal and state administrative records to

---

[23] *See* U.S. Census Bureau Press Release, *2018 Census Test Complete, Prototype Redistricting File Sent to States* (Mar. 29, 2019), *available at*
 https://www.census.gov/newsroom/press-releases/2019/prototype-redistricting-file.html.

validate census responses to the citizenship question.  Defendant Ross falsely claimed that the reason for adding the citizenship question was to collect citizenship data to assist the Department of Justice ("DOJ") in its enforcement of the VRA.

52.     Several lawsuits successfully challenged the addition of the citizenship question as unlawful and three federal courts permanently enjoined Defendants from adding a citizenship question to the 2020 census.[24]

53.     On June 27, 2019, the United States Supreme Court determined that the "VRA enforcement rationale—the sole stated reason [for adding a citizenship question]—seems to have been contrived."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019).

54.     Defendants were also permanently enjoined from "delaying the process of printing the 2020 decennial census questionnaire after June 30, 2019 for the purposes of including a citizenship question; and from asking persons about citizenship status on the 2020 Census questionnaire or otherwise asking a citizenship question as part of the 2020 decennial Census."  *Kravitz v. Dep't of Comm.*, No. 18-cv-1041, ECF No. 203; *see also California*, 358 F. Supp. 3d at 1050 (permanently enjoining defendants from including citizenship question on 2020 census); *New York*, 351 F. Supp. 3d 502 at 679 (same).

55.     On July 11, 2019, President Trump issued EO 13880 requiring that, among other things, all executive departments and agencies provide the Department of Commerce "the maximum assistance permissible, consistent with law, in determining the number of citizens and non-citizens in the country, including by providing any access that the Department may request to administrative records that may be useful in accomplishing" the objective of collecting

---

[24] *See Kravitz v. Dep't of Commerce*, 366 F. Supp. 3d 681, 755 (D. Md. 2019); *California v. Ross*, 358 F. Supp. 3d 965, 1050 (N.D. Cal. 2019); *New York v. Dep't of Commerce*, 351 F. Supp. 3d 502, 679 (S.D.N.Y.), aff'd in part, revd in part and remanded sub nom. *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019).

citizenship data.[25]  EO 13880 also directs Secretary Ross to instruct the Census Bureau to create

an inter-agency working group to collect citizenship data in connection with the 2020 decennial

census for redistricting, directs the Department of Commerce to "strengthen its efforts, consistent

with law, to obtain State administrative records concerning citizenship," and later directs that the

Department "shall strengthen its efforts, consistent with law, to gain access to relevant State

administrative records."[26]

56.     EO 13880 states several pretextual reasons for collecting robust citizenship data

from all federal agencies and states, including:  (1) "data on the number of citizens and aliens in

the country is needed to help us understand the effects of immigration on our country and to

inform policymakers considering basic decisions about immigration policy"; (2) "the lack of

complete data on numbers of citizens and aliens hinders the Federal Government's ability to

implement specific programs and to evaluate policy proposals for changes in those programs";

and (3) "data identifying citizens will help the Federal Government generate a more reliable

count of the unauthorized alien population in the country," which is necessary "evaluat[e] many

policy proposals."[27]

57.     The executive order also lists, at least in part, the true reason for the order and for

Secretary Ross's prior decision to add a citizenship question to the 2020 census:  so that  "State

and local legislative districts [can redistrict] based on the population of voter-eligible citizens."[28]

EO 13880 further states that "because eligibility to vote depends in part on citizenship, States

---

[25] *Executive Order on Collecting Information about Citizenship Status in Connection with the Decennial Census* at § 1 (July 11, 2019), *available at* https://www.whitehouse.gov/presidential-actions/executive-order-collecting-information-citizenship-status-connection-decennial-census/.
[26] *Id*. at §§ 1, 3(b), and 3(d).
[27] *Id*. at § 1.
[28] *Id*.

could more effectively exercise this option with a more accurate and complete count of the citizen population."[29]

58.     To that end, EO 13880 instructs the Census Bureau to continue its efforts to "make a design change to make [tabulations of citizenship data] available" for interested states to use for state and local redistricting purposes.[30]

59.     That same day during a press conference, President Trump stated that his intention in issuing EO 13880 is so that "[t]he Census Bureau can use [citizenship] information, along with information collected through the questionnaire, to create the official census.  In other words, as a result of today's executive order, we will be able to ensure the 2020 Census generates an accurate count of how many citizens, non-citizens, and illegal aliens are in the United States of America."[31]

60.     The President further stated that, "[t]his information is also relevant to administering our elections" because "[s]ome states may want to draw state and local legislative districts based upon the voter-eligible population," and that the Supreme Court "would not review certain types of districting decisions, which could encourage states to make such decisions based on voter eligibility."[32]

61.     Attorney General William Barr added that "there is a current dispute over whether illegal aliens can be included for apportionment purposes.  Depending on the resolution of that

---

[29] *Id.*

[30] *Id.*

[31] *Remarks by President Trump on Citizenship and the Census*, The White House (July 11, 2019, 5:37 p.m.), *available at* https://www.whitehouse.gov/briefings-statements/remarks-president-trump-citizenship-census/.

[32] *Id.*

dispute, this data may be relevant to those considerations," and that the DOJ "will be studying this issue."[33]

62.     On July 12, 2019, the Census Bureau published a revision of the February 2019 OMB request, reportedly backdated to July 3, 2019, that stated that Defendant Ross "directed the Census Bureau to proceed with the 2020 Census without a citizenship question on the questionnaire, and rather to produce Citizen Voting Age Population (CVAP) information prior to April 1, 2021 that states may use in redistricting."[34]

## C.     Shortcomings of Citizenship Data Derived From Administrative Records

63.     "[T]he Census Numident is the most complete and reliable administrative record source of citizenship data currently available to the Census Bureau.  The Numident file is a record of individual applications for Social Security cards and certain subsequent transactions for those individuals."[35]

64.     On March 1, 2018, Chief Scientist and Associate Director for Research and Methodology, John M. Abowd, prepared a memorandum for Defendant Ross that set forth the various reasons why collecting citizenship data from administrative records does not produce 100 percent accurate data on citizenship.[36]

---

[33] *Id.*

[34] *Paperwork Reduction Act Program, Information Collection Request 2020 Census - Enumeration Operations OMB Control Number 0607-1006*, Department of Commerce and U.S. Census Bureau at 18 (July 3, 2019), *available at* https://www.documentcloud.org/documents/6192581-2020-Census-Supporting-Statement-A-Revised-July.html#document/p18/a512146.

[35] J. David Brown, *et al.*, *Understanding the Quality of Alternative Citizenship Data Sources for the 2020 Census*, U.S. Census Bureau, Center for Economic Studies (August, 2018), *available at* https://www2.census.gov/ces/wp/2018/CES-WP-18-38.pdf.

[36] Memorandum from John M. Abowd, Chief Scientist & Assoc. Dir. for Research & Methodology, U.S. Census Bureau, to Wilbur L. Ross, Sec'y, U.S. Dep't of Commerce (Mar. 1, 2018) (hereinafter "Abowd Memo.").

65.     For example, "[i]n the 2017 Numident . . ., 6.6 million persons born outside the U.S. have blank citizenship among those born in 1920 or later with no year of death. The evidence suggests that citizenship is not missing at random. Of those missing citizenship in the Numident, a much higher share appears to be U.S. citizens than compared to those for whom citizenship data are not missing . . . some of the blanks may be noncitizens."[37]

66.     Dr. Abowd further stated that another weakness in administrative records is that there are questions about how complete the Numident citizenship data are and how timely it updates naturalization. Although naturalized citizens are instructed to apply for a social security number, "we do not know what fraction of naturalized citizens actually notify the [Social Security Administration], and how soon after being naturalized they do so."[38]

67.     Additionally, "[a] third potential weakness of Numident citizenship is that some people are not required to have a Social Security Number (SSN), whether they are a U.S. citizen or not." According to Dr. Abowd, although U.S. Citizenship and Immigration Services ("USCIS") and State Department memoranda of understanding could provide some context for gaps in citizenship data, USCIS data on naturalizations, lawful permanent residents, and I-539 non-immigrant visa extensions can only partially address the weakness of the Numident. "The data do not cover naturalizations occurring before 1988, as well as not covering and some between 1988-2000. USCIS data do not always cover children under 18 at the time a parent became a naturalized U.S. citizen" and some of the data for children may not be in electronic form.[39]

---

[37] *Id.*
[38] *Id.*
[39] *Id.*

68.     Other data gaps in administrative records includes the following categories:  (1) U.S. citizens from birth with no SSN or U.S. passport; (2) U.S. citizens from birth born outside the U.S., who do not have a U.S. passport and either applied for an SSN prior to 1974 and were 18 years or older, or applied before the age of 18 prior to 1978; (3) U.S. citizens who were naturalized prior to 2001 and did not inform SSA of their naturalization because they originally applied for an SSN after they were naturalized, and it was prior to when citizenship verification was required for those born outside the U.S. (1974); (4) U.S. citizens who were automatically naturalized if they were under the age of 18 when their parents became naturalized in 2000 or later, and did not inform USCIS or receive a U.S. passport; (5) Lawful permanent residents ("LPR") who received that status prior to 2001 and either do not have an SSN or applied for an SSN prior to when citizenship verification was required for those born outside the U.S. (1974); (6) noncitizen, non-LPR residents who do not have SSN or ITIN and who did not apply for a visa extension; and (7) persons with citizenship information in administrative data, but the administrative and decennial census data cannot be linked due to missing or discrepant Protected Identification Key.[40]

69.     Because of the gaps in administrative data, the Census Bureau "will most likely never possess a fully adequate truth deck to benchmark [citizenship] to."[41]

**D.     Defendants' Decision to Produce Citizenship Data For Use With the P.L. 94-171 File is Motivated By Racially Discriminatory Intent**

70.     Throughout the litigation challenging the addition of a citizenship question to the decennial census, including before the U.S. Supreme Court, Defendant Ross maintained that he decided to add the citizenship question to the 2020 decennial census so that the DOJ could better

---

[40] *Id.*
[41] *Id.*

enforce the VRA.   The documents produced during that litigation revealed instead that Defendant Ross, members of the Trump Administration, A. Mark Neuman, then-Kansas Secretary of State Kris Kobach, members of the DOJ, including then-Attorney General Jefferson Sessions ("AG Sessions") and head of the DOJ's Civil Rights Division John Gore, and Republican strategist Dr. Thomas Hofeller conspired to add a citizenship question to the 2020 census to reduce the response rates of people of color and immigrants, and exclude them from congressional apportionment and redistricting to achieve the objective of reducing their political power.

71.     After consulting with the White House and Mr. Kobach, Defendant Ross used the Department of Commerce to facilitate the conspiracy by directing staff to research the exclusion of immigrants from apportionment and to create an alternative justification for the addition of the citizenship question to the census.   Defendant Ross and the Department of Commerce then solicited the assistance first of the DOJ and then of the Department of Homeland Security ("DHS"), before finally securing the participation of the DOJ, including AG Sessions.

72.     Defendant Ross, through the Department of Commerce, coordinated with AG Sessions, other members of the DOJ, and the White House to fabricate a "need" for the citizenship question that resulted in a letter from the DOJ requesting the addition of the question to the 2020 census (the "DOJ Letter").

73.     Without their knowledge, Defendant Ross used the Census Bureau to continue to facilitate the conspiracy and directed the Census Bureau to look into the DOJ request.   In a March 28, 2018 memorandum, Defendant Ross ignored the findings and recommendation of the Census Bureau and reached the conspiracy's predetermined conclusion to add a citizenship question on the 2020 census questionnaire.

74.     After Defendant Ross issued the March 28 memorandum, the Trump Administration publicly admitted its role in the conspiracy in campaign emails to supporters. Defendant Ross has continued to facilitate the conspiracy to exclude non-citizens from congressional apportionment and redistricting to achieve the objective of reducing the political power of non-citizens and Latinos.

75.     Following the Supreme Court's rejection of the contrived rationale in *Department of Commerce v. New York*, Defendants continued to pursue the collection of data that would allow non-citizens to be excluded from apportionment and redistricting, as evidenced by EO 13880 and Defendant Ross's July 2019 directive.

76.     On June 3, 2019, plaintiffs in *LUPE v. Ross*, filed a motion for relief from final judgment and request for indicative ruling that included documents belonging to the late Dr. Hofeller, a leading Republican redistricting strategist and map-drawing expert for the Republican National Committee.  *La Unión Del Pueblo Entero, et al. v. Secretary Ross, et al.*, No. 18-CV-1570 (D. MD.) (hereinafter, "*LUPE v. Ross*"), ECF No. 136.

77.     The Hofeller documents demonstrate that the addition of the citizenship question, and now the directives that the Census Bureau to collect citizenship data to be produced for use with the P.L. 94-171 Redistricting Data File, was motivated by a racially discriminatory scheme to reduce Latino representation and increase over-representation of non-Latino Whites, thereby serving Republican political ends at Latinos' expense.

78.     Dr. Hofeller acknowledged that the shift from redistricting based on total population to CVAP was a "radical departure"—one that would alienate Latino voters. But, he concluded, "[a] switch to the use of citizen voting age population as the redistricting population base for redistricting would be advantageous to Republicans and Non-Hispanic Whites."  To

generate the necessary CVAP data and achieve this goal of diluting Latino representation while increasing over-representation of non-Latino Whites, Dr. Hofeller concluded that a citizenship question must be added to the 2020 census.

79.     The Hofeller documents show that Dr. Hofeller drafted and gave to Commerce and DOJ officials, including Mr. Neuman, part of President Trump's transition team, and Mr. Gore, the substantive content of the December 2017 DOJ letter requesting the addition of the citizenship question.

80.     The Hofeller documents demonstrate a partisan and discriminatory purpose behind the addition of the citizenship question.

81.     The same discriminatory motivation behind adding the citizenship question motivated Defendants to continue their unlawful course of action to collect citizenship data and produce citizenship population tabulation data for use with the P.L. 94-171 Redistricting Data File so that states can exclude non-U.S. citizens from apportionment to the advantage of non-Latino White Republican voters and at the expense of the Latino community.

**E.      The Production of Citizenship Data For Use With The P.L. 94-171 Redistricting Data File Population Tabulations Harms Latinos and Non-U.S. Citizens and Increases the Chances of Malapportioned State Legislative and Local Districts**

82.     Plaintiffs and members of organizational plaintiffs live in states where there is a higher population of non-citizens.

83.     Under Article I, Section 2, Clause 3 of the U.S. Constitution, as amended by the Fourteenth Amendment, the decennial population counts are used to determine the number of congressional representatives apportioned to each state.  Exclusion of non-citizens from the population count used for apportionment creates a significant risk that states in which large

numbers of non-citizens reside, including Texas and Arizona, will suffer a reduction in the number of congressional seats that would otherwise be apportioned to them.

84.     Plaintiffs and members of organizational plaintiffs also live in states where lawmakers have expressed an interest and desire to use CVAP as a population base for drawing congressional and state legislative redistricting plans in 2021.[42]   Plaintiffs and members of organizational plaintiffs reside in areas in which, according to recent ACS data, the population has a higher percentage of non-citizens than the population of their states as a whole.   Latinos and non-U.S. citizens, including individual Plaintiffs and members of Plaintiff organizations will be injured when the Census Bureau provides those states with citizenship data to be used along with the total population tabulations in the P.L. 94-171 Redistricting Data File, resulting in the exclusion of non-citizens from the population base used for redistricting congressional, state legislative and local districts.   As a result, Plaintiffs will suffer vote dilution and loss of representation in unconstitutionally overpopulated districts.

## CAUSES OF ACTION

### COUNT I

**(Administrative Procedure Act, 5 U.S.C. § 706 (2)(A))**

**(Inadequate Rationale)**

85.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

86.     The APA prohibits final agency action that is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law[.] "  5 U.S.C. § 706(2)(A).

---

[42] *See*, *e.g.*, Nick Brown, *Republicans want census data on citizenship for redistricting*, Reuters (Apr. 8, 2019), *available at* https://www.reuters.com/article/us-usa-census-redistricting-insight/republicans-want-census-data-on-citizenship-for-redistricting-idUSKCN1RK18D.

87.     Defendants represent or are agencies subject to the requirements of the APA.  5 U.S.C. § 701 (b)(1).

88.     Defendants failed to provide any independent analysis or support to justify collecting citizenship data to produce this data for use with the population tabulations provided to states in the 2020 Census P.L. 94-171 Redistricting Data File.  Defendants' decision to collect citizenship data and produce citizenship population tabulations for use alongside the 2020 Census P.L. 94-171 Redistricting Data File is thus arbitrary and capricious, discriminatory, an abuse of discretion, and otherwise not in accordance with law, and therefore violates the APA and must be set aside.

89.     Plaintiffs suffered and will suffer permanent and irreparable injury unless Defendants are enjoined from collecting citizenship data and producing tabulations of citizenship population for use along with the 2020 Census P.L. 94-171 Redistricting Data File.

## COUNT II

### (Administrative Procedure Act, 5 U.S.C. § 706 (2)(B))

### (Contrary to Law)

90.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

91.     The APA prohibits final agency action that is "contrary to constitutional right, power, privilege or immunity[.]"  5 U.S.C. § 706(2)(B).

92.     Defendants represent or are agencies subject to the requirements of the APA.  5 U.S.C. § 701 (b)(1).

93.     Defendants seek to collect and produce tabulations of citizenship population for use along with the 2020 Census P.L. 94-171 Redistricting Data File to discriminate against Plaintiffs and organizational Plaintiffs' members because of their race, national origin, or

alienage.  Exclusion of non-citizens from the population base used for redistricting without a hard count of citizens and non-citizens will result in unconstitutionally malapportioned congressional and state legislative districts.  Defendants' decision to collect citizenship data and produce citizenship population tabulations for use along with the 2020 Census P.L. 94-171 Redistricting Data File is contrary to constitutional right, power, privilege or immunity, and therefore violates the APA and must be set aside.

94.     Plaintiffs suffered and will suffer permanent and irreparable injury unless Defendants are enjoined from collecting citizenship data and producing tabulations of citizenship population for use along with the 2020 Census P.L. 94-171 Redistricting Data File.

**COUNT III**

**(Administrative Procedure Act, 5 U.S.C. § 706 (2)(C))**

**(Excess of Lawful Authority)**

95.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

96.     The APA prohibits final agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"  5 U.S.C. § 706(2)(C).

97.     Defendants represent or are agencies subject to the requirements of the APA.  5 U.S.C. § 701 (b)(1).

98.     Presidential power is limited to the authority conferred on the President by acts of Congress or by the Constitution itself.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  The Constitution gives Congress authority to conduct the census "in such a Manner as [Congress] shall by Law direct," U.S. Const. art. I, § 2, and "vests Congress with wide discretion over . . . the conduct of the census," *Wisconsin*, 517 U.S. at 15.  Under to this authority, Congress delegated the duty of conducting the census to the Secretary of Commerce,

subject to the provisions of the Census Act.  Neither the Census Act nor the Constitution vests the President with authority over the *conduct* of the census.

99.    Defendant Ross has exceeded his statutory authority over the conduct of the decennial census by following EO 13880, thus improperly allowing President Trump to usurp the discretion delegated to the Secretary by Congress.  Secretary Ross has directed the Census Bureau to collect citizenship data not because he finds that it is necessary to collect this data, but because President Trump, as a co-conspirator in the continuing scheme to deprive Plaintiffs of political representation, finds that it is necessary for the Census Bureau to collect this data.

100.    For the foregoing reasons, Defendant Ross's decision to follow EO 13380 and direct the Census Bureau to, among other things, collect citizenship data and produce citizenship population tabulations for use along with the 2020 Census P.L. 94-171 Redistricting Data File is in excess of the Secretary's statutory jurisdiction, authority, or limitations, or short of statutory right, and therefore violates the APA and must be set aside.

101.    Plaintiffs suffered and will suffer permanent and irreparable injury unless the Secretary is enjoined from following EO 13380.

## COUNT IV

### (Administrative Procedure Act, 5 U.S.C. § 706 (2)(D))

### (Improper Procedure)

102.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

103.    The APA prohibits final agency action that is "without observance of procedure required by law[.]"  5 U.S.C. § 706(2)(D).

104.    Defendants represent or are agencies subject to the requirements of the APA.  5 U.S.C. § 701 (b)(1).

105.    Defendants departed from statutory and regulatory requirements under 13 U.S.C. § 141(c) and Public Law 94-171, as well as OMB and Census Bureau standards and practices, to collect and produce specific tabulations of population other than total population, race, and Hispanic/non-Hispanic origin for use along with the 2020 Census P.L. 94-171 Redistricting Data File. Defendants' decision to collect citizenship data and produce citizenship population tabulations for use along with the 2020 Census P.L. 94-171 Redistricting Data File is thus without observance of procedure required by law, and therefore violates the APA and must be set aside.

106.    Plaintiffs suffered and will suffer permanent and irreparable injury unless Defendants are enjoined from collecting citizenship data and producing tabulations of citizenship population for use along with the 2020 Census P.L. 94-171 Redistricting Data File.

## COUNT V

### (Equal Protection Clause of the Fifth Amendment

### to the United States Constitution)

107.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

108.    The Due Process Clause of the Fifth Amendment incorporates the equal protection guarantee of the Fourteenth Amendment.

109.    The collection of citizenship data and the production of citizenship population tabulations for use along with the P.L. 94-171 Redistricting Data File violates the equal protection guarantee of the Fifth Amendment because it is motivated by racial animus towards Latinos, and animus towards non-U.S. citizens and foreign-born persons.

110.    Defendants' violation caused and will cause harm to Plaintiffs.

## COUNT VI

## (Conspiracy to Violate Civil Rights Under 42 U.S.C. § 1985(3))

111.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

112.    Motivated by their racial and class-based animus toward Latinos, President Trump, Defendant Ross, Defendant Dillingham, John Gore, Attorney General Sessions, Kris Kobach, and Stephen Bannon conspired to collect citizenship data and produce citizenship data for use along with the P.L. 94-171 Redistricting Data File so that states can use CVAP data to apportion state and local districts.

113.    By taking the actions described herein, President Trump, Defendant Ross, Defendant Dillingham, John Gore, Attorney General Barr, Kris Kobach and Stephen Bannon conspired to deprive Latinos and non-U.S. citizens of their Fifth Amendment right to equal protection of the laws under the Fifth Amendment of the U.S. Constitution in violation of 42 U.S.C. § 1985(3).

114.    Defendants' unlawful conduct to conspire to violate the constitutional rights of Latinos and non-U.S. citizen persons caused and will cause harm to Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court:

(a) Declare that production of citizenship data for use along with the P.L. 94-171 Redistricting Data File and population tabulations, or including citizenship data in the File, violates the Equal Protection guarantee of the Fifth Amendment;

(b) Declare that Secretary Ross's decision to follow EO 13380 and order the Census Bureau to produce tabulations of citizenship population data for use along with the P.L. 94-171 Redistricting Data File, or to include citizenship data in the File, violates §§ 706(2)(A)-

(D) of the APA because it is arbitrary and capricious, an abuse of discretion, and not in accordance with law; contrary to constitutional power, right, privilege or immunity; and/or in excess of statutory jurisdiction and authority, and without observance of procedure required by law;

(c) Enjoin Defendants and their agents from collecting data as dictated by EO 13380 and from producing tabulations of citizenship population for use alongside the P.L. 94-171 Redistricting Data File and population tabulations or including citizenship data in the File and from taking any irreversible steps to produce tabulations of citizenship population for use alongside with the File or including tabulations of citizenship population in the File;

(d) Award Plaintiffs reasonable costs, expenses, and attorneys' fees pursuant to 28 U.S.C. § 2412; and

(e) Award such additional relief as the interests of justice may require.

Dated:  September 13, 2019                  Respectfully submitted,

**By** /s/ Terry Ao Minnis

**ASIAN AMERICANS ADVANCING JUSTICE | AAJC**
John C. Yang (IL Bar No. 6210478)*
Niyati Shah (NJ Bar No. 026622005)*°
Terry Ao Minnis (MD Bar No. 20547)°
Eri Andriola (NY Bar No. 5510805)*°

1620 L Street, NW, Suite 1050
Washington, DC 20036
Phone: (202) 815-1098

**MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND**
Thomas A. Saenz (CA Bar No. 159430)*°
Denise Hulett (CA Bar No. 121553)*°
Andrea Senteno (NY Bar. No. 5285341)**°
Tanya G. Pellegrini (CA Bar No. 285186)*°
Julia A. Gomez (CA Bar No. 316270)*°

1016 16th Street NW, Suite 100
Washington, DC 20036
Phone: (202) 293-2828
Facsimile: (202) 293-2849

\* Pro hac vice *applications forthcoming*
*\*\* Application for admission forthcoming*
*° Not admitted in DC.*