# EXHIBIT 2

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 014001

COMMON CAUSE, et al.,

            Plaintiffs,

    v.

DAVID LEWIS, IN HIS OFFICIAL CAPACITY AS
SENIOR CHAIRMAN OF THE HOUSE SELECT
COMMITTEE ON REDISTRICTING, et al.,

            Defendants.

**PLAINTIFFS' MOTION FOR
THE COURT TO ISSUE
DIRECTION TO
LEGISLATIVE DEFENDANTS**



Plaintiffs bring this motion respectfully requesting that the Court issue certain direction to Legislative Defendants in light of recent developments relating to the electronic storage devices produced by Stephanie Hofeller to Plaintiffs in response to Plaintiffs' February 13, 2019 subpoena to Ms. Hofeller. In a May 31, 2019 letter to Plaintiffs' counsel, Legislative Defendants purported, unilaterally and without any plausible authorization, to designate "the entirety" of the Hofeller files as "Highly Confidential/Outside Attorneys' Eyes Only" in a transparent effort to conceal evidence of wrongdoing by Legislative Defendants and others. Legislative Defendants' May 31 letter further demanded, again without any plausible basis, that Plaintiffs return and destroy the Hofeller files in their entirety. Each of these attempts by Legislative Defendants to conceal evidence that is extraordinarily relevant to this case is unjustified and improper.

For the reasons set forth in detail below, Plaintiffs respectfully request that the Court direct Legislative Defendants as follows: (1) Legislative Defendants shall not further pursue the return or destruction of material properly produced by other parties or third parties in response to lawful court process in discovery in this case; and (2) Legislative Defendants shall not attempt to unilaterally designate material produced in discovery by other parties or third parties as Confidential or Highly Confidential under the Consent Protective Order.

## BACKGROUND

As the Court knows, on February 13, 2019, Plaintiffs issued a third-party subpoena pursuant to Rule 45 to Stephanie Hofeller, the daughter of the late mapmaker Dr. Thomas Hofeller who created the redistricting plans at issue in this case (the "2017 Plans"). The subpoena requested all documents in Ms. Hofeller's possession, custody, or control relating to Dr. Hofeller's work on the challenged plans, as well as "[a]ny storage device" in Ms. Hofeller's possession, custody, or control that may contain such documents or any information "relating to"

such documents.  Plaintiffs emailed a copy of the subpoena to all parties in this case on the same day the subpoena was served, February 13, 2019.  Neither Legislative Defendants nor any other party or non-party moved to quash or otherwise objected to the subpoena.

In mid-March 2019, in response to the subpoena, Ms. Hofeller produced four external hard drives and eighteen thumb drives containing over 75,000 files (the "Hofeller files").  Plaintiffs received these storage devices on March 13, 2019, and e-mailed notice to all Defendants on March 20, 2019, pursuant to Rule 45(d1).  A dispute subsequently arose between the parties regarding whether to filter out certain files containing sensitive personal information of the Hofeller family before providing copies of the contents of the devices to Defendants.  In attempting to negotiate a resolution of that issue, on April 9, 2019, Plaintiffs sent all Defendants a searchable index listing the files names and files paths of the over 75,000 Hofeller files.  And in early May, pursuant to the Court's direction, Plaintiffs provided complete copies of all of the Hofeller files to all three sets of Defendants.

It has now been nearly four months since all Defendants received notice of the subpoena to Ms. Hofeller.  It has been two-and-a-half months since all Defendants received notice of Plaintiffs' receipt of the Hofeller files in response to the subpoena.  It has been nearly two months since all Defendants received a substantially complete searchable index of the Hofeller files.  And it has been more than a month since all Defendants received all of the Hofeller files themselves.  Over this time, neither Legislative Defendants nor anyone else has filed a motion with this Court seeking a protective order or any other restriction over any of the Hofeller files.

On May 17, Plaintiffs took a trial-preservation deposition of Ms. Hofeller, with her own counsel defending the deposition, and also counsel for each set of Defendants present and afforded the opportunity to examine Ms. Hofeller.  (Legislative Defendants' counsel examined

Ms. Hofeller for many hours.)  Ms. Hofeller testified that she obtained the storage devices at issue with her mother's knowledge and express approval, while visiting her parents' home in Raleigh on October 11, 2018.  Ex. A (S. Hofeller Dep.) at 20:3-26:10; 52:6-10; 81:8-82:2; 110:17-11:24.  Specifically, Ms. Hofeller testified that she asked her mother, "Can I take these [devices]," and her mother "said absolutely" and in fact "encouraged" Ms. Hofeller to take them. *Id.* at 21:6-11, 26:3-10.  Ms. Hofeller testified that "[her] mother gave to [her] unconditionally" "everything on those hard drives that [her] father had left in his room." *Id.* at 81:8-82:2.

Ms. Hofeller testified that she again sought and received her mother's consent before producing the Hofeller files to Plaintiffs in response to their subpoena. *Id.* at 39:21-41:8.  Ms. Hofeller further testified that, in giving consent to produce the drives in response to the subpoena, her mother knew that the drives contained Dr. Hofeller's "work-related files." *Id.* at 56:22-57:18; *see id.* at 59:13-18 ("Q. At what point in time did you discuss with your mother the possibility of turning over your father's business records to Common Cause or to Arnold & Porter? A. The subpoena. That -- that would be when we specifically discussed that.").

In the course of reviewing the Hofeller files for this case, Plaintiffs' counsel recently realized that several of the files were also relevant to another pending lawsuit in which Plaintiffs' same counsel from Arnold & Porter are representing different plaintiffs—a federal challenge to the addition of a citizenship question on the 2020 Decennial Census, which is pending before the United States Supreme Court.  Specifically, Plaintiffs' counsel realized that several files revealed that Dr. Hofeller played a substantial, previously undisclosed role in orchestrating the Department of Justice's request to add a citizenship question to the Census, and that this fact called into question the veracity of testimony by two government witnesses in the case, and also bore directly on central merits issues in the case.  On May 30, 2019, the plaintiffs in the New

3

York action filed a motion in the district court for an order to show cause whether sanctions or other appropriate relief are warranted in light of the new evidence. *New York v. Dep't of Commerce*, No. 18-cv-2921, ECF No. 595 (S.D.N.Y.). The plaintiffs submitted notice of their district court filing to the Supreme Court. *Dep't of Commerce v. New York*, No. 18-966 (U.S.).

The very next day after Plaintiffs disclosed this evidence of potential government misconduct, Legislative Defendants in this case sent a letter to Plaintiffs' counsel purporting to take certain actions with respect to the Hofeller files, suggesting that Plaintiffs' counsel have been "neglecting [their] professional responsibilities," and making various demands. Ex. B at 5. First, Legislative Defendants' letter purported to suddenly and unilaterally designate "the entirety" of the Hofeller files as "Highly Confidential/Outside Attorney's Eyes Only" under the Consent Protective Order in this case. *Id.* at 1. Legislative Defendants' stated reason for taking this action—which is unauthorized and without effect under the plain terms of the Consent Protective Order for reasons explained below—was that there are some unidentified number of unspecified files supposedly containing "confidential financial information" beyond the 1,001 files designated Highly Confidential pursuant to the Court's May 1 order. *Id.* at 1. Legislative Defendants did not identify a single additional file containing "confidential financial information," did not provide any estimate of the number of such files, and did not make any claim that the number of such files is more than a miniscule fraction of the total Hofeller files.

Second, Legislative Defendants' May 31 letter asserted that Plaintiffs' counsel have "apparently been reviewing likely privileged materials" of Legislative Defendants. *Id.* at 1. But the letter listed only *five* specific files that Legislative Defendants asserted may be privileged on the ground that those five files were "expert witness materials created by Dr. Hofeller in connection with North Carolina legal matters." *Id.* at 2. Legislative Defendants provided no

4

substantiation for their assertion that Plaintiffs' counsel had "apparently" reviewed any of those five files or any other similar files.

Third, Legislative Defendants expressed various "concerns" about the circumstances under which Ms. Hofeller acquired the Hofeller files and produced them to Plaintiffs in response to their February 13, 2019 subpoena. *See id.* at 2-3. The details of these baseless concerns and Plaintiffs' responses are set forth in full in the attached letters and need not be repeated here.

Fourth, Legislative Defendants made a series of specific demands of Plaintiffs. In particular, Legislative Defendants demanded that Plaintiffs:

1) "immediately cease and desist reviewing all materials produced by Ms. Hofeller, and particularly all files unrelated to North Carolina";

2) "immediately cease and desist providing any or all of these materials to third parties unrelated to this case, as [Plaintiffs' counsel] have apparently recently done in a matter pending in New York";

3) "return all of the produced materials to the Trustee for the Kathleen H. Hofeller Irrevocable Trust to allow for a privilege review of Dr. Hofeller's materials";

4) "identify by name all individuals [Plaintiffs' counsel] employ who have reviewed and produced materials, the date[s] on which they reviewed those materials, and which materials they reviewed with sufficient specificity that [Legislative Defendants] can determine which materials are at issue";

5) "inform [Legislative Defendants] which of these wrongfully produced materials have been shared outside [Plaintiffs' counsel's] firms, including but not limited to any expert witnesses in the case, and, if so, with whom and which materials with

> sufficient specificity to allow [Legislative Defendants] to assess the scope of the
> intrusion into protected materials"; and

6) "attest that all copies of the materials wrongfully produced by Ms. Hofeller are no
longer in [Plaintiffs' counsel's] possession and have been *destroyed*."

*Id.* at 4-5 (emphasis added).

Finally, Legislative Defendants stated, without elaboration, that they "insist on" Plaintiffs' counsel's "compliance with the North Carolina Rules of Civil Procedure and Rules of Professional Responsibility." *Id.* at 5. Legislative Defendants' counsel continued: "Should you persist in neglecting your professional responsibilities, our clients are considering all options available to them to enforce their rights." *Id.* Immediately thereafter, Legislative Defendants demanded "compliance with the steps outlined above by June 5, 2019," including that Plaintiffs "return" all of the Hofeller files to a "Trustee" and "destroy[] . . . all copies of the materials." *Id.*

Plaintiffs responded to this letter on June 5, 2019. In their response, Plaintiffs explained that the Consent Protective Order does not authorize Legislative Defendants to designate *any* of the Hofeller files as Highly Confidential, let alone *all* of them. Ex. C at 2. As Plaintiffs explained, the Consent Protective Order unambiguously provides that only "***the Party producing the material***" may designate the material as Confidential or Highly Confidential under the Consent Protective Order. *Id.* (quoting Consent Protective Order ¶ 1) (emphasis added); *see also* Consent Protective Order ¶¶ 2-3 (only "the Producing party may designate" materials as Confidential or Highly Confidential). Legislative Defendants are not "the Producing party" of the Hofeller files.

With respect to Legislative Defendants' unsubstantiated allegations that Plaintiffs' counsel "apparently" have reviewed privileged materials in the Hofeller files, Plaintiffs' counsel

made clear that they have no intention of reviewing any of the five specific documents that

Legislative Defendants identified in their letter, nor have they reviewed—or have any intention

of reviewing—any other draft expert report or draft declaration prepared in connection with

litigation. *Id.* at 3.  Plaintiffs further noted, however, that Legislative Defendants have waived

any privilege they may have held over any information in the Hofeller files. *Id.* at 4-13.  Under

well-settled case law, Legislative Defendants waived any privilege when they did not move to

quash Plaintiffs subpoena to Ms. Hofeller or otherwise raise any objection to the subpoena. *Id.*

at 4-5 (citing cases).  Legislative Defendants independently waived privilege when they

acquiesced to—and indeed demanded—Plaintiffs' production of complete copies of all of the

Hofeller files to State Defendants and Intervenor Defendants, without any filtering or privilege-

related protections in place. *Id.* at 5-6 (citing cases).

Plaintiffs also explained in their response that any purported claim of work-product

privilege with respect to Dr. Hofeller's work in *Covington* or on the 2017 Plans challenged in

this case is overcome by Plaintiffs' substantial need for the information and the prejudice to

Plaintiffs and the public interest from concealing it. *Id.* at 6-13.  Specifically, Legislative

Defendants cannot possibly maintain any work-product privilege claim over such materials

because the Hofeller files reveal false statements and material omissions made by Legislative

Defendants to the federal district court in *Covington* and to the public, in at least three respects:

- In July 2017, Legislative Defendants convinced the federal district court in *Covington* not to order special elections under new remedial maps in 2017, based on Legislative Defendants' repeated statements that they had not yet started drawing new districts *at all* and needed sufficient time to develop criteria, draft the plans, and receive public input. *See id.* at 7-10. The Hofeller files reveal that not only had work on the remedial plans *begun* well before July 2017, but that the new state House and state Senate plans were already substantially *complete* by the end of June 2017. *See id.* at 10.

- In a September 7, 2017 submission to the *Covington* court, Legislative Defendants purported to describe the "process" and "criteria" used to the draw the 2017 Plans. They

stated that the process for drawing new plans began *at the end of June 2017* and that the criteria used were the ones adopted *on August 10, 2017*. *Id.* at 11. The Hofeller files reveal that Dr. Hofeller had in fact already substantially *completed* drawing the 2017 Plans in June 2017, before Legislative Defendants stated the process had even *begun* and a month-and-a-half before the adopted criteria were even introduced and adopted. *See id.* at 11-12.

- Legislative Defendants repeatedly stated to the *Covington* court and at public hearings that neither they nor Dr. Hofeller had any racial data on the new districts being developed. *Id.* at 12. They said that "data regarding the race of voters . . . *was not even loaded into the computer used by the map drawer to construct the districts*." *Id.* (quoting *Covington*, ECF No. 192 at 28) (emphasis added). The Hofeller files reveal that Dr. Hofeller had data on the racial composition of the proposed districts in every one of his draft maps, including drafts prepared *after* he was formally retained by Legislative Defendants. *Id.* at 12-13.

Plaintiffs explained in their June 5 response letter that the evidence and full details of these false statements will be made clear at trial, and that the false statements not only overcome any work-product privilege claim, but also raise troubling questions regarding Legislative Defendants' recent efforts to use improper means to conceal the Hofeller files in their entirety. *Id.* at 13.

Finally, Plaintiffs' June 5 letter rebutted Legislative Defendants' allegations and mischaracterizations regarding the circumstances under which Ms. Hofeller obtained and produced the Hofeller files, and Plaintiffs refused to accede to Legislative Defendants' specific demands that Plaintiffs return and destroy material evidence to this case. *Id.* at 13-18.

## ARGUMENT

I.  **This Court Should Direct Legislative Defendants Not To Pursue Further the Return and/or Destruction of the Hofeller Files**

Plaintiffs request that this Court direct Legislative Defendants to cease pursuing the return and/or destruction of the Hofeller files. Legislative Defendants have demanded that Plaintiffs "return" all of the Hofeller files to a "Trustee" of an Irrevocable Trust, and Legislative Defendants have further demanded that Plaintiffs "destroy" all remaining "copies of the materials." Ex. B at 4-5.

Such demands are improper and should stop.  Plaintiffs obtained the Hofeller files through the lawful process of this Court—a subpoena issued by Plaintiffs to Ms. Hofeller, through her attorney, with notice to all Defendants on the same day the subpoena was served. Ms. Hofeller produced the Hofeller files to Plaintiffs in response to their subpoena after no party or non-party moved to quash or otherwise raised any objection to the subpoena—none at all. The Hofeller files contain evidence that is highly relevant to the merits of this lawsuit, and Legislative Defendants' extrajudicial efforts to interfere with Plaintiffs' use of such lawfully obtained evidence—and indeed to have Plaintiffs "return" and/or "destroy" such evidence—are troubling.  Legislative Defendants' actions are even more concerning given that the evidence in question appears to reveal false statements they made to a federal court and the public.[1]

If Legislative Defendants believe there are grounds for preventing or limiting introduction of evidence in the Hofeller files at trial, they should file a motion *in limine* or an objection when the evidence is introduced.  They should not be making out-of-court demands that Plaintiffs' counsel destroy evidence that was obtained through a lawful subpoena and is highly materials to the merits of Plaintiffs' case.  Plaintiffs respectfully request that the Court direct Legislative Defendants to cease in such efforts.

---

[1] To the extent Legislative Defendants' demands are accompanied by threats directed to Plaintiffs' counsel regarding their purported "neglect[]" of their "professional responsibilities," they are all the more improper. Ex. B at 5.  A party may not seek to gain leverage or an advantage in civil litigation by "sending threatening letters to opposing counsel" alleging purported disciplinary violations. *Johnson v. EEOC Charlotte Dist. Office*, 2016 WL 3514456, at *5 n.2 (W.D.N.C. June 27, 2016); *see also Nieman v. Grange Mut. Ins. Co.*, 2012 WL 3779090, at *5 (C.D. Ill. Aug. 31, 2012) (admonishing party for "litigation tactics which are harassing and intimidating," including threatening opposing counsel with allegations of ethical violations).  Here, Legislative Defendants do not specify a single implicated Rule of Professional of Responsibility or even attempt to identify what "professional responsibilities" Plaintiffs' counsel are purportedly "neglecting." Ex. B at 5.  Indeed, Plaintiffs' counsel have acted cautiously, ethically, and above-board at every turn, and will continue to do so at all times.

II.     **This Court Should Direct Legislative Defendants Not to Attempt to Designate Documents in the Hofeller Files as Confidential or Highly Confidential Under the Consent Protective Order**

This Court should further direct Legislative Defendants not to attempt again to unilaterally designate materials produced by Ms. Hofeller or other third parties as Confidential or Highly Confidential under the Consent Protective Order. Legislative Defendants' purported designation of "the entirety" of the Hofeller files as Highly Confidential in their May 31 letter is plainly not authorized under the Consent Protective Order, and seems to have been done for improper purposes.

The Consent Protective Order is unambiguous that *only* "the Party producing the material" in discovery may designate those materials as Confidential or Highly Confidential. Paragraph 1 of the Order states: "To fall within the scope of this Agreement, any such Confidential material shall be designated as 'CONFIDENTIAL' or 'HIGHLY CONFIDENTIAL/OUTSIDE ATTORNEYS' EYES ONLY,' *by the Party producing the material.*" 4/5/19 Consent Protective Order ¶ 1 (emphasis added). Paragraphs 2 and 3 confirm that only "[*t*]*he producing Party may designate*" materials as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL." *Id.* ¶¶ 2, 3 (emphasis added). Specifically, "[t]he producing Party may designate as 'CONFIDENTIAL' any materials that *it* produces in the litigation" subject to meeting certain confidentiality criteria, *id.* ¶ 3, and "[t]he producing Party may designate as 'HIGHLY CONFIDENTIAL/ OUTSIDE ATTORNEYS' EYES ONLY' (a) any non-public personal information, or (b) any CONFIDENTIAL material that *the producing party* reasonably and in good faith believes" meets certain additional criteria. *Id.* ¶ 3 (emphases added); *see id.* ¶ 13 (stating that the Order applies equally to "information produced by a non-Party").

10

Legislative Defendants clearly are not "the *producing* Party" of the Hofeller files, but rather are a "*receiving* party" of those files. Legislative Defendants have no authority to unilaterally designate any of the Hofeller files as Highly Confidential under the Consent Protective Order, let alone all of them. Legislative Defendants could not reasonably and in good faith have read the Consent Protective Order to provide otherwise.

The sudden and pretextual nature of Legislative Defendants' attempted designation of material produced by a third party in discovery confirms as much. Legislative Defendants purported to designate each and every one of the over 75,000 documents in the Hofeller files as "Highly Confidential" because, supposedly, they have identified some unspecified and unknown number of files that contain "confidential financial information." Ex. B at 1. Plaintiffs can represent to this Court, and Legislative Defendants cannot dispute, that the *vast* majority of documents in the Hofeller files have no financial information whatsoever. Legislative Defendants' invocation of some small, unidentified number of files purportedly containing unspecified financial information as a basis to designate over 75,000 other files as Highly Confidential is a baseless and legally inoperative abuse of the Consent Protective Order.[2]

The true impetus for Legislative Defendants' attempted designation of the Hofeller files is laid bare by the timing of their actions. Legislative Defendants purported to designate "the entirety" of the files as Highly Confidential just *one day* after several of the files—which exposed misconduct by federal government officials—were submitted to a federal district court and the United States Supreme Court in a case of national public importance. At a June 5

---

[2] Plaintiffs offered in their June 5 response that, if Legislative Defendants are genuinely concerned about the privacy of files containing "confidential financial information," they should identify each such file, and Plaintiffs would consider jointly asking the Court to designate such files as Confidential or Highly Confidential, as appropriate, consistent with Plaintiffs' cautious approach to the highly sensitive personal information of the Hofeller family since they first received the Hofeller files. *See* Pls.' Mot. for Clarification Pursuant to Rule 45, filed 4/4/19.

hearing concerning the misconduct by public officials exposed by these several Hofeller files, the U.S. District Judge called the matter serious "serious" and set a schedule for full briefing on potential sanctions. Needless to say, concealing alleged misconduct by public officials is not a proper basis to designate materials as Highly Confidential/Outside Attorneys' Eyes Only under this or any other protective order.

Contrary to Legislative Defendants' suggestions in their May 31 letter, moreover, there was nothing improper about Plaintiffs' counsel sharing relevant, non-confidential materials obtained in discovery with litigants in another lawsuit. To the contrary, courts "have overwhelmingly and decisively endorsed the sharing of discovery information among different plaintiffs, in different cases, in different courts." *Burlington City Bd. of Educ. v. U.S. Mineral Prod. Co.*, 115 F.R.D. 188, 190 (M.D.N.C. 1987) (emphasis added); *accord United States v. Comstock*, 2012 WL 1119949, at *1 (E.D.N.C. Apr. 3, 2012) ("The general rule . . . is that information produced in discovery in a civil case may be used in other cases."); *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 135 (2d Cir. 2017) (nothing "prevent[s] [a litigant] who lawfully has obtained discovery . . . from using the discovery elsewhere."); *Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Grp., Inc.*, 121 F.R.D. 264, 268-69 (M.D.N.C. 1988) ("[A] party needs to present good cause for prohibiting the dissemination of non-confidential discovery information or from prohibiting the utilization of such discovery in other litigation."); *FTC v. Digital Interactive Assocs., Inc.*, 1996 WL 912156, at *3 (D. Colo. Nov. 18, 1996) ("[D]issemination of information to litigants in other forums is often encouraged for purposes of judicial economy."); *United States v. Hooker Chemicals & Plastics Corp.*, 90 F.R.D. 421, 426 (W.D.N.Y. 1981) (similar); *Patterson v. Ford Motor Co.*, 85 F.R.D. 152, 153-54 (W.D. Tex. 1980) (similar).

Again, if Legislative Defendants seek to restrict use of the Hofeller files, they must seek relief from this Court. While Plaintiffs would strenuously oppose any such request, nothing prevents Legislative Defendants from seeking an order of some sort from this Court. Legislative Defendants have had months to seek such an order with respect to these materials, but neither they nor anyone else has made any attempt to do so. What Legislative Defendants cannot do is purport to unilaterally take out-of-court actions that are contrary to the Consent Protective Order entered by this Court.

\*       \*       \*

Plaintiffs recognize that the relief sought in this motion is not common, but believe that the circumstances warrant it. Legislative Defendants' actions are not only improper, but have diverted Plaintiffs' time and resources away from the steep demands of preparing for the upcoming trial. Indeed, Plaintiffs' expert rebuttal reports are due at the end of this week, and Plaintiffs' counsel have been forced to spend significant time responding to Legislative Defendants' demands and improper attempted confidentiality designation. Legislative Defendants' conduct should be brought to a stop.

WHEREFORE, for the reasons stated above, Plaintiffs respectfully request that the Court enter an order directing that (1) Legislative Defendants shall not further pursue the return or destruction of material properly produced in response to lawful court process in discovery in this case; and (2) Legislative Defendants shall not attempt to designate material produced in discovery by other parties or third parties as Confidential or Highly Confidential under the Consent Protective Order.

Respectfully submitted this the 6th day of June, 2019

**POYNER SPRUILL LLP**

By: _____

 Edwin M. Speas, Jr.
  N.C. State Bar No. 4112
 Caroline P. Mackie
  N.C. State Bar No. 41512
 P.O. Box 1801
 Raleigh, NC 27602-1801
 (919) 783-6400
 espeas@poynerspruill.com

 *Counsel for Common Cause, the North*
 *Carolina Democratic Party, and the*
 *Individual Plaintiffs*

**ARNOLD AND PORTER**
 **KAYE SCHOLER LLP**

R. Stanton Jones*
David P. Gersch*
Elisabeth S. Theodore*
Daniel F. Jacobson*
601 Massachusetts Avenue NW
Washington, DC 20001-3743
(202) 954-5000
stanton.jones@arnoldporter.com

**PERKINS COIE LLP**

Marc E. Elias*
Aria C. Branch*
700 13th Street NW
Washington, DC 20005-3960
(202) 654-6200
melias@perkinscoie.com

Abha Khanna*
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
(206) 359-8000
akhanna@perkinscoie.com

*Counsel for Common Cause and the*
*Individual Plaintiffs*

*\*Admitted Pro Hac Vice*

14

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing *by email*, addressed to the following persons at the following addresses which are the last addresses known to me:

Amar Majmundar
Stephanie A. Brennan
Paul M. Cox
NC Department of Justice
P.O. Box 629
114 W. Edenton St.
Raleigh, NC 27602
amajmundar@ncdoj.gov
sbrennan@ncdoj.gov
pcox@ncdoj.gov
*Counsel for the State Board of Elections and Ethics Enforcement and its members*

Thomas A. Farr
Phillip J. Strach
Michael McKnight
Alyssa Riggins
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
4208 Six Forks Road, Suite 1100
Raleigh, NC 27609
Thomas.farr@ogletree.com
Phillip.strach@ogletree.com
Michael.mcknight@ogletree.com
Alyssa.riggins@ogletree.com
*Counsel for the Legislative Defendants*

John E. Branch III
Andrew D. Brown
Nathaniel J. Pencook
H. Denton Worrell
Shanahan Law Group, PLLC
128 E. Hargett Street, Suite 300
Raleigh, NC 27601
jbranch@shanahanlawgroup.com
abrown@shanahanlawgroup.com
dworrell@shanahanlawgroup.com
npencook@shanahanlawgroup.com
*Counsel for the Defendant-Intervenors*

E. Mark Braden
Richard B. Raile
Trevor M. Stanley
Elizabeth Scully
Katherine McKnight
Baker & Hostetler, LLP
Washington Square, Suite 1100
1050 Connecticut Ave., N.W.
Washington, DC 20036-5403
rraile@bakerlaw.com
mbraden@bakerlaw.com
tstanley@bakerlaw.com
escully@bakerlaw.com
kmcknight@bakerlaw.com
*Counsel for the Legislative Defendants*

This the 6th day of June, 2019.

Edwin M. Speas, Jr.

# EXHIBIT A

**Page 1**

STATE OF NORTH CAROLINA        GENERAL COURT OF JUSTICE
                               SUPERIOR COURT DIVISION
COUNTY OF WAKE                 18 CVS 014001

COMMON CAUSE, ET AL.,          )
                               )
              Plaintiffs,      )
                               )
     vs.                       )
                               )
DAVID LEWIS, IN HIS OFFICIAL   )
CAPACITY AS SENIOR CHAIRMAN    )
OF THE HOUSE SELECT COMMITTEE  )
ON REDISTRICTING, ET AL.,      )
                               )
              Defendants.      )


          VIDEOTAPED DEPOSITION OF
             STEPHANIE HOFELLER

_____

               9:38 A.M.
          FRIDAY, MAY 17, 2019


            POYNER SPRUILL

    301 FAYETTEVILLE STREET, SUITE 1900

          RALEIGH, NORTH CAROLINA


     BY:  LISA A. WHEELER, RPR, CRR

**Page 2**

A P P E A R A N C E S

Counsel for the Plaintiffs:

Arnold & Porter Kaye Scholer
BY:  R. Stanton Jones
     601 Massachusetts Avenue, NW
     Washington, D.C. 20001-3743
     (202) 942-5000
     stanton.jones@arnoldporter.com

            -and-

Poyner Spruill
BY:  Edwin M. Speas, Jr.
     301 Fayetteville Street, Suite 1900
     Raleigh, NC 27601
     (919) 783-6400
     espeas@poynerspruill.com

Counsel for the Defendants State Board of Elections
and Ethics Enforcement and its members:

North Carolina Department of Justice
Special Litigation
BY:  Paul M. Cox
     114 West Edenton Street
     Raleigh, North Carolina 27603
     (919) 716-6900
     pcox@ncdoj.gov

Counsel for the Legislative Defendants:

BakerHostetler
BY:  Elizabeth A. Scully
     Washington Square, Suite 1100
     1050 Connecticut Avenue, N.W.
     Washington, D.C. 20036-5403
     (202) 861-1500
     escully@bakerlaw.com

            -and-

Ogletree, Deakins, Nash, Smoak & Stewart
BY:  Thomas A. Farr
     4208 Six Forks Road, Suite 1100
     Raleigh, North Carolina 27609
     (919) 787-9700
     thomas.farr@ogletree.com

**Page 3**

A P P E A R A N C E S (continued)

Counsel for the Defendant-Intervenors:

Shanahan Law Group
BY:  John E. Branch, III
     128 E. Hargett Street, Suite 300
     Raleigh, North Carolina 27601
     (919) 856-9494
     jbranch@shanahanlawgroup.com

Counsel for the Deponent:

Fiduciary Litigation Group
BY:  Tom Sparks
     223 South West Street, Suite 900
     Raleigh, North Carolina 27603
     (919) 229-0845
     tom@fidlitlawgroup.com

Also Present:  Trae Howerton, Videographer


Reported By:  Discovery Court Reporters and Legal
              Videographers
     BY:  Lisa A. Wheeler, RPR, CRR
          4208 Six Forks Road, Suite 1000
          Raleigh, North Carolina 27609
          (919) 649-9998

              --oOo--

**Page 4**

I N D E X
                              PAGE

EXAMINATION BY MR. JONES          6

EXAMINATION BY MS. SCULLY        44

EXAMINATION BY MR. BRANCH        195


E X H I B I T S

HOFELLER
NUMBER        DESCRIPTION        PAGE

EXHIBIT 1   Subpoena, Stephanie Hofeller    9
            Lizon
EXHIBIT 2   Color Photocopied Photographs  14
EXHIBIT 3   Subpoena, Kathleen H. Hofeller 167
EXHIBIT 4   Subpoena, The Estate of Thomas 167
            Hofeller

EXHIBIT 5   Certificate of Service        174
            (Incompetent Proceeding), with
            Attachments

EXHIBIT 6   Petition for Adjudication of  174
            Incompetence and Application
            for Appointment of Guardian or
            Limited Guardian
EXHIBIT 7   Interim Report of the Guardian 180
            Ad Litem

EXHIBIT 8   Order on Motion for           184
            Appointment of Interim
            Guardian

EXHIBIT 9   Report of the Guardian Ad     188
            Litem
EXHIBIT 10  Motion to Dismiss             192

PROCEEDINGS

THE VIDEOGRAPHER: Going on the record at 9:38 a.m. Today's date is May the 17th, 2019. This begins the video deposition of Stephanie Hofeller taken in the matter of Common Cause, et al., versus David Lewis, in his Official Capacity As Senior Chairman of the House Select Committee on Redistrict -- Redistricting, et al. This is filed in the General Court of Justice, Superior Court Division, in Wake County, North Carolina, Case Number 18 CVS 014001.

If counsel will please identify yourselves for the record and whom you represent and then our court reporter will swear in our witness.

MR. JONES: Stanton Jones from Arnold & Porter for the plaintiffs.

MR. SPEAS: Eddie Speas with Poyner Spruill for the plaintiffs.

MR. COX: Paul Cox with the North Carolina Attorney General's Office for the State Board of Elections.

MR. BRANCH: John Branch with Shanahan Law Group for the intervenor defendants.

5

MR. FARR: Tom Farr with Ogletree Deakins for the def- --- legislative defendants.

MS. SCULLY: Elizabeth Scully with BakerHostetler for the legislative defendants.

MR. SPARKS: Tom Sparks representing the deponent, Stephanie Hofeller.

* * * *

STEPHANIE HOFELLER, having been first sworn or affirmed by the court reporter and Notary Public to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

BY MR. JONES:

Q. Good morning, Ms. Hofeller.

A. Hello.

Q. I'm Stanton Jones from Arnold & Porter and I represent the plaintiffs in this lawsuit. Would you please state your full name for the record.

A. Stephanie Louise Hofeller.

Q. Excellent. And am I right that you previously went by what I believe is a

6

married name of Stephanie Hofeller Lizon?

A. It was actually Stephanie Louise Lizon.

Q. Okay. And now you -- you've dropped the Lizon; you just go by Stephanie Hofeller?

A. That's right.

Q. And that's your maiden name?

A. Correct.

Q. Excellent. Okay. I'll go over some brief ground rules for the deposition today if that's okay.

A. Yes.

Q. So you understand that you've taken an oath to tell the truth today?

A. I do.

Q. Great. And the court reporter is taking down everything that we say so let's try not to talk over one another. If you let me finish my question, I will let you finish your answer. Does that make sense?

A. Acknowledged, yes.

Q. Your -- your counsel may object to some of my questions today and -- and that's fine. Un- -- you understand that unless he instructs you not to answer a question, you should let him state his objection for the

7

record and then you'll go ahead and answer?

A. Yes, I understand that.

Q. Great. Is there any reason that you couldn't give complete, accurate, and truthful testimony today?

A. No.

Q. And if you want a break, just let me know. We'll finish the question and answer that we're doing and -- and happy to take a break whenever you'd like, okay?

A. All right. Thanks.

Q. What state do you live in?

A. Kentucky.

Q. Great. So you don't live in North Carolina?

A. That's correct.

Q. Okay. And where you live in Kentucky, how far is it from where we are in Raleigh?

A. It's about a ten- or 11-hour drive.

Q. Okay. Do you know, roughly how many miles is it?

A. Roughly 650, something like that, I think.

Q. Okay. And can you tell me, who -- who are your parents?

A. My father is Thomas Brooks Hofeller and my mother is Kathleen Hartsough Hofeller.

8

2 (Pages 5 to 8)

Q.  Great.  So I have some questions about the
subpoena that you received in this case.  Is
that okay?

A.  Yes.

Q.  Great.  So earlier this year you received a
subpoena from the plaintiffs in this case; is
that right?

A.  That's correct.

Q.  Okay.

    MR. JONES:  Mark this.

    (HOFELLER EXHIBIT 1 was marked for
    identification.)

BY MR. JONES:

Q.  I'm showing you what's been marked as Exhibit
1.  Do you recognize this document as the
subpoena that you received from the
plaintiffs in this case?

A.  Yes.  Yes, I do.

Q.  Okay.  And do you see on the first page under
name and address of person subpoenaed on the
left side toward the top it says, Stephanie
Hofeller Lizon?  That -- that's you, correct?

A.  That is me.

Q.  Okay.  Great.  And it says, care of Tom
Sparks, Esquire.  That's -- that's your

9

attorney, correct?

A.  That's my attorney.

Q.  Great.  Okay.  And if you look down in the
handwritten portion where there's a date and
a signature, do you see it's dated February
13th, 2019?

A.  I do.

Q.  Okay.  And is -- does -- is that around the
time that you recall receiving this subpoena?

A.  Yes.

Q.  When you received the subpoena, did you take
a look at it?

A.  Yeah.

Q.  Great.

A.  I got it in an electronic format initially
from my attorney because I wasn't actually in
the state at that moment, but I was shortly
after that.

Q.  Great.  And if you flip a couple of pages
ahead to what's -- what's marked as Page 2 at
the bottom of the page, do you see where it
says, list of documents and things to be
produced pursuant to this subpoena?

A.  Yes, I do.

Q.  Okay.  And when you received this subpoena in

10

February, did you review this -- this list of
documents and things that were -- were asked
to be produced?

A.  Yes, I did.

Q.  Okay.  And did -- did you understand that the
subpoena was requesting any electronic
storage devices that had any of your father's
work drawing maps for the North Carolina
legislature?

A.  Yes.

Q.  Okay.  Did you have any materials that were
responsive to these requests in the subpoena?

A.  I did.

Q.  Okay.  And -- and were -- am I right that
those were electronic storage devices?

A.  Yes.

Q.  Okay.

A.  External hard drives and ad -- I don't know
what the proper -- or what people prefer to
call them, ad-stick, thumb drive, external
storage devices to be used as backup
principally.

Q.  Okay.  So -- so the materials that you had
that were responsive to the requests in the
subpoena were -- were external hard drives

11

and external what we'll call thumb drives?

A.  That's correct.

Q.  Okay.  Great.

A.  Nothing that -- that appeared to have been
pulled out from an already assembled
computer.  These were all, you know, backup
devices.

Q.  Okay.  These were all external devices that
you would need to plug into a computer some
way --

A.  Correct.

Q.  -- to look at them?  Okay.  Am I right that
these storage devices had previously belonged
to your father?

A.  Yes.

Q.  Okay.

A.  And mother.

Q.  And -- and you understood that the storage
devices contained your father's work on North
Carolina legislative maps?

    MS. SCULLY:  Objection to form,
leading.  You can answer.

A.  It was -- at what point you -- I would have
to -- ask you to clarify at what point
it -- it was or wasn't clear.  I knew -- when

12

1    I first saw them I knew that they were all
2    belonging to my father and mother. I wasn't
3    really sure which of them, if any, would have
4    anything involving his work in North Carolina
5    or elsewhere.
6    Q.  Got it.  Let -- let's focus on the time when
7    you received the subpoena and you --
8    A.  Oh, at that point, yes, I did know that it
9    contained -- that all of those devices had at
10   least -- at least one or two -- at least one
11   or two files that would -- that were labeled
12   in a -- in a way that it was obvious that
13   they pertained to my father's work
14   redistricting in North Carolina.
15   Q.  And did you send the storage devices -- those
16   storage devices that we've been discussing to
17   the plaintiffs' lawyers in response to the
18   subpoena?
19   A.  Yes, I did.
20   Q.  Okay.  Do you recall roughly when you sent
21   them?
22   A.  I remember it was about a month after I
23   received the subpoena.  Originally, I -- my
24   intention was to -- bring them physically
25   to Raleigh, but I got delayed and it was then

13

1    decided that it would be best for preserving
2    the integrity of -- of the evidence that it
3    would be going straight to a third party.
4    Q.  Great.  And I'll represent to you that I
5    received the materials you sent on March
6    13th.  Does that sound about right in terms
7    of --
8    A.  That does.
9    Q.  -- the time?
10   A.  That does, actually.  Where -- where I was in
11   Kentucky, I couldn't even find a FedEx
12   office.  I had to go -- I had to go down the
13   highway.  I was surprised.
14        MR. JONES:  Can we mark this?
15        (HOFELLER EXHIBIT 2 was marked for
16   identification.)
17   BY MR. JONES:
18   Q.  I'm showing you what's been marked as Exhibit
19   2.  On the -- you can take a moment to -- to
20   flip through.  That's fine.  Go ahead.
21   A.  That's...
22   Q.  So my first question is, if you look at the
23   very first page, do you -- do you recognize
24   the -- the photograph -- the photographs
25   there as images of the package that you sent

14

1    containing the storage devices in --
2    A.  Yes.
3    Q.  -- response to the subpoena?
4    A.  Yes, that does appear to be the box that I
5    sent them in, exactly.
6    Q.  Great.  And -- and on the first page, if you
7    look at that top picture, it's addressed to
8    R. Stanton Jones at Arnold & Porter, LLP, at
9    an address in Washington, D.C.  Is that the
10   address where you sent the package?
11   A.  Yes.
12   Q.  Great.  And if you flap -- flip to the second
13   page, do you recognize those as additional
14   photographs of the outside of the package
15   that you sent with the storage devices in
16   response to the subpoena?
17   A.  Yes.
18   Q.  If you flip to the third page, if you'll
19   focus on the bottom image, do you recognize
20   that as a photograph of the -- the interior
21   of the box that you sent to the plaintiffs'
22   lawyers with the storage devices in response
23   to the subpoena?
24   A.  Yes.
25   Q.  Okay.  If you flip to Page 4, do you

15

1    recognize the image there as being one of the
2    thumb drives that you put in the -- in the
3    package and sent to the plaintiffs' lawyers
4    in response to the subpoena?
5    A.  Yes.
6    Q.  Okay.  Do you remember offhand how many
7    external hard drives there were and how many
8    thumb drives there were?
9    A.  I know there were four external hard drives.
10   I honestly don't remember exactly how many --
11   you know, there were -- I -- I -- there were
12   a couple of empty thumb drives in my -- in
13   my, you know, possession so I -- I was making
14   sure that I wasn't, you know, sending
15   anything wrong.  These were all the ones
16   that -- that I got from my father, but I
17   don't remember exactly -- from his room, but
18   I don't remember exactly how many there were.
19   Like eight or nine, maybe, was it, or seven?
20   Q.  So if I -- I'll represent to you that inside
21   the package that we received that we're
22   looking at photographs of there were -- there
23   were four external hard drives, as you said,
24   and also 18 thumb drives.
25   A.  18, yeah.  Okay.

16

4 (Pages 13 to 16)

1   Q.  Does that seem right?
2   A.  Yeah.
3   Q.  Great.
4   A.  Yeah.
5       MR. FARR:  Excuse me.  I don't mean to
6   interrupt and I'm new to the game, but what
7   were the stipulations about objections in
8   this case?  Are all objections reserved
9   except for privilege and form of the
10  question?
11      MR. SPEAS:  Yeah.  That's the way we've
12  been operating so far.
13      MR. FARR:  Okay.  Thank you.
14  BY MR. JONES:
15  Q.  I'm not going to go through every single
16  photograph here.  There's about 50 pages of
17  photographs.  But would you just take a
18  moment and flip through them and if you could
19  just tell me, do you recognize these as
20  photographs of the storage devices, both the
21  external hard drives and the thumb drives,
22  that you sent to the plaintiffs' lawyers in
23  response to the subpoena?  Do you recognize
24  them that way?
25  A.  So far, yes.  It's a rainbow of colors.  I

                                                    17

1   remember that, too.  Yes, those look -- all
2   of them I -- I remember.
3   Q.  Great.  So having flipped through all of the
4   photographs here, you recognize all of these
5   images --
6   A.  Yes.
7   Q.  -- as being --
8   A.  I -- I don't see anything that I didn't have
9   my hands on and put in that package.
10  Q.  Okay.  Excellent.  Would you flip to Page 23.
11  Do you see the image there of a storage
12  device with the label, NC Data?
13  A.  Yes, I do.
14  Q.  Do you recall that as one of the images that
15  you sent?
16  A.  I do.
17  Q.  Or, sorry, as one of the --
18  A.  One of the --
19  Q.  -- storage devices?
20  A.  -- storage devices, yes.
21  Q.  Okay.  Before sending all of these storage
22  devices to the plaintiffs' lawyers in
23  response to the subpoena you received, did
24  you alter any of the -- the contents of the
25  storage devices?

                                                    18

1   A.  No.
2   Q.  Okay.
3   A.  No.
4   Q.  Did you -- did you delete any files that were
5   on any of the storage devices?
6   A.  No.  I was careful not to add or take
7   anything away.
8   Q.  Did you modify any of the files in any way?
9   A.  No.
10  Q.  Okay.  You didn't make any changes at all to
11  any of the files --
12  A.  None.
13  Q.  -- on the storage devices?  You have to --
14  A.  I'm sorry.
15  Q.  Yeah.  You -- you -- I'll just start over
16  again so we have a clean record.
17  A.  Yes.
18  Q.  So you -- you did not make any changes to any
19  of the files or data on these storage devices
20  before sending them to the plaintiffs'
21  lawyers in response to the subpoena?
22  A.  That's correct.  I did not.
23  Q.  Okay.  You can put that to the side.  So now
24  I have some -- some pretty basic questions
25  about where you got the devices from.  Is

                                                    19

1   that okay?
2   A.  Yes.
3   Q.  Okay.  Great.  So, first, can you please tell
4   me just the month and the year when you got
5   these devices.
6   A.  October 2018.
7   Q.  Okay.  And next could you please tell me just
8   where specifically did you get the devices
9   from, just the physical location for
10  starters?
11  A.  The apartment where my recently deceased
12  father lived with my mother at Springmoor.
13  Q.  Okay.  And what is Springmoor?
14  A.  Springmoor is a retirement community.
15  Q.  Okay.  And your father and mother had been
16  living in this apartment in Springmoor before
17  his -- his death; is that right?
18  A.  That's correct.
19  Q.  Okay.  And at the time you got these files
20  from the Springmoor apartment in October
21  2018, was your mother living there at the
22  time?
23  A.  Yes, she was.
24  Q.  Okay.  Before getting the devices from the
25  apartment in Springmoor, did you ask your

                                                    20

1    mother if it was okay to take them?
2    A.  Yes, I did.
3    Q.  Okay.  And did you ask her that in October
4        2018?
5    A.  Yes, that -- that same day.
6    Q.  Okay.  Did your mother object to you taking
7        the devices?
8    A.  No, she didn't.
9    Q.  Okay.  Did -- did -- did she say it was okay
10       to take the devices?
11   A.  Yes.  She encouraged me to.
12   Q.  Okay.  So now I'm -- I'm going to back and --
13       and ask a few more questions just to fill in
14       some additional details about when and where
15       you got the devices, okay?
16   A.  Yes.
17   Q.  Okay.  When did you first learn that your
18       father had died?
19   A.  September 30th, 2018.
20   Q.  Okay.  And when you -- when you learned of
21       his death -- and -- and I'll say for the
22       record, I'm -- I'm sorry for your -- for the
23       loss.
24           When you learned of your father's death,
25       did you contact your mother?

21

1    A.  Yes.
2    Q.  Did -- did you go to visit her then?
3    A.  Yes.
4    Q.  Okay.  And -- and did you go to visit her in
5        Raleigh at the Springmoor apartment in
6        October 2018?
7    A.  Yes, I did.
8    Q.  And at that time when you were there at the
9        Springmoor apartment in Raleigh in October
10       2018 visiting your mother, did -- did you
11       go -- did you and your mother go through some
12       of your father's things?
13   A.  There wasn't much to go through.  Most of
14       what there even was in there was what was
15       left out, really.  There were a couple of
16       desk drawers.  I -- there were a couple of
17       keepsakes of mine that I was looking for, but
18       one of the main reasons that I was looking
19       was because when I walked in the door to his
20       room, immediately I saw a keepsake of mine
21       from my childhood, a -- a jewelry box that I
22       had and that I had left in -- in my parents'
23       care.  And inside of it -- it was displayed
24       prominently right under the flag that he was
25       buried with and -- well, not with but the

22

1    flag that draped his coffin and a picture of
2    my grandparents and inside the box was
3    everything exactly as I had left it.  So I
4    took that to mean that I was supposed to look
5    for other things and so I started -- I -- I
6    thought there was a chance that there might
7    have been something specifically for me as in
8    a note or a message of some sort that I would
9    find.
10   Q.  Okay.  And -- and was that when you found the
11       storage devices that we've been discussing?
12   A.  It was in that same incident, yes, that --
13       that same evening.
14   Q.  Okay.  And where in the apartment were the
15       storage devices?
16   A.  They were on a shelf in my father's room.
17   Q.  Okay.  Were they just sitting out open on the
18       shelf?
19   A.  Yes, they were.  There was a bag -- a clear
20       plastic bag with the thumb drives and
21       ad-sticks and then there was just a stack
22       of -- it wasn't the only thing on the shelf.
23       He had also some of those pullout boxes that
24       kind of are like drawers that had some of his
25       papers in there, and the -- the hard drives

23

1    just were there in the corner of -- it was
2    a -- one of those kind of box-style book
3    shelves.  It wasn't just a straight shelf.
4    Some of them had those removable drawers in
5    them and others are just open.
6    Q.  Okay.  But all of the four external hard
7        drives and the 18 thumb drives that you sent
8        to the plaintiffs' lawyers in response to the
9        subpoena were on this bookshelf in your
10       father's room in the apartment at Springmoor?
11   A.  That's right.
12   Q.  Okay.  And -- and they weren't in any sort of
13       safe or lockbox; they were -- they were just
14       out?
15   A.  That's right.
16   Q.  Okay.  Had you seen any of these storage
17       devices before?
18   A.  Inasmuch as I could say later having looked
19       at them and when they were done, then I was
20       able to confirm that, yes, there were a
21       couple of those that I recognized from when I
22       was either staying with on short trips or
23       living with my parents in their house in
24       Alexandria, Virginia.
25   Q.  Okay.  And -- and could you just tell me

24

1    briefly how -- how did you recognize -- what
2    was the connection that you made to these
3    storage devices?
4    A.   The -- one of them had that blue rubber
5    lining around it that I recognized
6    immediately, and I know that there could be
7    more than one and I also know it's a
8    removable cover, so -- but then it just -- it
9    appeared to be really what I -- what I was
10   looking for, really.
11   Q.   And after getting the storage devices, when
12   did you ask your mother if it was okay to
13   take them?
14   A.   When I noticed them, it was in a survey and
15   I'd first come in and -- and I was a little
16   overwhelmed with emotion when I first walked
17   into my father's room.  Excuse me.  So, you
18   know, I was sort of looking around.  There
19   was heirloom furniture all around the
20   apartment and other -- other things that
21   belonged to my extended family, my, you know,
22   great-grandparents and such, so I -- I sort
23   of took the whole thing in, had another sort
24   of, you know, casual, brief conversation with
25   my mother about how things had unfolded, and

25

1    it was later when I was back in there and I
2    also said, this is -- I think he wanted me to
3    have this jewelry box.  And so I said, I'm
4    going to take that.  Is that okay?  And she
5    said, of course.  And I said, I'm going to
6    take these, too.  I think that I'll find the
7    pictures and some of the things that I'm
8    looking for on -- on these.  Can I take
9    these?  And she said, absolutely.  She -- she
10   said, I don't even know how to use them.
11   Q.   Okay.  Do you know if anyone else other than
12   you had been to your parents' apartment at
13   Springmoor to -- to look through or -- or
14   potentially take any of your father's things
15   before you had gotten there?
16   A.   That was my understanding because before I
17   took any of those things, I specifically
18   asked my mother -- I said, he had a work
19   laptop still, yes?  She said, yes.  And she
20   said, and a work computer.  And I said, okay,
21   did Dale come and take that stuff?  She said,
22   yes, Dale took the laptop, Dale took the work
23   computer, and Dale took everything that he
24   wanted.
25   Q.   And -- and who is Dale?

26

1    A.   Dalton Lamar Oldham.  That was my father's
2    business partner, attorney.  Together he and
3    my father were Geographic Strategies.
4    Q.   Okay.  And -- and you understood your mother
5    to be telling you that Mr. Oldham had come to
6    the apartment in Springmoor after your
7    father's death and taken -- is -- was it a
8    laptop and a desktop computer?
9    A.   Yes.  And, again, it was a -- it wasn't clear
10   exactly how much had -- he had taken as my
11   father was dying that he had -- that my
12   father had said to him, take this.  I don't
13   think my mother really remembers exactly what
14   was there before and -- shortly before and
15   then shortly after his -- his death.
16   Q.   Okay.  Great.  Thank you.  Okay.  So now I
17   have some questions just about what you did
18   after getting the devices, okay?
19   A.   Uh-huh.
20   Q.   Great.  So after getting the devices from
21   your parents' apartment in Springmoor, did
22   you consistently hold on to them until you
23   sent them to the plaintiffs' lawyers in
24   response to the subpoena?
25   A.   Yes.

27

1    Q.   Okay.  You didn't give them to anyone else
2    for any period of time in there?
3    A.   No.
4    Q.   Okay.
5    A.   I'm sorry I laugh.  It's just I was so
6    thrilled to have some of this precious data
7    of mine that I would not let anyone else near
8    them.
9    Q.   Great.  And did -- did you stay in Raleigh
10   then or did -- did you eventually go back to
11   Kentucky?
12   A.   I stayed in Raleigh for a few days that time
13   and then I went back to Kentucky.
14   Q.   Okay.  And -- and did you take the storage
15   devices with you when you went back to
16   Kentucky?
17   A.   Yes, I did.
18   Q.   Okay.  And were you then able to look at any
19   of the -- the actual contents of the devices?
20   A.   I looked at the content of some of them that
21   first night in my hotel room in Raleigh.
22   Q.   Oh, okay.  And did -- am I -- did you -- you
23   connected them to a computer to be able to
24   look at them?
25   A.   Yes.  Yes.  I had a -- I had -- I had a

28

laptop with me that I use. I had found a --
an appropriate cable in one -- one of my
father's drawers I found a whole box of
cables and one of them was the proper adapter
for that -- for those external hard drives.

Q. Okay. And -- and when you -- when you did
connect some of the -- the storage devices to
the computer to be able to look at the
contents, did -- did you see any personal
information in there like photographs or
other personal information?

A. Yes. I found specifically really what I was
looking for, which were files of mine that I
had -- essentially I backed them up onto my
parents' computer when I was visiting them
last and, actually, many times before that as
I felt that it was a really good way to
assure that they would be preserved because I
knew that my father was not -- you know, I
knew he had a tendency to -- to be, you know,
careful about those things -- those kinds of
things. And, yes, I found a great many
photographs that I was looking for of my
children and other documents that were
related to my life, matters that concerned me

29

and my children, and it was -- it was -- I
felt, well, I buried this treasure and that I
was getting to dig it up. I was really very
excited to see those pictures again,
pictures -- also some pictures of my -- of my
great-grandparents and things like that that
I had hoped that I would find copies of as
well.

Q. Got it. So -- so some of these photographs
and other personal materials were things that
you yourself had stored on your parents'
computer years earlier when your father was
still alive; is that correct?

A. That's correct.

Q. Okay. And -- and you -- you saw some of
those materials on these storage devices?

A. Yes.

Q. Okay. Other than personal files like
photographs, letters, et cetera, did you see
data or files on the storage devices re- --
that related to your father's work creating
maps?

A. Yes, I did.

Q. Okay. And I think I asked this before, but
I'll just ask it again. Before sending the

30

storage devices to the plaintiffs' lawyers in
this case in response to the subpoena, did
you change or manipulate any of the files on
the storage devices that related to your
father's work?

A. No, I did not.

Q. Okay. Am I right that at some point after
getting the storage devices, you contacted
someone at the organization Common Cause; is
that right?

A. Yes.

Q. Okay. And do -- do you remember the specific
person who you first contacted at Common
Cause?

A. I first reached out to Bob Phillips, the
director, and it was in hopes that he might
be able -- he and Common Cause might be able
to give me a referral to find an attorney for
my mother.

Q. Okay. And in the course of those discussions
with Mr. Phillips, did you -- did you discuss
these storage devices?

A. Not in that conversation, no.

Q. Okay. Did Mr. Phillips connect you to
someone else at Common Cause?

31

A. Yes.

Q. Okay. And who was that?

A. Jane Pinsky.

Q. Did you then have discussions with
Ms. Pinsky?

A. Yes, I did.

Q. Okay. And in the course of those discussions
with Ms. Pinsky did you mention the storage
devices that we've been discussing?

A. Yes, I did.

Q. Okay. And did -- did you offer to -- to
provide the devices to Ms. Pinsky and Common
Cause?

A. You know, when I first brought it up it was
really just kind of an anecdotal reference to
a interview with David Daley that I had
recently read. At the end of this interview
his last statement, and it was really the --
the gist of it was about the fact that the
rejected districts had been sent for redraw
back to my father and now he was deceased and
the comment that David Daley made was, I
wonder -- I -- I think that somewhere out
there on a hard drive there's a gift for the
state legislators.

32

8  (Pages 29 to 32)

Q. I see. And -- and am I right, Mr. Daley is a
journalist, an author who covers
redistricting issues?

A. Yes. He --

Q. Okay.

A. He sort of brought it to a little bit more
mainstream attention by, I don't know, making
it a little more personal, personable maybe
even.

Q. Got it. And -- and the article that you had
read by Mr. Daley was one that was discussing
the -- the redraw of North Carolina's
legislative districts?

A. Specifically, yes. Yes. That was the first
time -- I did not even know that -- I was
aware of Mr. Daley's book about Operation Red
Map, but I was not aware that he was actually
from North Carolina and would have such a
specific interest in this for that reason.

Q. Got it. So -- so in these discussions with
Ms. Pinsky, having read Mr. Daley's article,
am I right that you -- you expressed to
Ms. Pinsky that you wanted to provide the
storage devices to her and to Common Cause?

A. Well, I -- I sim- --

33

it -- because we were discussing whether
there was new evidence or no new evidence,
errors of law only. So she mentioned that
the case of the state legislative districts
would be accepting new evidence and I said,
well, I think this might be pertinent. And I
didn't know if it was -- I said -- even at
that time I said that I was skeptical that
there was anything here that was not already
disclosed after all of those. I recall
personally discovery and discovery and
discovery and discovery and a lot of
grumbling because everyone always grumbles
about discovery in civil litigation. That's
my experience.

Q. So when you say that this is pertinent, you
mean you believed that the storage devices
that you had gotten from your parents'
apartment in Springmoor had files or evidence
that were pertinent or relevant to -- to this
litigation?

A. Well, in that they -- they were clearly about
redistricting and they were clearly labeled,
North Carolina.

Q. Excellent. After speaking to Ms. Pinsky

35

THE WITNESS: Pardon?

MR. SPARKS: I just want you to let him
finish.

A. Oh, I'm sorry.

Q. Yeah. Go ahead.

A. I -- I -- I simply quipped that, I have -- I
have some hard drives. And we continued the
discussion about that. At that time I was
not aware that there was -- that one of the
matters was not an appeal. I -- I was under
the impression that all of the matters
pending were appeals, therefore, no new
evidence. I -- when I first mentioned these
things, it was really from a journalistic
point of view and more anecdotal. I did not
presume that they had any value as
evidence --

Q. I see. And --

A. -- per se.

Q. -- did Ms. Pinsky explain to you that there
is, in fact, a lawsuit relating to North
Carolina's legislative districts that -- that
is not on appeal yet, that is still in the
trial phase?

A. She did explain. I think the way she put

34

about the devices, did she put you in touch
then with the plaintiffs' lawyers in this
case?

A. Yes. And I wanted to clarify. This -- the
conversation about these hard drives did not
come up in the first of my conversations with
Ms. Pinsky. That was a development later on
when we were discussing how I was very
frustrated about what was -- what was going
on and -- with -- with my mother and I
commented -- that's -- that's -- that's
right. I commented on the progress that
Common Cause had made with their assertions
about the relative fairness of partisan
redistricting and also the underlying issues
that -- that sometimes are disguised, in my
opinion, as simply partisan. And I sort of
made that comment. I said, this is -- this
is the furthest I've ever seen a plaintiff
get with anything that my father drew, and I
will say I also said, and the way I knew my
father a decade ago, he would have looked at
those maps and -- and laughed.

Q. So am I understanding correctly that when you
originally contacted Bob Phillips at Common

36

1    Cause and then in your initial discussions
2    with Jane Pinsky, you were not contacting
3    them principally about these storage devices?
4    A.  No, I was not.
5    Q.  Okay.  Okay.  Did you say you were -- you
6      were contacting them in hopes that Common
7      Cause would be able to help refer you to a
8      lawyer in connection with your -- with your
9      mother's situation?
10   A.  Yes.
11       MR. SPARKS:  Objection.
12       MS. SCULLY:  Objection to form,
13   mischaracterizes the witness's testimony.
14   A.  I -- I know enough about litigation and
15     attorneys because I'm a Hofeller.  I knew
16     that bias would come into play whether or not
17     it was admitted.  My father was often
18     concerned that he would be discriminated
19     against for his political position and took
20     care to know the allegiance of someone he
21     chose to represent him.  I was not familiar
22     with this town.  I did not know -- I knew
23     that -- many of the parties that were
24     involved in the litigation surrounding my
25     mother.  I knew they had significant

37

1    A.  Yes.
2    Q.  Okay.  Then in February of -- of 2019 did you
3      receive the subpoena from plaintiffs and
4      that's when you sent the storage devices?
5    A.  Yes.
6    Q.  Okay.  Did you tell anyone that you object to
7      the subpoena or that you object to providing
8      a response to the subpoena?
9    A.  No.
10   Q.  Okay.  Did you, in fact, have any objection
11     or problem with the subpoena or with
12     providing a response to the subpoena?
13   A.  No, I didn't.
14   Q.  Okay.  Did anyone else tell you that they
15     object to the subpoena?
16   A.  No.
17   Q.  Did anyone else tell you that they had any
18     objection or problem with you providing a
19     response to the subpoena?
20   A.  No.
21   Q.  Did you -- did you ever speak to your mother
22     about the subpoena?
23   A.  Yes, I did.
24   Q.  Okay.  And did you tell her that you were
25     going to respond to the subpoena?

39

1    allegiances here and I felt that the only
2    party in Raleigh that would both believe me
3    that politics was an element and would know
4    who might be actually independent counsel for
5    my mother --
6    Q.  Okay.  And am I right that the -- the lawyer
7      you were seeking for your mother was in
8      connection with the incompetency proceeding?
9    A.  Correct.
10   Q.  Okay.  Let's go -- go back.  After you
11     discussed the storage devices with Ms. Pinsky
12     at Common Cause, am I right that Ms. Pinsky
13     then connected you directly with the
14     plaintiffs' lawyers in this case?
15   A.  That's correct.
16   Q.  Okay.  And is that Mr. Speas and Ms. Mackie?
17   A.  Yes.
18   Q.  Okay.  Great.  And did you -- did you have
19     conversations with them then?
20   A.  Yes.
21   Q.  Okay.  And in the course of those
22     conversations did you -- did you express that
23     you wanted to provide the storage devices
24     that you had gotten from the apartment in
25     Springmoor to them?

38

1    A.  Yes.  And because there were files that
2      belonged to her, I asked for her permission
3      also.  I said -- she said that she had no
4      problem with that.  She also felt, as I did,
5      that the process would most likely be
6      centered around provably pertinent files
7      anyway, but that -- I -- I reassured her -- I
8      assured her, I should say, that she should be
9      aware that once you -- and, again, this is
10     something my father taught me.  Once you let
11     go of it, you don't have control of it
12     anymore so you can't be guaranteed what will
13     and won't be disclosed, so it's something you
14     should be prepared for when you are involved
15     with discovery.
16   Q.  Okay.  And in the course of that discussion
17     with your mother, did you understand that
18     your mother was giving you permission or her
19     okay to --
20   A.  Yes.
21   Q.  -- to -- let me -- let me finish the
22     question.
23   A.  I'm sorry.
24   Q.  That's okay.  I'll just -- I'm just going to
25     ask it again, okay?

40

10  (Pages 37 to 40)

1    A.  (Nods head).
2    Q.  So in the course of that discussion with your
3        mother about the subpoena, did you understand
4        that she was giving you her permission or her
5        okay to provide the storage devices that
6        we've discussed to the plaintiffs' lawyers in
7        response to the subpoena?
8    A.  Yes.
9    Q.  Okay.  Thank you.  Okay.  I just have a -- a
10       few other questions and I -- I did want to
11       ask you just a couple of questions about your
12       relationship with each of your parents.  And
13       I -- and I don't intend to pry, but -- but
14       I'll just ask a couple of basic questions if
15       that's okay.
16   A.  That is okay, yes.
17   Q.  Okay.  Would -- would you say that you had a
18       positive relationship with your father in
19       recent years?
20   A.  Not in recent years, no.
21   Q.  Okay.  When was the last time you spoke to
22       your father before his death last year?
23   A.  July of 2014.
24   Q.  Okay.  Would you say that you have a positive
25       relationship, a functional relationship, with

41

1        your mother?
2    A.  Yes.
3    Q.  Okay.  Do you know whether an official estate
4        was opened for your father after his death?
5    A.  No.  That has been a confused issue.
6    Q.  Okay.  So when you say no, you --
7    A.  I --
8    Q.  -- the answer is no, you don't know?
9    A.  Exactly.
10   Q.  Okay.  That's fine.  Did you send these
11       storage devices to the plaintiffs' lawyers in
12       this case to -- get back at your father or
13       to spite your father for personal reasons?
14   A.  Not at all.
15   Q.  Okay.  Could you just tell me briefly in your
16       words, why did you want to provide these
17       devices to the plaintiffs' lawyers in this
18       case?
19   A.  When I was expressing my skepticism that
20       there would be anything in the way of
21       evidence, I stated that I felt that these
22       files would if -- certainly be of historical
23       value, that they would give insight into the
24       process, not any value judgment on that
25       process.  I did not have -- my political

42

1        viewpoint to me seemed irrelevant to the
2        function of census data turning into voting
3        districts, and I really thought of it in --
4        in those terms.  I really -- I knew that if I
5        presented them this way that they would be
6        preserved, that they -- their integrity would
7        be preserved and everything there, including
8        my files, including other matters completely
9        unrelated to this, that those -- that that
10       would be a snapshot in time.
11   Q.  Was -- was there any financial benefit to you
12       personally from providing these files to the
13       plaintiffs' lawyers?  Did you -- did you make
14       any profit here?
15   A.  No.
16   Q.  Okay.
17       MR. JONES:  Can we go off the record,
18       take a five-minute break?
19       THE WITNESS:  Sounds great.
20       THE VIDEOGRAPHER:  Going off the
21       record.  The time is 10:24 a.m.
22       (Whereupon, there was a recess in the
23       proceedings from 10:24 a.m. to 10:46 a.m.)
24       THE VIDEOGRAPHER:  Going back on the
25       record.  The time is 10:46 a.m.

43

1        MR. JONES:  Thank you.  Ms. Hofeller, I
2        have no more questions for you today.  Thank
3        you for your time.
4        THE WITNESS:  My pleasure.
5        EXAMINATION
6    BY MS. SCULLY:
7    Q.  Ms. Hofeller, Elizabeth Scully.  We met
8        earlier this morning.  I represent the
9        legislative defendants in this case and I do
10       have some follow-up questions that I would
11       like to ask of you today.
12       First, if I could turn your attention to
13       the document that was marked as Exhibit 2
14       that you went through with counsel for the
15       plaintiffs earlier.  Looking at -- at the --
16       at the first page where there's a photograph
17       of a -- of a box and then appears to be
18       handwriting for -- addressed to Arnold &
19       Porter.
20       Do you see that there?
21   A.  I see the handwriting behind the box.
22   Q.  Uh-huh.
23   A.  Yes.
24   Q.  Is that your handwriting?
25   A.  No.

44

Q.   No.  Do you know whose handwriting that is?

A.   No.

Q.   Did you personally prepare the box, label it, put the contents in the box and send it to Arnold & Porter?

A.   I put the contents in the box, I sealed the box, and at the FedEx office the label was printed out and put on it in front of me.

Q.   Okay.  Did you send the materials directly to Arnold & Porter or to a vendor before you sent them to Arnold & Porter?

A.   I sent them directly to Arnold Porter.

Q.   Did you ever send the materials to a -- a vendor?

A.   No.

Q.   Turning to the -- it's marked Number 4 in Exhibit Number 2.

A.   Okay.

Q.   You have that in front of you?

A.   I do.

Q.   And it appears on Page Number 4 of Exhibit Number 2 is a picture of a thumb drive.  Do you see that?

A.   I do.

Q.   And on that thumb drive there are some

45

drawing -- a handwritten drawing on that thumb drive.  Do you recall what material was contained in this thumb drive?

A.   Are -- are you -- please clarify the -- the handwriting being the A as opposed to the label on the drive, which is etched into the metal, I believe.

Q.   Well, let me -- let me back up and ask you this:  Do you know -- on this document on the fourth page there appears to be two photographs.  Both appear to reflect a thumb drive.  Do you know if these are two different thumb drives or one thumb drive?

A.   I believe that is the two opposite sides of the same thumb drive.

Q.   Do you know that for a fact or is that just -- you're making an assumption?

A.   I am making an assumption.

Q.   Do you know if you in -- if you ever reviewed the information that was on this thumb drive that appears on Page 4 of Exhibit Number 2 that you sent to Arnold & Porter?

A.   I know that I reviewed all of the drives that I sent to -- to Arnold Porter.  I do not recall what was on which storage device.

46

Q.   Did you review all of the drives that you sent to Arnold & Porter during the same day?

A.   Yes.  Yes.  Maybe perhaps I had to take a break overnight, but it was -- I -- I made sure that I was not including anything that was mine that wasn't, you know, related to this at all, that I hadn't mistakenly mixed anything in, that these were all just the files and things that had come from my father's apartment.  So that -- that's about the extent of it.

Q.   So if I understand you, if you found materials on the -- in any of these thumb drives or drives that you thought were yours or your personal information, you removed that information before you sent it to Arnold & Porter?

A.   No.

MR. JONES:  Objection.  That mischar---

THE WITNESS:  Oh, I'm sorry.

MR. JONES:  -- mischaracterizes the testimony.

MS. SCULLY:  I -- I believe --

MR. FARR:  He asked -- she asked the

47

question so she can answer it.

MR. SPEAS:  Tom, how many people are representing your side in this deposition?

MR. FARR:  Three.

BY MS. SCULLY:

Q.   I believe you testified earlier that when you looked through the materials you took from your father's room that you did find information on those electronic files that were personal to you, correct?

A.   That is correct.

Q.   Did you produce that personal information when you sent the electronic materials to Arnold & Porter?

A.   Yes, I did.

Q.   A moment ago when you said you looked through the electronic files before you produced them to Arnold & Porter to make sure that nothing that related only to you or that wasn't relevant -- you wanted to make sure that wasn't being produced, what did you mean by that?

A.   That wasn't what I said.  What I said is I checked them to make sure that they were my father's, that I hadn't mistakenly grabbed

48

12 (Pages 45 to 48)

1   something from my own room, a storage device
2   that I would keep, use with my phone, with my
3   laptop, completely unrelated to this, never
4   having been touched by my father. That's
5   what I meant.
6   Q. Okay. Thank you for that clarification. How
7   many hours did it take you to go through and
8   review the entire contents of the materials
9   that you provided to Arnold & Porter?
10  A. And please -- I would like to clarify that I
11  did not open every file. I merely observed
12  that this was the media that I thought it was
13  when I arrived at my home. So it was, oh,
14  two, three hours, I think, making sure. Some
15  of them, you know, I -- they didn't light up
16  at first. I had to put them in the other USB
17  drive, reseat the connectors. Some -- some
18  of them took -- some of them were slower than
19  others to open, but I would say that I had
20  made sure that -- done that last check before
21  putting it in the mail that I knew what I was
22  sending and that it was all what I was
23  asserting it was, and I think that process
24  took, yeah, maybe about two or three hours.
25  Q. Do you know how many files you opened during

49

1   those two to three hours?
2   A. During those two to three hours I didn't open
3   any of the files. I merely looked in the
4   basic root folders on each to confirm what it
5   was and that it had belonged to my father
6   really was the point. The files on all of
7   these that were mine specifically as in
8   photographs I took, letters I wrote, those I
9   had looked at early on. My interest in these
10  drives initially was only for those. I
11  ignored everything else for a period of time.
12  Q. When you took these files from your father's
13  room and spoke to your mother about it,
14  you -- in that conversation with your mother
15  you told her you were taking the files
16  because you wanted to look through the files
17  to find personal things related to you,
18  photographs that may be on the files,
19  correct?
20  A. That's correct.
21  Q. And with that understanding your mother gave
22  you permission to take the files, correct?
23  A. I did not feel that my mother's permission
24  for me to have these was conditional on
25  anything. When she gave me permission to

50

1   take them, it was -- maybe I mentioned that I
2   was excited about the possibility that there
3   would be pictures of my children, but she
4   said, they're yours. Take them. I don't
5   have any use for them.
6   Q. And when you had that initial conversation
7   with your mother, you had no discussions with
8   her and expressed no interest in looking
9   through to find any of your father's business
10  records or materials he may have created in
11  connection with his work as -- as an expert
12  in other litigations, correct?
13  A. Correct. As a matter of fact, I went to the
14  point of making sure that I asked my mother
15  that all of his specifically work-related
16  material had already been collected. I
17  didn't wish to assert myself in -- in --
18  in -- into the business intentionally.
19  Q. At some point you say when you were -- well,
20  when you first took the -- the files, did
21  you -- you didn't know what was on these
22  files when you first took them, correct?
23  A. Some of them I didn't. The backups that I
24  recognized from my parents' home PC back in
25  Alexandria -- I was at least vaguely familiar

51

1   with what had been on my parents' home PC
2   when I was there, so those were pretty much
3   as I expected them. And then I -- my thought
4   was that I would at least look at everything
5   and see what it was.
6   Q. Now, you said you went to your mother's home.
7   It was sometime in October 2018. Do you know
8   specifically when you were -- went to your
9   mother's home and took these files?
10  A. October 11th.
11  Q. And how do you know it was October 11th?
12  A. I have had to recount the details of my
13  arrival at my mother's house several times
14  over the past few months, so it's become
15  pretty -- pretty normal.
16  Q. Do you have any documents that reflect when
17  you were in North Carolina?
18  A. Documents. I don't think so, no.
19  Q. Did you go to any restaurants, make any
20  credit card charges, purchase gasoline near
21  your mother's apartment, any type of document
22  that would indicate the time period when you
23  were visiting with your mother?
24  A. I believe that receipts would reflect that I
25  was in Raleigh during certain days.

52

13 (Pages 49 to 52)

1    Q.  How long did you stay -- did you stay with
2        your mother at that time?
3    A.  Not at that time.  At that time I stayed in a
4        hotel and I stayed for, I believe, around
5        four days.  I think -- I don't honestly
6        recall off the top of my head if it was three
7        nights or four nights.
8    Q.  Was the hotel located in Raleigh?
9    A.  Yes.
10   Q.  What was the name of the hotel where you
11       stayed?
12   A.  I stayed one night in a hotel, the name of
13       which I don't recall because I didn't like
14       it.  So then I moved to the La Quinta, I
15       believe, yes --
16   Q.  And how --
17   A.  -- near Crabtree.
18   Q.  And how did you pay for your stay at the
19       La Quinta?
20   A.  I paid -- I think the first night I paid cash
21       and the next night I paid with my debit card.
22   Q.  And you get monthly statements of your debit
23       card?
24   A.  I think I've gone paperless.
25   Q.  Do you receive e-mails of -- notification of

53

1        your debit card statement --
2    A.  Yes.
3    Q.  -- when it's available?
4    A.  Yes.
5    Q.  And your debit card is held with what bank?
6    A.  PNC.
7    Q.  After you took the materials from -- from
8        your father's room, when did you first begin
9        to look through the materials?
10   A.  That same evening.
11   Q.  When you stayed at the hotel that you don't
12       recall the name of?
13   A.  Yes.
14   Q.  And how many -- well, did you review one
15       device?  How many devices did you review that
16       night?
17   A.  That first night I stuck with the one because
18       that's where I found hundreds of pictures of
19       me with my infant children.
20   Q.  And was the one a thumb drive or was it a
21       hard drive, if you remember?
22   A.  An external hard drive.
23   Q.  When looking through this one external hard
24       drive on that first night, did you also find
25       materials that appeared to be related to your

54

1        father's business work with his partner, Dale
2        Oldham?
3    A.  I noticed, as was standard on my father's
4        home PC, there would -- there was usually at
5        least a folder related to his work.  I was
6        accustomed to not really paying much
7        attention to the specifics.  I talked to him
8        about things.  I didn't need to poke.
9    Q.  And when you noticed that there were folders
10       on this hard drive that you reviewed related
11       to your father's work and knowing that Dale
12       Oldham had taken efforts to try to reclaim
13       business records, did you go back and tell
14       your mom, you know, we still have information
15       related to Dad's work?
16   A.  My father always had information related to
17       his work on the personal hard drive.  It
18       wasn't noteworthy.
19   Q.  Does that mean you did not go back and tell
20       your mom that there was information related
21       to his work on the hard drive that you had?
22   A.  At some point when I discussed the fact that
23       they might be of interest to the case, I --
24       again, with my mother there are some things
25       because she's my mother that don't need to be

55

1        explicitly stated.  She assumed that there
2        would be at least some work-related material
3        on the hard drive.  I discussed with her the
4        nature of this litigation and, again, such
5        similar litigation was a regular fixture in
6        my entire life living with my father.  So the
7        idea that there would be some litigation
8        going on around things that he had drawn was
9        just par for the course.  So, yes, I don't
10       know that I would have explicitly said,
11       Mother, there are these kinds of files on
12       this.  It was more like, Common Cause may
13       have an interest in these work files.  And
14       even I -- with her I even discussed my belief
15       that this would not -- these all being
16       backups, that this would not be any
17       information that was not already known and
18       had already been disclosed.  There were files
19       that were titled, Discovery, so I assumed
20       that those had gone previously into
21       discoveries that had already happened.
22   Q.  From your answer I'm still not clear whether
23       you actually had a conversation with your
24       mother about your father's business records
25       that you discovered on the external hard

56

1    drives.
2        Did you have a specific conversation
3    with your mother to tell her that you
4    identified business records of your father's
5    on these external hard drives that you had
6    taken possession of?
7        MR. JONES:  Objection, asked and
8    answered.
9    A.  All of those points were at some point
10   mentioned.  My mother was aware of the fact
11   that the interest -- the subpoena for these
12   hard drives was, in fact, for work-related
13   files only.  So not only was it clear to her
14   that there were work-related files, but it
15   was clear to her that the lawyers that would
16   be looking at it on either side would not be
17   looking at anything other than my father's
18   work-related files.
19   Q.  When did you first begin discussing with your
20   mother the fact that Common Cause may have an
21   interest in your father's work files?
22   A.  My -- wow.  She and I were discussing the
23   matter of this pressing issue of hers.  Most
24   of our discussions about Common Cause in
25   those first two months were just about how

57

1    nice it was that they had given us some
2    referrals.
3    Q.  When you say your discussions in those first
4    two months, you mean -- what -- what time
5    period do you mean?
6    A.  That would have been October and November.
7    Q.  Of 2018?
8    A.  Correct.  I'm sorry.  Yes.
9    Q.  So October/November 2018 your discussions
10   with your mother are focusing on the
11   referral -- attorney referral you received
12   for her and on the --
13   A.  And her case, really.
14   Q.  And her case?
15   A.  All of it as it may be related to the
16   unfortunate politicizing of our family life.
17   Q.  And when you say her case, I believe you
18   testified earlier that the case you're
19   referring to was a petition to have your
20   mother found incompetent, correct?
21   A.  Yes.
22   Q.  You are aware that there was an interim order
23   entered and your mother had a guardian over
24   her estate and over her person appointed,
25   correct?

58

1    A.  I'm aware.
2    Q.  Do you know the time period in which that
3    occurred?
4    A.  November.  Early November.
5    Q.  October/November your conversations with your
6    mom with respect to Common Cause are focused
7    on how they'd helped her identify an
8    attorney.  Who was that attorney that they
9    helped her identify?
10   A.  I was referred to Allan From, who explained
11   that he didn't handle specifically those
12   matters and referred us to Douglas Noreen.
13   Q.  At what point in time did you discuss with
14   your mother the possibility of turning over
15   your father's business records to Common
16   Cause or to Arnold & Porter?
17   A.  The subpoena.  That -- that would be when we
18   specifically discussed that.
19   Q.  Did you --
20   A.  I think I might have quipped about that David
21   Daley article way back in October when I was
22   looking at those hard drives recalling that
23   comment, somewhere out there on a hard drive.
24   Q.  Did you --
25   A.  I made a joke about that.  I wasn't really,

59

1    you know, saying, look at those hard drives.
2    Well --
3    Q.  Did you have --
4    A.  Dale got all the good stuff.  Sorry.
5    Q.  Did you have a conversation with your mother
6    about the possibility of turning over your
7    father's business records to Common Cause or
8    Arnold & Porter before you received the
9    subpoena?
10   A.  I think that I did -- the -- did -- she was
11   also curious about the case and I had said
12   that I was -- I think I shared with her on
13   that moment when I -- when I realized --
14   maybe around that same day when I realized
15   that this wasn't strictly appeal, that --
16   that there had been a new -- a new matter
17   opened.  And she never really was all that
18   familiar with the details and, to be honest,
19   I'm no expert on redistricting either.  I
20   really only felt that I was uniquely informed
21   about my father as a person and perhaps his
22   process, his -- his creative process, his --
23   his political philosophy.  Those kinds of
24   things I felt that I was perhaps -- that I
25   possessed some unique understanding of the

60

15  (Pages 57 to 60)

1    man, but my mother was not -- my mother has a
2    career of her own so her interest was really
3    more incidental, just as much as anyone in --
4    in -- in the public -- the general public
5    might be interested in the political process.
6    Q.   You testified earlier that you understood
7        your father had a business and a business
8        partner, Dale Oldham, correct?
9    A.   Correct.
10   Q.   And you understood that your -- your father
11       and Mr. Oldham in their business were
12       retained and engaged as experts in
13       litigations over the years, correct?
14   A.   That's correct.
15   Q.   You testified you're familiar with civil
16       litigation earlier, correct?
17   A.   Yeah, and specifically with litigation on the
18       matters of the concern of the people.
19   Q.   You understand that in connection with your
20       father's work as an expert consultant that
21       there are materials that he prepares as an
22       expert that are privileged materials --
23       MR. JONES:  Ob- --
24   BY MS. SCULLY:
25   Q.   -- materials that he prepares on behalf of

61

1    A.   That is absolutely correct.
2    Q.   You have no legal training, correct?
3    A.   No formal training.
4    Q.   You've never worked --
5    A.   Just on the front. I'm sorry.
6    Q.   You've never been employed or worked in a law
7        firm, correct?
8    A.   I believe that I've done temp work as a
9        receptionist for law firms but nothing --
10       nothing noteworthy in that it would pad my
11       CV.
12   Q.   You have never made any determinations or
13       been asked by anyone to make any
14       determinations about whether something is a
15       privileged document or not, correct?
16   A.   No.  That's correct.  I mean, I have not been
17       ever asked by anyone to do that, no.
18   Q.   Other than seeing a document marked as
19       privileged, you have -- you've testified you
20       don't know and haven't -- you don't have the
21       skills to determine whether a document is a
22       privileged document or not if it doesn't
23       reflect privileged on the document?
24   A.   Well, you know, if it was civil litigation
25       concerning personal matters, then I think I

63

1    the clients he's been retained to be an
2    expert for, correct?
3        MR. JONES:  Objection, calls for a
4    legal conclusion.  The witness is not a
5    lawyer.
6    A.   None of the materials were labeled
7        privileged.
8    Q.   Do you have -- do you believe that you have
9        the appropriate training or skills to
10       determine whether the materials on your
11       father's hard drives contained privileged
12       information?
13   A.   All of the attorneys I've ever worked with if
14       they were concerned about protecting
15       privilege have pretty bold letters that said,
16       the following contains privileged
17       attorney-client communication and the
18       proceeding contains privileged
19       attorney-client communications.  In that I
20       can read when something says that it's
21       privileged, I'm qualified.  But, no, beyond
22       that, I think if -- if -- if I just stumbled
23       into a client's file, I would not be able to
24       say which was and wasn't privileged, no.
25   Q.   You do not have a law degree, correct?

62

1    would assume privilege, but considering that
2    this is a public matter and it's -- this is
3    a -- this is a a -- my understanding of -- of
4    political philosophy and the founding of this
5    republic is that this is -- this concerns the
6    people and, therefore, I would probably err
7    in the direction of it not being privileged
8    if it weren't marked so, if that clarifies.
9    Q.   Prior to making the production of the
10       electronic files that you made to Arnold &
11       Porter in response to the subpoena marked as
12       Exhibit 1, did you engage in any sort of
13       review to determine whether the files that
14       you were turning over contained privileged
15       information?
16       MR. JONES:  I'll -- I'll object.  It's
17   ambiguous, the term privilege.  There are
18   lots of privileges.
19   A.   Also, I really was -- it had already been
20       kind of clarified that the best way to
21       preserve the integrity of this -- of this
22       data would be not to pick and choose.  There
23       were personal files of mine on these hard
24       drives and I left everything exactly as it
25       was.  I did not make decisions about what did

64

16 (Pages 61 to 64)

1     and didn't go specifically for the purpose of
2     a historical documentation of the complete
3     media as it was when I found it.
4     Q.  You testified that it was clarified to you
5         that the best way to preserve this data was
6         not to go through and make any selection or
7         remove anything from it, just to turn all of
8         the materials over to Arnold & Porter,
9         correct?
10            MR. JONES:  Objection.  I think that
11    mischaracterizes the testimony.
12    BY MS. SCULLY:
13    Q.  You can answer the question.
14    A.  Could you ask it again?
15    Q.  You testified that it was clarified to you
16        that the best way for you to preserve the
17        integrity of this data was to just turn over
18        the data in its entirety to Arnold & Porter
19        and not to go through and pick and choose or
20        remove anything from the data, correct?
21            MR. JONES:  I'll -- I'll object.
22    It's --
23    A.  These are theoretical --
24            MR. SPARKS:  Hold on.
25            MR. JONES:  Hold on.  Hold on.  Let

65

1             MR. JONES:  Okay.  I'll object because
2     it misclar- -- -characterizes the testimony.
3     She has not testified that anyone clarified
4     anything for her.
5     A.  Yeah.  That's --
6     Q.  You may answer the question.
7     A.  That's -- I -- yes, I was going to say
8         exactly that.  I don't recall that -- that it
9         was -- certainly if I said clarify -- in the
10        discussion that I had with the attorneys
11        Caroline Mackie and Eddie Speas, there was
12        discussion on how it would be best recognized
13        in court as -- as -- as a -- a good chain of
14        custody, transparency.  There would be no
15        accusation of picking and choosing, of
16        keeping some things secret and some things
17        not if the media were turned over to a third
18        party in its exact state.
19    Q.  Prior to turning over the hard drives and the
20        thumb drives to Arnold & Porter did you ask
21        your counsel to conduct -- well, let me ask
22        this:  Did you -- did you have representation
23        at that point in time?
24    A.  I did not or did --
25            THE WITNESS:  Were we -- were you

67

1     me --
2             THE WITNESS:  Sorry.
3             MR. JONES:  I have to state my
4     objection.  So I'll object because it
5     mischaracterizes the testimony and the use of
6     the passive voice makes it ambiguous.
7             MR. SPARKS:  Now you can answer.
8     A.  I don't think there are any -- I don't think
9         there are any solid lines in this.  I think
10        that there was a -- a collective attempt to
11        maintain accuracy, maintain transparency.
12    Q.  Who clarified that for you?  When you said,
13        it was clarified --
14    A.  It wasn't clar- --
15    Q.  -- for me --
16    A.  Okay.
17    Q.  -- who was that?
18            MR. SPARKS:  Hold on a second.  Please
19    let her finish.
20            THE WITNESS:  I'm sorry.
21            MR. JONES:  Yeah.  I'll --
22            MR. SPARKS:  Thank you.
23            MR. JONES:  Go ahead and -- is the
24    question done?
25            MS. SCULLY:  (Nods head).

66

1     retained yet?
2     A.  I don't -- certainly not in this matter.  No,
3         I did -- I did not have counsel at that time
4         I don't think.
5             THE WITNESS:  Or did I?
6     A.  I don't know.  I wasn't consulting with an
7         attorney on this matter.
8     Q.  I take it from --
9             MR. SPARKS:  Do you want me to
10    interject anything here?
11            MS. SCULLY:  No, that's all right.
12    BY MS. SCULLY:
13    Q.  I take it from your answer that you did not
14        seek counsel from any attorney about whether
15        there were concerns with respect to any
16        privileged information that may be turned
17        over to Arnold & Porter in response to the
18        subpoena?
19            MR. JONES:  I'll -- I'll object.  I
20    think the question is asking about
21    communications she may or may not have had
22    between herself and one of her lawyers, which
23    would be privileged.
24    BY MS. SCULLY:
25    Q.  You testified a moment ago you didn't have

68

17 (Pages 65 to 68)

counsel at that point in time.  I'm just
clarifying that you never sought any guidance
from any attorney as to whether there was a
concern about turning over privileged
information from your father's business
records to Arnold & Porter?

    MR. SPARKS:  And I will object to that
because if she did it --

    THE WITNESS:  It would be privileged.

    MR. SPARKS:  -- it would be
attorney-client privileged.

    MR. JONES:  Just answer it --
instruct -- instruct her not -- you should
instruct her not to answer.

    MR. SPARKS:  And don't answer, please.

BY MS. SCULLY:

Q.  I'll ask a more general question.  Did you
seek any counsel prior to producing the
materials in response to Arnold & Porter's
subpoena?

    MR. SPARKS:  Same objection and please
don't answer that.

    MR. FARR:  Whether -- whether she
talked to an attorney is privileged?  Are you
saying that?

69

    THE WITNESS:  I think so.

    MR. SPARKS:  I'm sorry.  Ask the
question again.

    MR. FARR:  Whether she -- whether she
talked to an attorney is privileged, just the
fact that she talked to an attorney?

    MS. SCULLY:  Just the general thing,
not what -- specifically what was discussed.
Did she speak with an attorney.

    MR. SPARKS:  I'm -- I'm going to lodge
the same objection, yes, and give the same
instruction.

BY MS. SCULLY:

Q.  You testified earlier that you understood
that your father's business partner,
Mr. Oldham, had taken steps to retrieve
records related to their business, correct,
retrieve one of your father's computers, yes?

A.  Two --

Q.  Two?

A.  -- of his computers.

Q.  When you realized that there was information
related to your father's business contained
on these hard drives and thumb drives, did
you reach out to Mr. Oldham to let him know

70

that you had possession of business records
of theirs?

A.  There have been work files on my father's
home PC since we had a home PC so, no, in
that I asked -- there are other matters
concerning contact.  Dale isn't exactly easy
to get ahold of, but I specifically -- I felt
that I had pretty much covered that when I
asked everyone involved that knew anything
about my father and/or Dale if Dale had
gotten everything he wanted and the answer
was yes given the fact those backups are from 2009, '10, '11, and that I
was in many of those times living at home
using that computer as my own and those files
were there.

Q.  You said you asked everyone involved if Dale
got everything he wanted and the answer was
yes.  Who is the everyone involved that you
asked?

A.  The other person that I asked -- there are
two other people that I asked other than my
mother.  I asked my uncle -- oh, and
through -- I asked my cousin and I -- I sort
of tried to establish that he had come and

71

gone.  That was when my mother explained that
also when Dale left with the things that were
related to Geographic Strategies before my
father died, that my father had given him his
half of the business, which amounted to
around $300,000.

Q.  Who was your uncle that you asked?  What's
his name?

A.  Chris Hartsough.

Q.  What was his relationship with Dale?

A.  There -- he did not have a relationship with
Dale; rather, he had been present during my
parents' move from their house in Raleigh to
the retirement community in Raleigh.  I was
interested in this move because many of my
personal possessions went missing at this
time.  That's my -- was my principle interest
in finding out what had happened.

Q.  And who's your cousin that you spoke with?

A.  Trudy Harris.

Q.  Did she have a relationship with Dale?

A.  No.  None of these people had a relationship
with Dale.  It's just that he had apparently
been there during this longer period of time
when my family was helping my parents move.

72

1    That's all.
2  Q.  If you wanted to know if Dale Oldham had
3    gotten everything that he wanted, why not ask
4    Mr. Oldham directly himself?
5  A.  Because he was a part of the litigation that
6    was ongoing with my mother.  He was a -- he
7    was an opposing party in that litigation and
8    noncommunicative before that point as well.
9    I did at -- at one point attempt to reach out
10   to him to discuss my mother, but he did not
11   return my calls and resisted all of my
12   attempts to -- to talk to him.
13  Q.  When did you attempt to reach out to
14   Mr. Oldham to discuss your mother?
15  A.  Twice, once during the first trip to Raleigh
16   and again in the second trip to Raleigh.  Oh,
17   and then we sent him notice of -- of certain
18   documents -- family documents that bore his
19   name as those documents had been changed.  He
20   got notice of that as well.
21  Q.  The first trip to Raleigh, was that the trip
22   in October around -- on or about October
23   11th, 2018?
24  A.  Yes.
25  Q.  And when was the second trip?

73

1  A.  That would have been shortly after.  Let's
2    see.  The first trip was October -- okay.  So
3    I -- I believe that I was then three or four
4    days back in Kentucky, but the situation
5    was -- was serious enough that I felt I had
6    to -- to change my plans to continue my work
7    in Kentucky and actually drop everything in
8    Kentucky and come back to Raleigh to help my
9    mother.  That would be -- I think I was back
10   by the 18th.
11  Q.  Prior to turning over the hard drives and the
12   thumb drives to Arnold & Porter, is it
13   correct that you never communicated with Dale
14   Oldham to let him know that materials related
15   to his business with your father were being
16   turned over?
17  A.  Those were my father's files.  I did not
18   assume that any of them or all of them --
19   many of them were there on that hard drive
20   before Geographic Strategies existed.  There
21   were files related to my father's work that
22   were there from a time when I'm not even sure
23   that Dale knew my father.  I did not really
24   think of this in terms of Dale Oldham, no.  I
25   thought of this in terms of my dead father

74

1    and his work in -- in public service, not so
2    much about -- about Dale, honestly.
3  Q.  Is that, no, you did not communicate with
4    Dale Oldham before you turned over these
5    files to Arnold & Porter to let him know that
6    there were --
7  A.  I did not make --
8  Q.  -- records related to --
9         THE WITNESS:  Yeah, I'm sorry.
10  BY MS. SCULLY:
11  Q.  -- that there were records related to his
12   business with your father that were being
13   turned over in response to a subpoena?
14        MR. JONES:  Objection, asked and
15   answered.
16        MR. SPARKS:  Go ahead and answer.
17  A.  I didn't attempt yet again to contact
18   Mr. Oldham in advance of responding to that
19   subpoena.  No, I did not.
20  Q.  Did you ever attempt to contact Mr. Oldham
21   and leave any substantive message for him
22   that you had possession of --
23  A.  Of my father's stuff.
24  Q.  -- business records --
25  A.  I'm sorry.

75

1  Q.  -- of records related to your father and
2    Mr. Oldham's business and that you intended
3    to turn those records over to Arnold & Porter
4    and Common Cause?
5         MR. JONES:  Objection, asked and
6    answered.
7  A.  I didn't.
8  Q.  Turning back to Exhibit Number 2.  I believe
9    you testified that you -- sitting here today,
10   you do not know what specific information is
11   contained on the thumb drive that is pictured
12   on Page 4 of Exhibit 2, correct?
13  A.  That's correct.
14  Q.  If I could turn your attention to Page 7.
15   And is -- do you know what this device is
16   that appears on Page 7?
17  A.  It appears to be an external drive.
18  Q.  Do you know what the contents were of the --
19   this external drive that appears on Page 7?
20  A.  I know that that's my father's handwriting on
21   that label.  Beyond that, I don't know
22   offhand.
23  Q.  Do you have any specific recollection of
24   reviewing the files that are contained on the
25   hard drive that appears on Page 7 of Exhibit

76

1   2?
2   A.  Not specifically that one, no.  None of them
3       specifically.  They all seem to have sort of
4       a -- a mix -- a mixture of -- of different
5       kinds of data on different matters.  All of
6       them were mingle -- mingled.
7   Q.  Turning to Page 9, do you know what that is a
8       picture of?
9   A.  Once again, it appears to be a picture of --
10      of one of the external drives.
11  Q.  I take it similar to the drive that we saw in
12      the picture immediately before that you have
13      no specific recollection of what material is
14      contained on this drive, correct?
15  A.  That's correct.
16  Q.  Is it fair to say that you do not have any
17      specific recollection of what information is
18      contained on any of the hard drives or the
19      thumb drives that are photographed that
20      appear in Exhibit 2?
21  A.  Well, it's very similar with all of them was
22      my impression.  So it was -- it would be very
23      difficult to say what was on which.  I mean,
24      I don't know offhand -- like there were
25      two -- for example, there were two drives

                                                          77

1       that were identical in appearance, but they
2       seemed to be backups of the same hard drive
3       but at different times.  So that would be
4       very hard for me to say which was the 2011
5       set and which was the 2013 set, for example.
6   Q.  You testified earlier when -- under your
7       examination with plaintiffs' counsel that you
8       recognized one of the hard drives because of
9       the blue rubber band that was around it.
10  A.  No, the blue cover.
11  Q.  Blue cover.  Turning your attention to Page
12      15 of Exhibit 2, is that the blue -- is that
13      a picture of the blue cover you were
14      referring to when you testified earlier?
15  A.  It -- it -- I would assume that it is the
16      cover that I was referring to.
17  Q.  And what did -- what is it about that cover
18      that stood out in your mind?
19  A.  You know, this -- it wasn't an effort at
20      precision.  I just remembered that this was a
21      cover that went typically with a brand and
22      type of external storage device that my
23      father liked to use.  And I had a hunch -- I
24      was hoping that it would be what it turned
25      out to be and that is a backup of the -- my

                                                          78

1       parents' personal computer, which would
2       contain the files that I was looking for of
3       mine.
4   Q.  In the subpoena that you received from
5       Arnold & Porter there was a specific request
6       looking for materials relating to the 2011 or
7       the 2017 North Carolina redistricting.  You
8       understood that, correct?
9   A.  Yes, I -- yes.
10  Q.  Did you undertake any efforts to limit the
11      materials that you were turning over to
12      Arnold & Porter in response to the subpoena
13      to only documents that related to the 2011 or
14      2017 North Carolina redistricting?
15          MR. JONES:  I'll -- I'll -- I'll
16      object.  I think it mischaracterizes the
17      scope of the face of the subpoena.
18          MR. SPARKS:  Go ahead and answer.
19  A.  The request was for any and all materials
20      that might, so I -- since there appeared to
21      be relevant -- relevant data, I -- I think I
22      already answered this question.  I think the
23      idea was that it was going to be preserved
24      and that I would not be deciding which files
25      would go and which files wouldn't.

                                                          79

1   Q.  I take it from your answer that you did not
2       review each hard drive and each thumb drive
3       to confirm that each hard drive and each
4       thumb drive, in fact, had any information
5       with respect to the 2011 or 2017 North
6       Carolina redistricting; instead, you just
7       turned it over in its entirety --
8   A.  I was answering the subpoena --
9           MR. SPARKS:  Let her finish.
10          THE WITNESS:  Sorry.
11  BY MR. SPARKS:
12  Q.  -- to Arnold & Porter, correct?
13  A.  Yes.  Yes.
14  Q.  You testified earlier when you took the
15      electronic hard drives and thumb drives from
16      your father's home you said you were so
17      thrilled to have precious data of yours.  You
18      said mine, but -- what precious data were you
19      referring to?
20  A.  Pictures of me and my infant children,
21      pictures of me on my property in West
22      Virginia, pictures of dead friends, music
23      recorded years ago by me and a friend who had
24      a band together, letters that I had written
25      to friends, letters that I wrote to my

                                                          80

1  father, documents that I might have otherwise
2  possession of if it weren't for first a house
3  fire that destroyed everything I owned in
4  2013 and also a divorce in which everything
5  else that I had pretty much was, you know,
6  left in the hands of -- of someone I didn't
7  really feel like communicating with.
8  Q.  You didn't consider the records relating to
9  your father's work -- redistricting work to
10 be your data, correct?
11 A.  The hard drives were given to me by my -- by
12 my mother, so I would say that I considered
13 everything on those hard drives that my
14 father had left in his room that my mother
15 gave to me unconditionally -- I considered
16 all of it mine at that point when it was
17 given to me by my deceased father's wife.
18 Q.  Even if the material related to your father's
19 business with another business partner, you
20 considered it your material, you --
21 A.  I considered the stor- ---
22    MR. JONES:  Ob- -- objection.  It's
23 been asked and answered.
24    MR. SPARKS:  Go ahead and answer.
25 A.  I considered everything that my mother gave

81

1  me that had previously belonged to my father
2  who was now dead mine, yes.
3  Q.  Did your father have a will?
4  A.  Yes.
5  Q.  Do you know if in the will there was any
6  provision with respect to his personal
7  property and who the personal property would
8  be left to?
9  A.  My understanding, not being an estate
10 attorney, is my mother was the beneficiary.
11 Q.  Have you seen a copy of the will?
12 A.  Yes.
13 Q.  Did you -- did your father make any direct
14 gifts to you in the will?
15 A.  I don't believe he did, no.
16 Q.  Did your father in the will address anything
17 related to his -- his business records,
18 business files?
19 A.  I don't recall.
20 Q.  Prior to turning over the electronic files to
21 Arnold & Porter you said you spent two to
22 three hours immediately before turning them
23 over to Arnold & Porter.  I would like to
24 understand how much time in total you spent
25 reviewing the materials at any point in time

82

1  before you gave them to Arnold & Porter.
2  A.  That would be difficult.  Do you mean -- you
3  know, I -- for example, I printed out copies
4  of pictures of me and my children.  Do you
5  consider me putting those on my wall time
6  reviewing the materials?
7  Q.  No.  Time spent looking through the
8  electronic files on a computer.
9  A.  That would be very difficult to determine.  I
10 mean, I don't know.  How much time do you
11 spend looking at pictures of your children?
12 Q.  Putting aside the amount -- well --
13 A.  I didn't spend a lot of time looking at my
14 father's work files if that's what you're
15 driving at.  No, I didn't.
16 Q.  So let's focus on that point.  Putting aside
17 the time you spent looking through files that
18 related to you or photographs related to you
19 or issues that were personal to you, putting
20 all of those personal materials aside, how
21 much time would you estimate you spent
22 reviewing files that related to your father,
23 his redistricting work, his business records,
24 any expert documents he may have created,
25 those materials?

83

1  A.  Well, it's also hard because there were
2  certain situations in some of those backups
3  where there were folders that contained a
4  multitude of mixed documents.  In certain
5  cases I would open something thinking that it
6  was one thing and find that it was something
7  different.  So there were -- there were both
8  situations where -- for example, news
9  articles that he had in a folder of -- I
10 believe there were a lot of -- of news
11 articles that I actually read through that he
12 had saved, maybe articles even that mentioned
13 him specifically and, of course, I was
14 interested in preserving that.  Of course, I
15 wanted, you know, a scrapbook of my father
16 and so -- also, there were -- just looking at
17 the file extensions and having a basic
18 familiarity with my father's work, I knew a
19 lot of them would be file extensions that I
20 wouldn't even be able to open considering
21 that I didn't have the right proprietary
22 software.  So -- wow.  I really -- it would
23 be very difficult for me to give an estimate.
24 I don't really understand.  Maybe -- I mean,
25 not -- not to be snide, but what -- what --

84

21 (Pages 81 to 84)

1    what -- what exactly are we driving at?  How
2    many hours I spent looking specifically at
3    just the files in folders that contained
4    things like, again, letters to me, old trust
5    documents, letters that my grandfather sent
6    to my father, and interesting stories and
7    maybe a few photographs, some of them of my
8    father and my relatives, some of them my
9    father and my children, some of them me and
10   my children?  It would be -- it would be very
11   difficult to give you an estimate of how many
12   of those minutes were spent looking at files
13   that were specifically related to his work,
14   much less specifically related to which -- I
15   mean, I wouldn't be able to distinguish the
16   legislative maps from the congressional
17   district maps.
18   Q.  Is it fair to say that the majority of the
19       time you spent reviewing the files was spent
20       reviewing materials related personal to you
21       and that, in comparison, you spent very
22       little time reviewing files related --
23   A.  Very little --
24   Q.  -- to your father's --
25   A.  -- is kind of a --

85

1    A.  The specifically work-related stuff, the
2        stuff that would be -- you know, the stuff
3        that he wanted, the stuff that he felt was
4        pertinent.
5    Q.  And you said he took two computers from your
6        father's office; is that correct?
7    A.  That's what I'm told.
8    Q.  You've also testified today that these hard
9        drives and the thumb drives, you understood
10       them to be backups, correct?
11   A.  That's correct.
12   Q.  Was it your understanding that your father's
13       work-related files that they had on the
14       computer that Dale Oldham had taken or
15       computers that he'd taken were also backed up
16       on any of these hard drives or thumb drives
17       that you received?
18       MR. JONES:  Ob- -- objection, calls for
19   speculation.
20   A.  Honestly, if I speculated I would speculate
21       that any backups that had been done
22       specifically of the work computers would be
23       already taken by him.  I did not -- I did
24       not -- actually, the opposite.  I assumed
25       that these were personal backups because they

87

MR. SPARKS:  Hold, please.
2    BY MS. SCULLY:
3    Q.  -- work?  Yeah.  It's a --
4    A.  I'm sorry.
5    Q.  It's -- my question, is it fair to say that?
6        MR. JONES:  Objection, asked and
7    answered.
8        MR. SPARKS:  Please answer.
9    A.  Yes.
10       MR. JONES:  We've been going about
11   an -- about an hour.
12       MS. SCULLY:  We can take a break.
13       MR. JONES:  Can we take a break?
14       THE WITNESS:  This time I am going to
15   smoke a cigarette.
16       THE VIDEOGRAPHER:  Going off the
17   record.  The time is 11:39 a.m.
18       (Whereupon, there was a recess in the
19   proceedings from 11:39 a.m. to 11:59 a.m.)
20       THE VIDEOGRAPHER:  Going back on the
21   record.  The time is 11:59 a.m.
22   BY MR. SPARKS:
23   Q.  Ms. Hofeller, you testified earlier today
24       that Dale got all the good stuff.  What did
25       you mean by that?

86

1    were there with -- with those things.  And,
2    again, it's -- it's always been a little
3    bit -- those lines have always been a bit
4    blurry in the household.
5        MR. BRANCH:  All right.  I'm --
6    BY MS. SCULLY:
7    Q.  Do you --
8        MR. BRANCH:  -- going to remind
9    everybody here that under the North Carolina
10   rules, counsel's only supposed to object to
11   the form of the question.  There are no
12   speaking objections allowed in North
13   Carolina.  This is multiple times now that
14   the witness has changed her answer in
15   response to a speaking objection by
16   Mr. Jones.  Now, unless I'm mistaken,
17   Mr. Jones, you do not represent the witness.
18   Under the rules you can object to the form of
19   the question and that's it.  You can't
20   instruct her not to answer and she should not
21   be changing her testimony in response to
22   something that you articulate for her.
23   BY MS. SCULLY:
24   Q.  Ms. Hofeller, do you, in fact, know one way
25       or another if the information that was

88

22  (Pages 85 to 88)

1    contained on the hard drives and the thumb
2    drives that you provided to Arnold & Porter
3    were in part duplicative of the information
4    that was contained on the computers that Dale
5    Oldham took possession of?
6    A.  I really don't know.  I really honestly don't
7    know.
8    Q.  Turning back to your communications with
9    Common Cause, you testified earlier that your
10   first outreach to Common Cause was a
11   communication that you had with someone named
12   Bob Phillips, correct?
13   A.  Correct.
14   Q.  When did that communication occur?
15   A.  That would have been in very -- very early
16   November, the first week of November.
17   Q.  How many times did you speak with
18   Mr. Phillips?
19   A.  Once.
20   Q.  Was your communication with Mr. Phillips in
21   person, telephonic?  How did you communicate
22   with him?
23   A.  Telephonic.
24   Q.  What did you know about Common Cause when you
25   reached out to Mr. Phillips?

89

1    concerning maps that had already been
2    redrawn.
3    Q.  You knew historically that Common Cause had
4    been antagonistic to the work that your
5    father had done in North Carolina, correct?
6    A.  If -- if -- if that's the way to characterize
7    it, then, yes.
8    Q.  I believe you testified you reached out to
9    Mr. Phillips to seek a referral for your
10   mother.  Did you communicate any specific
11   details to Mr. Phillips about why you were
12   looking for an attorney for your mother?
13   A.  Yes, so that I could get the right kind of
14   attorney.
15   Q.  What -- can you share with me specifically to
16   the best of your recollection what you said
17   to Mr. Phillips when you communicated with
18   him on the phone?
19   A.  That my mother was facing a challenge to her
20   competence.
21   Q.  Did you share with Mr. Phillips who had
22   brought the incompetency petition against
23   her?
24   A.  No.
25   Q.  Did you share with Mr. Phillips any

91

1    A.  I knew that they were representing the
2    interest of voters that felt that this
3    redistricting represented a violation of
4    their constitutional rights.
5    Q.  And the redistricting that you're referring
6    to, does that include the maps that were
7    prepared by your father, Mr. Hofeller, in
8    North Carolina?
9    A.  Yes.
10   Q.  So you understood that Common Cause was
11   seeking to have the redistricting maps that
12   your father had prepared thrown out, correct?
13   A.  Yes.
14   Q.  You knew that Common Cause was antagonistic
15   to the work of your father, Mr. Hofeller,
16   correct?
17   A.  I didn't know that they were -- initially, I
18   did not know that they were antagonistic to
19   the new maps.
20   Q.  When you say the new maps, what do you mean
21   by that?
22   A.  Well, he's drawn more than one set, so
23   interesting to know I didn't actually know
24   that there was a new case when I first spoke
25   to Common Cause.  I thought that this was all

90

1    information about who was involved in the
2    incompetency proceedings?
3    A.  Not specifically, no.
4    Q.  If I recall correctly, you testified that
5    Mr. Phillips then put you in touch with Jane
6    Pinsky?
7    A.  That's correct.
8    Q.  Jane Pinsky also works for Common Cause?
9    A.  Yes.
10   Q.  Is Ms. Pinsky a lawyer, if you know?
11   A.  I don't think she is.
12   Q.  How many times did you speak with Ms. Pinsky?
13   A.  In total I believe that we had three -- three
14   or four conversations, all on the phone.
15   Q.  Do you know what Ms. Pinsky's title is with
16   Common Cause?
17   A.  Not offhand, no.
18   Q.  I want to go through the three or four
19   communications that you had with Ms. Pinsky.
20   Do you recall the first communication you had
21   with her --
22   A.  Yes.
23   Q.  -- the time period?
24   A.  That would have been also very early
25   November.  Sometime during the first --

92

23 (Pages 89 to 92)

1    sometime during the first eight or nine days
2    of November.
3    Q.  Was anyone else on the phone during that
4    first communication that you had with
5    Ms. Pinsky?
6    A.  Not that I know of.
7    Q.  Approximately how long did that first
8    communication with Ms. Pinsky last?
9    A.  I'm not -- it wasn't a particularly long
10   conversation.  Ten minutes, maybe -- maybe,
11   if that.
12   Q.  Tell me what you recall about that
13   conversation, what you said and what she
14   said.
15   A.  She had -- she -- we confirmed that this was
16   about the matter of referral and that Bob had
17   said that she would be the one that would --
18   was more familiar with the names of -- of
19   local attorneys.  And she had some names for
20   me and so I took down those names, and she
21   wished me luck and expressed condolences for
22   the loss of my father and I think that was
23   about it in that first conversation, I think.
24   Q.  When you first communicated with Ms. Pinsky,
25   did she give you the impression that she was

                                              93

1    expecting your call?  Did you make the call
2    to her?
3    A.  I re- -- I think we -- I don't actually know
4    who initiated the call that was the one where
5    we actually spoke.  We exchanged a few
6    messages.  I got an e-mail from Bob saying
7    that he had told Jane to reach out to me and
8    then exactly what combination of who left who
9    what message, I'm not honestly sure.
10   Q.  You had an e-mail communication with Bob.
11   How many e-mail communications did you have
12   with Mr. Phillips?
13   A.  One.  I mean, one conversation.  It was, I
14   think, maybe two, maybe three messages, his
15   saying that and me saying thank you.  So I
16   think was -- two, I think, was all.
17   Q.  I just want to make sure I understand your
18   testimony.  You had one telephone
19   conversation with Mr. Phillips and then you
20   had one e-mail with Mr. Phillips, but the
21   e-mail may have had a couple of threads
22   within it?
23   A.  Recalling to my best ability, it was -- the
24   e-mail would have contained his noted that I
25   would be hearing from Jane and my thanks --

                                              94

1    Q.  Reply.
2    A.  -- for the -- for that.
3    Q.  Did you have any e-mail communications with
4    Jane Pinsky?
5    A.  I think that I did, yes, because I wanted --
6    we -- we were confirming names and numbers
7    and things.  Like I didn't know how do you
8    spell that and I said, can you just e-mail me
9    that?  And -- and then I think it was more --
10   I think maybe one more time in e-mail --
11   she -- she really prefers the phone.  We --
12   we both kind of felt that way, I think.  So
13   any further e-mail was more to the -- to
14   the -- to the -- like, are you going to be at
15   the office?  Can I reach you today?  Are you
16   busy?  That sort of thing.  Like the --
17   that -- that predicated the -- a follow-up
18   phone call about those attorneys.  It was
19   still pretty much exclusively on that and
20   just sort of incidentals on the topic of --
21   of what this proceeding against my mother
22   really actually was, you know, very -- I
23   didn't know much about what -- what -- what
24   was actually being asserted.  It's hard to
25   explain.  It wasn't really very detailed.  It

                                              95

1    was just kind of clarifying what kind of
2    attorney I would need, I think, really,
3    whether this is -- is this an estate
4    attorney?  Is this a litigation attorney?  Is
5    this -- and a lot of my questions she would
6    then say, you know, I would have to -- I
7    would have to ask an attorney what kind of
8    attorney you need for your mother, that sort
9    of thing.
10   Q.  Did you share with Ms. Pinsky any of the
11   documents from the incompetency proceedings,
12   any of the legal documents --
13   A.  No.
14   Q.  -- court documents?
15   A.  No, I don't -- no, I don't think I did,
16   actually.  It didn't seem necessary or
17   appropriate since she wasn't the attorney.
18   Q.  Approximately how many e-mail communications
19   did you have with Ms. Pinsky?
20   A.  I think maybe a grand total of two, if two.
21   I would have to look.  It may even be just
22   one thread.  I hon- -- I didn't really study
23   it.
24   Q.  Your first conversation that you had with
25   Ms. Pinsky in early November, first eight or

                                              96

                              24  (Pages 93 to 96)

1    nine days, said lasted approximately ten
2    minutes.  Can you tell me what you recall
3    specifically about what was discussed during
4    that conversation, what you said to her and
5    what she said to you?
6    A.  I don't recall specifics, no.  I -- it was --
7    I was just trying to get an attorney for my
8    mother, so I don't remember exactly what I
9    said on the --
10   Q.  In that first communication did she give you
11   names of attorneys that you could reach out
12   to?
13   A.  Yes.
14   Q.  In the first conversation that you had with
15   Ms. Pinsky did you talk substantively about
16   who was involved in the incompetency
17   proceedings?
18   A.  No.
19   Q.  Did you at any point in time discuss with
20   Ms. Pinsky who was involved in the
21   incompetency proceedings?
22   A.  Not that I recall, no.  I really said very
23   little other than I felt that the fact that
24   my father had so many friends and coworkers
25   and colleagues and -- and supporters and

97

1    really, frankly, people who really, really,
2    really idolized him and -- and -- and had
3    kind of a -- a nonhuman vision of him, and
4    that was why I was contacting Common Cause.
5    I didn't have any -- I wasn't expecting there
6    to be a discussion about specific names.  It
7    seemed to me from the point of view where I
8    was at the time that the specific names were
9    going to have to be people in Raleigh that
10   didn't worship my father.  There was no need
11   to -- no need to -- to -- to detail.  And
12   also I wasn't really trying to discuss the
13   merits of my mother's matter with -- with --
14   with Common Cause.  I was only trying to
15   really seriously just hope that I might find
16   an attorney in Raleigh that was independent
17   of -- of my father and -- and the people he
18   worked for.
19   Q.  When you say independent from your father,
20   what do you mean by that?
21   A.  I mean that in matters that concern a man as
22   a person, often when you're dealing with
23   people that only know him in a professional
24   context and have a great deal of their
25   personal and professional life mingled with

98

1    that image, when you begin to speak about
2    that person as if they were a human being
3    with multitudes of emotions, contradictions,
4    all of those things, often people get
5    hostile.  If you are -- if you are bringing a
6    human image to a hero's image, they -- they
7    sometimes feel that maybe they -- they get
8    angry.
9    Q.  How did your father's work in redistricting
10   relate, if at all, to the incompetency
11   proceedings that were ongoing with respect to
12   your mother?
13   A.  Many people who only knew my father
14   incidentally or knew him only in one context
15   were resisting the assertion that I had that
16   perhaps my mother and I would know better
17   what it was that my father wanted that was
18   not specifically spelled out.  There was a
19   lot of speculation about what your father
20   wanted coming from a variety of sources, some
21   people that really didn't know him very well
22   outside of the context of work, and it was,
23   frankly, a little bit offensive.
24   Q.  You did not have any conversations with your
25   father regarding what he wanted to have

99

1    happen with his work related to redistricting
2    upon his death, did you?
3    A.  I don't believe I -- I don't believe I ever
4    had a conversation with my father about what
5    he wanted to have happen after his death
6    pertaining specifically to his work.  I think
7    he felt that once he was dead, that his work
8    to him at least would be no longer relevant.
9    Q.  What led you to that belief?
10   A.  He often would say that that was -- you know,
11   if you're going to divide people into -- into
12   camps of how they view death, my father
13   would, whether he was sincere or not, he
14   would often say, you know, sometimes
15   jokingly -- I don't know how well you knew
16   him, but he -- he had a -- he had a penchant
17   for irony and he would often say, well, it
18   won't matter once I'm dead, right?  So -- he
19   also said things like, I know that people on
20   their deathbed very rarely look up and say, I
21   wish I'd spent more time at work.
22   Q.  At what point in time did you discuss with
23   Ms. Pinsky that you had some of your father's
24   hard drives that you thought might be of
25   interest to Common Cause?

100

25  (Pages 97 to 100)

A.   That would have been sometime in December.
That was later.  She -- she called me to ask
how things were going with my mother because
I also -- one of the things that I -- that
comes -- that was coming pretty clear to
anyone who talked to me in that time is there
was a lot of -- there was a lot of emotion
regarding the then still very recent death of
my father and that it was -- it was sad that,
you know, the principle concern about him,
his life, and everything having to do with
him was this -- this matter rather than the
matter of his family.

Q.   How many conversations did you have with
Ms. Pinsky about your father's hard drives
and electronic materials that you had?

A.   I'm sure -- pretty -- pretty sure it was only
one because she said that she really would
not be certain -- I mean, really, that was
it.  I said -- we -- we had that
conversation.  She said, I'll ask the
lawyers.  And I think then any further
conversation at all about those -- that media
was had with the attorneys.

Q.   When you say Ms. Pinsky said, I'll ask the

101

lawyers, was that in response to a question
you asked her?  What do you mean by that?

A.   That was not a response to a specific
question.  That was a response to the
conversation that had begun with me
mentioning the David Daley interview and
saying, I have hard drives.  And in the
context of that article he had -- David Daley
had implied that those hard drives would have
maps that the state legislators would like.
I, once again, didn't really think that it
was anything, you know -- I don't know how to
describe it.  I --

Q.   Do you -- do you have an understanding of
which lawyer she was referring to when
Ms. Pinsky said, I'll ask the lawyers?

A.   The -- the lawyers who were involved in this
matter since we were discussing whether or
not there would be any use -- any
admissibility.  Again, I thought -- I wasn't
even sure that -- I didn't even understand --
at that moment when I spoke to her the first
time about it and mentioned that article, I
was under the impression that everything in
this matter was on appeal so I wasn't

102

thinking of it in terms of -- of evidence for
any case.  I was thinking of it more just as
a -- an archival -- an academic interest.

Q.   When did you come to the understanding that
this action in which you received the
subpoena is still at the trial level and not
on appeal?

A.   Actually, what's funny is that I was -- I was
a little bit confused and, again, other
matters were really, really pressing
throughout, so I wasn't spending a lot of
time studying what was going on with this.  I
had somehow gotten the impression that this
already was in appeal, but for some reason
this was -- because it was going to the lower
court that it wasn't.  I -- I just -- you
know, I'm used to lawyers saying things.
Okay, all right, whatever.  I didn't even
know -- I just thought it was a certain type
of appeal that I wasn't even familiar with.
I didn't actually understand completely that
this was a new matter until it was said so
like about a week ago.  I -- I just -- all I
knew -- all I knew for certain was that
unlike the congressional districts that are

103

at the U.S. Supreme Court, this matter
would -- that new evidence would be allowed.
That was what was clear.

Q.   How did you come to that understanding?

A.   Because the -- because that first
conversation that -- on the matter -- I think
Jane mentioned that there might be.  I think
might be.  And, again, she was always saying,
you know, I'm not -- you know, I would have
to confirm that with the attorneys as a, you
know, good public servant.

Q.   What was Jane having to confirm with the
attorneys?

A.   That there would be -- that -- that the --
that the hard drives would be potential --
potentially usable as evidence in that the
matter was open in that regard.  I just,
again, initially felt that Common Cause,
being not directly affiliated with my father,
would be a good -- literally like a
repository for the information that I felt
had historical value beyond any partisan
interest but, rather -- I even used the words
insight into the process -- the literal
process because I -- I -- again, I'm not an

104

26 (Pages 101 to 104)

expert on redistricting, but I have worked in
political demographics and I have alongside
my father -- you know, he studied political
philosophy in general.  So the -- the
academic interest in this was -- was
paramount to me even above any other
potential.  I did -- I'm not a North Carolina
resident.  I'm not a North Carolina voter.  I
have no personal concern about what happens
in this case beyond the fact that this
would -- this -- this man was my father and
my mother was being -- being -- having a -- a
very unpleasant procedure in a town that was
not our home where the only people we even --
that she even knew were people that had been
working with my father.

Q.  I believe you testified that Jane mentioned
there might be some use for your father's
materials as evidence, correct?

A.  She did not put it in terms of use as
evidence.  She simply stated that the matter
in the lower house was not a closed matter as
far as evidence was concerned.  I think
that -- I don't remember her exact words, but
there was no implication in that that there

105

would be a literal use, just that there's
even a possibility that new evidence could be
heard on this matter at all.

Q.  So you did understand based on your
communications with Ms. Pinsky that there was
a possibility that this information might be
useful in the matter, correct?

A.  Yes.

Q.  And --

MR. SPARKS:  I need to clarify one
thing.  I'm sorry.  You said lower house.
Did you mean lower court?

THE WITNESS:  Lower court, yes.  I'm
sorry.

MR. SPARKS:  Go ahead.

BY MS. SCULLY:

Q.  And the party you were producing the
information that might be useful to was on
the opposite side from the work your father
had done, correct?

MR. JONES:  Objection, asked and
answered.

MR. SPEAS:  That's not a --

A.  I understood that Common Cause was
representing the voters.

106

Q.  Did Ms. Pinsky put you eventually in
communication with any of the attorneys in
this litigation?

A.  Yes.

Q.  Did you initiate the communications with any
of the attorneys in this litigation?

A.  No.

Q.  Who did you first speak with as an attorney
in this litigation?

A.  I got a text from Eddie Speas.

Q.  Do you still have a copy of the text message
you received from him?

A.  I don't.

Q.  When did you receive the text from him, if
you recall?

A.  Shortly after that conversation with Jane.  I
believe that was December.  I'm honestly -- I
really -- I didn't -- the phone that I was
using was running out of storage so it was --
it was kind of -- you know, the phones will
tend to dump those text messages.  There was
really no way for me to -- to track it back
to exactly when.

Q.  So you believe it was sometime in December
2018 you received a text message from Eddie

107

Speas, Jr. -- 2018, thank you, correct?

A.  Yes.

Q.  What do you recall the text message saying?

A.  Intro-- he introduced himself and -- and
basically said that -- I don't remember exact
words.  More like, Jane said you might be
willing to -- to speak to us, something along
those lines, and basically asking permission
for contact and doing what is now polite in
business and -- if you have a cell phone, you
introduce yourself over text so that if he
were to call again, I would know what that
number was.

Q.  Did you respond to the text message?

A.  Yes.

Q.  How did you respond?

A.  Yes.  I don't know if I said more than just
yes.  Maybe something polite just to -- to
make it not so terse, but --

Q.  You responded via text; is that correct?

A.  Yes, I did.

Q.  Approximately how many text communications
have you had with Mr. Speas?

A.  Not very many.  There -- it was really more
just an effort to schedule phone calls.

108

27 (Pages 105 to 108)

1    Q.  You have had more than one text communication
2        with Mr. Speas, correct?
3    A.  I think there were may- -- I think there were
4        two, one in advance of -- of -- of two phone
5        calls, two, you know, are you going to be
6        available at such and such a time sort of
7        thing.
8    Q.  After you communicated in response to
9        Mr. Speas's first text where you said, yes,
10       willing to talk to you, when was the next
11       time you spoke with Mr. Speas?
12   A.  I think that that was about a week or so.  It
13       was -- you know, it was starting to get close
14       to the holidays so, you know, there was time
15       between communiques.  If -- if, you know,
16       research needed to be done or references
17       or -- or questions asked, it -- everything
18       was starting to take a lot longer because it
19       was the holiday season.
20   Q.  The next time you spoke with Mr. Speas, was
21       that a telephone communication?
22   A.  Yes.
23   Q.  Did you initiate the call?
24   A.  I don't know.  I really don't remember.  It
25       was -- we -- the idea being follow-up

109

1        questions need to be asked on our end and --
2        and it -- the -- the discussion continued as
3        to whether or not there was -- I don't know.
4        I think I -- I don't know how to -- to
5        explain it any differently than I've already
6        explained it, frankly.
7    Q.  On the first telephone call that you had with
8        Mr. Speas, was there anyone else on the call
9        as far as you know?
10   A.  No.
11   Q.  So just you and Mr. Speas on the first
12       telephone call?
13   A.  That's how I remember it.
14   Q.  And that's all I can ask you for is the best
15       of your recollection --
16   A.  Yeah.
17   Q.  -- today.  Approximately how long did the
18       first telephone call between you and
19       Mr. Speas last?
20   A.  Maybe ten minutes, again, just -- there was
21       not a lot of detail --
22   Q.  Tell me --
23   A.  -- discussed.  It was really more just a
24       friendly business-style conversation.
25   Q.  Tell me as -- to the best of your

110

1        recollection what you said and what Mr. Speas
2        said on that first telephone call.
3    A.  I said that I had -- I said that I had
4        material that might be relevant to the case.
5    Q.  Did you explain in any further detail what
6        material you had?
7    A.  Vague detail, external storage devices
8        that -- I don't know whether or not I
9        mentioned -- I -- I don't think I
10       specifically said backups.  I just said
11       external storage devices.
12   Q.  What do you recall Mr. Speas saying in
13       response to that?
14   A.  I believe that he did even in that first
15       phone call want to clarify that these were --
16       that -- that these had been given to me.
17   Q.  What specifically did Mr. Speas ask you about
18       the hard drives?
19   A.  The -- I think if they'd been given to me.
20   Q.  And so your recollection is Mr. Speas said,
21       have these been given to you?
22   A.  I don't know what his exact words were.  The
23       gist of it was, are they yours, and I said
24       that they had, indeed, been given to me.
25   Q.  Did you tell him the circumstances under

111

1        which you had obtained them?
2    A.  More or less, that along with things that
3        literally belonged to me and things that I
4        took to mean from my father that he wanted me
5        to have, I had -- I had asked for these, you
6        know, and as I said, I asked my mother if I
7        could take my jewelry box, too, even though,
8        of course, the answer would have been yes and
9        many -- many would say that if it was
10       something that I left with my father of mine
11       specifically with the intent that he would
12       hold it for me, that when I came to his
13       apartment after his death, that anything that
14       had belonged to me up till the point of his
15       death was already mine, but I still went to
16       the extra effort to make sure because, you
17       know, I -- I didn't want to -- I didn't what
18       to give anyone the impression that I was
19       there to -- to pick over the corpse.
20   Q.  Just to clarify, your -- your father never
21       told you he wanted you to have his external
22       hard drives or these thumb drives, correct?
23   A.  He said that he wanted -- that he would keep
24       the data that I had stored on his computer.
25       With that I took to mean -- we didn't really

112

1   get a chance to discuss the details of all of
2   his personal effects because when I last
3   spoke to him he wasn't dying.
4   Q.   The information you turned over to Arnold &
5   Porter in response to the subpoena was not
6   limited to the -- your personal data that you
7   discussed with your father that he would
8   preserve for you, correct?
9   A.   Correct.
10  Q.   You did not have any conversations with your
11  father in which he told you he wanted you to
12  have possession of his hard drives or thumb
13  drives which you've turned over to Arnold &
14  Porter, correct?
15       MR. JONES:  Objection, asked and
16  answered.
17  A.   No.
18  Q.   In your initial conversation with Mr. Speas
19  did you share with him your understanding
20  that the external hard drives and thumb
21  drives that you had contained your --
22  contained information regarding your father's
23  redistricting work including his expert
24  consulting work?
25  A.   Could -- could you ask the question again?

                                        113

1   I'm sorry.
2   Q.   Did you share with Mr. Speas any detailed
3   information about what you believed these
4   hard drives and thumb drives -- what the
5   materials were on those hard drives and thumb
6   drives?
7   A.   I did not get very specific, no.  That is how
8   I'm accustomed to doing things with attorneys
9   is that attorneys decide what's relevant and
10  what isn't and that if there's a chance that
11  it might be relevant to a matter that that
12  attorney is working on, that I would say,
13  this might be relevant to the matter that
14  you're working on.  So that was pretty much
15  what I said.  I don't recall talking about
16  specific files.  I don't think that there
17  was -- already we -- there was a feeling that
18  it would be most proper to say, this might be
19  relevant, and then to not speculate further.
20  Q.   Did anyone from Arnold & Porter specifically
21  tell you that would be the better way to
22  proceed, to give --
23  A.   I did not have any discussion with anyone
24  from Arnold Porter.
25  Q.   Okay.  Did anyone from -- I apologize --

                                        114

1   Poyner Spruill tell you that the best way to
2   proceed would be to give them the entirety of
3   the contents?
4   A.   Well, I didn't necessarily know who was and
5   wasn't with Pointer Spruill [sic].  I only
6   knew that these were attorneys that were
7   working on the matter.
8   Q.   Did Mr. Speas or Ms. Mackie ever tell you
9   that it would be best for you to turn over
10  the entirety --
11  A.   They didn't say that it would be best.  I'm
12  sorry.  They said that it would be a -- a --
13  a better preservation of the integrity, that
14  the chain of custody would be transparent and
15  in that transparency, the integrity of the --
16  of the potential evidence would be preserved.
17  Q.   Who told you that, Mr. Speas, Mr. Mackie, or
18  both?
19       MR. FARR:  It's Ms. Mackie.
20  A.   Ms. Mackie.
21  Q.   Ms. Mackie.  Sorry.
22  A.   I -- I don't recall which one of them said
23  that.  I'm sorry.  I really don't.
24  Q.   This was a discussion you had with Mr. Speas
25  or Ms. Mackie prior to your receiving the

                                        115

1   subpoena, correct?
2   A.   I -- I don't know.  Now that you ask, I don't
3   know which -- because at some point,
4   honestly, I, once again, had assumed that
5   this had all been seen before and I was
6   really honestly talking about the fact that
7   there was personal information of mine and
8   explaining that, once again, it's that
9   classic, okay, you know, just because you
10  don't have anything to hide doesn't mean that
11  you aren't entitled to privacy.  So I
12  actually did have a -- you know, with my dad
13  echoing in my ear that you ask about that.  I
14  was getting ready to potentially turn over
15  data that was personal to me as well so I
16  really wanted to find out what the intentions
17  were.  And it was explained to me that --
18  that this was quite clear -- it was quite
19  clear that -- that anyone, either the -- the
20  legislative defendants or the plaintiffs,
21  were only properly entitled to even look at
22  the content of files that were explicitly and
23  obviously related to this case.
24  Q.   And that was something that either Mr. Speas
25  or Ms. Mackie told you, that the only

                                        116

1    information anyone would be entitled to look
2    at is information related to the
3    redistricting and that no one would be
4    entitled to look at any of your personal --
5    A.  Well --
6    Q.  -- information?
7    A.  -- no -- I'm sorry.  No one in this -- in
8    this -- in this matter, yes.
9    Q.  Is it your understanding that your personal
10   information to the extent it existed on the
11   hard drives and the thumb drives has been
12   maintained by Poyner Spruill and has not been
13   produced in this litigation?
14   A.  You know, I haven't really been keeping up to
15   date on -- I know that it's a matter of
16   contention.  I know that I was a little
17   bit -- kind of raised my eyebrows when I
18   found out that the legislative defendants
19   felt that they needed to see everything,
20   but -- I knew that that was probably going to
21   be the end result because I know how
22   litigation goes and I myself have been the
23   subject of, you know, quite a few
24   speculations about whether or not a person is
25   entitled to privacy or confidentiality.

117

1    Usually the answer ends up somehow being no
2    so with that expectation, I still yet spoke
3    my intention and that was that my personal
4    data be protected, that my mother's personal
5    data be protected, and that my father's
6    personal data be protected, and that the only
7    things that were on these drives that would
8    be -- would be looked at on paper was files
9    that were explicitly and clearly related to
10   this matter.  So when the legislative
11   defendants moved to see it all, I -- I went,
12   huh, well, what do you know.  Wonder why they
13   want that.  That was about the extent of it,
14   but it seemed pretty -- pretty predictable.
15   My father used to often exasperate about,
16   well, they -- they're not entitled to that,
17   it's personal, so...
18   Q.  Did you have any conversations with Mr. Speas
19   or with Ms. Mackie about the incompetency
20   proceedings that you were dealing with with
21   your mother?
22   A.  No.  No.  I mean, maybe I might have
23   mentioned that that's how we got into
24   conversation, because I was getting a
25   referral, but, no, I did not discuss the

118

1    incompetency matter with Eddie Speas or
2    Caroline Mackie beyond the fact that it
3    existed.
4    Q.  You do recall the -- having the discussion of
5    the existence of the fact with them in the
6    context --
7    A.  You know --
8    Q.  -- of the referral?
9    A.  -- I -- I'm sorry.  I didn't mean to cut you
10   off.  I honestly don't know if -- if we
11   discussed it even to that point.  The only
12   way in which there would have even been any
13   awareness -- I don't even know if I got as
14   specific as to say that it was incompetency.
15   I think, honestly, I probably used some sort
16   of colloquialism, à la Hofellerism, like,
17   yeah, I got to beat the vultures off the
18   widow.  So really I think I put it more in
19   terms like that.  It was never my intention
20   to discuss the matter or the merits of the
21   case or anything specific with these
22   attorneys.  It was unrelated.
23   Q.  And who are the -- the vultures you were
24   referring to?
25   A.  Various friends and family.

119

1    Q.  Who specifically?
2    A.  Trudy Harris, my cousin; a half-uncle who may
3    or may not have been -- you know, there --
4    it's -- it's been very unclear how many
5    friends and family were expressing some sense
6    of entitlement to things like my
7    grandmother's jewelry, you know, things like
8    that.
9    Q.  Were either Ms. Harris or your uncle involved
10   at all in the incompetency proceedings?
11   A.  Involved, no.  And, again, it's still yet
12   unclear exactly.  There's been very little
13   transparency.  So names of interested
14   parties.  That doesn't mean they were
15   involved.  It just means that someone, i.e.,
16   the petitioner, may have looked on documents
17   including trusts and wills and such and seen
18   names of beneficiaries and simply written
19   them down.  I was all very unclear who was
20   and wasn't literally involved.  I mean, this
21   is an estate.  There's usually a mess when
22   there's an estate that has any -- any
23   interest to anyone at all.
24   Q.  During your first telephone call with
25   Mr. Speas sometime in December 2018 did

120

1    Mr. Speas during that communication talk
2    about possibility of sending you a subpoena?
3    A.  I don't remember in which conversation, but,
4    actually, I believe that it was -- I believe
5    that it was Jane Pinsky that actually said
6    they're going to send -- I think she said,
7    they -- they asked me to let you know so that
8    you would have a heads-up that there was a
9    subpoena out.
10   Q.  So you had -- that there was a subpoena out.
11   I don't understand.
12   A.  That it had been mailed --
13   Q.  Okay.
14   A.  -- or whatever.
15   Q.  Prior to your receiving the subpoena, it's
16   your recollection that Ms. Pinsky called you
17   to let you know that there was a subpoena
18   being sent out?
19   A.  I don't know that that was the specific
20   reason that she called.  We had sort of --
21   you know, we were -- we had casual
22   conversation at that point because we --
23   she -- she, once again, was asking me how
24   things were going and was there -- you know,
25   how -- how was my mother feeling, was she --

121

1    how was she doing, because I'd told her that
2    she was extremely stressed out and -- and
3    emotionally -- emotionally drained and
4    very -- feeling very vulnerable and -- and
5    all because, you know, she really isn't --
6    she isn't prepared for litigation.  She was
7    not expecting to be in such a -- an exposed
8    position and, you know, my father had managed
9    to keep her very sheltered from his work up
10   until the point when he was no longer around
11   to do that.
12   Q.  In the first telephone call that you had with
13   Mr. Speas you told him that you had some
14   external storage devices.  You weren't sure
15   if they were backup or not, but you had these
16   materials.  You said he asked you for
17   clarification if they were yours and you said
18   yes, they were yours.
19       What else was discussed during that
20   conversation, if you recall?
21   A.  I think at that point really that -- there
22   wasn't much other than that.  It was -- as
23   communication with attorneys often is, you
24   know, there was a -- basic set of questions
25   and then it was let's -- let's consult, let's

122

1    re- -- do our research and get back to you.
2       MR. SPARKS:  Are you okay?  Do you need
3    a break?
4       THE WITNESS:  (Nods head).
5       MS. SCULLY:  We can take a break.
6       MR. SPARKS:  She seems to be tired.
7    Thank you.
8       THE VIDEOGRAPHER:  Going off the
9    record.  The time is 12:47 p.m.
10      (Whereupon, there was a recess in the
11   proceedings from 12:47 p.m. to 1:04 p.m.)
12      THE VIDEOGRAPHER:  Going back on the
13   record.  The time is 1:04 p.m.
14   BY MS. SCULLY:
15   Q.  Ms. Hofeller, before we went off the record
16   we were talking about the first telephone
17   communication that you had with Mr. Speas and
18   I believe you testified that in conclusion of
19   that conversation, Mr. Speas said something
20   along the lines of, okay, we'll have to do
21   some research.  We'll be back in
22   communication with you; is that correct?
23   A.  As far as I know.  I mean, it -- it -- I
24   remember it being very much what I would
25   expect communication with an attorney on a

123

1    civil matter to be like as in, tell us about
2    what you have and we will then -- they -- I
3    got the impression that they really wanted to
4    make sure that -- that I was -- that this was
5    a voluntary -- you know, that I was okay with
6    the idea that -- that -- that I might -- you
7    know, that this would be potentially involved
8    in the matter, not just, you know, an aside.
9    And with that they wanted to make sure that
10   it was relevant really, I guess, would be the
11   best word, that it was relevant.  And before
12   they even wanted to go into any more of the
13   nuts and bolts, they wanted to make sure that
14   this was even a relevant matter because I
15   think the impression being that they didn't
16   want to discuss -- they didn't want to
17   discuss a lot with me that wasn't
18   specifically relevant to the case.
19   Q.  When was the next communication that you
20   recall having with Mr. Speas after this
21   original approximately ten-minute phone
22   conversation that you had with him sometime
23   in December 2018?
24   A.  Well, again, my impressions from that time,
25   mostly about the fact that the holidays were

124

31 (Pages 121 to 124)

1    upon us and so there was a lot of -- there
2    was a lot of phone tag.  There was a lot of
3    someone's going to be out of town and then
4    another person's going to be on vacation and
5    things like that.  So I think -- I mean, the
6    next -- the next conversation, I believe,
7    that I can really firmly say it happened
8    instead of just leaving messages would have,
9    I think, been after the holidays, sometime --
10   I think sometime in January, I think.
11   Q.  That next conversation when you actually
12   spoke with Mr. Speas, not just exchanging
13   voicemail messages, sometime in January, did
14   you make that call or did Mr. Speas call you?
15   A.  I don't recall.
16   Q.  Regardless of who initiated the call, who was
17   on the call?
18   A.  I think that -- I think that it was just --
19   you know, it -- it -- it had come to the
20   point where it was clear to me at least
21   that -- that Eddie and Caroline were the
22   attorneys that -- that were -- at Common
23   Cause that were working on this matter.  So,
24   honestly, which -- which step was -- which --
25   which bit of information was given to me by

125

1    which one of them, Eddie or Caroline, it's
2    kind of hard for me to recall off the top of
3    my head, honestly.  I'm not trying to be
4    evasive.  I just don't know who -- who said
5    what.  I was -- I was already thinking of
6    them as interchangeable, you know, so --
7    Q.  I understand.
8    A.  -- it didn't seem relevant to me so I
9    didn't -- I didn't make the point to remember
10   who said what.
11   Q.  Did you have any telephone conversations in
12   which both Mr. Speas and Ms. Mackie were both
13   on the line at the same time?
14   A.  Yes.  Yes, we did have at least one, and I
15   think that was -- yeah, I think that would
16   have been in January.
17   Q.  What do you recall about that conversation
18   with both Mr. Speas and Ms. Mackie on the
19   phone in January?
20   A.  I remember that the -- I believe -- I could
21   say that the point of the conversation was
22   to -- to get a -- an accurate survey of what
23   information, what format, anything else that
24   might be includable -- I know that's not a
25   word but, you know, might be best included

126

1    with the -- the media we'd already
2    established was relevant to the -- to the
3    case.  Like is there any -- is -- is there
4    anything else that you have that appears to
5    be related to this directly that you would
6    like to -- to mention?  And I think -- I
7    think that there was only -- there were
8    things that were related to my father's work
9    in that everything was related to his work,
10   like, you know, certain -- certain statements
11   where the -- the business is mentioned like
12   as a -- like taxes, things like that, but
13   nothing -- you know, nothing specific.  I
14   don't -- I don't recall.
15   Q.  Do you recall having conversations with
16   Mr. Speas and Ms. Mackie about the fact that
17   information about your father's taxes were
18   included in these materials that you were
19   discussing producing to them?
20   A.  We did not discuss specifically taxes.  I
21   had -- we were -- it -- it was established
22   already that this media contained really a --
23   a masala of -- of -- of data that was my
24   personal data, my father's personal data, my
25   father's work data, and, frankly, even my

127

1    work data.  There was stuff relevant to my
2    work as well as my personal life on all of
3    them and that it was very -- it was -- I
4    think when I said personal that pretty
5    much covered everything nonre- --
6    specifically North Carolina redistricting
7    related.  What I'm saying is I don't remember
8    saying specifically, his tax returns are on
9    this.  I'm pretty sure I never said that.
10   I -- we just -- when -- when we discussed the
11   fact that it was all mingled, personal and
12   work, that I -- I think that was implied that
13   was covered.
14   Q.  If I understand your testimony, you discussed
15   with Mr. Speas and Ms. Mackie that within the
16   materials you were providing to them was both
17   data related to your father's work as well as
18   personal data with regards to your father and
19   personal data for your mother and personal
20   data for yourself, correct?
21   A.  Correct.
22   Q.  Do you recall what, if anything, Mr. Speas or
23   Ms. Mackie said in response to you sharing
24   with them that this data was commingled and
25   contained --

128

32  (Pages 125 to 128)

1  A.  They addressed it without -- I don't think I
2      even had to really specify what, I think,
3      seemed obvious and that is that obvious -- I
4      wouldn't expect to see a lot of personal data
5      suddenly appearing in this matter because
6      their understanding of the directive to them
7      was that only files that were explicitly,
8      obviously North Carolina redistricting during
9      this period of time related would even be
10     looked at, much less entered into evidence.
11     That was their understanding at that time.
12 Q.  And when you say that was their
13     understanding --
14 A.  That's what they told me their understanding
15     was.
16 Q.  Did you have any conversations with
17     Ms. Mackie without Mr. Speas on the line?
18 A.  Yes.
19 Q.  How many conversations have you had with
20     Ms. Mackie?
21 A.  I don't know.  Three, maybe four.  It was
22     very -- again, many of these conversations
23     weren't much more than just touch base, here's
24     here's what we're doing, we're doing the
25     research on this, we will get back to you,

129

1      just, you know, polite -- if it had been a
2      while or if I called and left a message,
3      like, you know, have you found out whether or
4      not X, X, X, then it was -- a lot of this was
5      voice mail.  I don't honestly -- I can't tell
6      you exactly how many conversations and many
7      of them were very brief, like just an attempt
8      to schedule a phone call or something.
9  Q.  Did you have any e-mail communications with
10     Ms. Mackie?
11 A.  I did and I -- the -- the -- what pops into
12     my mind instantly is she e-mailed me the
13     address to which I -- when it was established
14     that I was not going to be able to get to
15     Raleigh to actually produce the -- the
16     evidence as per the subpoena -- because that
17     was my original intention because I was back
18     and forth, you know, helping my mother
19     between my work in Kentucky and -- and -- and
20     visiting and helping her with -- with her
21     matters.  But it -- it -- it became
22     increasingly clear, one, that I wasn't going
23     to make it to Raleigh soon enough to -- to --
24     to -- to -- to get this produced and, two, I
25     think they -- that they had already said that

130

1      it was going to a third party anyway and that
2      it would be basically not even handled by
3      them.  It would go directly to a third party
4      anyway, so it would probably be just as well
5      that I mail it directly to that third party
6      for the -- the forensic IT expert really is
7      what my understanding was.  I don't remember
8      the exact words they used, but the idea that
9      this would be someone that could say, this is
10     how it was when we received it and could
11     confirm things like that none of the files
12     had been altered.
13 Q.  I thought you testified earlier that you did
14     not mail the materials directly to a
15     third-party vendor; is that correct?
16 A.  I mailed them to -- I mean, I thought that
17     Poyner Spruill -- no, not Poyner Spruill.  I
18     mean --
19 Q.  Is it your understanding that you thought --
20 A.  Yes.
21 Q.  -- Arnold & Porter was a third-party vendor
22     when you sent them the material?
23 A.  Vendor?  No.  Just another -- a different
24     attorney.  I said an attorney in D.C. who is
25     a forensic expert on IT essentially.

131

1  Q.  Okay.
2  A.  I don't remember the exact words, but that
3      was the understanding that I took away from
4      it, that they felt that it would be a -- a --
5      a better -- I don't know how to put it.  I
6      don't -- I don't have, as my father would
7      call it, the legalese to -- to repeat exactly
8      what was said.  I did not ever get the
9      impression this was a vendor.  My
10     understanding this was still a lawyer but
11     that this was somebody who specialized in
12     this sort of thing.
13 Q.  Okay.  Approximately how many e-mail
14     communications did you have with Ms. Mackie?
15 A.  Not very many.  I remember that she gave me
16     the address and then she had said that if I
17     was having trouble -- at a certain point
18     because I was having trouble finding a -- a
19     FedEx office close to my house, and also, for
20     a brief period of time, you know, the --
21     it -- it was about a hundred dollars to ship
22     and we had a brief discussion about how I
23     would be reimbursed and I said, well, I'll
24     have to wait till Friday because, you know,
25     my paycheck was clearing and I didn't want to

132

33 (Pages 129 to 132)

spend that money in advance. So, you know,
stuff like that. It was very much just how
was I going to actually achieve getting it in
a box and getting it to that party. So I
don't know exactly how many exchanges we had
over that.

Q. I know we talked about your text messages
with Mr. Speas. Did you have any e-mail
communications with Mr. Speas?

A. I don't know that I had a specific e-mail
communication with Mr. Speas. I -- I think
he was maybe CC'd on a couple of the things
or if not all the things that -- anything --
like I said, I was -- I was very quickly
aware of the fact that Caroline and Eddie
were the attorneys, so, again, I'm accustomed
to working with teams of lawyers where
everybody is CC'd on everything relevant. So
I don't know how many of them were. I just
remember seeing who was on the CC list and --
like, for example, when I saw the motion, I
noticed Mark Braden. I was like, oh, hey,
hi, Mark.

Q. In your -- you've testified in the
conversations that you've had with Ms. Mackie

133

and as well as with Mr. Speas that they've
mentioned doing research. Did they say
specifically what type of research they were
doing?

A. As to the relevance and admissibility of
this -- potential relevance and admissibility
of this evidence. Also, they -- they were --
you know, they were very polite and -- and
really wanted to make sure that I didn't feel
that they were pulling this out of me or that
I was on the spot. They were sensitive about
the fact that my father had very recently
passed and they were just, I mean, like
attorneys are, you know, careful, you know,
just polite. They didn't -- they didn't want
to make me feel like I was under any pressure
or -- I don't know how to put it best. I
think -- is my -- am I getting my point
across? I don't know.

Q. When you -- at what point in time did you
make the decision that you were going to turn
over to Arnold & Porter these hard drives and
thumb drives? I know you said you originally
had a plan that you were going to hand
deliver them in Raleigh and couldn't do that.

134

A. At what point did I make the decision to --
did we make the decision to mail them --

Q. No.

A. -- or --

Q. Earlier in the process. At what point did
you say, yeah, I'm going to give you -- I'm
comfortable giving you all of this stuff, you
can have it?

A. Well, honestly, I wouldn't have brought it up
if I wasn't comfortable with the idea that I
would eventually give it to somebody.

Q. So is it fair to say when you had your
initial communication with Mr. Speas, at that
point in time you already intended and
planned to provide them if they wanted it the
hard drives and the thumb drives?

A. Yes.

Q. Have you had conversations with anyone else
at Poyner Spruill besides Edwin Speas and
Ms. Mackie?

A. No.

Q. Is there anything you discussed with
Ms. Speas [sic] or Ms. Mackie in your
communications with them that we haven't
already covered?

135

A. I really don't think so, no. Maybe -- maybe
somebody said something about the weather but
nothing -- certainly nothing relevant.

Q. Other than exchanging of general pleasantries
on the communications that you've had with
Ms. Speas and Ms. Mackie, have we discussed
the substance of the communications that
you've had with them?

A. Yes.

Q. Have you had any communications with Stanton
Jones with Arnold & Porter before today?

A. Phone call.
      THE WITNESS: Were you -- yes, that
was --

A. I'm sorry. I don't remember all of the
names.
      THE WITNESS: When you called and --
and said, I have a room full of attorneys --
it's, you know, a colloquialism -- that
was -- what day was that?

A. Last week before the weekend. The Thursday,
I think it was, there was a conference call
where we -- where it was -- it was dropped
that there would very likely be a deposition
to authenticate.

136

34 (Pages 133 to 136)

Q.  Last Thursday you had a conference call with
Mr. Jones.  Was Mr. Sparks on the --
A.  Yes.
Q.  -- call as well?  Who else was on the call,
if anyone?
A.  I -- Caroline definitely and --
        THE WITNESS:  Eddie, were you part of
that, too?
A.  No.  Okay.
Q.  It's only if you recall.
A.  I don't.  I -- I -- I remember asking for the
list, but I was in the car and --
        MR. JONES:  I'll -- I'll just say we're
looking blankly at you because --
        MS. SCULLY:  Yes.
        MR. JONES:  -- you have to answer based
on your recollection.
        THE WITNESS:  I know.
        MR. JONES:  You're not allowed --
        THE WITNESS:  I know.  It's --
        MR. JONES:  -- to ask us questions.
        THE WITNESS:  It's -- it's -- I --
        MR. JONES:  So I don't --
        THE WITNESS:  I --
        MR. JONES:  And we're not trying to be

137

rude.
BY MS. SCULLY:
Q.  It's an un- --
A.  Sometimes I forget that it's not --
Q.  And it's an unnatural --
A.  -- a casual conversation.
        MR. JONES:  Yes.
BY MS. SCULLY:
Q.  Right.
A.  This is -- I honestly don't recall the names
of -- of everyone that was involved.  I do
remember because I said, hi, Caroline --
because I had spoken to her before.  And I
think that the other names were names that I
did not offhand know so...
Q.  So to the best of your recollection, on the
call was Stanton Jones, Caroline Mackie, and
Mr. Sparks.  There may have been a few
additional individuals whose names you can't
recall and you didn't recognize at the time?
A.  Yes.
Q.  You were in a car when you received the call
you said, yes?
A.  Yes.
Q.  Approximately how long did the telephone call

138

last?
A.  It -- it -- it's hard to say because my -- my
Bluetooth connection with my car kept
dropping calls so there were -- there were a
number of -- of drops.  There was -- at one
point I even continued -- I must have gone on
for at least a minute or two before I
realized that there was no one on the other
end.  Basically, it was just about how I
came -- the same set of questions that you
asked today, basically, how did I come by it,
making -- you know, was it given to
me?  All of that.  That -- and I -- you
know, I spoke a lot about -- actually, in
that phone call I ex- -- I spoke a lot about
the importance of -- of my father's work and
how it was a very -- it seemed to me a very
pertinent matter.  And I explained at that
time that I had throughout my young life
been as an only child very involved in --
involved in that when my father had a
PowerPoint presentation that he had just
designed for the state legislators, he would
say (indicates).  He -- I -- at age 11 I
think he felt that I was about at that level.

139

If you can understand this, then I've done --
I've done my job.  And -- and any -- any
attempts that he made to -- to -- to make the
matter understandable to someone who wasn't
in, you know, cartography and demographics,
he would often test that on me to see because
I knew more probably than your average
11-year-old but still wasn't, you know, like
one of the programmers.  So he thought that
if -- if it was clear to me, that that would
be a good measure of if he, you know,
summarized it accurately.  So, you know, I
did a little bit of -- of -- of, I don't
know, sort of anecdotal tales about what it
was like growing up in -- in a -- inside the
beltway as it were.
Q.  Would you say the call lasted more than an
hour?
A.  I don't think it was more than an hour, no.
It was about -- as -- as far as the amount of
time that I actually spent on the phone,
closer to 45 minutes.  I mean, I -- as best I
can recall.  I honestly was kind of trying to
find a place to park where people weren't all
close by.  I had -- you know, wasn't really

140

1    familiar with the area.  I just wanted to get
2    somewhere so I wasn't going to be talking and
3    driving at the same time.
4    Q.  Did you have any in-person meeting with
5    Mr. Jones or Mr. Speas in advance of today's
6    deposition?
7    A.  Nope.  This is the first time I've seen
8    either of them.
9    Q.  Prior to today's deposition had you ever seen
10   the photographs that were marked as Exhibit
11   2?
12   A.  No.
13   Q.  Have you had any other communications with
14   Mr. Jones besides this telephone conversation
15   we were talking about that occurred last
16   Thursday?
17   A.  No.  No.  Messages about everything have been
18   coming to me through my attorney.
19   Q.  In your communications with Mr. Speas and
20   Ms. Mackie, at what point in time did either
21   Ms. Speas or Ms. Mackie address the actual
22   issuance of a subpoena?
23   A.  I don't think -- I honestly don't think
24   that -- I'm not sure that I even spoke to
25   them directly in advance of -- well, I think

                                            141

1    that -- that -- that it was Jane who
2    mentioned that they wanted to give me the
3    heads-up that there would be -- that that
4    would be out and -- because I had mentioned
5    that the Geographic Strategies computers had
6    been taken already by my father's business
7    partner, I think they mentioned to me that
8    there was a subpoena issued to Dale, to
9    Dalton Oldham, but then at that point it
10   was -- I asked questions like, will I
11   theoretically get this back?
12   Q.  Uh-huh.
13   A.  And they said yes.  And I was just trying to
14   get an idea of -- of what their journey was
15   going to be, you know, considering that it
16   was my property.  And it was mostly at that
17   point discussion about just, you know,
18   literally where they should be sent and --
19   and all of that.
20   Q.  Who mentioned to you that a subpoena was
21   issued to Dale Oldham?
22   A.  I don't remember whether that was Eddie or
23   Caroline.
24   Q.  Were you surprised that a subpoena was issued
25   to Dale Oldham?

                                            142

1    A.  No.  No.
2    Q.  In what context did they bring up that a
3    subpoena was issued to Dale Oldham?
4    A.  I think it was when I, again, had said
5    something about -- I don't know.  I felt like
6    I didn't want to promise that any of this
7    was -- was relevant or new because -- and I
8    kept -- I really did genuinely believe that
9    because of the fact that Dale had had this
10   repeated conversation, this repeated
11   interaction with my father and his -- you
12   know, his possessions that everything that
13   could possibly be at all pertinent had
14   already been collected.
15   Q.  Did either Mr. Speas or Ms. Mackie tell you
16   that Dale Oldham had produced materials in
17   response to a subpoena?
18   A.  No.  I -- I did ask.
19   Q.  And what did they say?
20   A.  And I think it was Caroline that said, he's
21   refusing this -- to accept service.  And I
22   said, that's the Dale I know.
23   Q.  So it didn't surprise you that Mr. Oldham was
24   not responding to the subpoena?
25   A.  That's correct.  It's --

                                            143

1        MR. SPARKS:  Objection --
2        THE WITNESS:  Oh, yeah.
3        MR. SPARKS:  -- mischaracterization.
4        THE WITNESS:  Yeah.
5        MR. SPARKS:  Go ahead.
6    A.  I -- I would say nothing -- nothing surprises
7    me with attorneys.  I -- again, you know, my
8    father did not -- no offense to any -- any
9    esquire here, but he did not have a very
10   reverential attitude towards the whole
11   process.  He said something about that --
12   along with like a -- a little quip like with
13   legislation -- you know, legislation is like
14   sausage, you -- you shouldn't watch it being
15   made.  You know, I think he felt the same
16   about litigation so -- he --
17   Q.  You un- --
18   A.  -- often used to say that Dale was a very --
19   very -- a good strategist.
20   Q.  You understood at the time you were speaking
21   with Mr. Speas and Ms. Mackie that they had
22   been unable to obtain from Mr. Oldham records
23   relating to your father's work --
24   A.  Only --
25   Q.  -- correct?

                                            144

                          36 (Pages 141 to 144)

1    A.  -- because I --
2         THE WITNESS:  I'm sorry.
3         MR. SPARKS:  Objection,
4    mischaracterization.  And just to be specific
5    and not to have a talking -- she said that
6    her -- what she was told is he never accepted
7    service so -- and I'm not trying to shape
8    testimony.  That's just what she said.
9    A.  Yes.  I asked because I was curious because
10   I -- again, the same reason I was curious
11   when I saw all of these files and had a
12   minute to look at them, really my -- my
13   interest in them was a bit more on the
14   academic end than anything else.
15   Q.  You understood based on your conversations
16   with Mr. Speas and Ms. Mackie that they had
17   not received any of your father's business
18   records from Mr. Oldham in the litigation,
19   correct?
20        MR. JONES:  Objection.  It's been asked
21   and answered.
22   A.  It was --
23        MS. SCULLY:  It hasn't been answered.
24   A.  -- my --
25   Q.  You may answer.

                                                            145

1    A.  -- understanding based on a response to my
2    direct question that Dalton Oldham was
3    refusing to accept service on the subpoena.
4    Q.  And as a result of his refusing to accept
5    service, you understood he had not turned
6    over any documents, correct?
7    A.  Yes.
8    Q.  Did you retain copies of any of the hard
9    drives and thumb drives that you produced to
10   Arnold & Porter in response to the subpoena?
11   A.  Yes.
12   Q.  Did you make copies of all of the hard drives
13   and thumb drives?
14   A.  I was not actually able to copy everything
15   because I did not at that moment have
16   adequate storage.
17   Q.  What -- which files did you copy and
18   maintain?
19   A.  I was really principally concerned with --
20   well, first of all, I -- I did -- there was
21   one hard drive I know that had many, many,
22   many, many backups of the same hard drive, so
23   I copied, you know, the first one and the
24   last one only knowing that that was going to
25   be redundant and I was not -- I was not, I

                                                            146

1    didn't feel, charged with maintaining the
2    forensic integrity so I was just -- I wanted
3    to make sure that I had -- that I had
4    everything in that it was mine, in that it
5    was -- I don't have a lot of -- of memento
6    from my father.  I was kind of hoping that I
7    would be able to preserve this for posterity
8    if nothing else.  And knowing how these
9    things work, even though it was clear that
10   the -- that the intention was that these
11   things would be returned to me, that's
12   another thing my father taught me.  You don't
13   count on it.
14   Q.  The copies that you made of the -- some of
15   the materials that you provided to Arnold &
16   Porter, where are those copies maintained?
17   A.  I have those at home in my home in Kentucky
18   and I have it on a couple of my own thumb
19   drives.
20   Q.  And where are the thumb drives kept?
21   A.  In the same drawer where I keep pens,
22   pencils, stuff like that.
23   Q.  Is the drawer in your home in Kentucky?  I'm
24   trying to understand --
25   A.  Yes.

                                                            147

1    Q.  -- physically --
2    A.  Yes.
3    Q.  -- where it is.
4    A.  Yes.  I'm sorry.  I didn't mean to -- I -- I
5    wasn't sure what you were asking.  Yes,
6    they're -- they're in Kentucky.
7    Q.  So all of the copies that you've made are
8    maintained at someplace in your home in
9    Kentucky, correct?
10   A.  All of the copies that I made, yes, and --
11   Q.  Correct?
12   A.  Except, of course -- now, I have some copies
13   of the photographs of me and my children, for
14   example, on -- on -- on like my laptop that
15   is -- it's like -- I -- I don't put pictures
16   as background for desktop, but sometimes I
17   have little decorative things.  I was, again,
18   so happy to have these pictures again that I
19   have some of those, but other than that, no,
20   I -- I tried really to keep it separate.  I'm
21   not, you know -- have more pressing matters.
22   Q.  Have you provided anyone else with any copies
23   of the materials that you turned over to
24   Arnold & Porter?
25   A.  Yes.  My files, things that were literally

                                                            148

1    mine, I have shared with colleagues in my
2    work as a research consultant in criminology,
3    specifically victimology, specifically with
4    an emphasis on gender-based violence.  So
5    things that were relevant to our study of --
6    of anything involving that topic that were
7    there on note files, those -- mine, yes.
8    Q.   Have you shared with anyone any copies of any
9         materials that relate to your father or your
10        father's work?
11   A.   No, other than communication between him and
12        me on matters that were related to me, but
13        not -- nothing related to his work.
14   Q.   There was, I understand also, on the files
15        you provided to Arnold & Porter personal
16        health information about your mother,
17        correct?
18   A.   I -- I honestly don't know.  I didn't really
19        examine all of the files that appeared to be
20        health related to see which of them were Mom
21        and which of them were Dad, and honestly,
22        right at this moment I -- I don't -- I don't
23        know that I really observed -- okay.  I think
24        there was like a HIPAA form, but one of them
25        was mine and I know there are medical records

149

1    of mine on that hard drive, one of them.
2    Several, I think.  I have some HIPAA release
3    forms that I scanned and sent to hospitals,
4    doctors, to obtain medical records on myself
5    and my children.  My children's medical
6    records are part of that archive, vaccination
7    records, things like that.
8    Q.   Sitting here today, do you know if -- in the
9         materials that you provided to Arnold &
10        Porter if there was personal health
11        information related to your mother in those
12        materials?
13   A.   I don't know.
14   Q.   Could have been; you just don't know?
15   A.   Exactly.
16   Q.   Other than the information related to you
17        personally that you provided to some of your
18        coworkers, have you provided copies of
19        information -- this information that you
20        produced to Arnold & Porter to anybody else?
21   A.   I'm -- I'm sorry.  Clarify the question
22        again.
23   Q.   You've testified that you provided some of
24        your personal information that is contained
25        within the materials you provided to Arnold &

150

1    Porter, correct?
2    A.   Yes.
3    Q.   I'd like to understand if -- putting that
4         information aside --
5    A.   Uh-huh.
6    Q.   -- have you provided any other information
7         from the materials you provided to Arnold &
8         Porter to anyone else?
9    A.   No.
10   Q.   You mentioned that Mr. Speas and Ms. Mackie
11        talked to you about a subpoena that they'd
12        issued to Dale Oldham.  Did either Mr. Speas
13        or Ms. Mackie inform you that they had issued
14        a subpoena to your mother as well as to the
15        estate of your father?
16   A.   Yes.
17   Q.   When did they first tell you about that
18        subpoena that they had issued?
19   A.   I think almost immediately after it was
20        issued.
21   Q.   Did they tell you in advance of issuing it
22        that they were going to issue it?
23   A.   I don't think so.  I don't honestly remember.
24        No.  I think it was they had just issued it.
25   Q.   Did they tell you why they were sharing that

151

1    information with you?
2    A.   Because they knew that I was in constant
3         communication with my mother and they --
4         again, this was all -- there was -- there's a
5         lot of talk about being sensitive to the fact
6         that my father had recently deceased and I
7         think that the -- the impression was that
8         they wanted me to know so that I -- so that
9         my mother wouldn't, you know, see another
10        legal document and think that it was, you
11        know, something that she was going to be, you
12        know, directly -- I don't know.  That the
13        incompetency got her very understandably --
14        she felt very put upon, very examined, and --
15        and I think the idea was -- I think I had
16        told them that they -- that I would like them
17        to tell me at that point so that I could know
18        that my mother was not going to be scared
19        when -- when she received it and think, you
20        know, she's -- she has some memory -- memory
21        issues as is normal for someone her age.  So
22        they knew that I was very sensitive to that
23        and that she -- even if I had told her, which
24        I didn't, that she might not remember that --
25        that that's what that was.  So that was

152

1    really pretty much it, so that -- that I
2    would -- that my mother wouldn't be caught
3    off guard and -- and be frightened and that I
4    would have a chance to -- to, once again,
5    clarify with her what was going on and that
6    that wasn't going to be a -- a problem for
7    her.
8    Q.   And when you say it wasn't going to be a
9    problem for her, what do you mean by that?
10   A.   As opposed to the proceedings that are
11   directly -- that were directly challenging
12   her competence, which was very much a problem
13   for her.
14   Q.   Did you have conversations with either
15   Mr. Speas or Ms. Mackie about the fact that
16   your mom had these memory problems?
17   A.   No, not specifically the memory problems.  I
18   think it was more casual like, you know,
19   she's -- she's -- her emotions are very raw
20   right now.  She's on edge from everything
21   that's been happening.  And I think really it
22   was more, again, in casual conversation
23   the -- neither Eddie nor Caroline was
24   expressing any type of interrogatory interest
25   in -- in the other matter.  We really -- our

153

1    conversation really was very much centered on
2    this whole -- this, this matter, those
3    materials, and my father in his -- in the
4    context of his work as a political
5    demographer.
6    Q.   Did you have any conversations with Mr. Speas
7    or Ms. Mackie about whether your mom would --
8    had possession of any materials that would be
9    responsive to a subpoena?
10   A.   Yes, in that I -- basically, I -- I had said
11   that I -- that between Dale having taken the
12   work stuff and I taken the rest of what I
13   saw, then that all -- all that remained in
14   her home was -- was a personal PC that was
15   really relatively new.  I don't think that --
16   that my parents even had that PC for more
17   than a few weeks before my father died, and
18   it did not -- it did not appear to me -- and
19   the reason that I was familiar at all with
20   the content of my mother's -- now my mother's
21   personal computer is because she'd had some
22   issue with a virus shortly before I had come,
23   so I had -- along with the -- with the -- the
24   gentleman that she had -- had come in to help
25   her make sure that her -- her PC was secure,

154

1    I just checked around to see if I saw
2    anything untoward I -- looking for, you
3    know --
4    Q.   So you shared -- if I understand your
5    testimony correctly, you had shared with
6    Mr. Speas and Ms. Mackie that between Dale
7    Oldham having the two computers of your
8    father and you having the hard drives and the
9    thumb drives that your mother no longer had
10   possession of any of your father's electronic
11   work files, correct?
12   A.   I had said that if there was -- I remember
13   that I was, again, like a -- like a lawyer,
14   you know, I can't say for sure, but it looked
15   to me that the only thing that could possibly
16   even exist in her possession would be most
17   certainly a duplicate of one or two files, a
18   duplicate of something that was already in
19   the matter, i.e., that -- that might be
20   one or two of the last things that he -- he
21   mentioned to himself on that PC but that --
22   that -- at first glance -- because also, I
23   was looking for things relevant to me,
24   photographs of the family, things that I
25   might have missed, but it appeared as though

155

1    there really wasn't anything much new at all
2    on -- on -- on my mother's hard drive.  So
3    I -- I did not say for sure that I knew
4    because I -- I didn't feel confident.  I
5    wasn't even in Raleigh at that time.  I just
6    said, as far as I know, there is nothing on
7    her personal computer and I don't believe
8    there's anything else much there.  And I said
9    that I would -- that I would probably be
10   better able to confirm it when I was next in
11   Raleigh.
12        And in answer to your next question, no,
13   I haven't really been -- my mother and I have
14   not really been -- that hasn't been our
15   focus.  I only recently found out that there
16   was even going to be a deposition or that --
17   so I haven't actually gone through to --
18   to -- to confirm it, but that's my
19   understanding and that's her understanding,
20   my mother's understanding, as far as I know,
21   too.
22   Q.   I want to make sure I understand your
23   testimony.  So you --
24        MR. SPEAS:  Ms. Scully, your questions
25   about my conversations with this witness have

156

39  (Pages 153 to 156)

1  now exceeded the length of those
2  conversations. I really think it's time you
3  moved on to something else.
4  BY MS. SCULLY:
5  Q. In your communications with Mr. Speas, did
6  you share with him that you would take it
7  upon yourself to look to determine if your
8  mom in her files had information related to
9  your father's work?
10  A. I really -- it was not -- I don't know -- I
11  mean, I wasn't giving testimony. It was just
12  a casual conversation where I said, as far as
13  I know, there's really nothing there. I
14  can't say for sure because I'm not there, but
15  I'll ask my mother and I'll look just like to
16  see if there's a new computer sitting on the
17  table when I get there. I mean, really,
18  there was very nonspecific tone, but I
19  expressed what I'll go ahead and express
20  again and that is that I really think that I
21  had gotten the -- the survey of everything
22  that could possibly be relevant and it was
23  already in the hands of Poyner Spruill, I
24  guess. No. Which one? I'm -- I'm getting
25  all of you confused. Yes. Okay. Arnold

157

1  Porter.
2  Q. Did you at any point in time actually go
3  through your mother's files to determine if
4  she had any information that may be
5  responsive to the subpoena that was served on
6  her?
7  MR. SPARKS: Objection. That has been
8  asked and answered.
9  A. Yes, it has. It --
10  Q. Did you?
11  A. -- really has. I -- I said that I went
12  through her files before -- not her files --
13  again, the personal PC principally to look
14  for any other pictures -- honestly, pictures
15  of family members was specifically what I was
16  looking for. As I did that survey, I didn't
17  notice anything else work related -- my
18  father's work related. So did I go through
19  it with the idea that I was looking for stuff
20  for them? No. Did I go through it? Yes.
21  Q. Did you have a conversation with your mother
22  about the subpoena that was issued by Poyner
23  Spruill on her?
24  A. Yes. A conversation is a little bit an
25  exaggeration. I basically said, you don't

158

1  really have to be worried about this. This
2  is -- this is -- this is about stuff that you
3  gave me, but just -- she's used to the idea
4  that lawyers like to cross their T's and dot
5  their I's, and that's the way I put it to her
6  and she understood it that way, and that was
7  the end of the matter as far as she was
8  concerned. I really didn't want to -- I
9  mean, she -- she's bored with this. She
10  spent 52 years being married to my father.
11  MR. JONES: We've --
12  BY MS. SCULLY:
13  Q. It was your ex- --
14  MR. JONES: We've been going --
15  BY MS. SCULLY:
16  Q. It was your expectation that your mother
17  didn't have any materials to produce and so
18  you told her, you don't have to worry about
19  it because you have no materials to produce
20  in response to the subpoena, correct?
21  MR. SPARKS: Objection,
22  mischaracterization. Go ahead and answer the
23  question.
24  A. I'm really not trying to be evasive. I don't
25  understand what part of your question I

159

1  haven't answered yet. Maybe you could
2  clarify what you would like to know so that I
3  can answer --
4  Q. Did you --
5  A. -- your question.
6  Q. -- tell your mother that there -- there were
7  no materials that she needed to produce in
8  response to the subpoena?
9  A. You know what, no, I didn't put it that way
10  because -- I just told her not to worry about
11  it because my mother's really had enough of
12  all of this and I didn't -- really, it was --
13  it was pointless to -- to trouble her at that
14  moment because we were actually discussing
15  the funding of her trust, whether or not she
16  was going to be able to access funds to come
17  and visit me in Lexington. That was really
18  the meat of our conversation and I -- as she
19  was accustomed to sort of letting things go
20  by with my father's work as married couples
21  often don't pay a lot of attention to each
22  other's work, it was in that tone. So I
23  don't -- I'm really just trying to be
24  accurate.
25  Q. How about --

160

1    A.  I don't know how important it is...
2         MR. SPARKS:  Do you have any more?
3         THE WITNESS:  No.
4         MR. SPARKS:  Okay.  We need to take a
5    break.  She's -- she's tired.  Thank you.
6         THE VIDEOGRAPHER:  Going off the
7    record.  The time is 1:50 p.m.
8         (Whereupon, there was a recess in the
9    proceedings from 1:50 p.m. to 1:57 p.m.)
10        THE VIDEOGRAPHER:  Going back on the
11   record.  The time is 1:57 p.m.
12   BY MS. SCULLY:
13   Q.  Ms. Hofeller, have you had any communications
14       with a David Gersch?
15   A.  Not that I can recall, no.
16   Q.  Have you had any communications with someone
17       named Elizabeth Theodore?
18   A.  No.
19   Q.  Any conversations or communications with
20       Daniel Jacobson?
21   A.  No.
22   Q.  Any conversations that you can recall with
23       anyone that works for Arnold & Porter besides
24       Mr. Stanton Jones, the conversation we've
25       already discussed?

161

1    Q.  Are you a member of Common Cause?
2    A.  No.
3    Q.  Have you ever worked for Common Cause?
4    A.  No.
5    Q.  Have you ever told anyone that you were
6        working for Common Cause?
7    A.  No.
8    Q.  Have you ever received any money from Common
9        Cause?
10   A.  No.  Oh, you know, actually, I think there
11       was reimbursement for the FedEx --
12   Q.  And the reim- --
13   A.  -- in the form of a check.
14   Q.  The reimbursement for the FedEx -- and you're
15       referring to the FedEx for shipping the
16       documents to Arnold & Porter, correct?
17   A.  Yes.  I provided them with a receipt and they
18       provided me with a reimbursement for that
19       amount.
20   Q.  Other than the reimbursement for the shipment
21       for the box that you sent via FedEx to
22       Arnold & Porter, have you received any other
23       monies from Common Cause?
24   A.  No compensations, no considerations, no
25       money.

163

1    A.  No.
2    Q.  Any conversations with anyone working for
3        Poyner Spruill besides the conversations that
4        you've had with Mr. Speas and Ms. Mackie?
5    A.  No.
6    Q.  Have you had any conversations or
7        communications with Mark Elias?
8    A.  No.
9    Q.  Have you had any conversations or other
10       communications with someone named Aria C.
11       Branch?
12   A.  No.
13   Q.  Have you had any communications or other
14       written communications with Abha Khanna?
15   A.  No.
16   Q.  Have you had any communications with anyone
17       working for Perkins Coie?
18   A.  No.
19   Q.  Have you had any communications with anyone
20       at Common Cause besides the communications
21       with Ms. Pinsky and the communication with --
22        MR. JONES:  Mr. Phillips.
23   BY MS. SCULLY:
24   Q.  -- Bob Phillips?
25   A.  No.

162

1    Q.  Have you at any point in time received any
2        monies from anyone at Poyner Spruill?
3    A.  No.
4    Q.  Have you received any monies at any point in
5        time from anyone at Arnold & Porter?
6    A.  No.
7    Q.  Have you received monies at any time from
8        anyone working for Perkins Coie?
9    A.  No.
10   Q.  You've talked about the review of the
11       materials that you have conducted of the hard
12       drives and the thumb drives.  At any point in
13       time did anyone else have access to and
14       review those materials before you produced
15       them to Arnold & Porter?
16   A.  No.
17   Q.  Did -- you testified that the materials that
18       you took possession of from the residence
19       where your father and mother resided -- you
20       took those materials -- those electronic
21       materials to your home in Kentucky --
22   A.  That's correct.
23   Q.  -- before --
24   A.  I'm sorry.  I --
25   Q.  -- before you produced them to Arnold &

164

41  (Pages 161 to 164)

1    Porter approximately March 13th, 2019,
2    correct?
3  A.  Correct.
4  Q.  Has anyone else resided in your home in
5    Kentucky during that period of time between
6    October 2018 and March 13th, 2019?
7  A.  No.  I live alone.  Ditched the husband.
8    First time in my life, actually, I have my
9    own place.  It's wonderful.  I love it.
10  Q.  Prior to sending the hard drives and thumb
11    drives to Arnold & Porter, did you provide
12    copies of any of those materials to anyone
13    else?
14    MR. JONES:  Ob- -- objection.  That's
15    been --
16  A.  I already answered that.
17    MR. JONES:  -- asked and answered.
18  BY MS. SCULLY:
19  Q.  Was --
20  A.  I already answered that.
21  Q.  I just wanted to clarify if it was prior to
22    your -- I know you -- you've testified
23    already that you provided some personal
24    information to a coworker.  Was that prior to
25    your sending the information to Arnold &

165

1    done over the phone.  I didn't get the
2    impression that there was anyone else there
3    so as far as I know there wasn't, no.
4    MS. SCULLY:  Can I have these marked 3
5    and 4?  3 is on top, 4 is on bottom.
6    (HOFELLER EXHIBIT 3 was marked for
7    identification.)
8    (HOFELLER EXHIBIT 4 was marked for
9    identification.)
10    MR. BRANCH:  Thank you.
11    MS. SCULLY:  We're short one.
12    MR. BRANCH:  If you need to --
13    MS. SCULLY:  She has it.  It's marked.
14    MR. JONES:  Why don't we give Tom your
15    copy because --
16    MR. SPEAS:  Yeah.
17    MR. JONES:  -- he doesn't have one and
18    we can share.  So, Tom -- Tom --
19  A.  Okay.  I see.
20    MR. JONES:  -- take a --
21  BY MS. SCULLY:
22  Q.  Oh.
23    MR. JONES:  -- take a copy for each.
24    MR. SPARKS:  Thank you.
25  A.  I see that these are two different --

167

1    Porter or after?
2  A.  That was prior and after because there was
3    something else relevant.  So, again, my
4    material, exclusively mine, as in may -- I
5    sent a copy of one of those pictures to
6    another one of my colleagues, picture of my
7    son.
8  Q.  I just wanted to clarify --
9  A.  Yeah.
10  Q.  -- so there wasn't a confusion about whether
11    the copies were distributed prior to or after
12    the -- the release of the information to
13    Arnold & Porter.
14  A.  Yeah.  I mean, I don't know.  I mean, you
15    know...
16  Q.  You testified earlier that before you made
17    the production of the materials to Arnold &
18    Porter that you did have some conversations
19    with your mother about the fact that you were
20    going to produce those materials to Arnold &
21    Porter, correct?
22  A.  Yes.
23  Q.  Was anyone else present when you had those
24    communications with your mother?
25  A.  No.  I don't think so.  I mean, these were

166

1    MR. JONES:  We'll share.
2    MS. SCULLY:  Thank you.  I thought I'd
3    made enough copies but apparently not.
4    MR. SPARKS:  It's good.  We're good.
5    Thanks.
6  BY MS. SCULLY:
7  Q.  Ms. Hofeller, what's just been put in front
8    of you marked as Exhibit 3 and 4, focusing
9    first on Exhibit 3, do you recognize Exhibit
10    3 as a copy of the subpoena that was issued
11    to your mother, Kathleen Hofeller, on or
12    about January 15th, 2019?
13  A.  I see that it is, but I don't recognize it.
14  Q.  Had you ever seen -- I know you testified
15    earlier that you were aware that a subpoena
16    was issued to your mother in this case.  Had
17    you ever seen a copy of the subpoena before
18    today?
19  A.  Actually, no.
20  Q.  Exhibit 4 appears to be a copy -- I'll
21    represent to you is a copy of a subpoena that
22    was issued to the Estate of Thomas Hofeller.
23    I know you testified earlier that you were
24    aware that a subpoena was issued to your
25    father's estate.  Had you ever seen a copy of

168

42  (Pages 165 to 168)

1    the actual subpoena?
2    A.  No.
3    Q.  Put that aside.  You testified earlier that
4        you first learned of your father's passing
5        in -- I apologize --
6    A.  September 30th.
7    Q.  -- September 30th, 2018.  How did you come to
8        learn of your father's passing?
9    A.  I typed his name into Google and saw the New
10       York Times article of his obituary.
11   Q.  What had prompted you to search for your
12       father's name that day?
13   A.  I had a feeling, a hunch something might
14       be -- and, you know, it would -- I think it
15       had -- like a few months ago I was aware of
16       the -- the -- the fact that there was another
17       set of -- another set of districts in court,
18       so, I mean, I figured if nothing else, I'd
19       see if there was anything interesting about
20       that basically really in my role as a -- as
21       a -- as a student of -- of -- of political
22       philosophy and -- and other such things.
23       But, honestly, I -- I -- I had a hunch that
24       maybe something was wrong.
25   Q.  Once you found out that your father had

169

1        passed away, did you reach out to your
2        mother?
3    A.  Yes.
4    Q.  Did you ask your mother why she hadn't
5        contacted you to inform you --
6    A.  I didn't.
7    Q.  -- that your father --
8    A.  No.
9    Q.  -- had passed?
10   A.  No.
11   Q.  And why not?  You said you didn't --
12   A.  I didn't need to because I don't believe that
13       she knew how to reach me.
14   Q.  And -- and why do you say that?
15          MR. JONES:  I'm -- I'm -- I'll object
16       to this line of questioning.  I -- I can't
17       imagine why the -- the circumstances around
18       Ms. Hofeller's communications with her -- her
19       mother relating to her father's death could
20       possibly have any relevance here.  It
21       seems -- it seems vexatious.
22          MR. SPARKS:  Are you going to instruct
23       the witness not to answer?
24          MR. JONES:  She's not my witness.
25   A.  I was -- let's see.  No, I didn't ask her why

170

1        she hadn't contacted me.
2    Q.  Had your father -- had there already been a
3        funeral service for your father at that point
4        in time when you learned of his passing?
5          MR. JONES:  Object again.  It's -- I
6        think it's inappropriate.
7    A.  I know as much about it as anyone who read
8        the New York Times obituary.
9    Q.  I take it you did not attend a funeral
10       service for your father; is that correct?
11          MR. JONES:  Objection.
12   A.  No.
13   Q.  You testified that you -- earlier that you
14       had not spoken to your father -- the last
15       time you'd spoken to your father was July
16       2014 prior to his passing in August of 2018,
17       correct?
18   A.  Yes.
19   Q.  Had you followed your father's work in any
20       way between July 2014 and August 2018?
21          MR. SPARKS:  Now I'm going to object.
22       It's -- my understanding of this proceeding
23       is that this is to authenticate things that
24       she turned over and we're now getting to
25       personal family matters.  I'm going to -- are

171

1        we going to continue down this line?  If
2        we're going to continue down this line, I am
3        going to instruct her not to answer.
4          MS. SCULLY:  Not much further, but I
5        just want -- it is important.  It is relevant
6        and we can talk outside about whether it's
7        relevant or not, but I'm not going to talk
8        about that in front of the witness.
9          MR. SPARKS:  Okay.
10          MS. SCULLY:  I'm simply asking if she's
11       kept track of --
12          THE WITNESS:  Oh, go on ahead.
13          MS. SCULLY:  -- her father's work.
14          THE WITNESS:  Sorry.
15          MR. SPARKS:  Go ahead and answer that
16       question.
17          MR. JONES:  Can you repeat it?  I
18       forgot it.
19          Can you -- can you read back the last
20       question?
21          MS. SCULLY:  I can reask the question.
22   BY MS. SCULLY:
23   Q.  Between July 2014 and August 6 -- I'm sorry,
24       July 2014 and August 16th, 2018, have you
25       followed any of your father's work?

172

43  (Pages 169 to 172)

A. That is a very vague question. Maybe you
could be more specific. I was not in
communication with him. In what way would I
follow his work?

Q. Have -- did you read articles about any work
your father was doing in redistricting
between July 2014 and August 16th, 2018?

A. I quite certainly may have read any number of
the many, many newspaper articles about my
father who was rather well-known including
the one I just mentioned, the New York Times
article that was his obituary. I read that.

Q. Did you read any articles or any statements
made by Common Cause about your father's
work?

A. I do not recall having made note of the name
Common Cause until such point as my father
was already deceased. I really wasn't that
involved.

Q. Ms. Hofeller, have you ever been charged with
a crime?

   MR. SPARKS: Objection. Ob- -- this is
totally inadmissible. I mean, this is
absolutely inadmissible. Don't answer that.
Go ahead.

173

   MS. SCULLY: You're going to instruct
her not to answer?

   MR. SPARKS: I am instructing her not
to answer that question.

   MS. SCULLY: Okay.

   MR. BRANCH: Okay.

   MS. SCULLY: Oh, did I give you one
that's got any markings on it? I don't think
so.

   MR. SPARKS: Here, you can --

   MS. SCULLY: That's all right. No,
that's all right. I'll give you one in one
second. Sorry. I just...

   THE WITNESS: Oh, more -- you would
have --

   MR. SPARKS: Please.

   THE WITNESS: Yeah. Okay.

   (HOFELLER EXHIBIT 5 was marked for
identification.)

   MS. SCULLY: I seem to have lost mine.
I'm going to have this one marked also at the
same time.

   (HOFELLER EXHIBIT 6 was marked for
identification.)

   MR. BRANCH: Thank you.

174

   MR. JONES: These are 5 and 6?

   MS. SCULLY: Yes.

BY MS. SCULLY:

Q. Ms. Hofeller, have you had an opportunity to
review the documents that's been put in front
of you marked Exhibit 5 and Exhibit 6?

A. Let me look quickly at 6. Yes.

Q. Yes.

A. Yeah.

Q. Have you seen the documents marked as Exhibit
5 and Exhibit 6 before?

A. I have never seen this page right here
(indicates).

Q. When you're pointing to this page right here,
which one are --

A. This one on top, the first page --

Q. -- you referring to?

A. -- of Exhibit 5, I have never seen this
before. I have seen the -- the -- this page
is familiar to me.

Q. And when you're saying this page, I just want
to reflect for the record on the document
marked as Exhibit 5, you're referring to the
second page which has the caption, Notice of
Hearing on Incompetence Motion in the Cause

175

and Order Appointing Guardian Ad Litem?

A. Yes.

Q. Okay. And have you seen the third page of
the document?

A. No.

Q. In the document marked Exhibit 5, the second
page that you've seen, did you see that on or
about October 29th, 2018, that there was
going to be a hearing for your mother
regarding her in- -- whether she was
incompetent or not?

A. On or about.

   MR. SPARKS: Ask the question again,
please.

BY MS. SCULLY:

Q. Do you recall when you first saw the second
page of the document marked Exhibit 5?

A. Yes.

Q. When?

A. I think it was a few -- few days later.

Q. A few days later from --

A. After it was filed.

Q. -- when?

A. A few days after it was filed. I mean, I
guess that it was filed on the 29th

176

44 (Pages 173 to 176)

1     considering that this is stamped there.
2     Q.   And --
3     A.   I did not see it on the 29th.
4     Q.   Your recollection is that you recall seeing
5          the second page of the document marked as
6          Exhibit 5 a few days after October 29th,
7          2018, correct?
8     A.   Correct.
9     Q.   The document marked as Exhibit 6 which
10         states, Petition for Adjudication of
11         Incompetence and Application for Appointment
12         of Guardian or Limited Guardian, have you
13         seen that document before?
14    A.   Yes.
15    Q.   When did you first see that document?
16    A.   A few days after it was filed.
17    Q.   You understood that one of the grounds that
18         was asserted by the petitioner for seeking to
19         have your mother found incompetent, if you
20         refer to the --
21    A.   Yes, I understand --
22    Q.   -- second page --
23    A.   -- what's written here.
24    Q.   You had knowledge of that?
25    A.   I have know--- I had knowledge of what was

                                                  177

1     written here when I saw the document.
2     Q.   And when you're referring to what was written
3          here, you are referring to -- on the second
4          page under Paragraph 5 there are four grounds
5          listed as the grounds for seeking to have
6          your mother found incompetent.  You
7          understood those, correct?
8              MR. SPARKS:  Objection as to
9          characterization.  They're allegations.  I
10         understand that I'm parsing -- I'm being a
11         lawyer here, but they are allegations and
12         that -- to the extent that you're saying
13         they're grounds, they're -- they're verified
14         or they're -- they're true...
15             Do you understand they're allegations?
16             THE WITNESS:  I understand that they
17         are allegations.
18    BY MS. SCULLY:
19    Q.   I'll reask the question, Ms. Hofeller.  Did
20         you -- you understood -- when you're saying,
21         I understood what is written here, I'm just
22         trying to make sure we have agreement on the
23         record that the here you're referring to are
24         the four allegations that are set forth on
25         the second page of Exhibit 6 as the alleged

                                                  178

1     basis for seeking your -- to find your mother
2     incompetent, you understood that those were
3     the grounds that were being alleged, correct?
4     A.   I understood that these were the facts set
5          forth that the petitioner alleges are
6          grounds, yes.
7     Q.   One of the facts that were set forth that the
8          petitioner alleged that were grounds was that
9          the respondent is believed to be under the
10         influence of a previously estranged child.
11         Since appearance of child financial assistant
12         hired for respondent quit her employment upon
13         concerns of personal safety based on actions
14         of -- actions of previously estranged child.
15         Respondent removed appointed attorney-in-fact
16         over security of funds.
17             Did you disagree with those assertions?
18             MR. JONES:  I'll -- I'm going to
19         object.
20    A.   The --
21             MR. JONES:  I think that you're just --
22    A.   The -- you know what --
23             THE REPORTER:  One -- one at a time.
24             MR. JONES:  Hold on.  Hold on.  I'm
25         going to object.  I -- I think at this point

                                                  179

1     you're just harassing the -- the witness.
2             MR. SPARKS:  Yeah.
3             MR. JONES:  She's not my witness so I'm
4          not going to -- but it seems --
5     A.   This is not for me to say.
6             MR. SPARKS:  I believe the same thing.
7          I -- I believe the same thing.  If -- if you
8          want to ask about the factual basis of this,
9          I don't understand how it has anything to do
10         with something so we're going to take a
11         break -- or can you answer -- there's a
12         question on the table.  Can you answer the
13         question?
14             THE WITNESS:  No.
15             MR. SPARKS:  Okay.  Let's you and I
16         talk, please, if we can take a break.
17         Thanks.
18             Not you -- not you and I.
19             THE WITNESS:  Oh, good.  Excellent.
20             THE VIDEOGRAPHER:  Going off the
21         record.  Time is 2:23 p.m.
22             (Whereupon, there was a recess in the
23         proceedings from 2:23 p.m. to 2:36 p.m.)
24             (HOFELLER EXHIBIT 7 was marked for
25         identification.)

                                                  180

45  (Pages 177 to 180)

THE VIDEOGRAPHER: Going back on the
record. The time is 2:37 p.m.
BY MS. SCULLY:
Q. Ms. Hofeller, have you had an opportunity to
review the document that's marked Exhibit 7
that's in front of you?
A. Let me -- let me finish.
Q. Please, take your time. Tell me when you're
ready.
A. Hold on. Get my glasses. Is this -- when
was this filed? What is the date on this? I
don't see the date that it was filed. Is it
on the second page?
Q. It's -- the document is dated on Page 4,
the -- November 5th, 2018.
A. Oh, okay. All right. All right. I've
had -- I've reviewed this.
Q. Ms. Hofeller, my first question is, have you
prior to today seen the document that's
marked as Exhibit 7?
A. I don't believe that I did ever see this one,
no. No.
Q. Were you at any point aware that a guardian
ad litem had been appointed in the
incompetency proceedings related to your

181

mother?
A. A guardian ad litem?
Q. Yes.
A. As in the guardian ad litem, Erin Riddick?
Q. Yes.
A. At -- ask again. Was I at some point aware
that a guardian ad litem had been
appointed --
Q. Yes.
A. -- at -- yes. Yes.
Q. When did you first become aware of the
appointment of a guardian ad litem?
A. I think that that was part of the original
petition. Yes, it was. Erin Riddick was
appointed guardian ad litem when the petition
was filed. When that was served I was aware
of the fact that a guardian ad litem had been
appointed for my mother.
Q. Did you ever have any communications with
Ms. Riddick?
A. No. She never reached out to me.
Q. Did you ever reach out to Ms. Riddick
directly?
A. No.
Q. Did you ever become aware that Ms. Riddick

182

had concluded that based on the interview of
the petitioner's attorney and a review of
your mother's medical records, that she
believed the petitioner had met the burden to
show reasonable cause to believe that your
mother was --
A. My mother didn't have --
Q. -- incompetent?
A. -- and attorney.
     MR. SPARKS: Stop, please.
     THE WITNESS: I'm sorry.
     MR. SPARKS: Thank you. Go ahead.
     THE WITNESS: I'm sorry.
A. No. The answer to your question is no.
Q. Did you at any point in time become aware
that Ms. Riddick had informed the court that
she was concerned that your mother's
well-being and estate were at risk without
the appointment of an interim guardian?
A. Not really, no. No. No.
Q. Were you aware that the guardian ad litem had
informed the court that you had had until
recently an estranged relationship with your
mother?
A. Was I aware that Erin Riddick specifically

183

said that I had a previously estranged
relationship?
Q. Yes.
A. I don't think I was aware specifically that
Erin Riddick said that, no. No, I wasn't.
     (HOFELLER EXHIBIT 8 was marked for
identification.)
     MS. SCULLY: Can you provide Exhibit 8,
please, to the witness.
     THE WITNESS: I never saw this. I'm
sorry.
BY MS. SCULLY:
Q. Ms. Hofeller, you've had an opportunity to
review the document marked as Exhibit 8?
A. Uh-huh.
Q. I believe you said a moment ago you've not
previously seen the document marked as
Exhibit 8?
A. That's correct.
Q. This is the first time you've seen the
document marked as Exhibit 8?
A. Yep.
Q. You were aware, is it correct, that the court
had entered an order appointing an interim
guardian of your mother, correct? Whether

184

1  you'd seen the document or not, you -- you
2  were aware that the court had appointed an
3  interim guardian for your mother?
4  A.  At what point?
5  Q.  On or about November 6th, 2018.
6  A.  I was aware that the hearing -- the result of
7    the hearing was a interim guardian appointed,
8    I believe, yes.
9  Q.  You were aware that there was an interim
10   guardian appointed over both your mother's
11   person and over her estate, correct?
12  A.  You know, again, I am reading these
13   documents.  I am not an attorney in these
14   matters.  In that that is the proper
15   interpretation of these documents, I was
16   aware of what these documents said.  My
17   mother's attorney handled the matter from
18   that point forward, so my awareness would
19   extend to reading this as a layperson.  So
20   if -- if it says -- if you're asking me was I
21   aware that -- that this was done, I -- yes,
22   I -- I guess.  I'm not --
23  Q.  Contemporaneous with the proceedings that
24   were ongoing, the incompetency proceedings,
25   were you communicating with your mother's

185

1  attorney about the proceedings?
2  A.  Well, this is a -- this has -- this had been
3    going on -- this was on -- going on for quite
4    a while.  At -- at some point I did have
5    communication with my mother's attorney on
6    this matter, yes.
7  Q.  And your mother's attorney on this matter I
8    believe you said was Douglas Noreen?
9  A.  That's right.
10  Q.  Did Mr. Noreen share with you or discuss with
11   you the fact that an interim guardian over
12   your mother's estate and over her person was
13   going to be appointed by the court?
14  A.  Going to be?  No.
15  Q.  Did he share with you that it was, in -- that
16   it did, in fact, occur?
17  A.  I don't think that --
18      MR. SPARKS:  Objection.  You're
19   assuming facts not in -- in evidence and I --
20   you might want to find out when Doug Noreen
21   became her mother's attorney.  Just a hint.
22   Go ahead and answer the question to the
23   best -- if you can, please.
24  A.  I think that the actual -- the -- the moment
25   when I finally saw the result of that was --

186

1  was after Doug Noreen was retained that I saw
2  the petition; otherwise, I would not be --
3  not really --
4  Q.  Do --
5  A.  -- don't tend to be in communication with the
6    Wake County court as a -- as a matter of
7    course.
8  Q.  Did someone represent your mother prior to
9    Doug Noreen entering his appearance and
10   representing her in the incompetency
11   proceeding?
12  A.  No.
13  Q.  When did Mr. Noreen first begin to represent
14   your mother?
15  A.  I think that his first conversation with her
16   was one or two days after the preliminary.
17  Q.  What preliminary?
18  A.  The one at which apparently the interim
19   guardian -- the one requested the documents
20   documents that I explained that I had seen.
21  Q.  One or two days after the document that's
22   marked Exhibit 6, the petition for
23   incompetence?
24  A.  Yes.  Isn't there a -- yeah.  I think that --
25   if I -- let's see.  November 8th rings a bell

187

1  for the day that my mother retained Doug
2  Noreen.
3  Q.  November 8th --
4  A.  Uh-huh.
5  Q.  -- 2018?
6  A.  Yeah.
7      MS. SCULLY:  Can you provide the
8    witness Exhibit 9.
9      (HOFELLER EXHIBIT 9 was marked for
10   identification.)
11  BY MS. SCULLY:
12  Q.  Ms. Hofeller, actually, before I review
13   Exhibit 9, I had one follow-up question on
14   Exhibit 8.  If I could turn your attention
15   back to Exhibit 8.
16      Were you aware that the interim guardian
17   of the estate that was appointed in these
18   proceedings was Everett Bolton?
19  A.  Yes.
20  Q.  Did you have any communications with
21   Mr. Bolton at any point in time?
22  A.  No.
23  Q.  No?
24  A.  No.
25  Q.  Thank you.  Were you aware that the Wake

188

1    County Human Services was appointed as the
2    interim guardian over your mom's person?
3    A.  Was that the name?  I thought it was
4    LifeLinks?  Oh, that was the one they
5    suggested, maybe.  I -- I was aware that it
6    was a -- a -- a body of some sort rather than
7    a -- an individual.
8    Q.  Did you at any point in time have any
9    communications with anyone at Wake County
10   Human Services?
11   A.  No.
12   Q.  Turning your attention to Exhibit 9, I
13   believe you had an opportunity to review that
14   a few moments ago, correct?
15   A.  Yeah.
16   Q.  Have you seen the document marked as Exhibit
17   9 before today?
18   A.  I don't -- okay.  Report of the -- of the
19   guardian ad litem.  I think I reviewed it
20   briefly.
21   Q.  It appears on Exhibit 9, last page, there's a
22   certificate of service and it reflects
23   that -- do you see the last page there?
24   A.  Oh.  Oh, okay.  I -- I was going to say, this
25   isn't...

189

1    Q.  On that page it reflects that -- Tom Sparks
2    is listed as your attorney?
3    A.  Yes.
4    Q.  Yes.  At this point in time, No- -- February
5    6, 2019, was Tom Sparks acting as your
6    attorney in these proceedings?
7         MR. SPARKS:  What -- what is this
8    proceeding?  I want to make sure you
9    understand.
10        MS. SCULLY:  Sorry.
11   BY MS. SCULLY:
12   Q.  The incompetency proceedings for your mother.
13   A.  Yes.
14   Q.  When did you first retain Mr. Sparks in
15   connection with your mother's incompetency
16   proceedings?
17   A.  Was it December or January?  I don't -- it --
18   it's all a blur.  I think it was early
19   January.  It was after the hol- -- no.  It
20   was --
21        THE WITNESS:  I think you -- you got
22   back to me during the holiday -- what I felt
23   was the holiday time.  There you go.  Thank
24   you.
25   A.  I'm sorry.  I can't keep track of --

190

1    Q.  At this point --
2    A.  -- all these points.
3    Q.  -- in time, February 6, 2019, was Mr. Sparks
4    representing you in any other matters other
5    than your mom's incompetency proceedings?
6    A.  I -- not -- not -- what else was going on
7    then?
8    Q.  You were having communications with Mr. Speas
9    and --
10   A.  Oh.  Only in that --
11   Q.  -- Ms. Meese [sic].
12   A.  Only in that -- I'm sorry.  Only in that
13   he -- he was kind enough to allow me to use
14   his office address as a service address where
15   I could receive service.
16   Q.  Did you have any communications with your
17   mother's counsel, Mr. Noreen, about the
18   subpoena that was issued to her in -- in this
19   litigation?
20   A.  No, I did not.
21   Q.  I take it you didn't have any communications
22   with the interim guardian over her estate
23   about the subpoena that was directed to her
24   in this litigation, correct?
25   A.  Yes.

191

1    Q.  And you didn't have any communications with
2    the interim guardian over her person
3    regarding the subpoena that was issued upon
4    her in this litigation, correct?
5    A.  That is correct.
6         MS. SCULLY:  Can you show the witness
7    Exhibit 10.
8         (HOFELLER EXHIBIT 10 was marked for
9    identification.)
10   BY MS. SCULLY:
11   Q.  Ms. Hofeller, have you had -- had an
12   opportunity to review the document marked
13   Exhibit 10?
14   A.  Yes.
15   Q.  Have you seen the document marked as Exhibit
16   10 before?
17   A.  Yes.
18   Q.  When did you first see the document marked as
19   Exhibit 10?
20   A.  Sometime after.  I really don't know exactly
21   when.  My attorney received --
22        MR. SPARKS:  Some -- sometime after
23   when?  Please tell her.
24   A.  The 7th day of February, 2019.
25   Q.  Were you aware prior to February -- the date

192

48  (Pages 189 to 192)

1    on the document marked as Exhibit 7, February
2    7, 2019, that there was a plan to dismiss the
3    incompetency proceedings and submit to the
4    court the settlement agreement that had been
5    entered into among the interested parties?
6    A.   You know, I was represented by my attorney at
7         that time and he was in communication with my
8         mother's attorney.  What I was and wasn't
9         aware of, that would be really difficult to
10        say what and when and how and to what degree
11        because it was being negotiated.  I was,
12        again, represented by counsel so I wasn't
13        really being spoken to directly on these
14        matters other than my attorney.
15   Q.   You understood that Exhibit 10 was a motion
16        to dismiss that was submitted to the court
17        along with a settlement agreement that was in
18        the process of being executed, correct?
19             MR. JONES:  And I'll -- I'll -- I'll
20        object.  I think the witness has already
21        testified that she was communicating with her
22        attorney here so it seems like anything that
23        she learned from her attorney would be
24        privileged.
25             THE WITNESS:  Yes.

193

1             MR. SPARKS:  Your -- your awareness of
2        it -- she's asked about your awareness of it.
3        Will you --
4    A.   Yes.  At some --
5             MR. SPARKS:  -- answer her question.
6    A.   -- point I was aware of -- of this, yes.
7    Q.   Do you know if the settlement agreement that
8        is attached as Exhibit A to what's been
9        marked as Exhibit 10, do you know if that, in
10        fact, was ultimately signed by all the
11        individuals that are --
12   A.   I would --
13   Q.   -- listed on --
14   A.   -- not --
15   Q.   -- Page 6 and 7?
16   A.   I'm sorry.  I would not be able to tell you
17        if this is exactly like the one that's signed
18        without seeing the signatures on it.  I was
19        not a signator.  I would not have a
20        familiarity to the point where I would be
21        able to say that this is the one that was
22        signed.
23   Q.   Is it correct that you were aware that
24        between the period November 6th, 2018, and
25        February 7th, 2019, there was a interim

194

1    guardian over your mother's estate and over
2    her person?
3    A.   Yes.  I'm trusting you that those are the
4        right dates.
5             MS. SCULLY:  If I could just have a
6        moment to look through my notes, I believe I
7        don't have any further questions.  Might have
8        a couple col-- follow-ups.
9             THE VIDEOGRAPHER:  Going off the
10        record.  The time is 2:57 p.m.
11             (Whereupon, there was a recess in the
12        proceedings from 2:57 p.m. to 2:58 p.m.)
13             THE VIDEOGRAPHER:  Going back on the
14        record.  The time is 2:58 p.m.
15             EXAMINATION
16   BY MR. BRANCH:
17   Q.   Good afternoon, Ms. Hofeller.  My name is
18        John Branch.  I am counsel for the intervenor
19        defendants and with the Shanahan Law Group
20        law firm here in Raleigh.  Appreciate you
21        kind of plowing through things today.  I know
22        there's been a lot and my hope is that I
23        don't have very many topics for you to cover
24        and we can get out of here on a fairly quick
25        basis.  But what -- what's going to happen is

195

1    I'm going to jump around some because my
2    colleague has covered 95 percent of what I
3    had on my list to cover.  So if you would be
4    patient with me if I do that, and if you
5    don't understand any of the questions that I
6    pose, want me to restate anything, please
7    feel free to ask me to do so.  I'm happy to
8    accommodate you as best --
9    A.   Thank you.
10   Q.   -- that I can.
11        My first question is, what's your home
12        address?
13   A.   I stated that I wanted that protected.
14        I'm --
15   Q.   And --
16   A.   -- a survivor of domestic violence and these
17        documents proliferate at an amazing rate.  I
18        don't believe that it's in my best interest
19        or -- it's a risk to my safety.  That -- that
20        address is -- I've been able to have it
21        sealed with courts in the past.  I think it's
22        well established that I'm --
23   Q.   Well, and --
24   A.   -- at risk.
25   Q.   -- with all due respect, ma'am, I -- I don't

196

1   know that part of your personal history and
2   I'm not --
3   A.  Uh-huh.
4   Q.  -- trying to antagonize you by asking you
5       your home address.  However, there's a
6       process that the parties have agreed to with
7       regard to having documents held confidential
8       and highly confidential in the context of
9       this litigation.  And so what I would suggest
10      is that if you're asking that the -- your
11      address that you -- that would be -- that the
12      parties would agree that it is confidential
13      or highly confidential, I'm certain that we
14      would not have an objection to it so long as
15      we --
16          MR. SPARKS:  She can be served at my
17      office.  She's not going to agree to reveal
18      that.  If you want to go to the court and --
19      and compel that, you can go to the court and
20      compel that, but --
21          MR. BRANCH:  Okay.
22          MR. SPARKS:  -- she can be served at my
23      office.
24  BY MR. BRANCH:
25  Q.  And just -- just so we're clear, for purposes

                                                    197

1   of any later subpoenas that's served in --
2   that are served in the context of this
3   lawsuit, trial subpoenas or any other
4   documents, you're willing to be served
5   through counsel here as opposed to at your
6   house?
7       MR. JONES:  Hold on.
8       MR. SPARKS:  At this time are you
9   willing to have that done?
10      THE WITNESS:  Yes.
11  BY MR. BRANCH:
12  Q.  All right.  And in the event that you are --
13      you withdraw that authorization for your
14      lawyer, would you then be willing to provide
15      us with your home address so that we can
16      serve you with process?
17          MR. JONES:  I'll object.  She's
18      outside -- she lives outside the range of the
19      subpoena range of the court.  She already
20      testified --
21          MR. BRANCH:  I mean, doesn't mean we
22      can't subpoena her and we have a right to --
23      in the event that we believe that her
24      testimony is necessary at trial to subpoena
25      her to testify and --

                                                    198

1       MR. JONES:  Agree to disagree.  If
2   she's outside the range of the -- the
3   subpoena range of the court I think you can't
4   subpoena her.
5       MR. SPARKS:  So that we can move on,
6   we've been here for a long time, may I
7   interject with a question or two, please --
8       MR. BRANCH:  Uh-huh.
9       MR. SPARKS:  -- if -- if that's okay
10  with you because it's out of order?
11      At this time, Ms. Hofeller, are you
12  willing to have -- allow me to accept service
13  of documents on your behalf?
14      THE WITNESS:  I am, yes.
15      MR. SPARKS:  If that changes, will you
16  provide to me an address at which you can be
17  served, wherever that address is, and give me
18  permission to let all these fine people know
19  and everybody that's -- every attorney
20  involved in this case know where that address
21  might be?
22      THE WITNESS:  Yes.  Yes, as long as it
23  doesn't appear on any of these documents.
24      MR. SPARKS:  No.  No.  No.  I didn't
25  ask you for your home address.  I said an

                                                    199

1   address --
2       THE WITNESS:  Oh, yes.
3       MR. SPARKS:  -- at which you can be
4   served.
5       THE WITNESS:  Yes.  Absolutely.
6       MR. SPARKS:  Okay.  Is that -- is that
7   sufficient, sir?
8       MR. BRANCH:  Yeah, I think that's fine.
9       MS. SCULLY:  Yeah.
10      MR. SPARKS:  Thank you.  I'm sorry to
11  interrupt.
12      MR. BRANCH:  No.  No.  Well, that was
13  very helpful so thank you for interrupting.
14      THE WITNESS:  Thanks.
15  BY MR. BRANCH:
16  Q.  Why did you pick Common Cause to reach out to
17      you -- or to reach out to with regard to
18      finding an attorney to represent your mother
19      in the competency dispute?
20          MR. JONES:  Objection, asked and
21      answered earlier.
22  A.  I answered that question I thought pretty
23      thoroughly.
24  Q.  And maybe I missed it, but I'd just like to
25      go back over it just for a little bit.  I

                                                    200

mean, why -- again, why Common Cause?

MR. JONES: Objection, asked and answered.

MR. BRANCH: And, again, she can answer the question.

A. They are local. They're local and I needed to, you know, ascertain who was local as far as local attorneys, and their knowledge of the politicization of my family's affairs as it pertains to anyone who is involved on this level with politics, it seemed that they would comprehend that.

Q. And why -- why did it seem like Common Cause would have a comprehension of the politicization of your family's affairs?

A. Because all of the attorneys involved in all of these matters would have an understanding of it.

Q. So that's because Common Cause had attorneys that had been involved in legal matters with knowledge of the politicization of your family's affairs?

A. How shall I put this? Your average American doesn't understand what redistricting even is, so attorneys that are involved in matters

201

that pertain to it are much more likely to understand the importance of my father's position on these matters.

Q. Okay. And prior to reaching out to Common Cause about the -- about the topics on which you reached out to them, you were aware that they -- that Common Cause was involved in litigation regarding redistricting?

A. Yes.

Q. And were you -- and you were aware that they had taken positions adverse to those of your father or your father's businesses?

A. You know, my father --

MR. JONES: Oh, object. Object.

MR. SPARKS: She --

MR. JONES: Ans and ans --

MR. SPARKS: She --

MR. JONES: Asked and answered.

MR. SPARKS: She actually said that --

THE WITNESS: Yeah.

MR. JONES: You just changed the word antagonistic to adverse. It's been asked and answered multiple times.

MR. BRANCH: Well, then it's a --

A. And this wasn't my father's --

202

MR. BRANCH: -- different question.

A. -- position. This was just what he did.

MR. SPARKS: Please.

THE WITNESS: I'm sorry.

BY MR. BRANCH:

Q. Was your father retained by parties in litigation with Common Cause?

MR. JONES: Objection. There's no establishment of any foundation.

MR. BRANCH: I'm asking if she has knowledge of that.

A. I don't know the details of how my father was actually involved in all of this. I don't know the details. I -- he -- he was all over the country all the time my whole entire childhood. I don't know when he signed on with who in what capacity, whether he was working for the RNC, whether he was a consultant. I don't know those details. It would be very -- I don't know. It seems almost like it -- it -- we're trying to establish that I would misstate. I would rather just go ahead and say that I don't know these details. If you continue to press me to tell you yes or no, eventually there is

203

an idea that I will say that I know something that I wasn't aware of.

Q. And I -- to be clear, I don't know is a perfectly valid answer. If you don't know, you don't know. That's fine. I'm not trying to press you for a certain answer. I'm trying to understand what it is you do actually know.

A. And, again, I've really tried to --

MR. JONES: There's no --

THE WITNESS: Okay.

A. I tried to address it before.

Q. And so are you aware that the redistricting maps at issue in this case are ones that were passed by the North Carolina General Assembly in 2017?

A. Passed by? You mean -- no. No, I wasn't aware.

Q. Okay. Well, are you aware that redistricting maps are enacted laws by the North Carolina General Assembly in North Carolina?

A. No.

Q. And you weren't -- I believe you just testified that you weren't aware that the maps that are being challenged by the

204

1   plaintiffs in this lawsuit ones that were
2   enacted in 2017?
3   A.  No.  I didn't know --
4   Q.  Okay.
5   A.  -- any of those state- -- specifics.
6   Q.  If -- on the assumption that I'm correct that
7   the General Assembly passed the maps that are
8   at issue in this litigation in 2017, would it
9   be correct to say that you had no
10  communications with your father about those
11  maps that were passed?
12  A.  I don't know when he started drawing those
13  maps.  My fa- -- I was an only child.  My
14  father and I spoke about a lot of matters
15  right up until the point when I didn't speak
16  to him anymore.  So I have no idea whether or
17  not the maps that he was drawing the last
18  time I spoke to him were those maps.  I would
19  have no way of knowing that.
20  Q.  So you have no way of knowing one way or
21  another?
22  A.  That's right.
23  Q.  Okay.  Did you -- what's -- I'm not trying to
24  raise the same concerns you have about your
25  address, but I do have some questions about
                                              205

1   the use of your phone.  So --
2   A.  The use of my what?
3   Q.  Your --
4         MS. SCULLY:  Phone.
5   BY MR. BRANCH:
6   Q.  Your cell phone.  And so I'm going to ask you
7   what your cell phone number is so...
8         MR. JONES:  I'll --
9   BY MR. BRANCH:
10  Q.  Are you willing -- are you willing to share
11  that for the --
12  A.  No.
13  Q.  Okay.  Let me ask the question a different
14  way.  Have you used the same -- do you have a
15  smartphone that you use -- that is associated
16  with the regular phone number that you use
17  and give out to people?
18  A.  Forgive me for being a little bit concerned
19  about where -- I mean, I -- what can I say?
20  I mean, I -- the -- the what -- what period of
21  time are we talking about here?  I mean...
22  Q.  Current -- let's say today do you have an
23  iPhone?
24  A.  Do I have --
25  Q.  Do you have --
                                              206

1   A.  -- a smartphone?
2   Q.  -- an Android?  Yes.  That --
3   A.  Yes, I have a smartphone.
4   Q.  Okay.  And what kind of a phone is it?  Is it
5   an iPhone, Android?
6         MR. JONES:  Ob- -- object.  This is --
7   this is ri- -- ridiculously irrelevant.
8         MR. BRANCH:  It is not.
9   BY MR. BRANCH:
10  Q.  You can answer.
11  A.  It's -- it's either an iPhone or an Android.
12  Q.  All right.  And it's one specific device.  Is
13  that the same device that you have used since
14  September 30th of 2018?
15  A.  No.
16  Q.  Okay.  How many different devices have you
17  used since September 30th of 2018 associated
18  with your primary telephone number?
19  A.  Two.
20  Q.  Two?
21  A.  Two, I think, yeah.
22  Q.  Okay.  Do you --
23  A.  I don't know.  These were not associated with
24  the same phone number.  I -- I'm a popular
25  person.  I don't tend to just give my phone
                                              207

1   number out and I also tend to -- to find that
2   it's better when you're on Google to -- to
3   not be quite as consistent as most of -- most
4   people are.
5         MR. SPARKS:  Do you need to take a
6   break?
7         THE WITNESS:  No.  No, I don't.
8   A.  So, no, it hasn't been the same phone number.
9   Q.  Okay.  And -- all right.  So the question I
10  had was actually as to the device that you
11  use, the physical hardware.  And what I was
12  asking, and it was based on an assumption
13  that I think turned out not to be correct,
14  was how many different devices have you used
15  since September 30th of 2018 to present day?
16  A.  I think it's two.  Two.
17  Q.  Okay.  Okay.  Do you -- did you change phone
18  numbers when you changed devices at some
19  point during that period of time?
20  A.  Yes.
21  Q.  Okay.  Can you tell me approximately when
22  that was?
23  A.  Late last year, I think.
24  Q.  Towards the -- do you think possibly
25  December?  I'm not looking for a specific
                                              208

1       date.
2    A.  Possibly, yeah.
3    Q.  Okay.  Can you tell me why you switched phone
4       numbers and devices?
5    A.  Old -- old device, running out of storage.  I
6       didn't have a contract so...
7    Q.  Okay.  Did you keep the old device?
8    A.  For a while I did.
9    Q.  And where is it now?
10   A.  I gave it to a friend.  Cleared it off, reset
11      it to factory settings, and gave it to a
12      friend of mine who couldn't afford to buy a
13      new one.
14   Q.  Okay.  And when did you do that
15      approximately?
16   A.  January, February, sometime in there.
17   Q.  All right.  And is that -- you testified
18      earlier when you were asked about the --
19      being -- whether you're in possession of the
20      text messages with Mr. Speas that some of the
21      old text messages had been deleted.  Were
22      they -- when you talked about --
23   A.  That's why I got a --
24   Q.  -- them being --
25   A.  -- new phone.

209

1    A.  I don't think so.
2    Q.  Okay.  So you wouldn't have lost any of the
3       text messages that have been sent to or from
4       you with regard to the new phone?
5    A.  I don't suppose that I would have.
6    Q.  Okay.  And the old phone, I believe you
7       testified that you gave -- you erased the
8       information that was on the old phone and
9       gave it to a friend of yours in January or
10      February of this year?
11   A.  Sometime early this year, yeah.
12   Q.  Okay.  What -- I'm shifting topics back to
13      the -- the devices that you turned over to
14      Arnold & Porter in connection with the
15      subpoena.  What computers or other electronic
16      devices did you use to read the contents of
17      those hard drives or thumb drives?
18   A.  A laptop.
19   Q.  Was it just one laptop?
20   A.  Yes.
21   Q.  And do you still have possession of the
22      laptop?
23   A.  Yes, I do.
24   Q.  Okay.
25          MR. BRANCH:  All right.  If we can go

211

1          MR. SPARKS:  Let him --
2          THE WITNESS:  I'm sorry.
3          MR. SPARKS:  Let him answer --
4          THE WITNESS:  I'm sorry.
5          MR. SPARKS:  -- ask the question,
6       please.
7    BY MR. BRANCH:
8    Q.  Yeah.  Well, I think -- you -- you can go
9       ahead and explain.  Can you tell me what
10      happened?
11   A.  Yeah.  My phone started running out of
12      storage, it couldn't do the updates, and as
13      it ran more and more out of storage, it was
14      dropping -- it was dropping things like text
15      messages and -- yeah.  Both the iPhones and
16      the androids do that so...
17   Q.  Okay.  And then after it was dropping text
18      messages, you went and got a new phone?
19   A.  You know, as -- at my earliest convenience I
20      got a new phone.
21   Q.  Okay.  And -- and to the extent that
22      you've -- well, strike that.
23          Has -- have you encountered the same
24      problems with dropping phone calls and text
25      messages since you've had your new phone?

210

1    off the record for a couple minutes, I'm just
2    about done.
3          MS. SCULLY:  I want to talk about
4    something.
5          THE VIDEOGRAPHER:  Going off the
6    record.  The time is 3:15 p.m.
7          (Whereupon, there was a recess in the
8    proceedings from 3:15 p.m. to 3:18 p.m.)
9          THE VIDEOGRAPHER:  Going back on the
10   record.  The time is 3:18 p.m.
11         MR. BRANCH:  Nothing further.
12         MR. SPARKS:  Nothing from me.
13         MR. JONES:  Nothing from me either.
14         THE VIDEOGRAPHER:  This concludes the
15   video deposition.  Time going off the record
16   is 3:18 p.m.
17       [SIGNATURE RESERVED]
18       [DEPOSITION CONCLUDED AT 3:18 P.M.]
19
20
21
22
23
24
25

212

53  (Pages 209 to 212)

A C K N O W L E D G E M E N T   O F   D E P O N E N T

I, STEPHANIE HOFELLER, declare under the penalties of perjury under the State of North Carolina that I have read the foregoing 212 pages, which contain a correct transcription of answers made by me to the question therein recorded, with the exception(s) and/or addition(s) reflected on the correction sheet attached hereto, if any.

Signed this, the _____ day of _____, 2019.

_____
STEPHANIE HOFELLER

State of:_____
County of:_____

Subscribed and sworn to before me this _____ day of _____, 2019.

_____
Notary Public

My commission expires:_____

213

---

STATE OF NORTH CAROLINA  )
                         ) C E R T I F I C A T E
COUNTY OF WAKE           )

I, LISA A. WHEELER, RPR, CRR, Court Reporter and Notary Public, the officer before whom the foregoing proceeding was conducted, do hereby certify that the witness whose testimony appears in the foregoing proceeding was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter transcribed by me; and that the foregoing pages, inclusive, constitute a true and accurate transcription of the testimony of the witness.

I do further certify that I am neither counsel for, related to, nor employed by any of the parties to this action and, further, that I am not a relative or employee of any attorney or counsel employed by the parties thereof, nor financially or otherwise interested in the outcome of said action.

This the 20th day of May, 2019.

_____
Lisa A. Wheeler, RPR, CRR
Notary Public #19981350007

215

---

E R R A T A   S H E E T

Case Name:  COMMON CAUSE, ET AL. VS. DAVID R. LEWIS, ET AL.

Witness Name:  STEPHANIE HOFELLER

Deposition Date:  FRIDAY, MAY 17, 2019

Page/Line    Reads          Should Read

____/____|_____|_____
____/____|_____|_____
____/____|_____|_____
____/____|_____|_____
____/____|_____|_____
____/____|_____|_____
____/____|_____|_____
____/____|_____|_____
____/____|_____|_____
____/____|_____|_____
____/____|_____|_____
____/____|_____|_____
____/____|_____|_____
____/____|_____|_____
____/____|_____|_____
____/____|_____|_____
____/____|_____|_____

_____   _____
Signature          Date

214

**A**

à 119:16

**a.m** 1:15 5:3
43:21,23,23,25
86:17,19,19,21

**Abha** 162:14

**ability** 94:23
215:10

**able** 24:20 28:18
28:23 29:8
31:17,17 37:7
62:23 84:20
85:15 130:14
146:14 147:7
156:10 160:16
194:16,21
196:20

**absolutely** 26:9
63:1 173:24
200:5

**academic** 103:3
105:5 145:14

**accept** 143:21
146:3,4 199:12

**accepted** 145:6

**accepting** 35:5

**access** 160:16
164:13

**accommodate**
196:8

**accuracy** 66:11

**accurate** 8:4
126:22 160:24
215:12

**accurately**
140:12

**accusation**
67:15

**accustomed** 55:6
114:8 133:16
160:19

**achieve** 133:3

**Acknowledged**
7:20

**acting** 190:5

**action** 103:5
215:16,19

**actions** 179:13
179:14

**actual** 28:19

141:21 169:1
186:24

**ad** 4:19,22 11:18
176:1 181:24
182:2,4,7,12
182:15,17
183:21 189:19

**ad-stick** 11:20

**ad-sticks** 23:21

**adapter** 29:4

**add** 19:6

**addition(s)**
213:8

**additional** 15:13
21:14 138:19

**address** 9:20
15:9,10 82:16
130:13 132:16
141:21 191:14
191:14 196:12
196:20 197:5
197:11 198:15
199:16,17,20
199:25 200:1
204:12 205:25

**addressed** 15:7
44:18 129:1

**adequate** 146:16

**Adjudication**
4:16 177:10

**admissibility**
102:20 134:5,6

**admitted** 37:17

**advance** 75:18
109:4 133:1
141:5,25
151:21

**adverse** 202:11
202:22

**affairs** 201:9,15
201:22

**affiliated** 104:19

**affirmed** 6:11

**afford** 209:12

**afternoon**
195:17

**age** 139:24
152:21

**ago** 36:22 48:16
68:25 80:23

103:23 169:15
184:16 189:14

**agree** 197:12,17
199:1

**agreed** 197:6

**agreement**
178:22 193:4
193:17 194:7

**ahead** 8:1 10:20
14:20 34:5
66:23 75:16
79:18 81:24
106:15 144:5
157:19 159:22
172:12,15
173:25 183:12
186:22 203:23
210:9

**ahold** 71:7

**al** 1:4,5 6,9
214:2,3

**Alexandria**
24:24 51:25

**alive** 30:13

**Allan** 59:10

**allegations**
178:9,11,15,17
178:24

**alleged** 178:25
179:3,8

**alleges** 179:5

**allegiance** 37:20

**allegiances** 38:1

**allow** 191:13
199:12

**allowed** 88:12
104:2 137:19

**alongside** 105:2

**alter** 18:24

**altered** 131:12

**amazing** 196:17

**ambiguous**
64:17 66:6

**American**
201:23

**amount** 83:12
140:20 163:19

**amounted** 72:5

**and-** 2:6,21

**and/or** 71:10

213:8

**Android** 207:2,5
207:11

**androids** 210:16

**anecdotal** 32:15
34:15 140:14

**angry** 99:8

**ans** 202:16,16

**answer** 7:19,24
8:1,8 12:22
42:8 48:1
56:22 65:13
66:7 67:6
68:13 69:12,14
69:15,22 71:11
71:18 75:16
79:18 80:1
81:24 86:8
88:14,20 112:8
118:1 137:16
145:25 156:12
159:22 160:3
170:23 172:3
172:15 173:24
174:2,4 180:11
180:12 183:14
186:22 194:5
201:4 204:4,6
207:10 210:3

**answered** 57:8
75:15 76:6
79:22 81:23
86:7 106:22
113:16 145:21
145:23 158:8
160:1 165:16
165:17,20
200:21,22
201:3 202:18
202:23

**answering** 80:8

**answers** 213:6

**antagonistic**
90:14,18 91:4
202:22

**antagonize**
197:4

**anybody** 150:20

**anymore** 40:12
205:16

**anyway** 40:7
131:1,4

**apartment** 20:11
20:16,20,25
22:5,9 23:14
24:10 25:20
26:12 27:6,21
35:19 38:24
47:10 52:21
112:13

**apologize**
114:25 169:5

**apparently**
72:23 168:3
187:18

**appeal** 34:10,23
60:15 102:25
103:7,14,20

**appeals** 34:12

**appear** 15:4
46:11 77:20
154:18 199:23

**appearance** 78:1
179:11 187:9

**appeared** 12:4
25:9 54:25
79:20 149:19
155:25

**appearing** 129:5

**appears** 44:17
45:21 46:10,21
76:16,17,19,25
77:9 127:4
168:20 189:21
215:7

**Application**
4:17 177:11

**appointed** 58:24
179:15 181:24
182:8,15,18
185:2,7,10
186:13 188:17
189:1

**appointing**
176:1 184:24

**appointment**
4:17,21 177:11
182:12 183:19

**Appreciate**
195:20

**appropriate**
29:2 62:9
96:17
**approximately**
93:7 96:18
97:1 108:22
110:17 124:21
132:13 138:25
165:1 208:21
209:15
**archival** 103:3
**archive** 150:6
**area** 141:1
**Aria** 162:10
**Arnold** 2:3 5:17
6:19 15:8
44:18 45:5,10
45:11,12 46:22
46:24 47:2,17
48:14,18 49:9
59:16 60:8
64:10 65:8,18
67:20 68:17
69:6,19 74:12
75:5 76:3 79:5
79:12 80:12
82:21,23 83:1
89:2 113:4,13
114:20,24
131:21 134:22
136:11 146:10
147:15 148:24
149:15 150:9
150:20,25
151:7 157:25
161:23 163:16
163:22 164:5
164:15,25
165:11,25
166:13,17,20
211:14
**arrival** 52:13
**arrived** 49:13
**article** 33:10,21
59:21 102:8,23
169:10 173:12
**articles** 84:9,11
84:12 173:5,9
173:13
**articulate** 88:22

**ascertain** 201:7
**aside** 83:12,16
83:20 124:8
151:4 169:3
**asked** 11:2 26:18
30:24 40:2
47:25,25 51:14
57:7 63:13,17
71:5,9,17,20
71:21,22,23,24
72:7 75:14
76:5 81:23
86:6 102:2
106:21 109:17
110:1 112:5,6
113:15 121:7
122:16 139:11
142:10 145:9
145:20 158:8
165:17 194:2
200:20 201:2
202:18,22
209:18
**asking** 68:20
108:8 121:23
137:11 148:5
172:10 185:20
197:4,10
203:10 208:12
**assembled** 12:5
**Assembly**
204:15,21
205:7
**assert** 51:17
**asserted** 95:24
177:18
**asserting** 49:23
**assertion** 99:15
**assertions** 36:13
179:17
**assistant** 179:11
**associated**
206:15 207:17
207:23
**assume** 64:1
74:18 78:15
**assumed** 56:1,19
87:24 116:4
**assuming**
186:19

**assumption**
46:17,18 205:6
208:12
**assure** 29:18
**assured** 40:8
**attached** 194:8
213:9
**Attachments**
4:15
**attempt** 66:10
73:9,13 75:17
75:20 130:7
**attempts** 73:12
140:3
**attend** 171:9
**attention** 33:7
44:12 55:7
76:14 78:11
160:21 188:14
189:12
**attitude** 144:10
**attorney** 5:22
10:1,2,16 27:2
31:18 58:11
59:8,8 68:7,14
69:3,24 70:5,6
70:9 82:10
91:12,14 96:2
96:4,4,7,8,17
97:7 98:16
107:8 114:12
123:25 131:24
131:24 141:18
183:2,9 185:13
185:17 186:1,5
186:7,21 190:2
190:6 192:21
193:6,8,14,22
193:23 199:19
200:18 215:17
**attorney-client**
62:17,19 69:11
**attorney-in-fact**
179:15
**attorneys** 37:15
62:13 67:10
93:19 95:18
97:11 101:24
104:10,13
107:2,6 114:8

114:9 115:6
119:22 122:23
125:22 133:16
134:14 136:18
144:7 201:8,16
201:19,25
**August** 171:16
171:20 172:23
172:24 173:7
**authenticate**
136:25 171:23
**author** 33:2
**authorization**
198:13
**available** 54:3
109:6
**Avenue** 2:4,19
**average** 140:7
201:23
**aware** 33:16,17
34:9 40:9
57:10 58:22
59:1 133:15
168:15,24
169:15 181:23
182:6,11,16,25
183:15,21,25
184:4,23 185:2
185:6,9,16,21
188:16,25
189:5 192:25
193:9 194:6,23
202:6,10 204:2
204:13,18,19
204:24
**awareness**
119:13 185:11
194:1,2

──────────
**B**
**B** 4:7
**back** 21:12 26:1
28:10,13,15
32:21 38:10
42:12 43:24
46:8 51:24
55:13,19 59:21
74:4,8,9 76:8
86:20 89:8
107:22 123:1

123:12,21
129:25 130:17
142:11 161:10
172:19 181:1
188:15 190:22
195:13 200:25
211:12 212:9
**backed** 29:14
87:15
**background**
148:16
**backup** 11:21
12:6 78:25
122:15
**backups** 51:23
56:16 71:13
78:2 84:2
87:10,21,25
111:10 146:22
**bag** 23:19,20
**BakerHostetler**
2:17 6:5
**band** 78:9 80:24
**bank** 54:5
**base** 129:23
**based** 106:4
137:16 145:15
146:1 179:13
183:1 208:12
**basic** 19:24
41:14 50:4
84:17 122:24
**basically** 108:5,8
131:2 139:9,11
154:10 158:25
169:20
**basis** 179:1
180:8 195:25
**beat** 119:17
**begins** 5:4
**begun** 102:5
**behalf** 61:25
199:13
**belief** 56:14
100:9
**believe** 6:25 38:2
46:7,14 47:24
48:6 52:24
53:4,15 58:17
62:8 63:8 74:3

76:8 82:15
84:10 91:8
92:13 100:3,3
105:17 107:17
107:24 111:14
121:4,4 123:18
125:6 126:20
143:8 156:7
170:12 180:6,7
181:21 183:5
184:16 185:8
186:8 189:13
195:6 196:18
198:23 204:23
211:6
**believed** 35:17
114:3 179:9
183:4
**bell** 187:25
**belonged** 12:13
25:21 40:2
50:5 82:1
112:3,14
**belonging** 13:2
**beltway** 140:16
**beneficiaries**
120:18
**beneficiary**
82:10
**benefit** 43:11
**best** 14:1 64:20
65:5,16 67:12
91:16 94:23
110:14,25
115:1,9,11
124:11 126:25
134:17 138:16
140:22 186:23
196:8,18
215:10
**better** 99:16
114:21 115:13
132:5 156:10
208:2
**beyond** 62:21
76:21 104:22
105:10 119:2
**bias** 37:16
**bit** 33:6 88:3,3
99:23 103:9

117:17 125:25
140:13 145:13
158:24 200:25
206:18
**blankly** 137:14
**blue** 25:4 78:9
78:10,11,12,13
**Bluetooth** 139:3
**blur** 190:18
**blurry** 88:4
**Board** 2:11 5:23
**Bob** 31:15 36:25
89:12 93:16
94:6,10 162:24
**body** 189:6
**bold** 62:15
**Bolton** 188:18
188:21
**bolts** 124:13
**book** 24:2 33:16
**bookshelf** 24:9
**bore** 73:18
**bored** 159:9
**bottom** 10:21
15:19 167:5
**box** 15:4,21
22:21 23:2
26:3 29:3
44:17,21 45:3
45:4,6,7 112:7
133:4 163:21
**box-style** 24:2
**boxes** 23:23
**Braden** 133:22
**Branch** 3:3 4:4
5:24,24 88:5,8
162:11 167:10
167:12 174:6
174:25 195:16
195:18 197:21
197:24 198:11
198:21 199:8
200:8,12,15
201:4 202:24
203:1,5,10
206:5,9 207:8
207:9 210:7
211:25 212:11
**brand** 78:21
**break** 8:7,9

43:18 47:4
86:12,13 123:3
123:5 161:5
180:11,16
208:6
**brief** 7:8 25:24
130:7 132:20
132:22
**briefly** 25:1
42:15 189:20
**bring** 13:24
143:2
**bringing** 99:5
**Brooks** 8:24
**brought** 32:14
33:6 91:22
135:9
**burden** 183:4
**buried** 22:25
30:2
**business** 27:2
51:9,18 55:1
55:13 56:24
57:4 59:15
60:7 61:7,7,11
69:5 70:15,17
70:23 71:1
72:5 74:15
75:12,24 76:2
81:19,19 82:17
82:18 83:23
108:10 127:11
142:6 145:17
**business-style**
110:24
**businesses**
202:12
**busy** 95:16
**buy** 209:12

---

## C

**C** 2:1 3:1 5:1
162:10 213:1
215:1,1
**cable** 29:2
**cables** 29:4
**call** 11:20 12:1
94:1,1,4 95:18
108:12 109:23
110:7,8,12,18

111:2,15
120:24 122:12
125:14,14,16
125:17 130:8
132:7 136:12
136:22 137:1,4
137:4 138:17
138:22,25
139:15 140:17
**called** 101:2
121:16,20
130:2 136:17
**calls** 62:3 73:11
87:18 108:25
109:5 139:4
210:24
**camps** 100:12
**capacity** 1:7 5:7
203:17
**caption** 175:24
**car** 137:12
138:22 139:3
**card** 52:20 53:21
53:23 54:1,5
**care** 9:24 22:23
37:20
**career** 61:2
**careful** 19:6
29:21 134:14
**Carolina** 1:1,19
2:12,14,24 3:4
3:9,18 5:11,22
8:14 11:8
12:20 13:4,14
33:18 35:24
52:17 79:7,14
80:6 88:9,13
90:8 91:5
105:7,8 128:6
129:8 204:15
204:20,21
213:5 215:1
**Carolina's** 33:12
34:22
**Caroline** 67:11
119:2 125:21
126:1 133:15
137:6 138:12
138:17 142:23
143:20 153:23

**cartography**
140:5
**case** 5:12 9:2,6
9:17 17:8 31:2
35:4 36:3
38:14 42:12,18
44:9 55:23
58:13,14,17,18
60:11 90:24
103:2 105:10
111:4 116:23
119:21 124:18
127:3 168:16
199:20 204:14
214:2
**cases** 84:5
**cash** 53:20
**casual** 25:24
121:21 138:6
153:18,22
157:12
**caught** 153:2
**cause** 1:4 5:6
31:9,14,17,25
32:13 33:24
36:13 37:1,7
38:12 56:12
57:20,24 59:6
59:16 60:7
76:4 89:9,10
89:24 90:10,14
90:25 91:3
92:8,16 98:4
98:14 100:25
104:18 106:24
125:23 162:20
163:1,3,6,9,23
173:14,17
175:25 183:5
200:16 201:1
201:13,19
202:5,7 203:7
214:2
**CC** 133:20
**CC'd** 133:12,18
**cell** 108:10 206:6
206:7
**census** 43:2
**centered** 40:6
154:1

certain 52:25
73:17 84:2,4
101:19 103:19
103:24 127:10
127:10 132:17
197:13 204:6
certainly 42:22
67:9 68:2
136:3 155:17
173:8
certificate 4:14
189:22
certify 215:7,14
cetera 30:19
chain 67:13
115:14
Chairman 1:7
5:7
challenge 91:19
challenged
204:25
challenging
153:11
chance 23:6
113:1 114:10
153:4
change 31:3
74:6 208:17
changed 73:19
88:14 202:21
208:18
changes 19:10
19:18 199:15
changing 88:21
characterizati...
178:9
characterize
91:6
characterizes
67:2
charged 147:1
173:20
charges 52:20
check 49:20
163:13
checked 48:24
155:1
child 139:20
179:10,11,14
205:13

childhood 22:21
203:16
children 29:24
30:1 51:3
54:19 80:20
83:4,11 85:9
85:10 148:13
150:5
children's 150:5
choose 64:22
65:19
choosing 67:15
chose 37:21
Chris 72:9
cigarette 86:15
circumstances
111:25 170:17
civil 35:14 61:15
63:24 124:1
clar- 66:14
clarification
49:6 122:17
clarified 64:20
65:4,15 66:12
66:13 67:3
clarifies 64:8
clarify 12:24
36:4 46:4
49:10 67:9
106:10 111:15
112:20 150:21
153:5 160:2
165:21 166:8
clarifying 69:2
96:1
classic 116:9
clean 19:16
clear 12:25
23:19 27:9
56:22 57:13,15
101:5 104:3
116:18,19
125:20 130:22
140:10 147:9
197:25 204:3
Cleared 209:10
clearing 132:25
clearly 35:22,23
118:9
client's 62:23

clients 62:1
close 109:13
132:19 140:25
closed 105:22
closer 140:22
coffin 23:1
Coie 162:17
164:8
col- 195:8
colleague 196:2
colleagues 97:25
149:1 166:6
collected 51:16
143:14
collective 66:10
colloquialism
119:16 136:19
Color 4:11
colors 17:25
combination
94:8
come 25:15
26:21 27:5
36:6 37:16
47:9 71:25
74:8 103:4
104:4 125:19
139:11 154:22
154:24 160:16
169:7
comes 101:5
comfortable
135:7,10
coming 99:20
101:5 141:18
comment 32:22
36:18 59:23
commented
36:11,12
commingled
128:24
commission
213:24
Committee 1:8
5:8
Common 1:4 5:6
31:9,13,17,25
32:12 33:24
36:13,25 37:6
38:12 56:12

57:20,24 59:6
59:15 60:7
76:4 89:9,10
89:24 90:10,14
90:25 91:3
92:8,16 98:4
98:14 100:25
104:18 106:24
125:22 162:20
163:1,3,6,8,23
173:14,17
200:16 201:1
201:13,19
202:4,7 203:7
214:2
communicate
75:3 89:21
91:10
communicated
74:13 91:17
93:24 109:8
communicating
81:7 185:25
193:21
communication
62:17 89:11,14
89:20 92:20
93:4,8 94:10
97:10 107:2
109:1,21 121:1
122:23 123:17
123:22,25
124:19 133:11
135:13 149:11
152:3 162:21
173:3 186:5
187:5 193:7
communicatio...
62:19 68:21
89:8 92:15
94:11 95:3
96:18 106:5
107:5 108:22
130:9 132:14
133:9 135:24
136:5,7,10
141:13,19
157:5 161:13
161:16,19
162:7,10,13,14

162:16,19,20
166:24 170:18
182:19 188:20
189:9 191:8,16
191:21 192:1
205:10
communiques
109:15
community
20:14 72:14
comparison
85:21
compel 197:19
197:20
compensations
163:24
competence
91:20 153:12
competency
200:19
complete 8:4
65:2
completely 43:8
49:3 103:21
comprehend
201:12
comprehension
201:14
computer 12:6,9
26:20,23 27:8
28:23 29:8,15
30:12 71:15
79:1 83:8
87:14 112:24
154:21 156:7
157:16
computers 70:18
70:21 87:5,15
87:22 89:4
142:5 155:7
211:15
concern 61:18
69:4 98:21
101:10 105:9
concerned 29:25
37:18 62:14
105:23 146:19
159:8 183:17
206:18
concerning

63:25 71:6
91:1
**concerns** 64:5
68:15 179:13
205:24
**concluded** 183:1
212:18
**concludes**
212:14
**conclusion** 62:4
123:18
**conditional**
50:24
**condolences**
93:21
**conduct** 67:21
**conducted**
164:11 215:6
**conference**
136:22 137:1
**confident** 156:4
**confidential**
197:7,8,12,13
**confidentiality**
117:25
**confirm** 24:20
50:4 80:3
104:10,12
131:11 156:10
156:18
**confirmed** 93:15
**confirming** 95:6
**confused** 42:5
103:9 157:25
**confusion**
166:10
**congressional**
85:16 103:25
**connect** 29:7
31:24
**connected** 28:23
38:13
**Connecticut**
2:19
**connection** 25:2
37:8 38:8
51:11 61:19
139:3 190:15
211:14
**connectors**

49:17
**consider** 81:8
83:5
**considerations**
163:24
**considered**
81:12,15,20,21
81:25
**considering** 64:1
84:20 142:15
177:1
**consistent** 208:3
**consistently**
27:22
**constant** 152:2
**constitute**
215:12
**constitutional**
90:4
**consult** 122:25
**consultant** 61:20
149:2 203:19
**consulting** 68:6
113:24
**contact** 21:25
71:6 75:17,20
108:9
**contacted** 31:8
31:13 36:25
170:5 171:1
**contacting** 37:2
37:6 98:4
**contain** 79:2
213:6
**contained** 12:19
13:9 46:3
62:11 64:14
70:23 76:11,24
77:14,18 84:3
85:3 89:1,4
94:24 113:21
113:22 127:22
128:25 150:24
**containing** 15:1
**contains** 62:16
62:18
**Contemporan...**
185:23
**content** 28:20
116:22 154:20

**contention**
117:16
**contents** 18:24
28:19 29:9
45:4,6 49:8
76:18 115:3
211:16
**context** 98:24
99:14,22 102:8
119:6 143:2
154:4 197:8
198:2
**continue** 74:6
172:1,2 203:24
**continued** 3:1
34:7 110:2
139:6
**contract** 209:6
**contradictions**
99:3
**control** 40:11
**convenience**
210:19
**conversation**
25:24 31:23
36:5 50:14
51:6 56:23
57:2 60:5
93:10,13,23
94:13,19 96:24
97:4,14 100:4
101:21,23
102:5 104:6
107:16 110:24
113:18 118:24
121:3,22
122:20 123:19
124:22 125:6
125:11 126:17
126:21 138:6
141:14 143:10
153:22 154:1
157:12 158:21
158:24 160:18
161:24 187:15
**conversations**
36:6 38:19,22
59:5 92:14
99:24 101:14
113:10 118:18

126:11 127:15
129:16,19,22
130:6 133:25
135:18 145:15
153:14 154:6
156:25 157:2
161:19,22
162:2,3,6,9
166:18
**copied** 146:23
**copies** 30:7 83:3
146:8,12
147:14,16
148:7,10,12,22
149:8 150:18
165:12 166:11
168:3
**copy** 82:11
107:11 146:14
146:17 166:5
167:15,23
168:10,17,20
168:21,25
**corner** 24:1
**corpse** 112:19
**correct** 7:7 8:15
9:8,22 10:1
12:2,11 19:22
20:18 30:13,14
38:9,15 48:10
48:11 50:19,20
50:22 51:12,13
51:22 58:8,20
58:25 61:8,9
61:13,14,16
62:2,25 63:1,2
63:7,15,16
65:9,20 70:17
74:13 76:12,13
77:14,15 79:8
80:12 81:10
87:6,10,11
89:12,13 90:12
90:16 91:5
92:7 105:19
106:7,20 108:1
108:20 109:2
112:22 113:8,9
113:14 116:1
123:22 128:20

128:21 131:15
143:25 144:25
145:19 146:6
148:9,11
149:17 151:1
155:11 159:20
163:16 164:22
165:2,3 166:21
171:10,17
177:7,8 178:7
179:3 184:19
184:23,25
185:11 189:14
191:24 192:4,5
193:18 194:23
205:6,9 208:13
213:6
**correction** 213:9
**correctly** 36:24
92:4 155:5
**counsel** 2:2,11
2:16 3:2,6 5:13
7:21 38:4
44:14 67:21
68:3,14 69:1
69:18 78:7
191:17 193:12
195:18 198:5
215:15,17
**counsel's** 88:10
**count** 147:13
**country** 203:15
**County** 1:2 5:11
187:6 189:1,9
213:18 215:2
**couple** 10:19
16:12 22:15,16
24:21 41:11,14
94:21 133:12
147:18 195:8
212:1
**couples** 160:20
**course** 26:5
31:20 32:7
38:21 40:16
41:2 56:9
84:13,14 112:8
148:12 187:7
**court** 1:1,1 3:16
5:10,10,15

67:13 96:14
103:16 104:1
106:12,13
169:17 183:16
183:22 184:23
185:2 186:13
187:6 193:4,16
197:18,19
198:19 199:3
215:4
**courts** 196:21
**cousin** 71:24
72:19 120:2
**cover** 25:8 78:10
78:11,13,16,17
78:21 195:23
196:3
**covered** 71:8
128:5,13
135:25 196:2
**covers** 33:2
**coworker**
165:24
**coworkers** 97:24
150:18
**Cox** 2:13 5:21
5:21
**Crabtree** 53:17
**created** 51:10
83:24
**creating** 30:21
**creative** 60:22
**credit** 52:20
**crime** 173:21
**criminology**
149:2
**cross** 159:4
**CRR** 1:23 3:17
215:4,23
**curious** 60:11
145:9,10
**Current** 206:22
**custody** 67:14
115:14
**cut** 119:9
**CV** 63:11
**CVS** 1:2 5:12

_____
        **D**
_____

**D** 4:1 5:1 213:1

213:1
**D.C** 2:4,19 15:9
131:24
**dad** 116:12
149:21
**Dad's** 55:15
**Dale** 26:21,22,22
26:23,25 55:1
55:11 60:4
61:8 71:6,10
71:10,17 72:2
72:10,12,21,23
73:2 74:13,23
74:24 75:2,4
86:24 87:14
89:4 142:8,21
142:25 143:3,9
143:16,22
144:18 151:12
154:11 155:6
**Daley** 32:16,22
33:1,11 59:21
102:6,8
**Daley's** 33:16,21
**Dalton** 27:1
142:9 146:2
**Daniel** 161:20
**data** 18:12 19:19
28:6 30:20
43:2 64:22
65:5,17,18,20
77:5 79:21
80:17,18 81:10
112:24 113:6
116:15 118:4,5
118:6 127:23
127:24,24,25
128:1,17,18,19
128:20,24
129:4
**date** 5:3 10:4
117:15 181:11
181:12 192:25
209:1 214:5,25
**dated** 10:5
181:14
**dates** 191:2
195:4
**David** 1:7 5:6
32:16,22 59:20

102:6,8 161:14
214:2
**day** 21:5 47:2
60:14 136:20
169:12 188:1
192:24 208:15
213:10,20
215:20
**days** 28:12 52:25
53:5 74:4 93:1
97:1 176:20,21
176:24 177:6
177:16 187:16
187:21
**dead** 74:25
80:22 82:2
100:7,18
**Deakins** 2:22 6:2
**deal** 98:24
**dealing** 98:22
118:20
**death** 20:17
21:21,24 27:7
27:15 41:22
42:4 100:2,5
100:12 101:8
112:13,15
170:19
**deathbed** 100:20
**debit** 53:21,22
54:1,5
**decade** 36:22
**deceased** 20:11
32:21 81:17
152:6 173:18
**December** 101:1
107:17,24
120:25 124:23
190:17 208:25
**decide** 114:9
**decided** 14:1
**deciding** 79:24
**decision** 134:21
135:1,2
**decisions** 64:25
**declare** 213:3
**decorative**
148:17
**def-** 6:2
**Defendant-Int...**

3:2
**defendants** 1:9
2:11,16 5:25
6:3,6 44:9
116:20 117:18
118:11 195:19
**definitely** 137:6
**degree** 62:25
193:10
**delayed** 13:25
**delete** 19:4
**deleted** 209:21
**deliver** 134:25
**demographer**
154:5
**demographics**
105:2 140:5
**Department**
2:12
**deponent** 3:6 6:8
**deposition** 1:12
5:4 7:9 48:3
136:24 141:6,9
156:16 212:15
212:18 214:5
**describe** 102:13
**DESCRIPTION**
4:8
**designed** 139:23
**desk** 22:16
**desktop** 27:8
148:16
**destroyed** 81:3
**detail** 98:11
110:21 111:5,7
**detailed** 95:25
114:2
**details** 21:14
52:12 60:18
91:11 113:1
203:12,14,19
203:24
**determinations**
63:12,14
**determine** 62:10
63:21 64:13
83:9 157:7
158:3
**development**
36:7

**device** 18:12
46:25 49:1
54:15 76:15
78:22 207:12
207:13 208:10
209:5,7
**devices** 11:7,15
11:21 12:7,8
12:13,19 13:9
13:15,16 15:1
15:15,22 17:20
18:19,20,22,25
19:5,13,19,25
20:5,8,24 21:7
21:10,15 23:11
23:15 24:17
25:3,11 27:18
27:20 28:15,19
29:7 30:16,20
31:1,4,8,22
32:9,12 33:24
35:17 36:1
37:3 38:11,23
39:4 41:5
42:11,17 54:15
111:7,11
122:14 207:16
208:14,18
209:4 211:13
211:16
**died** 21:18 72:4
154:17
**different** 46:13
77:4,5 78:3
84:7 131:23
167:25 203:1
206:13 207:16
208:14
**differently**
110:5
**difficult** 77:23
83:2,9 84:23
85:11 193:9
**dig** 30:3
**direct** 82:13
146:2
**directed** 191:23
**direction** 64:7
**directive** 129:6
**directly** 38:13

45:9,12 73:4
104:19 127:5
131:3,5,14
141:25 152:12
153:11,11
182:23 193:13
**director** 31:16
**disagree** 179:17
199:1
**disclosed** 35:10
40:13 56:18
**discovered**
56:25
**discoveries**
56:21
**discovery** 3:16
35:11,11,12,12
35:14 40:15
56:19
**discriminated**
37:18
**discuss** 31:21
59:13 73:10,14
97:19 98:12
100:22 113:1
118:25 119:20
124:16,17
127:20 186:10
**discussed** 38:11
41:6 55:22
56:3,14 59:18
70:8 97:3
110:23 113:7
119:11 122:19
128:10,14
135:22 136:6
161:25
**discussing** 13:16
23:11 32:9
33:11 35:1
36:8 57:19,22
102:18 127:19
160:14
**discussion** 34:8
40:16 41:2
67:10,12 98:6
110:2 114:23
115:24 119:4
132:22 142:17
**discussions**

31:20 32:4,7
33:20 37:1
51:7 57:24
58:3,9
**disguised** 36:16
**dismiss** 4:24
193:2,16
**displayed** 22:23
**dispute** 200:19
**distinguish**
85:15
**distributed**
166:11
**district** 85:17
**districts** 32:20
33:13 34:22
35:4 43:3
103:25 169:17
**Ditched** 165:7
**divide** 100:11
**Division** 1:1
5:11
**divorce** 81:4
**doctors** 150:4
**document** 9:15
44:13 46:9
52:21 63:15,18
63:21,22,23
152:10 175:22
176:4,6,17
177:5,9,13,15
178:1 181:5,14
181:19 184:14
184:17,21
185:1 187:21
189:16 192:12
192:15,18
193:1
**documentation**
65:2
**documents**
10:22 11:2
29:24 52:16,18
73:18,18,19
79:13 81:1
83:24 84:4
85:5 96:11,12
96:14 120:16
146:6 163:16
175:5,10

185:13,15,16
187:20 196:17
197:7 198:4
199:13,23
**doing** 8:9 108:9
114:8 122:1
129:24,24
134:2,4 173:6
**dollars** 132:21
**domestic** 196:16
**door** 22:19
**dot** 159:4
**Doug** 186:20
187:1,9 188:1
**Douglas** 59:12
186:8
**drained** 122:3
**draped** 23:1
**drawer** 147:21
147:23
**drawers** 22:16
23:24 24:4
29:3
**drawing** 11:8
46:1,1 205:12
205:17
**drawn** 56:8
90:22
**drew** 36:20
**drive** 8:18 11:20
32:24 45:22,25
46:2,3,6,12,13
46:15,20 49:17
54:20,21,22,24
55:10,17,21
56:3 59:23
74:19 76:11,17
76:19,25 77:11
77:14 78:2
80:2,2,3,4
146:21,22
150:1 156:2
**drives** 11:18,25
12:1 16:2,7,8,9
16:12,23,24
17:21,21 23:20
23:25 24:7,7
29:5 34:7 36:5
46:13,23 47:1
47:14,14 50:10

57:1,5,12
59:22 60:1
62:11 64:24
67:19,20 70:24
70:24 74:11,12
77:10,18,19,25
78:8 80:15,15
81:11,13 87:9
87:9,16,16
89:1,2 100:24
101:15 102:7,9
104:15 111:18
112:22,22
113:12,13,20
113:21 114:4,4
114:5,6 117:11
117:11 118:7
134:22,23
135:16,16
146:9,9,12,13
147:19,20
155:8,9 164:12
164:12 165:10
165:11 211:17
211:17
**driving** 83:15
85:1 141:3
**drop** 74:7
**dropped** 7:3
136:23
**dropping** 139:4
210:14,14,17
210:24
**drops** 139:5
**due** 196:25
**duly** 215:8
**dump** 107:21
**duplicate** 155:17
155:18
**duplicative** 89:3
**dying** 27:11
113:3

_____ E _____
**E** 2:1,1 3:1,1,3,4
4:1,7 5:1,1
213:1,1,1,1,1
214:1,1,1
215:1,1
**e-mail** 94:6,10

94:11,20,21,24
95:3,8,10,13
96:18 130:9
132:13 133:8
133:10
**e-mailed** 130:12
**e-mails** 53:25
**ear** 116:13
**earlier** 9:5 30:12
44:8,15 48:6
58:18 61:6,16
70:14 78:6,14
80:14 86:23
89:9 131:13
135:5 166:16
168:15,23
169:3 171:13
200:21 209:18
**earliest** 210:19
**early** 50:9 59:4
89:15 92:24
96:25 190:18
211:11
**easy** 71:6
**echoing** 116:13
**Eddie** 5:19
67:11 107:10
107:25 119:1
125:21 126:1
133:15 137:7
142:22 153:23
**Edenton** 2:14
**edge** 153:20
**Edwin** 2:8
135:19
**effects** 113:2
**effort** 78:19
108:25 112:16
**efforts** 55:12
79:10
**eight** 16:19 93:1
96:25
**either** 24:22
57:16 60:19
116:19,24
120:9 141:8,20
143:15 151:12
153:14 207:11
212:13
**Elections** 2:11

5:23
**electronic** 10:15
  11:6,15 48:9
  48:13,17 64:10
  80:15 82:20
  83:8 101:16
  155:10 164:20
  211:15
**element** 38:3
**Elias** 162:7
**Elizabeth** 2:18
  6:4 44:7
  161:17
**emotion** 25:16
  101:7
**emotionally**
  122:3,3
**emotions** 99:3
  153:19
**emphasis** 149:4
**employed** 63:6
  215:15,18
**employee** 215:17
**employment**
  179:12
**empty** 16:12
**enacted** 204:20
  205:2
**encountered**
  210:23
**encouraged**
  21:11
**ends** 118:1
**Enforcement**
  2:11
**engage** 64:12
**engaged** 61:12
**entered** 58:23
  129:10 184:24
  193:5
**entering** 187:9
**entire** 49:8 56:6
  203:15
**entirety** 65:18
  80:7 115:2,10
**entitled** 116:11
  116:21 117:1,4
  117:25 118:16
**entitlement**
  120:6

**erased** 211:7
**Erin** 182:4,14
  183:25 184:5
**err** 64:6
**errors** 35:3
**escully@bake...**
  2:20
**espeas@poyn...**
  2:10
**esquire** 9:25
  144:9
**essentially** 29:14
  131:25
**establish** 71:25
  203:22
**established**
  127:2,21
  130:13 196:22
**establishment**
  203:9
**estate** 4:13 42:3
  58:24 82:9
  96:3 120:21,22
  151:15 168:22
  168:25 183:18
  185:11 186:12
  188:17 191:22
  195:1
**estimate** 83:21
  84:23 85:11
**estranged**
  179:10,14
  183:23 184:1
**et** 1:4,8 5:6,9
  30:19 214:2,3
**etched** 46:6
**Ethics** 2:11
**evasive** 126:4
  159:24
**evening** 23:13
  54:10
**event** 198:12,23
**eventually** 28:10
  107:1 135:11
  203:25
**Everett** 188:18
**everybody** 88:9
  133:18 199:19
**evidence** 14:2
  34:13,17 35:2

35:2,5,19
  42:21 103:1
  104:2,16
  105:19,21,23
  106:2 115:16
  129:10 130:16
  134:7 186:19
**ex-** 139:15
  159:13
**exact** 67:18
  105:24 108:5
  111:22 131:8
  132:2
**exactly** 15:5
  16:10,17,18
  23:3 27:10,13
  42:9 64:24
  67:8 71:6 85:1
  94:8 97:8
  107:23 120:12
  130:6 132:7
  133:5 150:15
  192:20 194:17
**exaggeration**
  158:25
**examination** 4:2
  4:3,4 6:15 44:5
  78:7 195:15
**examine** 149:19
**examined**
  152:14
**example** 77:25
  78:5 83:3 84:8
  133:21 148:14
**exasperate**
  118:15
**exceeded** 157:1
**Excellent** 6:24
  7:8 18:10
  35:25 180:19
**exception(s)**
  213:8
**exchanged** 94:5
**exchanges** 133:5
**exchanging**
  125:12 136:4
**excited** 30:4
  51:2
**exclusively**
  95:19 166:4

**Excuse** 17:5
  25:17
**executed** 193:18
**Exhibit** 4:9,11
  4:12,13,14,16
  4:19,20,22,24
  9:11,14 14:15
  14:18 44:13
  45:17,21 46:21
  64:12 76:8,12
  76:25 77:20
  78:12 141:10
  167:6,8 168:8
  168:9,9,20
  174:18,23
  175:6,6,10,11
  175:18,23
  176:6,17 177:6
  177:9 178:25
  180:24 181:5
  181:20 184:6,8
  184:14,18,21
  187:22 188:8,9
  188:13,14,15
  189:12,16,21
  192:7,8,13,15
  192:19 193:1
  193:15 194:8,9
**exist** 155:16
**existed** 74:20
  117:10 119:3
**existence** 119:5
**expect** 123:25
  129:4
**expectation**
  118:2 159:16
**expected** 52:3
**expecting** 94:1
  98:5 122:7
**experience**
  35:15
**expert** 51:11
  60:19 61:20,22
  62:2 83:24
  105:1 113:23
  131:6,25
**experts** 61:12
**expires** 213:24
**explain** 34:20,25
  95:25 110:5

111:5 210:9
**explained** 59:10
  72:1 110:6
  116:17 139:18
  187:20
**explaining** 116:8
**explicitly** 56:1
  56:10 116:22
  118:9 129:7
**exposed** 122:7
**express** 38:22
  157:19
**expressed** 33:22
  51:8 93:21
  157:19
**expressing**
  42:19 120:5
  153:24
**extend** 185:19
**extended** 25:21
**extensions** 84:17
  84:19
**extent** 47:11
  117:10 118:13
  178:12 210:21
**external** 11:18
  11:20,25 12:1
  12:8 16:7,9,23
  17:21 24:6
  29:5 54:22,23
  56:25 57:5
  76:17,19 77:10
  78:22 111:7,11
  112:21 113:20
  122:14
**extra** 112:16
**extremely** 122:2
**eyebrows**
  117:17

---

**F**

**F** 215:1
**fa-** 205:13
**face** 79:17
**facing** 91:19
**fact** 32:19 34:21
  39:10 46:16
  51:13 55:22
  57:10,12,20
  70:6 71:12

80:4 88:24
97:23 105:10
116:6 119:2,5
124:25 127:16
128:11 133:15
134:12 143:9
152:5 153:15
166:19 169:16
182:17 186:11
186:16 194:10
**factory** 209:11
**facts** 179:4,7
186:19
**factual** 180:8
**fair** 77:16 85:18
86:5 135:12
**fairly** 195:24
**fairness** 36:14
**familiar** 37:21
51:25 60:18
61:15 93:18
103:20 141:1
154:19 175:20
**familiarity**
84:18 194:20
**family** 25:21
58:16 72:25
73:18 101:13
119:25 120:5
155:24 158:15
171:25 201:9
**family's** 201:15
201:22
**far** 8:17 17:12
17:25 105:23
110:9 123:23
140:20 156:6
156:20 157:12
159:7 167:3
201:7
**Farr** 2:23 6:1,1
17:5,13 47:25
48:4 69:23
70:4 115:19
**father** 8:24
12:14 13:2
16:16 20:12,15
21:18 27:3,11
27:12 29:19
30:12 32:21

36:20,22 37:17
40:10 41:18,22
42:4,12,13
49:4 50:5
55:16 56:6
60:21 61:7,10
71:10 72:4,4
74:15,23,25
75:12 76:1
78:23 81:1,14
82:1,3,13,16
83:22 84:15
85:6,8,9 90:7
90:12,15 91:5
93:22 97:24
98:10,17,19
99:13,17,19,25
100:4,12 101:9
104:19 105:3
105:11,16
106:19 112:4
112:10,20
113:7,11
118:15 122:8
128:18 132:6
134:12 139:21
143:11 144:8
147:6,12 149:9
151:15 152:6
154:3,17 155:8
159:10 164:19
169:25 170:7
171:2,3,10,14
171:15 173:6
173:10,17
202:12,13
203:6,12
205:10,14
**father's** 11:7
12:19 13:13
21:24 22:12
23:16 24:10
25:17 26:14
27:1,7 29:3
30:21 31:5
47:10 48:8,25
50:12 51:9
54:8 55:1,3,11
56:24 57:4,17
57:21 59:15

60:7 61:20
62:11 69:5
70:15,18,23
71:3 74:17,21
75:23 76:20
80:16 81:9,17
81:18 83:14
84:18 85:24
87:6,12 99:9
100:23 101:15
105:18 113:22
118:5 127:8,17
127:24,25
128:17 139:16
142:6 144:23
145:17 149:10
155:10 157:9
158:18 160:20
168:25 169:4,8
169:12 170:19
171:19 172:13
172:25 173:14
202:2,12,25
**Fayetteville** 1:18
2:8
**February** 10:5
11:1 39:2
190:4 191:3
192:24,25
193:1 194:25
209:16 211:10
**FedEx** 14:11
45:7 132:19
163:11,14,15
163:21
**feel** 50:23 81:7
99:7 134:9,16
147:1 156:4
196:7
**feeling** 114:17
121:25 122:4
169:13
**felt** 29:17 30:2
38:1 40:4
42:21 60:20,24
71:7 74:5 87:3
90:2 95:12
97:23 100:7
104:18,21
117:19 132:4

139:25 143:5
144:15 152:14
190:22
**Fiduciary** 3:7
**figured** 169:18
**file** 49:11 62:23
84:17,19
**filed** 5:9 176:22
176:24,25
177:16 181:11
181:12 182:16
**files** 13:11 19:4
19:8,11,19
20:19 29:13
30:18,20 31:3
35:19 40:1,6
42:22 43:8,12
47:9 48:9,17
49:25 50:3,6
50:12,15,16,18
50:22 51:20,22
52:9 56:11,13
56:18 57:13,14
57:18,21 64:10
64:13,23 71:3
71:15 74:17,21
75:5 76:24
79:2,24,25
82:18,20 83:8
83:14,17,22
85:3,12,19,22
87:13 114:16
116:22 118:8
129:7 131:11
145:11 146:17
148:25 149:7
149:14,19
155:11,17
157:8 158:3,12
158:12
**fill** 21:13
**finally** 186:25
**financial** 43:11
179:11
**financially**
215:18
**find** 14:11 23:9
26:6 30:7
31:18 48:8
50:17 51:9

54:24 84:6
98:15 116:16
140:24 179:1
186:20 208:1
**finding** 72:18
132:18 200:18
**fine** 7:22 14:20
42:10 199:18
200:8 204:5
**finish** 7:17,18
8:8 34:3 40:21
66:19 80:9
181:7
**fire** 81:3
**firm** 63:7 195:20
**firmly** 125:7
**firms** 63:9
**first** 6:11 9:19
13:1 14:22,23
15:6 20:3
21:17 25:15,16
28:21 31:13,15
32:14 33:14
34:13 36:6
44:12,16 49:16
51:20,22 53:20
54:8,17,24
57:19,25 58:3
73:15,21 74:2
81:2 89:10,16
90:24 92:20,25
93:1,4,7,23,24
96:24,25 97:10
97:14 102:22
104:5 107:8
109:9 110:7,11
110:18 111:2
111:14 120:24
122:12 123:16
141:7 146:20
146:23 151:17
155:22 165:8
168:9 169:4
175:16 176:16
177:15 181:18
182:11 184:20
187:13,15
190:14 192:18
196:11
**five-minute**

43:18
**fixture** 56:5
**flag** 22:24 23:1
**flap** 15:12
**flip** 10:19 14:20
15:12,18,25
17:18 18:10
**flipped** 18:3
**focus** 13:6 15:19
83:16 156:15
**focused** 59:6
**focusing** 58:10
168:8
**folder** 55:5 84:9
**folders** 50:4 55:9
84:3 85:3
**follow** 173:4
**follow-up** 44:10
95:17 109:25
188:13
**follow-ups** 195:8
**followed** 171:19
172:25
**following** 62:16
**follows** 6:14
**foregoing** 213:5
215:6,8,11
**forensic** 131:6
131:25 147:2
**forget** 138:4
**Forgive** 206:18
**forgot** 172:18
**Forks** 2:23 3:17
**form** 12:21 17:9
37:12 88:11,18
149:24 163:13
**formal** 63:3
**format** 10:15
126:23
**forms** 150:3
**forth** 130:18
178:24 179:5,7
**forward** 185:18
**found** 23:10
29:1,3,12,22
47:12 54:18
58:20 65:3
117:18 130:3
156:15 169:25
177:19 178:6

**foundation**
203:9
**founding** 64:4
**four** 16:9,23
24:6 53:5,7
74:3 92:14,18
129:21 178:4
178:24
**fourth** 46:10
**frankly** 98:1
99:23 110:6
127:25
**free** 196:7
**Friday** 1:16
132:24 214:5
**friend** 80:23
209:10,12
211:9
**friendly** 110:24
**friends** 80:22,25
97:24 119:25
120:5
**frightened** 153:3
**front** 45:8,19
168:7 172:8
175:5 181:6
**frustrated** 36:9
**full** 6:21 136:18
**function** 43:2
**functional** 41:25
**funding** 160:15
**funds** 160:16
179:16
**funeral** 171:3,9
**funny** 103:8
**furniture** 25:19
**further** 95:13
101:22 111:5
114:19 172:4
195:7 212:11
215:14,16
**furthest** 36:19

---
**G**

**G** 5:1 213:1
**game** 17:6
**gasoline** 52:20
**gender-based**
149:4
**general** 1:1 5:10

61:4 69:17
70:7 105:4
136:4 204:15
204:21 205:7
**General's** 5:22
**gentleman**
154:24
**genuinely** 143:8
**Geographic** 27:3
72:3 74:20
142:5
**Gersch** 161:14
**getting** 20:24
25:11 27:18,20
30:3 31:8
116:14 118:24
133:3,4 134:18
157:24 171:24
**gift** 32:24
**gifts** 82:14
**gist** 32:19
111:23
**give** 8:4 28:1
31:18 42:23
70:11 84:23
85:11 93:25
97:10 112:18
114:22 115:2
135:6,11 142:2
167:14 174:7
174:12 199:17
206:17 207:25
**given** 58:1 71:12
72:4 81:11,17
111:16,19,21
111:24 125:25
139:12
**giving** 40:18
41:4 135:7
157:11
**glance** 155:22
**glasses** 181:10
**go** 7:4,8 8:1
14:12,12,20
17:15 22:2,4
22:11,11,13
28:10 34:5
38:10,10 40:11
43:17 49:7
52:19 55:13,19

65:1,6,19
66:23 75:16
79:18,25 81:24
92:18 106:15
124:12 131:3
144:5 157:19
158:2,18,20
159:22 160:19
172:12,15
173:25 183:12
186:22 190:23
197:18,19
200:25 203:23
210:8 211:25
**goes** 117:22
**going** 5:2 14:3
17:15 21:12
26:4,5 36:9
39:25 40:24
43:20,24 56:8
67:7 70:10
79:23 86:10,14
86:16,20 88:8
95:14 98:9
100:11 101:3
103:12,15
109:5 117:20
121:6,24 123:8
123:12 125:3,4
130:14,22
131:1 133:3
134:21,24
135:6 141:2
142:15 146:24
151:22 152:11
152:18 153:5,6
153:8 156:16
159:14 160:16
161:6,10
166:20 170:22
171:21,25
172:1,2,3,7
174:1,21 176:9
179:18,25
180:4,10,20
181:1 186:3,3
186:13,14
189:24 191:6
195:9,13,25
196:1 197:17

206:6 212:5,9
212:15
**good** 6:17 29:17
60:4 67:13
86:24 104:11
104:20 140:11
144:19 168:4,4
180:19 195:17
**Google** 169:9
208:2
**gotten** 26:15
35:18 38:24
71:11 73:3
103:13 157:21
**grabbed** 48:25
**grand** 96:20
**grandfather**
85:5
**grandmother's**
120:7
**grandparents**
23:2
**great** 7:15 8:3,14
9:1,5,24 10:3
10:14,19 12:3
14:4 15:6,12
17:3 18:3 20:3
27:16,20 28:9
29:22 38:18
43:19 98:24
**great-grandpa...**
25:22 30:6
**ground** 7:9
**grounds** 177:17
178:4,5,13
179:3,6,8
**Group** 3:3,7
5:25 195:19
**growing** 140:15
**grumbles** 35:13
**grumbling**
35:13
**guaranteed**
40:12
**guard** 153:3
**guardian** 4:17
4:18,19,21,22
58:23 176:1
177:12,12
181:23 182:2,4

182:7,12,15,17
183:19,21
184:25 185:3,7
185:10 186:11
187:19 188:16
189:2,19
191:22 192:2
195:1
**guess** 124:10
157:24 176:25
185:22
**guidance** 69:2

---

**H**

**H** 4:7,12 214:1
**half** 72:5
**half-uncle** 120:2
**hand** 134:24
**handle** 59:11
**handled** 131:2
185:17
**hands** 18:9 81:6
157:23
**handwriting**
44:18,21,24
45:1 46:5
76:20
**handwritten**
10:4 46:1
**happen** 100:1,5
195:25
**happened** 56:21
72:18 125:7
210:10
**happening**
153:21
**happens** 105:9
**happy** 8:9
148:18 196:7
**harassing** 180:1
**hard** 11:18,25
16:7,9,23
17:21 23:25
24:6 29:5
32:24 34:7
36:5 54:21,22
54:23 55:10,17
55:21 56:3,25
57:5,12 59:22
59:23 60:1

62:11 64:23
67:19 70:24
74:11,19 76:25
77:18 78:2,4,8
80:2,3,15
81:11,13 84:1
87:8,16 89:1
95:24 100:24
101:15 102:7,9
104:15 111:18
112:22 113:12
113:20 114:4,5
117:11 126:2
134:22 135:16
139:2 146:8,12
146:21,22
150:1 155:8
156:2 164:11
165:10 211:17
**hardware**
208:11
**Hargett** 3:4
**Harris** 72:20
120:2,9
**Hartsough** 8:25
72:9
**head** 41:1 53:6
66:25 123:4
126:3
**heads-up** 121:8
142:3
**health** 149:16,20
150:10
**heard** 106:3
**hearing** 94:25
175:25 176:9
185:6,7
**heirloom** 25:19
**held** 54:5 197:7
**Hello** 6:18
**help** 37:7 74:8
154:24
**helped** 59:7,9
**helpful** 200:13
**helping** 72:25
130:18,20
**hereto** 213:9
**hero's** 99:6
**hey** 133:22
**hi** 133:23 138:12

**hide** 116:10
**highly** 197:8,13
**highway** 14:13
**hint** 186:21
**HIPAA** 149:24
150:2
**hired** 179:12
**historical** 42:22
65:2 104:22
**historically** 91:3
**history** 197:1
**Hofeller** 1:13
4:8,9,12,13 5:5
6:8,10,17,23
7:1,4 8:24,25
9:11,22 14:15
37:15 44:1,7
86:23 88:24
90:7,15 123:15
161:13 167:6,8
168:7,11,22
173:20 174:18
174:23 175:4
178:19 180:24
181:4,18 184:6
184:13 188:9
188:12 192:8
192:11 195:17
199:11 213:3
213:15 214:4
**Hofeller's**
170:18
**Hofellerism**
119:16
**hol-** 190:19
**hold** 27:22 65:24
65:25,25 66:18
86:1 112:12
179:24,24
181:10 198:7
**holiday** 109:19
190:22,23
**holidays** 109:14
124:25 125:9
**home** 49:13
51:24 52:1,6,9
55:4 71:4,4,14
80:16 105:14
147:17,17,23
148:8 154:14

164:21 165:4
196:11 197:5
198:15 199:25
**hon-** 96:22
**honest** 60:18
**honestly** 16:10
53:5 75:2
87:20 89:6
94:9 107:17
116:4,6 119:10
119:15 125:24
126:3 130:5
135:9 138:10
140:23 141:23
149:18,21
151:23 158:14
169:23
**hope** 98:15
195:22
**hoped** 30:7
**hopes** 31:16 37:6
**hoping** 78:24
147:6
**hospitals** 150:3
**hostile** 99:5
**hotel** 28:21 53:4
53:8,10,12
54:11
**hour** 86:11
140:18,19
**hours** 49:7,14,24
50:1,2 82:22
85:2
**house** 1:8 5:8
24:23 52:13
72:13 81:2
105:22 106:11
132:19 198:6
**household** 88:4
**Howerton** 3:12
**huh** 118:12
**human** 99:2,6
189:1,10
**hunch** 78:23
169:13,23
**hundred** 132:21
**hundreds** 54:18
**husband** 165:7

---

**I**

**I's** 159:5
**i.e** 120:15
155:19
**idea** 56:7 79:23
109:25 124:6
131:8 135:10
142:14 152:15
158:19 159:3
204:1 205:16
**identical** 78:1
**identification**
9:12 14:16
167:7,9 174:19
174:24 180:25
184:7 188:10
192:9
**identified** 57:4
**identify** 5:13
59:7,9
**idolized** 98:2
**ignored** 50:11
**III** 3:3
**image** 15:19
16:1 18:11
99:1,6,6
**images** 14:25
18:5,14
**imagine** 170:17
**immediately**
22:20 25:6
77:12 82:22
151:19
**implication**
105:25
**implied** 102:9
128:12
**importance**
139:16 202:2
**important** 161:1
172:5
**impression**
34:11 77:22
93:25 102:24
103:13 112:18
124:3,15 132:9
152:7 167:2
**impressions**
124:24
**in-** 176:10
**in-person** 141:4

inadmissible
173:23,24
inappropriate
171:6
Inasmuch 24:18
incident 23:12
incidental 61:3
incidentally
99:14
incidentals
95:20
includable
126:24
include 90:6
included 126:25
127:18
including 43:7,8
47:5 113:23
120:17 173:10
inclusive 215:11
incompetence
4:17 175:25
177:11 187:23
incompetency
38:8 91:22
92:2 96:11
97:16,21 99:10
118:19 119:1
119:14 120:10
152:13 181:25
185:24 187:10
190:12,15
191:5 193:3
incompetent
4:15 58:20
176:11 177:19
178:6 179:2
183:8
increasingly
130:22
independent
38:4 98:16,19
indicate 52:22
indicates 139:24
175:13
individual 189:7
individuals
138:19 194:11
infant 54:19
80:20

influence 179:10
inform 151:13
170:5
information
29:10,11 46:20
47:15,16 48:9
48:12 55:14,16
55:20 56:17
62:12 64:15
68:16 69:5
70:22 76:10
77:17 80:4
88:25 89:3
92:1 104:21
106:6,18 113:4
113:22 114:3
116:7 117:1,2
117:6,10
125:25 126:23
127:17 149:16
150:11,16,19
150:19,24
151:4,6 152:1
157:8 158:4
165:24,25
166:12 211:8
informed 60:20
183:16,22
initial 37:1 51:6
113:18 135:13
initially 10:15
50:10 90:17
104:18
initiate 107:5
109:23
initiated 94:4
125:16
inside 16:20
22:23 23:2
140:15
insight 42:23
104:24
instantly 130:12
instruct 69:13
69:13,14 88:20
170:22 172:3
174:1
instructing
174:3
instruction

70:12
instructs 7:24
integrity 14:2
43:6 64:21
65:17 115:13
115:15 147:2
intend 41:13
intended 76:2
135:14
intent 112:11
intention 13:24
118:3 119:19
130:17 147:10
intentionally
51:18
intentions
116:16
interaction
143:11
interchangeable
126:6
interest 33:19
50:9 51:8
55:23 56:13
57:11,21 61:2
72:17 90:2
100:25 103:3
104:23 105:5
120:23 145:13
153:24 196:18
interested 61:5
72:15 84:14
120:13 193:5
215:19
interesting 85:6
90:23 169:19
interim 4:19,21
58:22 183:19
184:24 185:3,7
185:9 186:11
187:18 188:16
189:2 191:22
192:2 194:25
interior 15:20
interject 68:10
199:7
interpretation
185:15
interrogatory
153:24

interrupt 17:6
200:11
interrupting
200:13
intervenor 5:25
195:18
interview 32:16
32:17 102:6
183:1
Intro- 108:4
introduce
108:11
introduced
108:4
involved 37:24
40:14 71:9,17
71:19 92:1
97:16,20
102:17 120:9
120:11,15,20
124:7 138:11
139:20,21
173:19 199:20
201:10,16,20
201:25 202:7
203:13
involving 13:4
149:6
iPhone 206:23
207:5,11
iPhones 210:15
irony 100:17
irrelevant 43:1
207:7
issuance 141:22
issue 42:5 57:23
151:22 154:22
204:14 205:8
issued 142:8,21
142:24 143:3
151:12,13,18
151:20,24
158:22 168:10
168:16,22,24
191:18 192:3
issues 33:3 36:15
83:19 152:21
issuing 151:21

Jacobson 161:20
Jane 32:3 37:2
92:5,8 94:7,25
95:4 104:7,12
105:17 107:16
108:6 121:5
142:1
January 125:10
125:13 126:16
126:19 168:12
190:17,19
209:16 211:9
jbranch@sha...
3:5
jewelry 22:21
26:3 112:7
120:7
job 140:2
John 3:3 5:24
195:18
joke 59:25
jokingly 100:15
Jones 2:3 4:2
5:17,17 6:16
6:19 9:10,13
14:14,17 15:8
17:14 43:17
44:1 47:19,22
57:7 61:23
62:3 64:16
65:10,21,25
66:3,21,23
67:1 68:19
69:12 75:14
76:5 79:15
81:22 86:6,10
86:13 87:18
88:16,17
106:21 113:15
136:11 137:2
137:13,16,19
137:21,23,25
138:7,17 141:5
141:14 145:20
159:11,14
161:24 162:22
165:14,17
167:14,17,20
167:23 168:1
170:15,24

──────────
J
──────────

171:5,11
172:17 175:1
179:18,21,24
180:3 193:19
198:7,17 199:1
200:20 201:2
202:14,16,18
202:21 203:8
204:10 206:8
207:6 212:13
journalist 33:2
journalistic
34:14
journey 142:14
Jr 2:8 108:1
judgment 42:24
July 41:23
171:15,20
172:23,24
173:7
jump 196:1
Justice 1:1 2:12
5:10

_____
K
K 213:1
Kathleen 4:12
8:25 168:11
Kaye 2:3
keep 49:2
112:23 122:9
147:21 148:20
190:25 209:7
keeping 67:16
117:14
keepsake 22:20
keepsakes 22:17
Kentucky 8:13
8:16 14:11
28:11,13,16
74:4,7,8
130:19 147:17
147:23 148:6,9
164:21 165:5
kept 139:3 143:8
147:20 172:11
Khanna 162:14
kind 23:24 24:2
32:15 64:20
85:25 91:13

95:12 96:1,1,7
98:3 107:20
117:17 126:2
140:23 147:6
191:13 195:21
207:4
kinds 29:21
56:11 60:23
77:5
knew 12:25 13:1
29:19,20 36:21
37:15,22,25
43:4 49:21
71:9 74:23
84:18 90:1,14
91:3 99:13,14
100:15 103:24
103:24 105:15
115:6 117:20
140:7 152:2,22
156:3 170:13
know 8:7,19
11:18 12:6
13:8 16:9,11
16:13,14 25:6
25:7,18,21,24
26:10,11 29:19
29:20 32:14
33:7,15 35:7
37:14,20,22
38:3 42:3,8
45:1 46:9,12
46:16,19,23
47:6 49:15,25
51:21 52:7,11
55:14 56:10
59:2 60:1
63:20,24 68:6
70:25 73:2
74:14 75:5
76:10,15,18,20
76:21 77:7,24
78:19 81:5
82:5 83:3,10
84:15 87:2
88:24 89:6,7
89:24 90:17,18
90:23,23 92:10
92:15 93:6
94:3 95:7,22

95:23 96:6
98:23 99:16,21
100:10,14,15
100:19 101:10
102:12,12
103:17,19
104:9,9,11
105:3 107:20
108:12,17
109:5,13,14,15
109:24 110:3,4
110:9 111:8,22
112:6,17 115:4
116:2,3,9,12
117:14,15,16
117:21,23
118:12 119:7
119:10,13
120:3,7 121:7
121:17,19,21
121:24 122:5,8
122:24 123:23
124:5,7,8
125:19 126:4,6
126:24,25
127:10,13
129:21 130:1,3
130:18 132:5
132:20,24
133:1,5,7,10
133:19 134:8
134:14,14,17
134:19,23
136:19 137:18
137:20 138:15
139:12,14
140:5,8,11,12
140:14,25
142:15,17
143:5,12,22
144:7,13,15
146:21,23
148:21 149:18
149:23,25
150:8,13,14
152:8,9,11,12
152:12,17,20
153:18 155:3
155:14 156:6
156:20 157:10

157:13 160:2,9
161:1 163:10
165:22 166:14
166:15 167:3
168:14,23
169:14 171:7
179:22 185:12
192:20 193:6
194:7,9 195:21
197:1 199:18
199:20 201:7
202:13 203:12
203:14,16,19
203:20,24
204:1,3,4,5,8
205:3,12
207:20 210:19
know- 177:25
knowing 55:11
146:24 147:8
205:19,20
knowledge
177:24,25
201:8,21
203:11
known 56:17

_____
L
L 213:1
la 53:14,19
119:16
label 18:12 45:3
45:7 46:6
76:21
labeled 13:11
35:23 62:6
Lamar 27:1
laptop 26:19,22
27:8 29:1 49:3
148:14 211:18
211:19,22
lasted 97:1
140:17
Late 208:23
laugh 28:5
laughed 36:23
law 3:3 5:25
35:3 62:25
63:6,9 195:19
195:20

laws 204:20
lawsuit 6:20
34:21 198:3
205:1
lawyer 37:8 38:6
62:5 92:10
102:15 132:10
155:13 178:11
198:14
lawyers 13:17
15:22 16:3
17:22 18:22
19:21 24:8
27:23 31:1
36:2 38:14
41:6 42:11,17
43:13 57:15
68:22 101:22
102:1,16,17
103:17 133:17
159:4
layperson
185:19
leading 12:22
learn 21:17
169:8
learned 21:20,24
169:4 171:4
193:23
leave 75:21
leaving 125:8
led 100:9
left 9:21 22:15
22:22 23:3
64:24 72:2
81:6,14 82:8
94:8 112:10
130:2
legal 3:16 62:4
63:2 96:12
152:10 201:20
legalese 132:7
legislation
144:13,13
legislative 2:16
6:2,5 12:20
33:13 34:22
35:4 44:9
85:16 116:20
117:18 118:10

legislators 32:25
  102:10 139:23
legislature 11:9
length 157:1
let's 7:16 13:6
  38:10 74:1
  83:16 122:25
  122:25,25
  170:25 180:15
  187:25 206:22
letters 30:19
  50:8 62:15
  80:24,25 85:4
  85:5
letting 160:19
level 103:6
  139:25 201:11
Lewis 1:7 5:6
  214:3
Lexington
  160:17
life 29:25 56:6
  58:16 98:25
  101:11 128:2
  139:19 165:8
LifeLinks 189:4
light 49:15
liked 78:23
limit 79:10
limited 4:18
  113:6 177:12
line 126:13
  129:17 170:16
  172:1,2
lines 66:9 88:3
  108:8 123:20
lining 25:5
Lisa 1:23 3:17
  215:4,23
list 10:22 11:1
  133:20 137:12
  196:3
listed 178:5
  190:2 194:13
litem 4:19,23
  176:1 181:24
  182:2,4,7,12
  182:15,17
  183:21 189:19
literal 104:24

106:1
literally 104:20
  112:3 120:20
  142:18 148:25
litigation 2:13
  3:7 35:14,21
  37:14,24 56:4
  56:5,7 61:16
  61:17 63:24
  73:5,7 96:4
  107:3,6,9
  117:13,22
  122:6 144:16
  145:18 191:19
  191:24 192:4
  197:9 202:8
  203:7 205:8
litigations 51:12
  61:13
little 25:15 33:6
  33:8 85:22,23
  88:2 97:23
  99:23 103:9
  117:16 120:12
  140:13 144:12
  148:17 158:24
  200:25 206:18
live 8:12,14,16
  165:7
lived 20:12
lives 198:18
living 20:16,21
  24:23 56:6
  71:14
Lizon 4:10 7:1,2
  7:4 9:22
LLP 15:8
local 93:19
  201:6,6,7,8
located 53:8
location 20:9
lockbox 24:13
lodge 70:10
long 53:1 93:7,9
  110:17 138:25
  197:14 199:6
  199:22
longer 72:24
  100:8 109:18
  122:10 155:9

look 10:3,12
  12:12 14:22
  15:7 18:1 23:4
  26:13 28:18,24
  29:8 50:16
  52:4 54:9 60:1
  96:21 100:20
  116:21 117:1,4
  145:12 157:7
  157:15 158:13
  175:7 195:6
looked 24:18
  28:20 36:22
  48:7,16 50:3,9
  118:8 120:16
  129:10 155:14
looking 16:22
  22:17,18 25:10
  25:18 26:8
  29:13,23 44:15
  51:8 54:23
  57:16,17 59:22
  79:2,6 83:7,11
  83:13,17 84:16
  85:2,12 91:12
  137:14 155:2
  155:23 158:16
  158:19 208:25
loss 21:23 93:22
lost 174:20
  211:2
lot 35:12 83:13
  84:10,19 96:5
  99:19 101:7,7
  103:11 109:18
  110:21 124:17
  125:1,2,2
  129:4 130:4
  139:14,15
  147:5 152:5
  160:21 195:22
  205:14
lots 64:18
Louise 6:23 7:2
love 165:9
lower 103:15
  105:22 106:11
  106:12,13
luck 93:21

M

M 2:8,13 213:1
ma'am 196:25
Mackie 38:16
  67:11 115:8,17
  115:19,20,21
  115:25 116:25
  118:19 119:2
  126:12,18
  127:16 128:15
  128:23 129:17
  129:20 130:10
  132:14 133:25
  135:20,23
  136:6 138:17
  141:20,21
  143:15 144:21
  145:16 151:10
  151:13 153:15
  154:7 155:6
  162:4
maiden 7:6
mail 49:21 130:5
  131:5,14 135:2
mailed 121:12
  131:16
main 22:18
mainstream
  33:7
maintain 66:11
  66:11 146:18
maintained
  117:12 147:16
  148:8
maintaining
  147:1
majority 85:18
making 16:13
  33:7 46:17,18
  49:14 51:14
  64:9 139:12
man 61:1 98:21
  105:11
managed 122:8
manipulate 31:3
Map 33:17
maps 11:8 12:20
  30:22 36:23
  85:16,17 90:6
  90:11,19,20

91:1 102:10
  204:14,20,25
  205:7,11,13,17
  205:18
March 14:5
  165:1,6
mark 9:10 14:14
  133:22,23
  162:7
marked 9:11,14
  10:20 14:15,18
  44:13 45:16
  63:18 64:8,11
  141:10 167:4,6
  167:8,13 168:8
  174:18,21,23
  175:6,10,23
  176:6,17 177:5
  177:9 180:24
  181:5,20 184:6
  184:14,17,21
  187:22 188:9
  189:16 192:8
  192:12,15,18
  193:1 194:9
markings 174:8
married 7:1
  159:10 160:20
masala 127:23
Massachusetts
  2:4
material 46:2
  51:16 56:2
  77:13 81:18,20
  111:4,6 131:22
  166:4
materials 11:11
  11:23 14:5
  30:10,16 45:9
  45:13 47:13
  48:7,13 49:8
  51:10 54:7,9
  54:25 61:21,22
  61:25 62:6,10
  65:8 69:19
  74:14 79:6,11
  79:19 82:25
  83:6,20,25
  85:20 101:16
  105:19 114:5

122:16 127:18
128:16 131:14
143:16 147:15
148:23 149:9
150:9,12,25
151:7 154:3,8
159:17,19
160:7 164:11
164:14,17,20
164:21 165:12
166:17,20
**matter** 5:5 51:13
57:23 60:16
64:2 68:2,7
93:16 98:13
100:18 101:12
101:13 102:18
102:25 103:22
104:1,6,17
105:21,22
106:3,7 114:11
114:13 115:7
117:8,15
118:10 119:1
119:20 124:1,8
124:14 125:23
129:5 139:18
140:4 153:25
154:2 155:19
159:7 185:17
186:6,7 187:6
**matters** 29:25
34:10,11 43:8
59:12 61:18
63:25 71:5
77:5 98:21
103:10 130:21
148:21 149:12
171:25 185:14
191:4 193:14
201:17,20,25
202:3 205:14
**may-** 109:3
**mean** 17:5 23:4
35:17 48:21
55:19 58:4,5
63:16 77:23
83:2,10 84:24
85:15 86:25
90:20 94:13

98:20,21
101:19 102:2
106:12 112:4
112:25 116:10
118:22 119:9
120:14,20
123:23 125:5
131:16,18
134:13 140:22
148:4 153:9
157:11,17
159:9 166:14
166:14,25
169:18 173:23
176:24 198:21
198:21 201:1
204:17 206:19
206:20,21
**means** 120:15
**meant** 49:5
**measure** 140:11
**meat** 160:18
**media** 49:12
65:3 67:17
101:23 127:1
127:22
**medical** 149:25
150:4,5 183:3
**Meese** 191:11
**meeting** 141:4
**member** 163:1
**members** 2:11
158:15
**memento** 147:5
**memory** 152:20
152:20 153:16
153:17
**mention** 32:8
127:6
**mentioned** 34:13
35:3 51:1
57:10 84:12
102:23 104:7
105:17 111:9
118:23 127:11
134:2 142:2,4
142:7,20
151:10 155:21
173:11
**mentioning**

102:6
**merely** 49:11
50:3
**merits** 98:13
119:20
**mess** 120:21
**message** 23:8
75:21 94:9
107:11,25
108:3,14 130:2
**messages** 94:6
94:14 107:21
125:8,13 133:7
141:17 209:20
209:21 210:15
210:18,25
211:3
**met** 44:7 183:4
**metal** 46:7
**miles** 8:19
**mind** 78:18
130:12
**mine** 22:17,20
28:7 29:13
47:6 50:7
64:23 79:3
80:18 81:16
82:2 112:10,15
116:7 147:4
149:1,7,25
150:1 166:4
174:20 209:12
**mingle** 77:6
**mingled** 77:6
98:25 128:11
**minute** 139:7
145:12
**minutes** 85:12
93:10 97:2
110:20 140:22
212:1
**mischar-** 47:20
**mischaracteri...**
144:3 145:4
159:22
**mischaracteri...**
37:13 47:22
65:11 66:5
79:16
**misclar-** 67:2

**missed** 155:25
200:24
**missing** 72:16
**misstate** 203:22
**mistaken** 88:16
**mistakenly** 47:7
48:25
**mix** 77:4
**mixed** 47:7 84:4
**mixture** 77:4
**modify** 19:8
**mom** 55:14,20
59:6 149:20
153:16 154:7
157:8
**mom's** 189:2
191:5
**moment** 10:17
14:19 17:18
48:16 60:13
68:25 102:22
146:15 149:22
160:14 184:16
186:24 195:6
**moments** 189:14
**money** 133:1
163:8,25
**monies** 163:23
164:2,4,7
**month** 13:22
20:4
**monthly** 53:22
**months** 52:14
57:25 58:4
169:15
**morning** 6:17
44:8
**mother** 8:25
12:17 13:2
20:12,15,21
21:1,6,25
22:10,11 25:12
25:25 26:18
27:4,13 31:19
36:10 37:25
38:5,7 39:21
40:17,18 41:3
42:1 50:13,14
50:21 51:7,14
52:23 53:2

55:24,25 56:11
56:24 57:3,10
57:20 58:10,20
58:23 59:14
60:5 61:1,1
71:23 72:1
73:6,10,14
74:9 81:12,14
81:25 82:10
91:10,12,19
95:21 96:8
97:8 99:12,16
101:3 105:12
112:6 118:21
121:25 128:19
130:18 149:16
150:11 151:14
152:3,9,18
153:2 155:9
156:13 157:15
158:21 159:16
160:6 164:19
166:19,24
168:11,16
170:2,4,19
176:9 177:19
178:6 179:1
182:1,18 183:6
183:7,24
184:25 185:3
187:8,14 188:1
190:12 200:18
**mother's** 37:9
50:23 52:6,9
52:13,21 98:13
118:4 154:20
154:20 156:2
156:20 158:3
160:11 183:3
183:17 185:10
185:17,25
186:5,7,12,21
190:15 191:17
193:8 195:1
**motion** 4:20,24
133:21 175:25
193:15
**move** 72:13,15
72:25 199:5
**moved** 53:14

118:11 157:3
**multiple** 88:13
202:23
**multitude** 84:4
**multitudes** 99:3
**music** 80:22

———————
**N**
N 2:1 3:1 4:1 5:1
213:1,1,1,1
**N.W** 2:19
**name** 6:21 7:1,6
9:20 53:10,12
54:12 72:8
73:19 169:9,12
173:16 189:3
195:17 214:2,4
**named** 89:11
161:17 162:10
**names** 93:18,19
93:20 95:6
97:11 98:6,8
120:13,18
136:16 138:10
138:14,14,19
**Nash** 2:22
**nature** 56:4
**NC** 2:9 18:12
**near** 28:7 52:20
53:17
**necessarily**
115:4
**necessary** 96:16
198:24
**need** 12:9 55:8
55:25 96:2,8
98:10,11
106:10 110:1
123:2 161:4
167:12 170:12
208:5
**needed** 109:16
117:19 160:7
201:6
**negotiated**
193:11
**neither** 153:23
215:14
**never** 49:3 60:17
63:4,6,12 69:2

74:13 112:20
119:19 128:9
145:6 175:12
175:18 182:21
184:10
**new** 17:6 34:12
35:2,2,5 60:16
60:16 90:19,20
90:24 103:22
104:2 106:2
143:7 154:15
156:1 157:16
169:9 171:8
173:11 209:13
209:25 210:18
210:20,25
211:4
**news** 84:8,10
**newspaper**
173:9
**nice** 58:1
**night** 28:21
53:12,20,21
54:16,17,24
**nights** 53:7,7
**nine** 16:19 93:1
97:1
**No-** 190:4
**Nods** 41:1 66:25
123:4
**noncommunic...**
73:8
**nonhuman** 98:3
**nonre-** 128:5
**nonspecific**
157:18
**Nope** 141:7
**Noreen** 59:12
186:8,10,20
187:1,9,13
188:2 191:17
**normal** 52:15
152:21
**North** 1:1,19
2:12,14,24 3:4
3:9,18 5:11,21
8:14 11:8
12:19 13:4,14
33:12,18 34:21
35:24 52:17

79:7,14 80:5
88:9,12 90:8
91:5 105:7,8
128:6 129:8
204:15,20,21
213:4 215:1
**Notary** 6:12
213:23 215:5
215:24
**note** 23:8 149:7
173:16
**noted** 94:24
**notes** 195:6
**noteworthy**
55:18 63:10
**notice** 73:17,20
158:17 175:24
**noticed** 25:14
55:3,9 133:22
**notification**
53:25
**November** 58:6
59:4,4 89:16
89:16 92:25
93:2 96:25
181:15 185:5
187:25 188:3
194:24
**number** 4:8 5:12
45:16,17,21,22
46:21 76:8
108:13 139:5
173:8 206:7,16
207:18,24
208:1,8
**numbers** 95:6
208:18 209:4
**nuts** 124:13
**NW** 2:4

———————
**O**
O 5:1 213:1,1
**oath** 7:12
**Ob-** 61:23 81:22
87:18 165:14
173:22 207:6
**obituary** 169:10
171:8 173:12
**object** 7:21 21:6
39:6,7,15

64:16 65:21
66:4 67:1
68:19 69:7
79:16 88:10,18
170:15 171:5
171:21 179:19
179:25 193:20
198:17 202:14
202:14 207:6
**objection** 7:25
12:21 37:11,12
39:10,18 47:19
57:7 62:3
65:10 66:4
69:21 70:11
75:14 76:5
81:22 86:6
87:18 88:15
106:21 113:15
144:1 145:3,20
158:7 159:21
165:14 171:11
173:22 178:8
186:18 197:14
200:20 201:2
203:8
**objections** 17:7
17:8 88:12
**observed** 49:11
149:23
**obtain** 144:22
150:4
**obtained** 112:1
**obvious** 13:12
129:3,3
**obviously**
116:23 129:8
**occur** 89:14
186:16
**occurred** 59:3
141:15
**October** 20:6,20
21:3 22:6,9
52:7,10,11
58:6 59:21
73:22,22 74:2
165:6 176:8
177:6
**October/Nove...**
58:9 59:5

**offense** 144:8
**offensive** 99:23
**offer** 32:11
**offhand** 16:6
76:22 77:24
92:17 138:15
**office** 5:24 14:12
45:7 87:6
95:15 132:19
191:14 197:17
197:23
**officer** 215:5
**official** 1:7 5:7
42:3
**Ogletree** 2:22
6:1
**oh** 13:8 28:22
34:4 47:21
49:13 71:23
73:16 133:22
144:2 163:10
167:22 172:12
174:7,14
180:19 181:16
189:4,24,24
191:10 200:2
202:14
**okay** 7:3,8,10
8:10,16,19,22
9:3,9,19,24
10:3,8,25 11:5
11:11,14,17,23
12:3,8,12,16
13:20 15:25
16:6,25 17:13
18:10,21 19:2
19:10,23 20:1
20:3,7,13,15
20:19,24 21:1
21:3,6,9,9,12
21:15,17,20
22:4 23:10,14
23:17 24:6,12
24:16,25 25:12
26:4,11,20
27:4,16,16,18
28:1,4,14,18
28:22 29:6
30:15,18,24
31:7,12,20,24

32:2,7,11 33:5
37:5,5 38:6,10
38:16,18,21
39:2,6,10,14
39:24 40:16,19
40:24,25 41:5
41:9,9,15,16
41:17,21,24
42:3,6,10,15
43:16 45:9,18
49:6 66:16
67:1 74:2
103:18 114:25
116:9 121:13
123:2,20 124:5
132:1,13 137:9
149:23 157:25
161:4 167:19
172:9 174:5,6
174:17 176:3
180:15 181:16
189:18,24
197:21 199:9
200:6 202:4
204:11,19
205:4,23
206:13 207:4
207:16,22
208:9,17,17,21
209:3,7,14
210:17,21
211:2,6,12,24
old 85:4 209:5,5
209:7,21 211:6
211:8
Oldham 27:1,5
55:2,12 61:8
61:11 70:16,25
73:2,4,14
74:14,24 75:4
75:18,20 87:14
89:5 142:9,21
142:25 143:3
143:16,23
144:22 145:18
146:2 151:12
155:7
Oldham's 76:2
once 40:9,10
73:15 77:9

89:19 100:7,18
102:11 116:4,8
121:23 153:4
169:25
ones 16:15
204:14 205:1
ongoing 73:6
99:11 185:24
oOo-- 3:19
open 23:17 24:5
49:11,19 50:2
84:5,20 104:17
opened 42:4
49:25 60:17
operating 17:12
Operation 33:16
opinion 36:17
opportunity
175:4 181:4
184:13 189:13
192:12
opposed 46:5
153:10 198:5
opposing 73:7
opposite 46:14
87:24 106:19
order 4:20 58:22
176:1 184:24
199:10
organization
31:9
original 124:21
130:17 182:13
originally 13:23
36:25 134:23
other's 160:22
outcome 215:19
outreach 89:10
outside 15:14
99:22 172:6
198:18,18
199:2
overnight 47:4
overwhelmed
25:16
owned 81:3
_____
P
P 2:1,1 3:1,1 5:1
213:1

p.m 123:9,11,11
123:13 161:7,9
161:9,11
180:21,23,23
181:2 195:10
195:12,12,14
212:6,8,8,10
212:16,18
package 14:25
15:10,14 16:3
16:21 18:9
pad 63:10
page 4:1,8 9:19
10:20,21 14:23
15:6,13,18,25
18:10 44:16
45:21 46:10,21
76:12,14,16,19
76:25 77:7
78:11 175:12
175:14,16,19
175:21,24
176:3,7,17
177:5,22 178:4
178:25 181:13
181:14 189:21
189:23 190:1
194:15
Page/Line 214:6
pages 10:19
17:16 213:5
215:11
paid 53:20,20,21
paper 118:8
paperless 53:24
papers 23:25
paperwork
187:2
par 56:9
Paragraph
178:4
paramount
105:6
Pardon 34:1
parents 8:23
24:23 41:12
72:25 154:16
parents' 22:22
26:12 27:21
29:15 30:11

35:18 51:24
52:1 72:13
79:1
park 140:24
parsing 178:10
part 73:5 89:3
137:7 150:6
159:25 182:13
197:1
particularly
93:9
parties 37:23
120:14 193:5
197:6,12 203:6
215:16,18
partisan 36:14
36:17 104:22
partner 27:2
55:1 61:8
70:15 81:19
142:7
party 14:3 38:2
67:18 73:7
106:17 131:1,3
131:5 133:4
passed 134:13
170:1,9 204:15
204:17 205:7
205:11
passing 169:4,8
171:4,16
passive 66:6
patient 196:4
Paul 2:13 5:21
pay 53:18
160:21
paycheck
132:25
paying 55:6
PC 51:24 52:1
55:4 71:4,4
154:14,16,25
155:21 158:13
pcox@ncdoj.g...
2:15
penalties 213:4
penchant 100:16
pencils 147:22
pending 34:12
pens 147:21

people 11:19
48:2 61:18
64:6 71:22
72:22 98:1,9
98:17,23 99:4
99:13,21
100:11,19
105:14,15
140:24 199:18
206:17 208:4
percent 196:2
perfectly 204:4
period 28:2
50:11 52:22
58:5 59:2
72:24 92:23
129:9 132:20
165:5 194:24
206:20 208:19
perjury 213:4
Perkins 162:17
164:8
permission 40:2
40:18 41:4
50:22,23,25
108:8 199:18
person 9:20
31:13 58:24
60:21 71:21
89:21 98:22
99:2 117:24
185:11 186:12
189:2 192:2
195:2 207:25
person's 125:4
personable 33:8
personal 29:9,11
30:10,18 33:8
42:13 47:15
48:10,12 50:17
55:17 63:25
64:23 72:16
79:1 82:6,7
83:19,20 85:20
87:25 98:25
105:9 113:2,6
116:7,15 117:4
117:9 118:3,4
118:6,17
127:24,24

DISCOVERY COURT REPORTERS    www.discoverydepo.com    1-919-424-8242

128:2,4,11,18
128:19,19
129:4 149:15
150:10,24
154:14,21
156:7 158:13
165:23 171:25
179:13 197:1
**personally** 35:11
43:12 45:3
150:17
**pertain** 202:1
**pertained** 13:13
**pertaining** 100:6
**pertains** 201:10
**pertinent** 35:6
35:16,20 40:6
87:4 139:18
143:13
**petition** 4:16
58:19 91:22
177:10 182:14
182:15 187:22
**petitioner**
120:16 177:18
179:5,8 183:4
**petitioner's**
183:2
**phase** 34:24
**Phillips** 31:15,21
31:24 36:25
89:12,18,20,25
91:9,11,17,21
91:25 92:5
94:12,19,20
162:22,24
**philosophy**
60:23 64:4
105:4 169:22
**phone** 49:2
91:18 92:14
93:3 95:11,18
107:18 108:10
108:25 109:4
111:15 124:21
125:2 126:19
130:8 136:12
139:15 140:21
167:1 206:1,4
206:6,7,16

207:4,24,25
208:8,17 209:3
209:25 210:11
210:18,20,24
210:25 211:4,6
211:8
**phones** 107:20
**Photocopied**
4:11
**photograph**
14:24 15:20
17:16 44:16
**photographed**
77:19
**photographs**
4:11 14:24
15:14 16:22
17:17,20 18:4
29:10,23 30:9
30:19 46:11
50:8,18 83:18
85:7 141:10
148:13 155:24
**physical** 20:9
208:11
**physically** 13:24
148:1
**pick** 64:22 65:19
112:19 200:16
**picking** 67:15
**picture** 15:7
23:1 45:22
77:8,9,12
78:13 166:6
**pictured** 76:11
**pictures** 26:7
30:4,5,5 51:3
54:18 80:20,21
80:22 83:4,11
148:15,18
158:14,14
166:5
**Pinsky** 32:3,5,8
32:12 33:21,23
34:20 35:25
36:7 37:2
38:11,12 92:6
92:8,10,12,19
93:5,8,24 95:4
96:10,19,25

97:15,20
100:23 101:15
101:25 102:16
106:5 107:1
121:5,16
162:21
**Pinsky's** 92:15
**place** 140:24
165:9
**plaintiff** 36:19
**plaintiffs** 1:5 2:2
5:18,20 6:20
9:6,17 39:3
44:15 116:20
205:1
**plaintiffs'** 13:17
15:21 16:3
17:22 18:22
19:20 24:8
27:23 31:1
36:2 38:14
41:6 42:11,17
43:13 78:7
**plan** 134:24
193:2
**planned** 135:15
**plans** 74:6
**plastic** 23:20
**play** 37:16
**pleasantries**
136:4
**please** 5:13 6:21
20:3,7 46:4
49:10 66:18
69:15,21 86:1
86:8 174:16
176:14 180:16
181:8 183:10
184:9 186:23
192:23 196:6
199:7 203:3
210:6
**pleasure** 44:4
**plowing** 195:21
**plug** 12:9
**PNC** 54:6
**point** 12:23,24
13:8 31:7
34:15 50:6
51:14,19 55:22

57:9 59:13
67:23 69:1
73:8,9 81:16
82:25 83:16
97:19 98:7
100:22 112:14
116:3 119:11
121:22 122:10
122:21 125:20
126:9,21
132:17 134:18
134:20 135:1,5
135:14 139:6
141:20 142:9
142:17 152:17
158:2 164:1,4
164:12 171:3
173:17 179:25
181:23 182:6
183:15 185:4
185:18 186:4
188:21 189:8
190:4 191:1
194:6,20
205:15 208:19
**Pointer** 115:5
**pointing** 175:14
**pointless** 160:13
**points** 57:9
**poke** 55:8
**polite** 108:9,18
130:1 134:8,15
**political** 37:19
42:25 60:23
61:5 64:4
105:2,3 154:4
169:21
**politicization**
201:9,15,21
**politicizing**
58:16
**politics** 38:3
201:11
**pops** 130:11
**popular** 207:24
**Porter** 2:3 5:18
6:19 15:8
44:19 45:5,10
45:11,12 46:22
46:24 47:2,17

48:14,18 49:9
59:16 60:8
64:11 65:8,18
67:20 68:17
69:6 74:12
75:5 76:3 79:5
79:12 80:12
82:21,23 83:1
89:2 113:5,14
114:20,24
131:21 134:22
136:11 146:10
147:16 148:24
149:15 150:10
150:20 151:1,8
158:1 161:23
163:16,22
164:5,15 165:1
165:1 166:1
166:13,18,21
211:14
**Porter's** 69:19
**portion** 10:4
**pose** 196:6
**position** 37:19
122:8 202:3
203:2
**positions** 202:11
**positive** 41:18
41:24
**possessed** 60:25
**possession** 16:13
57:6 71:1
75:22 81:2
89:5 113:12
154:8 155:10
155:16 164:18
209:19 211:21
**possessions**
72:16 143:12
**possibility** 51:2
59:14 60:6
106:2,6 121:2
**possibly** 143:13
155:15 157:22
170:20 208:24
209:2
**posterity** 147:7
**potential** 104:15
105:7 115:16

134:6
**potentially**
26:14 104:16
116:14 124:7
**PowerPoint**
139:22
**Poyner** 1:17 2:7
5:19 115:1
117:12 131:17
131:17 135:19
157:23 158:22
162:3 164:2
**precious** 28:6
80:17,18
**precision** 78:20
**predicated**
95:17
**predictable**
118:14
**prefer** 11:19
**prefers** 95:11
**preliminary**
187:16,17
**prepare** 45:3
**prepared** 40:14
90:7,12 122:6
**prepares** 61:21
61:25
**present** 3:12
72:12 166:23
208:15
**presentation**
139:22
**presented** 43:5
**preservation**
115:13
**preserve** 64:21
65:5,16 113:8
147:7
**preserved** 29:18
43:6,7 79:23
115:16
**preserving** 14:1
84:14
**press** 203:24
204:6
**pressing** 57:23
103:10 148:21
**pressure** 134:16
**presume** 34:16

**pretty** 19:24
52:2,15,15
62:15 71:8
81:5 95:19
101:5,17,17
114:14 118:14
118:14 128:4,9
153:1 200:22
**previously** 6:25
12:13 56:20
82:1 179:10,14
184:1,17
**primary** 207:18
**principally**
11:22 37:3
146:19 158:13
**principle** 72:17
101:10
**printed** 45:8
83:3
**prior** 64:9 67:19
69:18 74:11
82:20 115:25
121:15 141:9
165:10,21,24
166:2,11
171:16 181:19
187:8 192:25
202:4
**privacy** 116:11
117:25
**privilege** 17:9
62:15 64:1,17
**privileged** 61:22
62:7,11,16,18
62:21,24 63:15
63:19,22,23
64:7,14 68:16
68:23 69:4,9
69:11,24 70:5
193:24
**privileges** 64:18
**probably** 64:6
117:20 119:15
131:4 140:7
156:9
**problem** 39:11
39:18 40:4
153:6,9,12
**problems** 153:16

153:17 210:24
**procedure**
105:13
**proceed** 114:22
115:2
**proceeding** 4:15
38:8 62:18
95:21 171:22
187:11 190:8
215:6,8
**proceedings**
43:23 86:19
92:2 96:11
97:17,21 99:11
118:20 120:10
123:11 153:10
161:9 180:23
181:25 185:23
185:24 186:1
188:18 190:6
190:12,16
191:5 193:3
195:12 212:8
**process** 40:5
42:24,25 49:23
60:22,22 61:5
104:24,25
135:5 144:11
193:18 197:6
198:16
**produce** 48:12
130:15 159:17
159:19 160:7
166:20
**produced** 10:23
11:3 48:17,21
117:13 130:24
143:16 146:9
150:20 164:14
164:25
**producing** 69:18
106:17 127:19
**production** 64:9
166:17
**professional**
98:23,25
**profit** 43:14
**programmers**
140:9
**progress** 36:12

**proliferate**
196:17
**prominently**
22:24
**promise** 143:6
**prompted**
169:11
**proper** 11:19
29:4 114:18
185:14
**properly** 116:21
**property** 80:21
82:7,7 142:16
**proprietary**
84:21
**protected** 118:4
118:5,6 196:13
**protecting** 62:14
**provably** 40:6
**provide** 32:12
33:23 38:23
41:5 42:16
135:15 165:11
184:8 188:7
198:14 199:16
**provided** 49:9
89:2 147:15
148:22 149:15
150:9,17,18,23
150:25 151:6,7
163:17,18
165:23
**providing** 39:7
39:12,18 43:12
128:16
**provision** 82:6
**pry** 41:13
**public** 6:12 61:4
61:4 64:2 75:1
104:11 213:23
215:5,24
**pulled** 12:5
**pulling** 134:10
**pullout** 23:23
**purchase** 52:20
**purpose** 65:1
**purposes** 197:25
**pursuant** 10:23
**put** 16:2 18:9
19:23 34:25

36:1 45:4,6,8
49:16 92:5
105:20 107:1
119:18 132:5
134:17 148:15
152:14 159:5
160:9 168:7
169:3 175:5
201:23
**putting** 49:21
83:5,12,16,19
151:3

---
**Q**
---

**qualified** 62:21
**question** 7:18,24
8:8 14:22
17:10 40:22
48:1 65:13
66:24 67:6
68:20 69:17
70:3 79:22
86:5 88:11,19
102:1,4 113:25
146:2 150:21
156:12 159:23
159:25 160:5
172:16,20,21
173:1 174:4
176:13 178:19
180:12,13
181:18 183:14
186:22 188:13
194:5 196:11
199:7 200:22
201:5 203:1
206:13 208:9
210:5 213:7
**questioning**
170:16
**questions** 7:22
9:1 19:24
21:13 27:17
41:10,11,14
44:2,10 96:5
109:17 110:1
122:24 137:21
139:10 142:10
156:24 195:7
196:5 205:25

**quick** 195:24
**quickly** 133:14
175:7
**Quinta** 53:14,19
**quip** 144:12
**quipped** 34:6
59:20
**quit** 179:12
**quite** 116:18,18
117:23 173:8
186:3 208:3

**R**

**R** 2:1,3 3:1 5:1
15:8 214:1,1,2
215:1
**rainbow** 17:25
**raise** 205:24
**raised** 117:17
**Raleigh** 1:19 2:9
2:14,24 3:4,9
3:18 8:17
13:25 22:5,9
28:9,12,21
38:2 52:25
53:8 72:13,14
73:15,16,21
74:8 98:9,16
130:15,23
134:25 156:5
156:11 195:20
**ran** 210:13
**range** 198:18,19
199:2,3
**rarely** 100:20
**rate** 196:17
**raw** 153:19
**re-** 30:20 94:3
123:1
**reach** 70:25 73:9
73:13 94:7
95:15 97:11
170:1,13
182:22 200:16
200:17
**reached** 31:15
89:25 91:8
182:21 202:6
**reaching** 202:4
**read** 32:17 33:11

33:21 62:20
84:11 171:7
172:19 173:5,8
173:12,13
211:16 213:5
214:6
**reading** 185:12
185:19
**Reads** 214:6
**ready** 116:14
181:9
**realized** 60:13
60:14 70:22
139:8
**really** 13:3 22:15
25:9,10 27:13
29:12,17 30:3
32:15,18 34:14
43:3,4 50:6
55:6 58:13
59:25 60:17,20
61:2 64:19
74:23 81:7
84:22,24 89:6
89:6 95:11,22
95:25 96:2,22
97:22 98:1,1,1
98:2,12,15
99:21 101:18
101:19 102:11
103:10,10
107:18,22
108:24 109:24
110:23 112:25
115:23 116:6
116:16 117:14
119:18 122:5
122:21 124:3
124:10 125:7
127:22 129:2
131:6 134:9
136:1 140:25
143:8 145:12
146:19 148:20
149:18,23
153:1,21,25
154:1,15 156:1
156:13,14
157:2,10,13,17
157:20 158:11

159:1,8,24
160:11,12,17
160:23 169:20
173:18 183:20
187:3 192:20
193:9,13 204:9
**reask** 172:21
178:19
**reason** 8:3 33:19
103:14 121:20
145:10 154:19
**reasonable**
183:5
**reasons** 22:18
42:13
**reassured** 40:7
**recall** 10:9 13:20
18:14 35:10
46:2,25 53:6
53:13 54:12
67:8 82:19
92:4,20 93:12
97:2,6,22
107:15 108:3
111:12 114:15
115:22 119:4
122:20 124:20
125:15 126:2
126:17 127:14
127:15 128:22
137:10 138:10
138:20 140:23
161:15,22
173:16 176:16
177:4
**recalling** 59:22
94:23
**receipt** 163:17
**receipts** 52:24
**receive** 39:3
53:25 107:14
191:15
**received** 9:2,5
9:16 10:11,25
13:7,23 14:5
16:21 18:23
58:11 60:8
79:4 87:17
103:5 107:12
107:25 131:10

138:22 145:17
152:19 163:8
163:22 164:1,4
164:7 192:21
**receiving** 10:9
115:25 121:15
**receptionist** 63:9
**recess** 43:22
86:18 123:10
161:8 180:22
195:11 212:7
**reclaim** 55:12
**recognize** 9:15
14:23 15:13,19
17:17,19,23
18:4 25:1
138:20 168:9
168:13
**recognized**
24:21 25:5
51:24 67:12
78:8
**recollection**
76:23 77:13,17
91:16 110:15
111:1,20
121:16 137:17
138:16 177:4
**record** 5:2,14
6:22 8:1 19:16
21:22 43:17,21
43:25 86:17,21
123:9,13,15
161:7,11
175:22 178:23
180:21 181:2
195:10,14
212:1,6,10,15
**recorded** 80:23
213:7
**records** 51:10
55:13 56:24
57:4 59:15
60:7 69:6
70:17 71:1
75:8,11,24
76:1,3 81:8
82:17 83:23
144:22 145:18
149:25 150:4,6

150:7 183:3
**recount** 52:12
**Red** 33:16
**Redistrict** 5:8
**redistricting** 1:8
5:9 13:14 33:3
35:23 36:15
60:19 79:7,14
80:6 81:9
83:23 90:3,5
90:11 99:9
100:1 105:1
113:23 117:3
128:6 129:8
173:6 201:24
202:8 204:13
204:19
**redraw** 32:20
33:12
**redrawn** 91:2
**redundant**
146:25
**refer** 37:7
177:20
**reference** 32:15
**references**
109:16
**referral** 31:18
58:11,11 91:9
93:16 118:25
119:8
**referrals** 58:2
**referred** 59:10
59:12
**referring** 58:19
78:14,16 80:19
90:5 102:15
119:24 163:15
175:17,23
178:2,3,23
**reflect** 46:11
52:16,24 63:23
175:22
**reflected** 213:8
**reflects** 189:22
190:1
**refusing** 143:21
146:3,4
**regard** 104:17
197:7 200:17

211:4
regarding 99:25
  101:8 113:22
  176:10 192:3
  202:8
Regardless
  125:16
regards 128:18
regular 56:5
  206:16
reim- 163:12
reimbursed
  132:23
reimbursement
  163:11,14,18
  163:20
rejected 32:20
relate 99:10
  149:9
related 29:25
  30:21 31:4
  47:6 48:19
  50:17 54:25
  55:5,10,15,16
  55:20 58:15
  70:17,23 72:3
  74:14,21 75:8
  75:11 76:1
  79:13 81:18
  82:17 83:18,18
  83:22 85:13,14
  85:20,22 100:1
  116:23 117:2
  118:9 127:5,8
  127:9 128:7,17
  129:9 149:12
  149:13,20
  150:11,16
  157:8 158:17
  158:18 181:25
  215:15
relating 34:21
  79:6 81:8
  144:23 170:19
relationship
  41:12,18,25,25
  72:10,11,21,22
  183:23 184:2
relative 36:14
  215:17

relatively 154:15
relatives 85:8
release 150:2
  166:12
relevance 134:5
  134:6 170:20
relevant 35:20
  48:20 79:21,21
  100:8 111:4
  114:9,11,13,19
  124:10,11,14
  124:18 126:8
  127:2 128:1
  133:18 136:3
  143:7 149:5
  155:23 157:22
  166:3 172:5,7
remained
  154:13
remember 13:22
  16:6,10,17,18
  18:1,2 31:12
  54:21 97:8
  105:24 108:5
  109:24 110:13
  121:3 123:24
  126:9,20 128:7
  131:7 132:2,15
  133:20 136:15
  137:11 138:12
  142:22 151:23
  152:24 155:12
remembered
  78:20
remembers
  27:13
remind 88:8
removable 24:4
  25:8
remove 65:7,20
removed 47:15
  179:15
repeat 132:7
  172:17
repeated 143:10
  143:10
Reply 95:1
Report 4:19,22
  189:18
Reported 3:16

reporter 5:15
  6:12 7:15
  179:23 215:5
Reporters 3:16
repository
  104:21
represent 5:15
  6:20 14:4
  16:20 37:21
  44:8 88:17
  168:21 187:8
  187:13 200:18
representation
  67:22
represented
  90:3 193:6,12
representing 6:7
  48:3 90:1
  106:25 187:10
  191:4
republic 64:5
request 79:5,19
requested
  187:19
requesting 11:6
requests 11:12
  11:24
research 109:16
  123:1,21
  129:25 134:2,3
  149:2
reseat 49:17
reserved 17:8
  212:17
reset 209:10
resided 164:19
  165:4
residence 164:18
resident 105:8
resisted 73:11
resisting 99:15
respect 59:6
  68:15 80:5
  82:6 99:11
  196:25
respond 39:25
  108:14,16
responded
  108:20
respondent

179:9,12,15
responding
  75:18 143:24
response 13:17
  15:3,16,22
  16:4 17:23
  18:23 19:21
  24:8 27:24
  31:2 39:8,12
  39:19 41:7
  64:11 68:17
  69:19 75:13
  79:12 88:15,21
  102:1,3,4
  109:8 111:13
  113:5 128:23
  143:17 146:1
  146:10 159:20
  160:8
responsive
  11:12,24 154:9
  158:5
rest 154:12
restate 196:6
restaurants
  52:19
result 117:21
  146:4 185:6
  186:25
retain 146:8
  190:14
retained 61:12
  62:1 68:1
  187:1 188:1
  203:6
retirement
  20:14 72:14
retrieve 70:16
  70:18
return 73:11
returned 147:11
returns 128:8
reveal 197:17
reverential
  144:10
review 11:1 47:1
  49:8 54:14,15
  64:13 80:2
  164:10,14
  175:5 181:5

183:2 184:14
  188:12 189:13
  192:12
reviewed 46:19
  46:23 55:10
  181:17 189:19
reviewing 76:24
  82:25 83:6,22
  85:19,20,22
ri- 207:7
Riddick 182:4
  182:14,20,22
  182:25 183:16
  183:25 184:5
ridiculously
  207:7
right 6:24 7:5
  8:11 9:7 11:14
  12:12 14:6
  17:1 20:17
  22:24 24:11,15
  31:7,10 33:1
  33:22 36:12
  38:6,12 68:11
  84:21 88:5
  91:13 100:18
  103:18 138:9
  149:22 153:20
  174:11,12
  175:12,14
  181:16,16
  186:9 195:4
  198:12,22
  205:15,22
  207:12 208:9
  209:17 211:25
rights 90:4
rings 187:25
risk 183:18
  196:19,24
RNC 203:18
Road 2:23 3:17
role 169:20
room 16:17
  22:20 23:16
  24:10 25:17
  28:21 48:8
  49:1 50:13
  54:8 81:14
  136:18

**root** 50:4
**roughly** 8:19,21
  13:20
**RPR** 1:23 3:17
  215:4,23
**rubber** 25:4
  78:9
**rude** 138:1
**rules** 7:9 88:10
  88:18
**running** 107:19
  209:5 210:11

**S**

**S** 2:1 3:1 4:7 5:1
  214:1
**sad** 101:9
**safe** 24:13
**safety** 179:13
  196:19
**sausage** 144:14
**saved** 84:12
**saw** 13:1 22:20
  30:15 77:11
  133:21 145:11
  154:13 155:1
  169:9 176:16
  178:1 184:10
  186:25 187:1
**saying** 60:1
  69:25 94:6,15
  94:15 102:7
  103:17 104:8
  108:3 111:12
  128:7,8 175:21
  178:12,20
**says** 9:21,24
  10:22 62:20
  185:20
**scanned** 150:3
**scared** 152:18
**schedule** 108:25
  130:8
**Scholer** 2:3
**scope** 79:17
**scrapbook** 84:15
**Scully** 2:18 4:3
  6:4,4 12:21
  37:12 44:6,7
  47:24 48:5

61:24 65:12
66:25 68:11,12
68:24 69:16
70:7,13 75:10
86:2,12 88:6
88:23 106:16
123:5,14
137:15 138:2,8
145:23 156:24
157:4 159:12
159:15 161:12
162:23 165:18
167:4,11,13,21
168:2,6 172:4
172:10,13,21
172:22 174:1,5
174:7,11,20
175:2,3 176:15
178:18 181:3
184:8,12 188:7
188:11 190:10
190:11 192:6
192:10 195:5
200:9 206:4
212:3
**se** 34:19
**sealed** 45:6
  196:21
**search** 169:11
**season** 109:19
**second** 15:12
  66:18 73:16,25
  174:13 175:24
  176:6,16 177:5
  177:22 178:3
  178:25 181:13
**secret** 67:16
**secure** 154:25
**security** 179:16
**see** 9:19 10:5,21
  18:8,11 29:9
  30:4,19 33:1
  34:18 44:20,21
  45:23 52:5
  74:2 117:19
  118:11 129:4
  140:6 149:20
  152:9 155:1
  157:16 167:19
  167:25 168:13

169:19 170:25
176:7 177:3,15
181:12,21
187:25 189:23
192:18
**seeing** 63:18
  133:20 177:4
  194:18
**seek** 68:14 69:18
  91:9
**seeking** 38:7
  90:11 177:18
  178:5 179:1
**seen** 24:16 36:19
  82:11 116:5
  120:17 141:7,9
  168:14,17,25
  175:10,12,18
  175:19 176:3,7
  177:13 181:19
  184:17,20
  185:1 187:20
  189:16 192:15
**Select** 1:8 5:8
**selection** 65:6
**send** 13:15 42:10
  45:4,9,13
  121:6
**sending** 16:14
  18:21 19:20
  30:25 49:22
  121:2 165:10
  165:25
**Senior** 1:7 5:7
**sense** 7:19 120:5
**sensitive** 134:11
  152:5,22
**sent** 13:20 14:5
  14:25 15:5,10
  15:15,21 16:3
  17:22 18:15
  24:7 27:23
  32:20 39:4
  45:11,12 46:22
  46:24 47:2,16
  48:13 73:17
  85:5 121:18
  131:22 142:18
  150:3 163:21
  166:5 211:3

**separate** 148:20
**September**
  21:19 169:6,7
  207:14,17
  208:15
**serious** 74:5
**seriously** 98:15
**servant** 104:11
**serve** 198:16
**served** 158:5
  182:16 197:16
  197:22 198:1,2
  198:4 199:17
  200:4
**service** 4:14 75:1
  143:21 145:7
  146:3,5 171:3
  171:10 189:22
  191:14,15
  199:12
**Services** 189:1
  189:10
**set** 78:5,5 90:22
  122:24 139:10
  169:17,17
  178:24 179:4,7
**settings** 209:11
**settlement** 193:4
  193:17 194:7
**seven** 16:19
**Shanahan** 3:3
  5:24 195:19
**shape** 145:7
**share** 91:15,21
  91:25 96:10
  113:19 114:2
  157:6 167:18
  168:1 186:10
  186:15 206:10
**shared** 60:12
  149:1,8 155:4
  155:5
**sharing** 128:23
  151:25
**she'd** 154:21
**sheet** 213:9
**shelf** 23:16,18
  23:22 24:3
**sheltered** 122:9
**shelves** 24:3

**shifting** 211:12
**ship** 132:21
**shipment** 163:20
**shipping** 163:15
**short** 24:22
  167:11
**shortly** 10:17
  27:14,15 74:1
  107:16 154:22
**show** 183:5
  192:6
**showing** 9:14
  14:18
**sic** 115:5 135:23
  191:11
**side** 9:21 19:23
  48:3 57:16
  106:19
**sides** 46:14
**signator** 194:19
**signature** 10:5
  212:17 214:25
**signatures**
  194:18
**signed** 194:10,17
  194:22 203:16
  213:10
**significant** 37:25
**sim-** 33:25
**similar** 56:5
  77:11,21
**simply** 34:6
  36:17 105:21
  120:18 172:10
**sincere** 100:13
**single** 17:15
**sir** 200:7
**sitting** 23:17
  76:9 150:8
  157:16
**situation** 37:9
  74:4
**situations** 84:2,8
**Six** 2:23 3:17
**skeptical** 35:8
**skepticism** 42:19
**skills** 62:9 63:21
**slower** 49:18
**smartphone**
  206:15 207:1,3

**Smoak** 2:22
**smoke** 86:15
**snapshot** 43:10
**snide** 84:25
**software** 84:22
**solid** 66:9
**somebody**
132:11 135:11
136:2
**someone's** 125:3
**someplace** 148:8
**son** 166:7
**soon** 130:23
**sorry** 18:17
19:14 21:22
28:5 34:4
40:23 47:21
58:8 60:4 63:5
66:2,20 70:2
75:9,25 80:10
86:4 106:11,14
114:1 115:12
115:21,23
117:7 119:9
136:15 145:2
148:4 150:21
164:24 172:14
172:23 174:13
183:11,13
184:11 190:10
190:25 191:12
194:16 200:10
203:4 210:2,4
**sort** 23:8 24:12
25:18,22,23
33:6 36:17
64:12 71:24
77:3 95:16,20
96:8 109:6
119:15 121:20
132:12 140:14
160:19 189:6
**sought** 69:2
**sound** 14:6
**Sounds** 43:19
**sources** 99:20
**South** 3:8
**Sparks** 3:8 6:7,7
9:25 34:2
37:11 65:24

66:7,18,22
68:9 69:7,10
69:15,21 70:2
70:10 75:16
79:18 80:9,11
81:24 86:1,8
86:22 106:10
106:15 123:2,6
137:2 138:18
144:1,3,5
145:3 158:7
159:21 161:2,4
167:24 168:4
170:22 171:21
172:9,15
173:22 174:3
174:10,16
176:13 178:8
180:2,6,15
183:10,12
186:18 190:1,5
190:7,14 191:3
192:22 194:1,5
197:16,22
198:8 199:5,9
199:15,24
200:3,6,10
202:15,17,19
203:2 208:5
210:1,3,5
212:12
**speak** 39:21 70:9
89:17 92:12
99:1 107:8
108:7 205:15
**speaking** 35:25
88:12,15
144:20
**Speas** 2:8 5:19
5:19 17:11
38:16 48:2
67:11 106:23
107:10 108:1
108:23 109:2
109:11,20
110:8,11,19
111:1,12,17,20
113:18 114:2
115:8,17,24
116:24 118:18

119:1 120:25
121:1 122:13
123:17,19
124:20 125:12
125:14 126:12
126:18 127:16
128:15,22
129:17 133:8,9
133:11 134:1
135:13,19,23
136:6 141:5,19
141:21 143:15
144:21 145:16
151:10,12
153:15 154:6
155:6 156:24
157:5 162:4
167:16 191:8
209:20
**Speas's** 109:9
**Special** 2:13
**specialized**
132:11
**specific** 31:12
33:19 57:2
76:10,23 77:13
77:17 79:5
91:10 98:6,8
102:3 114:7,16
119:14,21
121:19 127:13
133:10 145:4
173:2 207:12
208:25
**specifically** 20:8
23:7 26:17
29:12 33:14
50:7 51:15
52:8 59:11,18
61:17 65:1
70:8 71:7 77:2
77:3 84:13
85:2,13,14
87:1,22 91:15
92:3 97:3
99:18 100:6
111:10,17
112:11 114:20
120:1 124:18
127:20 128:6,8

134:3 149:3,3
153:17 158:15
183:25 184:4
**specifics** 55:7
97:6 205:5
**specify** 129:2
**speculate** 87:20
114:19
**speculated**
87:20
**speculation**
87:19 99:19
**speculations**
117:24
**spell** 95:8
**spelled** 99:18
**spend** 83:11,13
133:1
**spending** 103:11
**spent** 82:21,24
83:7,17,21
85:2,12,19,19
85:21 100:21
140:21 159:10
**spite** 42:13
**spoke** 41:21
50:13 72:19
90:24 94:5
102:22 109:11
109:20 113:3
118:2 125:12
139:14,15
141:24 205:14
205:18
**spoken** 138:13
171:14,15
193:13
**spot** 134:11
**Springmoor**
20:12,13,14,16
20:20,25 22:5
22:9 24:10
26:13 27:6,21
35:19 38:25
**Spruill** 1:17 2:7
5:20 115:1,5
117:12 131:17
131:17 135:19
157:23 158:23
162:3 164:2

**Square** 2:18
**stack** 23:21
**stamped** 177:1
**standard** 55:3
**Stanton** 2:3 5:17
6:19 15:8
136:10 138:17
161:24
**stanton.jones...**
2:5
**start** 19:15
**started** 23:5
205:12 210:11
**starters** 20:10
**starting** 109:13
109:18
**state** 1:1 2:11
5:23 6:21 7:25
8:12 10:17
32:25 35:4
66:3 67:18
102:10 139:23
213:4,17 215:1
**state-** 205:5
**stated** 42:21
56:1 105:21
196:13
**statement** 32:18
54:1
**statements**
53:22 127:10
173:13
**states** 177:10
**stay** 28:9 53:1,1
53:18
**stayed** 28:12
53:3,4,11,12
54:11
**staying** 24:22
**step** 125:24
**Stephanie** 1:13
4:9 5:5 6:8,10
6:23 7:1,2,4
9:21 213:3,15
214:4
**steps** 70:16
**Stewart** 2:22
**stipulations** 17:7
**stood** 78:18
**Stop** 183:10

stor- 81:21
storage 11:7,15
  11:21 12:13,18
  13:15,16 15:1
  15:15,22 17:20
  18:11,19,20,21
  18:25 19:5,13
  19:19 23:11,15
  24:16 25:3,11
  28:14 29:7
  30:16,20 31:1
  31:4,8,22 32:8
  33:24 35:17
  37:3 38:11,23
  39:4 41:5
  42:11 46:25
  49:1 78:22
  107:19 111:7
  111:11 122:14
  146:16 209:5
  210:12,13
stored 30:11
  112:24
stories 85:6
straight 14:3
  24:3
Strategies 27:3
  72:3 74:20
  142:5
strategist 144:19
street 1:18 2:8
  2:14 3:4,8 63:5
stressed 122:2
strictly 60:15
strike 210:22
stuck 54:17
student 169:21
studied 105:3
study 96:22
  149:5
studying 103:12
stuff 26:21 60:4
  75:23 86:24
  87:1,2,2,3
  128:1 133:2
  135:7 147:22
  154:12 158:19
  159:2
stumbled 62:22
subject 117:23

submit 193:3
submitted
  193:16
subpoena 4:9,12
  4:13 9:2,6,16
  10:9,11,23,25
  11:6,12,25
  13:7,18,23
  15:3,16,23
  16:4 17:23
  18:23 19:21
  24:9 27:24
  31:2 39:3,7,8
  39:11,12,15,19
  39:22,25 41:3
  41:7 57:11
  59:17 60:9
  64:11 68:18
  69:20 75:13,19
  79:4,12,17
  80:8 103:6
  113:5 116:1
  121:2,9,10,15
  121:17 130:16
  141:22 142:8
  142:20,24
  143:3,17,24
  146:3,10
  151:11,14,18
  154:9 158:5,22
  159:20 160:8
  168:10,15,17
  168:21,24
  169:1 191:18
  191:23 192:3
  198:19,22,24
  199:3,4 211:15
subpoenaed
  9:20
subpoenas 198:1
  198:3
Subscribed
  213:19
substance 136:7
substantive
  75:21
substantively
  97:15
suddenly 129:5
sufficient 200:7

suggest 197:9
suggested 189:5
Suite 1:18 2:8,18
  2:23 3:4,8,17
summarized
  140:12
Superior 1:1
  5:10
supporters
  97:25
suppose 211:5
supposed 23:4
  88:10
Supreme 104:1
sure 13:3 16:14
  47:5 48:18,20
  48:24 49:14,20
  51:14 74:22
  94:9,17 101:17
  101:17 102:21
  112:16 122:14
  124:4,9,13
  128:9 134:9
  141:24 147:3
  148:5 154:25
  155:14 156:3
  156:22 157:14
  178:22 190:8
surprise 143:23
surprised 14:13
  142:24
surprises 144:6
surrounding
  37:24
survey 25:14
  126:22 157:21
  158:16
survivor 196:16
swear 5:16
switched 209:3
sworn 6:11
  213:19 215:8

_____
T
T 4:7 213:1,1
  214:1,1 215:1
  215:1
T's 159:4
table 157:17
  180:12

tag 125:2
take 8:9 10:11
  14:19 17:17
  19:6 21:1,10
  25:13 26:4,6,8
  26:14,21 27:12
  28:14 43:18
  47:3 49:7
  50:22 51:1,4
  68:8,13 77:11
  80:1 86:12,13
  109:18 112:7
  123:5 157:6
  161:4 167:20
  167:23 171:9
  180:10,16
  181:8 191:21
  208:5
taken 5:5 7:12
  27:7,10 55:12
  57:6 70:16
  87:14,15,23
  142:6 154:11
  154:12 202:11
  215:9
tales 140:14
talk 7:17 73:12
  97:15 109:10
  121:1 152:5
  172:6,7 180:16
  212:3
talked 55:7
  69:24 70:5,6
  101:6 133:7
  151:11 164:10
  209:22
talking 114:15
  116:6 123:16
  141:2,15 145:5
  206:21
taught 40:10
  147:12
tax 128:8
taxes 127:12,17
  127:20
teams 133:17
telephone 94:18
  109:21 110:7
  110:12,18
  111:2 120:24

122:12 123:16
  126:11 138:25
  141:14 207:18
telephonic 89:21
  89:23
tell 6:12 7:13
  8:22 17:19
  20:3,7 24:25
  39:6,14,17,24
  42:15 55:13,19
  57:3 93:12
  97:2 110:22,25
  111:25 114:21
  115:1,8 124:1
  130:5 143:15
  151:17,21,25
  152:17 160:6
  181:8 192:23
  194:16 203:25
  208:21 209:3
  210:9
telling 27:5
temp 63:8
ten 93:10 97:1
  110:20
ten- 8:18
ten-minute
  124:21
tend 107:21
  187:5 207:25
  208:1
tendency 29:20
term 64:17
terms 14:6 43:4
  74:24,25 103:1
  105:20 119:19
terse 108:19
test 140:6
testified 6:13
  48:6 58:18
  61:6,15 63:19
  65:4,15 67:3
  68:25 70:14
  76:9 78:6,14
  80:14 86:23
  87:8 89:9 91:8
  92:4 105:17
  123:18 131:13
  133:24 150:23
  164:17 165:22

166:16 168:14
168:23 169:3
171:13 193:21
198:20 204:24
209:17 211:7
**testify** 198:25
**testimony** 8:5
37:13 47:23
65:11 66:5
67:2 88:21
94:18 128:14
145:8 155:5
156:23 157:11
198:24 215:7,9
215:13
**text** 107:10,11
107:14,21,25
108:3,11,14,20
108:22 109:1,9
133:7 209:20
209:21 210:14
210:17,24
211:3
**thank** 17:13
27:16 41:9
44:1,2 49:6
66:22 94:15
108:1 123:7
161:5 167:10
167:24 168:2
174:25 183:12
188:25 190:23
196:9 200:10
200:13
**thanks** 8:11
94:25 168:5
180:17 200:14
**theirs** 71:2
**Theodore**
161:17
**theoretical**
65:23
**theoretically**
142:11
**thereof** 215:18
**they'd** 59:7
111:19 151:11
**thing** 23:22
25:23 70:7
84:6 95:16

96:9 106:11
109:7 132:12
147:12 155:15
180:6,7
**things** 10:22
11:2 22:12
23:5 25:20,25
26:7,14,17
29:21,22 30:6
30:10 34:14
47:9 50:17
55:8,24 56:8
60:24 67:16,16
72:2 85:4 88:1
95:7 99:4
100:19 101:3,4
103:17 112:2,3
114:8 118:7
120:6,7 121:24
125:5 127:8,12
131:11 133:12
133:13 147:9
147:11 148:17
148:25 149:5
150:7 155:20
155:23,24
160:19 169:22
171:23 195:21
210:14
**think** 8:21 26:2
26:6 27:13
30:24 32:23
34:25 35:6
49:14,23 52:18
53:5,20,24
59:20 60:10,12
62:22 63:25
65:10 66:8,8,9
68:4,20 70:1
74:9,24 79:16
79:21,22 92:11
93:22,23 94:3
94:14,16,16
95:5,9,10,12
96:2,15,20
100:6 101:22
102:11 104:6,7
105:23 109:3,3
109:12 110:4
111:9,19

114:16 119:15
119:18 121:6
122:21 124:15
125:5,9,10,10
125:18,18
126:15,15
127:6,7 128:4
128:12 129:1,2
130:25 133:11
134:18 136:1
136:22 138:14
139:25 140:19
141:23,23,25
142:7 143:4,20
144:15 149:23
150:2 151:19
151:23,24
152:7,10,15,15
152:19 153:18
153:21 154:15
157:2,20
163:10 166:25
169:14 171:6
174:8 176:20
179:21,25
182:13 184:4
186:17,24
187:15,24
189:19 190:18
190:21 193:20
196:21 199:3
200:8 207:21
208:13,16,23
208:24 210:8
211:1
**thinking** 84:5
103:1,2 126:5
**third** 14:3 15:18
67:17 131:1,3
131:5 176:3
**third-party**
131:15,21
**Thomas** 2:23
4:13 8:24
168:22
**thomas.farr@...**
2:25
**thoroughly**
200:23
**thought** 23:6

43:3 47:14
49:12 52:3
74:25 90:25
100:24 102:20
103:19 131:13
131:16,19
140:9 168:2
189:3 200:22
**thread** 96:22
**threads** 94:21
**three** 48:4 49:14
49:24 50:1,2
53:6 74:3
82:22 92:13,13
92:18 94:14
129:21
**thrilled** 28:6
80:17
**thrown** 90:12
**thumb** 11:20
12:1 16:2,8,12
16:24 17:21
23:20 24:7
45:22,25 46:2
46:3,11,13,13
46:15,20 47:13
54:20 67:20
70:24 74:12
76:11 77:19
80:2,4,15 87:9
87:16 89:1
112:22 113:12
113:20 114:4,5
117:11 134:23
135:16 146:9
146:13 147:18
147:20 155:9
164:12 165:10
211:17
**Thursday**
136:21 137:1
141:16
**till** 112:14
132:24
**time** 10:9 13:6
14:9 20:19,22
22:8 28:2,12
33:15 34:8
35:8 41:21
43:10,21,25

44:3 50:11
52:22 53:2,3,3
58:4 59:2,13
67:23 68:3
69:1 72:17,24
74:22 82:24,25
83:5,7,10,13
83:17,21 85:19
85:22 86:14,17
86:21 92:23
95:10 97:19
98:8 100:21,22
101:6 102:23
103:12 109:6
109:11,14,20
123:9,13
124:24 126:13
129:9,11
132:20 134:20
135:14 138:20
139:19 140:21
141:3,7,20
144:20 156:5
157:2 158:2
161:7,11 164:1
164:5,7,13
165:5,8 171:4
171:15 174:22
179:23 180:21
181:2,8 183:15
184:20 188:21
189:8 190:4,23
191:3 193:7
195:10,14
198:8 199:6,11
203:15 205:18
206:21 208:19
212:6,10,15
**times** 29:16
52:13 71:14
78:3 88:13
89:17 92:12
169:10 171:8
173:11 202:23
**tired** 123:6
161:5
**title** 92:15
**titled** 56:19
**today** 7:9,13,22
8:5 44:2,11

76:9 86:23
87:8 95:15
110:17 136:11
139:11 150:8
168:18 181:19
189:17 195:21
206:22
**today's** 5:3
141:5,9
**told** 50:15 87:7
94:7 112:21
113:11 115:17
116:25 122:1
122:13 129:14
145:6 152:16
152:23 159:18
160:10 163:5
**Tom** 3:8 6:1,7
9:24 48:2
167:14,18,18
190:1,5
**tom@fidlitlaw...**
3:10
**tone** 157:18
160:22
**top** 9:21 15:7
53:6 126:2
167:5 175:16
**topic** 95:20
149:6
**topics** 195:23
202:5 211:12
**total** 82:24 92:13
96:20
**totally** 173:23
**touch** 36:1 92:5
129:23
**touched** 49:4
**town** 37:22
105:13 125:3
**track** 107:22
172:11 190:25
**Trae** 3:12
**training** 62:9
63:2,3
**transcribed**
215:10
**transcription**
213:6 215:12
**transparency**

66:11 67:14
115:15 120:13
**transparent**
115:14
**treasure** 30:2
**trial** 34:24 103:6
198:3,24
**tried** 71:25
148:20 204:9
204:12
**trip** 73:15,16,21
73:21,25 74:2
**trips** 24:22
**trouble** 132:17
132:18 160:13
**Trudy** 72:20
120:2
**true** 178:14
215:12
**trust** 85:4
160:15
**trusting** 195:3
**trusts** 120:17
**truth** 6:12,13,13
7:13
**truthful** 8:4
**try** 7:16 55:12
**trying** 97:7
98:12,14 126:3
137:25 140:23
142:13 145:7
147:24 159:24
160:23 178:22
197:4 203:21
204:5,7 205:23
**turn** 44:12 65:7
65:17 76:3,14
115:9 116:14
134:21 188:14
**turned** 67:17
68:16 74:16
75:4,13 78:24
80:7 113:4,13
146:5 148:23
171:24 208:13
211:13
**turning** 43:2
45:16 59:14
60:6 64:14
67:19 69:4

74:11 76:8
77:7 78:11
79:11 82:20,22
89:8 189:12
**Twice** 73:15
**two** 13:10,11
46:10,12,14
49:14,24 50:1
50:2 57:25
58:4 70:19,20
71:22 77:25,25
82:21 87:5
94:14,16 96:20
96:20 109:4,4
109:5 130:24
139:7 155:7,17
155:20 167:25
187:16,21
199:7 207:19
207:20,21
208:16,16
**type** 52:21 78:22
103:19 134:3
153:24
**typed** 169:9
**typically** 78:21

_____

U

**U.S** 104:1
**Uh-huh** 27:19
44:22 142:12
151:5 184:15
188:4 197:3
199:8
**ultimately**
194:10
**un-** 7:23 138:3
144:17
**unable** 144:22
**uncle** 71:23 72:7
120:9
**unclear** 120:4,12
120:19
**unconditionally**
81:15
**underlying**
36:15
**understand** 7:12
7:23 8:2 11:5
40:17 41:3

47:12 61:19
82:24 84:24
94:17 102:21
103:21 106:4
121:11 126:7
128:14 140:1
147:24 149:14
151:3 155:4
156:22 159:25
177:21 178:10
178:15,16
180:9 190:9
196:5 201:24
202:2 204:7
**understandable**
140:4
**understandably**
152:13
**understanding**
26:16 36:24
50:21 60:25
64:3 82:9
87:12 102:14
103:4 104:4
113:19 117:9
129:6,11,13,14
131:7,19 132:3
132:10 146:1
156:19,19,20
171:22 201:17
**understood**
12:18 27:4
61:6,10 70:14
79:8 87:9
90:10 106:24
144:20 145:15
146:5 159:6
177:17 178:7
178:20,21
179:2,4 193:15
**undertake** 79:10
**unfolded** 25:25
**unfortunate**
58:16
**unique** 60:25
**uniquely** 60:20
**unnatural** 138:5
**unpleasant**
105:13
**unrelated** 43:9

49:3 119:22
**untoward** 155:2
**updates** 210:12
**usable** 104:16
**USB** 49:16
**use** 26:10 29:1
49:2 51:5 66:5
78:23 102:19
105:18,20
106:1 191:13
206:1,2,15,16
208:11 211:16
**useful** 106:7,18
**usually** 55:4
118:1 120:21

_____

V

**vacation** 125:4
**vaccination**
150:6
**vague** 111:7
173:1
**vaguely** 51:25
**valid** 204:4
**value** 34:16
42:23,24
104:22
**variety** 99:20
**Various** 119:25
**vendor** 45:10,14
131:15,21,23
132:9
**verified** 178:13
**versus** 5:6
**vexatious**
170:21
**victimology**
149:3
**video** 5:4 212:15
**Videographer**
3:12 5:2 43:20
43:24 86:16,20
123:8,12 161:6
161:10 180:20
181:1 195:9,13
212:5,9,14
**Videographers**
3:16
**VIDEOTAPED**
1:12

view 34:15 98:7
100:12
viewpoint 43:1
violation 90:3
violence 149:4
196:16
Virginia 24:24
80:22
virus 154:22
vision 98:3
visit 22:2,4
160:17
visiting 22:10
29:15 52:23
130:20
voice 66:6 130:5
voicemail
125:13
voluntary 124:5
voter 105:8
voters 90:2
106:25
voting 43:2
vs 1:6 214:2
vulnerable
122:4
vultures 119:17
119:23

**W**

W 213:1
wait 132:24
Wake 1:2 5:11
187:6 188:25
189:9 215:2
walked 22:19
25:16
wall 83:5
want 8:7 34:2
41:10 42:16
68:9 92:18
94:17 111:15
112:17 118:13
124:16,16
132:25 134:15
143:6 156:22
159:8 172:5
175:21 180:8
186:20 190:8
196:6 197:18

212:3
wanted 26:2,24
33:23 36:4
38:23 48:20
50:16 71:11,18
73:2,3 84:15
87:3 95:5
99:17,20,25
100:5 112:4,21
112:23 113:11
116:16 124:3,9
124:12,13
134:9 135:15
141:1 142:2
147:2 152:8
165:21 166:8
196:13
Washington 2:4
2:18,19 15:9
wasn't 10:16
12:25 13:2
16:14 22:13
23:22 24:3
27:9 47:6
48:19,21,23
55:18 59:25
60:15 62:24
66:14 68:6
78:19 93:9
95:25 96:17
98:5,12 102:20
102:25 103:11
103:16,20
113:3 115:5
120:20 122:22
124:17 130:22
135:10 140:4,8
140:25 141:2
148:5 153:6,8
156:1,5 157:11
166:10 167:3
173:18 184:5
193:8,12
202:25 204:2
204:17
watch 144:14
way 12:10 13:12
17:11,24 19:8
29:17 34:25
36:21 42:20

43:5 59:21
64:20 65:5,16
88:24 91:6
95:12 107:22
114:21 115:1
119:12 159:5,6
160:9 171:20
173:3 205:19
205:20,20
206:14
we'll 8:8 12:1
123:20,21
168:1
we're 8:9 16:21
129:24,24
137:13,25
167:11 168:4
171:24 172:2
180:10 197:25
203:21
we've 13:16
17:11 23:11
32:9 41:6
86:10 159:11
159:14 161:24
199:6
weather 136:2
week 89:16
103:23 109:12
136:21
weekend 136:21
weeks 154:17
well-being
183:18
well-known
173:10
went 6:25 28:13
28:15 44:14
51:13 52:6,8
72:16 78:21
112:15 118:11
123:15 158:11
210:18
weren't 24:12
64:8 81:2
122:14 129:23
140:24 204:23
204:24
West 2:14 3:8
80:21

Wheeler 1:23
3:17 215:4,23
widow 119:18
wife 81:17
willing 108:7
109:10 198:4,9
198:14 199:12
206:10,10
wills 120:17
wish 51:17
100:21
wished 93:21
withdraw
198:13
witness 5:16
34:1 43:19
44:4 47:21
62:4 66:2,20
67:25 68:5
69:9 70:1 75:9
80:10 86:14
88:14,17
106:13 123:4
136:13,17
137:7,18,20,22
137:24 144:2,4
145:2 156:25
161:3 170:23
170:24 172:8
172:12,14
174:14,17
178:16 180:1,3
180:14,19
183:11,13
184:9,10 188:8
190:21 192:6
193:20,25
198:10 199:14
199:22 200:2,5
200:14 202:20
203:4 204:11
208:7 210:2,4
214:4 215:7,9
215:13
witness's 37:13
wonder 32:23
118:12
wonderful 165:9
word 124:11
126:25 202:21

words 42:16
104:23 105:24
108:6 111:22
131:8 132:2
work 11:8 12:19
13:4,13 26:18
26:20,22 30:21
31:5 51:11
55:1,5,11,15
55:17,21 56:13
57:21 61:20
63:8 71:3 74:6
74:21 75:1
81:9,9 83:14
83:23 84:18
85:13 86:3
87:22 90:15
91:4 99:9,22
100:1,6,7,21
106:19 113:23
113:24 122:9
127:8,9,25
128:1,2,12,17
130:19 139:16
144:23 147:9
149:2,10,13
154:4,12
155:11 157:9
158:17,18
160:20,22
171:19 172:13
172:25 173:4,5
173:15
work-related
51:15 56:2
57:12,14,18
87:1,13
worked 62:13
63:4,6 98:18
105:1 163:3
working 105:16
114:12,14
115:7 125:23
133:17 162:2
162:17 163:6
164:8 203:18
works 92:8
161:23
worried 159:1
worry 159:18

160:10
**worship** 98:10
**wouldn't** 79:25
84:20 85:15
129:4 135:9
152:9 153:2
211:2
**wow** 57:22 84:22
**written** 80:24
120:18 162:14
177:23 178:1,2
178:21
**wrong** 16:15
169:24
**wrote** 50:8 80:25

**X**

**X** 4:1,7 130:4,4
130:4

**Y**

**yeah** 10:13
16:25 17:2,4
17:11 19:15
34:5 49:24
61:17 66:21
67:5 75:9 86:3
110:16 119:17
126:15 135:6
144:2,4 166:9
166:14 167:16
174:17 175:9
180:2 187:24
188:6 189:15
200:8,9 202:20
207:21 209:2
210:8,11,15
211:11
**year** 9:5 20:4
41:22 208:23
211:10,11
**years** 30:12
41:19,20 61:13
80:23 159:10
**Yep** 184:22
**York** 169:10
171:8 173:11
**young** 139:19

**Z**

**0**

**014001** 1:2 5:12

**1**

**1** 4:9 9:11,15
64:12
**1:04** 123:11,13
**1:50** 161:7,9
**1:57** 161:9,11
**10** 4:24 71:13
192:7,8,13,16
192:19 193:15
194:9
**10:24** 43:21,23
**10:46** 43:23,25
**1000** 3:17
**1050** 2:19
**11** 71:13 139:24
**11-hour** 8:18
**11-year-old**
140:8
**11:39** 86:17,19
**11:59** 86:19,21
**1100** 2:18,23
**114** 2:14
**11th** 52:10,11
73:23
**12:47** 123:9,11
**128** 3:4
**13th** 10:6 14:6
165:1,6
**14** 4:11
**15** 78:12
**15th** 168:12
**167** 4:12,13
**16th** 172:24
173:7
**17** 1:16 214:5
**174** 4:14,16
**17th** 5:3
**18** 1:2 5:12
16:24,25 24:7
**180** 4:19
**184** 4:20
**188** 4:22
**18th** 74:10
**1900** 1:18 2:8
**192** 4:24
**195** 4:4
**19981350007**

215:24

**2**

**2** 4:11 10:20
14:15,19 44:13
45:17,22 46:21
76:8,12 77:1
77:20 78:12
141:11
**2:23** 180:21,23
**2:36** 180:23
**2:37** 181:2
**2:57** 195:10,12
**2:58** 195:12,14
**20001-3743** 2:4
**20036-5403** 2:19
**2009** 71:13
**2011** 78:4 79:6
79:13 80:5
**2013** 78:5 81:4
**2014** 41:23
171:16,20
172:23,24
173:7
**2017** 79:7,14
80:5 204:16
205:2,8
**2018** 20:6,21
21:4,19 22:6
22:10 52:7
58:7,9 73:23
107:25 108:1
120:25 124:23
165:6 169:7
171:16,20
172:24 173:7
176:8 177:7
181:15 185:5
188:5 194:24
207:14,17
208:15
**2019** 1:16 5:4
10:6 39:2
165:1,6 168:12
190:5 191:3
192:24 193:2
194:25 213:11
213:20 214:5
215:20
**202** 2:5,20

**20th** 215:20
**212** 213:5
**223** 3:8
**229-0845** 3:9
**23** 18:10
**27601** 2:9 3:4
**27603** 2:14 3:9
**27609** 2:24 3:18
**29th** 176:8,25
177:3,6

**3**

**3** 4:12 167:4,5,6
168:8,9,10
**3:15** 212:6,8
**3:18** 212:8,10,16
212:18
**300** 3:4
**300,000** 72:6
**301** 1:18 2:8
**30th** 21:19 169:6
169:7 207:14
207:17 208:15

**4**

**4** 4:13 15:25
45:16,21 46:21
76:12 167:5,5
167:8 168:8,20
181:14
**4208** 2:23 3:17
**44** 4:3
**45** 140:22

**5**

**5** 4:14 174:18
175:1,6,11,18
175:23 176:6
176:17 177:6
178:4
**50** 17:16
**52** 159:10
**5th** 181:15

**6**

**6** 4:2,16 172:23
174:23 175:1,6
175:7,11 177:9
178:25 187:22
190:5 191:3
194:15

**601** 2:4
**649-9998** 3:18
**650** 8:21
**6th** 185:5 194:24

**7**

**7** 4:19 76:14,16
76:19,25
180:24 181:5
181:20 193:1,2
194:15
**716-6900** 2:15
**783-6400** 2:9
**787-9700** 2:24
**7th** 192:24
194:25

**8**

**8** 4:20 184:6,8
184:14,18,21
188:14,15
**856-9494** 3:5
**861-1500** 2:20
**8th** 187:25 188:3

**9**

**9** 4:9,22 77:7
188:8,9,13
189:12,17,21
**9:38** 1:15 5:3
**900** 3:8
**919** 2:9,15,24
3:5,9,18
**942-5000** 2:5
**95** 196:2

# EXHIBIT B

# Ogletree
# Deakins

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**

*Attorneys at Law*

4208 Six Forks Road, Suite 1100
Raleigh, NC 27609
Telephone: 919-787-9700
Facsimile: 919-783-9412
www.ogletree.com

Phillip J. Strach
919-789-3179
phillip.strach@ogletree.com

May 31, 2019

Mr. Stanton Jones
Via Email (Stanton.jones@arnoldporter.com)
Arnold & Porter
601 Massachusetts Ave., NW
Washington, DC 20001

RE:   *Common Cause, et al. v. David R. Lewis, et al.*
      *Wake County Superior Court Case No.: 18-cvs-014001*

Dear Stanton:

We write today on behalf of legislative defendants in the following cases arising out of North Carolina: *Dickson v. Rucho*, 11-cvs-16896 (N.C. Sup. Ct.) *NC NAACP v. McCrory*, (1:13-cv-00658 (M.D.N.C.) *Currie v. North Carolina*, 13-cvs-1419 (N.C. Sup. Ct.) *Harris v. Cooper*, 1:13-cv-00949 (M.D.N.C) *Covington v. North Carolina*, 1:15-cv-00399 (M.D.N.C.) *Common Cause v. Rucho*, 1:16-cv-01026 (M.D.N.C) the matter referenced above, and any cases consolidated or combined with the foregoing matters.

Our clients are extremely concerned and disturbed about recent revelations regarding the materials produced by Stephanie Hofeller in response to the document subpoena issued to her by Plaintiffs on February 13, 2019. These materials were not made available to us until the evening of Friday, May 3rd, after the Court in the referenced matter ordered Plaintiffs to produce the entirety of the materials to all parties as clearly required by the North Carolina Rules of Civil Procedure.

Now that we have been able to process our own complete index of the data taken by Ms. Hofeller, we make several observations. First, it is apparent that the index of the files you deem "sensitive personal information" is woefully incomplete. For instance, even simple searches of our complete index reveal that files containing confidential financial information were left out of the 1,001 files Plaintiffs designated "Highly Confidential/Outside Attorney's Eyes Only." As a result, and for the additional reasons discussed below, *Legislative Defendants hereby designate the entirety of the materials produced by Ms. Hofeller as "Highly Confidential/Outside Attorney's Eyes Only"* pursuant to the Consent Protective Order in force in the referenced action.

Next, our clients are deeply concerned that Plaintiffs and/or their counsel have been reviewing files in the Hofeller materials without first providing Legislative Defendants or the rightful owner of the materials an opportunity to conduct a privilege review. That there are many files in these materials that are protected by the attorney-client or work product privilege, or protected expert witness

Atlanta ▪ Austin ▪ Berlin (Germany) ▪ Birmingham ▪ Boston ▪ Charleston ▪ Charlotte ▪ Chicago ▪ Cleveland ▪ Columbia ▪ Dallas ▪ Denver ▪ Detroit Metro ▪ Greenville ▪ Houston Indianapolis ▪ Jackson ▪ Kansas City ▪ Las Vegas ▪ London (England) ▪ Los Angeles ▪ Memphis ▪ Mexico City (Mexico) ▪ Miami ▪ Milwaukee ▪ Minneapolis ▪ Morristown Nashville ▪ New Orleans ▪ New York City ▪ Oklahoma City ▪ Orange County ▪ Paris (France) ▪ Philadelphia ▪ Phoenix ▪ Pittsburgh ▪ Portland, ME ▪ Portland, OR ▪ Raleigh Richmond ▪ St. Louis ▪ St. Thomas ▪ Sacramento ▪ San Antonio ▪ San Diego ▪ San Francisco ▪ Seattle ▪ Stamford ▪ Tampa ▪ Toronto (Canada) ▪ Torrance ▪ Tucson ▪ Washington

May 31, 2019
Page 2

materials, is beyond dispute. As just an example, the following filepath names from our index contain protected North Carolina case-related materials:

NC\ES0001A\C\NC 2015 Backup\NC Jan 2015 Expert Report\2014 GENERAL ELECTION SUMMARY.pdf

NC\ES0001A\C\NC 2015 Backup\NC Jan 2015 Expert Report\CVAP ACS 2009-2013.xlsx

NC\ES0001A\C\NC 2015 Backup\NC Jan 2015 Expert Report\North Carolina Declaration January  8 2014 1430.doc

NC\ES0001A\C\NC 2015 Backup\NC Jan 2015 Expert Report\North Carolina Declaration January 17 2014 2300.doc

NC\ES0018A\C\~$Covington - Named Plaintiffs - For Mapping.xlsx

The file names alone clearly reveal that these are expert witness materials created by Dr. Hofeller in connection with North Carolina legal matters. These materials may not be accessed or viewed by Plaintiffs or their counsel unless and until our clients or the rightful owner of the materials have had an opportunity to determine whether these and other North Carolina-related files are covered by any applicable privilege. While Dr. Hofeller was not an attorney, he often worked with North Carolina attorneys in developing expert reports and other materials for use in litigation. In this work Dr. Hofeller communicated with attorneys and developed drafts, most or all of which would be privileged and not discoverable, much less reviewable by opposing lawyers. Not only have you apparently been reviewing likely privileged materials, Plaintiffs actually filed some of them in their April 26, 2019 filing in this case.

Moreover, the manner in which Plaintiffs came into possession of these files raise grave questions for our clients. At her deposition in the referenced case on May 17, 2019, Ms. Hofeller testified that she took the storage devices that she ultimately turned over pursuant to the subpoena while visiting her mother on October 11, 2018 at her mother's apartment at Springmoor Retirement Community (52:6-15). Ms. Hofeller asked her mother if she could take the drives because she was looking for pictures and other documents of hers that she thought might be on the drives. (26:5-10; 50:2-19). Notably, however, Ms. Hofeller testified that she was aware that a guardian had been appointed over both her mother and her mother's estate shortly after this encounter with her mother. (194:23-195:2). This casts serious doubt on her mother's ability to consent to Ms. Hofeller's taking of the devices and Ms. Hofeller's providing of those devices to counsel for Plaintiffs after her mother was placed under guardianship.

Worse still, is that Ms. Hofeller testified she assumed that there would be work files on the devices, and wasn't surprised when she found such work materials on the drive as Dr. Hofeller "always had information related to his work on the personal hard drive." (55:3-18). Yet, Ms. Hofeller had no discussions with her mother regarding if there was any business information contained on the drives as she "didn't wish to assert [herself] into the business intentionally" (51:6-18). Moreover, upon plugging the drives into her own laptop, Ms. Hofeller found information pertinent to Dr. Hofeller's work. (29:12-30:23) She testified that despite not discussing the business materials with her mother

May 31, 2019
Page 3

that she "was more like, Common Cause may have an interest in these work files." (56:12-13). Further, Ms. Hofeller reviewed all of the drives prior to sending them to counsel for Plaintiffs. (46:19-24). There is no doubt, then, that Ms. Hofeller was aware that she was delivering Dr. Hofeller's confidential work files to counsel for Plaintiffs in this case.

Indeed, when Ms. Hofeller first reached out to Bob Phillips at Common Cause, it was for a referral to find an attorney for her mother during the incompetency proceedings. (31:15-32:6). She stated that she contacted Common Cause because she wanted "independent" counsel for her mother, and was concerned about potential political allegiances of lawyers she did not know in Raleigh. (37:14-38:9). She originally spoke with Bob Phillips in early November, 2018 by phone. (89:8-23). However, she also indicated that at the time she reached out, she knew that Common Cause was "representing the interest of voters that felt that this redistricting represented a violation of their constitutional rights" including maps that were drawn by Dr. Hofeller. (89:24-90:9). She also understood that she knew that Common Cause had historically been antagonistic to Dr. Hofeller's work. (91:3-7).

Ms. Hofeller was referred by Mr. Phillips to Jane Pinsky, another employee of Common Cause. Ms. Hofeller first brought up the drives in an "anecdotal" way in December, 2018 to Pinsky, indicating she had some hard drives of Dr. Hofeller's. (32:14-35:24; 100:22-101:1). Pinksy then explained to Ms. Hofeller that a current case was on appeal, but that in a new case about state legislative districts they would be "accepting new evidence." (33:20-35:15). Ms. Hofeller praised Common Cause for their "progress" in that this was "the furthest [she had] ever seen a plaintiff get with anything [her] father drew." (36:12-20). Ms. Pinksy then put Ms. Hofeller in touch with Eddie Speas and Caroline Mackie. (38:10-17).

Mr. Speas texted Ms. Hofeller shortly after her conversation with Ms. Pinksy in December 2018 and Ms. Hofeller then spoke with Mr. Speas and Ms. Mackie around the holidays. (38:10-17; 108-110). At the time of these conversations, Mr. Speas and Ms. Mackie were aware that there were issues regarding Mrs. Hofeller's competency. (118:19-119:3).

In those calls, Ms. Hofeller indicated that she had material that might be relevant to the case, specifically external storage devices, she wanted to provide to them. (111:3-16; 38:21-39:1).   She also disclosed that these drives contained information regarding personal data for herself and her parents in addition to the work data (127: 15-128: 20). Some of this personal data included personal health information about both Tom and Kathy Hofeller as well as Stephanie Hofeller's children. (149:14-150:7).

Rather than advise Ms. Hofeller to seek the advice of an attorney for herself or her mother, Mr. Speas and Ms. Mackie told her that it would be best to turn over the data in its entirety rather than piece meal. (115:8-20). *Ms. Mackie and Mr. Speas also told her that "anyone" including plaintiffs or legislative defendants, could only look at the content of items that were explicitly and obviously related to this case, and as a result, she should not be concerned about a privacy issue with her or her mother.* (115:24-117:8).

May 31, 2019
Page 4

When asked whether Ms. Hofeller engaged in any sort of review to determine whether the files on the drives contained privileged information, she testified that she had been told that the best way to "preserve the integrity" of the data was not to pick and choose and to leave everything as it was (64:9-65:5). Specifically, "in the discussion that I had with the attorneys Caroline Mackie and Eddie Speas, there was a discussion on how it would be best recognized in court as…a good chain of custody, transparency. There would be no accusation of picking and choosing, of keeping some things secret and some things not if the media were turned over to a third party in its exact state." (67:7-18; 79:19-25).

These are just the facts our clients know from Ms. Hofeller's deposition and other evidence so far. It appears that serious questions exist as to whether Kathy Hofeller was competent to give any alleged consent to Stephanie Hofeller to take Kathy Hofeller's property, or the property of any other individuals or entities, or whether Kathy Hofeller was taken advantage of by her estranged daughter. Even if Kathy Hofeller was competent to give Stephanie Hofeller permission to take these materials, which we doubt, grave questions exist as to whether Kathy Hofeller could even give permission to her daughter to take drives containing information belonging to Dr. Hofeller's business. Serious questions also exist as to whether Plaintiffs' counsel should have advised Ms. Hofeller to seek counsel in transferring this property and whether Ms. Hofeller was misled as to what aspects of that property, if even properly in her possession, should be turned over to the Plaintiffs. Serious questions also exist as to whether Plaintiffs' counsel encouraged Ms. Hofeller to transfer this property despite knowing that it contained or likely contained privileged information. At a minimum, North Carolina counsel would be familiar with N.C. R. Civ. P. 26(b)(4)(d)-(e), which protects draft reports and expert communications with counsel from discovery. Ms. Hofeller herself appears to have understood that such materials and communications existed on these drives yet counsel for Plaintiffs took no steps to ensure they did not come into possession of, much less review, such privileged materials and communications.

As our forensic vendor is continuing the process of processing the vast amount of data Ms. Hofeller took, we have not yet had an opportunity to examine all of the North Carolina-related files that may exist. Therefore, we reserve the right to identify and communicate any additional improper conduct that we may discover as we review the files. In the meantime, based on the undisputed facts known to the parties thus far, we demand that Plaintiffs and their counsel do the following immediately:

(1) immediately cease and desist reviewing all materials produced by Ms. Hofeller, and particularly all files unrelated to North Carolina. Plaintiffs' counsel Speas and Mackie assured Ms. Hofeller that only files related to this case could be reviewed, but it is clear based on recent events that Plaintiffs have not kept their word with Ms. Hofeller;

(2) immediately cease and desist providing any or all of these materials to third parties unrelated to this case, as you have apparently recently done in a matter pending in New York;

(3) return all of the produced materials to the Trustee for the Kathleen H. Hofeller Irrevocable Trust  to allow for a privilege review of Dr. Hofeller's documents;

May 31, 2019
Page 5

    (4) identify by name all individuals you employ who have reviewed the produced materials, the date(s) on which they reviewed those materials, and which materials they reviewed with sufficient specificity that we can determine which materials are at issue;

    (5) inform us which of these wrongfully produced materials have been shared outside your firms, including but not limited to any expert witnesses in this case, and, if so, with whom and which materials with sufficient specificity to allow us to assess the scope of the intrusion into protected materials; and,

    (6) attest that all copies of the materials wrongfully produced by Ms. Hofeller are no longer in your possession and have been destroyed.

We remain willing to meet and confer on these issues, but must insist on your compliance with the North Carolina Rules of Civil Procedure and Rules of Professional Responsibility. Should you persist in neglecting your professional responsibilities, our clients are considering all options available to them to enforce their rights. We appreciate your attention and compliance with the steps outlined above by June 5, 2019.

Sincerely,

Phillip J. Strach

CC: All Counsel of Record
PJS:amr

38739743.1

# EXHIBIT C

# Arnold&Porter

R. Stanton Jones
+1 202.942.5563 Direct
Stanton.Jones@arnoldporter.com

June 5, 2019

**VIA E-MAIL**

Phillip J. Strach
Ogletree, Deakins, Nash,
 Smoak & Stewart, P.C.
4208 Six Forks Road, Suite 110
Raleigh, NC 27609
phillip.strach@ogletree.com

Re:   *Common Cause v. Lewis*, 18 CVS 0140001 (Wake County Sup. Ct., N.C.)

Dear Mr. Strach:

On behalf of Plaintiffs in the above-captioned lawsuit, I write in response to your May 31, 2019 letter on behalf of Legislative Defendants in both this case and several other cases concerning certain electronic storage devices produced by Stephanie Hofeller to Plaintiffs in response to their February 13, 2019 subpoena to Ms. Hofeller (the "Hofeller files").  Your letter (1) purports to designate the entirety of the Hofeller files as "Highly Confidential/Outside Attorneys' Eyes Only" pursuant to the Consent Protective Order in this case, (2) asserts that Plaintiffs' counsel have "likely" reviewed "privileged materials" of Legislative Defendants contained on the devices at issue, (3) expresses concern about the manner in which Plaintiffs received the devices from Ms. Hofeller in response to their subpoena, (4) makes several specific demands, and (5) suggests, without specificity or elaboration, that Plaintiffs' counsel have been "neglecting [their] professional responsibilities."

Your letter is not only baseless in every respect, but also troubling in its own right.  We are concerned that Legislative Defendants are attempting—unilaterally and without authorization—to designate evidence produced by a *third party* in discovery pursuant to a *lawful subpoena* as Highly Confidential under the Court's Consent Protective Order, apparently in an effort to conceal their own wrongdoing.  Such wrongdoing appears to include false statements made by Legislative Defendants to federal courts, the Superior Court in this case, and the people of North Carolina.

# Arnold&Porter

Phillip J. Strach
June 5, 2019
Page 2

I.      **Legislative Defendants Have No Authority to Unilaterally Designate the Hofeller Files as Highly Confidential Under the Consent Protective Order**

Your letter purports to "designate the entirety of the materials produced by Ms. Hofeller as 'Highly Confidential/Outside Attorneys' Eyes Only' pursuant to the Consent Protective Order in" this case.  But the Consent Protective Order does not authorize Legislative Defendants to designate *any* of the Hofeller files as Highly Confidential, let alone *all* of them.  Paragraph 1 of the Order states:  "To fall within the scope of this Agreement, any such Confidential material shall be designated as 'CONFIDENTIAL' or 'HIGHLY CONFIDENTIAL/OUTSIDE ATTORNEYS' EYES ONLY,' *by the Party producing the material*."  4/5/19 Consent Protective Order ¶ 1 (emphasis added).  Paragraphs 2 and 3 confirm that only "[*t*]*he producing Party may designate*" materials as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL."  *Id.* ¶¶ 2, 3 (emphasis added).  Specifically, "[t]he producing Party may designate as 'CONFIDENTIAL' any materials that it produces in the litigation" subject to meeting certain confidentiality criteria, *id.* ¶ 2, and "[t]he producing Party may designate as 'HIGHLY CONFIDENTIAL/OUTSIDE ATTORNEYS' EYES ONLY' (a) any non-public personal information, or (b) any CONFIDENTIAL material that the producing party reasonably and in good faith believes" meets certain additional criteria.  *Id.* ¶ 3; *see also id.* ¶ 13 (stating that the Order applies equally to "information produced by a non-Party").

Thus, the Consent Protective Order does not authorize anyone other than the party or non-party "producing the material" to designate such material as either Confidential or Highly Confidential.  Legislative Defendants are not "the producing Party" of the Hofeller files, but instead are a "receiving party" of those files.  Ms. Hofeller produced the Hofeller files, and she did not designate any of them as Confidential or Highly Confidential.  To the contrary, Ms. Hofeller has testified to her desire that her father's political and redistricting work be made available to serve as "a snapshot in time" and a "repository for . . . historical value" to provide "insight into the process -- the literal process."  S. Hofeller Dep. at 42:10-43:16; 104:12-105:16.

Furthermore, Legislative Defendants' stated justification for attempting to designate the Hofeller files as Highly Confidential is pretextual.  Your letter asserts that, in addition to the 1,001 files designated Highly Confidential pursuant to the Court's May 1, 2019 Order, the devices include additional files containing "confidential financial information."  But your letter does not identify any such files, nor have you even attempted to establish that the number of such files is more than a small fraction of the total Hofeller files.  If you are genuinely concerned about the privacy of files containing "confidential financial information," you should identify each such file, and Plaintiffs will consider joining in a motion asking the Court to designate such files as Confidential

**Arnold&Porter**

Phillip J. Strach
June 5, 2019
Page 3

or Highly Confidential, as appropriate.  But your invocation of some small, unidentified number of files containing unspecified "confidential financial information" as a basis to designate hundreds of thousands of other files as Highly Confidential is unreasonable.  The pretextual nature of your purported concern for the Hofeller family's privacy is further laid bare by the fact that you attempted to designate "the entirety" of the files as Highly Confidential just one day after several of the Hofeller files—which exposed misconduct by federal government officials—were submitted to a federal district court and the United States Supreme Court in a case of national public importance.

While Plaintiffs would consider, as stated, jointly moving the Court to designate as Confidential or Highly Confidential any specific additional files containing "confidential financial information" for which a confidentiality designation would be appropriate, Legislative Defendants' attempt to unilaterally designate "the entirety" of the Hofeller files as Highly Confidential is not authorized under the Consent Protective Order and is therefore without legal effect.

## II.     Legislative Defendants' Privilege Claims Are Meritless

### A.     Plaintiffs' Counsel Have Acted Properly and Responsibly At All Times and Have Not Reviewed Any Conceivably Privileged Materials

Your letter asserts that Plaintiffs' counsel have "apparently been reviewing likely privileged materials" of Legislative Defendants.  That assertion in wrong on every level.

*First*, while your letter asserts that there are "many" privileged materials among the Hofeller files, your letter identifies only *five* specific documents that you say are "expert witness materials created by Dr. Hofeller in connection with North Carolina legal matters."  Plaintiffs' counsel have no intention of reviewing any of those five documents.  Nor have Plaintiffs' counsel reviewed—or have any intention of reviewing—any other draft expert report or draft declaration prepared in connection with litigation.

*Second*, your letter asserts that Plaintiffs "actually filed some" "likely privileged" materials in their April 26, 2019 Supplemental Reply Brief.  You do not identify which of the files included in Plaintiffs' April 26 reply brief are supposedly "likely privileged," and for good reason.  Legislative Defendants' own April 29, 2019 response to Plaintiffs' reply brief precludes Legislative Defendants from claiming privilege over the files included in the reply—or, indeed, over any draft maps or analyses of draft maps in the Hofeller files that existed before July 1, 2017.  In their April 29 response, Legislative Defendants asserted that they had no "knowledge" of Dr. Hofeller's work creating draft maps and analyses of draft maps before July 1, 2017, and Legislative Defendants

# Arnold&Porter

Phillip J. Strach
June 5, 2019
Page 4

specifically denied that they "authorized or were aware of any of the maps or charts Plaintiffs highlighted."  Having taken these positions that they had no knowledge of and did not authorize the creation of the material by Dr. Hofeller, Legislative Defendants cannot now contend that the materials are privileged as to them.  Moreover, if Legislative Defendants had authorized Dr. Hofeller to draft these maps, they should be public records under state law and responsive to Plaintiffs' discovery requests in this case.

Additionally, in the more than one month since Plaintiffs' April 26 reply, Legislative Defendants never sought a protective order as to any materials included in the reply or asked that the reply be placed under seal.

### B.   Legislative Defendants Have Waived Any Privilege Claim

In any event, Legislative Defendants have waived any privilege they may have held over *any* information on the Hofeller files, several times over.

### 1.   Legislative Defendants' Failure to Object to Plaintiffs' Subpoena or Move to Quash Waived Any Privilege Claim

As you know, we sent Legislative Defendants' counsel written notice of Plaintiffs' subpoena to Ms. Hofeller on February 13, 2019, the same day we served the subpoena.  The subpoena sought "[a]ny storage device in [Ms. Hofeller's] possession, custody, or control that contains" either any documents relating to Dr. Hofeller's work on the challenged state House and state Senate Plans or any information "related to" any such documents.  Legislative Defendants could have filed protective objections or a motion to quash, but they did not do so.  As the Court has acknowledged: "No objection to or motion to quash the subpoena was filed by any party to this action or Ms. Hofeller." 5/1/19 Order at 1; *see also* S. Hofeller Dep. at 39:2-20.

Legislative Defendants' failure to object to the subpoena or move to quash—even though the subpoena on its face sought materials related to Dr. Hofeller's work for Legislative Defendants—constitutes a clear waiver of any privilege.  A party "waive[s] its privilege by its own inaction" when it "fail[s] to act to protect any privilege when served with copies of [a third-party] subpoena." *Am. Home Assur. Co. v. Fremont Indem. Co.*, 1993 WL 426984, at *3-4 (S.D.N.Y. Oct. 18, 1993).  "Where a party is aware" that a subpoenaed third party may possess the party's privileged information, "the burden falls on that party to take affirmative steps to prevent the disclosure in order [to] preserve the privilege as to itself." *Id.* at *4.  "The failure to act to prevent or object to the disclosure of confidential communications when a party knows or should know that privileged documents may be disclosed by another party waives the privilege with respect to the

**Arnold&Porter**

Phillip J. Strach
June 5, 2019
Page 5

party failing to act."  *Id.*; *see also Ravenswood Inv. Co., L.P. v. Avalon Corr. Servs., Inc.*, 2010 WL 11443364, at *2 (W.D. Okla. May 18, 2010) ("Because Defendant did not state its claim of privilege within fourteen days of service of the subpoena on [a third party], the Court concludes Defendant has waived any such claim."); *Patterson v. Chicago Ass'n for Retarded Children*, 1997 WL 323575, at *3 (N.D. Ill. June 6, 1997) ("By failing to object" to third-party subpoena, party "essentially waived her claim to privilege, and the information gleaned via the subpoena may be used."); *Scott v. Kiker*, 59 N.C. App. 458, 461, 297 S.E.2d 142, 145 (1982) ("Defendant . . . waived his privilege because he failed to object to the testimony.").

Here, "[t]he broad scope of that subpoena" to Ms. Hofeller "should reasonably have alerted" Legislative Defendants "to the possibility that [Ms. Hofeller] might produce the [allegedly] privileged documents."  *Am. Home Assur.*, 1993 WL 426984, at *4. Legislative Defendants' "failure to take any steps to prevent the disclosure of [allegedly] privileged documents waived the privilege they seek to assert."  *Id.*

> **2.**    **Legislative Defendants' Successful Demand That Plaintiffs Transmit Complete Copies of All of the Hofeller Files to the Other Defendants Waived Any Privilege Claim**

Legislative Defendants independently waived any privilege by demanding that Plaintiffs transmit complete copies of all of the Hofeller files to State Defendants and Intervenor Defendants.  Following the Court's April 30 hearing, Plaintiffs transmitted complete copies of the full contents of the storage devices—without filtering out *any* of the files—to Intervenor Defendants and State Defendants, neither of which holds any privileged relationship with Legislative Defendants.  Legislative Defendants successfully requested that the Court order Plaintiffs to transmit complete copies of the devices to all Defendants even though weeks earlier, on April 9, 2019, Plaintiffs sent you a searchable index of file names and file paths that made apparent the devices contain files involving Dr. Hofeller's work for Legislative Defendants in litigation and other contexts. Legislative Defendants could have requested protective measures before these files were provided to the State Defendants and Intervenor Defendants, but they did not.

Given that "the documents were revealed to third parties without objection"—at Legislative Defendants' request, no less—Legislative Defendants have waived any claim of privilege over them.  *Durham Indus. Inc. v. N. River Ins. Co.*, 1980 WL 112700, at *2 (S.D.N.Y. May 8, 1980): *see also Scott v. Glickman*, 199 F.R.D. 174, 179 (E.D.N.C. 2001) (finding waiver where no "reasonable protective measures were employed in order to safeguard claims of privilege" or "to ensure confidentiality" before documents were produced); *Parkway Gallery Furniture, Inc. v. Kittinger/Penn. House Grp., Inc.*, 116

# Arnold&Porter

Phillip J. Strach
June 5, 2019
Page 6

F.R.D. 46, 50 (M.D.N.C. 1987) ("the privilege may be lost even by inadvertent disclosure when a person fails to take affirmative action and institute reasonable precautions to ensure that confidentiality will be maintained").

Not only did Legislative Defendants demand that Plaintiffs disseminate the Hofeller files to the other Defendants, Legislative Defendants did so knowing that State Defendants have not been aligned with them in this litigation. *In re Martin Marietta Corp.*, 856 F.2d 619, 625 (4th Cir. 1988) (finding waiver where party disclosed documents to government actors who were "adverse during the proceedings at issue"); *Navajo Nation v. Peabody Holding Co.*, 255 F.R.D. 37, 48 (D.D.C. 2009) (finding waiver where a party placed allegedly privileged materials "in the hands of" a potentially adverse party).

**3.      Any Work-Product Protection Is Defeated by Plaintiffs' Substantial Need for Information and Inability to Obtain It Elsewhere**

Any possible claim of work-product privilege over materials related to Dr. Hofeller's work during the *Covington* remedial phase and/or in drawing the 2017 Plans is also defeated by Plaintiffs' substantial need for the materials and the prejudice to Plaintiffs and the public interest that would ensue were they concealed.

"The work product doctrine" is "a qualified privilege for certain materials prepared by an attorney acting on behalf of his client in anticipation of litigation." *State v. Hardy*, 293 N.C. 105, 126, 235 S.E.2d 828, 841-42 (1977). It does not protect materials if a party shows "a 'substantial need' for the document and 'undue hardship' in obtaining its substantial equivalent by other means." *Evans v. United Servs. Auto. Ass'n*, 142 N.C. App. 18, 28, 541 S.E.2d 782, 789 (N.C. Ct. App. 2001) (quoting N.C. Gen. Stat. § 1A-1, Rule 26(b)(3)).

Even based on a limited review of non-privileged materials, it is clear that Plaintiffs have a substantial need for the Hofeller files related to Dr. Hofeller's work during the *Covington* remedial phase and/or in drawing the 2017 Plans, and that Plaintiffs—and the public—would suffer an extreme hardship if they were concealed. The files reveal evidence of false statements and material omissions to the federal district court in *Covington*, which will be highly relevant to the merits of Plaintiffs' claims as well as any remedial process.

# Arnold&Porter

Phillip J. Strach
June 5, 2019
Page 7

> **a.** **Legislative Defendants Made False Statements to the**
> ***Covington* Court to Avoid Special Elections in 2017**

The Hofeller files reveal that Legislative Defendants made false statements to the *Covington* district court about when the 2017 Plans were created. As a result of those false statements, the court did not order special elections in 2017 that would have jeopardized Republican super-majority control of the state House and state Senate.[1]

As you know, following the U.S. Supreme Court's decision in *Covington* on June 5, 2017, the *Covington* district court ordered briefing on whether to conduct special elections under remedial state House and state Senate plans in 2017 or instead wait until the 2018 elections to implement remedial plans. In a brief submitted to the *Covington* court on July 6, 2017, Legislative Defendants repeatedly stated that no work on remedial plans had yet begun, and that Legislative Defendants therefore needed a long period of time to draft new plans. For instance, Legislative Defendants told the court:

- The General Assembly had not "start[ed] the laborious process of redistricting earlier" than July 2017. *Covington*, ECF No. 161 at 28.

- It had not been "necessary to begin the process" of drawing new districts "until at, the earliest, the end of the current Supreme Court term" on June 30, 2017. *Id.* at 29.

- "The General Assembly could begin the process of compiling a record in July 2017 with a goal of enacting new plans by the end of the year." *Id.* at 28-29.

- In the "interim" between the Supreme Court's stay of the district court's judgment on January 10, 2017 and the end of the Supreme Court term on June 30, 2017, rather than engage in "drawing remedial legislative districts," "the North Carolina General Assembly did just what the Supreme Court allowed it to do – enact policies and legislation that benefit the State as a whole." *Id.* at 28.

---

[1] In their April 29, 2019 filing in the instant case, Legislative Defendants asserted that certain of the Hofeller files from before October 31, 2016 may be privileged because they may have been prepared in connection with a declaration that Dr. Hofeller submitted in *Covington* on October 31, 2016. Legislative Defendants provided no support for this claim of possible privilege, but in any event, all of the Hofeller files underlying the discussion in this section post-date October 31, 2016.

Arnold&Porter

Phillip J. Strach
June 5, 2019
Page 8

- "This Court should not short-circuit that process [of redistricting] by forcing the General Assembly to draw new maps without first engaging in the legislative and public consultation that this inherently policy-driven task necessitates." *Id.* at 4.

- "Proceeding on [its proposed] timeline will allow the General Assembly to receive public input, engage in internal discussions about the design of remedial districts, prepare draft remedial plans, receive public responses to those draft remedial plans, and incorporate public feedback into the final plans." *Id.* at 2.

- "Investigating, drawing, debating, and legislatively enacting satisfactory redistricting plans in time to hold elections in November 2017 or January 2018 would not even begin to allow [for sufficient] input by the public and other members of the General Assembly. And if the process and evidence relied upon by the General Assembly in 2011, developed over five months, was insufficient, it would be impossible for the General Assembly to establish a proper record in just a few days or weeks." *Id.* at 13.

Similarly, at a July 27, 2017 hearing, Legislative Defendants' counsel stated: "[R]edistricting is a very arduous, difficult task.  It takes a lot of time and attention." ECF No. 181 at 87:18-19.

Based on these statements by Legislative Defendants, the *Covington* court denied the plaintiffs' request to order special elections in 2017.  The court credited Legislative Defendants' assertion that "Plaintiffs' proposed August 11, 2017, deadline will provide them with insufficient time to conduct public hearings and engage in the robust deliberations necessary to develop districting plans."  *Covington v. North Carolina*, 267 F. Supp. 3d 664, 666 (M.D.N.C. 2017).  While the court admonished Legislative Defendants for not having started the process sooner, the court agreed with Legislative Defendants that "there are many benefits to a time line that allows for the General Assembly (1) to receive public feedback on the criteria to be used in drawing the remedial districts and proposed remedial districting plans applying those criteria; (2) to revise the proposed plans based on that feedback; and (3) to engage in robust deliberation."  *Id.* at 667.  Thus, the court concluded, an expedited schedule for adopting remedial plans, as needed to hold special elections in 2017, "[did] not provide the General Assembly with adequate time to meet their commendable goal of obtaining and considering public input and engaging in robust debate and discussion."  *Id.*

During the remedial phase through the fall of 2017, Legislative Defendants continued stating that no work had been done—including by Dr. Hofeller—to create new districts before July 2017:

# Arnold&Porter

Phillip J. Strach
June 5, 2019
Page 9

- Representative Lewis made the following statement at a July 26, 2017 hearing of the Joint Redistricting Committees (ECF 184-7 at 11-12):

    REP MICHAUX: Are there any other maps that have not yet been released?  For instance, anything that has been drawn by Dr. Hofeller or anybody else that you know of that have not yet been released?

    REP. LEWIS: Not that I know of, sir.

- Representative Lewis made the following statements at an August 4, 2016 hearing of the Joint Redistricting Committees (ECF 184-8 at 72-73):

    REP. MICHAUX: Can you assure this body right now that no redistricting maps have yet been drawn?

    REP. LEWIS: I can assure this body that none has been drawn at my direction and that I have direct knowledge of.  The only map I'm aware of was submitted by an independent group and presented to this committee last week.

    . . .

    REP. MICHAUX: Just to be clear, I'm talking about anything that any chairman or members of the Republican Party or anybody.  No map has yet been drawn that should be handed out here?  I'm -- people are concerned about the fact -- they think you've already drawn the maps.  I want to make sure, coming from you, that you have not yet drawn maps.

    REP. LEWIS: Thank you for the question.  *I have not yet drawn maps nor have I directed that maps be drawn, nor am I aware of any other entity operating in conjunction with the leadership that has drawn map*s.

On September 7, 2017, Legislative Defendants submitted the hearing transcripts containing these statements to the district court in connection with securing the court's approval of the 2017 Plans.

In a September 22, 2017 submission to the *Covington* court seeking approval of the 2017 Plans, Legislative Defendants further stated: "Shortly following this Court's order of July 31, 2017, the legislative leaders, Senator Ralph Hise and Representative David Lewis, met with the map drawing consultant, Dr. Hofeller.  Redistricting concepts

**Arnold & Porter**

Phillip J. Strach
June 5, 2019
Page 10

were discussed with Dr. Hofeller as leaders made plans to comply with the Court's
Order."  ECF No. 192 at 6.

Likewise, in this case, Legislative Defendants have stated to the Superior Court
that no draft maps existed prior to July or August 2017.  For instance:

- In response to one of Plaintiffs' interrogatories asking about any "draft or copy"
  of "all or parts of the 2017 Plans before August 10, 2017," Legislative
  Defendants responded: "To the best recollection of [Legislative] Defendants, no
  drafts of the 2017 Plans existed prior to August 10, 2017."

- On April 26, 2019, Legislative Defendants stated in a Superior Court filing that
  "no legislative redistricting was occurring prior to July 2017," and that "July 1,
  2017 to August 31, 2017 represented the period of time that the legislature was
  actually engaged in and preparing for legislative redistricting."

- At an April 30, 2019 hearing, Plaintiffs' counsel stated that July and August
  2017 were the "timeframes when the redistricting actually occurred."

The Hofeller files reveal, however, that Dr. Hofeller had not only created
numerous iterations of draft maps before July 2017, but that he had substantially
*completed* the 2017 Plans *by the end of June 2017*.  Specifically, the files show that Dr.
Hofeller had already completed *over 97%* of the new Senate plan and *over 90%* of the
new House plan by June 2017.

These facts are inconsistent with Legislative Defendants' prior statements to
courts and the public that they had not "start[ed] the laborious process of redistricting"
before July 2017, that "no legislative redistricting was occurring prior to July 2017," that
"no drafts of the 2017 Plans existed prior to August 10, 2017," that they wanted to "first
engag[e] in . . . legislative and public consultation" before "draw[ing] new maps," that
they needed "[]sufficient time" in July and August 2017 "to conduct public hearings and
engage in the robust deliberations necessary to develop districting plans," that they only
began discussing "redistricting concepts" with Dr. Hofeller in August 2017, and so on.

The inaccuracy of the above statements, and the fact that the entire public
redistricting process in the fall of 2017 appears to have been a charade, are obviously
relevant to Plaintiffs' claims on the merits, as well as the procedures to be used in any
remedial process should Plaintiffs prevail.  Plaintiffs cannot obtain this evidence from
any other source, and there would be substantial hardship to Plaintiffs and the public
interest were the truth concealed.

# Arnold&Porter

Phillip J. Strach
June 5, 2019
Page 11

> **b.   Legislative Defendants Made False Statements to the
> *Covington* Court About the 2017 Redistricting Process
> and the Criteria Used to Create the Remedial Plans**

In its July 31, 2017 order declining to order special elections in 2017 and allowing more time for the creation and enactment of remedial plans, the *Covington* court ordered Legislative Defendants to file, within seven days of enacting new plans, the following:

- "a description of the process the Senate Redistricting Committee, House Redistricting Committee, and General Assembly followed in enacting the new plans, including the identity of all participants involved in the process";

- "any alternative district plans considered by the Senate Redistricting Committee, House Redistricting Committee, or the General Assembly"; and

- "the criteria the Senate Redistricting Committee, House Redistricting Committee, and General Assembly applied in drawing the districts in the new plans."

*Covington*, 267 F. Supp. 3d at 668.

The Hofeller files reveal that statements in Legislative Defendants' September 7, 2017 submission to the *Covington* court are false or misleading.  In purporting to give a "Description of the 2017 Redistricting Process," Legislative Defendants suggested that the process began "[o]n June 27, 2017," when Senate President Pro Tempore Phil Berger and House Speaker Tim Moore approved a contract with Dr. Tom Hofeller as a mapdrawing consultant for Rep. David Lewis and Sen. Ralph Hise, the forthcoming chairs of the 2017 redistricting committees in the House and the Senate."  ECF No. 184 at 4.  In reality, Dr. Hofeller had been drawing draft remedial maps since at least *August 2016*, and the new maps were substantially complete by June 27, 2017.  In describing "Alternative Districting Plans Considered," Legislative Defendants listed various alternative maps proposed by other members of the General Assembly, but did not list the numerous iterations of alternative draft maps that Dr. Hofeller had created.  *Id.* at 9-10.

In the same submission, under the heading "Criteria Applied in Drawing the 2017 House and Senate Districts," Legislative Defendants stated that the criteria "used to draw new districts in the 2017 House and Senate Redistricting plans" were those adopted by the House and Senate Redistricting Committees "[o]n August 10, 2017."  *Id.* at 6, 10.  Of course, Dr. Hofeller had already completed drawing many of the districts by June 2017, over a month-and-a-half before August 10, 2017.  Therefore, the criteria adopted by

# Arnold&Porter

Phillip J. Strach
June 5, 2019
Page 12

House and Senate Redistricting Committees on August 10, 2017 definitively were not the actual criteria "used to draw" these districts.

Again, the fact that the "Adopted Criteria" of the General Assembly were not the real criteria used by Dr Hofeller to create the 2017 Plans is highly relevant to the merits of Plaintiffs' claims as well as any remedial process should Plaintiffs prevail, and there would be prejudice to Plaintiffs and the public interest if these facts were covered up.

**c.     Legislative Defendants Made False Statements About the Use of Racial Data in Creating the Remedial Plans**

Legislative Defendants made additional false statements to the *Covington* court and the public concerning the use of racial data during the 2017 redistricting process.  As you know, after the prior plans were invalidated as unconstitutional racial gerrymanders, *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), Legislative Defendants adopted a formal criterion prohibiting use of racial data for the 2017 Plans: "Data identifying the race of individuals or voters ***shall not be used*** in the drawing of legislative districts in the 2017 House and Senate plans."  ECF No. 184-37 at 2 (emphasis added).

Further, Legislative Defendants repeatedly stated to the court and the public that there was not any racial data in the map-drawing software or other databases, and that they and Dr. Hofeller accordingly did not know the racial composition of the new districts.  As just a few examples, Legislative Defendants said the following:

- "[D]ata regarding the race of voters was not used in the drawing of the districts, and, in fact, ***was not even loaded into the computer used by the map drawer to construct the districts***."  ECF No. 192 at 28 (court filing) (emphasis added);

- "[W]e have not had and do not have racial data on any of these districts."  ECF 184-17 (8/24/17 Senate Hr'g Tr. at 66 (statement of Sen. Hise)).

- "Race was not part of the database.  It could not be calculated on the system[.]"  *Id.* at 102 (statement of Sen. Hise).

- "There was no racial data reviewed in the preparation of this map."  ECF 184-18 (8/25/17 Hr'g Tr. at 20 (statement of Rep. Lewis)).

The Hofeller files reveal that none of the above statements were true.  Dr. Hofeller did have "data on the race of voters" "loaded into the computer" he used to "construct the districts."  Dr. Hofeller's computer in fact appears to have had data

**Arnold&Porter**

Phillip J. Strach
June 5, 2019
Page 13

regarding the racial composition of the proposed districts for each and every iteration of
his draft maps.  Every Maptitude file with draft House or Senate districts from 2017—
including draft maps from August 2017 *after* Legislative Defendants signed an
engagement letter formally retaining Dr. Hofeller to create new maps—appears to have
had racial data for the districts.  Images from some of the Maptitude files even reveal that
Dr. Hofeller apparently was displaying the black voting age population  or "BVAP" of
the new districts in some of the drafts.  Dr. Hofeller also had racial data on the draft
districts in Excel spreadsheets.  Legislative Defendants' statements that racial data "was
not even loaded into the computer used by the map drawer to construct the districts," that
"[r]ace was not part of the database," and so on were not true.

        The full details of all of the above false statements will be made clear at trial, but
in light of their existence, any work-product protection that could conceivably apply to
the files at issue is defeated by Plaintiffs' need for the materials and the inability to obtain
substantially equivalent evidence elsewhere.  *Hardy*, 235 S.E.2d at 841-42.  Legislative
Defendants' apparent attempt to cover up this evidence, including by ineffectually
designating "the entirety" of the Hofeller files as Highly Confidential under the Consent
Protective Order, is troubling.

                                                        ***

        Notwithstanding the above, if you believe that there are additional draft expert
reports similar to the specific files identified in your letter, we are willing to meet and
confer about such files.  As mentioned, we have no intention of reviewing any such files
and would be willing to consider an accommodation to address your concerns,
notwithstanding your clear waiver of any privilege.  To facilitate such a meet-and-confer
process, you should identify each such file, specify the privilege that you believe applies,
and provide appropriate legal and factual support for your contention that the file is
privileged.

**III.     Plaintiffs Properly Received the Hofeller Files in Response to their Subpoena**

        Your letter expresses concerns about "the manner in which Plaintiffs came into
possession of" the devices.  But as you know, on February 13, 2019, Plaintiffs served a
lawful subpoena to Ms. Hofeller, through her lawyer, seeking the entire storage devices,
and Ms. Hofeller produced the devices to Plaintiffs in response to the subpoena.  As you
also know from Ms. Hofeller's deposition on May 17, 2019, when your co-counsel Ms.
Scully questioned Ms. Hofeller about these issues for several hours, Ms. Hofeller testified
that she properly obtained possession of the devices on October 11, 2018 from her
parents' home in Raleigh, with her mother Kathleen Hofeller's knowledge and approval.

# Arnold&Porter

Phillip J. Strach
June 5, 2019
Page 14

S. Hofeller Dep. at 20:3-26:10; 52:6-10; 81:8-82:2; 110:17-11.24.  Ms. Hofeller testified that her mother did "not object to [her] taking the devices," and when asked whether her mother said "it was okay to take the devices," Ms. Hofeller testified, "Yes.  She encouraged me too."  *Id.* at 21:6-11; *see id.* at 26:3-10 (when Ms. Hofeller asked "Can I take these?" her mother "said absolutely").  Ms. Hofeller testified that "[her] mother gave to [her] unconditionally" "everything on those hard drives that [her] father had left in his room"—the devices were "given to [her] by [her] deceased father's wife."  *Id.* at 81:8-82:2.

Ms. Hofeller further testified that she properly produced the devices to Plaintiffs in March 2019 in response to Plaintiffs' February 13, 2019 subpoena, again with her mother's knowledge and approval.  *Id.* at 39:21-41:8.  When asked whether her mother had given "her permission or her okay [for Ms. Hofeller] to provide the storage devices . . . to the plaintiffs' lawyers in response to the subpoena," Ms. Hofeller testified, "Yes."  *Id.* at 41:2-8.

The following responds to the specific "concerns" raised in your letter:

*First*, your letter asserts that there is "serious doubt on [Ms. Hofeller's] mother's ability to consent to Ms. Hofeller taking of the devices and Ms. Hofeller's providing of those devices to counsel," because a temporary guardian was appointed for Kathleen Hofeller "after" she gave the devices to her daughter.  That is wrong.  As described, Ms. Hofeller testified that her mother gave her the devices containing the Hofeller files on October 11, 2018.  S. Hofeller Dep. at 52:6-10.  It was only weeks *later*, on November 6, 2018, that an interim guardian ad litem was appointed for Kathleen Hofeller in a then-*ex parte* proceeding, in response to a Petition for Adjudication of Incompetence that had been filed one week earlier.  On February 7, 2019, the incompetency petition with respect to Kathleen Hofeller was dismissed for failure to prosecute—without any finding of incompetency—after the parties reached a settlement.  *See In re The Matter of Kathleen H. Hofeller*, 18 SP 2634 (N.C. Super. Feb. 7, 2019).  That settlement, among other things, precludes the parties from bringing future incompetency proceedings against Kathleen Hofeller.  Plaintiffs issued their subpoena to Stephanie Hofeller on February 13, 2019— after the incompetency proceeding was dismissed.  The incompetency proceeding thus did not begin until after the date when Ms. Hofeller obtained possession of the devices with her mother's permission, and the incompetency proceeding concluded (with no finding of incompetency) before the date when Ms. Hofeller sent the devices to Plaintiffs in response to their subpoena again with her mother's permission,

*Second*, Ms. Hofeller's deposition testimony contradicts your assertion that "Ms. Hofeller had no discussions with her mother regarding if there was any business

# Arnold&Porter

Phillip J. Strach
June 5, 2019
Page 15

information contained on the drives."  When asked whether she had "a specific
conversation with [her] mother to tell her that [she] identified business records of [her]
father's on" the devices, Ms. Hofeller testified: "All of those points were at some point
mentioned.  My mother was aware of the fact that . . . the subpoena for these hard drives
was, in fact, for **work-related files only**.  So not only was it clear to her that there were
**work-related files**, but it was clear to her that the lawyers that would be looking at it on
either side would not be looking at anything other than ***my father's work-related files***."
S. Hofeller Dep. at 56:22-57:18 (emphases added); *see id.* at 59:13-18 ("Q. At what point
in time did you discuss with your mother the possibility of turning over your father's
business records to Common Cause or to Arnold & Porter?  A. The subpoena.  That --
that would be when we specifically discussed that.").

    *Third*, your letter's suggestion that Mr. Speas and Ms. Mackie should have
"advise[d] Ms. Hofeller to seek the advice of an attorney for herself or her mother" is
nonsensical.  As you know, Stephanie Hofeller testified that she originally contacted
Common Cause specifically to request a referral to an attorney independent of her father
who could represent her mother in the incompetency proceeding.  S. Hofeller Dep. at
31:7-19; 36:24-38:9.  Common Cause provided such a referral, leading to Ms. Hofeller's
mother retaining an attorney to represent her in the incompetency proceeding.  *Id.* at
59:5-12.  As to Ms. Hofeller, she is the one who proactively contacted Common Cause,
raised the fact that she had the electronic storage devices, and affirmatively offered to
provide the devices to Common Cause.  *Id.* at 31:7-38:17.  We are aware of no obligation
of a lawyer to advise a non-adverse third party like Ms. Hofeller to obtain counsel in
these circumstances, and your letter does not identify any such obligation.  In any event,
the point is moot because Plaintiffs served their subpoena on Ms. Hofeller through her
attorney, Tom Sparks, who later defended her deposition in this case.  Ms. Hofeller was
represented in connection with Plaintiffs' subpoena.

    *Finally*, your letter asserts that Mr. Speas and Ms. Mackie "told [Ms. Hofeller]
that 'anyone,' including plaintiffs or legislative defendants, could only look at the content
of items that were explicitly and obviously related to this case, and as a result, she should
not be concerned about a privacy issue with her or her mother."  But Plaintiffs' counsel
have in fact attempted to shield sensitive personal information of the Hofeller family
from disclosure, including through the designation of such materials as Highly
Confidential pursuant to the Court's May 1, 2019 Order.  It is Legislative Defendants
who successfully insisted that personal sensitive information in the Hofeller files be
shared with other parties in the case, rather than filtered out and never reviewed by
anyone.  Beyond that, we understand from Ms. Hofeller that she approves of Plaintiffs'
review and use of the Hofeller files pertaining to Dr. Hofeller's political and redistricting
work.  In any event, while Ms. Hofeller testified that she and her mother "felt . . . that the

# Arnold&Porter

Phillip J. Strach
June 5, 2019
Page 16

process would most likely be centered around provably pertinent files," Ms. Hofeller also testified that she "assured her [mother] that she should be aware that once you -- and, again, this is something my father taught me.  Once you let go of it, you don't have control of it anymore so you can't be guaranteed what will and won't be disclosed, so it's something you should be prepared for when you are involved with discovery."  S. Hofeller Dep. at 40:1-15.

## IV.     Legislative Defendants' Assertions Regarding Plaintiffs' Counsel's Professional Responsibilities Are Frivolous and Improper

Your letter states that you "insist on compliance with the North Carolina Rules of Civil Procedure and Rules of Professional Responsibility," and that Legislative Defendants "are considering all options available to them to enforce their rights" "[s]hould [Plaintiffs' counsel] persist in neglecting [their] professional responsibilities." But you do not identify a single rule of professional conduct purportedly implicated by Plaintiffs' counsel's actions.  Your nonspecific references to Plaintiffs' counsel's "professional responsibilities" appear to be nothing more than an attempt to intimidate. We note that frivolous claims of professional ethics violations made to obtain an advantage in a civil matter are impermissible, and we refer you to District of Columbia Rule of Professional Conduct 8.4(g) and North Carolina Rule of Professional Responsibility 3.1.  Under Rule 3.1, "a threat to file disciplinary charges is . . . improper if the disciplinary charges are frivolous."[2]

## V.      Legislative Defendants' Specific Demands Are Baseless and Unreasonable

*First*, your letter demands that Plaintiffs "immediately cease and desist reviewing all materials produced by Ms. Hofeller and particularly all files unrelated to North Carolina."  But Legislative Defendants, as leaders of the North Carolina General Assembly, have no legal interest in, and no standing to make demands regarding, files that are "unrelated to North Carolina."  Moreover, while this demand is predicated on Legislative Defendants' (erroneous) understanding of Ms. Hofeller's intent in producing the devices in response to Plaintiffs' subpoena, Ms. Hofeller's attorney recently confirmed in writing—prior to the filings in the federal census case—that Ms. Hofeller consents to use of the Hofeller files in connection with matters outside North Carolina.

*Second*, your letter demands that we "immediately cease and desist providing any or all of these materials to third parties unrelated to this case, as [we] have apparently

---

[2] Suzanne Lever, *I'm Telling Mom! Reporting Professional Misconduct*, N.C. State Bar Journal (June 2014), https://www.ncbar.gov/for-lawyers/ethics/ethics-articles/im-telling-mom-reporting-professional-misconduct.

# Arnold&Porter

Phillip J. Strach
June 5, 2019
Page 17

recently done in a matter pending in New York."  Again, Legislative Defendants have no
standing to make demands regarding materials unrelated to North Carolina.  Anyway,
your demand is contrary to hornbook law.  "The general rule . . . is that information
produced in discovery in a civil case may be used in other cases."  *United States v.
Comstock*, 2012 WL 1119949, at *1 (E.D.N.C. Apr. 3, 2012).  Sharing discovery with
litigants in other cases is not just permissible, but courts "have overwhelmingly and
decisively *endorsed* the sharing of discovery information among different plaintiffs, in
different cases, in different courts."  *Burlington City Bd. of Educ. v. U.S. Mineral Prod.
Co.*, 115 F.R.D. 188, 190 (M.D.N.C. 1987) (emphasis added).  Absent a protective order
to the contrary (and there is no such order here with respect to the files at issue), nothing
"prevent[s] [a litigant] who lawfully has obtained discovery . . . from using the discovery
elsewhere."  *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 135 (2d Cir. 2017); *see also
Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Grp., Inc.*, 121 F.R.D.
264, 268-69 (M.D.N.C. 1988) ("[A] party needs to present good cause for prohibiting the
dissemination of non-confidential discovery information or from prohibiting the
utilization of such discovery in other litigation."); *Ohio Valley Envtl. Coal. v. Elk Run
Coal Co.*, 291 F.R.D. 114, 122 (S.D. W. Va. 2013) ("[T] he potential use of the fruits of
discovery in other litigation is not, alone, a basis for a protective order."); *FTC v. Digital
Interactive Assocs., Inc.*, 1996 WL 912156, at *3 (D. Colo. Nov. 18, 1996)
("[D]issemination of information to litigants in other forums is often encouraged for
purposes of judicial economy."); *United States v. Hooker Chemicals & Plastics Corp.*, 90
F.R.D. 421, 426 (W.D.N.Y. 1981) ("Use of the discovery fruits disclosed in one lawsuit
in connection with other litigation, and even in collaboration among plaintiffs' attorneys,
comes squarely within the purposes of the Federal Rules of Civil Procedure"); *Patterson
v. Ford Motor Co.*, 85 F.R.D. 152, 153-54 (W.D. Tex. 1980) (similar).

   *Third*, your letter demands, bizarrely, that Plaintiffs "return all of the produced
materials to the Trustee for the Kathleen H. Hofeller Irrevocable Trust."  You cite no
legal authority, and we can think of none, for the notion that a litigant can demand that
subpoenaed electronic files be returned to the "Trustee" of a financial trust of the mother
of the subpoenaed individual.  Even if Kathleen Hofeller rather than Stephanie Hofeller
had produced the files in response to the subpoena (which she did not), Kathleen Hofeller
is legally competent, and you do not explain why the materials would go to a "Trustee"
rather than to her.  It appears that you are making this odd request because Kathleen
Hofeller herself does not want return of the materials.

   *Fourth*, your letter asks that Plaintiffs identify all "individuals [Plaintiffs'
counsel's law firms] employ" who have reviewed the "produced materials."  As stated
above, we can represent that no one at our law firms has any intention of reviewing any
of the five specific files identified in your letter as purportedly privileged.  We have no

**Arnold&Porter**

Phillip J. Strach
June 5, 2019
Page 18

obligation to provide you further information regarding names of attorneys who have worked on this matter.

*Fifth*, your letter also asks which of the files that you characterize as "wrongfully produced materials have been shared outside [Plaintiffs' counsel's] firms." While we have no obligation no respond, we can advise you of the following: As you know, on May 6, 2019, we provided complete copies of all of the Hofeller files to all three sets of Defendants, including Legislative Defendants represented by you, Intervenor Defendants represented by separate private counsel, and State Defendants represented by the North Carolina Attorney General's Office. We provided complete copies of all of the Hofeller files to each set of Defendants because you demanded that we do so. We have no information about whether and to what extent Defendants may have shared files with others.

*Lastly*, your letter demands that Plaintiffs "attest that all copies of the materials wrongfully produced by Ms. Hofeller are no longer in []our possession and have been destroyed." Legislative Defendants have offered no legitimate basis for this demand. Moreover, given that the Hofeller files reveal wrongdoing by government officials, "destoy[ing]" the files could constitute spoliation.

Sincerely,

*/s/ R. Stanton Jones*
R. Stanton Jones