# EXHIBIT 5

STATE OF NORTH CAROLINA

WAKE COUNTY

**Common Cause** *et al*

                    **Plaintiffs,**

    v.

**Representative David R. Lewis, in his official capacity as senior chairman of the House Select Committee on Redistricting,** *et al*

                 **Defendants.**

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 014001

**MEMORANDUM IN SUPPORT OF GEOGRAPHIC STRATEGIES' RESPONSE TO COURT ORDER OF 7/12/2019**

Geographic Strategies, LLC ("Strategies") submits this memorandum in response to this Court's Order allowing Strategies to assert its ownership and claims of confidentiality to its data obtained by the Plaintiffs by subpoena. Included herein is an itemization log and the affidavits of Ameillia F. Blankenship and Dalton Lamar Oldham, Esq. evidencing the factual basis of these claims.

## I.    Introduction

Strategies provides confidential legal and Voting Rights Act compliance advice to the Republican National Committee ("RNC"), the Republican State Leadership Committee ("RSLC"), and their allies. Strategies was formed in 2011 and was jointly owned by Dr. Thomas Hofeller and Mr. Dalton L. Oldham.  Strategies is currently solely owned by Mr. Oldham. Prior to his death, Dr. Hofeller stored electronic data ("Data" or "ESI") on 4 external hard drives and 18 thumb drives ("Storage Devices").  Much of that ESI was created and owned by Strategies pursuant to a written contract with the RNC and a similar arrangement with the RSLC.

After her father's death, Stephanie Hofeller, sometimes referred to as Stephanie Lizon, removed the Storage Devices found in her parents' residence, and after examination of their contents, offered Plaintiffs redistricting maps helpful in this case. After bargaining for and receiving assurances from Plaintiffs they would not even look at files other than the North-Carolina-related redistricting files,[1] Ms. Hofeller procured a North Carolina attorney to accept service of the eDiscovery subpoena on her behalf.  After Plaintiffs told Ms. Hofeller the Storage Devices were critical to support the admissibility of the maps, Ms. Hofeller sent the Storage Devices to Plaintiffs. Although both Ms. Hofeller and Plaintiffs knew or should have known the true owners of the files after even a cursory review examination of those files, neither Mr. Oldham nor any client of Dr. Hofeller was given notice of or had a reasonable opportunity to lodge any objection to their production.

On July 12, 2019, this Court granted in part the Motion filed by Strategies to examine the ESI and assert its legal rights.  In compliance with the Court's Order, Strategies submits its itemization logs of files and specific documents that include the names of the "file, the nature of the file, and the basis of the claim of ownership or claim of right" (the "Logs").  The Logs will provide this Court with the means to review Strategies' claims of legal right and examine any documents contested by the Plaintiffs. The Logs are organized into two groups: Log 1 contains maps and Log 2 contains documents. Log 2 is organized to provide the court with document classifications of Strategies' legal claims, documents of a personal nature, and individual client documents of Dr. Hofeller and Mr. Oldham which would be adversely affected by the subpoena.

Unfortunately, the ESI contains comingled business and personal files. As a result, the extracted data provided to Strategies contains a large number of extraneous files and documents

---

[1] (See Line 1-15, Page 129, Stephanie Holler Deposition) quoted hereinafter.

that cost a substantial amount to review.  Documents containing highly personal and confidential information related to members of the Hofeller family was produced which have not been marked "Highly Confidential."  In deference to the Hofeller family and guided by the Protective Order's intent, Strategies logged "personal" files totaling 19,953 documents which reviewers coded as Personal and which should be marked as "Highly Confidential." All of these "personal" files would be irrelevant, incompetent, or immaterial to this or any other related litigation and have no nexus to the subpoena served on Ms. Hofeller or the bargain she struck with the Plaintiffs.

This Memorandum and the supporting Affidavits of Mr. Oldham and Amelia F. Blankenship set forth the factual predicate and legal basis upon which the itemized files and documents should merit designations as "Confidential" or "Highly Confidential" in the existing Consent Protective Order.  These filings also evidence the legal rights to confidentiality status to which Strategies is entitled, including attorney-client privilege, attorney work product immunity, and First Amendment privilege.

Strategies has complied fully with the Court's order.  This Memorandum, the Logs, and the affidavits, demonstrate Strategies' ownership of the vast majority of the ESI. The discovery tactics leading to the production of the confidential business data has caused irreparable harm to Strategies' reputation for secrecy and confidentiality. Moreover, Strategies' document-by-document review cost well over $100,000 and took many weeks to produce. To fully mitigate the harm caused to Strategies and its clients from the improper release of ESI, and to promote judicial economy, all of the Storage Devices and Data should be designated "Confidential" or "Highly Confidential," and the Plaintiffs should disclose any third party with whom they have shared the ESI and Strategies should be made a party to the Protective Order to enforce its terms.

## II.    Relevant Facts

### A.  Creation of the Data

For two decades, the RNC employed Dr. Hofeller, a renowned expert witness, to advise on the demographics of redistricting.  Similarly, the RNC retained Mr. Oldham, an experienced redistricting attorney, with respect to the litigation strategy.  Dr. Hofeller's work as an expert and Mr. Oldham's work as an attorney complemented one another.  In the 2001 redistricting cycle and thereafter, these men developed their own approach to recurring legal and demographic election law issues.  Mr. Oldham memorialized his legal advice in election law manuals, written every ten years, containing articles whose contents were restricted to lawyers representing the Republican party and affiliated organizations and individuals.  These manuals were provided under strict confidentiality restrictions and contained litigation strategy which was common to most redistricting cases.

In 2011, Dr. Hofeller and Mr. Oldham created Strategies to assist Republican Affiliated organizations in formulating redistricting litigation strategies across the country. Strategies' only direct clients were the RNC and the RSLC. For Strategies' advice, Dr. Hofeller and Mr. Oldham were obligated by contract to keep every client's work confidential.  Strategies' services included work in anticipation of litigation but did not include trial work.

Dr. Hofeller's expertise was demography.  During the 2011 redistricting cycle after Strategies was created, Dr. Hofeller acquired redistricting maps to glean insights into these proposals that could be useful to Strategies' clients.  The strategic legal services the RNC provided to its affiliates in the states which could not afford this expertise on their own, depended upon the demographic depictions contained in the maps.  Clients would email maps to Strategies for Mr. Oldham and Dr. Hofeller to perform an intense legal and demographic analysis.  Strategies would then provide an appropriate strategy meeting the needs of its clients.  This advice was needed by

Republican affiliates who could not otherwise obtain it when they were not in charge of the redistricting process in their states.

Dr. Hofeller developed his own unique, confidential and proprietary redistricting methods. Dr. Hofeller's expertise was unique among demographic expert witnesses. His examination of district maps included examination of Census and election data over numerous elections. Dr. Hofeller's expertise was enhanced with time and experience. Using this expertise, he would create election districts which would remain in full compliance with federal law until the next redistricting. This predictive quality of Dr. Hofeller's methodology was a contribution in the field of demography.

As a matter of practice, Dr. Hofeller, using public and confidential information, organized his research into a Strategies' data library to be available to its clients and Mr. Oldham. Dr. Hofeller kept files of data separated by states and Republican political entities which were serviced by Strategies. An index of Strategies files and the Storage Devices reflect his filing methodology is attached as Exhibit 2 to Mr. Oldham's Affidavit. Strategies' clients included Republican affiliates in the following states: Alabama, Alaska, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin, and Wyoming.

Dr. Hofeller's data library enhanced Strategies' ability to service to its clients and included a large number of map files. These maps are identifiable in the database by inclusion in one of several unique suffixes. The map files were excluded from review by virtue of their path file

extension.  Any additional review other than by file paths would be unnecessary, because they are all part of the data library which should not be assessible to Plaintiffs.

If a client wanted Dr. Hofeller to serve as an expert witness at trial separately, the client would retain Dr. Hofeller separately.  If a client wanted litigation counsel, it would separately retain Mr. Oldham.  There were four states and three counties contained in these materials where either Dr. Hofeller or Mr. Oldham were separately retained during the 2010 cycle: North Carolina, Virginia, Arizona, Missouri, Nueces County and Galveston County, Texas and Nassau County, New York. During the review Strategies has uncovered confidential communications made by these clients which are privileged or which are proprietary to those clients.  Since the privilege belongs to the client, Strategies notified the clients of this action and the possibility that confidential files may be exposed.  Mr. Oldham views this as his ethical duty to protect his and Dr. Hofeller's clients.  With the assistance of Consilio, Strategies has assembled the Log to distinguish between files that belong to Strategies, the RNC, the RSLC and private clients of Dr. Hofeller and Mr. Oldham.

### B.  Confidentiality of the Data

In light of frequent changes in both the law and demographics related to redistricting, experts must stay current in the field. Most, if not all, redistricting consultants pick a political side because even though they provide independent advice, political parties typically do not share confidential information with experts who have ever been opposite to them in litigation. Hence it is generally unlikely and, to a great degree, unwise for attorneys and consultants of one party to share information with attorneys and consultants who typically work for an opposing party. The RNC is not unique in employing consultants who possess expert knowledge and skills in the specialized field of redistricting. The Democratic National Committee ("DNC") and

6

related entities, such as the North Carolina Democratic Party ("NCDP"), employ their own consultants.

As a result, Strategies' clients require confidentiality both with respect to individual projects and strategic advice in general. Mr. Oldham, Dr. Hofeller, and Strategies all understood the need for secrecy, and Strategies had written engagement letters with the RNC and RSLC that confirmed the need for confidentiality.  A redacted copy of the RNC contract is attached as Exhibit 1 to Mr. Oldham's Affidavit.

The fact that redistricting tools and strategies are highly secret is not a new concept. Fights over discovery of the tools used by experts is the frequent subject of disputes *between parties* to redistricting litigation. Fights arising out of subpoenas to third party consultants is rare, if not unheard of. Capture of such highly confidential information by an interloper is unheard of especially coupled with disclosure to an opposing political party. Illustrative of a fight over redistricting tools, the Court needs to look no further that the instant case in which Plaintiffs resisted Defendants' Rule 34 document request because Defendants sought the "scoring" sheets Plaintiffs used to create alternative redistricting maps.

### C.  Transfer of the ESI to Plaintiffs

The circumstances by which Ms. Hofeller and later Plaintiffs came into possession of the Data has been documented extensively by the Legislative Defendants. Relevant for our purposes are the following facts.  Ms. Hofeller was aware that the Storage Devices contained highly sensitive information, including Strategies' proprietary and confidential information. She knew Mr. Oldham for many years and knew that he was the sole owner of Strategies and already had removed the business computers owned by Strategies. She made Plaintiffs aware the Storage Devices contained information that had nothing to do with this case.

Ms. Hofeller offered Plaintiffs only what she thought were a few redistricting files "that pertained to [her] father's work redistricting in North Carolina." Dep. 13:12-14. Once she realized she "was getting ready to potentially turn over Data that was personal to [her] as well," she "really wanted to find out what the intentions were. And it was explained to [her] that -- that this was quite clear -- it was quite clear that -- that anyone, either the -- legislative defendants or the plaintiffs, were only properly entitled to even look at the content of files that were explicitly and obviously related to this case." Dep. 116: 14-23. Ms. Hofeller also testified and confirmed the directive she gave to Plaintiffs' attorneys and the limitations on use of Data she understood would apply: "I wouldn't expect to see a lot of personal Data suddenly appearing in this matter because their understanding of the directive to them was that only files that were explicitly, obviously North Carolina redistricting during this period of time related would even be looked at, much less entered into evidence. That was their understanding at that time. . . . That's what they told me their understanding was." Dep. 129:3-15.

But rather than subpoenaing only that information, the subpoena stated as follows:

1. All documents of, created by, or held by Thomas Hofeller in your possession, custody, or control relating to or concerning the redistricting of the North Carolina State Senate and State House in 2011 or 2017, including but not limited to, all correspondence, reports, notes, memos, data, electronic files, maps, charts, and/or graphs *relating to or concerning the redistricting of the North Carolina State Senate and State House in 2011 or 2017*.

2. All documents, notes, or correspondence reflecting any instructions, criteria, or requests of members of the North Carolina General Assembly *regarding the redistricting of the North Carolina State Senate and State House in 2011 or 2017*.

3. All documents, notes, or correspondence containing, relating to, or evidencing the first version and each subsequent version of any "redistricting maps and/or proposed redistricting maps, or any parts thereof, prepared by. or consulted by Thomas Hofeller *for purposes of the redistricting of the North Carolina State Senate or State House in 2011 or 2017*, as well as any information (including

8

but not limited to ESI) evidencing the date on which such maps (or parts thereof) were created and/or modified.

4.  Any storage device in your possession, custody, or control that contains, or may contain: (1) any and all ESI requested in the preceding paragraphs; (2) and/or any ESI relating to any documents requested in the preceding paragraphs.

Attachment to February 13, 2019 Subpoena to Stephanie Lizon at 2 (emphasis added).  In other words, the subpoena expressly seeks devices that Plaintiffs knew contained information unrelated to this litigation.

The Defendants had no way of knowing that Ms. Hofeller had taken ESI backed up from Dr. Hofeller's business computers. No doubt, as far as they knew, the subpoena looked like a waste of time. Strategies, even if it had seen the subpoena, would also have had no way of knowing that Ms. Hofeller found comingled ESI on backup devices. Mr. Oldham took possession of the actual computers and the actual hard drives on those computers.

### D.  Strategies' Review of the Data

On July 17, 2019, following the Court's Order, Strategies was finally provided with access to the Data, minus the files designated "Highly Confidential" by Plaintiffs. The Data consisted of nearly a terabyte of information, including thousands of map files and over 100,000 standard document files (e.g., emails, PDFs, Word files, etc.). In order to review the files and log them consistent with the Court's Order, Strategies employed Consilio, a well-known national document vendor, to assist.

To determine which files and documents belonged to Strategies, Strategies conducted a two-phase review.  In the first phase, Strategies obtained a file-level index of the Data from Legislative Defendants and used that index to identify files where ownership was apparent from the file-level information.  This was possible because the index contained detailed information

about each file, including the file name, file type, and the source path of the file. The source path reveals the folder structure in which each file was saved. During this first phase, it was also possible to exclude a number of files that obviously did not belong to Strategies.

The majority of files identified as Strategies files during the first phase were map files. Map files have unique file extensions based on the specialized mapping software that creates them, so they can be easily identified on the index. In addition, because Dr. Hofeller saved his map files in a highly organized folder structure corresponding to the states in which he worked, the source path for the map files allowed Strategies to determine which state each map file belonged to. As explained in the Oldham affidavit and above, for most states, Dr. Hofeller's work in anticipation of litigation was done under the auspices of Strategies. But for a few particular and identifiable states, Dr. Hofeller worked in his individual capacity. (Oldham Aff. ¶ 14). Thus, by identifying the state corresponding to each map file, Strategies was able to identify the map files it created. The map files belonging to Strategies are listed on Log 1 submitted with this brief.

For the second phase of the review, the remaining non-map files were loaded into a document review platform (Relativity) and were individually reviewed by licensed attorneys to determine ownership. As discussed in the Consilio Affidavit, the files were triaged to eliminate files unlikely to be owned by Strategies or containing Dr. Hofeller's work as a demographic consultant. (Consilio Aff. ¶ 7). Outdated commercial emails, such as solicitations for frequent flyer programs or personal purchases of on-line products could be easily eliminated from review by reference to domain names, e.g. "Blockbuster.com." *Id*. Additional files were also not reviewed based upon similar file extensions, domain names or suffixes that were unlikely to be

confidential to Strategies. *Id.* When files were backed-up on multiple devices, duplicate files were isolated and only one file was reviewed. *Id.*

Log 2 submitted herewith itemizes each individual document owned by Strategies. For Log 2, 100,658 documents were reviewed by Consilio's team. Of those, 17,553 documents were identified as owned by Strategies. *Id.* at ¶ 15. 19,953 documents were identified as documents that were personal and confidential to the Hofeller family. *Id.* at ¶ 16. An additional 1,682 documents were identified as documents contained in the Data that appear to be documents given to Dr. Hofeller by the RNC and 91 were identified as documents given to him in confidence by the RSLC. *Id.* Consistent with this Court's July 15 Order, Log 2 has the same columns as Log 1, but it also includes additional columns that provide additional metadata.

All confidentiality designations in the Logs rely on a determination that the file or document contains confidential information as defined by the Consent Protective Order all of the documents owned by Strategies are subject to First Amendment privilege. Where appropriate, the logs also identify documents subject to attorney-client privilege or the work product doctrine. As to "personal" documents not owned by Strategies, they are listed because the reviewers observed files that contain highly personal and confidential family information. Strategies understood that no such files would be produced because they were excluded under the "highly confidential" designation that could be shown to Strategies. If any of these files are duplicates of documents in the so-called "Highly Confidential" files, they should at a minimum be reclassified.

### III.   Legal Argument.

**A.      Strategies Owns the Files and Documents Itemized on Logs 1 and 2 and
Contends They Should Be Kept Confidential Under the Protective Order.**

On July 12, 2019, this Court issued an Order giving Strategies access to the Data,
allowing it to determine which files contained in the Data belonged to Strategies.  The Court
further ordered Strategies to provide "an itemization of all files in which Geographic Strategies
claims ownership or other claim of right and contends ought to continue to be treated as
confidential."   The Court specified that the "itemization shall contain the name of the file, the
nature of the file, and the basis for the claim of ownership."

The work of Mr. Oldham and Dr. Hofeller in creating Strategies was an intellectual
endeavor.  From its inception, Strategies was created to provide confidential advice and counsel
to political organizations, of which the advice fundamentally supports First Amendment rights.
The RNC and the RSLC, like the DNC, contract and pay for legal and demographic experts to
provide the best possible advice and pay a premium to retain the best possible experts.

Mr. Oldham, now as sole owner of Strategies, and Strategies' clients have inalienable
entitlements to "the enjoyment of the fruits of [their] own labor" under Article I, Section 1 of the
North Carolina Constitution. Their political rights to free speech and association are also
protected under the First Amendment of the federal and state constitutions as well as state
statutes.   Work produced by Strategies subject to contracts with its clients included preparation
of manuals, training, legal consultation, demographic analysis, and communications with
political allies in writing, all of which resulted in the creation and maintenance of Strategies' data
library.  The content of the data library is the culmination of years of effort—*i.e.*, the "fruits" of
Strategies' "labor." Based on the files and maps themselves, Strategies is entitled to an
irrebuttable legal presumption of ownership of its property that was on the Storage Devices.

That work is also confidential.  All of Strategies' work was done on behalf of two clients, the RNC and the RSLC.  Strategies' contracts with its two clients required it to keep all work confidential.  Work done individually by Mr. Oldham and Dr. Hofeller was all done on behalf of the same two clients and their allies and maintained in Strategies' data library on Strategies' computers. The data library contains an amalgam of documents created by its owners over their many years working for the RNC and RSLC.  It includes files that contain public information selected and curated by Dr. Hofeller and Mr. Oldham, as well as non-public documents that were created using their unique knowledge and talents.  As such all information stored in the data library was confidential by contract and became part of Strategies' proprietary information which was available to assist Strategies' clients.

In addition, this Court's Protective Order itself recognizes "property rights" and further defines Confidential Information as "confidential, non-public trade secrets, competitively sensitive or proprietary information, research and analysis, development or commercial information, or other information for which a good faith claim of need of protection from disclosure can be made."  Protective Order ¶ 2. The documents and files are listed in Logs 1 and 2 plainly qualify as "confidential" under this definition.

In fact, many files contained in the Data also embody Strategies' "trade secrets" under North Carolina law. Under the North Carolina Trade Secrets Act, a trade secret is defined as follows:

> "Trade secret" means business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that: a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; and c. The Data has

13

> information that was independently derived, has actual or potential commercial value, and was not generally known.

N.C. Gen. Stat. § 66-152. Allowing disclosure of the documents on Logs 1 and 2 would potentially reveal Strategies' proprietary methods of analysis, which the company considers its trade secrets, because the documents represent the corpus of Strategies' work, including the library of maps it created over the years as well as manuals describing proprietary redistricting strategy. These confidential and proprietary methods give Strategies a competitive advantage over other firms providing redistricting expertise. Strategies took reasonable steps to maintain the secrecy of its information, which was only disclosed by the improper acts of Dr. Hofeller's estranged daughter, after Dr. Hofeller had passed away.

### B.    Many of the Documents Itemized on Logs 1 & 2 Also Implicate Various Privileges, Immunities, and Other Equities.

As explained above, the documents listed on Logs 1 & 2 "ought to continue to be treated as confidential," 7/12/2019 Order, and they meet the standard in the Protective Order for "Confidential" information. That alone is sufficient reason to preserve their designation as "Confidential" under the Protective Order. But in addition to being confidential and proprietary, a large number of these files are also protected against disclosure by other privileges, immunities, and equities, including work-product immunity, First Amendment privilege, and the attorney-client privilege. During the review of the Data, documents were identified that were subject to these privileges. Logs 1 and 2 indicate where the attorney-client privilege and work-product immunity applies, as appropriate. The First Amendment privilege applies to all RNC and RSLC documents on the Logs—the only clients of Strategies—and thus was not separately noted in the Logs. Because Geographic Strategies is asserting a First Amendment privilege over all such documents on behalf of its clients, it has not separately noted a claim of First Amendment privilege in the Logs.

14

### 1. First Amendment Privilege

The Constitution protects a party from discovery of documents that would infringe upon its First Amendment rights. The First and Fourteenth Amendments protect the "freedom to associate with others for the common advancement of political beliefs and ideas . . ." *Kusper v. Pontikes*, 414 U.S. 51, 56-57 (1973). Infringement of this right "may inevitably follow from varied forms of governmental action." *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 461 (1958). In particular, the Supreme Court has "repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) (citing *Gibson v. Florida Legislative Comm.*, 372 U.S. 539 (1963); *NAACP v. Button*, 371 U.S. 415 (1963); *Shelton v. Tucker*, 364 U.S. 479 (1960); *Bates v. Little Rock*, 361 U.S. 516 (1960); *NAACP*, 357 U.S. 449 (1958)).

Accordingly, "[a] party who objects to a discovery request as an infringement of the party's First Amendment rights is in essence asserting a First Amendment *privilege*." *Perry v. Schwarzenegger*, 591 F.3d 1126, 1140 (9th Cir. 2009) (citing, *inter alia*, *Black Panther Party v. Smith*, 661 F.2d 1243, 1264 (D.C. Cir. 1981)); *see also N. Carolina Right to Life, Inc. v. Leake*, No. 5:99-CV-798-BO(3), 2000 WL 36741022, at *3 (E.D.N.C. Sept. 11, 2000) (citation omitted) ("Although there are relatively few cases applying a First Amendment privilege to discovery disputes, it is settled that such a privilege exists." (internal quotations omitted)). And that privilege applies even where all litigants are private parties. *Perry*, 591 F.3d at 1140 (quoting *Grandbouche v. Clancy*, 825 F.2d 1463, 1466 (10th Cir. 1987)) ("This privilege applies to discovery orders 'even if all of the litigants are private entities.'").

Courts applying the privilege have typically utilized a two-part framework. First, the party asserting the privilege must make "a prima facie showing of arguable [F]irst [A]mendment infringement." Second, the party seeking the information must "demonstrate an interest in

obtaining the disclosures it seeks which is sufficient to justify the deterrent effect on the free exercise of the constitutionally protected right of association." *Perry*, 591 F.3d at 1140 (citation and quotation omitted). A party makes a prima facie showing of First Amendment infringement when it demonstrates that "enforcement of the discovery requests" will have a chilling effect on associational rights. *Id.* at 1140. A substantial number of documents within the Hofeller Files are privileged under this test.

First, a large portion of the Data constitutes either communications between Strategies and its clients, the RNC and RSLC, or are internal communications of the RNC. Production of those documents would necessarily chill the First Amendment rights of Strategies and its clients. Disclosure of a political party's internal communications and its private communications with outside vendors constitute a prima facie showing of First Amendment infringement. In *Democratic Nat'l Comm. v. Arizona Sec'y of State's Office* ("*DNC v. Arizona*"), the District of Arizona "had no trouble concluding that Plaintiffs" established the first prong of the First Amendment Privilege with respect to "documents [that] provide[d] a detailed account of [the Arizona Democratic Party]'s election monitoring activities, including the location of precincts that it was targeting, the types of issues that it found most concerning, and its strategies in responding to incidents reported, including legal strategies" and "communications with strategic partners regarding strategy and analysis of voter demographics and likely voting behavior." No. CV-16-01065-PHX-DLR, 2017 WL 3149914, at *2 (D. Ariz. July 25, 2017) (citations and internal quotations omitted). The court accepted the political party's argument that it "would suffer significant prejudice if [its] internal planning materials were disclosed to its political opponents" because, *inter alia*, it would reveal:

- "where and when it is likely to focus its activities in future elections;"

16

- "proprietary information about [the party]'s voter-tracking technology and information about [the party]'s use of modeling to locate and target democratic voters;"

- the party's "strategies and targets for conducting outreach to voters;" and

- "estimates of demographic characteristics and likely voting behavior of the electorate"

*Id.* (citation and quotation omitted).

Other courts have used this rationale to uphold similar claims of First Amendment privilege. *See, e.g., Perry*, 591 F.3d at 1141 (court had "little difficulty concluding that disclosure of internal campaign communications" can "have a deterrent effect on the exercise of protected activities" by inhibiting "the free flow of information within campaigns"); *The Ohio Org. Collaborative v. Husted*, No. 2:15-CV-01802, 2015 WL 7008530, at *3 (S.D. Ohio Nov. 12, 2015) ("To require the Democratic Party to make further substantive response to the challenged requests would require the disclosure of a wealth of financial, donor, membership, and strategic information – information that goes far beyond the issue of standing or even the merits of this action. The Court has no doubt that the compelled disclosure of such sensitive information in the context of highly charged litigation involving issues of great political controversy would have a chilling effect on plaintiffs' freedom of association by adversely impacting their ability to organize, promote their message(s), and conduct their affairs."); *see also DeGregory v. Attorney Gen. of State of N.H.*, 383 U.S. 825, 827 (1966) (invoking First Amendment to reverse contempt conviction where member of the Communist Party refused to divulge information regarding his past association with the party).

The RNC's and RSLC's files here are at the heart of the associational rights protected by the First Amendment. *Cf. Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989) (recognizing that the government may not "interfere with a [political] party's internal affairs," absent "a compelling state interest"). Just as in *DNC v. Arizona*, disclosure of these documents would reveal a major political party's internal, proprietary, and highly confidential

17

communications and strategy. Thus, like the *DNC v. Arizona* documents, disclosure would chill the RNC's and RSLC's associational rights by (1) "chill[ing] [strategic] partners from associating with the [RNC or RSLC] in the future;" (2) "requir[ing] [the RNC and RSLC] to change the way that [they] operate[] and communicate[] going forward" in response to this newly unearthed information; and (3) "inhibit[ing] the free exchange of ideas that is necessary for [the RNC and RSLC] to pursue [their] goals." *DNC*, 2017 WL 3149914, at *2.

Moreover, Plaintiffs have already indicated their agreement on this point. They argued that turning over analytics regarding voting data and related work product from the Democratic Party "would have a chilling effect on plaintiffs' freedom of association by adversely impacting their ability to organize, promote their message(s), and conduct their affairs." Plaintiff North Carolina Democratic Party's Opposition to Legislative Defendants' Motion to Compel Production of Documents from N.C. Democratic Party at 12 (internal quotations omitted) (quoting *Husted*, No. 2:15-CV-01802, 2015 WL 7008530, at *2).

Plaintiffs are right. And while this Court allowed *in camera* review of the documents at issue in Plaintiffs' motion, it did so, in part, because "Plaintiff NCDP . . . squarely placed its associational rights at issue in this litigation." Order on Legislative Defendants' Motion to Compel Production of Documents from Plaintiff North Carolina Democratic Party at 7. As explained further below, that is simply not the case with regard to Strategies' documents. And, more importantly, this Court held that, regardless of discoverability, that information was to "be designated by Plaintiff NCDP as 'HIGHLY CONFIDENTIAL/OUTSIDE ATTORNEYS EYES ONLY' pursuant to the parties' April 5, 2019, Consent Protective Order, prior to production." *Id.* at 10–11. Thus, the Court has already granted the precise relief requested by Strategies for

materially indistinguishable information owned by Plaintiffs. The Court should take the same approach here.

Second, Plaintiffs cannot make even a threadbare showing that disclosure is "carefully tailored to avoid unnecessary interference with protected activities . . ." *Perry*, 591 F.3d at 1141. The reason is simple: Plaintiffs do not need *any* of the Strategies' documents at issue here. Strategies stipulated—and this Court accepted—that it had "no claim of ownership, privilege or proprietary interest" for files that Plaintiffs initially announced that they intended to introduce at trial. *See* Order on Geographic Strategies LLC's Motion to Designate Hofeller Files as Highly Confidential and to Compel Production, at 5. And ultimately, Plaintiffs used only *four* documents produced by Ms. Hofeller at trial.

For the remaining terabytes of documents, disclosure is entirely unnecessary. Indeed, because this disclosure will have no "substantial bearing" on "the merits," the Plaintiffs cannot show *any* "justification for the deterrent effect on the free enjoyment of the right to associate which disclosure . . . is likely to have." *NAACP*, 357 U.S. at 464–66; *see also Husted*, 2015 WL 7008530, at \*4 (refusing to order discovery of information that was not "highly relevant to either the issue of standing or the merits of plaintiffs' claims" and that went "far beyond the reasonable needs of defendants"); *Perry*, 591 F.3d at 1141 (explaining that second prong of First Amendment privilege examines "the centrality of the information sought to the issues in the case").

### 2. Work Product Immunity

In addition to being confidential and proprietary, there are many files itemized in the Logs that reflect the attorney work product of Mr. Oldham. As an attorney, Mr. Oldham worked extensively with Dr. Hofeller both with regard to pending litigation and in preparation for

anticipated litigation.  The material they prepared for that purpose is protectable attorney work product.  *See Crosmun v. Trustees of Fayetteville Tech. Cmty. Coll.*, No. COA18-1054, 2019 WL 3558764, at *10 (N.C. Ct. App. Aug. 6, 2019) (Work-product immunity "protects materials prepared in anticipation of litigation from discovery.").

In particular, Mr. Oldham and Dr. Hofeller assembled documents comprising their combined knowledge and expertise in redistricting into a Library of information, comprising years of research, summaries and analysis of data, statistical evaluations, and an accumulation of highly honed redistricting maps.  This Library is protectable work product used by Strategies to advise its clients in anticipation of redistricting litigation.

In addition, Mr. Oldham memorialized legal analysis and advice in a series of manuals and articles for the RNC and affiliated organizations or individuals.  These manuals and articles are attorney work product made in anticipation of redistricting litigation and are among the documents included in the Data.

Finally, Dr. Hofeller testified as an expert in redistricting cases and Mr. Oldham served as counsel in other cases.  Though this work was done in their individual capacity, the vast majority of the documents concerning the work they did for these other private clients was maintained in Strategies' data Library on Strategies' computers and became part of its proprietary information.  These materials are also protected from disclosure under Rule 26(b)(4)(e) of the North Carolina Rules of Civil Procedure.

### 3.  Attorney-Client Privilege

Many of the documents itemized on Logs 1 and 2 are also protected by the attorney-client privilege.  As stated in *Friday Investments, LLC v. Bally Total Fitness of the Mid-Atl., Inc.*, 370 N.C. 235, 805 S.E.2d 664 (2017), "[f]or the attorney–client privilege to apply, the

communication must satisfy the five-factor *Murvin* test: (1) the relation of attorney and client existed at the time the communication was made, (2) the communication was made in confidence, (3) the communication relates to a matter about which the attorney is being professionally consulted, (4) the communication was made in the course of giving or seeking legal advice for a proper purpose although litigation need not be contemplated and (5) the client has not waived the privilege." *Id.* at 240, 805 S.E.2d at 669 (quoting *Murvin*, 304 N.C. at 531, 284 S.E.2d at 294).

Dr. Hofeller and Mr. Oldham were an expert and attorney team. The team's specialty was providing advice, counsel, and expert consulting services to clients, including the RNC and RSLC. The redistricting work Dr. Hofeller did for these clients was in connection with anticipated litigation or trial. Other work done between redistricting efforts was also performed pursuant to contract and was done with reasonable confidentiality restrictions.

In addition, Strategies' work for its clients, the RNC and RSLC, was performed at the direction of the Chief Counsel of those organizations. All engagements by the RNC and RSLC were understood by each of them and Strategies to be confidential.

Logically, communications between an attorney and client are confidential for matters upon which an attorney is consulted. *State v. Jennings*, 333 N.C. 579, 611, 430 S.E.2d 188, 204 (1993) ("A communication is covered by the attorney-client privilege if it has been made in the course of seeking or giving legal advice for a proper purpose.") Even if a presumption were not to apply, confidentiality of communications concerning redistricting matters was a bargained for term of Strategies' agreements with the RNC and RSLC included as a condition of the relationship. Seeking advice to ascertain the state of law of redistricting and advise the client how to comply with the law in this changing field is clearly for a legal purpose. The history of

litigation in North Carolina over the past decades demonstrates that it is reasonable for either political party client to foresee litigation possibilities each time a new census is released. As Mr. Oldham's Affidavit shows, no waiver of the privilege by client or counsel has been made. In addition, Dr. Hofeller's death does not change the ownership of the privilege under North Carolina law. *In Re. the Investigation of Death of Miller*, 357 N.C. 316, 358 N.C. 364 (2004).

### 4. The Procedure by Which Plaintiffs' Obtained and Reviewed Strategies' Privileged and Immune Documents Was Improper.

Until recently, there was no binding precedent or caselaw in North Carolina that discussed the proper protocol with regard to examining ESI on another party's computers. On August 6, 2019, the North Carolina Court of Appeals decided *Crosmun et al. v. The Trustees of Fayetteville Technical Community College*, No. COA18-1054, 2019 WL 3558764, at *10. *Crosmun* arose out of an employment case in which the plaintiffs sought as a sanction, for the failure of defendants to produce documents, that defendants' computers be reviewed by an independent forensic expert. The plaintiffs convinced the trial court to allow unexpurgated access to the defendants' computers with the right to "claw back" any privileged or otherwise confidential information after the expert finished the examination of all the ESI on the computers.

The *Crosmun* court reversed the trial court holding that the defendants were entitled to screen their computer hard drives before any review by anyone, including an independent forensic expert. A protective order, even with a claw-back provision, is inadequate to protect the right to confidentiality related to attorney-client privilege, work product immunity and other rights to confidentiality.

The facts in the instant case differ from *Crosmun* but the rights implicated are even more compelling. In *Crosmun*, the affected parties, the defendants, knew what was on the storage

devices in question because they had possession of the computers. Defendants resisted discovery and plaintiffs pursued discovery before the court. Here, by contrast, Plaintiffs were handed the "gift" of a few documents for use at the trial and pursued unfiltered eDiscovery to obtain ESI totally unrelated to the instant case.

The court in *Crosmun* went on to discuss the protocol that the trial court had approved in the following terms: "The Protocol Order tasks [the forensic expert] with creating the Search Images, which contain *all* of FTCC's data, by mirror imaging FTCC's systems. The order provides for him to take those Search Images to his own office and conduct a forensic examination of those images pursuant to the protocol over the course of three weeks. A comparable protocol for a paper production would allow Plaintiffs' expert to photocopy all of Defendants' documents (including those in their in-house counsel's file cabinets), take those copies off-site, and then review those files for responsive documents, both privileged and non-privileged, without Defendants having had an opportunity to conduct their own review of those copies first. *Such a process would violate Defendants' attorney-client privilege as a disclosure to the opposing party.*" *Id.* at *12 (emphasis added).

In reversing the trial court, the court in *Crosmun* stated, "In short, the Protocol Order provides Plaintiffs' agent direct access to privileged information, which disclosure immediately violates Defendants' privileges. It furthers that violation by directing that agent, having attempted to screen some privileged documents out through the use of search terms, to produce potentially responsive documents without providing Defendants an opportunity to examine them for privilege. If, following that continued violation, Plaintiffs—their agent notwithstanding — receive privileged documents, *Defendants must attempt to clawback that information, reducing their privilege to a post-disclosure attempt at unringing the eDiscovery bell. Such compelled*

*disclosure of privileged information is contrary to our law concerning both attorney-client privilege and work-product immunity.*" *Id.* at *14 (emphasis added).

The *Crosmun* case itself may have been issued only recently but the principles upon which it is based are not new. The law regarding attorney-client privilege, work product immunity and trade secrets is well developed. Plaintiffs should have been aware of Strategies' interests in the Data (as evidenced by their subpoena to Strategies seeking the same documents subpoenaed from Ms. Hofeller). But in any event, as soon as Plaintiffs saw the first privileged document or secret proprietary information, they should have marked all such documents Confidential, and they should not be continuing to resist that marking today.

### C. Strategies' Review of the Data Has Demonstrated that Plaintiffs' Discovery Tactics Have Placed an Undue Burden on Strategies and the Court and that the Entirety of the Hofeller Files Should Be Designated "Confidential."

Out of the hundreds of thousands of files produced by Ms. Hofeller in response to Plaintiffs overbroad subpoena, Plaintiffs used exactly four of the documents at trial in this case. That is unsurprising—most of the documents produced by Ms. Hofeller have nothing to do with North Carolina, let alone the state's 2017 redistricting. Nevertheless, Strategies has had to pay over $100,000 to process and review the Hofeller Files—in addition to its attorneys' fees—to protect its proprietary interests and privileges.

Plaintiffs have never offered any reason as to why they needed access to this vast quantity of documents having nothing to do with the redistricting at issue in this case. Instead, they have cited cases suggesting that the "potential use of the fruits of discovery in other litigation is not, alone, a basis for a protective order." Pls' Opp. to Strategies' Mot. for Protective Order at 17-18 (quoting *Ohio Valley Envtl. Coal. v. Elk Run Coal Co.*, 291 F.R.D. 114, 122 (S.D. W. Va. 2013)). Strategies does not dispute that information properly obtained for

use in a case may, in some circumstances, be used in other cases, but that is not what happened here.

Rather, Plaintiffs sought discovery of, and obtained, every "storage device in [Ms. Hofeller's] possession, custody, or control" containing information concerning the North Carolina redistricting.  Plaintiffs had already requested the relevant documents in Ms. Hofeller's possession concerning the North Carolina redistricting, so there can be no serious question that the Storage Devices were requested to obtain additional documents that could be used in other cases. *See* Mot. for Direction at 3-4 ("Plaintiffs' counsel recently realized that several of the files were also relevant to another pending lawsuit in which Plaintiffs' same counsel from Arnold & Porter are representing different plaintiffs" and unilaterally "disclosed this evidence.").

This was improper.  It is an abuse of the discovery process to seek discovery in one case for use in another. *See Elm Energy & Recycling (U.K.) Ltd. v. Basic*, No. 96 C 1220, 1996 WL 596456, at *7 (N.D. Ill. Oct. 9, 1996) ("Although the federal rules allow for broad discovery, they do not sanction the use of discovery in one case as a sham for conducting discovery solely for a different case or to circumvent limitations on discovery in a different action."); *State of California, v Burlington Coat Factory*, No. RG04162075, 2005 WL 5302634 (Cal. Super. Mar. 22, 2005) (Restraining litigant from "using confidential information obtained in one case for the purpose of unrelated cases"); *Fawcett v. I.R.S.*, No. 10-60111-CIV, 2010 WL 1855961, at *1 (S.D. Fla. May 6, 2010) ("No law has been cited that a party in one case can conduct discovery for use in another case.").

It was also improper to seek the Storage Devices themselves, rather than seek only the relevant documents on the Storage Devices.  As the Court of Appeals recently recognized in *Crosmun*, allowing access to storage devices gives a third party "direct access to privileged

information, which disclosure immediately violates [attorney-client and work product] privileges

. . . without providing Defendants an opportunity to examine them for privilege." *Crosmun*,

2019 WL 3558764, at \*14. *Crosmun* cites favorably a number of cases holding that direct access

to devices is not permissible absent a factual finding of non-compliance with discovery rules and

a protocol to ensure that only relevant materials are reviewed. In fact, the Ninth Circuit has held

that an overbroad subpoena, similar to the subpoena at issue here, violated federal privacy law.

*See Theofel v. Farey Jones*, 341 F.3d 978 (9th Cir. 2003), *opinion amended and superseded on

denial of reh'g*, 359 F.3d 1066 (9th Cir. 2004).[2]

Moreover, Plaintiffs' insistence on retaining and using the irrelevant material produced

by Ms. Hofeller is contrary to their explicit representations to her that the review and use of any

documents she produced would be limited to documents relevant to the North Carolina

redistricting:

> Ms. Hofeller: -- I wouldn't expect to see a lot of personal data
> suddenly appearing in this matter because their understanding of the
> directive to them was that *only files that were explicitly, obviously
> North Carolina redistricting during this period of time related
> would even be looked at, much less introduced into evidence*. That
> was their understanding at the time.
>
> Q: And when you say that was their understanding -- Ms. Hofeller:
> That's what [Plaintiffs' counsel] told me their understanding was.

---

[2] "Under the Federal Rules, Kwasny was supposed to 'take reasonable steps to avoid imposing undue burden or expense' on NetGate. Fed.R.Civ.P. 45(c)(1). One might have thought, then, that the subpoena would request only e-mail related to the subject matter of the litigation, or maybe messages sent during some relevant time period, or at the very least those sent to or from employees in some way connected to the litigation. But Kwasny ordered production of '[a]ll copies of emails sent or received by anyone' at ICA, with no limitation as to time or scope." *Theofel*, 341 F.3d at 981.

Dep. 129:3-13 (emphasis added).   As it turns out, in addition to Strategies' confidential and privileged files, the Hofeller Files contain a substantial number of highly sensitive, personal documents and photographs of Ms. Hofeller that should have never been produced.

In light of Plaintiffs' abuse of the discovery process, as well as their complete failure to articulate why they need, let alone are entitled to, the terabytes of files irrelevant to this case, the Court could avoid the further waste of its own time and resources, as well as that of the parties, by simply designating the entirety of the Data "Confidential" such that they will be destroyed under the Consent Protective Order when this case concludes.   As the Logs submitted by Strategies demonstrate, the vast majority of files belong to Strategies, and most of the remaining documents are either personal files or the property of the individual clients of Dr. Hofeller and/or Mr. Oldham. There is simply no reason why Plaintiffs should benefit from their abusive tactics and be permitted to retain any of these personal, proprietary, and privileged documents from the Data besides those used at trial.   And this Court should not waste any more of its resources adjudicating this dispute of Plaintiffs' making.

## IV.   Conclusion

For the foregoing reasons, the Court should permanently designate all of the Data "Confidential," or at the very least, designate the materials itemized in Logs 1 and 2.   The Court should further Order the materials Strategies designated as privileged and/or work product to be immediately clawed back from the parties' possession, and anyone to whom they may have disseminated those materials.   Finally, the Court should admit Strategies as a party to the Protective Order so that it can enforce its terms to protect its Confidential information.

Dated: August 30, 2019.

Robert Neal Hunter, Jr.
NC State Bar No. 5679
HIGGINS BENJAMIN, PLLC
301 N Elm Street, Suite 800
Greensboro, North Carolina 27401
Email:  rnhunterjr@greensborolaw.com
Telephone:     (336) 273-1600
Facsimile:     (336) 274-4650

Kenneth J. Gumbiner
NC State Bar No. 12825
HIGGINS BENJAMIN, PLLC
301 N. Elm Street, Suite 800
Greensboro, North Carolina 27401
Email:  kgumbiner@greensborolaw.com
Telephone:     (336) 273-1600
Facsimile:     (336) 274-4650

*Attorneys for Geographic Strategies, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing upon all parties to this matter by

emailing counsel as per the Case Management Order as follows:

Edwin M. Speas, Jr.
Caroline P. Mackie
Poyner Spruill LLP
301 Fayetteville Street, Suite 1900
Raleigh, NC 27601
espeas@poynerspruill.com
cmackie@poynerspruill.com
*Counsel for Common Cause, the North Carolina Democratic Party, and the Individual Plaintiffs*

R. Stanton Jones
David P. Gersch
Elisabeth S. Theodore
Daniel F. Jacobson
Arnold and Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001-3743
stanton.jones@arnoldporter.com
david.gersch@arnoldporter.com
elisabeth.theodore@arnoldporter.com
daniel.jacobson@arnoldporter.com
Counsel for Common Cause and the Individual Plaintiffs

Marc E. Elias
Aria C. Branch
Abba Khanna
Perkins Coie LLP
700 13th Street, N.W.
Washington, D.C. 20005-3960
MElias@perkinscoie.com
ABranch@perkinscoie.com
AKhanna@perkinscoie.com
*Counsel for Common Cause and the Individual Plaintiffs*

Amar Majmundar
Stephanie A. Brennan
Paul M. Cox
NC Department of Justice
P.O. Box 629
114 W. Edenton St.
Raleigh, NC 27602

29

amajmundar@ncdoj.gov
sbrennan@ncdoj.gov
pcox@ncdoj.gov
*Counsel for the State Board of Elections and Ethics Enforcement and its members*

John E. Branch III
Andrew D. Brown
Nathaniel J. Pencook
H. Denton Worrell
Shanahan Law Group, PLLC
128 E. Hargett St., Suite 300
Raleigh, NC 27601
jbranch@shanahanlawgroup.com
abrown@shanahanlawgroup.com
dworrell@shanahanlawgroup.com
npencook@shanahanlawgroup.com
*Counsel for the Defendant-Intervenors*

Thomas A. Farr
Phillip J. Strach
Michael Mcknight
Alyssa Riggins
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
4208 Six Forks Rd., Suite 1100
Raleigh, NC 27609
Thomas.farr@ogletree.com
Phillip.strach@ogletree.com
Michael.mcknight@ogletree.com
Alyssa.riggins@ogletree.com
*Counsel for Legislative Defendants*

E. Mark Braden
Richard B. Raile
Trevor M. Stanley
Elizabeth Scully
Katherine McKnight
Baker & Hostetler, LLP
1050 Connecticut Ave., N.W., Suite 1100
Washington, D.C. 20036-5403
rraile@bakerlaw.com
mbraden@bakerlaw.com
tstanley@bakerlaw.com
escully@bakerlaw.com
kmcknight@bakerlaw.com
*Counsel for the Legislative Defendants*

30

Dated: August 30, 2019.

Robert Neal Hunter, Jr.
NC State Bar No. 5679
HIGGINS BENJAMIN, PLLC
301 N Elm Street, Suite 800
Greensboro, North Carolina 27401
Email: rnhunterjr@greensborolaw.com
Telephone:    (336) 273-1600
Facsimile:     (336) 274-4650

Kenneth J. Gumbiner
NC State Bar No. 12825
HIGGINS BENJAMIN, PLLC
301 N. Elm Street, Suite 800
Greensboro, North Carolina 27401
Email: kgumbiner@greensborolaw.com
Telephone:    (336) 273-1600
Facsimile:     (336) 274-4650

*Attorneys for Geographic Strategies, LLC*