UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LA UNIÓN DEL PUEBLO ENTERO, *et al.*,

                              Plaintiffs,

       v.

WILBUR L. ROSS, sued in his official
capacity as U.S. Secretary of Commerce, *et al.*,

                              Defendants.

No. 8:19-cv-02710-PX

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................. 1

LEGAL STANDARD............................................................................................. 3

ARGUMENT ........................................................................................................ 3

I.   Plaintiffs Have Standing to Bring this Action ................................................ 3

    A.   Plaintiffs Plausibly Allege Injury in Fact ...................................... 5

    B.   Plaintiffs' Harms are Traceable to Defendants' Actions and Redressable by a
Favorable Decision from this Court ................................................ 7

    C.   Organizational Plaintiffs Have Standing to Sue on Behalf of their Members .............. 10

II.  Plaintiffs' Claims are Ripe .......................................................................... 12

III. Defendants' Decision to Create and Provide Redistricting Citizenship Data Is Reviewable
Under The APA ....................................................................................... 15

    A.   Defendants' Decision to Create and Provide Citizenship Data for Redistricting Is Not
A Managerial Action and is Thus Reviewable ................................ 15

    B.   Defendants' Decision to Create and Provide Citizenship Data for Redistricting Is
Reviewable Agency Action ............................................................ 16

        1.   Defendants' Actions are Discrete and Circumscribed .......................... 16

        2.   Defendants' Actions Determine Plaintiffs' Rights and Obligations ...................... 17

IV. Plaintiffs Have Stated an Equal Protection Claim ................................ 22

    A.   Plaintiffs Plausibly Allege Intentional Discrimination ................................. 22

        1.   Historical Background of the Decision ................................. 23

        2.   Specific Sequence of Events ................................. 26

i

3. Departures from the Normal Procedural Sequence ............................................. 28

4. Substantive Departures ........................................................................ 29

5. Contemporaneous Statements ............................................................. 30

6. Disparate Impact ............................................................................... 32

   i. Disparate Impact is Not a Necessary Element of an Equal Protection Claim.. 33

B. Defendants' Other Arguments Are Unavailing ............................................ 33

V. Plaintiffs Have Stated a Cause of Action under 42 U.S.C. § 1985(3) ................................... 35

A. Injunctive Relief is Available as a Remedy for § 1985(3) Violations ........................... 36

B. Sovereign Immunity Does not Bar Plaintiffs' § 1985(3) claim. ................................ 37

C. Plaintiffs' Allegations Support a Claim Under 42 U.S.C. § 1985(3) .......................... 38

D. The Intracorporate-Conspiracy Doctrine Does Not Apply in this Case ...................... 40

**Cases**

*Action v. Gannon*,
450 F.2d 1227 (8th Cir. 1971) .................................................................. 37

*Affiliated Professional Home Health Care Agency v. Shalala*,
164 F.3d 282 (5th Cir. 1999) ................................................................... 37

*Am. Chemistry Council v. Dep't of Trans.*,
468 F.3d 810 (2006) ............................................................................. 11

*Am. Acad. of Pediatrics v. Food & Drug Admin.*,
379 F. Supp. 3d 461 (D. Md. 2019) ................................................... 19, 20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................... 3

*Attias v. Carefirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017) ................................................................. 4

*Bd. of Trustees of Univ. of Alabama v. Garrett*,
531 U.S. 356 (2001) ............................................................................. 34

*Bell v. City of Roanoke Sheriff's Office*,
2009 WL 5083459 (W.D. Va. Dec. 23, 2009) ........................................ 41

*Bennett v. Spear*,
520 U.S. 154 (1997) .......................................................................... 8, 19

*Bernal v. Fainter*,
467 U.S. 216 (1984) ............................................................................. 34

*Block v. Meese*,
793 F.2d 1303 (D.C. Cir. 1986) ............................................................... 8

*Bostic v. Schaefer*,
760 F.3d 352 (4th Cir. 2014) ................................................................. 11

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ............................................................................. 36

*Burns v. Richardson*,
384 U.S. 73 (1966) ................................................................................ 9

*Buschi v. Kirven,*
  775 F.2d 1240 (4th Cir. 1985) ................................................................ 41

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ............................................................................... 36

*Carey v. Klutznick,*
  637 F.2d 834 (2d Cir. 1980) ..................................................................... 5

*CASA de Maryland, Inc. v. Trump,*
  355 F. Supp. 3d 307 (D. Md. 2018) ......................................................... 23

*Cent. Delta Water Agency v. United States,*
  306 F.3d 938 (9th Cir. 2002) ..................................................................... 7

*Chafin v. Chafin,*
  568 U.S. 165 (2013) ................................................................................... 9

*Chai v. Caroll,*
  48 F.3d 1331 (4th Cir. 1995) ................................................................... 16

*Chamber of Commerce of the U.S. v. Reich,*
  74 F.3d 1322 (D.C. Cir. 1996) ................................................................ 21

*City of Carmel-by-the-Sea v. U.S. Dep't. of Transp.,*
  123 F.3d 1142 (9th Cir. 1997) ................................................................ 17

*City of New York v. Dep't of Def.,*
  913 F.3d 423 (4th Cir. 2013) ............................................................ 17, 19

*Davis v. Dep't of Justice,*
  204 F.3d 723 (7th Cir. 2000) ................................................................... 37

*Dep't of Commerce v. House of Representatives,*
  525 U.S. 316 (1999) ..................................................................... 5, 7, 14, 15

*Dep't of Commerce v. New York,*
  139 S. Ct. 2551 (2019) .......................................................... 1, 8, 25, 26

*Doe v. Virginia Dep't of State Police,*
  713 F.3d 745 (4th Cir. 2013) ................................................................... 12

*Duke Power Co. v. Carolina Envtl. Study Group, Inc.,*
  438 U.S. 59 (1978) ................................................................................... 10

*E. Bay Sanctuary Covenant v. Trump*,
909 F.3d 1219 (9th Cir. 2018)........................................................ 16, 17

*Evenwel v. Abbott*,
136 S. Ct. 1120 (2016) ................................................... 5, 9, 10, 24

*F.T.C. v. Dean Foods Co.*,
384 U.S. 597 (1966) ..................................................................... 36

*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*,
313 F.3d 852 (4th Cir. 2002)......................................................... 19

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ................................................................ 18, 21

*Frozen Food Express v. U.S.*,
351 U.S. 40 (1956) .................................................................. 17, 18

*Glavin v. Clinton*,
19 F. Supp. 2d 543 (1998)........................................................ 14, 15

*Golden & Zimmerman v. Domenech*,
599 F.3d 426 (4th Cir. 2010)......................................................... 20

*Gooden v. Howard Cnty.*,
954 F.2d 960 (4th Cir. 1992).......................................................... 39

*Graham v. Richardson*,
403 U.S. 365 (1971) ..................................................................... 34

*Hinkle v. City of Clarksburg, West Virginia*,
81 F.3d 416 (1996) ....................................................................... 40

*Hodgin v. Jefferson*,
446 F. Supp. 804 (D. Md. 1978) .................................................... 41

*Hunt v. Washington State of Apple Advertising Com'n*,
432 U.S. 333 (1977) ................................................................. 10, 11

*Hunter v. Underwood*,
471 U.S. 222 (1985) ..................................................................... 27

*Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*,
829 F.3d 613 (4th Cir. 2018).......................................................... 31

*Int'l Refugee Assistance Project v. Trump*,
    373 F. Supp. 3d 650 (D. Md. 2019) ................................................................ 16, 17

*Invention Submission Corp. v. Rogan*,
    357 F.3d 452 (4th Cir. 2004) ...................................................................... 19, 20

*Jean v. Nelson*,
    711 F.2d 1455 (11th Cir. 1983) ................................................................... 27, 28

*Jersey Heights Neighborhood Association v. Glendening*,
    174 F.3d 180 (4th Cir. 1999) ............................................................................ 20

*Johnston v. Lamone*,
    401 F. Supp. 3d 598 (D. Md. 2019) .............................................................. 12, 13

*Kravitz v. Dep't of Commerce*,
    382 F. Supp. 3d 393 (D. Md. 2019) ................................................................... 25

*Kronberg v. LaRouche*,
    2010 WL 1443898 (E.D. Va. Apr. 9, 2010) ...................................................... 40

*La Unión del Pueblo Entero v. Ross*,
    353 F. Supp. 3d 381 (D. Md. 2018) ............................................................ Passim

*La Unión del Pueblo Entero v. Ross*,
    771 F. App'x. 323 (4th Cir. 2019) .................................................................... 25

*Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*
    713 F.3d 187 (4th Cir. 2013) ........................................................................ 8, 13

*Larson v. Domestic Foreign Com. Corp.*,
    337 U.S. 682 (1949) ........................................................................................ 37

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................... Passim

*Mayor and City Council of Baltimore v. Trump*,
    2019 WL 4598011 (D. Md. Sept. 20, 2019) ............................................. 9, 13, 20

*Miller v. Brown*,
    462 F.3d 312 (4th Cir. 2006) ............................................................................ 14

*Mizell v. N. Broward Hospital Dist.*,
    427 F.2d 468 (5th Cir. 1970) ............................................................................ 37

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
   538 U.S. 803 (2003) ........................................................................ 13

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
   591 F.3d 250 (4th Cir. 2009) ......................................................... 35

*North Carolina State Conference of NAACP v. McCrory*,
   831 F.3d 204 (4th Cir. 2016) ................................................... Passim

*Nyquist v. Mauclet*,
   432 U.S. 1 (1977) .......................................................................... 34

*Orbital ATK, Inc. v. Walker*,
   2017 WL 2982010 (E.D. Va. July 12, 2017) ................................. 16

*Plata v. Schwarzenegger*,
   603 F.3d 1088 (9th Cir. 2010) ....................................................... 36

*Public Citizen v. U.S. Trade Representative*,
   5 F.3d 549 (D.C. Cir. 1993) .......................................................... 21

*Public Serv. Comm'n of Utah v. Wycoff Co., Inc.*,
   344 U.S. 237 (1952) ...................................................................... 14

*Reeves v. Sanderson Plumbing Prod., Inc.*,
   530 U.S. 133 (2000) ...................................................................... 25

*Simmons v. Poe*,
   47 F.3d 1370 (4th Cir. 1995) ................................................... 38, 39

*Smith v. Town of Clarkton, N.C.*,
   682 F.2d 1055 (4th Cir. 1982) ....................................................... 30

*South Carolina v. United States*,
   912 F.3d 720 (4th Cir. 2019) ......................................................... 12

*Sterk v. Redbox Automated Retail, LLC*,
   672 F.3d 535 (7th Cir. 2012) ......................................................... 36

*Susan B. Anthony List. v. Driehaus*,
   573 U.S. 149 (2014) ........................................................................ 5

*Traux v. Raisch*,
   239 U.S. 33 (1915) ........................................................................ 34

*Trustguard Ins. Co. v. Collins*,
    942 F.3d 195 (2019) .................................................................... 12

*Unimex, Inc. v. Dep't of Hous. and Urban Dev.*,
    594 F.2d 1060 (5th Cir. 1979) ..................................................... 37

*United States v. Testan*,
    424 U.S. 392 (1976) .................................................................... 37

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
    545 U.S. 464 (1982) .................................................................... 11

*Veasey v. Abbot*,
    830 F.3d, 216 (5th Cir. 2016) ...................................................... 29

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ..............................................................Passim

*Vill. of Bald Head Island v. U.S. Army Corps of Engineers*,
    714 F.3d 186 (4th Cir. 2013) ....................................................... 19

*Washington v. Davis*,
    426 U.S. 229 (1976) ............................................................. 32, 33

*Wikimedia Found. v. Nat'l Sec. Agency*,
    857 F.3d 193 (4th Cir. 2017) ......................................................... 3

*Wright v. North Carolina*,
    787 F.3d 256 (4th Cir. 2015) ..................................................... 3, 41

*Zhang v. Slattery*,
    55 F.3d 732 (2d Cir. 1995) .......................................................... 17

*Ziglar v. Abassi*,
    137 S. Ct. 1843 (2017) .............................................. 37, 38, 40, 41

**Statutes**

5 U.S.C. § 702 .............................................................................. 37
5 U.S.C. § 704 .............................................................................. 36
13 U.S.C. § 141(f) ......................................................................... 28
42 U.S.C. § 1985(3) ...............................................................Passim

# INTRODUCTION

Since 2017, Defendants have sought to diminish the political representation of Latinos, non-U.S. citizens, and other minority groups by manipulating the Census Bureau's information collection and reporting processes. First, Defendants sought to accomplish their discriminatory purpose by adding a question to the 2020 decennial census ("2020 Census") questionnaire that would have collected citizenship information from every individual in the United States. After this plan was blocked by various courts, including this Court and the Supreme Court, Defendants proceeded to plan b: create and provide to states a census redistricting dataset that purports to show citizenship for every person in the United States. The sole purpose of the redistricting citizenship dataset is to enable states to subtract purported non-U.S. citizens from the population used to draw new political boundaries, thereby drastically reducing the political strength and representation of Latinos and others.

Defendants' attempt to create a person-by-person redistricting citizenship dataset is a direct response to being thwarted in their effort to ask a citizenship question of all people responding to the 2020 Census. The attempt to add a citizenship question to the 2020 Census was accompanied by a "contrived" claim of enforcing the federal Voting Rights Act ("VRA"). *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019). By contrast, Executive Order 13880 ("EO 13880"), and Secretary Ross's directive, state their discriminatory goal overtly—create a redistricting citizenship dataset so that "State and local legislative districts [can redistrict] based on the population of voter-eligible citizens."[1]

---

[1] ECF No. 41, First Amended Complaint ("FAC") ¶ 60 (quoting *Executive Order on Collecting Information about Citizenship Status in Connection with the Decennial Census* at § 1 (July 11, 2019), *available at* https://www.whitehouse.gov/presidential-actions/executive-order-collecting-information-citizenship-status-connection-decennial-census/).

Defendants' actions are nothing more than an attempt to perpetuate a scheme already halted once by the courts, and the First Amended Complaint more than adequately pleads a case and controversy. Plaintiffs challenge Defendants' attempt to use administrative records to create a redistricting citizenship dataset that is specific to every person in the country, and then share that information with the states for the purpose of redistricting—an effort that is neither routine nor a natural development of prior agency practices.

This effort to use administrative records to compile a person-by-person redistricting citizenship dataset is not decades in the making as claimed by Defendants. It is new and radical. Its goal is to equip, and invite, states to exclude certain immigrant populations when drawing political lines, thereby conducting "redistricting [that] would be advantageous to Republicans and Non-Hispanic Whites." Plaintiffs First Amended Complaint ("FAC") ¶ 81. In the words of one expert who urged the acquisition of citizenship data for redistricting, it would be a "radical departure" from prior redistricting practice. *Id.*

Defendants mischaracterize the First Amended Complaint as simply challenging the "routine" collection of administrative records, ECF. No. 60-1, Memorandum of Law in Support of Defendants Motion to Dismiss ("MTD") at 3, or "the use of administrative records to gather citizenship data," MTD at 8, before claiming that their actions are too innocuous to be challenged, *see* MTD at 21 (claiming Defendants are "merely tabulat[ing] citizenship data."). Defendants' failure to engage with Plaintiffs' claims, which are much different from Defendants' straw men, dooms the Motion to Dismiss.

Plaintiffs' First Amended Complaint more than adequately alleges that Plaintiffs have standing and the lawsuit is ripe, because Defendants' actions will harm Latinos and non-U.S. citizens, and that harm is the part of the chain of causation created by Defendants. Further,

Plaintiffs successfully pleaded Administrative Procedure Act ("APA") and race discrimination claims. The decision to create a redistricting citizenship dataset and provide that data to states for use in redistricting is a final agency action, and this final agency action purposefully discriminates against Latinos and non-citizens. Finally, Plaintiffs adequately pleaded a 42 U.S.C. § 1985(3) claim that is not barred under the doctrine of sovereign immunity, and empowers Plaintiffs to seek injunctive relief.

## LEGAL STANDARD

A complaint is sufficient when it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). A plaintiff must allege facts sufficient to "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. General factual allegations suffice to satisfy Rule 12(b)(1), and courts must "presume that the general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citation and alternations omitted). When considering a motion to dismiss, courts must view the plaintiffs' allegations through a "forgiving lens," accepting the facts alleged as true and construing the pleadings in a light most favorable to the party opposing the motion. *Wright v. North Carolina*, 787 F.3d 256, 265 (4th Cir. 2015).

## ARGUMENT

### I.  Plaintiffs Have Standing to Bring this Action

Plaintiffs' First Amended Complaint adequately pleaded their standing with allegations showing: "(1) injury in fact; (2) a sufficient causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision." *See Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 207 (4th Cir. 2017) (citing *Lujan*, 504 U.S. at 560). "[P]laintiffs are required only to state a plausible claim that each of the

standing elements is present" in order to defeat a motion to dismiss for lack of standing, *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625 (D.C. Cir. 2017), and courts must "presume[e] that general allegations embrace those specific facts that are necessary to support the claim," *Lujan*, 504 U.S. at 561 (1992) (alternations original).

Defendants argue that Plaintiffs have not plausibly alleged facts supporting their standing but fail to engage with Plaintiffs' specific allegations. *See generally* MTD at 10-23. In particular, Plaintiffs allege that:

- For discriminatory reasons, Defendants made the decision to use administrative records to create and provide to states a citizenship dataset for use in redistricting. *See, e.g.*, Plaintiffs' "FAC" ¶ 112. As a result of Defendants' decision, Plaintiffs will lose political representation because: 1) the use of Citizen Voting Age Population ("CVAP") by states and localities for apportionment will result in vote dilution, FAC ¶¶ 86-87, and 2) the Census Bureau's ("Bureau") citizenship dataset will contain inaccuracies that will misclassify, and therefore undercount, naturalized U.S. citizens, *see* FAC ¶¶ 66-72, which will further cause vote dilution where states and localities use CVAP as a population base, *see* FAC ¶¶ 86-87.

- Defendants made the decision to create and provide a redistricting citizenship dataset to states so that this data will be used for redistricting. *See, e.g.*, FAC ¶ 65. Defendants plan to release their redistricting citizenship dataset to states with the dataset that the Census Bureau provides to states for redistricting. FAC ¶ 91. Plaintiffs live in jurisdictions that have expressed an interest in redistricting using CVAP as a population base for apportionment. FAC ¶¶ 61, 87. Defendants plan to create and provide a redistricting citizenship dataset to states, and these jurisdictions will use the dataset for its intended purpose: to redistrict using CVAP as a population base. *See id.*

- Plaintiffs' harms will be redressed if the Court enjoins Defendants from creating the redistricting citizenship dataset. If the Bureau does not create and provide the redistricting citizenship dataset, states will continue their established practice of using the Census Bureau's traditional redistricting dataset to redistrict. *See* FAC ¶¶ 36-38, 53.

As discussed in more detail below, Plaintiffs' allegations are more than sufficient to establish standing at the pleading stage.

### A. Plaintiffs Plausibly Allege Injury in Fact

Plaintiffs have adequately alleged "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. Plaintiffs have further alleged facts showing that "the threatened injury is certainly impending, [and] there is a substantial risk that the harm will occur." *Susan B. Anthony List. v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted).

Plaintiffs allege that they face a concrete injury from the exclusion of non-U.S. citizens from redistricting in their jurisdictions as a result of Defendants' decision to create and provide to states a redistricting citizenship database. FAC ¶ 87. Plaintiffs allege that because Plaintiffs and members of Plaintiffs La Unión del Pueblo Entero ("LUPE") and Promise Arizona ("PAZ") (collectively, "Organizational Plaintiffs") live in jurisdictions with higher populations of immigrants, the exclusion from apportionment of non-U.S. citizens (and naturalized U.S. citizens improperly classified as non-U.S. citizens) will result in a loss of political representation. FAC ¶¶ 66-71, 85-87. In particular, excluding non-U.S. citizens and misclassified naturalized U.S. citizens will result in Plaintiffs' districts being overpopulated and result in fewer districts in which Plaintiffs and their members have the opportunity to elect their preferred candidates. FAC ¶¶ 86-87.

Plaintiffs possess standing in census cases where, as here, they face an expected loss of representation; this injury "undoubtedly satisfies the injury-in-fact requirement of Article III standing." *Dep't of Commerce v. House of Representatives*, 525 U.S. 316, 331-32 (1999); *see also Evenwel v. Abbott*, 136 S. Ct. 1120, 1125 (2016) (adjudicating claim "that basing apportionment on total population dilutes [plaintiffs'] votes in relation to voters in other Senate districts"); *Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) (holding that vote dilution is a "concrete harm" sufficient to confer standing). Here, Plaintiffs have alleged that vote dilution

and the loss of representation is imminent, concrete and particularized. *Lujan*, 504 U.S. at 560.

Thus, assuming all facts in the First Amended Complaint to be true, Plaintiffs have plausibly

alleged that they will lose representation as a result of Defendants' decision to create and provide

a redistricting citizenship dataset to states.

Defendants erroneously argue that Plaintiffs' allegations are speculative, and that vote

dilution as a result of redistricting based on CVAP is not a cognizable legal injury.  MTD at 15-

21.  First, ignoring years of Supreme Court jurisprudence, Defendants argue that Plaintiffs'

injuries do not satisfy standing requirements because a series of "speculative events" must first

occur before Plaintiffs suffer injury.  MTD at 15-18.  But the series of "speculative events"

Defendants point to are not speculative at all.  For example, notwithstanding the fact that

Defendants have already committed to create and provide a redistricting citizenship dataset to

states, Defendants argue that maybe they won't, after all, follow through with their commitment

if they are unable collect a requisite amount of administrative records, ensure the quality of the

data, and come up with a methodology to create and provide the data.  MTD at 16-18.  However,

nothing in either EO 13880 or Sectary Ross's directive indicates that Defendants will not create

and provide states with a redistricting citizenship dataset if the citizenship data is spotty or

unreliable according to Census Bureau standards.  *See* FAC ¶ 58-61, 65.  Defendants have

already ignored evidence that administrative records will not yield accurate citizenship data.

FAC ¶¶ 66-72.  Contrary to Defendants' assertion, Secretary Ross's directive, as reflected in the

July 3 Office Management and Budget ("OMB") request ("July 3 OMB Request"), is

unequivocal, FAC ¶ 65, and EO 13880 orders federal agencies to do everything in their power to

facilitate the collection of this data, FAC ¶¶ 58-61.

"It would be inequitable in the extreme" to permit Defendants "to create a significantly increased risk of harm to [Plaintiffs], and then avoid [Plaintiffs] from trying to prevent the potential harm because the party that created the risk promises that it will ensure that the harm is avoided." *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir. 2002). Ultimately, Defendants' claims that the dataset they have already decided to create and give states may ultimately be incomplete and inaccurate at most provides factual support for Plaintiffs' allegations regarding vote dilution resulting from inaccuracies in the Bureau's dataset and support for their APA and equal protection claims.

Furthermore, as in other cases challenging the conduct of the decennial census, it is "certainly not necessary" for the Court to wait until the Bureau creates and provides a redistricting citizenship dataset to states "to consider the issues presented here, because such a pause [from judicial action] would result in extreme—possibly irremediable—hardship." *Dep't of Commerce*, 525 U.S. at 332.

Finally, Defendants improperly collapse a standing argument into a merits argument, conflating the question of whether Plaintiffs plausibly alleged an injury with the question of whether redistricting using CVAP as a population base is unconstitutional. MTD at 19-20. As explained above, Plaintiffs' allegations regarding their vote dilution injuries more than satisfy the pleading standard under Rule 12; Defendants can try to justify their actions under the Constitution at the merits stage of the case.

### B. Plaintiffs' Harms are Traceable to Defendants' Actions and Redressable by a Favorable Decision from this Court

Plaintiffs sufficiently alleged that their alleged injuries are fairly traceable to the challenged conduct of the Defendants. *See Lujan*, 504 U.S. at 560. Defendants' argument regarding traceability and redressability rests entirely on the erroneous premise that lawsuits are

precluded where injury depends at least in part on the actions of third parties. MTD at 11-15. But Defendants wrongly "equate[ ] injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step of the chain of causation." *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC (Lansdowne)*, 713 F.3d 187, 196-97 (4th Cir. 2013) (finding traceability where challenged action was not the last in the series of injurious acts). Even where standing "depends on the unfettered choices made by independent actors not before the court," plaintiffs can "adduce facts showing that those choices . . . will be made in such a manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562 (internal quotations and citations omitted).

Traceability exists where, for example, "third parties will likely react in predictable ways to the" challenged conduct. *See Dep't of Commerce*, 139 S. Ct. at 2566; *Block v. Meese*, 793 F.2d 1303, 1307, 1309 (D.C. Cir. 1986) (Scalia, J.) (holding plaintiff had standing to challenge classification of film as "political propaganda" based on anticipated, albeit irrational, public reaction to the classification).

Here, Plaintiffs have satisfied the "relatively modest" burden of alleging traceability and redressability at the pleading stage. *See Bennett v. Spear*, 520 U.S. 154, 171 (1997). Plaintiffs allege that the sole purpose of Defendants' decision to create and provide a redistricting citizenship dataset to states is so that they will use these data in redistricting. *See, e.g.*, FAC ¶ 65 (quoting July 3 OMB Request noting that Secretary Ross "directed the Census Bureau to . . . produce [CVAP] information prior to April 1, 2021 that states may use in redistricting."); *see also Lansdowne*, 713 F.3d at 196-97 (rejecting argument that plaintiffs' injury was not traceable to defendant cable provider's exclusivity agreements because it was up to third party providers to refuse to provide service to plaintiffs, and instead finding traceability because the "whole

purpose" of the exclusivity agreements was for third party providers to decline service); *Mayor and City Council of Baltimore v. Trump*, No. ELH-19-3636, 2019 WL 4598011, at *17 (D. Md. Sept. 20, 2019) (where plaintiff's injuries rested on third party immigrants declining to use public benefits, finding traceability because challenged provision was designed to discourage immigrants from using public benefits).

Plaintiffs allege that, in the absence of the Bureau's redistricting citizenship dataset, jurisdictions have redistricted using total population in the "overwhelming majority of cases." FAC ¶ 53 (quoting *Evenwel*, 136 S. Ct. at 1124).[2]  Plaintiffs further allege (and Defendants admit) that, given the tools by Defendants, jurisdictions in which Plaintiffs reside will redistrict using CVAP data as a population base, and Plaintiffs will suffer vote dilution as a result.  FAC ¶ 87; MTD at 12 n.8 (noting Texas argued in favor of excluding non-U.S. citizens from redistricting in 2015).  Plaintiffs thus plausibly allege that states and local jurisdictions in which they reside will make a choice "in such a manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562 (citation omitted).

Defendants also make disingenuous arguments that jurisdictions attempting to use CVAP to redistrict might not use the Bureau's redistricting citizenship dataset, but instead would turn to voter registration data or Census sample data currently available from the American Community Survey ("ACS").  MTD at 12-13.[3]  However, jurisdictions currently redistrict using total

---

[2] A rare exception is *Burns v. Richardson*, 384 U.S. 73, 94 (1966), in which the Supreme Court upheld redistricting that was not based on total population.  However, *Burns* is limited to its facts which showed that Hawaii acted to correct population distortions created by a large number of *non-residents*, including military personnel and tourists largely concentrated in Oahu.  *Id.*

[3] Defendants' citation to *Chafin v. Chafin*, 568 U.S. 165, 172 (2013), in support of their argument that Plaintiffs' claims are not redressable because they purportedly rely on hypothetical facts is inapposite.  As discussed in Section II below, the instant case is ripe for review, and Plaintiffs' lawsuit challenging Defendants' *decision* to create and provide a citizenship dataset to states does not rest on hypothetical, future facts, but on a directive that has already been issued.

population tabulations prepared by the Bureau in the Redistricting Data File,[4] not Census datasets on voter registration or sample data, although both have existed for decades.  FAC ¶¶ 36-40, 42.  *See also* FAC ¶ 54 (quoting *Evenwel*, 136 S. Ct. at 11240); FAC ¶¶ 52-53, 81 (although ACS data was available, Dr. Thomas Hofeller, a redistricting expert for the Republican Party, opined that a citizenship question was necessary to generate CVAP data for use in redistricting).  Plaintiffs need not "negate the kind of speculative and hypothetical possibilities suggested in order to demonstrate" traceability and the likely effectiveness of judicial relief.  *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 78 (1978).

Plaintiffs have plausibly alleged that the sole purpose of Defendants' decision to create and provide a redistricting citizenship dataset to states is for states *to use that dataset* in redistricting.  The Court should reject Defendants' attempts to disclaim the very result they seek to achieve.

### C.  Organizational Plaintiffs Have Standing to Sue on Behalf of their Members

Organizational Plaintiffs have more than adequately pleaded that they have standing because "(a) [their] members would otherwise have standing to sue in their own right; (b) the interests [they seek] to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Washington State of Apple Advertising Com'n*, 432 U.S. 333, 343 (1977).

Organizational Plaintiffs pleaded that:  (1) at least one of their respective members would otherwise have standing to sue in their own right, FAC ¶¶ 7, 9-10, 85, 87 and (2) the interests LUPE and PAZ seek to protect are germane to their purpose, FAC ¶¶ 6, 8.  The First Amended

---

[4] "A [Redistricting] dataset is the assembled result of one data collection operation (for example, the 2010 Census) as a whole or in major subsets (2010 Census Summary File 1)."  *Redistricting Data Datasets*, United States Census Bureau, (2017) *available at* https://www.census.gov/programs-surveys/decennial-census/data/datasets/rdo.html.

Complaint demonstrates on its face that neither the claims asserted, nor the relief requested, requires the participation of the individual members in this lawsuit. *Hunt*, 432 U.S. at 343.

Defendants do not dispute that Organizational Plaintiffs adequately alleged the last two *Hunt* requirements, but instead argue that because Plaintiffs did not name a PAZ member with standing, Plaintiffs have failed to meet first *Hunt* requirement. MTD at 21-22. Even if Defendants were correct that Plaintiffs must name a member with standing (they are not), Plaintiffs identify Juanita Valdez-Cox as a LUPE member who has standing, and the case may proceed if at least one plaintiff has standing to sue. *Bostic v. Schaefer*, 760 F.3d 352, 370-71 (4th Cir. 2014).

Defendants cite to no Fourth Circuit case that stands for the proposition that organizational plaintiffs must name a member with standing at the pleading stage. *See* MTD at 21. Instead, an organization need only "allege facts sufficient to establish that one or more of its members has suffered, or is threatened with, an injury." *LUPE*, 353 F. Supp. 3d at 391 n.6 (rejecting defendants' argument that an organizational plaintiff must identify a particular member by name at pleading stage) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 545 U.S. 464, 487 n.23 (1982)).

None of the cases on which Defendants rely support their position. In *Valley Forge Christian College*, for example, the Court granted summary judgment in favor of defendants on standing grounds where plaintiffs alleged only that the Constitution had been violated and failed "to identify any personal injury suffered by them as a consequence of the alleged constitutional error." 454 U.S. at 485-87. The Court did not enter summary judgment based on a failure by plaintiffs to name a particular member who was harmed. Similarly, *American Chemistry Council v. Department of Transportation*, does not stand for the proposition that Organizational

Plaintiffs must name a member with standing at the pleading stage. 468 F.3d 810 (2006). Instead, the Court noted that despite having had at least two opportunities to show standing for one of their members during the administrative appeal stage, plaintiffs had not shown that anyone had suffered an injury-in-fact. *Id*. at 819.

## II.     Plaintiffs' Claims are Ripe

In support of their argument that Plaintiffs' claims are unripe, Defendants again misstate Plaintiffs' allegations. MTD at 22-23. Plaintiffs challenge Defendants' decision to create and provide a redistricting citizenship dataset to states, *see, e.g.*, FAC ¶¶ 96, 103, 108, 112, 115, not, as Defendants disingenuously claim, redistricting based on CVAP. MTD at 22. All of Defendants' arguments regarding ripeness rest on this mischaracterization, and many of the cases they cite in support of their arguments are inapposite because the cases involved challenges to decisions or events that had not yet occurred.[5] In this case, Plaintiffs plausibly allege that Defendants have already made their decision and are implementing that decision in order to create and release a redistricting citizenship dataset for use in the 2021 redistricting cycle. FAC ¶¶ 1, 58, 62, 65.

---

[5] *See, e.g.*, *Trustguard Ins. Co. v. Collins*, 942 F.3d 195, 200 (2019) (holding claim unripe where plaintiff requested a declaratory judgment that it did not have to indemnify insured should court in another proceeding find the insured liable for car accident); *South Carolina v. United States*, 912 F.3d 720, 726-27, 728-31 (4th Cir. 2019) (holding claims unripe where state alleged it would become a permanent repository of nuclear waste but this was uncertain because defendants planned to remove waste and were statutorily required to remove waste by 2021); *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 751, 758-59 (4th Cir. 2013) (holding claim unripe where plaintiff, a registered sex offender, sought to challenge a law that excluded her from school premises unless she petitioned a state court or school board, but plaintiff had not yet filed a petition); *Johnston v. Lamone*, 401 F. Supp. 3d 598 (D. Md. 2019) (holding claims unripe where political party alleged state standards for verifying petition signatures were needlessly stringent in violation of First and Fourteenth Amendment, but political party had not yet collected signatures or submitted them to state, and plaintiff included no allegations regarding how state standards would result in needless invalidations).

Plaintiffs allege that the case is ripe because: 1) the issues are fit for judicial decision, and 2) Plaintiffs would suffer great hardship if the Court withheld consideration of Plaintiffs' claims. *See Mayor and City Council of Baltimore*, 2019 WL 4598011, at *20 (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)) (laying out standard for ripeness). A case is fit for decision "when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Lansdowne*, 713 F.3d at 198. "The hardship prong is measured by the immediacy of the threat and burden imposed on the plaintiff." *Id.* (internal quotation marks and brackets omitted). Plaintiffs meet both prongs to establish ripeness.

Plaintiffs' APA claims—that Defendants' decision is contrary to law, arbitrary and capricious, in excess of authority, and without observance to proper procedure—challenge actions already taken by Defendants and present purely legal questions. *Compare Mayor and City Council of Baltimore*, 2019 WL 4598011, at *199 (holding APA review of amendments to policy was a purely legal question); *with Johnston v. Lamone*, 401 F. Supp. 3d 598 (D. Md. 2019) (holding claims unripe where political party alleged state standards for verifying petition signatures were needlessly stringent in violation of First and Fourteenth Amendment, but additional facts regarding standards were necessary to identify the legal question). Similarly, Plaintiffs' equal protection claim challenges the decision already made by Defendants to create and provide a redistricting citizenship dataset to states. *See, e.g.*, *Mayor and City Council of Baltimore*, 2019 WL 4598011, at *199 (holding plaintiff's equal protection claim based on prior statements by President Donald J. Trump was ripe for review).

Plaintiffs also meet the hardship prong. Here, as in other cases where plaintiffs challenge decisions made before the census and before census data is produced, courts routinely hold that

"it is certainly not necessary . . . to wait until the census [has taken place] to consider the issues presented." *Dep't of Commerce*, 525 U.S. at 332 (allowing case to go forward where challenged statistical adjustments would not take place until after the census); *Glavin v. Clinton*, 19 F. Supp. 2d 543, 547 (1998) (same). Here, Plaintiffs challenge Defendants' discriminatory decision to compile a "census . . . of how many citizens, non-citizens, and illegal aliens are in the United States" FAC ¶ 62 (quoting President Trump), and although the Bureau will not provide the redistricting citizenship dataset to states until 2021, it is not necessary for the Court to wait until the dataset has been created and provided to states for the Court to review Defendants' final discriminatory decision. *See Glavin*, 19 F. Supp. 2d at 547 ("Given the finality of the Department's decision to utilize statistical sampling as a means to determine the population for purposes of congressional apportionment in the 2020 Census, it is clear that ripeness concerns have no application in the instant case."); *Public Serv. Comm'n of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 244 (1952) (challenged action ripe for review where it has "taken on a fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them).

Defendants' reliance on *Miller v. Brown*, 462 F.3d 312 (4th Cir. 2006) is misplaced. MTD at 22-23. *Miller* involved a challenge to an election law that required open primaries, and identified one way to show a case is ripe for review: where plaintiffs would be "compelled to act under threat of enforcement of the challenged law." 462 F.3d at 316, 319. But, as demonstrated above, *Miller* and other cases cited by Defendants in which the challenged decision obligates or prohibits action are by no means the only ripe cases. For example, the decision to use statistical sampling during the 2000 Census challenged in *Department of Commerce* and *Glavin* did not

force plaintiffs to act. Nonetheless, both of these cases were ripe for review. *Dep't of Commerce*, 525 U.S. at 332; *Glavin*, 19 F. Supp. 2d at 547.

## III. Defendants' Decision to Create and Provide Redistricting Citizenship Data Is Reviewable Under The APA

Defendants contend that Plaintiffs' APA claims are not reviewable agency action, arguing that: (1) the executive order was a managerial tool, and (2) Plaintiffs do not challenge a cognizable agency action. *See* MTD at 34-41. Defendants are wrong on both fronts. Plaintiffs have adequately alleged that Defendants' decision to create and provide to states citizenship data with the Redistricting Data File is agency action that is reviewable under the APA. *See* FAC ¶¶ 88-109.

### A. Defendants' Decision to Create and Provide Citizenship Data for Redistricting Is Not A Managerial Action and is Thus Reviewable

To avoid APA review, Defendants attempt to characterize Plaintiffs' APA claims as merely challenging EO 13880. *See* MTD at 34. But as Plaintiffs allege consistently throughout the First Amended Complaint, the APA claims are not focused on EO 13880, but challenge Defendants' decision to create and provide citizenship data for states to use in redistricting as evidenced by the July OMB Request. *See, e.g.*, FAC ¶¶ 1-4, 88-109.[6] One day after President Trump issued EO 13880, the Bureau released the OMB request stating that the Secretary "directed the Census Bureau to . . . produce [CVAP] information prior to April 1, 2021 that states may use in redistricting." *Id.* at ¶ 65 (quoting July 3 OMB Request). Plaintiffs challenge Defendants' decision, made in connection with EO 13880, to create and provide states with

---

[6] Subsequent statements by Defendants, such as the official Bureau policy presented by Dr. John Abowd, Chief Scientist and Associate Director for Research and Methodology at the Bureau, on September 6, 2019, further demonstrate that a final agency action has been taken and that Defendants are executing their plan as set forth in the decision. *See* John Abowd, Census Bureau Citizenship Data Research and Product Development, Census Bureau, Sept. 6, 2019, http://www.copafs.org/UserFiles/file/2019%20Documents/2019-09-06-Abowd-COPAFS%20(Approved).pdf.

redistricting citizenship data. *See e.g.*, *E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1246-47 (9th Cir. 2018) (holding that an agency rule that incorporated a presidential proclamation constituted an "operative rule of decision for asylum eligibility" that courts may review under the APA); *see also, Int'l Refugee Assistance Project v. Trump (IRAP)*, 373 F. Supp. 3d 650, 663 (D. Md. 2019) ("declin[ing] to find that APA review of the implementation of the Proclamation is foreclosed because the agency action was taken in response to presidential action."). Accordingly, Plaintiffs' challenge to Defendants' decision—made in connection with a presidential directive—is reviewable under the APA.

Defendants' reliance on *Chai v. Caroll*, 48 F.3d 1331 (4th Cir. 1995), and *Orbital ATK, Inc. v. Walker*, No. 1:17-cv-163(LMB/IDD), 2017 WL 2982010 (E.D. Va. July 12, 2017), is unavailing, as these cases concern whether third parties can compel executive agencies to comply with presidential orders. In *Chai,* the Fourth Circuit held that an asylum seeker could not sue to require an agency to follow an executive order or previously-withdrawn interim rules. *Chai*, 48 F.3d at 1339. Similarly, in *Orbital ATK*, the court held that a presidential policy directive (akin to an executive order) did not have the force of law against which to measure agency action. 2017 WL 2982010, at *9.

## B. Defendants' Decision to Create and Provide Citizenship Data for Redistricting Is Reviewable Agency Action

Defendants further contend that "Plaintiffs do not challenge an 'agency action.'" MTD at 35. On the contrary, the challenged action in this case is both "circumscribed and discrete" and it "determines rights and obligations." MTD at 35 (internal citation and quotation omitted).

### 1. Defendants' Actions are Discrete and Circumscribed

An agency action that is "discrete" is reviewable under the APA. "Accordingly, courts that have conducted APA review of agency actions implementing a presidential directive are

typically presented with a discrete agency rule or decision to review." *IRAP*, 373 F.Supp.3d at 665 (citation omitted). *See also East Bay Sanctuary Covenant,* 909 F.3d at 1246-47 (finding that an interim final rule, incorporating a presidential proclamation issued on the same day as the interim final rule, created an "operative rule of decision for asylum eligibility" that is reviewable under the APA)*; City of Carmel-by-the-Sea v. U.S. Dep't. of Transp.*, 123 F.3d 1142, 1166 (9th Cir. 1997) (reviewing whether the Federal Highway Administration's findings in a final environmental impact statement/report complied with two separate executive orders and were thus lawful under the APA); *Zhang v. Slattery,* 55 F.3d 732, 743-45, 748-49 (2d Cir. 1995) (reviewing whether a rule issued in connection with an executive order requiring the attorney general to overrule a previous Board of Immigration Appeals decision was lawfully promulgated under the APA)*.*

Indeed, "[c]ourts are well-suited to reviewing specific agency decisions[.]" *City of New York v. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2013). Here, Plaintiffs allege that Defendants' discrete decision to create, and provide citizenship data for use along with the Redistricting Data File violates the APA, and Defendants do not dispute the discrete nature of that agency action. *See* MTD at 34-41.

## 2. Defendants' Actions Determine Plaintiffs' Rights and Obligations

Plaintiffs' allegations "demonstrate that the challenged act had an immediate and practical impact or altered the legal regime in which it operates." *City of New York*, 913 F.3d at 431 (internal citations omitted); *see also Frozen Food Express v. U.S.*, 351 U.S. 40, 44 (1956) (finding that a commission's order that categorized certain commodities as nonexempt from the agricultural exception had an "immediate and practical impact" on carriers transporting the commodities). Defendants argue that EO 13880 "has no impact whatsoever on private parties,

let alone an 'immediate and practical' one." MTD at 36. Defendants again mischaracterize Plaintiffs' claims as merely challenging EO 13880. Plaintiffs allege that Defendants' decision to create and provide a redistricting citizenship dataset in accordance with EO 13880 will harm Plaintiffs by reducing their political representation and violating their right to equal protection under the law. *See* FAC ¶¶ 73-87. Moreover, this injury is imminent, as the Bureau already confirmed in the July 3 OMB Request that it is carrying out the Secretary's directive. *Supra* Part I (A); *see City of New York*, 913 F.3d at 43; *Frozen Food Express*, 351 U.S. at 40, 44.

Here, the rights of Plaintiffs are impaired by the vote dilution and reduction in Plaintiffs' political representation that flow from the challenged agency action. *See* FAC ¶¶ 85-87, 96. Plaintiffs further will be injured by the unreliable and faulty citizenship data created and provided by Defendants for use in redistricting. FAC at ¶¶ 3, 7, 9, 10-14, 67-72, 81, 85-87. This discrimination certainly "directly affect[s] the parties," *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992); *see also Frozen Food Express,* 351 U.S. at 44 (finding an agency action reviewable when that action had "immediate and practical impact" on the plaintiff, as well as other similarly-situated entities).[7]

Defendants further err in arguing that Plaintiffs' APA claim fails because EO 13880 does not alter the "legal regime in which it operates." *See* MTD at 37 (relying on *City of New York*, 913 F.3d at 431).[8] First, Plaintiffs have alleged an "immediate and practical impact" and thus are not required to show that the decision also altered the "legal regime in which it operated." *City of*

---

[7] Having established that Defendants' actions affect Plaintiffs' rights, Plaintiffs need not demonstrate that an agency action must "obligate private parties to do [some]thing" to be reviewable under the APA. *See* Defs.' Mot. at 36-37.

[8] Because Defendants mischaracterize Plaintiffs' APA claims as only challenging EO 13880, Defendants' argument that EO 13880 does not "dictate how the Census Bureau must use the administrative records once they are collected," MTD at 37-38, is irrelevant. Defendants' decision, as outlined in the July 3 OMB Request, directs the Bureau to collect, create, and provide the citizenship data file to states for use in redistricting. *See* FAC ¶ 65.

*New York*, 913 F.3d at 431; *Bennett*, 520 U.S. at 178. ("[T]he action must be one by which 'rights or obligations have been determined,' *or* from which 'legal consequences will flow[.]'") (emphasis added). Second, *City of New York* did not address whether there were alterations in the "legal regime." 520 U.S. at 432-34 (finding instead that the municipalities' requested relief that the court "supervise an agency's compliance with the broad statutory mandate" was not a challenge to a discrete agency action, and that the challenged action did not determine rights and obligations).[9] Third, Defendants' decision to create and provide citizenship data for the purpose of redistricting, as alleged, changes the legal regime related to redistricting and political representation.

Defendants are also wrong in suggesting that civil or criminal liability must follow for an agency action to alter the legal regime in which it operates. MTD at 28-29 (relying on *Bennett*, 520 U.S. at 154 and *Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 841 (4th Cir. 2002)).[10] Agency actions that do not trigger civil or criminal penalties are reviewable

---

[9] Defendants' reliance on *Vill. of Bald Head Island v. U.S. Army Corps of Engineers*, 714 F.3d 186 (4th Cir. 2013) to support their contention that Defendants' decision does not determine rights and obligations is misplaced. In *Bald Head Island*, the plaintiff challenged the implementation of an ongoing project to deposit sand on a beach. *Id*. at 193-94. The court found that the Corps had already taken a final agency action when it announced formal approval of the project, and any subsequent "project implementation" was not reviewable under the APA. *Id*. at 195. That is not the case here, where Plaintiffs challenge Defendants' decision to create and provide a redistricting citizenship data file for states to use in redistricting.

[10] Defendants' reliance on cases in which agency action has no direct effect on the plaintiff are misplaced. *Flue-Cured* "is readily distinguished . . . because when the Fourth Circuit 'first look[ed] for direction to the Radon Act,' it noted that 'section 404 of the Radon Act prohibits the EPA (and the courts) from giving the Report 'any regulatory' effect.'" *Am. Acad. of Pediatrics v. Food & Drug Admin.*, 379 F. Supp. 3d 461, 488 (D. Md. 2019) (citing *Flue-Cured*, 313 F.3d at 858-59). *Flue-Cured* turned on this statutory language, but Defendants point to no equivalent statutory provision that prohibits the challenged action from having a regulatory effect—likely because they cannot do so. Similarly, in *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 459 (4th Cir. 2004), the Patent and Trademark Office's advertisement campaign warning the public of promotional scams that did not directly affect the plaintiff, also did not mention the plaintiff or target the plaintiff in any way. *Id*. at 460. It was the actions of a journalist who read

under the APA. *See, e.g.*, *Mayor & City Council of Balt.*, No. ELH-18-3636, 2019 WL 4598011 at *27-28 (revisions to the Foreign Affairs Manual's criteria for determining "public charge" for purposes of an immigrant visa application were reviewable agency action because legal consequences flowed from the challenged action). Moreover, discrimination determines rights and renders agency action reviewable under the APA. *See Jersey Heights Neighborhood Association v. Glendening*, 174 F.3d 180, 186 (4th Cir. 1999) (noting that a demonstration of discrimination alone is a sufficient enough injury to be considered an action determining rights).

Defendants' reliance on *Golden & Zimmerman v. Domenech*, 599 F.3d 426, 432-33 (4th Cir. 2010) is also incorrect. In that case, the court held agency action was not reviewable because the challenged Reference Guide restated an established interpretation of the Gun Control Act and simply served to inform licensees about compliance with the Gun Control Act and implementing regulations. *Id.* Here, Defendants' decision does not merely "inform" agencies, stakeholders, and individuals, but directs the preparation and distribution to states of a new redistricting citizenship dataset and determines the rights of Latinos and non-U.S. citizens. Defendants' decision is more akin to the FDA Guidance in *American Academy of Pediatrics v. FDA*, 379 F. Supp. 3d 461, 490 (D. Md. 2019), that removed a regularity requirement for new products to undergo premarket review and "immediately brought a number of new tobacco

---

the report, and linked the plaintiff to the report, that had a deleterious effect on the plaintiff. *See Id.* at 459-60 ("[B]y looking at the campaign material, the public would see only that a consumer complained about an invention promoter and that invention promotion scams are causing the public $200 million in losses every year. Surely Invention Submission would not suggest that the attribution in the advertisements of $200 million in losses to patent scams was in any respect focusing the public's eye on it."). The journalist's conduct was too attenuated to be connected to the agency action. *Id.* Here, however, Defendants' decision itself harms plaintiffs by discriminating against them. Moreover, the effects are hardly the "independent" actions of third parties, but instead, actions both concerted and traceable to illegal conduct of Defendants. *See Supra* Sec. I (discussing traceability of the injury).

products into compliance." The court held that the FDA Guidance was a final agency action that directly affected the parties and was therefore subject to judicial review. *Id.*[11]

Furthermore, Defendants' reliance on *Franklin* to argue that "the mere gathering of administrative records parallel to the census cannot constitute 'final agency action,'" MTD at 38, is inapposite. Although both *Franklin* and the instant case concern the census, the similarities end there. In *Franklin*, the Supreme Court held that the Secretary's report to the President was unreviewable because "the final action complained of is that of the President, and the President is not an agency within the meaning of the Act." 505 U.S. at 796-97. Thus, *Franklin* is limited to "those cases in which the President has final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties." *Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (quoting *Public Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993)). Here, Plaintiffs challenge Defendants' directive that issued in tandem with EO 13880. Unlike *Franklin*, where the final action rested with the President and not an agency, here Defendants have made the final decision, pursuant to EO 13880, to create and provide states a redistricting citizenship dataset, as evidenced by the July 3 OMB Request. Finally, Defendants' conduct at issue here is not the "mere gathering" of records, but the creation and distribution of citizenship dataset for states to use in redistricting. *See* FAC ¶¶ 65, 84.

---

[11] Defendants also appear to argue that EO 13880 has little effect because the Bureau has already collected 90 percent of citizenship data from administrative records, which collection is authorized by the Census Act. *See* MTD at 40-41. As discussed *supra* Section I., Plaintiffs challenge the creation and distribution of a dataset to be used to specifically to discriminate against Latinos and noncitizens by removing some of them from the population base used for redistricting. The Census Act does not authorize such discrimination. *See generally* United States Code Title 13.

For the foregoing reasons, Plaintiffs have sufficiently alleged that Defendants' decision to create and provide a citizenship dataset along with the Redistricting Data File was a discrete decision that imminently and directly affects Plaintiffs' rights. *See City of New York*, 913 F.3d at 431. Thus, Defendants' decision is a final agency action that this Court is "well-suited" to review pursuant to the APA. *Id.*

## IV. Plaintiffs Have Stated an Equal Protection Claim

### A. Plaintiffs Plausibly Allege Intentional Discrimination

Defendants offer a hodge podge of arguments in support of their contention that Plaintiffs failed to properly plead an equal protection claim. All are unavailing. The First Amended Complaint meticulously sets out allegations supporting the equal protection claim.

Plaintiffs plausibly alleged that the challenged decision was motivated by intentional discrimination and adversely affects a protected group. *See La Unión del Pueblo Entero v. Ross ("LUPE I")*, 353 F. Supp. 3d 381, 393-95 (D. Md. 2018) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp. ("Arlington Heights")*, 429 U.S. 252, 264-65 (1977)). Plaintiffs' allegations bear directly on the Court's required "sensitive inquiry into such circumstantial evidence of intent as may be available[,]" including:

- the impact of the official action, *i.e.* whether it "bears more heavily on one race than another" and whether "a clear pattern, unexplainable on grounds other than race emerges from the effect of the state action even when the governing legislation appears neutral on its face";
- the historical background of the decision;
- the specific sequence of events leading up to the challenged decision;
- departures from the normal procedural sequence;
- substantive departures, "particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"; and
- the legislative or administrative history, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.

*Arlington Heights*, 429 U.S. at 264-68.  A plaintiff can survive a motion to dismiss without independently establishing that each factor weights in the plaintiff's favor.  *LUPE I*, 353 F. Supp. 2d at 394.

Plaintiffs more than adequately allege that Defendants are motivated by a desire to reduce the electoral strength of Latinos and other racial minorities by inviting and equipping states to exclude non-U.S. citizens from apportionment.  FAC ¶¶ 2, 54-84; *see also LUPE I*, 353 F. Supp. 2d at 394-95 (holding plaintiffs stated an equal protection claim where they alleged facts touching on the *Arlington Heights* factors); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 325 (D. Md. 2018) (same); *North Carolina State Conference of NAACP v. McCrory ("NAACP")*, 831 F.3d 204,  233 (4th Cir. 2016) (finding intentional discrimination where totality of the circumstances showed that defendants adopted a voting law to politically entrench themselves to the detriment of African Americans who were unlikely to vote for them).  In particular, Plaintiffs allege that the decision to create and provide states with a redistricting citizenship dataset was motivated by a discriminatory purpose to increase the political representation of "Non-Hispanic Whites" to the detriment of Latinos and other racial minorities, in violation of the Fifth Amendment.  FAC ¶ 80.

### 1.  Historical Background of the Decision

Plaintiffs adequately pleaded that the historical background of the decision to create and provide a redistricting citizenship dataset evidences discriminatory animus.  The Fourth Circuit requires courts to engage in a broad inquiry into historical discrimination and look at the historical origins of the challenged decision, particularly where matters of political representation are at issue.  *NAACP*, 831 F.3d at 226-27.

Although earlier in its history the United States excluded certain racial minorities from

congressional apportionment, with the attendant reduction of representation and political power (*see Evenwel*, 136 S. Ct. at 1127-29), the origins of the challenged action in this case are found in more recent history.  Plaintiffs allege that the decision to have the Bureau prepare and release a redistricting citizenship dataset to the states—first by adding a citizenship question to the 2020 Census, and now by using administrative records—goes at least as far back as the Hofeller Study.  *See* FAC ¶ 73.  Dr. Hofeller, a leading Republican redistricting strategist and map-drawing expert for the Republican National Committee, FAC ¶ 79, prepared a memo explaining how using CVAP instead of total population to apportion population to election districts in redistricting would "be advantageous for Republicans and Non-Hispanic Whites."  FAC ¶¶ 73, 79-81.  He acknowledged that CVAP apportionment was a "radical departure" from prior practice, FAC ¶ 81, and concluded that it was necessary to add a citizenship question to the 2020 Census to acquire the data necessary to use CVAP as a population base for redistricting.  FAC ¶ 81.  This information was then promulgated among major players in the Administration.  *See* FAC ¶ 73.

Plaintiffs allege that after Dr. Hofeller explained the political advantages of using CVAP as a population base for redistricting to suppress the representation of Latinos and others, Dr. Hofeller, Secretary Ross, White House officials, A. Mark Neuman (a Presidential transition team member), then-Kansas Secretary of State Kris Kobach, and U.S. Department of Justice (DOJ) attorneys, including then-Attorney General Jeff Sessions ("AG Sessions") and the head of the DOJ's Civil Rights Division John Gore, conspired to reduce the political power of people of color by using CVAP as a population base for redistricting.  FAC ¶ 73.

Secretary Ross first consulted with Mr. Kobach, a proponent of excluding non-U.S. citizens from apportionment, and Steve Bannon, then a White House official, about adding a

citizenship question to the 2020 Census.  *See* FAC ¶ 74.  Secretary Ross then directed U.S. Department of Commerce ("Commerce") staff to research the exclusion of non-U.S. citizens from apportionment and solicit and secure the help of DOJ.  *Id.*  Secretary Ross, through Commerce, coordinated with DOJ, Mr. Neuman, Dr. Hofeller, and the White House to fabricate a "need" for a Census citizenship question to better enforce the VRA, FAC ¶ 73, resulting in a letter from DOJ to the Bureau requesting the addition of the question to the 2020 Census (the "DOJ letter"), FAC ¶ 75.  Dr. Hofeller provided Mr. Neuman and Mr. Gore with the substantive content of the DOJ Letter.  FAC ¶ 82.[12]

Ultimately, three federal courts in six cases enjoined Defendants from adding a citizenship question on the 2020 Census, and the Supreme Court affirmed the New York district court's injunction.  FAC ¶¶ 55-56, n.24.  After reviewing evidence of the failed attempt to add a citizenship question to the Census, the U.S. District Court for the District of Maryland concluded: "it is becoming difficult to avoid seeing what is increasingly clear.  As more puzzle pieces are placed on the mat, a disturbing picture of the decisionmakers' motives take shape." *Kravitz v. Dep't of Commerce*, 382 F. Supp. 3d 393, 402 (D. Md. 2019).  *See also La Union del Pueblo Entero v. Ross*, 771 F. App'x. 323, 324-25 (4th Cir. 2019) (Wynn, J., concurring) (emphasizing that discriminatory intent can be inferred from the totality of the circumstances, including where the decisionmaker provides a pretextual rationale); *LUPE v. Ross*, Case No. 19-

_____

[12] The Supreme Court later determined that Secretary Ross's initial "VRA enforcement rationale—the sole stated reason [for adding a citizenship question]—seems to have been contrived." FAC ¶ 56 (quoting *Dep't of Commerce*, 139 S. Ct. at 2575).  Such "[p]roof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000).

1425 (4th Cir. Aug. 19, 2019), ECF No. 52 (instructing the district court to vacate its judgment on the equal protection claim).[13]

These well pleaded facts are relevant, because the historical background of the decision to accomplish CVAP redistricting was rooted in a study that advocated for the creation of a redistricting citizenship dataset and the failed attempt to add a citizenship question to the Census. This history sparked a highly specific and suspect series of events that further evidenced the discriminatory intent of the Defendants.

### 2. Specific Sequence of Events

Plaintiffs adequately pleaded that the specific series of events surrounding the challenged action in this case further support their claim of racial discrimination. *See NAACP*, 831 F.3d at 227 (recognizing that sequences of events leading to official action can provide further evidence of racial animus).

In the immediate aftermath of the Supreme Court's decision blocking the addition of the citizenship question to the Census, Secretary Ross directed the Bureau "to proceed with the 2020 Census without a citizenship question on the questionnaire, and [instead] produce [CVAP] information . . . that states may use in redistricting." FAC ¶ 65 (quoting July 3 OMB Request). Thus, Secretary Ross directly tied his decision to create and provide to states a redistricting citizenship dataset to the citizenship question, describing it as an alternative to the citizenship question to achieve Defendants' discriminatory purpose. *See Id.*

President Trump issued EO 13880 only a few days later. FAC ¶ 1; *see also* MTD at 1.

---

[13] In fact, Defendants continue to maintain that they sought to include a citizenship question on the Census to "enhance Voting Rights Act enforcement by allowing the Census Bureau to calculate citizenship data at the census-block level." MTD at 5. This is despite the fact that this rationale was found to be "contrived" by the U.S. Supreme Court. *Dep't of Commerce*, 139 S. Ct. at 2575.

The purpose of issuing EO 13880 was to speed up the process of collecting and producing a redistricting citizenship dataset. FAC ¶ 58. That same day President Trump explained during a press conference that the purpose of the order was to make sure that the census could generate an accurate dataset of non-U.S. citizens, in part, for the purpose of "administering our elections." FAC ¶ 63. Attorney General William Bar further elaborated that they were studying "whether illegal aliens could be counted for [legislative] apportionment purposes." FAC ¶ 64 (quoting Attorney General Barr). The next day, the Census Bureau published the July 3 OMB Request, a revision of the February 2019 OMB Request, that reflects Secretary Ross's directive that the bureau continue collecting citizenship data for the purposes of creating the redistricting citizenship dataset. FAC ¶ 65.

The decision to redirect Bureau and other federal government resources to create and give to states a redistricting citizenship dataset occurred "in the immediate aftermath" of the Supreme Court's June 27, 2019 decision blocking the Census citizenship question. FAC ¶¶ 56-58, 65; *see NAACP*, 831 F.3d at 226-27 (noting that the timing of the adoption of a restrictive voting law was evidence of discriminatory intent). Plaintiffs adequately pleaded that the discriminatory purpose that infected the decision to add a citizenship question to the 2020 Census also provides evidence that the agency action at issue in this case is similarly motivated. *See, e.g.*, *Hunter v. Underwood*, 471 U.S. 222, 222-33 (1985) (looking at the original enactment of state constitutional provision to support finding that, even 80 years later and after several changes, the provision was still discriminatory); *NAACP*, 831 F.3d at 225 ("[T]hat a legislature impermissibly relied on race" in enacting a prior election law "certainly provides relevant evidence as to whether race motivated other election legislation passed by the same legislature."); *Jean v. Nelson*, 711 F.2d 1455, 1490-92 (11th Cir. 1983) (finding evidence of prior

discriminatory policies to be probative of whether the challenged policy was motivated by discriminatory intent).

### 3. Departures from the Normal Procedural Sequence

Plaintiffs plausibly allege that Defendants' decision to create and provide to states a redistricting citizenship dataset significantly departs from the Bureau's normal procedural sequence. *See LUPE*, 353 F. Supp. 3d at 394 (holding plaintiffs stated a claim for an equal protection violation where plaintiffs provided, among other things, detailed allegations regarding procedural departures). In *NAACP*, for example, the voting bill at issue was rushed through the legislative process to avoid in-depth scrutiny, was afforded far less debate than normally offered to other bills, and targeted African American voters. 831 F.3d at 227-28. Finding error in the district court's "accepting the State's efforts to cast this suspicious narrative in an innocuous light," the Fourth Circuit held that such departures, even as other procedural rules were adhered to, provided "another compelling piece of the [motivation] puzzle." *Id*. at 228-29.

Plaintiffs allege that Defendants made the challenged decision *before* fully studying the issue, affording less in-depth scrutiny to this data collection than normally afforded to other data collections, and departing from other normal procedures along the way. *See, e.g.*, FAC ¶¶ 3, 91, 108. For example, Plaintiffs allege that Secretary Ross added a citizenship question to the 2020 Census and directed the Bureau collect administrative citizenship data to validate question responses just two years before the 2020 Census. FAC ¶¶ 54, 76. This was contrary to the normal procedure of informing Congress about subjects on the decennial census three years before the Census, or by April 2017, *see* FAC ¶ 23 (citing 13 U.S.C. § 141(f)).

Plaintiffs further allege that, following its normal procedures, the Bureau began to plan the contents of the Redistricting Data File at least as early as 2014. FAC ¶¶ 41-42. It was not

until December 2018, however, that the Bureau first mentioned including citizenship data in this file in connection with the citizenship question. FAC ¶¶ 46-47. And it was not until July 3, 2019, less than a year before the 2020 Census, that Defendants first made the affirmative decision to redirect Bureau resources to collect administrative records from federal agencies and states and use these records to compile a completely new dataset to accompany the Redistricting Data File. *See* FAC ¶¶ 58, 60-61, 65. Such a hurried pace "strongly suggests an attempt to avoid in-depth scrutiny." *NAACP*, 831 F.3d at 227-28 (comparing the robust deliberations afforded to other bills to the minimal deliberations afforded to the bill at issue); *Veasey v. Abbot*, 830 F.3d, 216, 236-39 (5th Cir. 2016) (highlighting departures from normal procedural sequence, including intervention by the governor and extreme prioritization of a bill that did not present a problem of great magnitude).

Defendants emphasize that the Bureau has collected administrative data regarding citizenship in the past. MTD at 3-4. But Plaintiffs do not challenge past well-planned, measured collection of citizenship data for other purposes (e.g., validating ACS responses). Plaintiffs adequately pleaded that Defendants' unstudied and rushed decision to redirect federal resources to create a redistricting citizenship dataset, specifically for the purpose of using this data as a population base for redistricting and apportionment, departed from procedural norms and these allegations support a claim of discriminatory intent.

### 4. Substantive Departures

Plaintiffs also allege a number of substantive departures where "factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Arlington Heights*, 429 U.S. at 564-65. For example, Plaintiffs allege that Secretary Ross ignored the known shortcomings of citizenship data derived from administrative sources,

including those explained in the Bureau's March 1, 2018 memorandum concluding that citizenship data from administrative records does not produce 100 percent accurate data on citizenship, and that the Bureau "will most likely never possess a fully adequate truth deck to benchmark [citizenship] to." FAC ¶¶ 65, 66-72. Departing from these important substantive considerations, Secretary Ross directed the Bureau to produce a redistricting citizenship dataset using this flawed and incomplete data. FAC ¶ 65;[14] *see also* FAC ¶ 76 (alleging that Secretary Ross ignored the recommendation of the Bureau not to add a citizenship question to the 2020 Census).

Plaintiffs also allege that federal laws, regulations, and guidelines require that data created and provided by the Bureau have integrity, objectivity, and impartiality, that the Bureau be independent from political influence in the development, production, and dissemination of statistics, and that Defendants departed from substantive considerations when they violated many of these provisions. FAC ¶¶ 3, 27-31, 37, 108.

### 5. Contemporaneous Statements

The Fourth Circuit recognizes that officials "seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority." *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1064 (4th Cir. 1982). Plaintiffs nonetheless allege statements made by Defendants and their conspirators which support their allegation that Defendants were motivated by discriminatory intent.

---

[14] Defendants' contention that as of July 11, 2019 they had 90 percent of citizenship data necessary for the purpose of validating citizenship question responses to better enforce the federal voting rights act says nothing about the quality of this data for the purposes of apportionment, and says nothing about the sufficiency of Plaintiffs' discriminatory intent allegations. *See* FAC ¶ 3.

For example, contemporaneous statements reflect that Defendants first "contrived" a reason for gathering citizenship information from the total U.S. population. FAC ¶ 54. After the U.S. Supreme Court held that Secretary Ross's rationale was pretextual, Defendants and the President publicly revealed their real reason to create and provide citizenship data—to conduct redistricting and apportionment based on CVAP instead of total population. FAC ¶¶ 56, 58-65. Statements made by President Trump and Attorney General William Bar regarding EO 13880 also support Plaintiffs' allegations that Defendants seek to reduce the political power of racial minorities and non-U.S. citizens. *See, e.g.*, FAC ¶¶ 63-64 (noting that some jurisdictions "may want to draw state and local legislative districts based upon the voter-eligible population, and that there is "a dispute over whether illegal aliens can be included for apportionment purposes") (internal quotation omitted). Plaintiffs' general allegations of racial animus, FAC ¶¶ 112, 115, further support their claim of discriminatory intent, s*ee Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 829 F.3d 613, 620 (4th Cir. 2018) (on a motion to dismiss, courts "presume that general allegations embrace those specific facts that are necessary to support the claim.").

Defendants concede that their purpose in preparing and distributing a redistricting citizenship dataset is to enable states to "design State and local legislative districts based upon the voter-eligible citizens." MTD at 36 (quoting EO 13880 at 33823).[15] Plaintiffs plainly allege that removing non-U.S. citizens from the apportionment base used for redistricting would, as described by the expert who drafted Defendants' plan, be "advantageous to . . . Non-Hispanic Whites" FAC ¶ 81. Defendants' admission that their purpose is to provide the tool to states

---

[15]  Plaintiffs note that equating CVAP, which is what the redistricting citizenship dataset contains, and voter eligibility is incorrect. The redistricting citizenship dataset does not contain information related to criminal conviction history or mental competency—voter eligibility requirements found in most states.

needed to subtract primarily Latinos and Asian Americans from the apportionment base demonstrates the adequacy of Plaintiffs' allegations, and does not undermine it.

### 6. Disparate Impact

Finally, Plaintiffs allege that Defendants' creation and provision to states of a redistricting citizenship dataset will have a disparate impact on the basis of race and national origin. *Arlington Heights*, 429 U.S. at 266 ("The impact of the official action whether it 'bears more heavily on one race than another,' . . . may provide an important starting point.") (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). Plaintiffs allege that they live in areas with relatively larger Latino and non-U.S. citizen populations when compared to the population of the U.S. and their states. FAC at ¶¶7, 9, 10-14, 85, 87. Furthermore, citizenship data based on administrative records will be inaccurate, and the Bureau's own research confirms that inaccuracies will be greater for naturalized citizens, those in mixed-immigration status households, certain U.S. citizens, and certain types of immigrants. FAC ¶¶ 66-72. Given that Latinos and Asian Americans are overrepresented among immigrants, naturalized citizens and those in mixed-immigration status households, Plaintiffs adequately pleaded disparate impact. Furthermore, although not necessary to set forth an equal protection claim, Plaintiffs adequately pleaded that Defendants relied on Dr. Hofeller's explanation that, for example in Texas, redistricting based on CVAP would benefit "Non-Hispanic Whites," FAC ¶ 81, and that Defendants intended this disparate impact to occur, FAC ¶¶ 81-83. Redistricting based on CVAP as a population base will result in a disproportionate harm to Latinos and non-U.S. citizens, because they will live in "unconstitutionally overpopulated districts." FAC ¶ 87.

Plaintiffs further allege that the decision to provide states with citizenship data for use in redistricting bears more heavily on Latino, Asian-American, and non-U.S. citizen populations

32

because it will result in less political representation for these communities. *See* FAC ¶¶ 2, 4, 7, 9-14, 80-81, 85-87. In particular, Plaintiffs allege that jurisdictions' use of CVAP data to apportion population for redistricting will result in: 1) less majority-minority CVAP districts; and 2) malapportionment. *Id*. Plaintiffs allege that Defendants made the decision to create and provide citizenship data because of, not in spite of, this disparate impact. FAC ¶¶ 60, 63-65, 73, 80-84.

### i. Disparate Impact is Not a Necessary Element of an Equal Protection Claim

Defendants' argument that Plaintiffs failed to allege disparate impact as a necessary element of an equal protection claim is factually incorrect and legally unfounded. First, Defendants cite no case to support their argument that Plaintiffs asserting an equal protection claim must allege discriminatory effects. *See* MTD at 32; *see also Arlington Heights*, 429 U.S. at 265 ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination.") (quoting *Washington*, 426 U.S. at 242). Second, even if pleading discriminatory effects was a requirement, Plaintiffs have more than satisfied it. *See supra* Sec. IV.A.6; *see also* FAC ¶¶ 67-72, 86, 87 (alleging that administrative data regarding citizenship is inaccurate and misclassifies some naturalized U.S. citizens as non-U.S. citizens, and that Plaintiffs live in states where there is a higher population of non-U.S. citizens). Plaintiffs allege facts related to discriminatory effects in satisfaction of one of the *Arlington Heights* factors, not because equal protection plaintiffs are required to plead disparate effects.

### B. Defendants' Other Arguments Are Unavailing

Defendants misstate equal protection law when they assert that "Plaintiffs cannot maintain an equal protection claim based on 'animus towards non-U.S. citizens and foreign-born persons,' FAC ¶ 112, because they are not suspect classifications." MTD at 33 n.16. It is well-

established that individuals treated differently because they are non-U.S. citizens can prevail on an equal protection claim. *See, e.g.*, *Bernal v. Fainter*, 467 U.S. 216, 226 (1984) (strict scrutiny applied to law that prevented non-U.S. citizen from becoming a notary public); *Nyquist v. Mauclet*, 432 U.S. 1, 7-9 (1977) (applying strict scrutiny to law that prevented non-U.S. citizens from receiving state financial aid, and finding that the law was unconstitutional); *Graham v. Richardson*, 403 U.S. 365, 372 (1971) ("[C]lassifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a 'discrete and insular' minority . . . for whom such heightened judicial solicitude is appropriate."); *Traux v. Raisch*, 239 U.S. 33, 37 (1915) (striking down an anti-non-U.S. citizen labor law as unconstitutional under Equal Protection Clause of the Fourteenth Amendment).

Furthermore, even if the Court found that the Plaintiffs are not entitled to strict scrutiny, the level of scrutiny that a court applies to analyze an equal protection claim (e.g. strict scrutiny, intermediate scrutiny or rational basis review) has nothing to do with whether a plaintiff can assert an equal protection claim. *See, e.g.*, *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 366 (2001) (reflecting that constitutional protections still exist under the equal protection clause, even though challenged law did not target a suspect classification).

Defendants' argument that this case involves "the mere collection of administrative records" and thus there cannot be an equal protection challenge rests on a mischaracterization of Plaintiffs' complaint and ignores the facts surrounding the challenged action. *See* MTD at 32. Plaintiffs do not challenge the "mere" collection of administrative records. *See e.g.*, FAC ¶ 61, 65, 112 ("Defendant Ross 'directed the Census Bureau to proceed with the 2020 Census without a citizenship question on the questionnaire, and rather to produce Citizen Voting Age Population

(CVAP) information prior to April 1, 2021 that states may use in redistricting.'"). Even if Defendants hope to prove that Plaintiffs' challenge involves mere record collection, that is a dispute of fact. Disputes of fact are properly resolved at the merits, not the pleading, stage of litigation. Defendants will have an opportunity later in the case to present their competing version of the facts; at this point, Plaintiffs well-pleaded facts are taken as true and Defendants' fact disputes cannot sustain their motion to dismiss. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) ("[I]n evaluating a Rule 12(b)(6) motion to dismiss, a court accepts all well-pleaded facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint.").

The same is true for Defendants' unsuccessful attempt to re-litigate the facts that led one court to conclude, "it is becoming difficult to avoid seeing that which is increasingly clear. As more puzzle pieces are placed on the mat, a disturbing picture of the decionsmakers' motives take shape." *Kravitz*, GJH-18-1041, Opinion, Dkt. No. 175 at 13. The question before the Court is whether Plaintiffs adequately pleaded that Defendants are motivated by discriminatory intent—not whether Defendants deny those allegations.

Finally, Plaintiffs also sufficiently allege that Latinos, other racial minority individuals, and non-U.S. citizens will be harmed if Defendants are not enjoined from continuing their discriminatory conduct. *See supra* Sec. I (standing); *see supra* Sec. IV.A.6 (disparate impact).

## V.     Plaintiffs Have Stated a Cause of Action under 42 U.S.C. § 1985(3)

Plaintiffs more than adequately pleaded a claim under 42 U.S.C. § 1985(3) that Defendants and others are engaged in a conspiracy to create and provide to states a redistricting citizenship dataset in order to increase the political power of non-Hispanic whites and reduce the power of Latinos, other racial minority individuals, and non-U.S. citizens. Further, creating and providing a redistricting citizenship dataset from administrative sources is an overt act that is part

of the same conspiracy Defendants initiated when they attempted to add a citizenship question to the 2020 Census. *See, e.g.*, FAC ¶¶ 54-56, 58, 60-65. Accordingly, plaintiffs adequately pleaded that such a conspiracy exists.

### A. Injunctive Relief is Available as a Remedy for § 1985(3) Violations

Defendants erroneously argue that § 1985(3) provides no basis for injunctive relief. MTD at 37-38. It is well-established, however, that "[a]bsent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction." *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979); *see also Plata v. Schwarzenegger*, 603 F.3d 1088, 1094 (9th Cir. 2010) (same); *LUPE I*, 353 F. Supp. 3d at 398 n.7 (noting that argument that § 1985(3) prohibits injunctive relief is "not persuasive"); *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 608 (1966) (holding that courts retain authority under All Writs Act "[i]n the absence of explicit direction from Congress"); *Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 539 (7th Cir. 2012) (holding that "when all that a plaintiff seeks is to enjoin an unlawful act, there is no need for express statutory authorization" from Congress).

Congress did not divest federal courts of their equitable powers when it enacted § 1985(3), and this Court thus retains the power to enjoin Defendants from violating § 1985(3).[16]

---

[16] Defendants erroneously argue that the Court must dismiss Plaintiffs' APA claims if their conspiracy claim survives. MTD at 44-45. In support of this argument, Defendants cite 5 U.S.C. § 704, which provides that the APA allows review of "final agency actions for which there is no other adequate remedy in a court[.]" Defendants interpret this language to mean that if a plaintiff brings an APA claim for injunctive relief, they cannot add additional claims that provide for the same relief. This is incorrect. Instead, the Supreme Court in *Bowen v. Massachusetts* held that the "no other adequate remedy" language is "merely a restatement of the proposition that one need not exhaust administrative remedies that are inadequate," and is meant to make clear that Congress did not intend for the APA "to duplicate the previously established special statutory procedures relating to specific agencies." 487 U.S. 879, 901-03 (1988) (alteration and internal quotation omitted). Section 704 does not speak to what other claims, in addition to an APA claim a plaintiff, may bring in federal court, and the Court should reject this meritless attempt to dismiss Plaintiffs' APA claims.

*See, e.g.*, *Mizell v. N. Broward Hospital Dist.*, 427 F.2d 468, 473 (5th Cir. 1970) (holding that the power to issue an injunction "is available to a trial court in an action brought under Section 1985, even though that section refers in precise terms only to a suit for damages"); *Action v. Gannon*, 450 F.2d 1227, 1237-38 (8th Cir. 1971) (en banc) (in holding that injunctive relief is available under § 1985(3), reasoning that "[f]ederal courts have the power to afford all remedies necessary to the vindication of federal substantive rights defined in statutory and constitutional provisions except where Congress has explicitly indicated that such remedy is not available").

### B. Sovereign Immunity Does not Bar Plaintiffs' § 1985(3) claim.

The Supreme Court has long held that federal officials may be sued for injunctive relief to prevent future infringement of federal laws. *See, e.g.*, *Larson v. Domestic Foreign Com. Corp.*, 337 U.S. 682, 689-691 (1949) (federal officers may be enjoined from acting unconstitutionally); *Unimex, Inc. v. Dep't of Hous. and Urban Dev.*, 594 F.2d 1060, 1062 (5th Cir. 1979) (same). Here, Plaintiffs allege that Defendants acted unconstitutionally when they conspired to violate Plaintiffs' rights to equal protection of the law, in violation of the Fifth Amendment of the Constitution. Because Plaintiffs seek only injunctive relief, not damages, Plaintiffs' § 1985(3) claim is not barred on sovereign immunity grounds.[17] *See Ziglar v. Abassi*,

---

[17] The cases cited by Defendants are either inapposite or not persuasive for the proposition for which Defendants cite them. *United States v. Testan,* 424 U.S. 392, 392 (1976), *Davis v. Dep't of Justice*, 204 F.3d 723, 725 (7th Cir. 2000), and *Unimex*, 594 F.2d at 1061 all involved claims for damages, not injunctive relief. Further, in *Unimex*, the Fifth Circuit acknowledged that had plaintiffs alleged that defendant federal officials acted *ultra vires*, plaintiffs could have brought an action for injunctive relief. 594 F.2d at 1062 (citing *Larson*, 337 U.S. at 691, and 5 U.S.C. § 702). *Larson* supports Plaintiffs' argument that their § 1985(3) claim is not barred by sovereign immunity. 337 U.S. at 689-691. There, the Supreme Court acknowledged that federal employees may be sued for injunctive relief in their official capacities where, like Defendants here, they violate the Constitution. *Id.* Finally, although the plaintiffs in *Affiliated Professional Home Health Care Agency v. Shalala*, 164 F.3d 282, 286 (5th Cir. 1999), sought both monetary

137 S. Ct. 1843, 1853 (2017) (entertaining § 1985(3) claim against federal administration officials acting in their official capacity).

### C. Plaintiffs' Allegations Support a Claim Under 42 U.S.C. § 1985(3)

Plaintiffs have sufficiently stated a claim under § 1985(3) because they plausibly allege: "(1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy." *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995). Plaintiffs allege that Defendants, including Secretary Ross and Commerce and Census Bureau officials, worked with individuals in the White House, including President Trump, and others outside of the administration to create and provide a citizenship redistricting dataset to the states because it would negatively affect the representation of Latinos, Asian Americans and non-U.S. citizens. FAC ¶¶ 1-2, 46-47, 49, 73-74, 80-83. Defendants carried out overt acts in furtherance of this conspiracy, from the collection of citizenship and immigration administrative records, to the effort to add a citizenship question to the decennial census, to the most recent executive order and implementing actions. FAC ¶¶ 54-56, 58-65, 73-78, 85.

Contrary to Defendants' claim, MTD at 40-41, Plaintiffs allege more than the existence of the Hofeller Study. Plaintiffs' First Amended Complaint also includes allegations regarding: 1) Mr. Kobach's involvement early in 2017 in persuading the Commerce Department to add a Census citizenship question to 2020 Census, FAC ¶ 74; 2) Secretary Ross's request that Commerce research excluding immigrants from apportionment, *id.*; 3) The involvement of Dr.

---

damages and injunctive relief, the Fifth Circuit did not address the plaintiffs' request for injunctive relief.

Hofeller and Mr. Neuman in drafting the DOJ Letter requesting a citizenship question for pretextual reasons, FAC ¶ 82; 4) Secretary Ross's decision to add a citizenship question to the 2020 Census notwithstanding the Bureau's recommendations to the contrary, FAC ¶ 76; and 5) statements by Defendants, President Trump, and Attorney General William Bar in July 2019 admitting that, after more than a year of hiding their true purpose and consistent with the Hofeller Study, that found that using CVAP would diminish the political power of minority groups, Defendants were in fact moving forward to create and give states citizenship data for use in redistricting and apportionment, FAC ¶¶ 60-65.[18,19]

Plaintiffs' allegations are nothing like the allegations in the cases cited by Defendants. In *Simmons*, the Fourth Circuit provided examples of conclusory allegations of conspiracy, including cases where the "§ 1985(3) claim was essentially an afterthought with little more to support it than the respective racial identities of the individuals involved." 47 F.3d at 1377 (quoting *Gooden v. Howard Cnty.*, 954 F.2d 960, 969-70 (4th Cir. 1992)) (alteration omitted).[20] Here, Plaintiffs allege with specificity that Defendants conspired to create and provide citizenship data for use in redistricting and with the purpose of discriminating against Latinos, Asian Americans and others.

---

[18] In *LUPE I*, the U.S. District Court for the District of Maryland held that plaintiffs pleaded sufficient facts to state a claim for conspiracy by defendants to violate plaintiffs' constitutional rights. *LUPE I*, 353 F. Supp. 3d at 397-98. Notably, this was before Dr. Hofeller's study became public, and before Defendants and President Trump admitted their true purpose for collecting and reporting citizenship data in July 2019.

[19] Defendants argue that some of the conspirators were only involved with the citizenship question. MTD at 42. But there is no requirement that all conspirators be involved at every step of the conspiracy. Instead, *Simmons* requires only that conspirators have a meeting of the minds (here, to use citizenship data in redistricting to reduce the political power of Latinos and other groups), and that they commit an overt act in furtherance of the conspiracy. 47 F.3d at 1376. Plaintiffs allege that Dr. Hofeller, Mr. Kobach, Mr. Neuman, AG Sessions, Secretary Ross, among others, committed such overt acts.

[20] It was also uncontested in *Simmons* that one of the alleged conspirators had acted on his own. *Simmons,* 47 F.3d at 1377-78.

*Hinkle v. City of Clarksburg, West Virginia*, also cited by Defendants, involved not a motion to dismiss, but a summary judgment motion where defendants had proffered evidence that contradicted plaintiffs' allegations. 81 F.3d 416, 241-43 (1996). And, unlike the claims in *Hinkle*, Plaintiffs' allegations here are not "rank speculation and conjecture," MTD at 44, but are instead supported by allegations related to documents released in connection with the citizenship question cases, FAC ¶¶ 55-56. Plaintiffs further alleged facts connected to the Hofeller Study and other documents evidencing the important roles played by Dr. Hofeller and Mr. Neuman in the conspiracy. *See* FAC ¶¶ 79-83.

### D. The Intracorporate-Conspiracy Doctrine Does Not Apply in this Case

Defendants erroneously argue that the intracorporate-conspiracy doctrine, an antitrust principle that provides that "there is no unlawful conspiracy where officers within a single corporate entity consult among themselves and then adopt a policy for the entity." *Ziglar*, 137 S. Ct. at 1867, applies in this case, MTD at 43-44. Plaintiffs here allege a conspiracy between private parties and individuals working for different state and federal governments. *See* FAC ¶¶ 73-84; *see also Ziglar*, 137 S. Ct. at 1867 (in discussing whether intracorporate-conspiracy doctrine applies to civil rights suits, focusing on whether officers were members of the same department, not members of the same branch of government).[21] Further, "[i]ndividuals are not immune from liability under [§] 1985(3) merely because the same corporation employs them," and they remain liable for their "unauthorized acts in furtherance of [the] conspiracy[.]" *Hodgin v. Jefferson*, 446 F. Supp. 804, 807 (D. Md. 1978); *see also Buschi v. Kirven*, 775 F.2d 1240,

---

[21] To the extent there is a question of fact as to whether Commerce and DOJ officials are part of the same governmental body, this does not defeat Plaintiffs' claim at the motion to dismiss stage. *Kronberg v. LaRouche*, No. 1:09-CV-947-AJT/TRJ, 2010 WL 1443898, at *8 (E.D. Va. Apr. 9, 2010) (denying defendants' motion to dismiss where there was a question of fact as to whether the intracorporate-conspiracy doctrine applied).

1251-53 (4th Cir. 1985) (same). Plaintiffs alleged that the conspirators took steps to disadvantage Latinos, Asian Americans, and non-U.S. Citizens individuals in violation of their right to equal protection, and Defendants' acts were therefore unauthorized.[22]

Even though the Supreme Court did not decide the issue, it acknowledged in *Ziglar* that it "has not given its approval to [the intracorporate-conspiracy] doctrine in the specific context of § 1985(3)," and that "[t]here is a division in the courts of appeals . . . respecting the validity or correctness of the intracorporate-conspiracy doctrine with reference to § 1985 conspiracies." 137 S. Ct. at 1868. The Court should thus further decline to dismiss Plaintiffs' § 1985(3) claim on the basis of unsettled law. *Wright*, 787 F.3d at 263 (holding that the fact that a plaintiff's claim does "not fall within the four corners of . . . prior case law . . . does not justify dismissal under Rule 12(b)(6)," and that dismissal in these circumstances is "especially disfavored") (internal quotation marks omitted). Indeed, Plaintiffs here "should be given an opportunity to develop evidence before the merits are resolved." *Id.* (internal quotation marks omitted).

---

[22] Moreover, to the extent there is a question as to whether an exception to the intracorporate-conspiracy doctrine applies under the facts of this case, such a question requires denial of Defendants' Motion to Dismiss. *Bell v. City of Roanoke Sheriff's Office*, No. 7:09-cv-214, 2009 WL 5083459, at *4 (W.D. Va. Dec. 23, 2009) ("Because the applicability of the exceptions to intracorporate immunity entail a factual inquiry, the court will deny the defendants' motion to dismiss").

Dated: January 9, 2020

Respectfully submitted,

By /s/ Terry Ao Minnis

**ASIAN AMERICANS ADVANCING JUSTICE | AAJC**
John C. Yang (IL Bar No. 6210478)*
Niyati Shah (NJ Bar No. 026622005)°
Terry Ao Minnis (MD Bar No. 20547)°
Eri Andriola (NY Bar No. 5510805)°

1620 L Street, NW, Suite 1050
Washington, DC 20036
Phone: (202) 815-1098

**MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND**
Thomas A. Saenz (CA Bar No. 159430)°
Nina Perales (TX Bar No. 24005046)°
Denise Hulett (CA Bar No. 121553)°
Andrea Senteno (NY Bar. No. 5285341)**°
Tanya G. Pellegrini (CA Bar No. 285186)°
Julia A. Gomez (CA Bar No. 316270)°
1016 16th Street NW, Suite 100
Washington, DC 20036
Phone: (202) 293-2828
Facsimile: (202) 293-2849

* Pro hac vice *applications forthcoming*
** *Application for admission forthcoming*
° *Not admitted in DC.*

## CERTIFICATE OF SERVICE

I certify that on this 9th day of January, 2020, I caused a copy of Plaintiffs' Response to Defendants' Motion to Dismiss to be sent to all parties receiving CM/ECT notices in this case.

/s/ Terry Ao Minnis
Terry Ao Minnis