**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, PROMISE ARIZONA, LYDIA CAMARILLO, JUANITA VALDEZ-COX, ROGENE GEE CALVERT; ZEENAT NISHA HASAN; ~~and~~ CANDY L. GUTIERREZ,; EUGENE WU, DEBORAH CHEN, ORGANIZATION OF CHINESE AMERICANS-GREATER HOUSTON, DAVID CHIU, PHILLIP TING, ALBERT MURATSUCHI, KENNY CHU, YICHENG WU, CYNTHIA CHOI, VINCENT PAN, JOHN PARK, JEFFREY D. HSI, JACINTA TITIALII ABBOTT, VENGHAN TANG, RAJ MUKHERJI, SHARON TOMIKO SANTOS, MIA GREGERSON, JENNIFER REYES, RAYMOND SANCHEZ, MARICELA LECHUGA, MARTY RAMIREZ, FELIPE CRUZ, ALEXANDRA ROSY PALOMO-PUJOL, MARCO ABARCA, COALITION FOR HUMANE IMMIGRANT RIGHTS OF LOS ANGELES, RALPH CARMONA, and JAVIER GASTON-GREENBERG, | Civil Action No. 8:19-CV-02710-~~GJH~~PX<br><br>SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| *Plaintiffs*, v. | |
| DONALD J. TRUMP, sued in his official capacity as President of the United States, | |
| WILBUR L. ROSS, sued in his official capacity as U.S. Secretary of Commerce, | |
| STEVEN DILLINGHAM, sued in his official capacity as Director of the U.S. Census Bureau, | |
| U.S. DEPARTMENT OF COMMERCE, and | |
| U.S. CENSUS BUREAU, | |
| *Defendants*. | |

## ~~AMENDED COMPLAINT~~

## INTRODUCTION

1.      Since at least 2017, Defendants have sought, through a series of policy changes, to deprive Latinos, Asian Americans and immigrants of political representation by manipulating the manner in which Census Bureau data is collected and used. To that end, Defendants have brazenly—and repeatedly—violated fundamental Constitutional commands requiring that all persons living in the United States be counted in the decennial Census and that all persons be counted and afforded political representation. Defendants' efforts have included four discrete but related initiatives, one of which has already been squarely rejected by the Supreme Court of the United States, and three of which are the subject of this litigation.

2.      First, Defendants sought to accomplish their unlawful purpose by attempting to add a citizenship question to the 2020 decennial census questionnaire sent to every household in the United States. This initiative was blocked by various courts, including this Court and the Supreme Court, as violative of the federal Administrative Procedure Act after evidence demonstrated that the purported rationale for adding such a question was nakedly pretextual.

~~1. On July 11, 2019, President Trump issued Executive Order 13880, Collecting Information about Citizenship Status in Connection with the Decennial Census ("EO 13880"), that directs:  (1) Secretary Ross to instruct the Census Bureau to create an inter-agency working group to collect citizenship data in connection with the 2020 decennial census for redistricting; (2) the Department of Commerce to "strengthen its efforts, consistent with law, to obtain State administrative records concerning citizenship"; and (3) all federal agencies to provide citizenship~~

data via administrative records to the Census Bureau. On July 12, 2019, the Census Bureau published a notice dated July 3, 2019, stating that Secretary Ross had directed the Census Bureau to collect and produce Citizenship Voting Age Population ("CVAP") information prior to April 1, 2021 that states may use in redistricting.

2. The President's order and Secretary Ross's directive that the Department of Commerce provide states with CVAP information for redistricting is motivated by a racially discriminatory scheme to reduce Latino political representation and increase the over-representation of non-Latino Whites, thereby advantaging White voters at Latino voters' expense. As the Department of Commerce and the Census Bureau comply with Secretary Ross's directive and EO 13880 to collect citizenship data and when they produce population tabulations that purport to exclude non-citizens for purposes of drawing state and local districting plans, voters will be denied their constitutionally guaranteed rights to equitable political representation based on actual population.

3. The Court should enjoin Defendants' actions as violative of the Administrative Procedure Act ("APA") for a number of reasons. First, Defendants failed to articulate an adequate rationale for making the decision to collect and produce citizenship data from administrative records. Second, for discriminatory reasons, EO 13880 and Secretary Ross's directive instructs the Census Bureau to perform an impossible task contrary to law: to determine the total number of non-U.S. citizens without an actual enumeration of the non-U.S. citizen population. Administrative records cannot provide citizenship data to the states without the use of statistical sampling and estimation, and therefore cannot provide a total enumeration of the citizen and non-citizen population. Third, Secretary Ross's compliance with EO 13880 is in excess of the statutory authority that the Secretary has to conduct the decennial census. By

deciding to collect citizenship data in response to EO 13880, Secretary Ross is improperly allowing the President's judgment to displace his own discretion over the census. The Constitution vests Congress, not the President, with discretion over the conduct of the census. Congress delegated this responsibility to the Secretary, not the President. Fourth, Defendants failed to comply with the mandated procedures and requirements for making a substantive change to the data collected and reported by the Census Bureau in connection with the 2020 decennial census, in violation of the requirements of federal laws and regulations. A mere thirteen days after the Supreme Court rejected Defendants' attempted addition of the citizenship question to the decennial Census, Defendants unveiled their "Plan B": creating, and providing to states, a census redistricting dataset that purports to show, based on administrative records, citizenship for every person in the United States. The sole purpose of the redistricting citizenship dataset, as the government's serial efforts reveal, is to enable states to subtract purported non-U.S. citizens from the apportionment base used to draw new political boundaries, thereby drastically reducing the political strength and representation of non-U.S. citizens, Latinos, Asian Americans, and other U.S. citizens of color who live in proximity to non-U.S. citizens.

4. Defendants' actions should also be enjoined because they are motivated by racial animus, are discriminatory toward Latinos and non-citizens, and are the result of a partisan conspiracy intended to dilute the representation of non-citizens and Latinos, in violation of the equal protection guarantee of the Fifth Amendment of the U.S. Constitution, and 42 U.S.C. § 1985(3).

4. In furtherance of that illegal and unconstitutional purpose, Defendants recently announced "Plan C": excluding undocumented immigrants from the count of "persons" for purposes of allocating congressional seats to states. This initiative, declared in a Presidential

memorandum, violates the unambiguous constitutional command that seats in the House of Representatives are to be allocated based on a count of the "whole number of persons in each state." If given effect, the Presidential memorandum will directly reduce the number of House of Representatives seats and Electoral College votes apportioned to states with high populations of Latinos and Asian Americans—including the three states with the largest Latino populations and two of the three states with the largest Asian American populations.

5.      Defendants have not stopped there. Most recently, on August 3, 2020, they announced their latest effort to ensure that minorities are undercounted and underrepresented: "Plan D" ends field collection of data for the decennial Census one month early on September 30, 2020, even though an estimated 60 million households (nearly 40%) remain uncounted, a disproportionately large number of whom are from "hard to count" communities of immigrants, Latinos, Asian Americans and other people of color. By cutting short the data collection process, Defendants will foreclose an accurate count of racial minority populations, including Latinos and Asian Americans, that historically have been disproportionately undercounted in the Census. This sudden and ill-conceived cessation of the census count is especially perverse in the context of an enumeration already complicated and delayed by the COVID-19 pandemic.

6.      5. Plaintiffs seek declaratory and injunctive relief to prevent Defendants from violating the APA, the equal protection guarantee of the Fifth Amendment of the U.S. Constitution, andDefendants' four strategies described above have distinct features, but a common aim: in the words of an advisor who laid the foundation for Defendants' efforts, they seek to increase the political power of "non-Hispanic whites." In pursuing this goal, Defendants have violated the Constitution's Enumeration Clause and Equal Protection Clause, the Administrative Procedure Act, 42 U.S.C. § 1985(3)., and the statutory and regulatory regime

governing the Census and congressional apportionment. Accordingly, Plaintiffs seek declaratory, injunctive, and mandamus relief to prevent Defendants from carrying out their unlawful and racially discriminatory plans.

## PARTIES

### *Plaintiffs*

7. 6. Plaintiff La Unión del Pueblo Entero ("LUPE") is a nonprofit membership organization founded by labor rights activists César Chávez and Dolores Huerta. LUPE's mission is to build strong, healthy communities in the Texas Rio Grande Valley through community organizing and civic engagement. To promote civic engagement in the communities it serves, LUPE conducts know-your-rights discussions and membership meetings, participates in issue-focused advocacy, connects its members to social services, conducts census outreach, and conducts voter registration, education, and non-partisan get-out-the-vote campaigns.

8. 7. LUPE is headquartered in San Juan, Texas, and its members primarily reside in Hidalgo, Cameron, Willacy, and Starr Counties, Texas. LUPE has over 8,000 members, including Latinos, U.S. citizens, and non-U.S. citizens. Some LUPE members are immigrants not authorized to be present in the United States. LUPE has members that live in neighborhoods, cities, counties, and voting districts with relatively larger Latino and non-U.S. citizen populations when compared to Texas and the United States. Plaintiff LUPE has members who will suffer the injuries of citizenship misclassification, vote dilution and loss of representation as a result of Defendants' challenged actions.

9. 8. Plaintiff Promise Arizona ("PAZ") is a nonprofit, faith-based membership organization founded in 2010 in response to the passage of Arizona Senate Bill 1070. It is headquartered in Phoenix, Arizona. PAZ's mission is to build Latino and immigrant political

power to ensure family unity, a path to citizenship, worker protections, and a path to equitable educational opportunities for all immigrants. To achieve its mission, PAZ promotes civic engagement, provides scholarships to members and other individuals for immigration-related expenses, partners with community colleges to conduct educational and job training programs, conducts youth leadership programs, and provides assistance with applications for immigration relief. To promote civic engagement, PAZ registers members and individuals to vote, educates members about important voting issues, conducts get-out-the-vote campaigns, and participates in various issue-focused advocacy.

10.    9. PAZ has members and serves individuals who primarily reside in Maricopa, Yuma, and Pinal Counties, Arizona. PAZ has hundreds of members, including Latinos, U.S. citizens, non-U.S. citizens, and members of mixed-status families (in which some members are citizens or non-U.S. citizens with legal status and others are not). Some PAZ members and some of the individuals PAZ serves are immigrants not authorized to be present in the United States. PAZ has members and serves individuals who live in neighborhoods, cities, counties, and voting districts with relatively larger Latino and non-U.S. citizen populations when compared to Arizona and the United States. Plaintiff PAZ has members who will suffer the injuries of citizenship misclassification, vote dilution and loss of representation as a result of Defendants' challenged actions.

11.    10. Plaintiff Juanita Valdez-Cox is a member and the Executive Director of LUPE, and has held that position since approximately 2007. She identifies as Latina, is ais a Latina resident and registered voter, and lives in Donna of Hidalgo County, Texas. According to American Community Survey ("ACS")census data, the total population of Donna, Texas, is 16,507Hidalgo County is 849,390 and Latinos constitute approximately 92.3 percent92.0% of the

total population.  Plaintiff Valdez-Cox lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Latinos when compared to the rest of Texas.

12.    11. Plaintiff Lydia Camarillo is the President of Southwest Voter Registration Education Project ("SVREP") and has worked with SVREP for approximately twenty years. Ms. Camarillo identifies asShe is a Latina, is a resident and registered voter, and lives in San Antonio of Bexar County, Texas. According to ACScensus data, the total population of San Antonio, where Plaintiff Lydia Camarillo resides, is 1,461,623,Bexar County is 1,925,865 and Latinos constitute approximately 64 percent57.1% of the total population.  Plaintiff Camarillo lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Latinos when compared to the rest of Texas.

13.    12. Plaintiff Rogene Gee Calvert identifies asis an Asian American, is a registered voter, and in Harris County, Texas.  She lives in Houston, Texas. According to ACS data, the total population of Houston, Texas is 2,267,336 and Asian Americans constitute approximately 6.7 percent of the total population. Plaintiff Calvert lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Asian Americans when compared to the rest of Texas.

14.    13. Plaintiff Zeenat Nisha Hasan identifies asis an Asian American, is a registered voter, and in Maricopa County, Arizona. She lives in Phoenix, Arizona. According to ACS data, the total population of Phoenix, Arizona is 1,574,421 and Asian Americans constitute approximately 3.6 percent of the total population.

15.    14. Plaintiff Candy L. Gutierrez identifies as Latina, is ais a Latina resident and registered voter, and lives in of Yakima County, Washington. According to ACScensus data, the

total population of Yakima, ~~Washington is~~91,067 County is 249,325 and Latinos constitute approximately ~~46.2 percent~~48.9% of the total population. Plaintiff Gutierrez lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Latinos when compared to the rest of Washington.

16.    Plaintiff OCA-Greater Houston ("OCA-GH") is a Texas non-profit corporation that is a local chapter of the Organization of Chinese Americans ("OCA"), a national membership-driven civil rights organization of community advocates dedicated to advancing the social, political, and economic well-being of Asian Pacific Americans. Founded in 1979, OCA-GH's mission is to increase the long-term leadership, civic participation, education and engagement of Asian Americans in the Greater Houston metropolitan area. In service of its mission, OCA-GH works on behalf of individuals with limited English proficiency and low income residents in the Greater Houston area, who often face language, cultural, and economic barriers to political and civic participation. OCA-GH organizes volunteers for non-partisan civic engagement activities including but not limited to phone banking, voter education, candidate forums, voter registration, and voting assistance. OCA-GH relies on the accuracy of decennial Census data for purposes of strategic planning and communication, resource allocation, and advocacy.

17.    OCA-GH has both dues-paying and non-dues-paying members, and serves parts of the Greater Houston area with significant Asian American populations, including southwest Houston, Harris and Fort Bend Counties, and the cities of Sugarland, Jersey Village, and Clear Lake. OCA-GH currently has about 160 dues-paying members as well as non-dues-paying members, who are overwhelmingly volunteers and students. Most OCA-GH members are Asian American who are both U.S. and non-U.S. citizens, and live in the greater Houston area which

has a relatively larger Asian American population when compared to Texas and the United States.

18.     Plaintiff Deborah Chen is an Asian American registered voter in Harris County, Texas, and is a member of OCA-GH. She lives in Houston, Texas. According to ACS data, the total population of Houston, Texas is 2,267,336 and Asian Americans constitute approximately 6.7 percent of the total population. Plaintiff Chen lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Asian Americans when compared to the rest of Texas.

19.     Plaintiff Eugene Wu is an Asian American registered voter in Harris County, Texas. He lives in Houston, Texas. According to ACS data, the total population of Houston, Texas is 2,267,336 and Asian Americans constitute approximately 6.7 percent of the total population. Plaintiff Wu lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Asian Americans when compared to the rest of Texas. Plaintiff Wu is the State Representative for Texas House District 137.

20.     Plaintiff David Sen-Fu Chiu is an Asian American registered voter in San Francisco County, California. According to ACS data, the total population of San Francisco, California is 864,263 and Asian Americans constitute approximately 34.2 percent of the total population. Plaintiff Chiu lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Asian Americans when compared to the rest of California. Plaintiff Chiu is a member of the California State Legislature for the 17th Assembly District in California.

21.     Plaintiff Phillip Yuli Ting is an Asian American registered voter in San Francisco County, California. According to ACS data, the total population of San Francisco, California is

864,263 and Asian Americans constitute approximately 34.2 percent of the total population. Plaintiff Ting lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Asian Americans when compared to the rest of California. Plaintiff Ting is a member of the California State Legislature for the 19th Assembly District in California.

22.     Plaintiff Albert Y. Muratsuchi is an Asian American registered voter in Los Angeles County.  He lives in Rolling Hills Estates, California. According to ACS data, the total population of Rolling Hills Estates, California is 8,229 and Asian Americans constitute approximately 30.6 percent of the total population. Plaintiff Muratsuchi lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Asian Americans when compared to the rest of California. Plaintiff Muratsuchi is a member of the California State Legislature for the 66th Assembly District in California.

23.     Plaintiff Kenny Chu is an Asian American registered voter in San Francisco County, California. According to ACS data, the total population of San Francisco, California is 864,263 and Asian Americans constitute approximately 34.2 percent of the total population. Plaintiff Chu lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Asian Americans when compared to the rest of California.

24.     Plaintiff Yicheng "Emma" Wu is an Asian American registered voter, in San Francisco County, California. According to ACS data, the total population of San Francisco, California is 864,263 and Asian Americans constitute approximately 34.2 percent of the total population. Plaintiff Wu lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Asian Americans when compared to the rest of California.

25. Plaintiff Cynthia Choi is an Asian American registered voter in San Francisco County, California. According to ACS data, the total population of San Francisco, California is 864,263 and Asian Americans constitute approximately 34.2 percent of the total population. Plaintiff Choi lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Asian Americans when compared to the rest of California.

26. Plaintiff Vincent Pan is an Asian American registered voter in San Francisco County, California. According to ACS data, the total population of San Francisco, California is 864,263 and Asian Americans constitute approximately 34.2 percent of the total population. Plaintiff Pan lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Asian Americans when compared to the rest of California.

27. Plaintiff John Park is an Asian American registered voter in Queens County, New York. He lives in Flushing, New York. According to ACS data, the total population of Queens County, New York is 2,339,280 and Asian Americans constitute approximately 25.3 percent of the total population. Plaintiff Park lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Asian Americans when compared to the rest of New York.

28. Plaintiff Jeffrey D. Hsi is an Asian American registered voter in Palm Beach County, Florida. He lives in West Palm Beach, Florida. According to ACS data, the total population of West Palm Beach, Florida is 106,805 and Asian Americans constitute approximately 2.8 percent of the total population.

29. Plaintiff Jacinta Titialii Abbott is an Asian American registered voter in Sarasota County, Florida. She lives in Sarasota, Florida. According to ACS data, the total population of

Sarasota, Florida is 404,839 and Asian Americans constitute approximately 1.7 percent of the total population.

30.     Plaintiff Venghan "Winnie" Tang is an Asian American registered voter in Miami-Dade County, Florida.  She lives in Miami, Florida.  According to ACS data, the total population of Miami, Florida is 443,007 and Asian Americans constitute approximately 1% percent of the total population.  Plaintiff Tang lives in a geographic area that contains a proportionately larger population of immigrants and non-U.S. citizens when compared to most of Florida.

31.     Plaintiff Raj Mukherji is an Asian American registered voter in Hudson County, New Jersey.  He lives in Jersey City, New Jersey. According to ACS data, the total population of Jersey City, New Jersey is 265,932 and Asian Americans constitute approximately 25.4 percent of the total population. Plaintiff Mukherji lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Asian Americans when compared to most of New Jersey. Plaintiff Mukherji is a State Assemblyman in the New Jersey Legislature, representing the 33rd Legislative District, and serves as the Majority Whip of the New Jersey General Assembly.

32.     Plaintiff Sharon Tomiko Santos is an Asian American registered voter in King County, Washington.  She lives in Seattle, Washington. According to ACS data, the total population of Seattle, Washington is 688,245 and Asian Americans constitute approximately 25.4 percent of the total population. Plaintiff Santos lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Asian Americans when compared to the rest of Washington. Plaintiff Santos is the State Representative for Washington

State House District 37, Position 1, which includes the historic Chinatown-International District of Seattle, Washington.

33.    Plaintiff Mia Su-Ling Gregerson is an Asian American registered voter in King County, Washington.   She lives in SeaTac, Washington. According to ACS data, the total population of SeaTac, Washington is 28,597 and Asian Americans constitute approximately 15.8 percent of the total population. Plaintiff Gregerson lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Asian Americans when compared to the rest of Washington. Plaintiff Gregerson is the State Representative for Washington State House District 33, Position 2, which includes all or a portion of Burien, Renton, Kent, SeaTac, Des Moines, Normandy Park and Unincorporated King County, Washington.

34.    Plaintiff Jennifer Reyes is a Latina resident and registered voter of Davidson County, Tennessee. According to census data, the total population of Davidson County is 684,015 and Latinos constitute approximately 10.2% of the total population. Plaintiff Reyes lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Latinos when compared to the rest of Tennessee.

35.    Plaintiff Raymond Sanchez is a Latino resident and registered voter of New York County, New York. According to census data, the total population of New York County is 1,632,480 and Latinos constitute approximately 26.0% of the total population. Plaintiff Sanchez lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Latinos when compared to the rest of New York State.

36.    Plaintiff Maricela Lechuga is a Latina resident and registered voter of Santa Clara County, California. According to census data, the total population of Santa Clara County is

1,922,200 and Latinos constitute approximately 25.8% of the total population.  Plaintiff Lechuga lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Latinos when compared to the rest of California.

37.     Plaintiff Marty Ramirez is a Latino resident and registered voter of Lancaster County, Nebraska. According to census data, the total population of Lancaster County is 310,095 and Latinos constitute approximately 6.9% of the total population.  Plaintiff Ramirez lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Latinos when compared to the rest of Nebraska.

38.     Plaintiff Felipe Cruz is a Latino resident and registered voter of Hall County, Nebraska. According to census data, the total population of Hall County is 61,345 and Latinos constitute approximately 27.2% of the total population.  Plaintiff Cruz lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Latinos when compared to the rest of Nebraska.

39.     Plaintiff Alexandra Rosy Palomo-Pujol is a Latina resident and registered voter of Miami-Dade County, Florida. According to census data, the total population of Miami-Dade County is 2,715,515 and Latinos constitute approximately 68.0% of the total population.  Plaintiff Palomo-Pujol lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Latinos when compared to the rest of Florida.

40.     Plaintiff Marco Abarca is a Latino resident and registered voter of Denver County, Colorado.  According to census data, the total population of Denver County is 693,415 and Latinos constitute approximately 30.3% of the total population.  Plaintiff Abarca lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Latinos when compared to the rest of Colorado.Plaintiff Coalition for Humane

Immigrant Rights of Los Angeles (CHIRLA) is an organization based in Los Angeles County, California. It is a nonprofit membership organization whose mission is to advance the human and civil rights of immigrants and refugees through outreach, education, advocacy, civic engagement, and direct legal services.  CHIRLA relies on the accuracy of decennial census data for purposes of strategic planning and communication, resource allocation, and advocacy. According to census data, the total population of Los Angeles County is 10,098,050 and Latinos constitute approximately 48.5% of the total population.  Plaintiff CHIRLA's members live in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Latinos when compared to the rest of California.  CHIRLA has approximately 13,000 members, including Latinos, U.S. citizens, and non-U.S. citizens. Some CHIRLA members are immigrants not authorized to be present in the U.S. Many of CHIRLA's members live in neighborhoods, cities, counties, and voting districts with relatively larger Latino and non-U.S. citizen populations when compared to California and the United States. Plaintiff CHIRLA has members who will suffer the injuries of citizenship misclassification, vote dilution and loss of representation as a result of Defendants' challenged actions.

41.     Plaintiff Ralph Carmona is a Latino registered voter of Cumberland County, Maine. According to census data, the total population of Cumberland County is 290,945 and Latinos constitute approximately 2.0% of the total population.  Plaintiff Carmona lives in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Latinos when compared to the rest of Maine.

42.     Plaintiff Javier Gaston-Greenberg is a Latino registered voter of Kings County, New York. According to census data, the total population of Kings County is 2,600,745 and Latinos constitute approximately 19.2% of the total population.  Plaintiff Gaston-Greenberg lives

in a geographic area that contains a proportionately larger population of immigrants, non-U.S. citizens and Latinos when compared to the rest of New York State.

***Defendants***

43. Defendant Donald J. Trump is the President of the United States. In his official capacity, President Trump issued Executive Order 13880 on July 11, 2019, and the July 21, 2020 Memorandum on Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census. Congress has also instructed the President to transmit a "statement showing the whole number of persons in each state, excluding Indians not taxed, as ascertained under the seventeenth and each subsequent decennial Census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions, no State to receive less than one Member." 2 U.S.C. § 2a. President Trump is sued in his official capacity.

44. ~~15.~~ Defendant Wilbur L. Ross is Secretary of the U.S. Department of Commerce. The Secretary of Commerce carries out the functions and duties imposed on him by the Census Act, issues rules and regulations to carry out his responsibilities, and delegates functions and duties as necessary. 13 U.S.C. § 4. The Secretary of Commerce prepares questionnaires, determines inquiries, and determines the number and form of statistics, surveys, and censuses. 13 U.S.C. § 5. Congress delegated the duty to conduct the census to the Secretary of Commerce, who must take a census on April 1 every 10 years "in such form and content as he may determine[.]" 13 U.S.C. § 141 (a); *see also* 13 U.S.C. § 5. ~~In that capacity, Defendant~~Congress has also directed the Secretary of Commerce to provide apportionment numbers to the President, who in turn, as provided by statute, transmits them to Congress. 13 U.S.C. § 141(b); 2 U.S.C.

§ 2a. In his official capacity, Secretary Ross directed the Census Bureau to produce CVAP information as part of the redistricting dataset provided to ~~States~~states prior to April 1, 2021, for the purpose of ~~affording states the option of using a voter-eligible~~equipping states to use CVAP as the population base for ~~redistricting.  Defendant~~legislative and congressional apportionment. Secretary Ross is sued in his official capacity.

45.    ~~16.~~ Defendant Steven Dillingham is the Director of the U.S. Census Bureau. The Director of the U.S. Census Bureau oversees the 2020 decennial ~~census~~Census operations and is responsible for ensuring the accuracy of the 2020 decennial ~~census~~Census count. Defendant Dillingham directs the Census Bureau and performs census-related duties assigned by law, regulation, or the Secretary of Commerce. 13 U.S.C. § 21. He is sued in his official capacity.

46.    ~~17.~~ Defendant U.S. Department of Commerce is an agency of the U.S. government which oversees the U.S. Census Bureau and its conduct of the decennial ~~census~~Census and other census programs.

47.    ~~18.~~ Defendant U.S. Census Bureau is an agency within the U.S. Department of Commerce. 13 U.S.C. § 2. The Census Bureau is responsible for conducting all census programs, including the development and implementation of the 2020 decennial ~~census~~Census and the collection of information for and formulation of the P.L. 94-171 population tabulations used by states for redistricting.

## JURISDICTION AND VENUE

48.    ~~19.~~ This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiffs' causes of action under the United States Constitution and federal statutes. This Court has jurisdiction under 5 U.S.C. §§ 702 and 704 over Plaintiffs' claims under the APA. This Court may grant Plaintiffs' request for declaratory and injunctive relief under 28 U.S.C. §§

2201 and 2202, and may grant Plaintiffs' requests for mandamus relief pursuant to 28 U.S.C. § 1651.

49.   ~~20.~~ Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1), because:  (1) Defendants Dillingham (in his official capacity) and United States Census Bureau reside in Prince George's County within this District, and (2) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

A.   **Legal and Historical Background ~~onof~~ the ~~U.S.~~ Census and ~~P.L. 94-171 Redistricting Data File~~Congressional Apportionment**

1.   ~~1.~~   **The Census Act, the President, the Secretary of Commerce, and the Census Bureau**

50.   ~~21.~~ The U.S. Constitution requires an "actual Enumeration" of every person living in the United States to take place every ten years. U.S. Const. art. I, § 2, cl. 3.

51.   ~~22.~~ The Constitution gives Congress authority to conduct the census "in such a Manner as [Congress] shall by Law direct," U.S. Const. art. I, § 2, and "vests Congress with wide discretion over ~~. . .~~… the conduct of the census," *Wisconsin v. City of N.Y.*, 517 U.S. 1, 15 (1996). Pursuant to this authority, Congress delegated the duty of conducting the census to the Secretary of Commerce, subject to the provisions of the Census Act of 1976, 13 U.S.C. § 141, *et seq.* (the "Census Act"), and other applicable federal statutes and regulations promulgated thereunder.

52.   ~~23. Section 141(f) of Tile 13,~~The Census Act requires ~~that~~ the Secretary ~~report his "determination[s]" as to the content of the next census within certain deadlines in advance of the~~ to conduct a "decennial census of population" and report to the President a "tabulation of total population by State" from the decennial Census ~~Date~~. 13 U.S.C. § 141(~~f~~a)~~; 90 Stat. 2462~~, (b).

53.   24. The Census Act authorizes the Secretary to collect information "other" than total population only "as necessary."   13 U.S.C. § 141(a). The Secretary may not modify the "subjects" for the decennial census report to Congress under § 141(f)(1), without finding that "new circumstances exist under which necessitate" such a modification and reporting that finding to Congress. *Id*. § 141(f)(3).

54.   25. Section 6 of Title 13 addresses the methods that the Secretary is authorized to use in collecting data other than the enumeration of total population for apportionment purposes. In particular, Section 6 provides:

> (a) The Secretary, whenever he considers it advisable, may call upon any other department, agency, or establishment of the Federal Government, or of the government of the District of Columbia, for information pertinent to the work provided for in this title.
>
> (b) The Secretary may acquire, by purchase or otherwise, from States, counties, cities, or other units of government, or their instrumentalities, or from private persons and agencies, such copies of records, reports, and other material as may be required for the efficient and economical conduct of the censuses and surveys provided for in this title.
>
> (c) To the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required, the Secretary shall acquire and use information available from any source referred to in subsection (a) or (b) of this section instead of conducting direct inquiries.

13 U.S.C. § 6.

55.   26. The Census Bureau is a statistical agency subject to the standards and directives of the Office of Management and Budget ("OMB") under the Paperwork Reduction Act ("PRA"), 44 U.S.C. §§ 3501-21, and the federal Information Quality Act ("IQA"), *see* consolidated Appropriations Act of 2001, Pub. L. No. 106-554, 114 Stat. 2763 (2000) (amending PRA). *See also* 5 C.F.R. § 1320.18(c).

56.    27. The PRA sets forth standards that federal agencies must meet before the OMB can approve a proposed data collection, and requires the OMB to "coordinate the activities of the Federal statistical system to ensure the efficiency and effectiveness of the system[] and the integrity, objectivity, impartiality, utility, and confidentiality of information collected for statistical purposes."  44 U.S.C. § 3504(e)(1). *See also*, the IQA, consolidated Appropriations Act of 2001, Pub. L. No. 106-554, 114 Stat. 2763 (2000).

57.    28. Under the OMB's Policy Directive No. 1, federal statistical agencies must: (1) provide objective, accurate, and timely information; (2) have credibility with data users; (3) have the trust of the individuals whose information is collected; and (4) be independent from political and other undue external influence in the development, production, and dissemination of statistics.[1]

58.    29. Policy Directive No. 1 states that the Census Bureau is a federal statistical agency. The Directive also states that federal statistical agencies must "seek input regularly from the broadest range of private-and public-sector data users" in any plans for information collection or dissemination and must "apply sound statistical methods to ensure statistical products are accurate."[2]

59.    30. The Census Bureau must also "conduct objective statistical activities," which means that they must "produce data that are impartial, clear, and complete" and make

---

[1]        Statistical Policy Directive No. 1:  Fundamental Responsibilities of Federal Statistical Agencies and Recognized Statistical Units ("Policy Directive No.1"), 79 Fed. Reg. 71611-12        (Dec.        2,        2014),        *available        at* https://www.govinfo.gov/content/pkg/FR-2014-12-02/pdf/2014-28326.pdf.

[2]        *Id*. at 71615.

information available on an "equitable, policy-neutral, transparent, timely, and punctual basis."[3]

The agency "must seek to avoid even the appearance that agency design, collection, processing, editing, compilation, storage, analysis, release, and dissemination processes may be manipulated."[4]  To guarantee such impartiality, statistical agencies including the Census Bureau "must function in an environment that is clearly separate and autonomous from the other administrative, regulatory, law enforcement, or policy-making activities within their respective Departments" and "must be able to conduct statistical activities autonomously when determining information to collect and process."[5]

60.    ~~31.~~ Pursuant to the IQA, the Census Bureau's Information and Quality Guidelines state that the Census Bureau must "provide information that is accurate, reliable, and unbiased."[6]

**~~2.    Apportionment, the Bureau's Apportionment Tabulation, State Redistricting, and the P.L. 94-171 Redistricting Data File~~**

61.    The Census Bureau's "Statistical Quality Guidelines"[7] were issued to comply with the IQA guidance, which complements the Statistical Policy Directives issued by OMB and the Principles and Practices for a Federal Statistical Agency issued by the National Research Council of the National Academies.[8] "By following these standards, the Census Bureau . . . will

---

| [3] | *Id.* |
| [4] | *Id.* |
| [5] | *Id.* at 71615. |

[6]      Information Quality Guidelines Objectivity, U.S. Census Bureau, https://www.census.gov/about/policies/quality/guidelines/objectivity.html (last visited Aug. 28, 2019).

[7]      *Available                                                                                      at*: https://www.census.gov/content/dam/Census/about/about-the-bureau/policies_and_notices/quality/statistical-quality-standards/Quality_Standards.pdf

[8]      *Available at*: https://www.nap.edu/read/12564/chapter/1

ensure the utility, objectivity, and integrity of the statistical information provided by the Census Bureau to Congress, to federal policy makers, to sponsors, and to the public."[9]

62.     The Statistical Quality Guidelines establish various processes and requirements for Census data products, including but not limited to, planning stages for Census programs, standards for administrative records, testing requirements, and requirements to ensure that the Census Bureau uses statistically sound practices to produce data.

63.     The Census Bureau is required to adhere to these Statistical Quality Guidelines when producing a data product, including the block level CVAP data. However, the Census Bureau has to date failed to fulfill its obligations under the Guidelines for the block level CVAP dataset and does not have the time to complete the required planning, research, and testing in order to produce accurate and reliable block level CVAP data at this late stage.

## 2.  The Census Enumeration Process

64.     The Census Bureau has conducted four Censuses since the adoption of the Census Act of 1976. Each Census has included mail-in self-response questionnaires as well as four field operations deemed essential to achieving an accurate enumeration. The field operations include non-response follow-ups, non-response re-interviews, vacant-delete checks, and residual canvassing.[10]

---

[9]     U.S. Census Bureau, "U.S. Census Bureau Statistical Quality Standards" (Reissued July 2013), at i, *available at*: https://www.census.gov/content/dam/Census/about/about-the-bureau/policies_and_notices/quality/statistical-quality-standards/Quality_Standards.pdf.

[10]     U.S. Census Bureau, 1980 Census of Population and Housing, Chapter 5, *available at* https://www.census.gov/prod/www/decennial.html; U.S. Census Bureau, 1990 Census of Population and Housing, Chapter 6, *available at* https://www2.census.gov/prod2/cen1990/cph-r/cph-r-2.pdf; U.S. Census Bureau, Census 2000 Operational Plan (December 2000), *available at*

65.     The Census Bureau delivers questionnaires to every addressed household in the United States in the early part of the census year. Most households self-respond using these questionnaires. In 2010, 79.3% of occupied households responded to the Census using the mail-in questionnaire.[11]

66.     After an initial period of self-response collection, the Census Bureau establishes field offices to facilitate the enumeration of the remaining population. The first operation conducted by the field offices is an initial door-knocking campaign referred to as non-response follow-ups ("NRFU").[12]  Running concurrently with NRFU, field offices conduct re-interviews to correct discrepancies and ensure an accurate count.

67.     After processing the NRFU and re-interviews, field offices transition to vacant-delete checks and residual canvassing. Each of these steps must be completed in sequence and specific processes must be completed before field offices move on to the next activity. Vacant-delete checks require field operators to investigate vacant and non-existent listed housing units throughout the country, confirming or correcting their status. Residual canvassing on nonresponsive households is conducted to interview individuals who were not captured in the previous phases of the Census, and has occurred in some form near the end of the field operation in the past four censuses.

---

https://www.census.gov/dmd/www/pdf/Operational2000.pdf; U.S. Census Bureau, 2010 Census Planning Memoranda Series: 2010 Census Nonresponse Followup Operations Assessment Report (April 30, 2012), *available at* https://www.census.gov/content/dam/Census/library/publications/2012/dec/2010_cpex_190.pdf.

[11]     U.S. Census Bureau, 2010 Census Planning Memoranda Series: 2010 Census Mail Response/Return Rates Assessment Report (June 6, 2012) at 14, *available at* https://www.census.gov/content/dam/Census/library/publications/2012/dec/2010_cpex_198.pdf.

[12]     In 1980 this operation was termed Followup 1. *See* 1980 Census of Population and Housing, Chapter 5.

68.     These field operations are time intensive and necessary to accurately enumerate the population of the United States. Of the past four Censuses, three had field operations that lasted approximately three months, and one had a field operation lasting more than six months.[13]

### 3.     The Use of Census Data in Congressional Apportionment

69.     ~~32.~~ The decennial count of the national population is used to allocate seats in the U.S. House of Representatives to states based on the "whole number of persons in each State." U.S. Const. amend. XIV, § 2.

70.     More than two hundred years of history, practice and precedent confirms that the apportionment of Representatives must be based on a count of *all* persons residing in each state, regardless of their citizenship or immigration status.

71.     Under the "Great Compromise" brokered at the Constitutional Convention of 1787, each state received two seats in the Senate and a number of House seats allocated based on states' total populations. "Representatives and direct Taxes," therefore, "shall be apportioned among the several States which may be included within this Union, according to *their respective Numbers*." U.S. Const., art. I, § 2, cl. 3 (emphasis added); *see Wesberry v. Sanders*, 376 U.S. 1, 13–14 (1964); *Evenwel v. Abbott*, 136 S. Ct. 1120, 1127 (2016).

72.     In line with this express constitutional mandate, every ten years since 1790, the federal government has conducted a Census that counts all persons residing within the United States, irrespective of citizenship or legal status. Notably, and relevant to Defendants' current

---

[13]     *See id*. at 26, 38 (198 day field operation in 1980); 1990 Census of Population and Housing, Chapter 6 at 34, 38 (89 day field operation in 1990); Census 2000 Operational Plan at 12-13 (at least 93 day field operation between April and August 2000, but exact dates not available); 2010 Census Nonresponse Followup Operations Assessment Report at 47, 108, 153, 192 (112 day field operation in 2010).

strategy, in a resounding and constitutionally contemptible mark of the now discredited link between racism and political exclusion, until the passage of the Fourteenth Amendment, the Constitution directed that, in states that allowed slavery, enslaved persons should be counted as three-fifths of a person for purposes of congressional apportionment.

73.     In framing what is now the Fourteenth Amendment, Congress reconsidered the Apportionment Clause but did not alter the requirement that apportionment be based on a count of the "whole number of persons in each state." U.S. Const. amend. XIV, § 2; *Evenwel*, 136 S. Ct. at 1127-1128.

74.     In fact, Congress rejected a proposal for voter-based apportionment and recognized that "women, children, and *other non-voting classes* may have as vital an interest in the legislation of the country as those who actually deposit the ballot." *Evenwel*, 136 S. Ct. at 1128 (quoting Cong. Globe, 39th Cong., 1st Sess., 141 (1866) (remarks of Rep. Blaine)) (emphasis added). Specifically, by excluding non-U.S. citizens, voter-based apportionment of congressional seats would fly in the face of long-settled constitutional principles: "Under the Constitution as it now is and as it always has been, the entire immigrant population of this country is included in the basis of representation." Cong. Globe, 39th Cong., 1st Sess., 432 (1866) (remarks of Rep. Bingham); *see also id*. at 411 (representation based on number of voters improperly "takes from the basis of representation all unnaturalized foreigners" (Rep. Burton Cook)).

75.     Since the passage of the Fourteenth Amendment, it has been understood that exclusion of non-U.S. citizens from apportionment—whether documented or not—would require an amendment of the Constitution. *See, e.g.*, *Fed. For Am. Immigration Reform (FAIR) v. Klutznick*, 486 F. Supp. 564, 576-577 (D.D.C.) (three-judge court) ("[I]t appears to have been

generally accepted that [exclusion of non-U.S. citizens from enumeration] would require a constitutional amendment."), *appeal dismissed*, 447 U.S. 916 (1980).

76. Time and again, the Supreme Court and other courts have reaffirmed the Constitution's requirement that congressional apportionment be based on the total number of *all persons living in each state*. *See, e.g.*, *Wesberry*, 376 U.S. at 10-18; *Evenwel*, 136 S. Ct. at 1127-1129. Moreover, courts have consistently recognized that that the "whole number of persons" used to apportion Representatives includes "every single person residing in the United States, whether citizen or noncitizen, whether living here with legal status or without." *See, e.g.*, *New York v. United States Dep't of Commerce*, 351 F. Supp. 3d 502, 514 (S.D.N.Y. 2019), *affirmed in part, reversed on other grounds in part by Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2576 (2019); *see also Klutznick*, 486 F. Supp. at 576-578.

77. The Executive Branch, irrespective of the party in power, has consistently adhered to this long-standing constitutional principle that apportionment be based on a count of all inhabitants, irrespective of citizenship or immigration status—until now.

78. For example, in 1980, during the administration of President Carter, private plaintiffs filed a lawsuit seeking to exclude "illegal aliens" from the Census and the congressional apportionment base. *Klutznick*, 486 F. Supp. at 565. Opposing the suit, the U.S. Department of Justice argued that excluding non-U.S. citizens—whether documented or not—would be "a radical revision of the constitutionally mandated system for allocation of Representatives to the States of the Union and an equally radical revision of the historic mission of the decennial census." Federal Defendants' Post-Argument Mem. at 1, *FAIR v. Klutznick*, No. 79-3269 (D.D.C. filed Feb. 15, 1980).

79.   Next, in 1988 and 1989 during the administrations of Presidents Reagan and Bush, and in response to inquiries about the possibility of excluding "illegal aliens" from congressional apportionment base, the DOJ consistently found that any such exclusion was unconstitutional. *See, e.g.*, Letter from Assistant Attorney Gen. Carol T. Crawford to Honorable Jeff Bingaman (Sept. 22, 1989), in 135 Cong. Rec. S22,521 (daily ed. Sept. 29, 1989).

80.   Against this long historical backdrop, the Supreme Court four years ago unanimously reaffirmed that Section 2 of the Fourteenth Amendment "retained total population as the congressional apportionment base." *Evenwel*, 136 S. Ct. at 1129; *see also id.* at 1148 (Alito, J., concurring in the judgment) and at 1138 (Thomas, J., concurring in the judgment).

81.   ~~33. Federal~~Today, federal law requires the Secretary of Commerce, by the end of the census year, to deliver the "tabulation of total population of states ~~. . . .~~… for the apportionment of Representatives in Congress among the several States" to the President ~~by the end of the census year~~, who must report them to Congress within a week after the start of Congress's new session. 13 U.S.C. § 141(a)-(b); 2 U.S.C. § 2a.

82.   The regulations and guidance materials of the U.S. Department of Commerce reflect that the 2020 decennial Census *must* count foreign citizens living in the United States. 83 Fed. Reg. 5525, 5526 (Feb. 8, 2018). Department regulations explain that this approach is "guided by the constitutional and statutory mandates to count all residents of the several states." *Id.*

83.   Specifically, regulations require the Census Bureau to include in the decennial Census each foreign citizen who "lives and sleeps most of the time" at a residence in the United States. 83 Fed. Reg. at 5526, 5530; *see also* U.S. Dep't of Commerce, Residence Criteria and Residence Situations for the 2020 Census of the United States, at 2 (explaining that "[c]itizens of

foreign countries living in the United States" are to be "[c]ounted at the U.S. residence where they live and sleep most of the time").[14]

84.    After the Census is complete, the Secretary of Commerce ~~takes the census in a form and content determined by the Secretary of Commerce, he~~ reports the "tabulation of total population ~~tabulations to the President.~~by States … as required for the appointment of Representatives in Congress." 13 U.S.C. § 141(b). ~~"After receiving the Secretary's report, the~~

85.    ~~34.~~ The President ~~'shall~~is required to transmit to Congress, within one week of the first day of the Congress ~~a statement showing~~ seated in 2021, "the whole number of persons in each State ~~. . .~~… as ascertained under the ~~. . .~~… decennial census of the population~~,~~" and "the number of Representatives to which each ~~State~~state would be entitled ~~under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions[.]'" *Franklin v. Massachusetts*, 505 U.S. 788, 792 (1992) (quoting~~." 2 U.S.C. § 2a(a)~~).~~.~~

86.    Congress has specified the methodology the President shall use in apportioning congressional seats by state: the "method of equal proportions."  2 U.S.C. § 2a(a). That methodology specifies a process for calculating the number of representatives to which each state is entitled based on applying calculations to the population of each state as ascertained under the decennial Census. *See U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 455 n.26 (1992); *see also* 83 Fed. Reg. at 5526 n.1 ("Apportionment is based on the resident population, plus a count of overseas federal employees, for each of the 50 states.").

---

[14]    *Available at*:  https://www.census.gov/content/dam/Census/programs-surveys/decennial/2020-census/2020-Census-Residence-Criteria.pdf.

87.     All three branches of government have recognized that the President's role in this statutory scheme is narrowly circumscribed, and primarily a matter of applying a formula to the "whole number of persons in each State . . . as ascertained under the . . . decennial census," 2 U.S.C. § 2a(a), rather than granting him broad authority to substitute his preferred figures for those reported by the Secretary. *See, e.g.*, *Franklin*, 505 U.S. at 800 (describing President's role as "mak[ing] the calculations and send[ing] the final apportionment to Congress"); *id.* at 811 (Stevens, J., concurring) (noting statement of congressional sponsor of apportionment statute that the "function served by the President is as purely and completely a ministerial function as any function on earth could be" (quoting 71 Cong. Rec. 1858 (1929)); *id.* at 813 (noting statement of then–Deputy Solicitor General John Roberts that statute directs President "to apply, of course, a particular mathematical formula to the population figures he receives," and it would be "unlawful just to say, these are the figures, they are right, but I am going to submit a different statement").

### 4.  The Use of Census Data in State Legislative Redistricting

88.     ~~35.~~ Decennial census data are also used for state congressional and legislative redistricting. *See*, *e.g.*, 13 U.S.C. § 141(c) ("tabulations of population of each State ~~. . .~~… shall ~~. . .~~… be completed, reported, and transmitted to each respective State within one year after the decennial census date" by the Secretary of Commerce).

89.     ~~36.~~ Public Law (P.L.) 94-171, enacted in 1975 and codified in 13 U.S.C. § 141(c), "directs the Census Bureau to make special preparations to provide redistricting data needed by the fifty states. Within a year following Census Day, the Census Bureau must send the data agreed upon to redraw districts for the state legislature to each state's governor and majority and minority legislative leaders."[15]

---

[15]     Public Law 94-171 (P.L. 94-171), U.S. Census Bureau, Fact Finder, https://factfinder.census.gov/help/en/public_law_94_171_p_l_94_171.htm (last visited Aug. 15,

90.    ~~37.~~ To fulfill this obligation, the Census Bureau is also required to conduct the program in a non-partisan manner. 13 U.S.C. § 141(c).

91.    ~~38.~~ To comply with the requirements of P.L. 94-171, "the Census Bureau set up a voluntary program that enables participating states to receive data for voting districts (e.g., election precincts, wards, state house and senate districts) in addition to standard census geographic areas such as counties, cities, census tracts, and blocks."[8][16]

92.    Thus, the P.L. 94-171 Redistricting Data File provides data at the census block level.

93.    ~~39.~~ While P.L. 94-171 ~~only~~ requires the Census Bureau only to furnish counts of the total population, additional data items are also included. For example, since 1990 the Census Bureau has included summaries for the major race groups specified by the Statistical Programs and Standards Office of the OMB in Directive 15 (as issued in 1977 and revised in 1997).[9][17]

94.    Since the passage of Public Law 94-171, citizenship data has not been included in any of the tabulations contained within the P.L. 94-171 Redistricting Data File.

95.    ~~40.~~ The ~~2020~~ Census Bureau did not plan to create a block level citizenship dataset as a data product for Census 2020.  On July 15, 2014, the Census Bureau announced and sought public comments on the establishment of the 2020 Census Redistricting Data Program ("2020 CRDP") ~~provides states the opportunity to delineate voting districts and to suggest census~~

---

https://factfinder.census.gov/help/en/public_law_94_171_p_l_94_171.htm (last visited Aug. 15, 2019).

[8][16]    *Id.*

[9][17]    Decennial Census P.L. 94-171 Redistricting Data, U.S. Census Bureau (Mar. 8, 2017),                                     *available*                                     *at* https://www.census.gov/programs-surveys/decennial-census/about/rdo/summary-files.html.

block boundaries for use in the 2020 census redistricting data tabulations ("P.L. 94-171 Redistricting Data File"). .[18] The CRDP is also "responsible for the effective delivery of the 2020 Census P.L. 94-171 Redistricting Data ("P.L. 94-171 Redistricting Data File") prior to April 1st, 2021, one year from census day."[10][.]"[19]

41. On July 15, 2014, the Census Bureau announced and sought public comments on the establishment of the 2020 CDRP.[11]

96. 42. As part of its process, the Census Bureau issued a "prototype product to illustrate what the states can expect from the decennial census."[12][20] The "prototype data product [is used] to illustrate and solicit feedback on what the 2020 Census P.L. 94-171 Redistricting Data File will look like and how it addresses the needs of the states for their legislative redistricting requirements. This prototype is used to build and test systems in advance of the

---

[18] Establishment of the 2020 Census Redistricting Data Program, 79 Fed. Reg. 41258 (Jul. 15, 2015), *available at* https://www.govinfo.gov/content/pkg/FR-2014-07-15/pdf/2014-16532.pdf.

[10] Redistricting & Voting Rights Data Office, *Redistricting Data Program Management*, U.S. Census Bureau (last revised Dec. 27, 2018), https://www.census.gov/programs-surveys/decennial-census/about/rdo/program-management.html?.

[19] Redistricting & Voting Rights Data Office, *Redistricting Data Program Management*, U.S. Census Bureau (last revised Dec. 27, 2018), https://www.census.gov/programs-surveys/decennial-census/about/rdo/program-management.html?.

[11] Establishment of the 2020 Census Redistricting Data Program, 79 Fed. Reg. 41258 (Jul. 15, 2015), *available at* https://www.govinfo.gov/content/pkg/FR-2014-07-15/pdf/2014-16532.pdf.

[12][20] Redistricting & Voting Rights Data Office, *Redistricting Data Program Management*, U.S. Census Bureau (last revised Dec. 27, 2018), https://www.census.gov/programs-surveys/decennial-census/about/rdo/program-management.html?.

official data release so that states can begin work immediately, as many have short statutory deadlines that begin with the receipt of their data."[13][21]

97.   43. The Census Bureau's standard procedure is "[i]f substantive changes are needed to the 2020 Census P.L. 94-171 Redistricting Data File design based on comments received regarding this prototype, then an additional Federal Register Notice explaining those differences will be issued."[14][22]

98.   44. On November 8, 2017, the Census Bureau published a notice in the Federal Register asking for public comment on the "Proposed Content for the Prototype 2020 Census Redistricting Data File."[15][23]  The prototype did not include citizenship population tabulation data as substantive content to be included in the P.L. 94-171 file. The Census Bureau received three public comments. None of the public comments requested that the Census Bureau include citizenship data in the 2020 Census Redistricting File.[16][24]

99.   45. The final Prototype 2020 Census Redistricting Data File published in the Federal Register on May 1, 2018, did not include citizenship population tabulation data as substantive content to be included in the P.L. 94-171 file.[17][25]

| [13][21] | *Id.* |
|---|---|
| [14][22] | *Id.* |

[15][23]    Ron Jarmin, *Final Content Design for the Prototype 2020 Census Redistricting Data File* (Apr. 24, 2018), *available at*

https://www.federalregister.gov/documents/2018/05/01/2018-09189/final-content-design-for-the-prototype-2020-census-redistricting-data-file.

| [16][24] | *Id.* |
|---|---|

[17][25]    *2020 Census Prototype Redistricting Data (Public Law 94-171) Summary File from the End-to-End Census Test*, U.S. Census Bureau, https://www2.census.gov/programs-surveys/decennial/rdo/about/2020-census-program/Phase3/~~Phase3_prototype_schematic_final~~Phase3_prototype_schematic_final.pdf?# (last visited Aug. 27, 2019).

46. On December 28, 2018, in connection with the Census Bureau's submission to OMB

for clearance, the Census Bureau submitted a proposal for collection of information under the

provisions of the PRA.[18]The proposal posted to the Federal Register, included the following

notice:

The purpose of the 2020 Census Redistricting Data Program (RDP) is to provide
to each state the legally required redistricting data tabulations by the mandated
deadline of one year from Census Day: April 1, 2021. In compliance with Public
Law (Pub. L.) 94-171, the Census Bureau will tabulate for each state the total
population counts by race and Hispanic origin. The Census Bureau will tabulate
these counts for the total population and for the population age 18 and over in a
prototype redistricting data file released as part of the 2018 End-to-End Census
Test. The Census Bureau intends to work with stakeholders, specifically "the
officers or public bodies having initial responsibility for the legislative
apportionment of each state," to solicit feedback on the content of the prototype
redistricting data file. If those stakeholders indicate a need for tabulations of
citizenship data on the 2020 Census Public Law 94-171 Redistricting Data File,
the Census Bureau will make a design change to include citizenship as part of that
data.[19]

47. The December 28, 2018 notice was issued in connection with a prior proposal that

included a citizenship question on the 2020 decennial census for the pretextual reason of using

the data for VRA enforcement.

48. Since its creation, citizenship population data has not been included in any of the

tabulations contained within the P.L. 94-171 Redistricting Data File.

100. 49. In February 2019, the Department of Commerce released the final version of

the OMB request.[20][26] The request noted that the issue of whether a citizenship question would

---

[18] *OMB Information Collection Request, 2020 Census, OMB Control Number 0607-1006*,
Department of Commerce and U.S. Census Bureau, *available* at
https://www.reginfo.gov/public/do/DownloadDocument?objectID=88197702 (last visited Sep.
13, 2019).

[19] *Id.* at 38-39.

[20] [26] *Information Collection Request 2020 Census – Enumeration Operations OMB
Control Number 0607-1006,* U.S. Census Bureau, *available at* https://t.co/j0FuZmgUKf?amp=1.

be included in the 2020 ~~census~~Census was still being litigated.[~~21~~27]   The document also
~~provides~~provided that if "stakeholders indicate a need for tabulations of citizenship data on the
2020 Census P.L. 94-171 Redistricting Data File, the Census Bureau will make a design change
to include citizenship as part of that data, if collected.~~ That new design would then be published
in the Federal Register after it is completed in the summer of 2019.~~"[~~22~~28]

101.   ~~50.~~ On March 29, 2019, the Census Bureau published the prototype redistricting
data file to states based on the test enumeration of Providence County, Rhode Island~~,~~ that took
place in 2018.[~~23~~29]   The Providence County, Rhode Island test did not collect citizenship data, and
the prototype redistricting data file did not contain citizenship data.

### 5. ~~3.~~   Citizenship Data From the Census Bureau's American Community Survey

102.   Despite Defendants' unlawful and unsuccessful effort, described elsewhere
herein, to add a question to the 2020 decennial Census regarding the citizenship of respondents
and their households, no such question has been included. There also is no question on the 2020
decennial Census regarding the immigration status of respondents and their households.
Therefore, the 2020 decennial Census "hard count" will not include a count of the total
population divided into citizen and non-citizen categories and will not include information on the
immigration status of respondents.

---

| | |
|---|---|
| [~~21~~27] | *Id*. at 38-42. |
| [~~22~~28] | *Id*. at 30-31 (emphasis added). |
| [~~23~~29] | *See* U.S. Census Bureau Press Release, *2018 Census Test Complete, Prototype Redistricting File Sent to States* (Mar. 29, 2019), *available at* https://www.census.gov/newsroom/press-releases/2019/prototype-redistricting-file.html. |

51. There will not be a question on the 2020 decennial census regarding the citizenship of respondents and their households.  Therefore, the decennial census hard count will not include a count of the total population divided into citizen and non-citizen categories.

103.   52. The American Community Survey ("ACS") is an ongoing, yearly survey by the Census Bureau that collects detailed demographic information including ancestry, citizenship, educational attainment, income, language proficiency, migration, disability, employment, and housing characteristics from approximately 2.5 percent of U.S. households. ACS data are based on self-reporting by respondents.

104.   ACS data are an estimate of population characteristics, including citizenship, are based on sample data, and are not a count of U.S. citizens and non-citizens.  ACS data are non-U.S. citizens.

105.   ACS data are reported at the census block group level and, unlike decennial survey Census data, are not available at the census block level.

106.   53. ACS data are not used to determine whether voting districts are equipopulous and comply with the "one person, one vote" constitutional requirement. Rather, "in the overwhelming majority of cases, jurisdictions have equalized total population, as measured by the decennial census" total population enumeration. *Evenwel v. Abbott*, 136 S. Ct. 1120,at 1124 (2016).

**B.   Defendants' Collection of Citizenship Data For Apportionment and Redistricting Purposes**

107.   The citizenship question in the ACS does not ask individuals about their immigration status. Thus, the ACS does not make it possible to estimate who is and is not an undocumented immigrant. ACS data does not show the immigration status of persons in the United States.

108.     Further, the Census Bureau has represented, via a declaration by Census Bureau Senior Advisor Enrique Lamas, that it "lack[s] … accurate estimates of the resident undocumented population" on a state-by-state basis. Defendants' Supp. Rule 26(a)(1) Disclosures and Rule 26(a)(2)(C) Disclosures, *State of Alabama v. Dep't of Commerce*, Case No. 2:18-cv-00772-RDP (N.D. Ala. March 13, 2020).

**109.**     Therefore, in order to reach any conclusions concerning the undocumented population, the Census Bureau must by necessity rely on statistical modeling or sampling to fill in acknowledged data gaps.

110.     Among other uses, states use ACS data on citizenship in order to evaluate proposed redistricting plans for compliance with section 2 of the Voting Rights Act of 1965, which prohibits minority vote dilution.  52 U.S.C. § 10101.

111.     In conjunction with its effort to create a block level citizenship dataset using administrative records, the Census Bureau has cancelled the release of ACS citizenship data in February 2021, explaining "the Post 2020 Census CVAP Special Tabulation, based on the 2020 Census, administrative records data, and other possible census data, will replace the CVAP tables based on the American Community Survey that would have been released in February 2021 from the 2015-2019 ACS data."[30]

---

[30]     Census Bureau, Post-2020 Census Citizen Voting Age Population by Race and Ethnicity (CVAP) Special Tabulation, available at https://www2.census.gov/programs-surveys/decennial/rdo/technical-documentation/special-tabulation/ CVAP_Post2020_Census_documentation_v5.pdf?

## B. Attempts To Add A Citizenship Question To The Census

112. 54. On March 26, 2018, Defendant Ross issued a decisional memorandum that directed the Census Bureau to add a citizenship question to the 2020 censusCensus and to use federal and state administrative records to validate census responses to the citizenship question. Defendant Ross falsely claimed that the reason for adding the citizenship question was to collect citizenship data to assist the Department of Justice ("DOJ") in its enforcement of the VRA.

113. 55. Several lawsuits successfully challenged the addition of the citizenship question as unlawful and three federal courts permanently enjoined Defendants from adding a citizenship question to the 2020 census.[24]Census.[31]

114. 56. On June 27, 2019, the United States Supreme Court determined that the "VRA enforcement rationale—the sole stated reason [for adding a citizenship question]—seems to have been contrived." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019).

115. 57. Defendants were also permanently enjoined from "delaying the process of printing the 2020 decennial census questionnaire after June 30, 2019 for the purposes of including a citizenship question; and from asking persons about citizenship status on the 2020 Census questionnaire or otherwise asking a citizenship question as part of the 2020 decennial Census." *Kravitz v. Dep't of Comm.Commerce*, No. 18-cv-1041 (D. Md.), ECF No. 203; *see*

---

[24] *See Kravitz v. Dep't of Commerce*, 366 F. Supp. 3d 681, 755 (D. Md. 2019); *California v. Ross*, 358 F. Supp. 3d 965, 1050 (N.D. Cal. 2019); *New York v. Dep't of Commerce*, 351 F. Supp. 3d 502, 679 (S.D.N.Y.), aff'd in part, revd in part and remanded sub nom. *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019).

[31] *See Kravitz v. Dep't of Commerce*, 366 F. Supp. 3d 681, 755 (D. Md. 2019); *California v. Ross*, 358 F. Supp. 3d 965, 1050 (N.D. Cal. 2019); *New York v. Dep't of Commerce*, 351 F. Supp. 3d 502, 679 (S.D.N.Y.), *aff'd in part, rev'd in part and remanded sub nom. Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019).

*also California*, 358 F. Supp. 3d at 1050 (permanently enjoining defendants from including citizenship question on 2020 ~~census~~Census); *New York*, 351 F. Supp. 3d 502 at 679 (same).

116.   Shortly after the Supreme Court decision in *Dep't of Commerce v. New York*, President Trump announced that the Commerce Department would still move forward with adding a citizenship question to the 2020 Census.[32]  He retracted that position a week later.[33]

### C.   Collection of Citizenship Data for Apportionment and Redistricting Purposes

#### 1.   The President's Executive Order 13880

117.   ~~58. On~~ Immediately following the administration's representation that it would no longer seek to add a citizenship question to the 2020 Census survey, on July 11, 2019, President Trump issued EO 13880 requiring that, among other things, all executive departments and agencies provide the Department of Commerce "the maximum assistance permissible, consistent with law, in determining the number of citizens and non-citizens in the country, including by providing any access that the Department may request to administrative records that may be useful in accomplishing" the objective of collecting citizenship data.[~~25~~34]  EO 13880 also directs Secretary Ross to instruct the Census Bureau to create an inter-agency working group to collect

---

[32]     *See* Donald J. Trump (@realDonaldTrump), TWITTER (July 3, 2019, 11:06 AM), https://twitter.com/realdonaldtrump/status/1146435093491277824 (announcing that the Commerce Department was "absolutely moving forward" with a citizenship question on the census).

[33]     *Remarks by President Trump on Citizenship and the Census*, The White House (July 11, 2019, 5:37 p.m.), *available at* https://www.whitehouse.gov/briefings-statements/remarks-president-trump-citizenship-census/.

[~~25~~ 34]     *Executive Order on Collecting Information about Citizenship Status in Connection with the Decennial Census* at § 1 (July 11, 2019), *available at* https://www.whitehouse.gov/ presidential-actions/executive-order-collecting-information-citizenship-status-connection-decennial-census/.

citizenship data in connection with the 2020 decennial ~~census~~Census for redistricting, directs the Department of Commerce to "strengthen its efforts, consistent with law, to obtain State administrative records concerning citizenship," and later directs that the Department "shall strengthen its efforts, consistent with law, to gain access to relevant State administrative records."[26][35]

118.   ~~59.~~ EO 13880 states several pretextual reasons for collecting ~~robust~~ citizenship data from all federal agencies and states, including:  (1) "data on the number of citizens and aliens in the country is needed to help us understand the effects of immigration on our country and to inform policymakers considering basic decisions about immigration policy"; (2) "the lack of complete data on numbers of citizens and aliens hinders the Federal Government's ability to implement specific programs and to evaluate policy proposals for changes in those programs"; and (3) "data identifying citizens will help the Federal Government generate a more reliable count of the unauthorized alien population in the country," which is necessary to "evaluat[e] many policy proposals."[27][36]

119.   ~~60.~~ The executive order also lists, at least in part, the true reason for the order and for Secretary Ross's prior decision to add a citizenship question to the 2020 ~~census~~Census and current plan to collect administrative records to create an enumeration of citizens for the 2020 Census: so that  "State and local legislative districts [can redistrict] based on the population of voter-eligible citizens."[28][37]  EO 13880 further states that "because eligibility to vote depends in

| [26][35] | *Id*. at §§ 1, 3(b), and 3(d). |
| [27][36] | *Id*. at § 1. |
| [28][37] | *Id*. |

part on citizenship, States could more effectively exercise this option with a more accurate and complete count of the citizen population."[29][38]

120. 61. To that end, EO 13880 instructs the Census Bureau to continue its efforts to "make a design change to make [tabulations of citizenship data] available" for interested states to use for state and local redistricting purposes.[30][39]

121. 62. That same day during a press conference, President Trump stated that his intention in issuing EO 13880 is so that "[t]he Census Bureau can use [citizenship] information, along with information collected through the questionnaire, to create the official census. In other words, as a result of today's executive order, we will be able to ensure the 2020 Census generates an accurate count of how many citizens, non-citizens, and illegal aliens are in the United States of America."[31][40]

122. 63. The President further stated that, "[t]his information is also relevant to administering our elections" because "[s]ome states may want to draw state and local legislative districts based upon the voter-eligible population," and that the Supreme Court "would not review certain types of districting decisions, which could encourage states to make such decisions based on voter eligibility."[32][41]

123. 64. Attorney General William Barr further added that "there is a current dispute over whether illegal aliens can be included for apportionment purposes. Depending on the

| | |
|---|---|
| [29][38] | *Id.* |
| [30][39] | *Id.* |
| [31][40] | *Remarks by President Trump on Citizenship and the Census*, The White House (July 11, 2019, 5:37 p.m.), *available at* https://www.whitehouse.gov/briefings-statements/remarks-president-trump-citizenship-census/. |
| [32][41] | *Id.* |

resolution of that dispute, this data may be relevant to those considerations," and that the DOJ "will be studying this issue."³³⁴²

124.   65.  On July 12, 2019, the Census Bureau published a revision of the February 2019 OMB request, reportedly backdated to July 3, 2019, that statedannounced that Defendant Ross "directed the Census Bureau to proceed with the 2020 Census without a citizenship question on the questionnaire, and rather to produce Citizen Voting Age Population (CVAP) information prior to April 1, 2021 that states may use in redistricting."³⁴⁴³

125.   Defendants have taken steps to create the block level CVAP dataset, including the creation of the Interagency Working Group, under EO 13880, charged with facilitating the Census Bureau's acquisition of administrative records to be used to establish citizenship status for 100 percent of the population.

126.   Upon information and belief, Defendants have received administrative records from members of the Interagency Working Group, and are in the process of receiving additional administrative records that contain citizenship data.

127.   Upon information and belief, Defendants have received, or are in the process of receiving from States, administrative records that contain citizenship data. The Census Bureau requested driver's license, Supplemental Nutrition Assistance Program ("SNAP"), Special Supplemental Nutrition Program for Women, Infant, and Children ("WIC"), and Temporary Assistance for Needy Families ("TANF") records from all states.

---

³³ ⁴² *Id.*

³⁴ ⁴³ *Paperwork Reduction Act Program, Information Collection Request 2020 Census - Enumeration Operations OMB Control Number 0607-1006*, Department of Commerce and U.S. Census Bureau at 18 (July 3, 2019), *available at* https://www.documentcloud.org/ documents/6192581-2020-Census-Supporting-Statement-A-Revised-July.html#document/p18/a5 12146.

128.    The Census Bureau was scheduled to announce the model that would be used for the CVAP redistricting file by March 31, 2020, but to date the Census Bureau has not released this information.  This lack of an announcement demonstrates Defendants' failure to meet the requirement to conduct "extensive testing of the citizenship models."[44]

129.    On May 1, 2020, the Census Bureau announced its intended use of administrative records in the 2020 Census and provided some information about the use of administrative records to create the CVAP special tabulations.[45]  The Census Bureau identified administrative records that it expects to use in the creation of the CVAP special tabulation, including previous surveys and data from other federal agencies and states.

130.    Upon information and belief, the Census Bureau will create a probabilistic model of citizenship for each individual counted in the decennial Census that will state a person's citizen or non-citizen status, using administrative records.[46]

---

[44]  U.S. Department of Homeland Security, "Privacy Impact Assessment for the Department of Homeland Security (DHS) Immigration-Related Information Sharing with U.S. Census Bureau" at 4 (Dec. 20, 2019), *available at* https://www.dhs.gov/sites/default/files/publications/privacy-pia-dhs079-sharingwithcensus-june2020.pdf.

[45] U.S. Census Bureau, Intended Administrative Data Use in the 2020 Census (May 1, 2020), https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/administrative-data-use-2020-census.pdf.

[46]    The Census Bureau plans to "use several administrative data sources of citizenship and immigration status in a statistical model that will produce a probability of being a U.S. citizen, a lawfully present non-citizen, or an unauthorized immigrant…. The citizenship and immigration status probabilities will be used together with age, race, ethnicity, and location information … to produce CVAP statistics." U.S. Department of Homeland Security, *Privacy Impact Assessment for the Department of Homeland Security (DHS) Immigration-Related Information Sharing with U.S. Census Bureau*, at 4 (Dec. 20, 2019), *available at* https://www.dhs.gov/sites/default/files/publications/privacy-pia-dhs079-sharingwithcensus-june2020.pdf.

131.    Upon information and belief, Defendants have not tested the methodology for this probabilistic model.  Neither Defendants nor stakeholders have had any opportunity to evaluate the efficacy of the modeling or to implement improvements for any errors.  Although the Census Bureau has collected citizenship data in the past, collection of citizenship data through administrative records for 100% of the population is a radical departure from prior practice.

132.    The current COVID-19 pandemic has created and will create delays in the Census Bureau's efforts to receive additional administrative records.

133.    There is not sufficient time remaining for the Census Bureau to incorporate the feedback from stakeholders about how to address this issue among populations most likely to have poor citizenship administrative records.

### 2.    ~~C.    Shortcomings of~~ Citizenship Data Derived From Administrative Records will be Inaccurate

134.    Upon information and belief, Defendants will create a block level CVAP redistricting file using statistical modeling.  Defendants' modeling will not be able to overcome the deficiencies in the underlying administrative records and thus the block level CVAP dataset will be inaccurate and unreliable.  The block level CVAP dataset will be disproportionately more inaccurate and unreliable for naturalized, Latino and Asian American citizens because the data deficiencies are more pronounced for these groups.

135.    Defendants plan to "use several administrative data sources of citizenship and immigration status in a statistical model that will produce a probability of being a U.S. citizen, a lawfully present non-citizen, or an unauthorized immigrant . . . .  The citizenship and immigration status probabilities will be used together with age, race, ethnicity, and location information … to produce CVAP statistics."[47]

[47]    U.S. Department of Homeland Security, "Privacy Impact Assessment for the Department of Homeland Security (DHS) Immigration-Related Information Sharing with U.S.

136.   CVAP block level data based on existing administrative records will be inaccurate and unreliable because it will disproportionately mis-assign or will not fully capture citizenship for Latinos, Asian Americans and naturalized citizens.

137.   In his March 26, 2018 Decisional Memo, Secretary Ross noted that the Census Bureau matched 88.6 percent of the persons who were counted in the 2010 Census to administrative records that the Bureau considers credible. Thus, Secretary Ross concluded that at a minimum citizenship data was missing for "more than 10 percent of the American population - some 25 million voting age people." The individuals for whom citizenship data is missing must have their citizenship status assigned through some other method, such as statistical modeling.

138.   Missing citizenship information disproportionately impacts Latinos and Asian Americans because immigrant communities in the United States since the 1970s are predominantly from Latin America and Asia. Latino and Asian immigrants constitute the majority of the eligible-to-naturalize population, and are those most likely to become naturalized U.S. citizens.

139.   66. "[T]heAccording to the U.S. Census Bureau, "the Census Numident is the most complete and reliable administrative record source of citizenship data currently available to the Census Bureau. The Numident file is a record of individual applications for Social Security cards and certain subsequent transactions for those individuals."3548

Department of Homeland Security (DHS) Immigration-Related Information Sharing with U.S. Census Bureau" at 9 (Dec. 20, 2019), *available at* https://www.dhs.gov/sites/default/files/publications/privacy-pia-dhs079-sharingwithcensus-june2020.pdf.

35 48   J. David Brown, *et al.*, *Understanding the Quality of Alternative Citizenship Data Sources for the 2020 Census*, U.S. Census Bureau, Center for Economic Studies (August, 2018), *available at*  https://www2.census.gov/ces/wp/2018/CES-WP-18-38.pdf.

140.    Of the persons in the 2016 ACS, Latinos had missing administrative record citizenship data (in the 2016 Numident file) nearly three times as often as non-Hispanic whites, and non-Hispanic Others (which included Asian Americans) had missing administrative record citizenship data nearly twice as often as non-Hispanic whites.[49]

141.    67. On March 1, 2018, Chief Scientist and Associate Director for Research and Methodology, John M. Abowd, prepared a memorandum for Defendant Ross that set forth the various reasons why collecting citizenship data from administrative records does notcan produce 100 percent accurate data on citizenship.[36]inaccurate results.[50]

142.    68. For example, "[i]n the 2017 Numident . . ., 6.6 million persons born outside the U.S. have blank citizenship among those born in 1920 or later with no year of death.  The evidence suggests that citizenship is not missing at random.  Of those missing citizenship in the Numident, a much higher share appears to be U.S. citizens than compared to those for whom citizenship data are not missing . . . some of the blanks may be noncitizens."[37][51]

143.    69. Census Numident data also does not contain citizenship information for all naturalized citizens. Dr. Abowd further stated that another weakness in administrative records is that there are questions about how complete the Numident citizenship data are and how timely it updates naturalization.  Althoughalthough he believed naturalized citizens are instructed to apply

---

[49]    *Id.* at 16-17.

[36]   Memorandum from John M. Abowd, Chief Scientist & Assoc. Dir. for Research & Methodology, U.S. Census Bureau, to Wilbur L. Ross, Sec'y, U.S. Dep't of Commerce (Mar. 1, 2018) (hereinafter "Abowd Memo.").

[50]    Memorandum from John M. Abowd, Chief Scientist & Assoc. Dir. for Research & Methodology, U.S. Census Bureau, to Wilbur L. Ross, Sec'y, U.S. Dep't of Commerce (Mar. 1, 2018) (hereinafter "Abowd Memo.").

[37][51]    *Id.*

for a social security number, "we do notify the Social Security Association of the change in citizenship status, the Census Bureau does, "not know what fraction of naturalized citizens actually notify the [Social Security Administration], and how soon after being naturalized they do so."[38]

144.   [52] The Additionally, "[a] third potential weakness of Numident citizenship is that is also incomplete because "some people are not required to have a Social Security Number (SSN), whether they are a U.S. citizen or not." According to

145.   The Census Bureau stated in 2018 that "missing data rates are higher for administrative records (AR) than the ACS, and both sources' rates are higher for minorities and nonrelatives."[53]

146.   CVAP tabulations based on administrative records obtained from DHS or other federal agencies do not accurately or fully capture the true number of Latino and Asian American citizens because those records are incomplete and can erroneously misclassify Latinos and Asian Americans as non-U.S. citizens.

147.   70. Dr. Abowd, although stated that additional records from U.S. Citizenship and Immigration Services ("USCIS") and State Department memoranda of understanding could provide some contextinformation for existing gaps in citizenship data, but that USCIS data on naturalizations, lawful permanent residents, and I-539 non-immigrant visa extensions can only partially address the weakness of the Numident. "The data do not cover naturalizations occurring before 1988, as well as not covering and some between 1988-2000.  USCIS data do

---

[38] *Id.*

[52] *Id.*

[53] Brown, *supra* n.48, at 4.

not always cover children under 18 at the time a parent became a naturalized U.S. citizen" and some of the data for children may not be in electronic form.[39][54]

148.    In furtherance of the creation of the CVAP redistricting file, the Census Bureau entered into a Memorandum of Understanding with DHS and the Department of State to obtain immigration and citizenship-related data and passport data, respectively.

149.    71. Other data gaps inHowever, even with the additional administrative records includes, data gaps related to citizenship and immigration status persist in the following categories:  (1) Native born U.S. citizens from birth with no SSN or U.S. passport; (2) U.S. citizens from birth born outside the U.S., who do not have a U.S. passport and either applied for an SSN prior to 1974 and were 18 years or older, or applied before the age of 18 prior to 1978; (3) U.S. citizens who were naturalized prior to 2001 and did not inform SSA of their naturalization because they already had an SSN or originally applied for an SSN after they were naturalized, and it was prior to when citizenship verification was required for those born outside the U.S. (1974); (4) U.S. citizens who were automatically naturalized if they were under the age of 18 when their parents became naturalized in 2000 or later, and who did not informsecure a certificate of citizenship from USCIS or receive a U.S. passport; (5) Lawful permanent residents ("LPR") who received that status prior to 2001 and either do not have an SSN or applied for an SSN prior to when citizenship verification was required for those born outside the U.S. (1974); (6) noncitizen, non-LPR residents who do not have SSN or ITIN and who did not apply for a visa extension; and (7) persons with citizenship information in administrative data, but the

---

[39] Id[54]  Abowd Memo, https://www.osec.doc.gov/opog/FOIA/Documents/AR%20-%20FINAL%20FILED%20-%20ALL%20DOCS%20%5bCERTIFICATION-INDEX-DOCUMENTS%5d%206.8.18.pdf at 1310.

administrative and decennial census data cannot be linked due to missing or discrepant Protected Identification Key.4055

150. On December 20, 2019, the DHS published a Privacy Impact Assessment for the sharing of immigration-related information with the Census Bureau.  DHS acknowledged that "[n]o one source of citizenship information is complete and up-to-date," and that its administrative records are not accurate or complete with respect to naturalizations or immigration status.[56]

151. For example, the data provided by USCIS to the Census Bureau does not include records of naturalizations before 1988.  Further, USCIS does not have complete records of the U.S. citizenship status of individuals naturalized by operation of law as minors when their parents naturalized.[57]

152. CVAP tabulations based on administrative records from the states also will not be accurate or complete for Latino and Asian American U.S. citizens because the state administrative records are incomplete and outdated. For example, state data on U.S. citizenship from motor vehicle departments is often erroneous and outdated because many individuals secure their driver's licenses before they naturalize and the motor vehicles departments maintain records showing that the individuals are not U.S. citizens.

---

40 55 *Id.*

[56] U.S. Department of Homeland Security, "Privacy Impact Assessment for the Department of Homeland Security (DHS) Immigration-Related Information Sharing with U.S. Census Bureau" at 12 (Dec. 20, 2019), *available at* https://www.dhs.gov/sites/default/files/publications/privacy-pia-dhs079-sharingwithcensus-june2020.pdf.

[57] Abowd Memo.

153.    Not all states have provided administrative records to the Census Bureau.  Even among those states which have provided some records, not all provided Defendants with citizenship data. For example, Iowa's transfer of driver's license information to the Census Bureau does not include citizenship data.   As a result, Defendants will have inconsistent records from one state to another.

154.    ~~72.~~ Because of the various gaps in administrative data, Mr. Abowd explained that the Census Bureau "will most likely never possess a fully adequate truth deck to benchmark [citizenship] to."~~41~~158

~~D.      Defendants' Decision to Produce Citizenship Data For Use With the P.L. 94-171 File is Motivated By Racially Discriminatory Intent~~

**D.      Presidential Memorandum Seeking to Subtract Undocumented Persons from the Apportionment Totals**

155.    Every prior apportionment under the current statutory framework has included undocumented persons in the apportionment totals presented to Congress, as required by the Constitution's clear command that "the *whole number of persons* in each State, excluding Indians not taxed," be counted. U.S. Const. amend. XIV, § 2 (emphasis added); *see id.* art. I, § 2, cl. 3.

156.    Nevertheless, and in violation of applicable law, on July 21, 2020 President Trump issued a memorandum entitled "Memorandum on Excluding Illegal Aliens from the Apportionment Based Following the 2020 Census" (the "Presidential Memorandum"). 85 Fed. Reg. 44,679 (July 23, 2020).

157.    This Presidential Memorandum declared that it is now "the policy of the United States to exclude from the [congressional] apportionment base aliens who are not in a lawful

---

~~41~~ 58      *Id.*

immigration status under the Immigration and Nationality Act … to the maximum extent feasible …." *Id.* at 44,680.

158.    To advance this policy, the Memorandum states that the President will, in "transmit[ting] . . . to Congress" his report on the "whole number of persons in each State," *id.* at 44,679, unilaterally exclude from this calculation all "aliens who are not in a lawful immigration status under the Immigration and Nationality Act," *id.* at 44,680. These manipulated figures—rather than the "whole number of persons"—will then purport to "settle[] the apportionment of Representatives among the States." *Id.* at 44,679 (internal citation and quotation marks omitted).

159.    The Presidential Memorandum further directs the Secretary of Commerce to "take all appropriate action . . . to provide information permitting the President, to the extent practicable, to exercise the President's discretion to carry out the policy set forth in section 2 of this memorandum." *Id.* at 44,680. This directive requires the Secretary to provide President Trump with the "data on the number of citizens, non-citizens, and illegal aliens in the country" that he instructed the Department of Commerce to collect under EO 13880. *Id.* (citing 84 Fed. Reg. 33,821 (July 16, 2019)).

160.    The Memorandum declares that the "Constitution does not specifically define which persons must be included in the apportionment base," *id.* at 44,679, ignoring the Constitution's directive that apportionment shall be determined based on the "*whole number of persons*," with limited and specified exceptions. U.S. Const., art. 1, § 2; amend. XIV, § 2 (emphasis added).

161.    The Memorandum asserts further, without citing any authority, that "[d]etermining which persons should be considered 'inhabitants' for the purpose of

apportionment requires the exercise of [the President's] judgment," and that "the President[] [has] discretion to settle the apportionment" that "is more than 'ceremonial or ministerial,'" *id.* at 44,679.

162. The Memorandum further states that excluding undocumented immigrants from the apportionment base "is . . . consonant with the principles of representative democracy." 84 Fed. Reg. at 44,680.

163. President Trump's own statements following the release of the Memorandum confirm that the purpose of the policy is not to advance principles of representative democracy, but to discriminate against undocumented individuals, non-U.S. citizen immigrants more generally, and U.S. citizens who live in proximity to undocumented individuals. In his statement accompanying the Memorandum, for example, President Trump declared that the policy was needed because "the radical left is trying to erase the existence of this concept [of U.S. citizenship] and conceal the number of illegal aliens in our country" as part of "a broader left-wing effort to erode the rights of Americans citizens." According to the President, "we should not give political power to people who should not be here at all." The White House, *Statement from the President Regarding Apportionment* (July 21, 2020).[59]

164. President Trump's reelection campaign also sent a campaign email on July 23, 2020 that affirms that the purpose of the Memorandum is to undermine the Census and to discriminate against immigrants. The email states that the Memorandum "will block" undocumented individuals from "receiving congressional representation" and from "being

---

[59] *Available at* https://www.whitehouse.gov/briefings-statements/statement-president-regarding-apportionment.

counted in the U.S. Census." It further states that the policy is necessary because "Democrats are prioritizing dangerous, unlawful immigrants over American Citizens."[60]

165. The President's policy of excluding undocumented immigrants from congressional apportionment not only contravenes constitutional and statutory authority, but is unadministrable. The Census Bureau does not have a means to by which to enumerate undocumented immigrants. EO 13880 suggests that the Census Bureau may rely on administrative records to identify non-U.S. citizens. *See* 84 Fed. Reg. at 33,821. These administrative records, however, do not provide reliable or accurate information about immigration status, and consequently cannot be used to determine whether census respondents are undocumented immigrants.[61]

166. Indeed, as noted above, the Department of Commerce, through Census Bureau Senior Advisor Enrique Lamas, admitted in separate litigation that it "lack[s] … accurate estimates of the resident undocumented population" on a state-by-state basis." *See* Defendants' Supp. Rule 26(a)(1) Disclosures and Rule 26(a)(2)(C) Disclosures, *State of Alabama v. Dep't of Commerce*, Case No. 2:18-cv-00772-RDP (N.D. Ala. March 13, 2020).

167. The Department of Homeland Security also recently acknowledged that determining immigration status from their records is "challenging" due to the "decentralized nature of admission and immigration information, as well as the lack of a nationwide departure control system." DHS further admitted that delays between collecting and reporting data mean

---

[60] Hansi Lo Wang (@hansilowang), TWITTER (July 23, 2020, 3:34 PM), https://twitter.com/hansilowang/status/1286384297314844672.

[61] *See* John L. Czajka, *Can Administrative Records Be Used to Reduce Nonresponse Bias?*, 645 Annals Am. Acad. Pol. & Social Sci. 171, 175 (2013) ("administrative records are "weak in their coverage of undocumented aliens because programs typically require documentation that many undocumented aliens do not have.").

that "data accuracy issues may arise." *See* Department of Homeland Security, Privacy Impact Assessment for the Department of Homeland Security Immigration-Related Information Sharing with the U.S. Census Bureau, 2, 11 (Dec. 20, 2019).[62]

168. Defendants have further admitted in this matter that "there may need to be some statistical modeling" in order to carry out the Memorandum and that the Government has not yet "formulated a methodology."[63] Defendants have further indicated that statistical sampling and/or other methods that do not constitute enumeration may be utilized to carry out the Memorandum. But statistical sampling, which is not an "actual Enumeration" as required under Article I of the Constitution, and/or other methods that do not constitute enumeration, are not permissible. *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 338 (1999); *id.* at 346 (Scalia, J., concurring) ("It is in my view unquestionably doubtful whether the constitutional requirement of an 'actual Enumeration,' Art. I, § 2, cl. 3, is satisfied by statistical sampling.").

169. On July 29, 2020, the House Oversight Committee convened a hearing entitled "Counting Every Person: Safeguarding the 2020 Census Against the Trump Administration's Unconstitutional Attacks." Present at the hearing were Vincent Barabba (Former Director of the Census Bureau from 1973-1976 and 1979-1981), Kenneth Prewitt (Former Director of the Census Bureau from 1998-2001), Robert M. Groves (Former Director of the Census Bureau from 2009-2012), John H. Thompson (Former Director of the Census Bureau from 2013-2017), and Dr. Steven Dillingham (Current Director of the Census Bureau).

---

[62] *Available at* https://www.dhs.gov/sites/default/files/publications/privacy-pia-dhs079-sharingwithcensus-december2019.pdf.

[63] *LUPE v. Ross ("LUPE II")*, No. 19-2710, ECF No. 97, at 21 (July 29, 2020) (transcript of July 22, 2020 hearing).

170.     During this hearing, each former head of the Census Bureau was asked whether the Presidential Memorandum complied with the legal enumeration and apportionment requirements, and each former Census Bureau director testified that the Presidential Memorandum violated the laws as each understood them.

171.     Under oath, Defendant and current Census Director Dillingham refused to state that the Presidential Memorandum complies with the law.

172.     Director Dillingham further testified that he was not asked to, nor did he, provide any input on the Presidential Memorandum. He also testified that he was unaware of aid anyone in the Census Bureau provided in the drafting of the Presidential Memorandum.

173.     The Census Bureau has already properly adopted a rule that undocumented immigrants must be counted where they live and included in apportionment numbers.

174.     On February 8, 2018, the Census Bureau promulgated its "Resident Rule" for the 2020 Census. 83 Fed. Reg. 5525 (Feb. 8, 2018) (formally titled "Final 2020 Census Residence Criteria and Residence Situations."). The rule determines the "residence criteria" to be used to decide "where" people are counted for purposes of the census. *Id.* at 5526. In other words, it is used to determine when a person is "in" a state for census purposes.

175.     The Residence Rule also addresses non-U.S. citizens, indicating "[c]itizens of foreign countries living in the United States" must be "[c]ounted at the U.S. residence where they live and sleep most of the time." *Id.* at 5533.

176.     The Residence Rule discusses apportionment specifically, stating the numbers are then used "to apportion the seats in the U.S. House of Representatives among the states" and that "[a]pportionment is based on the resident population, plus a count of overseas federal employees, for each of the 50 states." *Id*. at 5526 n.1.

177.   The Residence Rule was lawfully promulgated pursuant to Notice and Comment. There has been no notice and comment to modify the residence rule. There has been no publication in the Federal Register indicating that the Residence Rule will change.

**E.     Early Cessation of Field Operations**

178.   In April 2020, the Census Bureau staff announced extensions to field operations and requested an extension to the statutory reporting deadline for apportionment and redistricting.[64] At that time, the Census Bureau extended field operations by three months to October 31, 2020 and asked Congress for a four-month extension to the statutory reporting requirements for apportionment.

179.   This extended plan allowed six months after field operations for data processing and quality checks. Data processing can only take place after the completion of NRFU operations.

180.   On August 3, 2020, Defendants continued their efforts to ensure that non-U.S. citizens, Latinos, Asian Americans, and other U.S. residents of color are undercounted in the Census and thus underrepresented in the apportionment of congressional, state legislative, and local districts.  On that date, Defendant Dillingham announced that field data operations would cease a month earlier, on September 30, 2020, and that the planned delivery date would be truncated by four months to meet the statutory December 31 deadline for apportionment.[65]

---

[64]     U.S. Department of Commerce Secretary Wilbur Ross and U.S. Census Bureau Director Steven Dillingham Statement on 2020 Census Operational Adjustments Due to COVID-19 (Apr. 13, 2020), https://www.census.gov/newsroom/press-releases/2020/statement-covid-19-2020.html
[65]     Statement from U.S. Census Bureau Director Steven Dillingham: Delivering a Complete and Accurate 2020 Census Count (Aug. 3, 2020), https://www.census.gov/newsroom/press-releases/2020/delivering-complete-accurate-count.html.

181.    In essence, these field operations are follow-up designed to maximize the likelihood that households that have not yet self-responded to the Census are included in the census count. This process has been vital in past years for ensuring that minority households are counted in the Census.

182.    The August 3 decision provides for the shortest field operation in modern history in the midst of an unprecedented and ongoing pandemic that has already made conducting the Census vastly more difficult.

183.    When the Census Bureau began planning for the 2020 Census, it scheduled 113 days for the 2020 field operation, in line with other census years.[66]

184.    In March 2020, however, the Census Bureau delayed the initiation of field operations due to the COVID-19 pandemic, stating "[t]he Census Bureau is taking this step to help protect the health and safety of the American public, Census Bureau employees, and everyone who will go through the hiring process for temporary census taker positions.[67]

185.    In light of this delay, on April 13, 2020, the Census Bureau announced that it would extend its field data collection process through October 31, along with the deadline for households to submit self-responses.[68]

---

[66]    U.S. Census Bureau, 2020 Census Detailed Operational Pan for Nonresponse Followup Operational Plan for Nonresponse Followup Operation (July 2019), at 43, *available at* https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/NRFU-detailed-operational-plan_v20.pdf.

[67]    Census Bureau Update on 2020 Census Field Operations, (2020), https://www.census.gov/newsroom/press-releases/2020/update-on-2020-census-field-operations.html.

[68]    U.S. Department of Commerce Secretary Wilbur Ross and U.S. Census Bureau Director Steven Dillingham Statement on 2020 Census Operational Adjustments Due to COVID-19,                                                                          (2020), https://www.census.gov/newsroom/press-releases/2020/statement-covid-19-2020.html.

186.    The Census Bureau subsequently announced in June 2020 that field data collection would generally begin on August 11 and confirmed that it would run through October 31.[69] This adjusted timeline provided for 81 days of field operations.

187.    Just one week before the start of the field operation, however, the Census Bureau announced that it would shorten this stage, moving the cessation date for field data collection from October 31 to September 30. This change provides a mere 50 days, in the midst of a global pandemic, for the Census Bureau to follow-up with nonresponsive households and to undertake other activities to ensure an accurate count of households in the 2020 Census—the shortest field operation period in modern census history.[70]

188.    The Bureau further announced that it would stop collecting self-responses to the Census a month earlier than planned, also on September 30.

189.    At the time of the Bureau's announcement, an estimated 60 million households (nearly 40%) remained uncounted.[71]

F.    **Discriminatory Intent and Conspiracy**

190.    Defendants' actions are motivated by racially discriminatory intent and are the product of a conspiracy to deprive Plaintiffs and others of equal protection of the laws.

---

[69] Updates to 2020 Census Operations, (2020), https://www.census.gov/newsroom/press-releases/2020/update-census-operations.html.

[70] Statement from U.S. Census Bureau Director Steven Dillingham: Delivering a Complete and Accurate 2020 Census Count, (2020), https://www.census.gov/newsroom/press-releases/2020/delivering-complete-accurate-count.html.

[71] *See* Michael Wines & Richard Fausset, *With Census Count Finishing Early, Fears of a Skewed Tally Rise*, N.Y. TIMES (Aug. 4, 2020), https://www.nytimes.com/2020/08/04/us/2020-census-ending-early.html; U.S. Census Bureau, 2020 Census Total Self-Response (Aug. 11, 2020), https://public.tableau.com/profile/us.census.bureau#!/vizhome/2020CensusSelf-ResponseRankings/RankingsDashboard.

191. Defendant Ross, President Trump, and others conspired to discriminate against Plaintiffs and other Latinos, Asian Americans, immigrants, and other U.S. residents of color by undercounting them, excluding them, and denying them fair representation.

192. Throughout the litigation challenging the addition of a citizenship question to the decennial census, including before the U.S. Supreme CourtCensus, Defendant Ross maintained that he decided to add the citizenship question to the 2020 decennial censusCensus so that the DOJ could better enforce the VRA. The documents produced during that litigation revealed insteadfederal Voting Rights Act. The U.S. Supreme Court concluded that Defendant Ross's proffered reason was pretextual and appeared "contrived."

193. 73. Ross, members of the Trump Administration, A. Mark Neuman, then-KansasDefendants' ongoing conspiracy has involved several participants outside of Defendants Ross and Trump, including but not limited to: Dr. Thomas Hofeller, former Kansas Secretary of State Kris Kobach, members of the DOJ, including then-Attorneyformer United States Attorney General Jefferson B. Sessions ("AG Sessions") and head of the DOJ's Civil Rights Division John Gore, and Republican strategist Dr. Thomas Hofeller conspired to add a citizenship question to the 2020 census to reduce the response rates of people of color and immigrants, and exclude them from congressional apportionment and redistricting to achieve the objective of reducing their political power., Mr. Mark Neuman, Mr. John Gore, and Attorney General William Barr.

194. Defendants Ross and Trump and others have undertaken numerous actions to further, disguise, and facilitate this conspiracy, including but not limited to: attempting to add a citizenship question to the Census survey under false pretenses; obstructing Congress; resorting to creating a block level CVAP dataset based on administrative records when the Supreme Court

blocked the Census citizenship question; announcing the exclusion of undocumented immigrants from congressional apportionment; and ceasing enumeration of the population when a disproportionate number of Latinos, Asian Americans, immigrants and other U.S. residents of color remain unenumerated.

195.    Defendants' conspiracy is reflected in a study prepared in August 2015 by Dr. Thomas B. Hofeller, a leading Republican redistricting strategist and map-drawing expert for the Republican National Committee. The study, titled "The Use of Citizen Voting Age Population in Redistricting," concluded that "[a] switch to the use of citizen voting age population as the redistricting population base"—excluding non-U.S. citizens residents—"would be advantageous to Republicans and non-Hispanic whites" and dilute the political power of racial minorities.[72]

196.    Dr. Hofeller also acknowledged in his memo that the shift from redistricting based on total population to CVAP was a "radical departure"— and one that would alienate Latino voters.

197.    Dr. Hofeller's study found that this switch would be "functionally unworkable" without "add[ing] a citizenship question to the 2020 Decennial Census form," because there was no other adequate source of information identifying the citizen voting-age population.[73]

198.    To fill this need, Trump Administration transition staff started to lay the groundwork for Defendants' first attempt to discriminate against people of color and immigrants: adding the citizenship question to the Census. These preparations included discussing the citizenship question with then-Secretary of State of Kansas Kris Kobach.[74]

_____

[72]    *See* "The Use of Citizen Voting Age Population in Redistricting," at 9, available at https://www.commoncause.org/wp-content/uploads/2019/05/2015-Hofeller-Study.pdf (last accessed July 28, 2020).

[73]    *Id.* at 4.

[74]    U.S. House. Committee on Oversight and Reform. White House Interference Committee Interview of Kris Kobach, June 7, 2019, at 10,

199.   After President Trump's inauguration, the conspirators moved forward with the plan to add a citizenship question to the Census. In a July 14, 2017 email, Mr. Kobach reconnected with the Trump Administration to discuss the 2020 Census, writing, "the US census does not currently ask respondents their citizenship. This lack of information . . . leads to the problem that aliens who do not actually "reside" in the United States are still counted for congressional apportionment purposes." Mr. Kobach concluded his email saying "it is essential" that the citizenship question be added to the 2020 Census and that he was available to assist to "accomplish the addition of this question."[75]

200.   74. After consulting with the White House and Mr. Kobach, Defendant Ross used the Department of Commerce to facilitate thefurther this conspiracy by directing staff to research the exclusion of immigrants from apportionment and to create an alternative justification for the addition of the citizenship question to the censusCensus and cover up the conspiracy. Defendant Ross and the Department of Commerce then solicited the assistance first of the DOJ and then of the Department of Homeland Security ("DHS"), before finally securing the participation of the DOJ, including AG and then-Attorney General Sessions.

201.   75. Together, Defendant Ross, through the Department of Commerce, coordinated with AGAttorney General Sessions, other members of the DOJ, and the White House to fabricatefabricated a "need" for the citizenship question thatto cover up the underlying

Committee Interview of Kris Kobach, June 7, 2019, at 10, https://oversight.house.gov/sites/democrats. oversight.house.gov/files/2019-06-07.%20COR%20DEM%20Memo%20re%20Kris%20 Kobach%20Interview.pdf.

[75]   Kris Kobach, Follow up on our phone call (2017), https://apps.npr.org/documents/ document.html?id=4500011-1-18-Cv-02921-Administrative-Record#document/p776/a428457.

conspiracy. This collaboration resulted in a letter from the DOJ requesting the addition of the question to the 2020 ~~census~~Census for the purposes of enforcing the Voting Rights Act (the "DOJ Letter").

202.   The DOJ Letter reflected language drafted by Dr. Hofeller. The Hofeller documents show that Dr. Hofeller drafted and gave to Commerce and DOJ officials the substantive content of the December 2017 DOJ letter requesting the addition of the citizenship question. Mr. Neuman, then part of President Trump's transition team, and Mr. Gore, then the acting head of DOJ's Civil Rights Division, were among the recipients.

203.   Dr. Hofeller's involvement demonstrates a partisan and discriminatory purpose behind the Defendants' scheme to further Republican political ends by reducing Latino representation and the representation of non-White communities generally, and increase over-representation of non-Latino Whites.

204.   ~~76. Without their knowledge,~~ Defendant Ross used the Census Bureau to continue to facilitate the conspiracy and directed the Census Bureau to look into the DOJ Letter as if it were a legitimate, non-pretextual request. In a March 28, 2018 memorandum, Defendant Ross ignored the findings and ~~recommendation of~~recommendations of career staff at the Census Bureau and reached the conspiracy's predetermined conclusion to add a citizenship question ~~on~~to the 2020 census questionnaire. As his rationale, Secretary Ross claimed that he was adding the citizenship question at DOJ's request, in order to allow "more effective enforcement of the [Voting Rights] Act."[76]  Secretary Ross stated that he began consideration of this question after

---

[76]   United States Department of Commerce. Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire (March 26, 2018), https://www.commerce.gov/sites/default/files/2018-03-26_2.pdf.

receipt of the December 12, 2017 DOJ request, although that very request had in fact originated with the Department of Commerce.

205. Defendant Trump and Trump campaign officials have publicly discussed the President's role in adding the citizenship question in campaign emails to supporters. One email sent in March 2018 told supporters that "[t]he President wants the 2020 United States Census to ask people whether or not they are citizens." A later email sent in July 2019 accused opponents of "trying to block President Trump's efforts to ask people if they are citizens. . . ."

206. 77. After Defendant Ross issued the March 28 memorandum, the Trump Administration publicly admitted its role in the conspiracy in campaign emails to supporters. Defendant Ross hasDefendants Ross and Trump have continued to facilitatefurther the conspiracy to exclude non-citizensnon-U.S. citizens from congressional apportionment and redistricting to achieve the objective of reducingreduce the political power of non-citizens andnon-U.S. citizens, Latinos, Asian Americans, and other U.S. citizens of color.

207. In litigation regarding the inclusion of the citizenship question in the Census, the Trump administration stood by Defendant Ross's pretextual rationale, dismissing allegations that the addition of the citizenship question was directed at congressional apportionment as "a speculative conspiracy theory that is unsupported by the evidence."[77]

208. President Trump himself later refuted this piece of misdirection, declaring that the "[n]umber one" reason to add a citizenship question to the Census was congressional districting.[78]

[77] Letter from Noel J. Francisco, Solicitor General, to Honorable Scott S. Harris, Clerk, Supreme Court of the United States (June 25, 2019), https://www.supremecourt.gov/DocketPDF/ 18/18-966/103988/20190625110441312_Letter%20Response%2018-966.pdf.

[78] The White House, Remarks by President Trump Before Marine One Departure, July 5, 2019,

209.    While litigation was pending, the U.S. House of Representatives Committee on Oversight and Reform initiated an investigation into the Defendants' conspiracy to discriminate against Latinos and immigrants. The Committee, concerned that Secretary Ross had provided a pretextual reason for adding the question, issued subpoenas to Secretary Ross and Attorney General Barr.

210.    Rather than comply with the subpoena, Secretary Ross and Attorney General Barr stonewalled Congress to hide the real reasons behind the Department's newfound interest in citizenship data and further the conspiracy.

211.    In response, Congress formally held Secretary Ross and Attorney General Barr in contempt of Congress, marking only the second time in U.S. history that Congress has held a sitting Cabinet official in contempt.

212.    The Supreme Court ultimately concluded that Defendant Ross had acted in bad faith by giving a pretextual rationale to "distract[]" from his true motivations. The Court found "that the Secretary began taking steps to reinstate a citizenship question about a week into his tenure, but [the record] contains no hint that he was considering VRA enforcement in connection with that project." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019).

213.    The Supreme Court concluded further that: "the Secretary was determined to reinstate a citizenship question from the time he entered office; instructed his staff to make it happen; waited while Commerce officials explored whether another agency would request

July 5, 2019, https://www.whitehouse.gov/briefings-statements/remarks-president-trump-marine-one-departure-51 ( "Q: What's the reason, Mr. President, for trying to get a citizenship question on the census?; THE PRESIDENT: Well, you need it for many reasons. Number one, you need it for — ; Q: (Inaudible) reason?; THE PRESIDENT:  — Congress. You need it for Congress, for districting.").

census-based citizenship data; subsequently contacted the Attorney General himself to ask if DOJ would make the request; and adopted the Voting Rights Act rationale late in the process" as a "distraction" from his true, invidious motive. *Id.* at 2574.

214. A federal district court ultimately ordered the Department of Commerce to pay costs and attorneys' fees relating to its failure to produce 3,700 pages of relevant discovery during the litigation challenging its basis for adding the citizenship question to the Census. *See New York v. United States Dep't of Commerce*, 2020 WL 2564933, at *8 (S.D.N.Y. May 21, 2020).

215. 78. Following the Supreme Court's rejection of the contrived rationale in *Department of Commerce v. New York*, Defendants Undeterred, Defendants prepared for their "Plan B"—using administrative records to create a block level CVAP dataset that would achieve the same result as the Census citizenship question. Defendants continued to pursue the collection of data that would allow non-citizens to be excluded from apportionment and redistricting, as evidenced by EO 13880 and Defendant Ross's July 2019 directive.

79. On June 3, 2019, plaintiffs in *LUPE v. Ross*, filed a motion for relief from final judgment and request for indicative ruling that included documents belonging to the late Dr. Hofeller, a leading Republican redistricting strategist and map-drawing expert for the Republican National Committee. *La Unión Del Pueblo Entero, et al. v. Secretary Ross, et al.*, No. 18-CV-1570 (D. MD.) (hereinafter, "*LUPE v. Ross*"), ECF No. 136.

80. The Hofeller documents demonstrate that the addition of the citizenship question, and now the directives that the Census Bureau to collect citizenship data to be produced for use with the P.L. 94-171 Redistricting Data File, was motivated by a racially discriminatory scheme to

reduce Latino representation and increase over-representation of non-Latino Whites, thereby serving Republican political ends at Latinos' expense.

81. Dr. Hofeller acknowledged that the shift from redistricting based on total population to CVAP was a "radical departure"—one that would alienate Latino voters. But, he concluded, "[a] switch to the use of citizen voting age population as the redistricting population base for redistricting would be advantageous to Republicans and Non-Hispanic Whites." To generate the necessary CVAP data and achieve this goal of diluting Latino representation while increasing over-representation of non-Latino Whites, Dr. Hofeller concluded that a citizenship question must be added to the 2020 census.

82. The Hofeller documents show that Dr. Hofeller drafted and gave to Commerce and DOJ officials, including Mr. Neuman, part of President Trump's transition team, and Mr. Gore, the substantive content of the December 2017 DOJ letter requesting the addition of the citizenship question.

83. The Hofeller documents demonstrate a partisan and discriminatory purpose behind the addition of the citizenship question.

84. The same discriminatory motivation behind adding the citizenship question motivated Defendants to continue their unlawful course of action to collect citizenship data and produce citizenship population tabulation data for use with the P.L. 94-171 Redistricting Data File so that states can exclude non-U.S. citizens from apportionment to the advantage of non-Latino White Republican voters and at the expense of the Latino community.

**E. The Production of Citizenship Data For Use With The P.L. 94-171 Redistricting Data File Population Tabulations Harms Latinos and Non-U.S. Citizens and Increases the Chances of Malapportioned State Legislative and Local Districts**

216. The block level CVAP dataset "Plan B" was part of Defendants' conspiracy from the outset. During a Spring 2019 meeting of the National Advisory Committee on Racial, Ethnic and Other Populations ("NAC"), Dr. John Abowd spoke about Secretary Ross's directive in the March 26, 2018 memo to use alternative methods to produce citizenship data. Regarding administrative records he stated, "[T]here is a source for citizenship data whether the question is asked or not and there is an instruction [from Secretary Ross] to produce block level citizen voting age population that has not been rescinded. . . ."[79]

217. In their first information collection request submitted to the Office of Management and Budget, Defendants claimed that they were preparing CVAP data in anticipation of states requesting this data. No states requested any CVAP data.

218. Nevertheless, Defendants forged ahead and—without any explanation—announced that they would prepare the block level CVAP dataset regardless of whether any state asked for it.

219. Defendants' departures from substantive considerations and normal procedure, as well as their demonstrated disregard for their own previous statements, reveals that Defendants' stated goal of helping states is but the latest pretextual justification fabricated for the purpose of covering up an invidious and discriminatory plan to deprive Latinos, Asian Americans, immigrants, and other U.S. residents of color of equal protection of the laws.

220. Indeed, the President's Memorandum is only the latest example of a series of recent executive actions or Presidential statements effectively excluding or marginalizing Latinos and Asian Americans, including immigrants, and inflicting dignitary harm upon them.

[79] *See* National Advisory Committee Spring Meeting (Day 1), Census Bureau (May 2, 2019), https://www.youtube.com/watch?time_continue=4709&v=5eICccdzfdo&feature=emb_logo, at 3:25.

221. For example, on July 6, 2020, the United States Immigration and Customs Enforcement agency within the Department of Homeland Security announced that, in spite of the ongoing COVID-19 pandemic, international students studying at American colleges or universities conducting classes online would not be permitted to remain in the United States during the fall 2020 semester. Seventy-seven percent of international students at such institutions are from Asian nations, with a majority from China and India. The announcement was rescinded after a public outcry among (and initiation of litigation by) Asian American communities and American colleges and universities.

222. On June 22, 2020, the President issued a proclamation suspending entry into the United States by holders of H-1B visas, along with several other types of work visas. The suspension of H-1B visas in particular has disproportionately affected Asians seeking to work and reside in the United States.

223. On June 15, 2020, the Executive Office for Immigration Review ("EOIR") and United States Citizenship and Immigration Services ("USCIS") issued a Notice of Proposed Rulemaking announcing, *inter alia*, new travel-based restrictions on eligibility for asylum seekers, by which refugees traveling through more than one nation en route to the United States would be virtually ineligible for asylum. At least forty-five percent of refugees arriving in the United States are from Asian nations, according to figures compiled by the United States Department of State, and most must travel through several nations before reaching the United States simply because of geographical distance. Similarly, at least fifty-two percent of asylum seekers filing applications with USCIS are from Latin American nations, and the majority must travel through multiple nations before arriving in the United States.

224.    In 2019, the Secretary of Homeland Security ended Temporary Protected Status programs for hundreds of thousands of Salvadoran, Honduran, and Nicaraguan immigrants.

225.    In 2018, the United States Department of Justice instituted a policy of separating children from families when detained at the southwestern border, a policy which disproportionately affected immigrants from Latin America, who constitute the lion's share of arrivals at the southern border. In announcing the new policy, then-Attorney General Jefferson B. Sessions stated that "Donald Trump ran for office on that idea. . . . He is on fire about this. This entire government knows it."

226.    In 2017, within the first months of his administration, President Trump unilaterally ended the Central American Minors program, an initiative to reunite children and other family members from Central American nations—predominantly El Salvador, Guatemala and Honduras—with parents legally residing in the United States. The Administration did so without notice to eligible families.

227.    President Trump has also personally stigmatized Asian American communities during the ongoing COVID-19 pandemic crippling the nation, publicly referring to COVID-19 as "the Chinese virus" and "Kung Flu."  As several news outlets have reported, these statements have been correlated with increased violence against Asian Americans.

228.    Similarly, President Trump has personally stigmatized and derided Latino communities since well before his election, and has continued to do so throughout his administration. As a candidate, and subsequently as President, Defendant Trump has variously referred to Mexican immigrants as "people that have lots of problems," "the bad ones," and "criminals, drug dealers, [and] rapists," and has compared undocumented immigrants at the United States southern border, who hail predominantly from Latin America, to "animals"

responsible for "the drugs, the gangs, the cartels, the crisis of smuggling and trafficking, [and] MS13." *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1917 (2020) (Sotomayor, J., concurring) ("Taken together, the words of the President help to create the strong perception that the rescission decision was "contaminated by impermissible discriminatory animus.") (citations omitted).

### G. Defendants' Actions Have Harmed, And Will Harm, Plaintiffs

#### 3. Harms of Production of CVAP Dataset

229. 85. Plaintiffs and members of organizational ~~plaintiffs~~Plaintiffs who live in states ~~where there is a higher population of non-citizens.~~

230. 86. that ~~Under Article I, Section 2, Clause 3 of the U.S. Constitution, as amended by the Fourteenth Amendment, the decennial population counts are used to determine the number of congressional representatives apportioned to each state.  Exclusion of non-citizens from the population count used for apportionment creates a significant risk that states in which large numbers of non-citizens reside, including Texas and Arizona, will suffer a reduction in the number of congressional seats that would otherwise be apportioned to them.~~ are required to exclude non-U.S. citizens from apportionment in state redistricting will be harmed by the production of a CVAP dataset because that dataset will be used by their states to reduce political representation in areas that contain proportionally more non-U.S. citizens, including the regions and communities in which Plaintiffs live. As a result, Plaintiffs will suffer vote dilution and loss of representation in unconstitutionally overpopulated districts.

231. 87. Plaintiffs and members of organizational ~~plaintiffs~~Plaintiffs also live in states where lawmakers will use, or have expressed an interest and desire to use, CVAP ~~as a~~to apportion population ~~base for drawing~~in congressional and state legislative redistricting plans in

2021.[42][80]   Plaintiffs and members of organizational ~~plaintiffs~~Plaintiffs reside in areas in which~~,~~ ~~according to~~recentACS ~~data,~~ the population has a higher percentage of ~~non-citizens~~non-U.S. citizens than the population of their states as a whole. Latinos, Asian Americans, and non-U.S. citizens, including individual Plaintiffs and members of Plaintiff organizations, will be injured when the Census Bureau provides those states with citizenship data ~~to be used along with the total population tabulations in the P.L. 94-171 Redistricting Data File, resulting~~which will result in the exclusion of ~~non-citizens~~non-U.S. citizens from the population base used for redistricting congressional, state legislative, and local districts. As a result, Plaintiffs will suffer vote dilution and loss of representation in unconstitutionally overpopulated districts.

232.   By statute, Tennessee requires the General Assembly to apportion seats in the State House and Senate according to the number of "qualified voters." Tenn. Code Ann. § 3-1-101 (West).  Despite the "qualified voters" language of the statute, it has historically been impossible to use CVAP data in Tennessee. *See Baker v. Carr*, 369 U.S. 186, 191 fn.4 (1962) . As a result, Tennessee has historically used Voting Age Population, which necessarily includes non-citizens. However, the statute provides that "qualified voters" shall make up the district and, if provided with data indicating immigration status, the State of Tennessee will use it for reapportionment.

233.   The Nebraska State Constitution states that the basis for apportionment "shall be the population excluding aliens, as shown by the next preceding federal census." Neb. Const.

---

[42][80]   *See*, *e.g.*, Nick Brown, *Republicans want census data on citizenship for redistricting*, Reuters (Apr. 8, 2019), *available at* https://www.reuters.com/article/us-usa-census-redistricting-insight/republicans-want-census-data-on-citizenship-for-redistricting-idUSKCN1RK18D; *see also* Brief of the City of Yakima, Washington as Amicus Curiae Supporting Appellants, *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016) (No. 14-940).

Art. III, § 5. It has historically been impossible to exclude immigrants from the redistricting totals.  If provided with data indicating citizenship status, the State of Nebraska will use it for reapportionment.

234.    When Tennessee and Nebraska use the inaccurate block level CVAP dataset generated from administrative records for apportionment, Plaintiffs who live in those states will suffer the injuries of vote dilution and loss of representation.

235.    Plaintiff Marco Abarca resides in Colorado and will suffer the injury of loss of political representation and the injury of vote dilution when Colorado uses the block level CVAP dataset produced by Defendants for redistricting and apportionment of state legislative districts.

236.    Colorado state redistricting law states:

> For purposes of redrawing the boundaries of congressional, state senatorial, and state representative districts after each federal census, the independent legislative and congressional redistricting commissions established pursuant to sections 44 and 46 of article V of the state constitution shall use total population data supplied by the United States census bureau that has been used to apportion the seats in the United States house of representatives among the states;

Colo. Rev. Stat. Ann. § 2-2-901 (2020) (emphasis added). In other words, the statute requires that Colorado redistricting be based on data identical to the data used for congressional apportionment.

237.    Because Defendants will provide states a block level CVAP redistricting dataset, that same exclusionary data must and will be used by Colorado for legislative and congressional apportionment and redistricting.

238.    In addition, because Plaintiff Abarca lives in a geographic area of Colorado that contains disproportionately more immigrants, non-U.S. citizens and Latinos, he will suffer the

injuries of loss of political representation and vote dilution that will flow from inaccurate and unreliable citizenship data produced by Defendants in the block level CVAP dataset.

239.     Plaintiff Zeenat Nisha Hasan resides in Arizona and will suffer the injury of loss of political representation and the injury of vote dilution when Arizona uses the block level CVAP dataset produced by Defendants for redistricting and apportionment of state legislative districts.

240.     Plaintiff PAZ is located in Arizona, and has members that live in Arizona. Its members will suffer the injury of loss of political representation and the injury of vote dilution when Arizona uses the block level CVAP dataset produced by Defendants for redistricting and apportionment of state legislative districts.

241.     Arizona law requires the state to use population data "identical to those from the actual enumeration conducted by the bureau for the apportionment of the representatives of the United States house of representatives in the United States decennial census." Ariz. Rev. Stat. § 16-1103 (emphasis added). As such, Arizona statute requires that Arizona apportionment be based on data identical to the data used for federal apportionment.

242.     Because the President's Memorandum announces a policy of excluding undocumented immigrants from congressional apportionment, that same exclusionary data will be used in Arizona legislative and congressional apportionment and redistricting.

243.     In addition, because Plaintiff PAZ has members residing in Arizona who live in a geographic area that contains disproportionately more immigrants, non-U.S. citizens and Latinos, its members will suffer the injuries of loss of political representation and vote dilution that will flow from inaccurate and unreliable citizenship data produced by Defendants in the block level CVAP dataset.

244.    Plaintiff Ralph Carmona resides in Maine and will suffer the injury of loss of political representation and the injury of vote dilution when Main uses the block level CVAP dataset produced by Defendants for redistricting and apportionment of state legislative districts.

245.    Maine law states: "The number of Representatives shall be divided into the number of inhabitants of the State exclusive of foreigners not naturalized according to the latest Federal Decennial Census." Maine Const. Art. IV Part I § 2 (emphasis added).

246.    Because state law requires the use of census data excluding non-U.S. citizens, and Defendants will provide states a block level CVAP redistricting dataset, that same exclusionary data must and will be used by Maine for legislative and congressional apportionment and redistricting.

247.    In addition, because Plaintiff Carmona lives in a geographic area that contains disproportionately more immigrants, non-U.S. citizens and Latinos, he will suffer the injuries of loss of political representation and vote dilution that will flow from inaccurate and unreliable citizenship data produced by Defendants in the block level CVAP dataset.

248.    Plaintiffs are also members of racial and ethnic minorities, and many reside in election districts drawn to comply with Section 2 of the Voting Rights Act of 1965. Use of CVAP data for apportionment will reduce the percentage of racial and ethnic minorities in the apportionment population base, which is in turn relied upon by states to ensure compliance with the Voting Rights Act. The exclusion would therefore endanger the ability of Plaintiffs and other voters of color to elect the candidates of their choice.

249.    Defendants' use of administrative records to create the CVAP redistricting file will disproportionately harm Latinos, Asian Americans, and naturalized citizens because individuals in these groups are less likely to have a Protected Identification Key.  A Protected

Identification Key is a unique person identifier that is used to match individuals in the ACS to an individual in administrative records.  Thus, matching an individual to an administrative record requires a Protected Identification Key. However, there are fewer Protected Identification Key s assigned to foreign-born individuals compared to U.S.-born individuals.[81]  In addition, characteristics associated with lacking a Protected Identification Key include Hispanic ethnicity, not being a U.S. citizen, limited English or no English, and being a recent immigrant. "Hispanics . . . have lower odds of being assigned a Protected Identification Key and matching to administrative records."[82]  Because they are less likely to have a Protected Identification Key, U.S. citizen Latinos, U.S. citizen Asian Americans, and naturalized citizens are more likely to be injured through misclassification as non-U.S. citizens as well as more likely to suffer vote dilution and loss of representation caused by inaccurate and unreliable CVAP data.

250.   In addition, by cancelling the February 2021 ACS data release and replacing ACS data with the flawed block level CVAP redistricting file based on administrative records, Defendants will leave states with no other option than to use the inaccurate and unreliable block level CVAP dataset to create their redistricting plans because states will lack reliable CVAP data from the ACS.  Thus even if states choose to use total population to apportion their districts, Defendants' cancellation of the ACS data release in February 2021 will force states to use the flawed block level CVAP redistricting file to create redistricting plans in compliance with the Voting Rights Act.  Defendants' actions have a coercive and determinative effect on states that is currently known, imminent and will result in injury to Plaintiffs in the form of vote dilution and loss of representation.

251.   In addition, to the extent that Defendants use a methodology similar to "hot deck" imputation, where the Census Bureau derives its information from the current census rather than prior censuses,[83] to create citizenship data for the CVAP dataset, individual Plaintiffs and the

---

[81]   Renuka Bhaskar et al., *Assimilation and Coverage of the Foreign-Born Population in Administrative Records* (Apr. 21, 2015), https://www.census.gov/content/dam/Census/library/working-papers/2015/adrm/carra-wp-2015-02.pdf  at 9

[82]   *Id.* at 12

[83]   *See Utah v. Evans*, 536 U.S. 452, 463 (2002).

members of organizational plaintiffs are likely to be misclassified as non-U.S. citizens because they live in geographic areas that contain disproportionately more immigrants, non-U.S. citizens, Latinos and/or Asian Americans when compared to their state averages. Plaintiffs will also suffer the injuries of loss of political representation and vote dilution that will flow from inaccurate and unreliable citizenship data produced by Defendants in the block level CVAP dataset.

### 4.     Harms of Excluding Undocumented Individuals from Apportionment

252.    Exclusion of undocumented individuals from the population count used for apportionment will harm Plaintiffs and members of organizational Plaintiffs who live in states where there is a higher proportion of undocumented immigrants in the population by reducing the number of congressional seats that would otherwise be apportioned to the states in which they live.

253.    The Presidential Memorandum will result in harm to the Plaintiffs by limiting their political representation and the representation of Latinos, Asian Americans, immigrants, and other U.S. residents of color in general.

254.    The Pew Research Center studies undocumented immigrant populations in the United States. Shortly after the release of the Presidential Memorandum, the Pew Research Center released a study based on its internal research on projections of the Census Bureau. This study examined the effects of excluding undocumented immigrants from the apportionment totals.

255.    Under this system, at least three states would each lose a congressional seat they otherwise would receive in the 2020 apportionment. At a minimum, that will be the effect of the Presidential Memorandum on California, Florida, and Texas.[84] According to Pew Data, these are

---

[84]    Jeffrey S. Passel & D'Vera Cohn, *How Removing Unauthorized Immigrants from Census Statistics Could Affect House Reapportionment*, Pew Research Center (July 24, 2020),

also the three states with the largest Latino populations and two states (California and Texas) with the largest Asian American population.[85]

256.    Other states with a high Latino and Asian American population as well as a large undocumented population include New York, New Jersey, Arizona, and Washington. As such, these states are likely to have fewer seats in the U.S. House of Representatives if undocumented individuals are excluded from the population count.

257.    The results of excluding undocumented immigrants from apportionment will have ripple effects on the Census itself. The new action is patently anti-immigrant and anti-Latino, will reasonably be interpreted by Latino, Asian American (for whom 73% of adults are foreign-born)[86] and immigrant communities as an effort to exclude them from political representation, and will discourage those communities from participation in the Census and in public affairs. The ultimate effect of such a radical departure from apportionment will be a reduction in 2020 Census response rates by immigrants, Latinos, Asian Americans, and other U.S. residents of color, as well as a widespread loss of credibility by the Census Bureau and federal officials that conduct the Census.

---

*Census Statistics Could Affect House Reapportionment*, Pew Research Center (July 24, 2020), https://www.pewresearch.org/fact-tank/2020/07/24/how-removing-unauthorized-immigrants-from-census-statistics-could-affect-house-reapportionment/.

[85]    Renee Stepler & Mark Hugo Lopez, *Ranking the Latino Population in the states*, Pew Research Center (Sept. 8, 2016), https://www.pewresearch.org/hispanic/2016/09/08/4-ranking-the-latino-population-in-the-states/.

[86]    Gustavo López, Neil G. Ruiz & Eileen Patten, Pew Research Center, *Key facts about Asian Americans, a diverse and growing population*, FACTTANK (Sept. 8, 2017), https://www.pewresearch.org/fact-tank/2017/09/08/key-facts-about-asian-americans/.

258.    President Trump signaled this reality in the aforementioned July 23, 2020 campaign email following the Presidential Memorandum, entitled: "BREAKING: PRESIDENT TRUMP SIGNS EXECUTIVE ORDER BLOCKING ILLEGAL ALIENS FROM BEING COUNTED IN U.S. CENSUS." The email opined that the Presidential Memorandum (which the email mis-labels as an "executive order") will keep undocumented immigrants from "being counted in the U.S. Census."  The email then asks, "Do you support President Trump's Executive Order to block illegal aliens from being counted in the U.S. Census."

259.    The individual plaintiffs reside in Arizona, California, Florida, New York, New Jersey, Texas, and Washington. Each is among the states with the largest Latino or Asian American populations in the United States.

260.    Each of these states is home to an above-average percentage of undocumented residents, and some, particularly Texas and California, are highly likely to lose congressional seats to which that state would otherwise be entitled if undocumented immigrants were counted.

261.    The stated intent of the Presidential Memorandum to exclude undocumented immigrants from the congressional apportionment base as assessed by the 2020 Census will result in the undercounting of each state's population by hundreds of thousands of residents.

262.    For example, as of 2017 estimates, California is home to 2 million undocumented immigrants; Texas is home to 1.6 million; Florida, to 825,000; Arizona, to 275,000; New York, to 650,000; New Jersey to 450,000; and Washington, to 250,000.[87]

---

[87]    Pew Research Center, Unauthorized Immigrant Population Estimates by State, Country, and Birth Region, 2017 (June 12, 2019), https://www.pewresearch.org/hispanic/interactives/unauthorized-trends.

263.    As of July 28, 2020, the Census Bureau estimates the U.S. population at 330.03 million, or roughly 758,686 per each of the nation's 435 congressional districts.

264.    Experts at the Pew Research Center have projected that removing undocumented residents from the congressional apportionment base would cause California to lose two seats in the House of Representatives, and consequently two votes in the Presidential Electoral College, as opposed to the loss of a single seat and a single electoral vote if undocumented residents were counted nationwide.  In other words, California will lose one Congressional seat and electoral vote to which it is otherwise entitled if the Census is conducted in accordance with the Presidential memorandum.

265.    Texas and Florida, meanwhile, will gain fewer Congressional districts and electoral votes than they otherwise would. According to projections, excluding undocumented residents from apportionment would cost both Texas and Florida at least one increased seat in Congress and one increased electoral vote to which those states would otherwise be entitled if the Census proceeded as normal.[88]

266.    These estimates are likely conservative. Although it did not name the state in question, the President's Memorandum expressly referenced California's large undocumented population, and projected an even more significant dilution of California's congressional representation and electoral strength: the Memorandum emphasizes that a single state, California, has "more than 2.2 million illegal aliens" and that excluding undocumented immigrants from the apportionment base could cost California "two or three . . . congressional

---

[88]    If the census is conducted in accordance with the law, Texas will gain three Congressional seats and electoral votes, and Florida will gain two. If undocumented immigrants are excluded from the apportionment base, Texas will gain two seats and electoral votes, and Florida one.

seats," and consequently the same number of votes in the Electoral College. 85 Fed. Reg. at 44,680.

267. Consequently, the proposed reapportionment regime would dilute the voting strength of Plaintiffs and all residents of their states with respect to representation in Congress and to their ability to participate in the elections of the President and Vice-President.

268. Moreover, the exclusion of undocumented immigrants from the reapportionment base would, by requiring Plaintiffs to live and vote in congressional districts with an artificially inflated population, further force Plaintiffs to compete for resources and the attention of their Representatives with an artificially inflated number of other residents.

269. Plaintiffs are also members of racial and ethnic communities which themselves include large numbers of undocumented immigrants, as well as other immigrants, naturalized citizens, and children of immigrants. The President's Memorandum has inflicted dignitary harm and intimidation upon these communities.

### 5. Harms of Early Cessation of Field Operations

270. The early cessation of census field operations and the self-response period, as well as the reduced data processing and quality check time, will lead to an undercount of individuals who have not yet responded to the Census. Four former directors of the Census Bureau, who served under nine presidents of both parties, expressed this exact concern following the Bureau's announcement, noting that the "end result" of the limited field operations will be "under-representation of those persons [these operations were] expected to reach" and, ultimately, "seriously incomplete enumerations in many areas across our country."[89]

---

[89] Statement by Former U.S. Census Bureau Directors: On the Importance of Extending the 2020 Census Statutory Deadlines to Achieve a Fair and Accurate Enumeration of the United States (Aug. 4, 2020),

271.    This truncated field operation period is inadequate to ensure an accurate count of the population, particularly given the complexity of census field operations, the number of households that remain to be counted, and the unique challenges posed by COVID-19. Census field operators must interview millions of households, conduct re-interviews, perform vacant-delete checks, and complete final canvassing of nonresponsive households. The time requirements for each of these operations are immense. And COVID-19 has only made this work more difficult, including by complicating efforts to recruit and train staff to conduct door-knocking operations and making it less likely that individuals will be willing to speak with strangers on their doorstep.[90]

272.    In particular, the curtailed field operation period will undermine the counting of households of color that tend to have lower self-response rates than white households and thus depend on the Bureau's follow-up operations to be accurately counted. In the 2010 Census, for example, white, non-Hispanic households completed the mail-in self-response at a rate of 82.5%, whereas Hispanic households self-responded at a rate of 69.7%, Black households self-responded at a rate of 70%, Asian Americans self-responded at a rate of 75.4%, and other communities of color self-responded at even lower rates.[91]   Early data on the 2020 Census

https://www.documentcloud.org/documents/7013550-Aug-4-2020-Statement-By-Former-U-S-Census-Bureau.html; *see also* Michael Wines & Richard Fausset, *With Census Count Finishing Early, Fears of a Skewed Tally Rise*, N.Y. TIMES (Aug. 4, 2020), https://www.nytimes.com/2020/08/04/us/2020-census-ending-early.html.

[90]    *See* Mike Schneider, *Census Bureau drop-outs complicate door-knocking efforts*, ABC NEWS (Aug. 8, 2020), https://abcnews.go.com/Health/wireStory/census-bureau-drop-outs-complicate-door-knocking-efforts-72253639; Sarah Holder & Kriston Capps, *The Census Bureau Wasn't Counting on the Coronavirus*, BLOOMBERG CITY LAB (Mar. 4, 2020), https://www.bloomberg.com/news/articles/2020-03-04/coronavirus-fears-complicate-2020-census-planning.

[91]    U.S. Census Bureau, 2010 Census Planning Memoranda Series: 2010 Census Mail Response/Return Rates Assessment Report (June 6, 2012) at 24, 26, *available at*

self-response rates indicate that similar patterns are playing out this year: As of June 18, the average response rate for white households was 66%, while the average response rate for Hispanic, Black, and Asian households was 54.4%, 51.6%, and 64%, respectively.[92]  As the former census directors observed, early cessation of field data collection will result in "under-representation of … [these] traditionally hard-to-count populations and over-representation of all other populations," particularly white households, "with potentially extreme differential undercounts."[93]

273.    The likely undercount of Latino, Black, Asian, and other minority households, and over-representation of white households, will in turn lead to malapportioned state legislative and local districts and the loss of political power for the undercounted groups.

274.    The Census Bureau's decision to severely curtail the field operation and self-response periods, on the eve of the start of field operations and in light of the challenges posed by COVID-19, continues Defendants' relentless effort to undermine the Census so as to ensure the undercounting and, ultimately, the political underrepresentation, of households of color in comparison to white households.

---

Mail Response/Return Rates Assessment Report (June 6, 2012) at 24, 26, *available at* https://www.census.gov/content/dam/Census/library/publications/2012/dec/2010_cpex_198.pdf.

[92]    Center for Urban Research, Census 2020 Response Rate Analysis: Weeks 12 and 13 (June 21, 2020), *available at* https://www.gc.cuny.edu/Page-Elements/Academics-Research-Centers-Initiatives/Centers-and-Institutes/Center-for-Urban-Research/CUR-research-initiatives/Census-2020-Response-Rate-Analysis-Weeks-12-and-13 (see No. 3 – "Response Rate Trends Across Census Tracts by Plurality Race/Hispanic Origin").

[93]    Statement by Former U.S. Census Bureau Directors: On the Importance of Extending the 2020 Census Statutory Deadlines to Achieve a Fair and Accurate Enumeration of the United States (Aug. 4, 2020), https://www.documentcloud.org/documents/7013550-Aug-4-2020-Statement-By-Former-U-S-Census-Bureau.html.

## CAUSES OF ACTION

## COUNT I

### (Enumeration Clause, U.S. Const. art. I, § 2, cl. 3; amend. XIV, § 2)

### (Against All Defendants)

275.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

276.    The Constitution requires that representatives in Congress be allocated based on "the whole number of persons in each State." U.S. Const. Amend. XIV, § 2; *see also* U.S. Const., art. I, § 2, cl. 3.

277.    An undocumented immigrant is a person. *See Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons'. . . ."); *see also Evenwel v. Abbott*, 136 S. Ct. 1120, 1128 (2016) (recounting legislative process by which "total population," rather than voter population, was chosen "as the congressional apportionment base" under Fourteenth Amendment).

278.    The President's Memorandum announces a policy of "exclud[ing] from the appointment base aliens who are not in a lawful immigration status." The White House, Memorandum for the Secretary of Commerce, Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census (July 21, 2020). The Memorandum violates the unambiguous command of the Fourteenth Amendment that all "persons in each State" be counted in congressional apportionment.

279.    The early cessation of the field data collection and the self-response period for the decennial Census one month early, creating the shortest field operation period in modern census history, as well as the truncated data processing period, also violates the Fourteenth Amendment as it will lead to a significant undercount of Latino, Black, Asian, and other historically

undercounted households of color and thus will unreasonably compromise the distributive accuracy of the 2020 Census.

280.    Plaintiffs will suffer permanent and irreparable injury unless Defendants are enjoined from executing the Memorandum.

## COUNT II

### (Equal Protection Guarantee of the Fifth Amendment

### to the United States Constitution)

### (Against All Defendants)

281.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

282.    The Due Process Clause of the Fifth Amendment incorporates the equal protection guarantee of the Fourteenth Amendment.

283.    The collection of citizenship data and the production of citizenship population tabulations for use along with the P.L. 94-171 Redistricting Data File by all Defendants except President Trump violates the equal protection guarantee of the Fifth Amendment because it is motivated by racial animus towards Latinos and Asian Americans, and animus towards non-U.S. citizens and foreign-born persons.

284.    The Presidential Memorandum and actions taken to comply with the Presidential Memorandum violate the equal protection guarantee of the Fifth Amendment because they are motivated by racial animus towards Latinos, Asian Americans, and non-U.S. citizens and undocumented foreign-born persons.

285.    The early cessation of field collection of data and the self-response period, as well as a truncated data processing period for the decennial Census violates the equal protection guarantee of the Fifth Amendment because it is motivated by racial animus towards Latinos,

Asian Americans, and non-U.S. citizens and undocumented foreign-born persons and will disproportionately affect the counting and political representation of those groups.

286.   Defendants' violations caused and will cause harm to Plaintiffs.

## COUNT III

**(Administrative Procedure Act, 5 U.S.C. § 706 (2)(A))**

**(Inadequate Rationale)**

**(Against All Defendants Excluding President Trump)**

287.   ~~88.~~ Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

288.   ~~89.~~ The APA prohibits final agency action that is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law[.]"  5 U.S.C. § 706(2)(A).

289.   ~~90.~~ Defendants represent or are agencies subject to the requirements of the APA. 5 U.S.C. § 701 (b)(1).

290.   Defendants' decision to collect and use administrative records to report the citizenship of persons in the United States relies on inadequate rationale. Specifically, the memorandum from Secretary Ross in March 2018 indicates that the reason the administration is implementing this policy is for Voting Rights Act enforcement. This rationale, however, is mere pretext.

291.   ~~91.~~ Defendants failed to provide any independent analysis or support to justify collecting citizenship data to produce this data for use with the population tabulations provided to states ~~in~~with the 2020 Census P.L. 94-171 Redistricting Data File. Defendants' decision to collect citizenship data and produce citizenship population tabulations for use alongside the 2020 Census P.L. 94-171 Redistricting Data File is thus arbitrary and capricious, discriminatory, an

abuse of discretion, and otherwise not in accordance with law, and therefore violates the APA and must be set aside.

292. ~~92.~~ Plaintiffs suffered and will suffer permanent and irreparable injury unless Defendants are enjoined from collecting citizenship data and producing tabulations of citizenship population for use along with the 2020 Census P.L. 94-171 Redistricting Data File.

## COUNT ~~II~~IV

### (Administrative Procedure Act, 5 U.S.C. § 706 (2)(B))

### (Contrary to Law)

### (Against All Defendants Excluding President Trump)

293. ~~93.~~ Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

294. ~~94.~~ The APA prohibits final agency action that is "~~contrary to constitutional right, power, privilege or immunity~~ in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(~~B~~C).

295. ~~95.~~ Defendants represent or are agencies subject to the requirements of the APA. 5 U.S.C. § 701 (b)(1).

296. Presidential power is limited to the authority conferred on the President by acts of Congress or by the Constitution itself. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Constitution gives Congress authority to conduct the census "in such a Manner as [Congress] shall by Law direct," U.S. Const. art. I, § 2, and "vests Congress with wide discretion over . . . the conduct of the census," *Wisconsin*, 517 U.S. at 15. Pursuant to this authority, Congress delegated the duty of conducting the census to the Secretary of Commerce, subject to the provisions of the Census Act. Neither the Census Act nor the Constitution vests the President with authority over the *conduct* of the census.

297.   Defendant Ross has exceeded his statutory authority over the conduct of the decennial Census by ordering the creation of the block level CVAP data, as articulated in the July 2019 OMB request , thus improperly allowing President Trump to usurp the discretion delegated to the Secretary by Congress.

298.   Secretary Ross has directed the Census Bureau to collect citizenship data not because he finds that it is necessary to collect this data, but because President Trump, as a co-conspirator in the continuing scheme to deprive Plaintiffs of political representation, finds that it is necessary for the Census Bureau to collect this data.

299.   96. Defendants seek to collect and produce tabulations of citizenship population for use along with the 2020 Census P.L. 94-171 Redistricting Data File to discriminate against Plaintiffs and organizational Plaintiffs' members because of their race, national origin, or alienage.  Exclusion of non-citizens from the population base used for redistricting without a hard count of citizens and non-citizens will result in unconstitutionally malapportioned congressional and state legislative districts.  Defendants' decision toFor the foregoing reasons, Defendant Ross's decision to Ross's order to create and disseminate the block level CVAP data and direct the Census Bureau to, among other things, collect citizenship data and produce citizenship population tabulations for use along with the 2020 Census P.L. 94-171 Redistricting Data File is contrary to constitutional right, power, privilege or immunity, in excess of the Secretary's statutory jurisdiction, authority, or limitations, or short of statutory right, and therefore violates the APA and must be set aside.

300.   97. Plaintiffs suffered and will suffer permanent and irreparable injury unless Defendants arethe Secretary is enjoined from collecting citizenship data and producing

tabulations of citizenship population for use along with the 2020 Census P.L. 94-171 Redistricting Data Filecreating the inaccurate and unreliable block level CVAP dataset.

## COUNT IIIV

**(Administrative Procedure Act, 5 U.S.C. § 706 (2)(C))**

**(Excess of Lawful Authority)**

**(Against All Defendants Excluding President Trump)**

301.    98. Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

302.    99. The APA prohibits final agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(C).

303.    100. Defendants represent or are agencies subject to the requirements of the APA. 5 U.S.C. § 701 (b)(1).

304.    101. Presidential power is limited to the authority conferred on the President by acts of Congress or by the Constitution itself. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Constitution gives Congress authority to conduct the census "in such a Manner as [Congress] shall by Law direct," U.S. Const. art. I, § 2, and "vests Congress with wide discretion over . . . the conduct of the census," *Wisconsin*, 517 U.S. at 15. UnderPursuant to this authority, Congress delegated the duty of conducting the census to the Secretary of Commerce, subject to the provisions of the Census Act. Neither the Census Act nor the Constitution vests the President with authority over the *conduct* of the census.

305.    Defendant Ross has exceeded his statutory authority over the conduct of the decennial census by following EO 13880Census by ordering the creation of the block level CVAP data, as articulated in the July 2019 OMB request , thus improperly allowing President Trump to usurp the discretion delegated to the Secretary by Congress

306.   ~~102. .~~ Secretary Ross has directed the Census Bureau to collect citizenship data not because he finds that it is necessary to collect this data, but because President Trump, as a co-conspirator in the continuing scheme to deprive Plaintiffs of political representation, finds that it is necessary for the Census Bureau to collect this data.

307.   ~~103.~~ For the foregoing reasons, Defendant Ross's decision to ~~follow EO 13380 and~~create and disseminate the block level CVAP data and direct the Census Bureau to, among other things, collect citizenship data and produce citizenship population tabulations for use along with the 2020 Census P.L. 94-171 Redistricting Data File is in excess of the Secretary's statutory jurisdiction, authority, or limitations, or short of statutory right, and therefore violates the APA and must be set aside.

308.   ~~104.~~ Plaintiffs suffered and will suffer permanent and irreparable injury unless the Secretary is enjoined from ~~following EO 13380~~creating the inaccurate and unreliable block level CVAP dataset.

## COUNT ~~IV~~VI

### (Administrative Procedure Act, 5 U.S.C. § 706 (2)(D))

### (Improper Procedure)

### (Against All Defendants Excluding President Trump)

309.   ~~105.~~ Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

310.   ~~106.~~ The APA prohibits final agency action that is "without observance of procedure required by law[.]"  5 U.S.C. § 706(2)(D).

311.   ~~107.~~ Defendants represent or are agencies subject to the requirements of the APA. 5 U.S.C. § 701(b)(1).

312.   108. Defendants departed from statutory and regulatory requirements under 13 U.S.C. § 141(c) and Public Law 94-171, as well as OMB and Census Bureau standards and practices, to collect and produce specific tabulations of population other than total population, race, and Hispanic/non-Hispanic origin for use along with the 2020 Census P.L. 94-171 Redistricting Data File. Defendants' decision to collect citizenship data and produce citizenship population tabulations for use along with the 2020 Census P.L. 94-171 Redistricting Data File is thus without observance of procedure required by law, and therefore violates the APA and must be set aside.

313.   109. Plaintiffs suffered and will suffer permanent and irreparable injury unless Defendants are enjoined from collecting citizenship data and producing tabulations of citizenship population for use along with the 2020 Census P.L. 94-171 Redistricting Data File.

### COUNT V

### (Equal Protection Clause of the Fifth Amendment

### to the United States Constitution)

110. Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

111. The Due Process Clause of the Fifth Amendment incorporates the equal protection guarantee of the Fourteenth Amendment.

112. The collection of citizenship data and the production of citizenship population tabulations for use along with the P.L. 94-171 Redistricting Data File violates the equal protection guarantee of the Fifth Amendment because it is motivated by racial animus towards Latinos, and animus towards non-U.S. citizens and foreign-born persons.

314.   113. Defendants' violationcaused and will cause harm to Plaintiffs also departed from proper procedure by modifying the Residence rule without Notice and Comment.

315.   Plaintiffs will suffer permanent and irreparable injury unless Defendants are enjoined from subtracting undocumented immigrants from apportionment totals.

**COUNT ~~VI~~VII**

**(Conspiracy to Violate Civil Rights Under 42 U.S.C. § 1985(3))**

316.   ~~114.~~ Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

317.   ~~115.~~ Motivated by their racial and class-based animus toward Latinos and non-U.S. citizens, President Trump, Defendant Ross, Defendant Dillingham, John Gore, Attorney General Sessions, Kris Kobach, and Stephen Bannon conspired to collect citizenship data and produce citizenship data for use along with the P.L. 94-171 Redistricting Data File so that states can use CVAP data to apportion state and local districts. This group also conspired to subtract from apportionment totals undocumented immigrants, and thus diminish Latino political power and representation.

318.   ~~116.~~ By taking the actions described herein, President Trump, Defendant Ross, Defendant Dillingham, John Gore, Attorney General Barr, Kris Kobach and Stephen Bannon conspired to deprive Latinos and non-U.S. citizens of their Fifth Amendment right to equal protection of the laws under the Fifth Amendment of the U.S. Constitution in violation of 42 U.S.C. § 1985(3).

319.   ~~117.~~ Defendants' unlawful conduct to conspire to violate the constitutional rights of Latinos and non-U.S. citizen persons caused and will cause harm to Plaintiffs.

**COUNT VIII**

**(Ultra Vires Claims – 2 U.S.C. § 2a; 13 U.S.C. § 141)**

**(Against All Defendants)**

320.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

321.    The Constitution vests authority over the decennial census in the Congress. U.S. Const. art. I, § 2, cl. 3.

322.    Congress has directed the Secretary of Commerce to carry out the decennial census "in such form and content as he may determine," and to report the results of that decennial census to the President. 13 U.S.C. § 141(a), (b). Under the Secretary's regulations for the 2020 decennial census, the Census Bureau will count undocumented immigrants.

323.    Under the statutory framework established by Congress for the congressional apportionment process, the President performs only a circumscribed role. The President must submit to Congress "the whole number of persons in each State . . . as ascertained under the . . . decennial census of the population." 2 U.S.C. § 2a(a). And he must submit to Congress "the number of Representatives to which each state would be entitled," based on applying a specified calculation method to the number of persons ascertained under the decennial census. *Id.*

324.    The President's Memorandum directs the Secretary to provide information on the number of undocumented immigrants in each state, and announces that the President will use that information to calculate congressional apportionment numbers based on an "apportionment base" calculated by the President. Using an apportionment base other than the "whole number of persons in each State" as ascertained under the decennial census exceeds the authority delegated to the President by Congress. Plaintiffs suffered and will suffer permanent and irreparable injury unless Defendants are enjoined from subtracting undocumented immigrants from apportionment totals.

### PRAYER FOR RELIEF

WHEREFORE, ~~plaintiffs~~Plaintiffs respectfully request that this Court:

(a) Declare that production of citizenship data for use along with the P.L. 94-171 Redistricting Data File and population tabulations, or including citizenship data in the File, violates the Equal Protection ~~guarantee~~Guarantee of the Fifth Amendment;

(b) Declare that the decision to collect and use administrative records to report the citizenship of persons in the United States violates the Administrative Procedures Act because it is arbitrary and capricious,

(c) ~~(b)~~ Declare that Secretary Ross's decision to ~~follow EO 13380 and~~ order the Census Bureau to produce tabulations of citizenship population data for use along with the P.L. 94-171 Redistricting Data File, or to include citizenship data in the File, violates §§ 706(2)(A)-(D) of the APA because it is arbitrary and capricious, an abuse of discretion, and not in accordance with law; contrary to constitutional power, right, privilege or immunity; and/or in excess of statutory jurisdiction and authority, and without observance of procedure required by law;

(d) Declare that Defendants' decision to exclude undocumented immigrants from the congressional apportionment base following the 2020 Census, as well as any action Defendants take to implement the decision to exclude undocumented immigrants from the apportionment base, is unauthorized by and contrary to the Constitution and laws of the United States, specifically Article I, section 2, clause 3, the Equal Protection Guarantee of Amendment V, and Amendment XIV of the Constitution.

(e) Declare that Defendants' decision to terminate the 2020 decennial Census field operations and self-response period one month early, on September 30, 2020, and reducing the data processing time is unauthorized by and contrary to the Constitution and laws of the United States, specifically Article I, section 2, clause 3, Amendment XIV of

the Constitution, and the Equal Protection Guarantee of Amendment V of the Constitution.

(f) Enjoin Defendants Ross and Dillingham, the United States Department of Commerce, and the United States Census Bureau, and all those acting under the direction of or on behalf of these Defendants, from terminating the 2020 decennial Census field operations and self-response period one month early, on September 30, 2020, and order these Defendants to continue field operations and the self-response period through October 31, 2020.

(g) Enjoin Defendants Ross and Dillingham, the United States Department of Commerce, and the United States Census Bureau, and all those acting under the direction of or on behalf of these Defendants, from reporting apportionment tabulations by December 31, 2020, allowing for additional time past the statutory deadline to produce the tabulations, or in the alternative, lift the statutory deadline of December 31 to report apportionment tabulations based on the 2020 census until April 30, 2021.

(h) (c) Enjoin Defendants, and their agentsall those acting under the direction of Defendants or on behalf of Defendants, from collecting data as dictated by EO 13380 or creating a block level citizenship dataset based on administrative records or otherwise and from producing tabulations of citizenship population for use alongside the P.L. 94-171 Redistricting Data File and population tabulations or including citizenship data in the File and from taking any irreversible steps to produce tabulations of citizenship population for use alongside with the File or including tabulations of citizenship population in the File;

(i) Enjoin Defendants, and all those acting under the direction of Defendants or on behalf of Defendants, from excluding undocumented immigrants from the apportionment base following the 2020 Census, or taking any action to implement or further such a policy;

(j) Enjoin the Secretary of Commerce, and those acting on behalf of or under the direction of the Secretary of Commerce, from transmitting to the President a calculation of the number of persons residing in each state that excludes undocumented immigrants in connection with the calculation of the apportionment base;

(k) Enjoin the President from transmitting to Congress any calculation of the number of persons residing in each state that excludes undocumented immigrants in connection with the calculation of the apportionment base;

(l) Issue a writ of mandamus compelling the Secretary of Commerce to tabulate and report to the President the total population by states based solely on the total number of persons in each state, including undocumented immigrants.

(m) Issue a writ of mandamus compelling the President to tabulate and report to Congress a statement of the whole number of persons in each state that does not exclude undocumented immigrants from that number of persons, pursuant to pursuant to 2 U.S.C. § 2a(a).

(n) (d) Award Plaintiffs reasonable costs, expenses, and attorneys' fees pursuant to 28 U.S.C. § 2412; and

(o) (e) Award such additional relief as the interests of justice may require.

Dated: ~~October 9~~August 12, ~~2019~~2020                    Respectfully submitted,

**By** /s/ Terry Ao Minnis

**ASIAN AMERICANS ADVANCING JUSTICE | AAJC**
John C. Yang (IL Bar No. 6210478)*
Niyati Shah (NJ Bar No. 026622005) °
Terry Ao Minnis (MD Bar No. 20547)°
Eri Andriola (NY Bar No. 5510805)°
1620 L Street, NW, Suite 1050
Washington, DC 20036
Phone: (202) 815-1098
Facsimile: (202) 296-2318

**MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND**
Thomas A. Saenz (CA Bar No. 159430)°
Denise Hulett (CANina Perales (TX Bar No. 1215532400546)°
Andrea Senteno (NY Bar. No. 5285341)**°
Tanya G. Pellegrini (CA Bar No. 285186)°
JuliaDaniel A. GomezHatoum (CATX Bar No. 31627024099136)°
1016 16th Street NW, Suite 100
Washington, DC 20036
Phone: (202) 293-2828
Facsimile: (202) 293-2849

\* Pro hac vice *applicationsapplication* forthcoming
*\*\* Application for admission forthcoming*
° *Not admitted in DC.*

## CERTIFICATE OF SERVICE

I certify that on this 12th day of August 2020, I caused a copy of Second Amended Complaint to be sent to all parties receiving CM/ECT notices in this case.

/s/ Terry Ao Minnis
Terry Ao Minnis

| **Summary report:** Litera® Change-Pro for Word 10.9.0.460 Document comparison done on 8/13/2020 12:00:06 AM | |
|---|---|
| **Style name:** WH-Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://IMANAGEWORKUS.WILMERHALE.COM/ActiveUS/181306987/1 | |
| **Modified DMS:** iw://imanageworkus.wilmerhale.com/ACTIVEUS/181242848/10 | |
| **Changes:** | |
| Add | 1223 |
| Delete | 484 |
| Move From | 120 |
| Move To | 120 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1947 |