# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>　　　　　　Defendants. | No. 8:19-cv-02710-PX-PAH-ELH |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR <u>TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................ 2

I.   Constitutional and Statutory Authority for the Census ............................................. 2

II.   2020 Census Procedures ........................................................................................... 3

LEGAL STANDARDS ................................................................................................... 4

ARGUMENT .................................................................................................................. 5

I.   Plaintiffs' Claim is Barred by the Political Question Doctrine .............................. 5

    A.   The census deadline is textually committed to Congress. ............................... 6

    B.   There are no judicially manageable standards for determining the
        appropriate census period. ................................................................................ 9

II.   Plaintiffs Lack Standing ........................................................................................... 13

    A.   Plaintiffs' alleged injuries are not redressable by a court order .................... 13

    B.   Plaintiffs' alleged injuries are not traceable to Defendants. .......................... 17

    C.   Plaintiffs' alleged injuries are entirely speculative. ....................................... 19

III.   Plaintiffs Cannot Prevail on their Enumeration Clause Claim ............................... 24

IV.   Plaintiffs Cannot Satisfy the Other Preliminary-Injunction Factors ...................... 30

    A.   Plaintiffs cannot establish any imminent and irreparable harm ................... 31

    B.   The public interest and harm to the government weigh heavily
        against a preliminary injunction. ..................................................................... 33

V.   Plaintiffs Cannot Sidestep the Three-judge Court ................................................... 34

CONCLUSION ............................................................................................................... 37

## TABLE OF AUTHORITIES

**Cases**

*6th Dist. Republican Comm. v. Alcorn,*
   913 F.3d 393 (4th Cir. 2019) ................................................. 13

*Allstate Ins. Co. v. McKinney,*
   2018 WL 4186421 (W.D.N.C. Aug. 31, 2018) ..................... 21

*Alperin v. Vatican Bank,*
   410 F.3d 532 (9th Cir. 2005) ................................................. 6

*Baker v. Carr,*
   369 U.S. 186 (1962) ................................................................ 5

*Carey v. Klutznick,*
   508 F. Supp. 420 (S.D.N.Y. 1980) ....................................... 15

*Carey v. Klutznick,*
   637 F.2d 834 (2d Cir. 1980) ................................................. 14

*Carey v. Klutznick,*
   653 F.2d 732 (2d Cir. 1981) ................................... 11, 15, 26

*Citizens United v. FEC,*
   558 U.S. 310 (2010) .............................................................. 14

*City of Chicago v. Int'l Coll. of Surgeons,*
   522 U.S. 156 (1997) .............................................................. 36

*City of New York v. Dep't of Commerce,*
   713 F. Supp. 48 (E.D.N.Y. 1989) ................................... 15, 16

*City of New York v. U.S. Dep't of Commerce,*
   34 F.3d 1114 (2d Cir. 1994), *rev'd sub nom. Wisconsin,* 517 U.S. at 1 ................ 28

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ................................................ 13, 19, 23

*Corrie v. Caterpillar, Inc.,*
   503 F.3d 974 (9th Cir. 2007) ................................................. 6

*Dep't of Commerce v. New York,*
    139 S. Ct. 2551 (2019) ........................................................................................ *passim*

*Dep't of Commerce v. U.S. House of Representatives,*
    525 U.S. 316 (1999) ............................................................................................ *passim*

*El–Shifa Pharm. Indus. Co. v. United States,*
    378 F.3d 1346 (Fed. Cir. 2004) ................................................................................. 6

*Fed'n for Am. Immigration Reform v. Klutznick,*
    486 F. Supp. 564 (D.D.C. 1980) .............................................................................. 21

*Forest Guardians v. Babbitt,*
    174 F.3d 1178 (10th Cir. 1999) ............................................................................... 14

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ............................................................................................ *passim*

*Gilligan v. Morgan,*
    413 U.S. 1 (1973) ...................................................................................................... 6

*Gonzalez v. Gorsuch,*
    688 F.2d 1263 (9th Cir. 1982) ................................................................................. 14

*Gordon v. Exec. Comm. of Democratic Party of City of Charleston,*
    335 F. Supp. 166 (D.S.C. 1971) .............................................................................. 36

*Grand River Enter. Six Nations, Ltd. v. Pryor,*
    481 F.3d 60 (2d Cir. 2007) ................................................................................. 31, 32

*Hagans v. Lavine,*
    415 U.S. 528 (1974) ................................................................................................ 36

*Japan Whaling Ass'n v. Am. Cetacean Soc'y,*
    478 U.S. 221 (1986) ............................................................................................. 5, 10

*Karcher v. Daggett,*
    462 U.S. 725 (1983) ........................................................................................... 12, 26

*Klutznick v. Carey,*
    449 U.S. 1068 (1980) .............................................................................................. 15

*La Unión Pueblo Entero v. Ross*,
  353 F. Supp. 3d 381 (D. Md. 2018)........................................................................ 16

*Lewis v. Casey*,
  518 U.S. 343 (1996)............................................................................................ 17

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)........................................................................... 14, 17, 19

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990)............................................................................................ 17

*Made in the USA Found. v. United States*,
  242 F.3d 1300 (11th Cir. 2001) .......................................................................... 6

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997)..................................................................................... 31, 32

*McConnell v. FEC*,
  540 U.S. 93 (2003)............................................................................................ 14

*McCulloch v. Maryland*,
  17 U.S. 316 (1819)............................................................................................ 12

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
  915 F.3d 197 (4th Cir. 2019) ............................................................................ 31

*Munaf v. Geren*,
  553 U.S. 674 (2008) .......................................................................................... 30

*NAACP v. Bureau of Census*,
  --- F. Supp. 3d ---, 2020 WL 1890531 (D. Md. Apr. 16, 2020) ..................... 26, 30

*NAACP v. Bureau of the Census*,
  399 F. Supp. 3d 406 (D. Md. 2019), *aff'd in part, rev'd on other grounds*,
  945 F.3d 183 (4th Cir. 2019) ...................................................................... 7, 17

*Nat. Res. Def. Council, Inc. v. Hodel*,
  865 F.2d 288 (D.C. Cir. 1988)............................................................................ 7

*Nat'l Law Ctr. on Homelessness & Poverty v. Kantor*,
  91 F.3d 178 (D.C. Cir. 1996)......................................................... 17, 18, 20, 32

*New York v. Trump*,
  ---F. Supp. 3d ---, 2020 WL 5422959 n.21 (S.D.N.Y. Sept. 10, 2020) ................................. 35

*Nken v. Holder*,
  556 U.S. 418 (2009)................................................................................................... 32, 33

*NLRB v. Noel Canning*,
  573 U.S. 513 (2014) ........................................................................................................ 12

*Page v. Bartels*,
  248 F.3d 175 (3d Cir. 2001) ...................................................................................... 35, 36

*Pashby v. Delia*,
  709 F.3d 307 (4th Cir. 2013) ........................................................................................... 5

*Profiles, Inc. v. Bank of Am. Corp.*,
  --- F. Supp. 3d ---, 2020 WL 1849710 (D. Md. Apr. 13, 2020) ........................................... 31

*Raines v. Byrd*,
  521 U.S. 811 (1997)......................................................................................................... 13

*Ridge v. Verity*,
  715 F. Supp. 1308 (W.D. Pa. 1989) ................................................................................ 21

*Rucho v. Common Cause*,
  139 S. Ct. 2484 (2019)...................................................................................................... 5

*Schneider v. Kissinger*,
  412 F.3d 190 (D.C. Cir. 2005) .......................................................................................... 6

*Sharrow v. Brown*,
  447 F.2d 94 (2d Cir. 1971) ............................................................................................. 21

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976)........................................................................................................... 18

*South Carolina v. United States*,
  907 F.3d 742 (4th Cir. 2018) .......................................................................................... 14

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016)............................................................................................... 13, 19

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ................................................................................................ 19

*Taylor v. Freeman*,
    34 F.3d 266 (4th Cir. 1994) ...................................................................................... 5

*Thomas v. Bryant*,
    919 F.3d 298 (5th Cir. 2019) .................................................................................. 36

*Thomas v. Reeves*,
    961 F.3d 800 (5th Cir. 2020) .................................................................................. 36

*Tucker v. U.S. Dep't of Commerce*,
    135 F.R.D. 175 (N.D. Ill. 1991) .............................................................................. 11

*Tucker v. U.S. Dep't of Commerce*,
    958 F.2d 1411 (7th Cir. 1992) ................................................................................ 11

*U.S. Dep't of Commerce v. Montana*,
    503 U.S. 442 (1992) ................................................................................... 10, 20, 27

*United States v. Munoz-Flores*,
    495 U.S. 385 (1990) .................................................................................................. 5

*United States v. Richardson*,
    418 U.S. 166 (1974) ................................................................................................ 24

*Utah v. Evans*,
    536 U.S. 452 (2002) ......................................................................................... *passim*

*Vieth v. Jubelirer*,
    541 U.S. 267 (2004) .................................................................................................. 5

*Wesberry v. Sanders*,
    376 U.S. 1 (1964) .................................................................................................... 10

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ................................................................................................ 19

*Williamson v. Maciol*,
    2020 WL 4449527 (N.D.N.Y. Aug. 3, 2020) ........................................................ 21

*Winter v. Nat. Res. Def. Council, Inc.,*
     555 U.S. 7 (2008) ........................................................................................... 4, 30, 31, 33

*Wisconsin v. City of New York,*
     517 U.S. 1 (1996) ...................................................................................................... *passim*

*Young v. Ditech Fin., LLC,*
     2017 WL 3066198 (D. Md. July 19, 2017) .......................................................................... 4

*Young v. Klutznick,*
     497 F. Supp. 1318 (E.D. Mich. 1980) .............................................................................. 15

*Young v. Klutznick,*
     652 F.2d 617 (6th Cir. 1981) ........................................................................................... 15

*Zivotofsky ex rel. Zivotofsky v. Clinton,*
     566 U.S. 189 (2012) ...................................................................................................... 5, 9

## **Constituional Provisions**

U.S. Const. art. I, § 2, cl. 3 ................................................................................ 2, 6, 25, 28

U.S. Const. art. III, § 2 ................................................................................................ 13

## **Statutes**

2 U.S.C. § 2a ........................................................................................................ 3, 8, 20, 35

13 U.S.C. § 2 ......................................................................................................................... 3

13 U.S.C. § 4 ......................................................................................................................... 3

13 U.S.C. § 141 ........................................................................................................... *passim*

28 U.S.C. § 1253 ............................................................................................................ 16, 25

28 U.S.C. § 2284 ....................................................................................................... 34 ,35, 37

42 U.S.C. § 1396d ........................................................................................................ 20, 32

49 U.S.C. § 5305 ........................................................................................................... 20, 32

An Act to Amend the Act for Taking the Fifth Census, 4 Stat. 439 (1831) .......................... 7

An Act to Extend the Time for Completing the Third Census, 2 Stat. 658 (1811) .............. 7

An Act to Provide for Taking the Fourth Census, 3 Stat. 548 (1820) ................................... 8

An Act to Provide for Taking the Fourth Census, 3 Stat. 643 (1821) ................................... 7

An Act to Provide for Taking the Sixth Census, 5 Stat. 452 (1841) ................................... 7, 8

An Act Providing for the Taking of the Seventh and Subsequent Censuses (1841),
    9 Stat. 445 ............................................................................................................................ 8

An Act to Provide for Taking the Tenth and Subsequent Censuses,
    20 Stat. 473 (1879) ............................................................................................................. 8

Census Act of 1790, 1 Stat. 101 (1790) ........................................................................................ 7

Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13 ........................ 8, 9

## Other Authorities

11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2949
    (3d ed. 2002) ....................................................................................................................... 21

13A Charles Alan Wright et al., *Federal Practice & Procedure* § 3531.6
    (3d ed. Apr. 2018 update) ................................................................................................. 13

Black's Law Dictionary, "Action" (11th ed. 2019) ................................................................ 36

H.R. 6800, 116th Cong. § 70201(a) (2020) ...................................................................... 4, 8, 12

H.R. 7034, 116th Cong., § 2 (2020) ................................................................................... 4, 8, 12

H.R. 7974, 116th Cong., § 2 (2020) ................................................................................... 4, 8, 12

Letter from Carolyn B. Maloney to Mitch McConnell *et al.* (Sept. 2, 2020) ........................ 8

S. 4048, 116th Cong., § 2 (2020) ........................................................................................ 4, 8, 12

Thomas R. Lee, *The Original Understanding of the Census Clause: Statistical Estimates and
    the Constitutional Requirement of an "Actual Enumeration,"*
    77 Wash. L. Rev. 1 (2002) .................................................................................................. 26

U.S. Census Bureau, Statement on 2020 Census Operational Adjustments Due to
    COVID-19 (Apr. 13, 2020) ............................................................................................... 19

## INTRODUCTION

Plaintiffs' preliminary-injunction motion presents a simple question: is this Court empowered to disregard a statutory deadline enacted under Congress's "virtually unlimited discretion" to regulate the decennial census? *Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996).  The answer is equally simple: no.  While Congress has largely delegated its plenary authority over the census to the Secretary of Commerce, it has nonetheless required that the Secretary finish the census before year's end.  13 U.S.C. § 141(a)–(b).  In light of the disruptions caused by the COVID-19 pandemic, the Commerce Department and Census Bureau requested a congressional extension of the December 31, 2020 deadline.  But Congress has not yet acted, forcing the Secretary and the Bureau to adjust their planned operations in order to meet the statutory requirement.  Nevertheless, the Bureau is confident that, following this plan, it can deliver a complete census within the allotted time.

Plaintiffs clearly harbor concerns about both the Census Bureau's operational plan and the statutory timeline.  But they should take those concerns to the branch of Government that can address them:  Congress.  Contrary to what Plaintiffs may think, neither the Secretary nor the Census Bureau are free to casually disregard a statutory deadline to pursue some ethereal notion of a better census.  And this Court should not countermand the Census Bureau's entire operational plan—a decade-long, 15.6-billion-dollar endeavor culminating in one of the largest peacetime mobilizations in American history—simply because Plaintiffs are frustrated with Congress's inaction.

That frustration is evident from Plaintiffs' motion, which is long on facts but short on law.  They rebuke the Census Bureau's extraordinary efforts to meet an unmoving statutory deadline in the face of an unprecedented pandemic, and then proclaim that the statutory deadline must yield to their notions of a better count.  Pls.' Mot. at 33, ECF No. 112-1.  That would surely be news to Congress, which has plenary authority over the census and has exercised its exclusive power to set and reset deadlines, as needed, from

1

the earliest days of our Republic.  It would also be news to 230 years of litigants, who, in Plaintiffs' view, could have simply run to court and demanded extra time whenever they desired a last-minute change in census procedures.  Perhaps unsurprisingly, that theory has garnered no support from the Supreme Court.  In the only two instances where district courts brazenly ordered the Census Bureau to disregard § 141(b)'s statutory deadline, the Supreme Court swiftly stayed those decisions before they were later reversed on appeal.

Put simply, Plaintiffs cannot succeed on the merits of their Enumeration Clause claim.  Absent an extension of § 141(b)'s deadline—a statutory timeline they do not challenge—the Census Bureau has no choice but to meet that congressional requirement. So Plaintiffs' claim is barred by the political question doctrine and they fail meet any of the Article III standing requirements.  But even if this case were theoretically justiciable, it wouldn't matter.  The Supreme Court has never found a violation of the Enumeration Clause, and the Census Bureau's accelerated person-by-person headcount easily clears whatever standard applies under that deferential review.

Merits aside, Plaintiffs also fail to establish irreparable injury or harms that weigh in their favor.  To the contrary, the public interest weighs squarely against ordering the Census Bureau to again replan a massive operation that is designed and run by scientists and statisticians to achieve the best possible results within Congress's established parameters.  Plaintiffs' preliminary-injunction motion should be denied.

## BACKGROUND

## I.     CONSTITUTIONAL AND STATUTORY AUTHORITY FOR THE CENSUS

The Constitution's Enumeration Clause requires an "actual Enumeration" of the population every ten years and vests Congress with the authority to conduct that census "in such Manner as they shall by Law direct."  U.S. Const. art. I, § 2, cl. 3.  Through the Census Act, Congress has delegated to the Secretary of Commerce the responsibility to conduct the decennial census "in such form and content as he may determine."  13 U.S.C.

§ 141(a).   The Census Bureau assists the Secretary in the performance of this responsibility.  *See id.* §§ 2, 4.

Notably, however, Congress has required the Secretary to report to the President the "tabulation of total population by States . . . within 9 months after the census date," defined as April 1 of the census year.  13 U.S.C. § 141(b).  That is, the Secretary must provide the final census report to the President by December 31, 2020.  After receiving the Secretary's report, the President calculates "the number of Representatives to which each State would be entitled," and transmits the resulting information to Congress. 2 U.S.C. § 2a(a).

## II.    2020 CENSUS PROCEDURES

The goal of the decennial census is to count each resident of the United States once, only once, and in the right place.  Fontenot Decl. ¶ 19.  As detailed in the declaration of Albert E. Fontenot, Jr., Associate Director for Decennial Census Programs at the Census Bureau, the 2020 Census is a massive undertaking.  It is the culmination of an estimated $15.6 billion, over a decade of research and testing, and meticulous planning by thousands of Census Bureau employees to count about 330 million people across 3.8 million square miles.  *See id.* ¶¶ 12, 16.  To enumerate all persons, great efforts and the most resources are expended on populations that are most difficult to count.  *Id.*  After extensive testing and various iterations, the latest published version of the Census Bureau's operational plan is Version 4.0, which was issued in December 2018.  *See Id.* ¶¶ 12, 76–77.

As the gravity of the COVID-19 pandemic emerged in March 2020, the Census Bureau adjusted its operational plans for the census, contingent on a four-month extension of § 141(b)'s deadline.  Fontenot Decl. ¶¶ 83–85.  In April 2020, the Secretary and Bureau Director requested such statutory relief from Congress and announced a new plan to meet that extended schedule (the "COVID-19 Plan").  *Id.* ¶ 86.  At various times throughout the pandemic, legislation has been introduced to modify § 141(b)'s deadline

consistent with the Secretary's plan.  *See* H.R. 6800, 116th Cong. § 70201(a) (2020) (extending deadline for 2020 Census under § 141(b) from December 31, 2020 to April 30, 2021); H.R. 7974, 116th Cong., § 2 (2020) (same); H.R. 7034, 116th Cong., § 2 (2020) (same); S. 4048, 116th Cong., § 2 (2020) (same).  But none of those proposals were enacted into law.

Once it became apparent in late July that Congress may not alter the December 31, 2020 statutory deadline, the Secretary directed the Bureau to present a plan for how it could accelerate operations to meet that deadline.  Fontenot Decl. ¶ 87.  Senior managers in the Census Bureau considered various operational adjustments, "evaluat[ing] the risks and quality implications of each suggested time saving measure and select[ing] those that [the Census Bureau] believed presented the best combination of changes to allow [it] to meet the statutory deadline without compromising quality to an undue degree." *Id.* ¶ 88. The Census Bureau formalized its plan (called the "Replan") and presented it to the Secretary on August 3, 2020.  *Id.* ¶ 87.  Later that day, the Secretary approved, and Director Dillingham announced, the Replan.  Since that time the Bureau has been working tirelessly to conduct the census under the Replan, mindful of its need to meet the statutory deadline.  *Id.* ¶¶ 87–98. The Bureau "is confident that it can achieve a complete and accurate census and report apportionment counts by the statutory deadline following the Replan Schedule." *Id.* ¶ 97.

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

equities tips in his favor, and that an injunction is in the public interest."[1]  *Id.* at 20.  Where, as here, a plaintiff seeks a "preliminary injunction [that] is mandatory rather than prohibitory in nature," *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013), relief is especially disfavored and "warranted only in the most extraordinary circumstances."  *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994).

## ARGUMENT

### I.    PLAINTIFFS' CLAIM IS BARRED BY THE POLITICAL QUESTION DOCTRINE

Plaintiffs' entire preliminary-injunction motion is built on the faulty premise that the Census Bureau's extraordinary efforts to meet § 141(b)'s statutory deadline will lead to an inaccurate census.  *See, e.g.*, Pls.' Mot. at 21–34.  But the Court cannot entertain that speculation because Congress, not the judiciary, is constitutionally tasked with deciding whether any particular timeline will ensure an acceptable (though unknowable) level of census accuracy.

"The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).  The doctrine is "primarily a function of the separation of powers," *Baker v. Carr*, 369 U.S. 186, 210 (1962), and "is designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government," *United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990).  The Supreme Court has identified several hallmarks of nonjusticiable political questions.  *Id.*  Foremost among these are "a textually demonstrable constitutional commitment of the issue to a coordinate political department," or "a lack of judicially discoverable and manageable standards for resolving" the dispute.  *Vieth v. Jubelirer*, 541

---

[1] "The standard for granting either a TRO or a preliminary injunction is the same." *Young v. Ditech Fin., LLC*, 2017 WL 3066198, at *8 (D. Md. July 19, 2017) (Xinis, J.).

U.S. 267, 277–78 (2004) (internal citation omitted); *see Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012); *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) (finding partisan gerrymandering nonjusticiable for lack of administrable standards).  Although either hallmark alone renders a case nonjusticiable, *see Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005), Plaintiffs' motion runs headlong into both.

> A.    <u>The census deadline is textually committed to Congress.</u>

The Enumeration Clause grants Congress the authority to conduct the "actual Enumeration" in "such Manner as they shall by Law direct."  U.S. Const. art. I, § 2, cl. 3. Courts routinely recognize the nonjusticiability of cases grounded in far less explicit constitutional language.  Most notably, courts acknowledge that a variety of actions implicating foreign relations can present nonjusticiable political questions, even when the actual text of the Constitution is far from clear.  *See, e.g.*, *Made in the USA Found. v. United States*, 242 F.3d 1300, 1313–14 (11th Cir. 2001) (explaining that the Constitutional commitment of "foreign relations . . . to the executive and legislative" rests on various textual provisions and established case law); *El–Shifa Pharm. Indus. Co. v. United States*, 378 F.3d 1346, 1367 (Fed. Cir. 2004) (holding that the Constitution, "in its text and by its structure, commits to the President the power to make extraterritorial enemy property designations"); *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 983 (9th Cir. 2007) ("Whether to grant military or other aid to a foreign nation is a political decision inherently entangled with the conduct of foreign relations."); *Alperin v. Vatican Bank*, 410 F.3d 532, 545 (9th Cir. 2005) (surveying cases applying the political question doctrine in the foreign-relations context).  But where, as here, the Constitution explicitly commits an issue to Congress or the Executive, the political-question determination is straightforward.  *See, e.g.*, *Gilligan v. Morgan*, 413 U.S. 1, 5–11 (1973) (noting Congress's explicit power to "organiz[e]. . . the Militia" in holding that a suit to restrain the Governor's use of National Guard troops presented a nonjusticiable political question).

As the Supreme Court has recognized, the text of the Enumeration Clause "vests Congress with virtually unlimited discretion in conducting the decennial 'actual Enumeration.'" *Wisconsin*, 517 U.S. at 19; *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019) (Congress has "broad authority over the census, as informed by long and consistent historical practice"); *see also NAACP v. Bureau of the Census*, 399 F. Supp. 3d 406, 418 (D. Md. 2019) ("[T]he Founders clearly intended Congress to have paramount authority in both the design and execution of the census"), *aff'd in part, rev'd on other grounds*, 945 F.3d 183 (4th Cir. 2019).

That "virtually unlimited discretion" necessarily includes the authority to weigh policy considerations—like the need for timely census results to calculate apportionment, the need for a thorough census, and the funding for lengthy census operations—to determine the deadline for each decennial enumeration. That's why Congress, and Congress alone, has set the deadline for every one of the 24 censuses in American history. *See, e.g.*, Census Act of 1790, 1 Stat. 101 (1790) (directing that the census would commence on August 2, 1790 and end on May 2, 1791). And "[i]t should go without saying that the National Legislature well knows how to amend a statute when it so desires." *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 317 (D.C. Cir. 1988). In fact, Congress has extended census deadlines from the earliest days of our Republic. For example, in the 1790 Census, Congress directed that the census would commence on August 2, 1790 and end on May 2, 1791. Census Act of 1790, 1 Stat. 101 (1790). But Congress later amended the first census act to extend the reporting deadline for Rhode Island and Vermont until late 1791, and for South Carolina until March 1, 1792. *Id.* Such amendments became a running theme, with census deadlines codified, then subsequently extended in every census from 1810 to 1850. *See* An Act to Extend the Time for Completing the Third Census, 2 Stat. 658 (1811); An Act to Amend the Act Entitled "An Act to Provide for Taking the Fourth Census," 3 Stat. 643 (1821), An Act to Amend the Act for Taking the Fifth Census, 4 Stat. 439 (1831), An Act to Amend the Act Entitled "An Act to Provide for Taking the Sixth Census," 5

Stat. 452 (1841), An Act Supplementary to the Act Entitled "An Act Providing for the Taking of the Seventh and Subsequent Censuses," 9 Stat. 445 (1850).[2]

Congress's sole responsibility to set or change census deadlines is not lost on the current Congress.  Bills have been introduced, letters exchanged, and hearings held, all concerning whether Congress should extend the § 141(b) deadline in light of the COVID-19 pandemic.  *See* H.R. 6800, § 70201(a) (extending deadline for 2020 Census under § 141(b) from December 31, 2020 to April 30, 2021); H.R. 7974, § 2 (same); H.R. 7034, § 2 (same); S. 4048, § 2 (same).  As one Congresswoman stated in a letter earlier this month, "it is more urgent than ever that the Senate act."  *See* Letter from Carolyn B. Maloney to Mitch McConnell et al. (Sept. 2, 2020) (emphasis added).[3]  That letter conspicuously did not chide the Secretary or Census Bureau, but urged *Congress* to take action because "Congress has a solemn responsibility under the Constitution to help ensure an accurate and complete count, and there is bipartisan support in the Senate for extending these deadlines."  *Id.*  So while the Census Act now delegates many aspects of Congress's "broad authority over the census to the Secretary," *Wisconsin*, 517 U.S. at 5, 19, Congress maintains ultimate control over the census by, among other things, setting deadlines for completion and appropriating funds for the Census Bureau to meet those deadlines.  *See, e.g.*, 13 U.S.C. § 141(b)–(c); 2 U.S.C. § 2a; *see also* Consolidated Appropriations Act, 2019,

---

[2] Extensions became less necessary in 1880 when professional enumerators were used in lieu of U.S. Marshals.  *See* An Act to Provide for Taking the Tenth and Subsequent Censuses, 20 Stat. 473 (1879).  Congress has also altered the start date of the decennial census.  From 1790 to 1820, censuses began on the first Monday in August.  *See* An Act to Provide for Taking the Fourth Census, 3 Stat. 548 (1820).  In 1828, President John Quincy Adams suggested the census be conducted earlier, so from 1830 to 1900, decennial censuses began on June 1.  After sfluctuation in the early Twentieth Century, Congress eventually codified April 1 as Census Day, 13 U.S.C. § 141(a), where it remains today.

[3] Available at this link.

Pub. L. No. 116-6, 133 Stat. 13 (appropriating $3.5 billion to the Census Bureau for use through 2021).

As the plain constitutional text and history make clear, it is Congress that has responsible for updating census deadlines to accommodate changing circumstances.  Not the Secretary.  Not the Census Bureau.  Not this Court.  And certainly not Plaintiffs.

B.    <u>There are no judicially manageable standards for determining the appro-priate census period.</u>

This case is also nonjusticiable because there is "a lack of judicially discoverable and manageable standards for resolving" the dispute.  *Zivotofsky*, 566 U.S. at 195.  How is a Court to evaluate whether Congress's decisions about census timing are appropriate?  It can't.

In prior census-related cases, courts entertained challenges to discrete statistical methodologies or data-collection decisions made by the Secretary.  *See, e.g.*, *New York*, 139 S. Ct. 2551 (evaluating reinstatement of citizenship question on census questionnaire); *Utah v. Evans*, 536 U.S. 452, 452 (2002) (holding that "hot-deck imputation"—a process which imputes characteristics of households based upon the characteristics of neighbors—does not violate the Enumeration Clause); *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999) (holding that statistical sampling violates the Census Act and declining to reach the Enumeration Clause claim); *Wisconsin*, 517 U.S. at 1 (holding that Secretary did not violate Enumeration Clause by declining to correct a census undercount with data from a post-enumeration survey); *Franklin v. Massachusetts*, 505 U.S. 788 (1992) (holding that allocating federal employees serving overseas to their home States did not violate Enumeration Clause).  Each of those cases involved a discrete policy choice that could be juxtaposed with an alternative—*e.g.*, to omit a citizenship question, to forego imputation, to decline the use of a statistical adjustment.  And nearly all of those disputes could be resolved by examining whether the calculation methodology at issue was a permissible person-by-person count (an "actual

Enumeration") or an unlawful statistical estimate.[4]   *See, e.g., Utah*, 536 U.S. at 457–58 ("Utah's constitutional claim rests upon the words 'actual Enumeration' as those words appear in the Constitution's Census Clause."); *House of Representatives*, 525 U.S. at 346–49 (Scalia, J., concurring in part) ("For reasons of text and tradition . . . a strong case can be made that an apportionment census conducted with the use of 'sampling techniques' is not the 'actual Enumeration' that the Constitution requires."); *id.* at 363 (Stevens, J., dissenting) (concluding that an "actual Enumeration" does not preclude "the use of sampling procedures to supplement data obtained through more traditional census methods"); *Wisconsin*, 517 U.S. at 24 (examining the Secretary's decision that an "'actual Enumeration' would best be achieved without the [ ] statistical adjustment of the census").  Not so here.

A reporting deadline necessarily limits the possible range of the Bureau's operations and requires the Bureau to perform a careful and complex balancing of numerous considerations such as cost, testing, training, effectiveness, timing, informational need, and accuracy.  These tradeoffs are quintessentially "policy choices and value determinations constitutionally committed for resolution to the halls of Congress [and] the confines of the Executive Branch."  *Japan Whaling*, 478 U.S. at 230.  A litigant could *always* posit, as Plaintiffs do here, that some alleged deficiency can be cured with more time, staff, money, or a different design.  But such hypotheticals do not provide

---

[4] Similarly, the Supreme Court has routinely decided cases involving congressional districting by States on the theory that the Constitution requires "equal representation for equal numbers of people."  *See Wesberry v. Sanders*, 376 U.S. 1, 18 (1964).  And, based on those precedents, the Court has similarly decided that challenges to the way in which Congress allocates congressional seats are justiciable.  *U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 459 (1992).  But the nature of those controversies provided an easily administrable standard for courts to apply: the number of people in each congressional district.  No such standard is available here.

any vehicle by which a court (as opposed to Congress) can evaluate the many policy choices that Congress has made to establish a deadline and that the Bureau has made to meet that deadline.  Where, as here, Plaintiffs challenge the operations of an ongoing census, "[n]o districts have been drawn, no benefits cut, no actual harm yet suffered by the plaintiffs." *Tucker v. U.S. Dep't of Commerce*, 135 F.R.D. 175, 180 (N.D. Ill. 1991).  So "[t]he question is which of the coordinate branches of government is best equipped to deal with plaintiffs' concern." *Id.* And the answer is Congress because Congress alone can balance the need for timely census results with the need for a thorough census with the appropriations needed to conduct the census.  As a result, there is no rule or standard that a Court could apply to determine when census operations are too limited or too curtailed in response to Congress's statutory deadline.  Indeed, "you might as well turn [this case] over to a panel of statisticians and political scientists and let them make the decision, for all that a court could do to add to its rationality or fairness." *Tucker v. U.S. Dep't of Commerce*, 958 F.2d 1411, 1417–18 (7th Cir. 1992).

Plaintiffs seem to suggest that the Court may decide this case because the Enumeration Clause demands accuracy at all costs.  *See* Pls.' Mot. at 21–34.  But the Supreme Court has recently rejected the idea that the Enumeration Clause commands accuracy.  *New York*, 139 S. Ct. at 2565–66.[5]  That makes sense because no census is ever perfect and every census can, presumably, be made better with more time or resources. *See Wisconsin*, 517 U.S. at 6 (recognizing that "no census is recognized as having been wholly successful in achieving" perfect accuracy); *Carey v. Klutznick*, 653 F.2d 732, 735 (2d

---

[5]  The *Wisconsin* reasonable-relationship test, on which Plaintiffs rely, speaks only to the requirement that there be a person-by-person headcount rather than a statistical estimation.  *See* Argument Section III., *infra*.  Whether any method used by the Censu Bureau constitutes a headcount is a justiciable question with a readily administrable standard.  Here, though, no one disputes that the Bureau is conducting just such a headcount.  *See* Pls.' Mot. at 18.

Cir. 1981) ("Although the mechanics of the counting process have been improved in [every] census[], there has never been a perfect count."). So *any* census deadline would be inimical to Plaintiffs' purported standard, and thus improper. *See, e.g.*, *Wisconsin*, 517 U.S. at 6; *see also Karcher v. Daggett*, 462 U.S. 725, 732 (1983). Yet Congress—and Congress alone—has always set and reset deadlines using its plenary control over the census. *See supra*. That history merely highlights the obvious: census deadlines are nonjusticiable. *See NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (accepting James Madison's view that "a regular course of practice" may "liquidate & settle the meaning" of constitutional provisions); *id.* at 572 (Scalia, J., concurring the judgement) ("[W]here a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision."); *McCulloch v. Maryland*, 17 U.S. 316, 401 (1819) (Marshall, C.J.) (when questions arise about "the respective powers of those who are equally the representatives of the people," the "practice of the government" should "receive a considerable impression from that practice" if not settle it completely).

With the lack of any discernible standards, this Court should not wade into the realm of cost/benefit analyses and policy disagreements necessary to adjudicate the Replan or § 141(b)'s census deadline. Even during the COVID-19 pandemic, which presents unique challenges, those determinations are constitutionally entrusted to representatives of the people and executive officials confirmed by the same. And they are up to the task: the Census Bureau has adjusted its operations to meet the current statutory deadline and Congress is presently considering whether to extend that deadline. *See* H.R. 6800, § 70201(a); H.R. 7974, § 2 (same); H.R. 7034, § 2 (same); S. 4048, § 2. Plaintiffs may well believe that completing the census before December 31, 2020 will prove difficult. They may also believe that § 141(b), which has governed the last four censuses, should be changed. But Plaintiffs should take those concerns to Congress, not

an Article III court ill-equipped to resolve these policy judgments. Plaintiffs' constitutional claim is barred by the political question doctrine.

## II. PLAINTIFFS LACK STANDING

Plaintiffs are also unlikely to succeed on the merits of their Enumeration Clause claim because they lack standing. Article III of the Constitution limits the judicial power of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. "[R]ooted in the traditional understanding of a case or controversy," standing doctrine developed to implement this Article III command. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). It "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong," thus preventing "the judicial process from being used to usurp the powers of the political branches" and "confin[ing] the federal courts to a properly judicial role." *Id.*

Standing "requires an injury in fact that is caused by the challenged conduct and is likely to be redressed by a favorable decision." *6th Cong. Dist. Republican Comm. v. Alcorn*, 913 F.3d 393, 405 (4th Cir. 2019). As the parties invoking this Court's jurisdiction, Plaintiffs bear the burden of establishing these requirements. *Spokeo*, 136 S. Ct. at 1547. Here, that burden is heavy because the standing inquiry is "especially rigorous when reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997)). Plaintiffs are far from satisfying this "especially rigorous" review.

### A.    Plaintiffs' alleged injuries are not redressable by a court order.

Plaintiffs must establish redressability by demonstrating "that some personal benefit will result from a remedy *that the court is prepared to give*." 13A Charles Alan Wright et al., *Federal Practice & Procedure* § 3531.6 (3d ed. Apr. 2018 update) (emphasis added). That is, a plaintiff must show that "the court has the power to right or to prevent

the claimed injury." *Gonzalez v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982) (Kennedy, J.). If the court does not "have the power to 'redress' the 'injury' that the defendant allegedly 'caused' the plaintiff," Article III standing is lacking. *Utah v. Evans*, 536 U.S. 452, 459 (2002) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)); *see McConnell v. FEC*, 540 U.S. 93, 229 (2003) (no redressability because court "has no power to adjudicate a challenge to the [allegedly unconstitutional] FECA limits in this litigation"), *overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010). Here, the Court has neither the power to abrogate an unchallenged statutory deadline, nor the power to order wholesale improvement of the census.

## 1.     The Court has no power to ignore § 141(b)'s statutory deadline.

Plaintiffs have not mounted § 141(b)'s statutory deadline for the census. *See generally* Pls.' Mot. at 1–34. Rightly so. Congress's "virtually unlimited discretion" over the "actual Enumeration" necessarily includes the power to set a deadline for census completion. *See Wisconsin*, 517 U.S. at 19. This has been true since the beginning of our Republic. *See* Argument Section I., *supra*. And "[w]hen Congress by [ ] statute sets a specific deadline for agency action, neither the agency nor any court has discretion. The agency must act by the deadline." *South Carolina v. United States*, 907 F.3d 742, 758 (4th Cir. 2018) (quoting *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999)). So ordering relief that compels the Census Bureau to miss the statutory deadline "would be an affront to our tradition of legislative supremacy and constitutionally separated powers." *Id.*

It is therefore no surprise that district courts ordering the Census Bureau to flout § 141(b)'s statutory deadline were swiftly reversed by the Supreme Court. Plaintiffs rely most heavily on *Carey v. Klutznick*, where the Second Circuit affirmed a district court order (later made permanent) that required the Census Bureau "to compensate for [a] disproportionate undercount" and explained that relief was available because there was "nothing sacred in the due date" established by § 141(b). 637 F.2d 834, 837–38 (2d Cir.

14

1980); *Carey v. Klutznick*, 508 F. Supp. 420, 433 (S.D.N.Y. 1980).  Evidently, the Supreme Court disagreed.  Within days, the Court reinstated the statutory deadline by staying the district court's order, which had precluded the Census Bureau "from certifying to the President the population totals for New York and the state-by-state census tabulations, on December 31, 1980, as mandated by 13 U.S.C. § 141(b)."  *Klutznick v. Carey*, 449 U.S. 1068 (1980).  And following the stay order, the district court's judgment was reversed on appeal.  *Carey v. Klutznick*, 653 F.2d 732, 736 (2d Cir. 1981).  A near-identical sequence of events unfolded in *Young v. Klutznick*, where the district court erroneously found that § 141(b)'s deadline was merely "directory," not "mandatory."  497 F. Supp. 1318, 1338 (E.D. Mich. 1980).  Again, the Supreme Court stayed the district court's order.  *Klutznick v. Young*, No. A-533 (Dec. 24, 1980).  And again, the district court's judgment was reversed on appeal after the stay.  *Young v. Klutznick*, 652 F.2d 617, 626 (6th Cir. 1981).  Contrary to Plaintiffs' position, these cases straightforwardly demonstrate that § 141(b)'s December 31 mandate is absolute and cannot be overridden by judicial fiat.

Plaintiffs' reliance on *Wisconsin* is equally unavailing.  Pls.' Mot. at 30–31.  That case concerned a possible statistical adjustment to *already-collected* census data *after* the count was complete and *after* the Census Bureau had met its statutory deadline.  *Wisconsin*, 517 U.S. at 20.  It said nothing about whether courts have the power to alter operations of the census itself so that compliance with § 141(b)'s deadline is impossible.[6]

---

[6] Plaintiffs also include a passing citation to *City of New York v. Dep't of Commerce*, 713 F. Supp. 48 (E.D.N.Y. 1989).  In wrongly concluding that "[i]t is not Congress' intent to sacrifice [census] accuracy for the sake of timeliness," the district court in *City of New York* cited only *Carey v. Klutznick* and *Young v. Klutiznick*, both of which are fatally undermined by the Supreme Court's stays in those cases.  But rather than appealing the *City of New York* order, the government entered a stipulation that later became the basis for the Supreme Court's decision in *Wisconsin*.  517 U.S. at 10 (noting the "interim stipulation").  The *City of New York* case is also distinguishable because the plaintiffs there submitted evidence that the statistical adjustment at issue *was* feasible before the

In fact, the Supreme Court would later impliedly recognize the importance of § 141(b)'s deadline in deciding whether the Secretary may reinstate a citizenship question on the census questionnaire.  There, the Court granted certiorari directly from a district court judgment, specifically because "the census questionnaire needed to be finalized for printing by the end of June 2019" in order to meet § 141(b)'s statutory deadline.  *New York*, 139 S. Ct. at 2565.  If the Court thought that deadline unimportant, it could have simply allowed the Second Circuit to opine on the case, granted certiorari at its leisure, and allowed the census questionnaires to be printed sometime in 2020.[7]  That procedural history is especially illuminating here because any order by this Court "granting or denying . . . an interlocutory or permanent injunction" is directly appealable to the Supreme Court.  28 U.S.C. § 1253.

There is no authority, let alone binding authority, for the proposition that courts may instruct the Census Bureau to disregard § 141(b)'s statutory deadline.  And because courts cannot do so, Plaintiffs lack standing. *Utah*, 536 U.S. at 459.

> **2.**     **The Court has no power to order wholesale changes to the census.**

Redressability (and standing) are also lacking because Plaintiffs "cannot seek wholesale improvement of [a federal] program by court decree, rather than in the offices

---

statutory deadline.  *City of New York*, 713 F. Supp. at 51.  Plaintiffs submit no analogous evidence here.

[7] This makes Plaintiffs' reliance on a district court decision in the citizenship-question litigation doubly flawed.  Pls.' Mot. at 31 (citing *La Unión del Pueblo Entero v. Ross*, 353 F. Supp. 3d 381, 393 (D. Md. 2018)).  First, nothing in that case remotely suggested that the Census Bureau could simply ignore § 141(b)'s deadline and, as explained above, the Supreme Court tacitly recognized the opposite.  Second, Plaintiffs cite that district court case for the idea that "[w]hen the Census Bureau unreasonably compromises the distributive accuracy of the census, it may violate the Constitution." *Id.* (*La Unión del Pueblo Entero*, 353 F. Supp. 3d at 393).  But the Supreme Court specifically rejected that standard, reasoning that it "would seem to render every census since 1790 unconstitutional." *New York*, 139 S. Ct. at 2567.

of the [agency] or the halls of Congress, where programmatic improvements are normally made." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). "[I]t is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution." *Lewis v. Casey*, 518 U.S. 343, 349 (1996). So given the unchallenged statutory deadline, Plaintiffs' broad programmatic challenge to ongoing census operations is not redressable.

For all their criticism of the Census Bureau's current plan, Plaintiffs have no alternative proposal—none—for how the Bureau is to complete a better census by the statutory deadline. In fact, they seem to categorically reject the idea. *See, e.g.*, Pls.' Mot. at 39. That alone should be dispositive. *Nat'l Law Ctr. on Homelessness & Poverty v. Kantor*, 91 F.3d 178, 183 (D.C. Cir. 1996) (alleged enumeration injury not redressable where plaintiffs "do not even ask that [] alternative methodologies . . . be employed in a recount" and the court has no basis to find "that a commission of as-yet unnamed persons, using as-yet unidentified methodologies, will devise a better [] count that will redound to appellants' benefit"). Without any alternative, and facing § 141(b)'s unmoving deadline, the Court would be in the untenable position of exercising "supervisory control over the execution of the 2020 Census." *NAACP*, 399 F. Supp. 3d at 416. But "[t]hat is not a remedy that a court has the authority, expertise, or time to provide. Rather, Congress determined that it was the Bureau that was best equipped to complete this task." *Id.* (citing 13 U.S.C. § 141(a)).

B.     Plaintiffs' alleged injuries are not traceable to Defendants.

For similar reasons, Plaintiffs fail to establish the requisite "causal connection between" their alleged injury and the Replan they challenge. *Defs. of Wildlife*, 504 U.S. at 560. To establish such a connection, Plaintiffs must show more than that their populations may be undercounted under the plan the Bureau has developed. They must establish that their populations will be "improperly undercounted by [a particular]

methodology as compared to a feasible, alternative methodology," and that the difference between the two methodologies is sufficiently large to produce some kind of harm. *Kantor*, 91 F.3d at 183, 185–86; *see also Franklin*, 505 U.S. at 802 (plurality) (challengers to the allocation of overseas employees among states had "neither alleged nor shown . . . that [they] would have had an additional Representative if the allocation had been done using some other source of 'more accurate' data" and did not have standing "to challenge the accuracy of the data used in making that allocation").  Plaintiffs have not done so.

As noted above, Plaintiffs complain that the current census plan will result in an undercount of people in their communities, but they have identified no other feasible method by which the Bureau could meet the end-of-year deadline, let alone one that can produce a supposedly more-accurate result.  Absent such an alternative, Plaintiffs cannot meaningfully contend that any alleged undercount of their communities is, in fact, caused by the Bureau's plan, rather than by an independent factor like the COVID-19 pandemic, the statutory deadline, natural disasters, or all of the above.  *See* Pls.' Mot. at 33 ("These natural disasters are legitimate threats to an accurate census count.").

Indeed, Plaintiffs' praise of the COVID-19 Plan—a plan that bypasses the existing statutory deadline—only highlights that their alleged injuries derive from Congress's current refusal to alter the census deadline, not the Bureau's extraordinary attempt to meet that deadline.  This is fatal to their standing.  *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976) (federal courts have jurisdiction only if the plaintiff's injury "fairly can be traced to the challenged [conduct] of the defendant, and [does] not . . . result[] from the independent action of some third party not before the court.").  Plaintiffs cannot seek redress against the Bureau for choosing to follow the law, and they should petition Congress, not this Court, if they are concerned about congressional inaction.

C.   Plaintiffs' alleged injuries are entirely speculative.

Besides redressability and causation, Article III also requires that Plaintiffs establish "injury in fact" by showing that they "ha[ve] sustained or [are] immediately in danger of sustaining a direct injury" as a result of the challenged action.  *Spokeo*, 136 S. Ct. at 1552.  The injury must be "concrete and particularized," *Defs. of Wildlife*, 504 U.S. at 560, and not "merely 'conjectural' or 'hypothetical' or otherwise speculative."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 505 (2009).  An alleged future injury must be "*certainly impending*"; '"[a]llegations of *possible* future injury' are not sufficient."  *Clapper*, 568 U.S. at 409, 410 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).  Plaintiffs' alleged injuries rest on exactly that kind of prohibited speculation.

As detailed in Mr. Fontenot's declaration, the Replan was designed to provide "the best combination of" procedures to allow the Bureau "to meet the statutory deadline without compromising quality to an undue degree."  Fontenot Decl. ¶¶ 88–93.  Among other things, the plan "intends to improve the speed of the [Nonresponse Followup] operations without sacrificing completeness."  *Id.* ¶ 92.  The Bureau "is confident that it can achieve a complete and accurate census and report apportionment counts by the statutory deadline following the Replan Schedule."[8]  *Id.* ¶ 97.  Plaintiffs and their declarants appear to disagree.  *See* Pls.' Mot. at 31 ("Nothing suggests Defendants can

---

[8] Plaintiffs mischaracterize the Secretary and the Director's joint statement of April 13, 2020 as stating that "more time than [the Replan] is necessary to ensure 'the completeness and accuracy of the 2020 Census.'" Pls.' Mot. at 31.  Rather, the statement simply acknowledged that congressional relief was necessary to effectuate the COVID-19 Plan, and that the COVID-19 Plan would "ensure the completeness and accuracy of the 2020 Census."  U.S. Census Bureau, Statement on 2020 Census Operational Adjustments Due to COVID-19 (Apr. 13, 2020), available at this link.  The statement never said that an extension was "necessary" to complete the 2020 Census, as Plaintiffs erroneously contend.  In any event, any ambiguity is put to rest by Mr. Fontenot's statement that the Bureau "is confident that it can achieve a complete and accurate census and report apportionment counts by the statutory deadline."  Fontenot Decl. ¶ 97.

complete an accurate count by the end of 2020.").  But their opinion cannot be credited over Mr. Fontenot's; as Associate Director for Decennial Census Programs, he was (and is) directly involved with the design and implementation of the Replan.  The Census Bureau is in best position to opine on the likely effects of its operational choices, and generalized assertions to the contrary must be discounted accordingly.

In any event, purportedly "dire consequences" do not flow directly from even a "significant undercount."  Pls.' Mot. at 30.  The number of congressional seats for each State is affected not only by that State's *own* total population, but also by the population of *every other* State in the country. *See* 2 U.S.C. § 2a(a); *U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 461 (1992).  Likewise, the allocation of federal funds is not directly proportional to population, but is a function of multiple factors, usually including the populations of *other* geographical areas.  *See, e.g.*, 42 U.S.C. § 1396d(b) (Medicaid formula measuring a State's per capita income against the national average per capita income); 49 U.S.C. § 5305(d)(1) (apportioning public transit funds to States based on the population of urbanized areas in each State compared to the total population of urbanized areas in all States); Reamer Decl. ¶ 44, ECF No. 112-7 ("Census-guided financial assistance programs use census-derived datasets to differentiate among geographic areas in terms of eligibility and/or allocation and then distribute funds based on those differentiations.").  So an undercount may be immaterial if it is replicated elsewhere or does not exceed some as-yet-unknown threshold.  *See, e.g.*, *Kantor*, 91 F.3d at 183.

That is why a purported "undercount" is not talismanic: Plaintiffs must actually demonstrate that any alleged undercount will be so severe and disproportionate that it will cause them to lose representation or funding.  *Id.* at 185 (no standing because court could not determine "what effect any methodology for counting the homeless would have on the federal funding of any particular appellant," since "if a more accurate count would have enlarged some communities' shares, it likely would have reduced the shares of other communities"); *Ridge v. Verity*, 715 F. Supp. 1308, 1318 (W.D. Pa. 1989) (no

standing because "none of the plaintiffs in this case can show which states would gain and which would lose representation in Congress"); *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 570 (D.D.C. 1980) (three-judge court) (no standing because "none of the plaintiffs are able to allege that the weight of his or her vote in the next decade will be affected" since plaintiffs "can do no more than speculate as to which states might gain and which might lose representation," which depends on "the interplay of all the other population factors which affect apportionment"); *see also Sharrow v. Brown*, 447 F.2d 94, 97 (2d Cir. 1971) (no standing to challenge apportionment method because plaintiff "would have to show, at least approximately, the apportionment his interpretation . . . would yield, not only for New York but for every other State as well").

Plaintiffs have not come close to that showing. For starters, they do not even attempt to calculate the supposedly "statistically certain" undercount for their own States and localities.[9] Pls.' Mot. at 30; *see, e.g.*, Thompson Decl. ¶¶ 22, 32, ECF No. 112-2 ("I am very concerned that these timing constraints will significantly increase the risk of much larger undercounts for the 2020 Census than measured in previous censuses."); Hogan

---

[9] Plaintiffs also seem to rely on cursory, but fundamental, assertions based only on "information" and/or "belief." *See, e.g.*, Park Decl. ¶ 6, ECF No. 112-8 (stating his "belief" that "the truncation of field operations will result in Asian Americans and immigrants not being counted in the 2020 Census"); Valdez Decl. ¶ 3, ECF No. 112-9 (stating her "belief" that "the truncation of field operations on September 30, 2020 will result in many Latinx individuals and immigrants not being counted in the 2020 Census"); Chen Decl. ¶ 5, ECF No. 112-10 (stating her "belief" that "the truncation of census field operations will . . . result in an undercount of Asian Americans in Texas"). Such statements are "insufficient for a preliminary injunction." *Williamson v. Maciol*, 2020 WL 4449527, at *7 (N.D.N.Y. Aug. 3, 2020); *Allstate Ins. Co. v. McKinney*, 2018 WL 4186421, at *3 (W.D.N.C. Aug. 31, 2018) (explaining that "averments based 'upon information and belief' are no substitute for evidence"); 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2949 (3d ed. 2002) ("[W]hen the primary evidence introduced is an affidavit made on information and belief rather than on personal knowledge, it generally is considered insufficient to support a motion for a preliminary injunction.").

Decl. ¶ 69, ECF No. 112-3 ("I have described the risks of a greatly increased differential undercount and an inaccurate census."); O'Hare Decl. ¶ 127, ECF No. 112-4 ("[C]hanging the end of the 2020 Census data collection period . . . will result in greater omissions and undercounts . . . ."); O'Hara Decl. ¶ 24, ECF No. 112-5 ("[T]he result of adhering to the truncated schedule will be a failure to conduct an actual enumeration of the population."); Brace Decl. ¶ 33, ECF No. 112-6 ("The Bureau's changes to the timeline for the counting and post-count process will likely result in a greater undercount than experienced in prior censuses.").  Without those calculations, and the concomitant calculations for every other relevant area in the country, Plaintiffs have no way of demonstrating that they will be impacted in any way.

And while Plaintiffs complain about potential undercounts in various cities and populous counties with allegedly low self-response rates, Pls.' Mot at 28–29, their own expert notes that self-response rates are *also* "disproportionately lower . . . in some rural areas."  Thompson Decl. ¶ 21.  In fact, Plaintiffs' expert notes that (1) those rural areas have a response rate under 51.3 percent, Thompson Decl. ¶ 21, which is at or below the 51.4 to 64.6 percent range[10] that Plaintiffs identify in their constituent communities, Pls.' Mot. at 28–29, and (2) this low response rate is "likely" to result in "increased undercounts" for these rural areas, Thompson Decl. ¶ 21.  Yet Plaintiffs completely fail to consider how any potential undercount in those rural communities, or any other communities, could affect Plaintiffs' share of representation or funding.  *See* Pls.' Mot. at 21–34 (contending that Plaintiffs' communities may be undercounted, but offering no evidence regarding how any such undercount may relate to counts in other jurisdictions).

---

[10] Plaintiffs practically argue themselves out of Article III standing by acknowledging that certain Plaintiffs live in areas with self-response rates *equal to or above* the national average.  *See* Pls.' Mot. at 28–29 (Yakima County, Washington and Maricopa County, Arizona).

As a result, the Court would need to guess how those undercounts, if they occur at all, may affect Plaintiffs.

Such guesswork does not support jurisdiction, much less an injunction.  *See Clapper*, 568 U.S. at 414 n.5 (no Article III standing exists if a plaintiff's theory of injury rests on an "attenuated chain of inferences necessary to find harm").  In the census context, the Supreme Court has consistently scrutinized claims of census harm to ensure that prospective litigants have demonstrated not some amorphous "increased risk" of an undercount untethered from the count of other areas, but an actual or likely injury from the census count.  *See, e.g., New York*, 139 S. Ct. at 2565 (finding standing after trial where plaintiffs would "lose out on federal funds" "if noncitizen households [were] undercounted by as little as 2%" due to inclusion of a citizenship question on the census questionnaire); *Utah*, 536 U.S. at 458 (noting that the challenged methodology indisputably changed which state received a Representative); *House of Representatives*, 525 U.S. at 330 (noting that plaintiffs produced evidence showing that under the challenged plan a State would lose a representative compared to the prior method).  Here, by contrast, Plaintiffs present nothing of the sort.  Instead, they generally claim that they will be injured by an undercount, seemingly no matter how small.  That falls far short of the requisite standard.

Nor can they bypass that Article III standard by simply stating that the Replan's NRFU and post-data processing phases are shorter than prior censuses.  *See, e.g.*, Pls.' Mot. at 16–18.  As Mr. Fontenot explains, "[t]he Census Bureau designed the 2020 Census NRFU operation to leverage automation and technological advances to control and track the NRFU workload and improve the efficiency of enumerators and the process of collecting census responses."  Fontenot Decl. ¶ 60.  With improvements like a state-of-the-art Field Operational Control System and iPhones for field work, 2020 NRFU "replaces paper-based NRFU operations used in past Censuses, providing a faster, more accurate, more efficient and more secure means of data collection."  *Id.* ¶¶ 59–61.

Similarly, "[t]he 2020 Census leveraged significant advances in computing technology that have occurred since the 2010 Census" to significantly enhance its post-data processing operations. *Id.* ¶ 71. The Census Bureau has optimized its "computer processing systems" in "partnership with industry leaders using the latest hardware, database, and processing technology available" to "accelerate [its] processing time to fit within the re-planned schedule." *Id.* ¶ 72. So the Replan's compressed timeframe for completing NRFU and post-data processing, while less than ideal, simply demonstrates the enormous technological advancements that make this year's census the most efficient and flexible in history. *See, e.g., id.* ¶¶ 41, 81; *see generally id.* ¶¶ 20–77. It says nothing about whether there will be an undercount in any particular area, much less a significant differential undercount.

Plaintiffs fall far short of the required showing to establish Article III standing. But that makes sense because "the absence of any particular individual or class to litigate these claims gives support to the argument that the subject matter is committed to the surveillance of Congress, and ultimately to the political process." *United States v. Richardson*, 418 U.S. 166, 179 (1974). So while Plaintiffs may lack standing "within the narrow confines of Art. III jurisdiction," they are free "to assert [their] views in the political forum or at the polls." *Id.*

## III. PLAINTIFFS CANNOT PREVAIL ON THEIR ENUMERATION CLAUSE CLAIM

If the Court finds this case justiciable, Plaintiffs are nonetheless unlikely to succeed on their Enumeration Clause claim. Indeed, in almost three decades of census-related litigation, the Supreme Court has *never* found an Enumeration Clause violation. *See New York*, 139 S. Ct. at 2567 (holding that a citizenship question on the census questionnaire does not violate the Enumeration Clause); *Utah*, 536 U.S. at 452 (holding that hot-deck imputation does not violate the Enumeration Clause); *House of Representatives*, 525 U.S. at 344 (holding that statistical sampling violates the Census Act and declining to reach the Enumeration Clause claim); *Wisconsin*, 517 U.S. at 1 (holding that the Secretary did not

violate Enumeration Clause by failing to correct a census undercount with data from a post-enumeration survey); *Franklin*, 505 U.S. at 788 (holding that the method used to count federal employees serving overseas did not violate Enumeration Clause).  This case presents no reason to break from those Supreme Court precedents, especially because any injunction by this Court is directly appealable to the Supreme Court.  28 U.S.C. § 1253.

The Constitution's reference to "actual Enumeration" is simple: population is to be determined by a person-by-person headcount, rather than through estimates or conjecture.  Prior to the first census in 1790, the Framers settled on an interim number of Representatives allocated to each State.  U.S. Const. art. I, § 2, cl. 3 (providing the number of Representatives for each State "until such enumeration shall be made" within "three Years after the first Meeting of the Congress of the United States").  This allocation was based on "estimates" of the population derived from "materials ranging from relatively complete enumerations . . . to fragmentary data such as contemporary local population estimates, militia registrations, tax records, church records, and official vital statistics." U.S. Dep't of Commerce, Historical Statistics of the United States, 1789–1945 (1949).

Given that context, "Article I makes clear that the original allocation of seats in the House was based on a kind of 'conjectur[e],' in contrast to the deliberately taken count that was ordered for the future.  What was important was that contrast—rather than the particular phrase used to describe the new process." *Utah*, 536 U.S. at 475 (citations omitted); *see id.* at 493 (Thomas, J., concurring in part and dissenting in part) ("[A]t the time of the founding, 'conjecture' and 'estimation' were often contrasted with the actual enumeration that was to take place pursuant to the Census Clause."); *House of Representatives*, 525 U.S. at 363 (Stevens, J., dissenting) ("The words 'actual Enumeration' require post-1787 apportionments to be based on actual population counts, rather than mere speculation or bare estimate."); Thomas R. Lee, *The Original Understanding of the Census Clause: Statistical Estimates and the Constitutional Requirement of an "Actual*

*Enumeration,"* 77 Wash. L. Rev. 1, 20 (2002) (providing an in-depth examination of this contrast and its historical context).

The Replan endeavors to do exactly the person-by-person headcount required by the Constitution without any reliance on prohibited estimates or guesswork. Plaintiffs tacitly acknowledge as much, *see* Pls.' Mot. at 18, and focus not on any impermissible estimation, but on their speculative belief that the Replan will result in a "significant undercount," Pls.' Mot. at 30. Yet Plaintiffs do not even attempt to identify any meaningful standard by which to evaluate whether the Replan achieves a constitutionally adequate census. There's a reason for that: no such standard exists. "[D]espite the command of the Enumeration Clause that there be an 'actual enumeration' during a decennial census, there has never in our country's history been a completely accurate enumeration of the entire population, and absolute perfection is neither possible nor required." *NAACP v. Bureau of Census*, --- F. Supp. 3d ---, 2020 WL 1890531, at *7 (D. Md. Apr. 16, 2020); *see Wisconsin*, 517 U.S. at 6 (recognizing that "no census is recognized as having been wholly successful in achieving" perfect accuracy); *see also Karcher v. Daggett*, 462 U.S. 725, 732 (1983) (recognizing that "census data are not perfect," and that "population counts for particular localities are outdated long before they are completed"); *Carey v. Klutznick*, 653 F.2d 732, 735 (2d Cir. 1981) ("Although the mechanics of the counting process have been improved in [every] census[], there has never been a perfect count."). That Plaintiffs have subjectively prejudged the 2020 Census to be a failure by some unknown and inscrutable metric is not sufficient to prevail on their Enumeration Clause claim.

Nor can Plaintiffs find refuge in the *Wisconsin* reasonable-relationship test. In *Wisconsin*, the Supreme Court considered whether the Secretary violated the Enumeration Clause by declining to statistically adjust the 1990 census to rectify alleged differential undercounts. 517 U.S. at 10–11. The Court cited Congress's "virtually unlimited discretion in conducting the decennial 'actual Enumeration,'" and explained

that Congress had in turn delegated its "broad authority" to the Secretary.  *Id.* at 19.  It then announced that the Secretary's decision not to adjust the census count "need bear only a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census."  *Id.* at 20.  The Court observed that a similar standard had been applied in *Montana* and *Franklin*, both of which similarly involved Executive Branch decisions to adjust the census *after* it was completed.  *See Franklin*, 505 U.S. at 804 (reviewing the Secretary's decision to allocate overseas federal personnel to their home States); *Montana*, 503 U.S. at 460 (considering the method used to apportion House seats among the States).

The Supreme Court recently confirmed the limited applicability of *Wisconsin*'s reasonable-relationship test, explaining that it is only used when reviewing "decisions about the population count itself"—*i.e.*, census data *already collected* by the Bureau.  *New York*, 139 S. Ct. at 2566 (citing *Wisconsin*, 517 U.S. at 4 and *Franklin*, 505 U.S. at 790–91).  If the *Wisconsin* test applied in every case remotely implicating the final census count, at least some member of the Supreme Court would have conceivably applied that standard in *House of Representatives* (concerning statistical sampling), *Utah* (concerning hot-deck imputation), or even in *New York* itself (concerning a citizenship question).  None of them did.  *See New York*, 139 S. Ct. at 2566–67 (explicitly eschewing the *Wisconsin* reasonable-relationship standard in determining the constitutionality of a citizenship question); *Utah*, 536 U.S. at 464 (foregoing the *Wisconsin* reasonable-relationship standard in determining the constitutionality of hot-deck imputation); *House of Representatives*, 525 U.S. at 346–47 (Scalia, J., concurring in part) (discussing the constitutionality of statistical sampling without reference to the *Wisconsin* reasonable-relationship standard); *id.* at 363 (Stevens, J., dissenting) (same).

Plaintiffs' Enumeration Clause claim here—in contrast to *Wisconsin*—challenges detailed operational aspects of the Census Bureau's plans to actually *conduct* the census, well before "the population count itself" is determined.  So Plaintiffs' claim should

instead be assessed under Congress's (and by delegation the Secretary's) "virtually unlimited discretion" to conduct the census "in such Manner as they shall by Law direct." U.S. Const., art. I, § 2, cl. 3; *Wisconsin*, 517 U.S. at 19.

Measured against that standard, Plaintiffs cannot prevail.  Choices over how to allocate resources, conduct data processing, and manage timetables in order to meet a statutory deadline amidst a pandemic are prototypical questions about the "Manner" in which the person-by-person headcount should be conducted, falling well within the scope of the Secretary's "broad authority over the census." *Wisconsin*, 517 U.S. at 17.  And, again, Plaintiffs nowhere allege that Defendants are conducting something other than an "actual Enumeration," like an impermissible estimate or an educated guess of the population.  Instead, Plaintiffs simply dislike the "actual Enumeration" being conducted, and complain about an "inevitable undercount of minority populations."  Pls.' Mot. at 34.  But the possibility of a differential undercount exists in every census and does not inherently violate the Enumeration Clause—the Constitution does not require perfection.  *See Utah*, 536 U.S. at 504 (Thomas, J., concurring in part and dissenting in part) (canvassing the history of census undercounts, including the first census in 1790); *City of New York v. U.S. Dep't of Commerce*, 34 F.3d 1114, 1117 (2d Cir. 1994) ("This phenomenon, known as the 'differential undercount,' has skewed every census since at least 1940.  The Census Bureau started measuring the differential undercount in that year."), *rev'd sub nom. Wisconsin*, 517 U.S. at 1.  Even Plaintiffs' own experts acknowledge that differential undercounts are commonplace in the census.  Thompson Decl. ¶ 21; Hogan Decl. ¶ 9; O'Hare Decl. ¶ 32; Brace Decl. ¶ 33.  So if the Secretary is attempting to individually count every resident of the United States, any undercount (differential or otherwise) is the constitutionally permissible result of attempting to enumerate upwards of 330 million people across 3.8 million square miles.

Plaintiffs get no closer to an Enumeration Clause violation with their other passing quibbles.  For example, they seem to take issue with the Census Bureau's planned use of

certain enumeration techniques, like proxy responses, administrative records, and imputation. *See* Pls.' Mot. at 24–26. But none of those practices are themselves unlawful, and Plaintiffs wisely do not argue otherwise. *See, e.g.*, *Utah*, 536 U.S. at 457–59, 473–79 (approving the Census Bureau's use of "hot-deck imputation" in the census); *Franklin*, 505 U.S. at 794–96, 803–06 (approving the Census Bureau's use of "home of record" information from Defense Department personnel files in the census).

Plaintiffs also insinuate that the sheer length of certain 2020 Census operations somehow violates the Enumeration Clause when compared to prior censuses. *See* Pls.' Mot. at 32 (noting that "Defendants have now announced their intent to proceed with the shortest NRFU operation in modern history"). But there is no constitutionally mandated duration for particular census operations. That bizarre theory would mean that nearly every census has been unconstitutional simply because the 1790 Census allowed a year or more to count certain States. *See* Argument Section I., *supra*. Not to mention that such a preposterous constitutional principle would cripple the Census Bureau's ability to harness new technology and perform the enumeration more quickly, efficiently, and with less taxpayer dollars. This case is the paragon: the Census Bureau is able to compress the time needed for NRFU *precisely because* of technological advances like a state-of-the-art optimizer and the digitization of field work. Fontenot Decl. ¶¶ 59–72. This Court should reject the absurd notion of a constitutionally required, judicially-managed procrustean census, and it should "decline [Plaintiffs'] invitation to measure the constitutionality of [census operations] by a standard that would seem to render every census since 1790 unconstitutional." *New York*, 139 S. Ct. at 2567.

Notably, Plaintiffs could not succeed on their constitutional claim even if the Court were to disregard the text, history, and case law surrounding the Enumeration Clause and simply ask, as Plaintiffs urge, whether the Bureau's planned operations bear a "reasonable relationship to the accomplishment of an actual enumeration." Pls.' Mot. at 30 (quoting *Wisconsin*, 517 U.S. at 19). For one, an "actual Enumeration" simply means a

person-by-person headcount.  *See supra*.  So unlike the *post hoc* statistical adjustment at issue in *Wisconsin*—which implicated the concept of estimation—there is no dispute that the Replan endeavors to count each U.S. resident individually.  *Compare* Pls.' Mot. at 18 *with Wisconsin*, 517 U.S. at 24 (examining the Secretary's decision that an "'actual Enumeration' would best be achieved without the [ ] statistical adjustment of the census").  For another, Defendants are aware of no decision finding a violation of the reasonable-relationship test.  *See NAACP v. Bureau of Census*, --- F. Supp. 3d ---, 2020 WL 1890531, at *6 (D. Md. Apr. 16, 2020) ("I have located no case where a court has found a violation of the *Wisconsin* reasonable relationship standard.").  And the Census Bureau's extraordinary effort to meet Congress's statutory deadline, in the midst of a global pandemic and a series of natural disasters, should not be the first.  In moving to the Replan, the Census Bureau "evaluated the risks and quality implications of each suggested time-saving measure and selected those that [the Bureau] believed presented the best combination of changes to allow [it] to meet the statutory deadline without compromising quality to an undue degree."  Fontenot Decl. ¶ 88.  Nothing more can be required if the "substantial deference" owed by this Court to the "virtually unlimited discretion" of Congress and the Secretary is to mean anything.  *See NAACP*, --- F. Supp. 3d ---, 2020 WL 1890531, at *6.

## IV.  PLAINTIFFS CANNOT SATISFY THE OTHER PRELIMINARY-INJUNCTION FACTORS

The "extraordinary remedy" of a preliminary injunction may not be awarded when a plaintiff fails to demonstrate a likelihood of success on the merits.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 32–33 (2008); *see also see Munaf v. Geren*, 553 U.S. 674, 690 (2008) (likelihood of success requires far more than identifying "serious, substantial, difficult, and doubtful" questions); *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." (internal

quotes and citations omitted; emphasis in original)).  So Plaintiffs' unlikelihood of success on the merits is itself sufficient to deny their preliminary-injunction motion.

But Plaintiffs' position only gets worse as the Court proceeds further.  Because Plaintiffs are seeking an injunction that would compel the Census Bureau to yet again re-configure and extend its operations, Pls.' Mot. at 39, they are requesting a mandatory injunction.  *See Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019) (mandatory injunctions are "those that alter rather than preserve the status quo").   Such injunctions are "particularly disfavored," and require Plaintiffs to demonstrate that their "right to relief is indisputably clear."   *Profiles, Inc. v. Bank of Am. Corp.*, --- F. Supp. 3d ---, 2020 WL 1849710, at *3 (D. Md. Apr. 13, 2020) (citing *id.*).  Just as they fail to establish a likelihood of success on the merits, Plaintiffs cannot satisfy this demanding standard for the remaining injunction factors: irreparable injury, balance of harms, and the public interest.  *See Winter*, 555 U.S. at 20.

A.   Plaintiffs cannot establish any imminent and irreparable harm.

Most significantly, Plaintiffs fail to establish that they are "likely to suffer irreparable harm in the absence of preliminary relief."  *Winter*, 555 U.S. at 20.  Plaintiffs cannot "demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted).  Because a preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies," *id.*, Plaintiffs' burden to show irreparable harm is necessarily higher than what is required to establish standing.  *See, e.g., Mazurek*, 520 U.S. at 972.

Here, Plaintiffs fail this test for the same reasons that they fail to establish standing: they cannot show that they will suffer any imminent and certain injury.  As explained above, Plaintiffs' assertions that their communities are likely to be undercounted as a

result of the Replan are speculative.  They are also inconsistent with the evidence presented by Mr. Fontenot.  *See* Fontenot Decl. ¶ 97 ("[T]he Census Bureau is confident that it can achieve a complete and accurate census and report apportionment counts by the statutory deadline following the Replan Schedule.").

Even more significant, however, is Plaintiffs' failure to connect any alleged undercount in their communities to potential undercounts in *other* jurisdictions.  Because Plaintiffs are competing for dollars and legislative seats with other communities in their States and across the country, they can only be injured by inaccuracies that affect their members disproportionately.  *See Kantor*, 91 F.3d at 185 (finding lack of standing where court could not determine "what effect any methodology for counting the homeless would have on the federal funding of any particular appellant," noting that "if a more accurate count would have enlarged some communities' shares, it likely would have reduced the shares of other communities"); *see, e.g.*, 42 U.S.C. § 1396d(b) (Medicaid formula measuring a State's per capita income against the national average per capita income); 49 U.S.C. § 5305(d)(1) (apportioning public transit funds to States based on the population of urbanized areas in each State compared to the total population of urbanized areas in all States).

There is no evidence in the record here to establish (1) the undercount in Plaintiffs' communities; (2) how that undercount compares to undercounts in other communities; and (3) how that comparison will result in some appreciable funding or representational loss for Plaintiffs.  Absent this evidence, Plaintiffs cannot be said to establish anything more than the abstract "possibility of irreparable injury."  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  But, as the Supreme Court has emphasized, the "'possibility' standard is too lenient" a basis upon which to issue the drastic remedy of a preliminary injunction. *Winter*, 555 U.S. at 22.  So Plaintiffs' failure to establish anything more than the theoretical possibility of harm means that requested injunction should be denied.

If Plaintiffs' theory of irreparable harm were accepted, anyone who comes to court complaining about census operations and the mere prospect of an undercount could obtain an injunction as a matter of course to drastically alter a $15.6 billion census operation. That is not, and cannot be, the law. *See id.*

B. The public interest and harm to the government weigh heavily against a preliminary injunction.

On the other side of the ledger, the harm to the government and the public interest from an injunction would be ruinous and immediate. *See Nken*, 556 U.S. at 435 (explaining that harm to opposing party and the public interest "merge" when relief is sought against the government). As a legal matter, judicial intervention would usurp Congress's and the Executive's discretion over the census. *See* Argument Section I., *supra*. Congress has set the December 31 deadline, has so far declined to extend it, and has created an expectation that States and localities reliant on census data for redistricting and other purposes will receive it at a particular time. And as a practical matter, the requested injunction may make it *more* difficult to execute the census. Fontenot Decl. ¶¶ 100–08.

There is no denying that § 141(b)'s end-of-year statutory deadline presents a number of challenges. But if the Court sets aside the Replan, the Bureau would have to generate a *new* plan to comply with § 141(b)'s deadline or, if the Court somehow disregards that statutory provision, whatever new timelines the Court may impose. *See id*. This would require another re-planning of the various operations and staffing allocations of a nationwide census—one of the largest peacetime mobilizations in American history—whose field operations are nearly complete. *See id*. As the congressional clock ticks away with no statutory relief in sight, the Census Bureau would need to complete this massive re-Replan in perhaps only a few days. And, of course, there is no guarantee that any judicially mandated re-Replan would better achieve Plaintiffs' unknown and inscrutable "standard" of census accuracy.

With "the decennial census [ ] again generat[ing] a number of [ ] controversies," *Franklin*, 505 U.S. at 790, and the extraordinary disruption caused by the COVID-19 pandemic and various natural disasters, the public interest favors only one course: allowing the Census Bureau to complete the census under its current plan—the only plan that complies with the current statutory deadline.  In denying a similar preliminary-injunction motion earlier this year, Judge Grimm said it best:

> The founders were clear in their allocation of where the power and authority to plan and execute the census should lie—with Congress, which in turn has delegated its broad authority to the Secretary.  While Plaintiffs are right to be concerned about a differential undercount . . . it would not be in the public interest for me to substitute my judgment for that of the Constitution, Congress, the Secretary, and the Census Bureau, which would certainly disrupt the conduct of the census in ways that would have consequences far beyond the reaches of Prince George's County.  Balancing the impact of granting the injunction against the alternative of allowing the census to proceed as planned, with the Plaintiffs having the opportunity to prosecute their Enumeration Clause challenge after the results are known . . . seems to me to be far more in the public interest.

*NAACP v. Bureau of the Census*, No. 18-cv-0891 (D. Md. March 5, 2020), ECF No. 82 (citations omitted).  The Census Bureau is confident that its Replan will produce the best possible census under the circumstances.  *See* Fontenot Decl. ¶¶ 82, 97.  Plaintiffs can ask for, and obtain, no more from this Court.

## V.   PLAINTIFFS CANNOT SIDESTEP THE THREE-JUDGE COURT

"A district court of three judges shall be convened . . . when *an action* is filed challenging the constitutionality of the apportionment of congressional districts."  28 U.S.C. § 2284(a).  The "action" here challenges not just the duration of census operations, but also "the apportionment" calculation by the President under 2 U.S.C. § 2a.[11]  *See*

---

[11] As Plaintiffs themselves note, one California "action" (as here) involves claims "directly challenging the constitutionality of apportionment" and was concomitantly assigned to a three-judge court.  Pls.' Mot. at 1 n.2 (citing No. 20-cv-05167 (N.D. Cal.

Second Am. Compl. ¶¶ 273–322, ECF No. 98.  Everyone agrees on that point, which is why a three-judge court was convened to hear this case.  Letter, ECF No. 101 (Judge Xinis requesting a three-judge court under § 2284(a) and noting that "[t]he parties did not oppose the referral"); Order, ECF No. 104 (appointing three-judge court under § 2284(a)); *see New York v. Trump*, ---F. Supp. 3d ---, 2020 WL 5422959, at *36 n.21 (S.D.N.Y. Sept. 10, 2020) (noting that an challenge to "the apportionment" was "properly heard by a three-judge panel" under § 2284).  And once a three-judge court is convened, a single judge is not allowed to "hear and determine *any* application for a preliminary or permanent injunction."[12]  28 U.S.C. § 2284(b)(3) (emphasis added).  Plaintiffs cannot sidestep that unequivocal text now.  *See* Pls.' Mot. at 1.

"A straightforward reading of the pertinent language suggests that the entire case, and not just the constitutional claims [triggering § 2284], must be heard by a three-judge court."  *Page v. Bartels*, 248 F.3d 175, 187–88 (3d Cir. 2001) (Becker, C.J.).  "This is because the language of § 2284 itself is broadly applicable to 'actions'—not narrowly to 'claims'—challenging the constitutionality of the apportionment."  *Id.*; *Thomas v. Reeves*, 961 F.3d 800, 802 n.2 (5th Cir. 2020) (en banc) (Costa, J., concurring) (explaining that "§ 2284(a) refers to 'action[s] . . . filed,' not individual claims"); Black's Law Dictionary, "Action"

_____

2020)).  A different California "action"—despite substantial overlap in parties and identical plaintiffs' counsel—does *not* include such claims and was *not* assigned to a three-judge court. Pls.' Mot. at 1 n.2 (citing No. 20-cv-0577 (N.D. Cal. 2020)).  This proves Defendants' point that § 2284's applicability hinges on the "action" at issue, not the claims in any particular motion.  *Page v. Bartels*, 248 F.3d 175, 187–88 (3d Cir. 2001) (Becker, C.J.).

[12] Although a single judge may "grant a temporary restraining order," that order can "remain in force only until the hearing and determination by the district court of three judges o[n] an application for a preliminary injunction."  *Id.* § 2284(b)(3).  Because Plaintiffs simultaneously move for a temporary restraining order and a preliminary injunction, § 2284(b)(3)'s allowance for a single-judge temporary restraining order is overcome by its prohibition on a single-judge preliminary injunction.

(11th ed. 2019) (defining "action" as "[a] civil or criminal judicial proceeding"); *cf. City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 166 (1997) (holding that "federal claims suffice to make the actions 'civil actions'" for removal purposes under 28 U.S.C. § 1441(a) even when there are also non-removable state-law claims).   So if § 2284 is properly invoked, all claims "are subject to § 2284(a)'s requirement that they be heard by a three-judge district court."[13] *Page*, 248 F.3d at 188.   "That is consistent with the common practice when both constitutional and statutory challenges to reapportionment are brought—the constitutional hook for three-judge jurisdiction sweeps in the statutory claims." *Thomas v. Bryant*, 919 F.3d 298, 305 n.4 (5th Cir. 2019).

The Court should summarily reject Plaintiffs' bizarre attempt to sidestep both the three-judge court to which they agreed and the plain language of § 2284.   Because a single judge cannot "hear and determine *any* application for a preliminary or permanent injunction," 28 U.S.C. § 2284(b)(3) (emphasis added), the full three-judge court should deny Plaintiffs' motion.

---

[13] To the extent courts have declined to address claims that would not themselves trigger § 2284, those decisions were based on pre-1976 interpretations of § 2284 before the statute was overhauled, dealt with situations where the claims triggering § 2284 had already been dismissed, or both.   *See Page*, 248 F.3d at 189 ("[T]he 1976 amendments limited the scope of the Three Judge Court Act considerably, making it questionable whether the policy considerations that drove the original, narrow construction are still applicable today. These revisions militate in favor of our broader reading of § 2284(a)'s scope."); *see, e.g.*, *Hagans v. Lavine*, 415 U.S. 528, 543 (1974) (allowing a single judge to adjudicate a statutory claim before a three-judge court adjudicates the constitutional challenges that triggered the pre-1976 version of § 2284); *Gordon v. Exec. Comm. of Democratic Party of City of Charleston*, 335 F. Supp. 166, 170 (D.S.C. 1971) (three-judge court) (resolving three-judge-court claims, declaring the "statutory court [ ] accordingly dissolved," and stating that "[a]ny rights asserted by the plaintiffs under other federal statutes or Constitutional provisions can be asserted only before the [single-judge] District Court.").

## CONCLUSION

For the reasons discussed above, the Court should deny Plaintiffs' motion for temporary restraining order or preliminary injunction.   Plaintiffs should petition Congress, not this Court, for appropriate relief.


DATED: September 11, 2020                  Respectfully submitted,

                                           JEFFREY BOSSERT CLARK
                                           Acting Assistant Attorney General

                                           DIANE KELLEHER
                                           Assistant Director, Federal Programs Branch

                                           */s/ Stephen Ehrlich*
                                           STEPHEN EHRLICH
                                           Trial Attorney
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           1100 L Street, N.W.
                                           Washington, DC  20005
                                           Tel.:  (202) 305-9803
                                           Email: stephen.ehrlich@usdoj.gov

                                           *Counsel for Defendants*