# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

LA UNIÓN DEL PUEBLO
ENTERO, et al.,

                    *Plaintiffs*,

    v.

DONALD J. TRUMP, sued in
his official capacity as President
of the United States, et al.,

                  *Defendants*.

Civil Action No. 8:19-cv-02710-PX-PAH-ELH

## REPLY IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION
## FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Absent emergency relief, Plaintiffs will be irreparably harmed by Defendants' premature truncation of the 2020 Census.  Five days after Plaintiffs filed their opening brief, another federal district judge, in a case similar to this one, agreed with the arguments advanced by Plaintiffs here concerning injury.  *National Urban League v. Ross*, No. 20-cv-05799, Dkt. No. 84, at *3-6 (N.D. Cal. Sept. 5, 2020).  Five days after that, in another similar case, a three-judge panel rejected the same standing arguments advanced by Defendants in this case.  *New York v. Trump*, No. 20-cv-5770, 2020 WL 5422959, at *9-23 (S.D.N.Y. Sept. 10, 2020).  Defendants offer no basis to reach a different result here.  Instead, they wrongly insist, based upon mischaracterizations of the record and the law, that this Court is powerless to address these issues.  Defendants' contention that Plaintiffs' brief is "long on facts, but short on law" is half right:  Plaintiffs have mounted an exhaustive evidentiary showing that overwhelms Defendants' lone, self-serving, party declaration.  The law, meanwhile, amply supports Plaintiffs' request for relief.

## I.      Plaintiffs Have Standing

The Supreme Court's decision in *Department of Commerce v. New York*, 139 S. Ct. 2551, (2019), sets out a clear standing test for plaintiffs challenging the conduct of the Census.  First, plaintiffs must demonstrate a "concrete, particularized, and actual or imminent" injury, such as "diminishment of political representation, loss of federal funds … and diversion of resources." *Id.* at 2565.  Second, they must demonstrate that their injuries are "fairly traceable to the defendant's challenged behavior."  *Id.*  Finally, they must demonstrate that their injuries are "likely to be redressed by a favorable ruling."  *Id.*  As in the two recent cases mentioned above, Plaintiffs amply satisfy these requirements because truncation of the Census will cause the harms the Supreme Court specified, those harms are directly traceable to the failure to enumerate that will result from truncation, and an order barring Defendants from prematurely terminating the Census will avoid those harms.

### A.  Plaintiffs Have Demonstrated Injury In Fact

To establish injury in fact, Plaintiffs must show that they suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016).  "An allegation of future injury may suffice if … there is a 'substantial risk' that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).  "Sworn statements" alone may suffice to prove injury in fact. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000).  In census-related cases like this one, a plaintiff may show harm by demonstrating "historically low census response rates," which, if not addressed, present "substantial risk that … residents will not be counted, and a substantial risk of diminished political representation." *National Urban League*, 2020 WL 5441356, at *7.  Here, as in *National Urban League*, Plaintiffs' theory of standing rests "on the predictable effect of Government action on the decisions of third parties—specifically, the predictable harms of accelerating census deadlines, without warning, after months of publicly operating under a plan tailored to COVID-19." *Id.* at *8.  Those injuries are not speculative; they are real and imminent.  Indeed, Plaintiffs have established *three* imminent injuries:  (1) "diminishment of political representation"; (2) "loss of federal funds"; and (3) "diversion of resources." *Department of Commerce*, 139 S. Ct. at 2565.

### 1.  Truncation will diminish Plaintiffs' political representation

Plaintiffs have shown that truncation of the Census will diminish their political representation.  Mem. 27-30.  Defendants argue that the undercount may not produce disparate political representation because "[t]he number of congressional seats for each State is affected not only by that State's *own* total population, but also by the population of *every other* State in the country." Opp. 20.  This reasoning would make sense if the undercount affected every

population sub-group in the same way, so that it was still distributively, if not numerically, accurate. But Plaintiffs have shown that the truncation of the Census will result in a differential undercount in Plaintiffs' own communities, and these communities are not evenly distributed across or within states.[1]  *See* Hogan Decl. ¶¶ 58-59; Thompson Decl. ¶¶ 21, 32.

As Judge Koh concluded in *National Urban League*, where there are "historically low census response rates," there is "a substantial risk that … residents will not be counted, and a substantial risk of diminished political representation."  2020 WL 5441356, at *7.  Plaintiffs have seen historically low response rates in their own communities.  *See* Valdez-Cox Decl. ¶¶ 18-23, 48-52; Valdez Decl. ¶ 16.  Those low rates will lead to undercounts that, in turn, will endanger political representation at the local, state, and national levels.  For example, several Plaintiffs are residents of Florida, New York, and Texas, all of whose response rates are significantly lower than those for the nation as a whole, and all of which are in danger of losing a congressional seat and electoral college vote as a result.  *See* Brace Decl. ¶ 31.

Plaintiffs have also shown that undercounts will affect political representation, not only for undercounted jurisdictions, but for specific communities of color within those jurisdictions. Hogan Decl. ¶¶ 58-59; Thompson Decl. ¶¶ 21, 32.  As explained in *New York*, "[m]any of those not [yet] counted are undoubtedly in the 'hard to count' population, which includes immigrant and Hispanic populations" and "is even harder to count during this census due to widespread concerns, fueled by the policies and rhetoric of this Administration, that census data will be used for immigration enforcement purposes."  2020 WL 5422959, at *16.

---

[1]     As Plaintiffs have shown, a differential undercount affects intra-state as well as congressional redistricting.  Mem. 35-36; Brace Decl. ¶ 33; O'Hare Decl. ¶ 99.

### 2.    Truncation will deprive Plaintiffs of federal funds

Plaintiffs have also established that they and their communities will be deprived of federal funds due to the undercount that will result from truncation of the Census.  Defendants argue that this injury may not actually flow from the undercount, because "the allocation of federal funds is not directly proportional to population, but is a function of multiple factors, usually including the populations of *other* geographical areas."  Opp. 20.  Again, however, Plaintiffs have shown that the undercount will not affect every geographic area equally—some areas will be undercounted more severely.

Plaintiffs have produced ample evidence on this point.  The evidence includes a sworn declaration from a census expert explaining that "when a state, county, or community loses population share due to a differential undercount, it receives less federal funding" and "[e]ven modest geographic differences in census accuracy can lead to changes in funds distribution." Reamer Decl. ¶¶ 13, 45.  Sworn declarations from the directors of non-profit organizations in as-yet undercounted areas, meanwhile, describe personal and community reliance on funds that are distributed based on Census data and are at risk as a result of the Census truncation and resulting undercount.  Falcon Decl. ¶¶ 20-21; Valdez-Cox Decl. ¶¶ 10-11.

### 3.    Truncation will force Plaintiffs to divert resources to mitigate harms

Finally, Plaintiffs have shown that they are already being forced to divert resources in order to mitigate the impact of Defendants' unlawful actions.  Plaintiffs offer, for example, a sworn declaration from a non-profit director explaining that "major changes like … the timeline changes cause us to have to spend time making more plans.  Consequently, we lose time on getting the work done."  Valdez Decl. ¶ 14.  Another sworn declaration describes how truncation has forced one Plaintiff's organization to "adjust [their] census outreach plan," and "expend considerably more resources to convince the communities that [they] serve to respond to the

2020 Census," which will "take staff time away from [the organization's] civic engagement, voter registration, and voter education efforts." Chen Decl. ¶¶ 21-22.

In response to Plaintiffs' showing of the multiple discrete injuries they will suffer, Defendants do not actually dispute that the current timeframe will damage the accuracy of the Census. Nor could they; their own public statements make clear that such damage is inevitable. Addressing the prospect of an accurate Census count, Defendants' own expert admitted in July that the Bureau was "past the window" of being able to deliver the Census numbers to the President by December 31, 2020.[2] Defendants' expert declaration *in this case* admits that the changes Defendants have made "increase the risk the Census Bureau will not identify errors during post processing in time to fix them." Fontenot Decl. ¶ 96; *see also id.* ¶ 107 ("We previously planned and tested our post processing systems assuming that we would follow a traditional, sequential processing sequence, and the 3-month schedule necessary for the Replan Schedule has already increased risk."). And, in an internal document created on the very day the truncated Census plan was announced, Defendants admitted that "[a]ll of these activities" comprising truncation of the Census "represent abbreviated processes or eliminated activities that will reduce accuracy." Dkt. 116, Ex. C at 10. In light of those statements, Defendants' self-serving and empty reassurance, quoted multiple times in their opposition brief, that they are "confident that [the Bureau] can achieve a complete and accurate census and report apportionment counts by the statutory deadline," Fontenot Decl. ¶ 97, does not come close to overcoming Plaintiffs' showing of injury.

---

[2]     Transcript of Operational Press Briefing – 2020 Census Update, at 21 (July 8, 2020), https://www.documentcloud.org/documents/7007573-July-8-2020-Census-Bureau-Transcript-of-2020.html#document/p21/a573697.

Unable to dispute that their truncation plan will compromise the accuracy of the decennial Census, Defendants fall back on an argument that Plaintiffs' claim of injury is speculative because, as a result of Defendants' own actions, no one can know the precise degree of the inevitable undercount. Opp. 21. The three-judge panel in *New York* rejected that perverse logic: "To be sure, on the present record, the Court cannot calculate with precision the number of people that will be so affected. But there is no doubt that that number is greater than zero." 2020 WL 5422959, at *16. The argument should fare no better in this case.

Defendants also argue that Plaintiffs "fail to consider how any potential undercount in … rural communities … could affect Plaintiffs' share of representation or funding." Opp. 22. In fact, some Plaintiffs live in rural areas, and Plaintiffs have provided evidence of the injuries undercounts in such areas will cause. Mem. 18 & n.45, 26-27, 29-30; *see generally* Valdez-Cox Decl. More generally, Defendants accuse Plaintiffs of failing to "consider how any potential undercount in … other communities … could affect Plaintiffs' share of representation or funding." Opp. 22. Defendant Ross made the same arguments in *National Urban League*. The court rejected those arguments, holding that plaintiffs' injuries were in fact "concrete, particularized, and actual or imminent." *National Urban League*, 2020 WL 5441356, at *8. The same is true of the injuries Plaintiffs describe here.

## B. Plaintiffs Have Demonstrated That Their Injuries Are Traceable To Defendants' Conduct

There is no serious dispute about whether Plaintiffs' injuries are traceable to Defendants' actions. As the Supreme Court recently held, "Article III requires no more than de facto causality." *Department of Commerce*, 139 S. Ct. at 2566 (internal quotation marks omitted). That is why, in that case, the plaintiffs' showing concerning "the predictable effect of Government action" sufficed. *Id.* Plaintiffs here have made at least as robust a showing,

establishing that Defendants' premature truncation of the Census will cause undercounts and, as a further consequence, multiple discrete injuries to Plaintiffs and their communities.  Mem. 27-30.  Indeed, and as detailed in Plaintiffs' opening memorandum and above, Defendants themselves have made explicit the causal connection between their premature truncation of Census operations and their own resulting inability to accomplish their constitutional duty to perform an accurate count.  *See, e.g.*, Mem. 31.

        In arguing otherwise, Defendants argue that Plaintiffs must show that their communities "will be 'improperly undercounted by [a particular] methodology as compared to a feasible, alternative methodology.'"  Opp. 17-18 (quoting *National Law Ctr. on Homelessness & Poverty v. Kantor*, 91 F.3d 178, 183 (D.C. Cir. 1996)).  A comparison to *Kantor* is instructive.  There, the plaintiffs were unable to show that the challenged census methodology was inferior to any other census methodology or point to any superior approach, and they asked the court to appoint a commission to devise a new plan.  *See* 91 F.3d at 183.  Plaintiffs' arguments here are materially distinguishable in two ways.  First, Plaintiffs do not ask the Court to compel Defendants to use, or not use, a specific methodology, much less to appoint a commission to do so.  Rather, Plaintiffs request that Defendants be enjoined from stopping work on the Census according to a timeline that Defendants' own statements demonstrate is unworkable.  Second, to the extent it is Plaintiffs' burden to point to a superior methodology—which Plaintiffs do not concede— Defendants themselves have already devised, advertised, induced reliance upon, and then abruptly withdrawn such a methodology.  Defendants' complaint that their original plan "bypasses the statutory deadline," Opp. 18, is no answer.  It is precisely Defendants' determination to truncate operations and "complete" the Census by the deadline, in plain derogation of their constitutional duty, that Plaintiffs challenge here.

### C.       Plaintiffs' Injuries Are Redressable By This Court

There similarly is no reasonable dispute that Plaintiffs' injuries "would be reduced to some extent if [they] received the relief they seek." *Massachusetts v. E.P.A.*, 549 U.S. 497, 526 (2007). That is, if Defendants were required to implement the timeline they have publicly described as necessary for an accurate Census, the undercounts affecting Plaintiffs' communities would be mitigated. *See, e.g.*, Hogan Decl. ¶¶ 8-59, Thompson Decl. ¶¶ 1-4, 15-28. Defendants' own internal documents state that "[e]ach additional day of [NRFU] production expands the capacity by 2%." *National Urban League v. Ross*, No. 20-cv-05799, Dkt. 105-3, at 118 (N.D. Cal. Sept. 13, 2020). Each additional day, in other words, *measurably* reduces the extent of the undercount, and thus Plaintiffs' injury. Unable to plausibly contend otherwise, Defendants instead insist that this Court lacks power to grant the requested relief. The law is otherwise.

As explained in Plaintiffs' opening brief, the Second Circuit has granted relief very similar to the relief Plaintiffs seek here. It did so in *Carey v. Klutznick*, 637 F.2d 834, 837 (2d Cir. 1980) (per curiam), in which it affirmed the grant of a preliminary injunction barring the cessation of certain census operations. As here, the defendants in *Carey* argued that the requested injunction would preclude the agency from meeting Congress's deadline, causing them irreparable harm: "The Census Bureau also argues that if the injunction is enforced the Bureau cannot meet the statutory deadline of December 31, 1980 for filing the census report, see 13 U.S.C. § 141(b), and that it does not have the employees available to perform the functions ordered by the lower court." *Id.* at 837. The Second Circuit was unmoved: "We see nothing sacred in the due date of the filing, especially when the work of the Census Bureau, at least as preliminarily demonstrated below, is incomplete." *Id.*

According to Defendants, the Court can ignore *Carey* because "evidently" the Supreme Court disagreed with the Second Circuit's analysis. Opp. 15. Defendants rely upon the Court's

orders in *Carey* and in a companion case staying the injunctions issued in those cases, which they say "straightforwardly demonstrate that § 141(b)'s December 31 mandate is absolute and cannot be overridden by judicial fiat." *Id.* (citing *Klutznick v. Carey*, 449 U.S. 1068 (1980); *Klutznick v. Young*, No. A-533 (U.S. Dec. 24, 1980)). The Court's orders say no such thing. Neither directly addresses the question of whether the stayed injunction was proper. That question is addressed only in a dissent by Justice Marshall, who agreed that there is "nothing sacrosanct about the December 31 deadline." 449 U.S. at 1071 (Marshall, J., dissenting).

Subsequent federal court decisions have relied upon *Carey*, citing and applying its holding regarding the extension of congressional deadlines and in the process demonstrating its continuing vitality. *See, e.g.*, *American Acad. of Pediatrics v. Food & Drug Admin.*, 399 F. Supp. 3d 479, 483 (D. Md. 2019) (citing *Carey* and other "appellate court decisions affirming a district court's power to extend statutory deadlines to remedy improper agency delay"); *City of New York v. U.S. Dep't of Commerce*, 713 F. Supp. 48, 51 (E.D.N.Y. 1989) ("The nine-month time period between April and December set forth at § 141(b) is neither 'sacred,' as the Second Circuit recognized in *Carey ...* nor mandatory …. If the Census Bureau demonstrates that accurate adjusted figures cannot be compiled by December 31, 1990, this Court is empowered to grant it a reasonable extension of time.") (internal quotation marks omitted).

Other courts have reached similar conclusions concerning their ability to grant relief notwithstanding a statutory deadline. For example, in *Defy Ventures, Inc. v. U.S. Small Business Administration*, 2020 WL 3546873, at *12 (D. Md. June 29, 2020), plaintiffs challenged revisions by the Small Business Administration ("SBA") to a rule restricting eligibility for Paycheck Protection Program ("PPP") loans. *Id*. at *1-2. The rule was revised five weeks before the deadline to apply for a loan, and the plaintiffs requested additional time to permit

newly eligible applicants to apply.  *Id*. at *11.  The SBA argued, as Defendants do here, that the plaintiffs' claimed injuries were not redressable, because their requested relief—a preliminary injunction "requiring the Government to ensure the availability of funds for PPP loans beyond [the] Congressionally-prescribed deadline"—was beyond the court's power to grant.  *Id*. at *6.  The court disagreed, citing its "power to fashion equitable remedies especially in extraordinary circumstances" and explaining that although "[t]he parties disagree as to whether the court has the authority to extend [a statutory] deadline … this court agrees with the plaintiffs that it does have such authority."  *Id*. at *12 & n.20.  The same logic applies equally here.

## II.     The Political Question Doctrine Does Not Bar Plaintiffs' Claims

This Court has the power to grant the relief Plaintiffs request.  As Judge Koh recognized in *National Urban League*, "the overwhelming weight of authority [at all levels of the federal courts] rejects applying the political question doctrine to census-related decisionmaking."  2020 WL 5441356, at *6 (N.D. Cal. Sept. 10, 2020).  Defendants contend that there is no judicially manageable standard by which this Court may adjudicate Plaintiffs' claims, insisting that Congress has unlimited and unreviewable authority over the conduct of the Census.  Opp. 5-13.  Courts have repeatedly rejected these arguments in challenges to Census operations, including in *National Urban League* with respect to the very same misconduct at issue here—truncation of field operations and post-processing.

Courts regularly "entertain both constitutional and statutory challenges to census-related decisionmaking."  *Department of Commerce*, 139 S. Ct. at 2568.  In doing so, courts apply a well-established, judicially manageable standard:  The conduct of the census must bear "a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census."  *Wisconsin v. City of New York*, 517 U.S. 1, 20 (1996).  Because the purpose of the Census is to "determine the apportionment of the

Representatives among the States," *id.*, there is a "strong constitutional interest in accuracy" of

the population count, *Utah*, 536 U.S. at 455-56, and a particular interest in distributive accuracy,

*Wisconsin*, 517 U.S. at 20; *see also La Unión del Pueblo Entero v. Ross*, 353 F. Supp. 3d 381,

393 (D. Md. 2018) (where "the Census Bureau unreasonably compromises the distributive

accuracy of the census, it may violate the Constitution"); *Kravitz v. U.S. Dep't of Commerce*, 336

F. Supp. 3d 545, 564-65 (D. Md. 2018) ("the type of accuracy that most directly implicates the

constitutional purpose of the census is the need for distributive accuracy").  In short, Defendants

have a "duty to conduct a census that is accurate and that fairly accounts for the crucial

representational rights that depend on the census and the apportionment," and, where Defendants

fail to satisfy their duty, courts have the power to act.  2020 WL 5441356, at *6 (quoting

*Department of Commerce*, 139 S. Ct. at 2569).

Defendants' attempt to manufacture uncertainty about whether a judicially manageable

standard exists here, *see, e.g.*, Opp. 2 (arguing that Defendants satisfy "whatever standard

applies"), must fail.  Defendants contend that this case is materially different from others in

which courts have applied the reasonable relationship test as those cases involved "discrete

statistical methodologies or data-collection decisions made by the Secretary."  *Id.* at 9.  In fact,

this case is no different, as all of the referenced cases concern "decisions about the population

count itself"—that is, decisions that must be analyzed under the reasonable relationship test.

*Department of Commerce*, 139 S. Ct. at 2566.  Here, the conduct of field operations and post-

processing are directed at—and central to—determining the population count and ensuring the

accuracy of the Census, Mem. 16-21, 22-27, and thus must be reasonably related to the

accomplishment of an actual enumeration.  Defendants complain that the Court cannot "evaluate

the many policy choices that Congress has made to establish a deadline and that the Bureau has

made to meet that deadline," Opp. 11, but that is not Plaintiffs' request.  Plaintiffs ask the Court

to apply well-established doctrine to determine whether a truncated Census will unreasonably

compromise distributive accuracy—which, as Defendants' own statements confirm, it will.

Mem. at 6-8; Dkt. 116, Ex. C at 10.

Nor, contrary to Defendants' assertions, do Plaintiffs suggest that the Census must

achieve "accuracy at all costs" or that "any deadline" set by Congress would be unconstitutional.

Opp. 11-12.  As Plaintiffs explained in their opening brief, the truncated Census plan deviates

significantly from past Census operations, Mem. 3-8, 16-21, and will yield a significant

undercount of the U.S. population, including a differential undercount of Black, Latino, and

Asian American communities, *id.* at 27-30.  In other words, under the truncated Census plan, the

Census will not "fairly account[] for the crucial representational rights that depend on the census

and the apportionment," *Department of Commerce*, 139 S. Ct. at 2569, and thus the challenged

plan cannot possibly bear a "reasonable relationship" to the completion of an actual enumeration.

Similarly unsupported and untenable is Defendants' argument that the Enumeration

Clause vests Congress with unreviewable authority over the Census by granting it power to

conduct the "actual enumeration" in "such manner as they shall by Law direct."  Opp. 6 (quoting

U.S. Const. art. I, § 2, cl. 3).  Neither Congress nor, derivatively, the Commerce Secretary has

unlimited discretion in conducting the census.  Instead, their authority is "'limited by the

constitutional language [of the Enumeration Clause] and the constitutional goal of equal

representation,'" *Wisconsin*, 517 U.S. at 19-20 (1996) (quoting *Franklin v. Massachusetts*, 505

U.S. 788, 804 (1992)).  Moreover, "[c]ourts have routinely held that the Enumeration Clause

does not textually commit exclusive, non-reviewable control over the census to Congress."

*National Ass'n for Advancement of Colored People v. Bureau of Census*, 382 F. Supp. 3d 349,

385 (D. Md. 2019).  The Enumeration Clause's reference to the "manner" in which the enumeration is conducted "suggests the breadth of congressional methodological authority," but it does not prescribe authority that is "distinct from the requirement … [to] conduct an actual Enumeration."  *Kravitz*, 336 F. Supp. 3d at 563 (internal quotation marks omitted); *see also California v. Ross*, 362 F. Supp. 3d 727, 742 (N.D. Cal. 2018) (listing Supreme Court decisions that "ultimately denied challenges to the decennial census [and] did so by evaluating challenged procedures as part of the 'manner' in which the census is conducted").

Nor does Defendants' argument that Congress has set a deadline, and delegated to the agency power to implement the Census, support their theory of unlimited discretion.  Defendants assert that "Congress, and Congress alone, has set the deadline for every one of the 24 censuses in American history," Opp. 7, but the bare fact that Congress has exercised its constitutionally-conferred authority to set these deadlines says nothing about the Court's power to determine whether Census operations conducted within that timeframe meet constitutional standards. *Young v. Klutznick*, 497 F. Supp. 1318, 1326 (E.D. Mich. 1980) ("All it [the Enumeration Clause] does is impose on Congress the responsibility to provide for the taking of a decennial census.  It does not say that Congress and Congress alone has the responsibility to decide the meaning of, and implement, Article 1, Section 2, Clause 3."), *rev'd on other grounds*, 652 F.2d 617 (6th Cir. 1981).  Furthermore, every example Defendants cite involves Congress's decision to extend Census operations, presumably to ensure compliance with the constitutional directive to conduct an "actual enumeration."  Opp. 7-8.  None of these examples involves a situation like the one here, where the timeline for Census operations was truncated despite the Census

Bureau's own acknowledgment that an extended deadline was necessary to ensure "the completeness and accuracy of the … Census."[3]

Defendants ultimately fall back on the argument that this Court may not "updat[e] census deadlines to accommodate changing circumstances."  Opp. 9.  This point goes to the Court's ability to redress Plaintiffs' injury, not to the applicability of the political question doctrine. Regardless, and as discussed above, this argument fails because there is "nothing sacred in the due date of the filing" of the final population totals with the President, "especially when the work of the Census Bureau … is incomplete."  *Carey*, 637 F. 2d at 837.  This Court has authority to restrain Defendants from proceeding with their constitutionally inadequate Census plan.

## III.    Plaintiffs Have Satisfied The Requirements For Preliminary Relief

### A.    Plaintiffs Are Likely To Prevail On Their Enumeration Clause Claim

Plaintiffs are likely to succeed on the merits of their Enumeration Clause claim because, as the record shows, Defendants' truncated Census plan will result in an undercount and differential undercount of Latino, Asian American, and other communities of color, in service of Defendants' discriminatory agenda and in plain violation of the constitutional command that Defendants conduct an "actual Enumeration" of the population.  Defendants do not seriously dispute the testimony of Plaintiffs' expert witnesses regarding the likelihood of a differential undercount, but instead contend that Plaintiffs cannot succeed in their claim because the extent of the undercount is unknown, or because operation of the Census is committed to their unreviewable discretion.  Defendants largely rely on the same arguments they raised with regard to the political question doctrine, and the arguments fail here for many of the same reasons.

---

[3]      U.S. Census Bureau, Statement on 2020 Census Operational Adjustments Due to COVID-19 (Apr. 13, 2020), https://www.census.gov/newsroom/press-releases/2020/statement-covid-19-2020.html.

The Enumeration Clause requires an "actual enumeration" to be performed in accordance with the "constitutional purpose of the census"—namely, to "determine the apportionment of the Representatives among the States." *Wisconsin*, 517 U.S. at 20.  From that purpose arises a "strong constitutional interest in accuracy," *Utah*, 536 U.S. at 455-56, including especially distributive accuracy, *Wisconsin*, 517 U.S. at 20.  Defendants' plan falls far short of this constitutional standard by abandoning the actual enumeration and creating a significant undercount that will disproportionately affect Plaintiffs and the communities of color to which they belong, depriving them of political representation, among other injuries.  Mem. 27-30.

Defendants' dramatically shortened field operation—which will be the shortest in modern history—has been (and will be) hampered in ways that will have serious adverse effects on the enumeration of Plaintiffs and their communities.  Not only are NRFU workloads relatively higher in areas with lower self-response rates—areas that contain higher proportions of Black, Latino, and immigrant populations relative to the white non-Hispanic population—but lower-than-anticipated staffing for these field operations will further complicate counting these hard-to-count populations.  Thompson Decl. ¶¶ 21-22.  Defendants' shortening of the self-response period by four weeks is also likely to contribute to a differential undercount of minority populations compared to white households.  O'Hare Decl. ¶¶ 101-111.  With such limited field operations, the Census Bureau will need to rely on measures such as proxy enumerations, imputation, and administrative records that, while permissible, will exacerbate inaccuracies and cannot fully compensate for reduced field operations. Thompson Decl. ¶¶ 21-24; Hogan Decl. ¶¶ 9, 38, 43, 47, 50, 52, 59-60; O'Hara Decl. Ex. D, ¶¶ 5, 11-24.  Finally, the Census Bureau's compressed timeline for post-processing, and likely shortening or eliminating critical steps in the data verification process, will ensure that data inaccuracies persist, also making it likely that

minority households will be undercounted at higher rates than other groups.  Hogan Decl. ¶¶ 9, 60-61, 64-66; *see also* Fontenot Decl. ¶ 96 (admitting changes to Census plan will "increase the risk the Census Bureau will not identify errors during post processing in time to fix them").  In the face of such evidence, Defendants argue that the truncated census plan is not a "decision[] about the population count itself" and thus is not subject to the "reasonable relationship" test. Opp. 27 (quoting *Department of Commerce*, 139 S. Ct. at 2566).  Yet Defendants fail to explain what the purpose of NRFU or post-processing is, if not to count the population.  *See* Mem. 22-27 (explaining importance of NRFU and post-processing).  In fact, Defendants' own expert admits that NRFU and post-processing are "major components" in "ensur[ing] as complete and accurate a count as possible."  Fontenot Decl. ¶¶ 13, 15.

Seeking to narrow the application of *Wisconsin*, Defendants argue that a "decision[] about the population count itself" concerns only "census data already collected by the Bureau," Opp. 27 (emphasis omitted), as opposed to the process of collecting that data through field operations.  Defendants offer no support for this proposition and misread the Supreme Court's decision in *Department of Commerce*.  Opp. 27.  There, the Court held that the reasonable relationship test did not apply to the decision to add a citizenship question to the census because the question sought "demographic information" that "bears no relationship whatsoever to the goal of an accurate headcount."  139 S. Ct. at 2566.  In contrast, NRFU and post-processing are central to achieving an accurate count.  And although the Supreme Court did not use the phrase "reasonable relationship" in *Utah v. Evans*, the Court acknowledged that the Secretary's discretion in conducting the census was subject to constitutional bounds that are judicially administrable—particularly, the constitutional command that the census be conducted in a manner that promotes accuracy.  536 U.S. at 478.  These constitutional standards apply fully to

this Court's review of the truncated Census plan, which, as Plaintiffs' experts have testified and Defendants themselves have admitted in prior public statements (Mem. 7-8, 31), will produce an undercount and differential undercount.

Defendants' remaining arguments misunderstand Plaintiffs' position.  As explained in Part II, Plaintiffs do not argue that Defendants must (or could) achieve a "perfect[]" census or eliminate the possibility of *any* differential undercount.  Opp. 28.  Plaintiffs merely argue that Defendants may not pursue a course that they have *publicly admitted* is inadequate.  Mem. 7-8. Nor do Plaintiffs argue that the Constitution mandates a certain duration for all census operations.  Opp. 29.  Historical practice, however, is very much relevant to constitutional review of census operations, *Wisconsin*, 517 U.S. at 22 (emphasizing "the importance of historical practice in this area"), and Defendants' truncated census plan represents a sharp break from the Bureau's historical practice (not to mention from the timeline that Defendants themselves until recently claimed was needed).  Mem. 6-7.  Defendants tout the Bureau's supposed ability to "compress the time needed for NRFU [in the 2020 Census] precisely because of technological advances," Opp. 29, but these advances did not prevent Defendants' declarant, Mr. Fontenot, from publicly stating in July that the Bureau was "past the window" of being able to deliver the Census numbers to the President by the end of the year.  Mem. 8.  Defendants point to no change that would explain how a schedule that was too short in July could be just right in September.  Rather, on the very day that the truncated Census plan was announced, Defendants admitted that the truncated plan's "abbreviated processes [and] eliminated activities" would "reduce [the] accuracy" of the Census.  Dkt. 116, Ex. C at 9.

In sum, Plaintiffs' Enumeration Clause claim is reviewable under the same standards that courts routinely apply to other challenges to the conduct of the Census.  And given that the

truncated Census plan will undermine the strong constitutional interest in accuracy of the population count—and particularly, the distributive accuracy of the 2020 Census—Plaintiffs are likely to succeed on the merits of their claim.

**B.      Plaintiffs Have Demonstrated Irreparable Harm**

Plaintiffs have also established that they will be irreparably harmed if Defendants are permitted to truncate the enumeration.  Defendants repeat their arguments as to standing— arguments that fail here, and have failed repeatedly in several courts.  *New York*, 139 S. Ct. at 2565-66; *National Urban League*, 2020 WL 5441356, at *8; *State v. Trump*, No. 20-5770, 2020 WL 5422959, at *17.  The *immediacy* of the potential harm to racial and ethnic minorities caused by truncation of the Census, however, does not appear to be in dispute.  As the Fourth Circuit has explained, "discriminatory voting procedures in particular are the kind of serious violation of the Constitution … [for] which courts have granted immediate relief. …  [W]hether the number is thirty or thirty-thousand, surely some … minority voters will be disproportionately adversely affected in the upcoming election.  And once the election occurs, there can be no do-over and no redress."  *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).  Here, once Defendants shut down field operations and data processing, there will be "no do-over and no redress."  Defendants will simply leave a multitude of Latinos, Asian-Americans, and other people of color uncounted, unrepresented, and excluded for the next ten years.  If Defendants' truncation of the Census is permitted, Plaintiffs will suffer imminent harm that "cannot be remedied if a court waits until the end of trial to resolve the harm."  *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007).  Such imminence is demonstrated by Defendants' own expert witness, Mr. Fontenot, who confirms that should this Court issue an injunction, it should do so *as soon as possible*:

Reduced numbers of field staff would be a barrier to reverting to the COVID Schedule were the Court to rule later in September. Prior to issuance of the TRO, based on progress to date, we had already begun terminating some of our temporary field staff in areas that had completed their work, as is standard in prior censuses. It is difficult to bring back field staff once we have terminated their employment. Were the Court to enjoin us tomorrow we would be able to keep more staff on board than were the Court to enjoin us on September 29, at which point we will have completed enumeration of most of the nations' housing units and terminated many more employees.

Fontenot Decl. ¶ 105.  Mr. Fontenot further states that "[w]ere the Court to enjoin us, we would evaluate all of the changes we made for the Replan Schedule and determine which to reverse or modify." *Id*. ¶ 106.  The Court should grant the Bureau that opportunity, as soon as possible because—per the testimony of Defendants' own expert—every day is critical.

### C.     The Remaining Equitable Factors Favor Preliminary Relief

Compared to the serious and irreparable harm that Plaintiffs will experience if Defendants are allowed to proceed with the truncated Census plan, Defendants will experience only minimal harm if this Court grants Plaintiffs preliminary relief.  Although Defendants argue that it is *they* who would suffer irreparable harm if an injunction is granted, Opp. 33, that assertion is implausible given that the timeline Plaintiffs request was initially proposed by *Defendants*, who adhered to it for months.[4]  Defendants cite Paragraphs 100-108 of Mr. Fontenot's declaration to support their assertion that "the requested injunction may make it more difficult to execute the census."  Opp. 33.  But those paragraphs say no such thing.  Instead, Mr. Fontenot emphasizes that "*some certainty* as to the amount of time available to conclude data

---

[4]      *See* U.S. Census Bureau, Statement on 2020 Census Operational Adjustments Due to COVID-19 (Apr. 13, 2020), https://www.census.gov/newsroom/press-releases/2020/statement-covid-19-2020.html; *see also* U.S. Census Bureau, Updates to 2020 Census Operations (June 12, 2020), https://www.census.gov/newsroom/press-releases/2020/update-census-operations.html; *see also League of Women Voters*, 769 F.3d at 248 (hardship to defendants was limited where "for some of the challenged changes … systems have existed, do exist, and simply need to be resurrected" or where injunction simply required "revival of previous practices").

collection and post processing will increase the likelihood of a successful outcome," (emphasis added), and that he remains committed to quality however much time the Bureau is afforded.

Finally, the public interest weighs in favor of this Court using its broad equitable powers to fashion relief. The truncation of the Census threatens to deprive racial and ethnic minorities and underserved communities of political representation and of essential government resources; the public interest therefore weighs heavily in favor of an injunction. *Cf. League of Women Voters of N. Carolina*, 769 F.3d at 247–48 (4th Cir. 2014). Defendants do not even attempt to address the impact of truncation upon communities of color, an issue at the heart of Plaintiffs' claims. The fact that Defendants do not appear to dispute that truncation will subject communities of color to a differential undercount speaks volumes—and speaks to the necessity and urgency of injunctive relief. Defendants assert that the public interest weighs in favor of deferring to agency discretion, but as the Second Circuit held in *Carey*:

> The problem is that the Census Bureau assumes that the public interest is solely with it, because it is a public agency. But the public interest also requires obedience to the Constitution and to the requirement that Congress be fairly apportioned, based on accurate census figures. Furthermore, it is in the public interest that the federal government distribute its funds, when the grant statute is keyed to population, on the basis of accurate census data.

637 F.2d at 839. The same constitutional interests of fairness and accuracy are at play here, and counsel strongly in favor of an injunction.

## D. Plaintiffs Do Not Seek A Mandatory Injunction

Finally, Defendants argue that Plaintiffs seek a mandatory injunction compelling the Census Bureau "to yet again re-configure and extend its operations," which would require Plaintiffs to demonstrate an indisputable right to relief. Opp. 31. Defendants are wrong on both the law and the facts. The Fourth Circuit makes clear that "the status quo to be preserved by a preliminary injunction … is not the circumstances existing at the moment the lawsuit or

injunction request was actually filed, but the 'last uncontested status between the parties which preceded the controversy.'" *Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 378 (4th Cir. 2012). "[T]o require a party who has recently disturbed the status quo to reverse its actions … restores, rather than disturbs, the status quo ante." *Id.* (citing *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004).

Compelling Defendants to resume the operations they themselves identified as necessary—before hastily adopting a plan on August 3 to halt those operations—is the sort of prohibitory relief courts customarily grant to maintain the status quo ante. Accordingly, no heightened standard of review applies here. Even if it were otherwise, Plaintiffs readily satisfy the heightened standard, having demonstrated that their "right to relief is indisputably clear." *Profiles, Inc. v. Bank of Am. Corp.*, 2020 WL 1849710, at *3 (D. Md. Apr. 13, 2020) (citing *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019)).

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for a TRO and/or preliminary injunction.

Dated:   September 16, 2020

Respectfully submitted,

By /s/ Terry Ao Minnis

**ASIAN AMERICANS ADVANCING JUSTICE |
AAJC**
John C. Yang (IL Bar No. 6210478)*
Niyati Shah (NJ Bar No. 026622005)
Terry Ao Minnis (MD Bar No. 20547)º
Eri Andriola (NY Bar No. 5510805)º
1620 L Street, NW, Suite 1050
Washington, DC 20036
Phone: (202) 815-1098
Facsimile: (202) 296-2318

**MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND**
Thomas A. Saenz (CA Bar No. 159430)º
Nina Perales (TX Bar No. 24005046)º
Andrea Senteno (NY Bar. No. 5285341)º
Tanya G. Pellegrini (CA Bar No. 285186)º
Daniel A. Hatoum (TX Bar No. 24099136)º
1016 16th Street NW, Suite 100
Washington, DC 20036
Phone: (202) 293-2828
Facsimile: (202) 293-2849

**WILMER CUTLER PICKERING
HALE AND DORR LLP**
Debo P. Adegbile (NY Bar No. 2699742)
Jamie S. Dycus (NY Bar No. 4523569)
Alan E. Schoenfeld (NY Bar. No. 4500898)
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Phone: (212) 230-880
Facsimile: (212) 230-8888

* Pro hac vice *application forthcoming*
º *Not admitted in DC.*

## <u>CERTIFICATE OF SERVICE</u>

I, Terry Ao Minnis, hereby certify that on September 16, 2020, I caused a copy of the foregoing motion and all accompanying filings to be sent to all parties receiving CM/ECF notices in this case.


<u>/s/ Terry Ao Minnis</u>
Terry Ao Minnis